# EXHIBIT "H"

1      IN THE COURT OF COMMON PLEAS

2     OF LACKAWANNA COUNTY, PENNSYLVANIA

3

4                    *  *  *

5  PHILIP GODLEWSKI,        : CIVIL DIVISION

        Plaintiff          :

6                          :

        vs                 : JURY TRIAL DEMANDED

7                          :

   CHRIS KELLY, et al.,     :

8       Defendants         : NO. 2021-CV-2195

9

                       *  *  *

10

11          Oral deposition of PHILIP GODLEWSKI,

12  taken at the Lackawanna County Bar Association, 233 Penn

13  Avenue, Scranton, Pennsylvania 18503, on Tuesday, July

14  25, 2023, beginning at 9:13 a.m. before Pamela Pratt,

15  Court Reporter and Notary Public in and for the

16  Commonwealth of Pennsylvania.

17

18

19                    *  *  *

20

21          VERITEXT LEGAL SOLUTIONS

            MID-ATLANTIC REGION

22          5100 Tilghman Street

23              Suite 205

24      Allentown, Pennsylvania 18104

25            (610) 434-8588



1  in June, you were facing a sentencing hearing with Judge
2  Barrasse regarding the bad check and doctoring bank
3  records charge?
4  A.    Correct. You were there for that.
5  Q.    Well, it was on Zoom.
6  A.    Right.
7  Q.    I watched it on Zoom.
8  A.    Uh-huh.
9  Q.    And you went to jail for 30 days for that
10  charge; is that correct?
11  A.    Correct.
12  Q.    And you were feeling some stress over that
13  upcoming hearing coming up?
14  A.    Yes.
15  Q.    And then you saw somebody in John Kuna's
16  office next on June 8th, 2021 regarding ▮
▮  ▮?
18  A.    My sentence started June 22. So that June
19  8th appointment that you're referencing would have been
20  before the sentence. But yes.
21  Q.    Now, do you take a drug called Sertraline?
22  A.    Sertraline is the generic form of ▮ but
23  it's the same drug that you were referencing in the last
24  document.
25  Q.    Okay. And you take sildenafil for --

1  A.    Occasionally.
2  Q.    Okay. Prior to sex, correct?
3  A.    Yeah.
4  Q.    Now, looking at Page 16 -- I'm sorry, 1563
5  under the section entitled Marital, do you see that
6  about in the middle of the page?
7  A.    And then it says ▮?
8  Q.    Yes.
9  A.    Yes.
10  Q.    Let's focus on that paragraph. You get to
11  the section on education and the -- Monica Stroz from
12  Dr. Berger's office wrote ▮
▮  Do you see that?
14  A.    Yes.
15  Q.    Is that information you gave Monica?
16  A.    I'm unsure what college credit total means.
17  Q.    How about it's -- you've got five years worth
18  of credits but no degree, is that what you meant?
19  A.    To be honest with you, I don't remember
20  exactly what I said to Monica. I was in school four or
21  five years, although they were not five full years and
22  they were separated in some cases by either months or
23  years in between. I don't believe I would have said
24  that I had a total of five years of college credits. I
25  don't think that's something I would have said because

1  it's not true.
2  Q.    Under this section of ST1563, it says,
3  ▮
▮
▮  ▮ Is that information that you gave
6  to Monica?
7  A.    Half of that is true. I don't have a
8  master's degree. That's a completely different thing
9  than Master's of the Arts. Master's of the Arts, I
10  believe, is an associate's degree or maybe even less
11  than that. So she may have taken what I said maybe out
12  of confusion and she wrote master's degree. But I,
13  obviously, don't have a master's degree.
14  Q.    Did you tell her that you attended Regent
15  University?
16  A.    I don't know if I had told her that I
17  attended -- what date was this? I don't remember if I
18  told her that I attended or was planning on attending.
19  But I know I mentioned it to her for sure.
20  Q.    Okay. Then reading on, on ST1563 it says,
21  ▮ Did you
22  tell Monica Stroz on May the 3rd, 2021 that you attended
23  a program at Harvard Business School on negotiation
24  mastery?
25  A.    Same answer as to the last one. I don't know

1  if I told her that I did attend or I planned on
2  attending. I can't remember exactly what I told her.
3  And this is, obviously, very vague, so I'm not sure.
4  Q.    Is it your testimony here today, Phil, that
5  you never attended Regent University or any programs at
6  Regent University?
7  A.    It's a complicated answer because I thought I
8  did until you did discovery.
9  Q.    Okay. Well, Phil, I supplied you with a
10  letter and e-mails from Regent University that they
11  don't have your name or any variation of your name in
12  their records that you ever attended any program there.
13  You saw that record, right?
14  A.    I saw that as well as the one from Harvard
15  which caused me to answer the last question that you
16  asked as the way I answered it. I had been under the
17  impression, since I signed up for those courses, that I
18  did attend and I did take those courses as I intended.
19  Apparently -- and I took a course. Apparently, I did
20  not take a course at the institutions that I thought I
21  did. I think your records in discovery actually showed
22  that I did register with one or both of the schools. I
23  was registered to take the course, but I never completed
24  the course. So somewhere along the line, I think I got
25  duped.

7 (Pages 22 - 25)

1 Q. And that's when you determined she was a
2 lunatic?
3 A. Yes.
4 Q. Okay. And then after that point in time, did
5 you begin communicating with her again?
6 A. Yes.
7 Q. When was that?
8 A. She threatened to kill herself.
9 Q. Okay. What year was that?
10 A. It was right after the -- the -- so, again, I
11 described my communication with Brie in three different
12 phases. The first phase was during Joe's death and all
13 of that. Dori finds out about that, says, hey, this is
14 inappropriate, you have to stop. I go back to Brie and
15 I say, hey, I'm, you know, resigning from Riverside as
16 the coach. Things are getting out of hand here. Dori
17 found our communications, doesn't like them, and -- you
18 know --
19 Q. You were hiding them from Dori; were you?
20 MR. KOLMAN: Objection. Can he finish
21 his answer?
22 MR. HINTON: Uh-huh.
23 MR. KOLMAN: Thank you.
24 THE WITNESS: And -- I will answer that
25 question. But -- and as I communicated those feelings

1 to Brie is when she threatened suicide. And between you
2 and I, I totally -- well, it's not you and I, I guess,
3 anymore. But I totally believed her.
4 BY MR. HINTON:
5 Q. Well, were you keeping your text messages
6 with Brie a secret from Dori?
7 A. Not the -- not through that first round when
8 Dori found them, no. Dori had full access to my phone
9 at all times. That's how she found them to begin with.
10 The second time after I started
11 recommunicating with Brie when she threatened suicide, I
12 felt like if -- I felt like I was betraying Dori --
13 Dori's trust telling her that, okay, I'll stop talking
14 to her. And I felt like if Dori found me talking to her
15 again, she would have assumed something was happening
16 that wasn't. I truly felt at the time that if -- after
17 Brie said that to me -- I had a choice at that time. Go
18 to the police, go to her counselor or talk to her and
19 wait it out. Try to tell her how good her life is and
20 be the person that could ultimately help change her
21 mental state.
22 Q. Did you feel she was a lunatic at that stage
23 too?
24 MR. KOLMAN: Asked and answered. You
25 can answer it for the third time.

1 MR. HINTON: I'm breaking it into stages
2 here.
3 THE WITNESS: When somebody says to you,
4 I'm going to tell your wife a lie so that she'll break
5 up with you and I could be with you, anything they say
6 after that point to me, yes, I think you're a lunatic.
7 For you to even put that into words let alone think
8 it -- for you to even put that into words, you've
9 changed my opinion about you forever. So yes, I
10 believed Brie was a lunatic then. I believe she's still
11 a lunatic today. That -- my opinion on that has not
12 changed. In fact, it's gotten worse.
13 BY MR. HINTON:
14 Q. And the second phase where you reconnected
15 with Brie, how did that end, that phase of your
16 relationship?
17 A. Poorly.
18 Q. Okay. It wasn't -- it ended before you were
19 charged with crimes on July 9th, 2010, right?
20 A. Yeah.
21 Q. Okay. How long before you were charged with
22 crimes did it end?
23 A. I don't know how long before. I could tell
24 you when it ended and how -- the circumstances. But
25 dates, I don't remember how long before it would have

1 been.
2 Q. How did it end?
3 A. I, again -- Dori, for the second time, found
4 me speaking to Brie. And now this time she's not as
5 nice about it. She's actually pissed. And she demanded
6 that I stop because now, as I mentioned before, just as
7 I thought, she thought something in addition to me
8 being -- and I showed it to her. I showed all the text
9 messages. So she knew, but she didn't care anymore.
10 She took me telling her that I stopped talking to her as
11 truth and I violated that trust by talking to Brie
12 again. So it doesn't matter what the contents of the
13 conversation was, which Dori knew about which she
14 testified to last week. But --
15 Q. Were you meeting her in person as well?
16 A. Let me finish. But the way that it ended
17 with Brie in that second phase was me telling Brie that
18 Dori found out again, now she's threatening to leave me
19 and I'm not going to let that happen. So I need to stop
20 talking to you. That's when Brie threatened to go to
21 the police. And I said, the police? For what? And she
22 told me what. I believe I still have an old Instant
23 Messenger conversation saved with that particular
24 conversation. It wasn't very long, but this was through
25 writing -- or reduced to writing in the form of Instant

1   were you ever alone with Brie in person?
2   A.      No.
3   Q.      Did you and Brie chat a lot by phone, not
4   text messages, verbal phone conversations?
5   A.      No. I believe there were one or two
6   occasions where a drunken Brie would call me at what
7   sounded like a party in the background, it was very
8   loud, lot of voices, a lot of music, and asked me to
9   purchase her alcohol.
10  Q.      And did you?
11  A.      No.
12  Q.      Did you ever meet her at Amanda Turoni's
13  house before you were arrested?
14  A.      I have been with Brie at Amanda Turoni's
15  house, yes, but I never met Brie at Amanda Turoni's
16  house.
17  Q.      What was the occasion you were with Brie at
18  Amanda Turoni's house before you were arrested?
19  A.      Christine Turoni, Amanda's mother, and Sam
20  Turoni were good friends with my parents growing up.
21  Again, all from Taylor. And I believe we were either
22  listing -- I was a Realtor at the time. We were either
23  listing or talking about listing their house on Claire
24  Drive. But I don't remember if that predated my
25  conversations through text with Brie or if it was

1   afterwards. I don't remember the year that that all
2   happened.
3   Q.      Is that the only time you were at Amanda's
4   house?
5   A.      No, I've been at Amanda's house dozens of
6   times.
7   Q.      Because of the --
8   A.      We were friends.
9   Q.      Your parents were friends with her parents?
10  A.      Uh-huh.
11  Q.      Correct?
12  A.      Yes. Sorry.
13  Q.      Amanda would be nine years younger than you,
14  right?
15  A.      Uh-huh. Correct.
16  Q.      So you weren't friends with Amanda in high
17  school; were you?
18  A.      No. No. Amanda was too young for me to
19  be --
20  Q.      Friends with?
21  A.      -- friends with at the time. I mean, we're
22  good friends now. But Nikki Turoni was Amanda's
23  sister -- older sister. I wouldn't say we were friends,
24  either, but we were more of the same age. I think Nikki
25  was two years younger than me -- grades younger than me.

1   Q.      Were you ever at Amanda's house that Brie was
2   there?
3           MR. KOLMAN: Asked and answered. You
4   can answer it again.
5           THE WITNESS: Asked and answered. Yes.
6           MR. HINTON: I don't recall an answer.
7           MR. KOLMAN: He did. He said he was
8   there.
9   BY MR. HINTON:
10  Q.      You were there, but --
11  A.      Brie was there when I was attempting to list
12  or listing Amanda's home for sale -- Christine's home
13  for sale.
14  Q.      So you weren't alone with Brie on that
15  occasion, there were other people there?
16  A.      Yes.
17  Q.      Okay. Other than that time with Brie and
18  other people being present, were you ever personally
19  with Brie anywhere?
20  A.      No. Not that I recall, no.
21  Q.      You never took her to houses that were -- you
22  had listed for sale?
23  A.      Absolutely not.
24  Q.      You were never in a car with her before you
25  were arrested on July 9th, 2010?

1   A.      I was in a car with her, yes, with Amanda and
2   Christine.
3   Q.      Okay.
4   A.      Not alone, though.
5   Q.      Okay.
6   A.      As far as I remember.
7   Q.      What was the occasion that you were in a car
8   with Brie, Amanda and Amanda's mother?
9   A.      I don't recall. I think it had something to
10  do with Sam Turoni. But I don't recall.
11  Q.      Okay. In the May 3rd, 2002 [sic] five-hour
12  long chat with the hate group that you referred to them
13  as --
14  A.      Not this one, the other one.
15  Q.      The other one.
16  A.      Yeah.
17  Q.      Remember that long, long chat with
18  them?
19  A.      Yes.
20  Q.      Do you remember calling Brie conniving in
21  that chat?
22  A.      Yes.
23  Q.      Okay. And that's how you feel about her, she
24  was conniving?
25  A.      Absolutely.

21 (Pages 78 - 81)

1  Q.    Has that ever changed?

2  A.    Has it ever changed?

3  Q.    Your feeling of her as a conniving person.

4  A.    No. She's connived many different false

5 truths or half-truths in many different situations in

6 her life. Not just with me; in many other situations as

7 well. So no, I believe the definition of conniving

8 would be the way that Brie acts. Absolutely.

9  Q.    You believe she's a lunatic and conniving?

10  A.    Yes.

11  Q.    Now, let's look at your supplemental Answer

12 to Interrogatory in this case. Let's see. It's the

13 second tab.

14  A.    12-9-21?

15  A.    Yes.

16  A.    Okay.

17  Q.    Let's look at Number 27 of your Supplemental

18 Answer to Interrogatory. Do you see that?

19  A.    Yes.

20  Q.    And Attorney Kolman's office typed these up.

21 The details are these. "Plaintiff's best childhood

22 friend, Joe, was dating the victim." Is that a true

23 statement, that he was your best childhood friend?

24  A.    I wouldn't categorize it as be -- I had a lot

25 of best childhood friends. I wouldn't single out Joe as

1 the only one. I could probably name six what I

2 considered at the time best friends. Joe would happen

3 to be one of those several that I was referring to. But

4 yes.

5  Q.    And you were at his house?

6  A.    What?

7  Q.    Did you ever go to Joe's house as one of your

8 childhood friends?

9  A.    I don't remember being at Joe's house ever,

10 no. Joe moved a lot. I don't really remember being at

11 too many of my friends' houses, specifically Joe's.

12  Q.    Reading on in 27 of your supplemental answer,

13 "He was 21, she was 16. They were having a sexual

14 relationship. Plaintiff did not know this at the time,

15 but apparently there was a threat to expose Joe. As a

16 result, he committed suicide. The relationship between

17 plaintiff and the victim was only with respect to

18 discussions regarding Joe and his suicide." Is that

19 true and accurate?

20  A.    Everything you read is just true. I would be

21 forced to say that there was a threat to expose Joe

22 in -- according to what Brie told me, in Brie's state of

23 mind at the time. She not only threatened to break up

24 with Joe because of the impregnation of another girl,

25 but she also threatened to go to the police on Joe. Joe

1 being 21 at the time and her being 16 was a crime,

2 especially if they were sexually involved, which they

3 were which both sets of parents knew about as far as

4 I -- as far as Brie told me and I was aware. So yes,

5 everything other than you said there is true except the

6 fact that there was a threat to expose Joe as sleeping

7 with Brie as a minor.

8  Q.    But all of your conversations with Brie,

9 text, in-person, phone, whatever they were, it was

10 always about Joe?

11        MR. KOLMAN: Objection.

12 BY MR. HINTON:

13  Q.    You can answer.

14  A.    The content of our text messages was

15 primarily about Joe. I'm not saying that there couldn't

16 be a text message out there that said, hey, how's your

17 day going. That's not about Joe, that's to state of

18 mind. So little innuendos and small talk like that, I'm

19 sure, did exist but, truthfully, I don't remember the

20 exact content of the conversations. But I do know that

21 the primary focus of our conversations was about Joe

22 Strok.

23  Q.    Did -- in your conversations with Brie about

24 Joe Strok, did you talk about or communicate with her

25 about her having sex with Joe Strok?

1  A.    Yeah.

2  Q.    Okay. Did you think that was appropriate?

3        MR. KOLMAN: Objection.

4 BY MR. HINTON:

5  Q.    You can answer.

6  A.    No.

7  Q.    It was not appropriate?

8  A.    Well, at the time, I guess I didn't see

9 anything wrong with it, especially considering the fact

10 that Joe had just killed himself and she was grieving.

11 Looking back on it now, and not only just now but also

12 when I pled to my misdemeanor, I totally believed that

13 all of my communication with Brie was inappropriate; all

14 of it.

15  Q.    Because you were in -- a person of authority?

16  A.    I wouldn't say I was a person of authority,

17 no. I was a coach at a high school. But the fact that

18 I was in my 20s and Brie was still in high school,

19 that's inappropriate.

20  Q.    She was a freshman?

21  A.    She was a freshman.

22  Q.    And you're communicating with her about her

23 past sex with Joe Strok?

24  A.    I wasn't communicat -- well, I guess I was

25 communicating with her, but she could bring it up. And

1 I thought that that would have been on my -- on my
2 hand -- I thought that would have been blood on my
3 hands. But I also thought that what I was providing to
4 Brie was better than what she was getting. That is why
5 I pled guilty to corruption of minors. That was not
6 true. I know that now, but I'm 40 years old. At 25
7 years, you don't know things.
8 Q.    Did Brie ever communicate to you that she was
9 thinking about suicide because of Joe Strok killing
10 himself?
11 A.    No.
12 Q.    Okay. It was only after you told her that
13 you needed to stop communicating with her that she
14 talked about suicide?
15 A.    To me, yes. I don't know if she had those
16 sentiments to other people. But yes, she never talked
17 about suicide to me until after our impending breakup in
18 her mind -- in her words.
19 Q.    Turn to your Answers to Interrogatories, Set
20 7. It's one of the tabs there. Set 7.
21 A.    Okay.
22 Q.    Do you see Number 10? I asked, "At what
23 locations did you have sex with Brie DuBorgel in the
24 year 2015?"
25 A.    Yes.

1 Q.    And in 2015, you considered her a lunatic,
2 right? You've already testified that you've always
3 thought she was a lunatic; is that correct?
4 A.    I thought Brie was a lunatic, yes.
5 Q.    Yeah. In 2015 too?
6 A.    Yes.
7 Q.    Okay. And so you've testified on February
8 6th you had sex with her at least five times in and
9 around 2015, correct?
10      MR. KOLMAN: Objection.
11 BY MR. HINTON:
12 Q.    You can answer.
13 A.    I don't remember my testimony from that day.
14 If you showed it to me, I could clarify it or confirm it
15 but --
16 Q.    How many times did you have sex with her in
17 and around 2015? Yeah, 2015.
18 A.    First of all, I believe the year is wrong. I
19 did testify to that. But the more I thought about it
20 and looked back at events versus my encounters with Brie
21 at that time, the year is definitely wrong. But it
22 probably was less than five.
23 Q.    What year did you think it was that you had
24 sex with her?
25 A.    I'm pretty sure it was 2017. It would have

1 been later 2017.
2 Q.    Okay. 2015 or 2017, you've testified you've
3 thought she's been a lunatic her --
4 A.    Oh, yeah. I thought she was a lunatic then,
5 yeah.
6 Q.    Okay. So you had sex with her how many times
7 in 2017?
8 A.    Under five.
9 Q.    Okay. And looking at this Answer to
10 Interrogatory, you mention having sex with her in
11 vehicles; is that correct?
12 A.    Yes.
13 Q.    Do you remember having sex with her anyplace
14 else other than vehicles?
15 A.    No.
16 Q.    Did you ever have sex with her at her
17 grandparents' house?
18 A.    No.
19 Q.    Her grandmother's house?
20 A.    No.
21 Q.    What --
22 A.    I don't know where --
23 Q.    Never been to any of her grandparents'
24 houses?
25 A.    No. I don't know where they live, any of

1 them.
2 Q.    Do you remember having sex with her in any
3 apartments?
4 A.    No.
5 Q.    Any houses?
6 A.    Nope.
7 Q.    You never went to the apartment she shared
8 with Ciara O'Malley in Old Forge in 2014?
9 A.    No.
10 Q.    Okay. You were here during Ciara O'Malley's
11 testimony where she said you came to that apartment in
12 Old Forge.
13 A.    I was here during Ciara's testimony where she
14 perjured herself, yes.
15 Q.    Was that a lie by Ciara O'Malley saying you
16 came to that apartment?
17 A.    It wasn't a lie, it was perjury. But yes.
18 Q.    Why did you have sex with Brie in 2017 when
19 you're married and you thought she was a lunatic that
20 ruined your life in 2010?
21 A.    I was in a very bad mental place in 2017. I
22 had just cheated on my wife with Miranda. That's the
23 first time I've ever cheated on my wife and probably the
24 first time I've cheated on a partner maybe ever. I felt
25 as though my marriage was -- I was losing my marriage.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  I tried very hard to gain it back. And every attempt
2  that I made in trying to save the marriage was thwarted
3  with aggressiveness by my ex-wife, Dori. So probably, I
4  would say, out of frustration, sadness, aggravation, in
5  fear of loss is why I started having sex with different
6  women. I used sex at the time, I believe, as a crutch.
7  Q.    Did you reach out to Brie to have sex with
8  her?
9  A.    No. I believe Brie reached out to me because
10  she had heard Dori was leaving me. And around that time
11  that Dori decided to leave, I was -- other than trying
12  unsuccessfully to get Dori to come back, I was
13  influenced by alcohol quite a bit, so I made some very
14  poor decisions and one of them was engaging with Brie,
15  the lunatic.
16  Q.    Okay. Why did it happen repeatedly with
17  Brie? Why did you repeatedly have sex with her?
18  A.    It was good sex.
19  Q.    Were you using her for sex?
20  A.    Yes -- not just for sex. I wouldn't say
21  using her for sex. So I'm going to say no to that if I
22  can correct. I was using it as a medicine for loss. I
23  was really messed-up then.
24  Q.    And how did you break it off with Brie when
25  you were having sex with her in 2017?

1  A.    There was nothing to break off. They were
2  casual encounters that I think we were both probably
3  under the influence of alcohol. Me for certain and her
4  probably; from what seemed to me, other drugs as well.
5  But there was nothing to break off. It wasn't a
6  full-blown relationship, so to speak, where you have to
7  have a conversation and break up with the other party.
8  It was just -- it sizzled. Went down to nothing.
9  Q.    And you still thought she was a lunatic?
10  A.    To this day, I think Brie is -- you know, I
11  guess we would have to define lunatic, but I think Brie,
12  based on her actions in particular to this case and up
13  until recently with her affidavit, I think that Brie is
14  totally mentally ill.
15  Q.    And that's remained consistent throughout the
16  entire time you've known her?
17  A.    Pretty much.
18  Q.    And -- so you were just using her for sex?
19  A.    You already asked me that.
20        MR. KOLMAN: Objection. Asked and
21  answered.
22        THE WITNESS: And what I said was, I
23  wasn't using her for sex, so to speak. I think I was
24  using her to cure something that was wrong with my mind.
25  It was a distraction that I needed at the time. And

1  Brie wasn't the only one.
2  BY MR. HINTON:
3  Q.    Who else?
4  A.    Oh, Miranda.
5  Q.    And who else?
6  A.    I'd rather not admit to that today, but --
7  Q.    I just want to know how many affairs you had.
8  A.    I wouldn't consider them affairs.
9        MR. KOLMAN: Objection.
10  BY MR. HINTON:
11  Q.    Well, you were married. You were having sex
12  with other people besides Amanda and Brie.
13  A.    I was married, I was separated. I was
14  separated.
15  Q.    In 2017?
16  A.    Yeah. I was kicked out. Dori testified to
17  that last week.
18  Q.    How long were you kicked out for?
19  A.    Period of weeks. Probably three weeks.
20  Q.    Did you have sex with Melissa, Jason Thomas's
21  girlfriend?
22  A.    Melissa -- Jason Thomas, the Realtor?
23  Q.    Yeah.
24  A.    Melissa Graziano?
25  Q.    Yes.

1  A.    No.
2  Q.    How many other sex partners did you have
3  while you were still married to Dori?
4        MR. KOLMAN: Objection.
5  BY MR. HINTON:
6  Q.    You can answer.
7  A.    While I was separated from Dori?
8  Q.    Yes.
9  A.    Under five.
10  Q.    Okay. So you had five sexual partners up
11  until the time she filed for divorce in March of 2021,
12  correct? During the marriage.
13  A.    Yes.
14  Q.    Let's go to ST1580.
15  A.    1580?
16  Q.    Yes, 1580. Looking at ST1580, is this a post
17  you made to your Telegram page?
18  A.    No.
19  Q.    Are you the Real Phil Godlewski 3.0?
20  A.    Nope.
21  Q.    So is it your belief that the text messages
22  in your criminal case from 2010 were made up by 13- and
23  14-year-old girls?
24        MR. KOLMAN: Objection.
25        THE WITNESS: I don't know who made up

31 (Pages 118 - 121)

1 credit card's declined?
2 A.  I don't remember.  Could have been the phone
3 or it could have been through text.  I don't remember.
4 Q.  Look at the exhibit Scranton Times ST1829,
5 please.  Is this the -- a copy of the certificate that
6 you had hanging on your wall in one of your homes?
7 A.  I believe so, yes.
8 Q.  This is the one that got lost when you moved
9 to Shavertown?
10 A.  Yes.
11 Q.  And this is the one I was asking you to
12 produce rather than me using a --
13 A.  Photo.
14 Q.  -- photo of your videos?
15 A.  Yes.
16 Q.  And where did you get this document that was
17 hanging on your wall?
18 A.  It was mailed to me.
19 Q.  Okay.  And when was that?
20 A.  Shortly after I completed the course which I
21 thought was at Harvard University Business School.
22 Q.  You got duped, right?
23 A.  I think so.
24 Q.  Yeah.  And you read the Harvard testimony
25 from the two witnesses from Harvard that said, we don't

1 hand out certificates that look like this?
2 A.  Yeah, I can't argue with their testimony.  I
3 mean, they are the institution.  So I'm not going to
4 argue against that.  But I did have this document, this
5 document was sent to me in this frame.  It was a classy
6 frame, too.  It wasn't something that you get at
7 Wal-Mart.
8 Q.  So Harvard sent you not only the document,
9 they sent you the frame too?
10      MR. KOLMAN:  Objection.
11      THE WITNESS:  I didn't say Harvard sent
12 me anything.  Apparently Harvard did not send me
13 anything at all because I didn't take a class there.
14 BY MR. HINTON:
15 Q.  Right.
16 A.  But this was sent to me, yes, the frame
17 included.
18 Q.  With the frame included?
19 A.  Yeah.
20 Q.  Okay.  Back to 513 and then we'll take a
21 break for lunch.  513.  Moceyunas.
22 A.  Oh, 513.
23 Q.  Yes.
24 A.  Got it.
25 Q.  So about ten lines from the bottom, Mr.

1 Moceyunas writes, "He said that he doesn't speak to her
2 anymore and he hadn't in weeks."  And he's referring to
3 you, whether you're speaking with Brie anymore.  Did you
4 tell him on January 8th that you don't speak to her
5 anymore and hadn't in weeks?
6 A.  Yeah.  So this conversation with Mr. Mo
7 happened after Brie had threatened me with police.
8 That's when I stopped speaking to her.
9 Q.  Right.
10 A.  And subsequently, the conversa -- I thought
11 it was over after that, but it wasn't.  And that's when
12 I had this conversation with Mr. Mo.
13 Q.  And the second-to-the-last line says,
14 "Make sure he has no contact or conversations with her.
15 I told him to make sure he has no contact or
16 conversations with her."  Do you see that?
17 A.  Yes.
18 Q.  And do you remember him telling you that?
19 A.  Yes.
20 Q.  And did you listen to him?
21 A.  Yes.  A few weeks later, my resignation was
22 accepted.  Only, the next time, I believe, I started
23 communicating with Brie would have been when I had heard
24 that there was an investigation into me.  And then I was
25 really pissed.

1 Q.  Okay.  So is it fair to say that you heard
2 about the investigation into you by the police about a
3 year later, 2010?
4 A.  I wouldn't say a year later.  I think -- I
5 remember hearing about it and then a long period of time
6 passing before I got arrested.  So this wasn't in what,
7 February of 2009?  So it would have definitely been
8 after February of 2009 but before July of 2010.  But I
9 remember it felt like a long time passing before I heard
10 anything at all, so I didn't think anything was
11 happening.  And then, suddenly, I got arrested.
12      MR. HINTON:  Okay.  Let's take a break
13 for lunch.
14      THE WITNESS:  Yes.
15      THE VIDEOGRAPHER:  We are going off the
16 record.  The time is 12:11 p.m.
17      (A luncheon recess was taken from 12:11 p.m.
18           until 1:02 p.m.)
19      THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 1:02 p.m.
21 BY MR. HINTON:
22 Q.  Phil, we had spent a good bit of time talking
23 about Mr. Moceyunas's memo dated January 8th, 2009
24 and -- where he reports that you told him you don't
25 speak to Brie anymore and hadn't in weeks, right?

37 (Pages 142 - 145)

1  intelligence community at a very, very young age." Were
2  you trying to make the impression that you were one of
3  those people recruited at a very, very young age?
4  A.    I wasn't trying to make any impression at
5  all. The words are what they are.
6  Q.    What did you mean by it?
7  A.    I meant -- can you -- I meant what I said.
8  At very young ages, people get recruited to the
9  three-letter agencies.
10  Q.    Okay. But what does that have to do with
11  you?
12  A.    Nothing.
13  Q.    Well, the que -- you went off on this long
14  paragraph here, the question from the writer of the
15  article or interviewer was, "What more about your
16  background can you share with us?"
17  A.    Uh-huh.
18  Q.    And you went into this speech, I guess, about
19  how the CIA or the intelligence recruits people at a
20  very young age. Were you trying to make the impression
21  that you were one of those people?
22      MR. KOLMAN: Asked and answered.
23      THE WITNESS: You asked me that three
24  times now and the answer is no. I wasn't trying to make
25  that impression. I was asked about my background and

1  what I thought was more pertinent to the article. And I
2  wanted to put what I knew from my background or from my
3  expertise into writing and I thought it was a good fit
4  for the article.
5  BY MR. HINTON:
6  Q.    Did you think of -- Brie, who you labeled a
7  lunatic today, did you think of her as your sister?
8  A.    As my sister?
9  Q.    Yeah.
10  A.    No.
11  Q.    Did you think you were a father figure for
12  Brie at any point in time?
13  A.    A father figure; I may have thought that for
14  a brief period of time.
15  Q.    What period of time did you consider yourself
16  to be a father figure for Brie?
17  A.    Brie, throughout her life, has had a lacking
18  male adult figure in her life starting from when her
19  parents got divorced at a young age. I think she was
20  always -- my opinion, I think she was always reaching
21  for some sort of older person to have in her life --
22  older male person to have in her life. I think one of
23  those people were me. Another was Tom Nezlo. Another
24  was the teacher at Lackawanna that she recently slept
25  with and got expelled for. So I think she's always

1  wanted that father figure in her life. So I think over
2  the years of my relationship with Brie -- and I can say
3  this now but I couldn't say it earlier, you know, in
4  that relationship, I think that I've recognized or
5  realized the fact that I may have been a father figure
6  for her even though, at the time, I didn't necessarily
7  know it.
8  Q.    Did you know it when you were sleeping with
9  her in 2017?
10  A.    I didn't know much about that period in 2017.
11  My wife was leaving me, my kids hadn't -- you know, my
12  kids were young. I faced a potential divorce while
13  having infants at home. So I was a little distraught,
14  so I really wasn't thinking about anything but sex. It
15  was a mistake and I regret it.
16  Q.    You didn't make a similar mistake in 2009 and
17  2010; did you?
18      MR. KOLMAN: Objection.
19  BY MR. HINTON:
20  Q.    You can answer.
21      MR. KOLMAN: Asked and answered.
22      THE WITNESS: I don't know what you're
23  referencing, so I'd have to say no.
24  BY MR. HINTON:
25  Q.    In the transcript in front of Judge Minora on

1  February the 6th, Page 138.
2  A.    Okay.
3  Q.    You see at the top the answer says, "At some
4  point last year, Brie was..." Do you see that page?
5  A.    Yes.
6  Q.    Phil, your testimony -- you're the person
7  answering the questions here. A little bit above the
8  middle of the page on Page 138 of this transcript you
9  say, "I always felt like I was a father to Brie and I
10  always felt that it was somehow my responsibility to
11  help her if I could. We've had, obviously, some very
12  well-known public episodes with one another. But in the
13  grand scheme of things, we always seem to have each
14  other's backs." Did I read that correctly?
15  A.    Yes.
16  Q.    In what way did Brie have your back?
17  A.    Support through hard times that I was having
18  professionally and in my marriage. It was, as I stated,
19  a brother-sister-like relationship. I don't have a
20  brother or sister, so I could only speak to what I think
21  that would mean. But I do see now -- when I said this
22  in February, I do see the relationship that my sons have
23  with one another. The first person they go to, even
24  before me or their mom, is each other when there's --
25  when they have even a small problem in life. So I

1 business. My response to Sunita was that my business is
2 better than it ever had been. In 2020, I was the top
3 real estate agent in the Greater Scranton Board of
4 Realtors.
5 Q. I saw a 1099 from 2020 from Sunita for
6 $136,000. Is that what you made in 2020?
7 A. Maybe it was 2019. When was COVID?
8 Q. 2019, your property went into foreclosure,
9 the land that you owned.
10 A. It was 2020.
11 Q. How much did you make in 2020?
12 A. On one transaction, I made $90,000. What I
13 made from the rest, I don't remember. It could have
14 been 140 whatever you said, but I don't have a document
15 in front of me.
16 Q. You're claiming you were the number one
17 Realtor in Lackawanna County?
18 MR. KOLMAN: Objection. Asked and
19 answered.
20 THE WITNESS: You're not -- you're
21 taking what I said in terms of income for some reason.
22 That's not what I said. When you're ranked as Realtor
23 in the Board, it's by total sales. I had 17 million.
24 In fact, I was just about to put a billboard up -- in
25 fact, I paid for the billboard and then the article came

1 out by Chris Kelly.
2 BY MR. HINTON:
3 Q. You've posted on social media that you have
4 no intention of ever going back to real estate. Isn't
5 that correct?
6 A. Absolutely not. I did state that. I have no
7 intention of going back. Absolutely not.
8 Q. You like what you're doing now?
9 A. I like -- I like my career. I like my
10 lifestyle. I like helping people as much as I possibly
11 can. Real estate was a totally different employment
12 than what I do now. It was the opposite, in fact.
13 Q. As a reporter and journalist, do you have a
14 code of ethics that you adhere to?
15 A. Of course.
16 Q. And does that code of ethics include being
17 fair, honest and accurate?
18 A. Yes. As much as possible, sure.
19 Q. And in your view, do you provide the truth to
20 your viewers?
21 A. Yes.
22 MR. HINTON: Let's take a break.
23 THE VIDEOGRAPHER: We are going off the
24 record. The time is 2:33 p.m.
25 (A recess was taken from 2:33 p.m. until 2:49 p.m.)

1 THE VIDEOGRAPHER: We are back on the
2 record. The time is 2:49 p.m.
3 BY MR. HINTON:
4 Q. Phil, in this case here, you have stated your
5 position that you never had sex with Brie when she was a
6 minor, correct?
7 A. Correct.
8 Q. And how -- and she has produced an affidavit
9 saying she did have sex with you when she was a minor.
10 MR. KOLMAN: Is that a question?
11 BY MR. HINTON:
12 Q. Yes.
13 A. Yes.
14 Q. And what evidence do you have that you didn't
15 have sex with her when she was a minor?
16 MR. KOLMAN: Objection.
17 BY MR. HINTON:
18 Q. He can answer.
19 MR. KOLMAN: Objection.
20 MR. HINTON: I'm just asking if he has
21 any evidence.
22 THE WITNESS: You want me to prove --
23 MR. KOLMAN: Why does he have evidence
24 for a negative?
25 MR. HINTON: I'm just asking if he has

1 any. If his position is you prove that I did it.
2 THE WITNESS: Can I give you an example
3 of -- when you ask me that question, can I give you an
4 example of what I think of?
5 BY MR. HINTON:
6 Q. No. Phil, I --
7 A. And then I'll answer it. But I don't think
8 you quite get it.
9 Q. Go ahead.
10 A. If I had a watermelon and I brought it in and
11 I put it right here and I put a knife next to it and I
12 said, Tim, the inside of that watermelon is blue. Until
13 you cut the skin, you slice the watermelon in half,
14 opens up, it's pink. And I say, ha ha, I was right.
15 How are you going to prove that it was blue? How am I
16 going to prove that it was blue? You can't. I can't
17 prove that something didn't happen in this case. Chris
18 Kelly said that it happened.
19 BY MR. HINTON:
20 Q. Right.
21 A. He supposedly has proof as a journalist since
22 he put it in a major publication that it happened.
23 You've got to prove it. I can't prove that it didn't.
24 I'm suing Brie for her affidavit. You know that.
25 That's also defamatory and it's been made public by you.

1  A.    No, not that I'm aware of.

2  Q.    Did you ever meet him in person?

3  A.    I think he was at events that I was at. I

4  don't know if I would say I met him per se, but he would

5  go to the -- there was an event up here at the Cultural

6  Center that I saw him at. He's a prominent reporter in

7  the area, so I knew of him. I have seen him at various

8  places. I think I saw him at the Italian Festival. I'd

9  say, what's up, Chris? He probably didn't know who I

10  was -- or maybe he did. I don't know. But he's a

11  popular guy.

12  Q.    Did you ever have any problems with him in

13  the past?

14  A.    Oh, yeah. I think his reporting is terrible.

15  I didn't have any problems personally with him.

16  Q.    Yeah.

17  A.    But in the sense of being a reporter, I think

18  he's awful.

19  Q.    Okay. You just think he's too liberal or

20  what is it?

21  A.    No, he's just -- he's a terrible person.

22  When he writes article, he lies --

23  Q.    Okay.

24  A.    -- about the people in the articles and I

25  think he sets out to destroy people's lives. And

1  that's -- I guess that's my personal opinion, but it's

2  based on things that he's done to people in the past.

3  Q.    Well, do you -- do you think Chris disliked

4  you before this text message with you?

5  A.    I have no idea. He may have.

6  Q.    Are you claiming that Chris Kelly was sloppy

7  and should have done a better job investigating your

8  criminal case from 2010 and 2011?

9  A.    Sloppy?

10  Q.    Yeah.

11  A.    He said I slept with a 15-year-old girl and I

12  didn't. I went through the arrest of all of this and

13  the case went through litigation and was litigated. All

14  he had to do was research that. So sloppy wouldn't even

15  be the word I would use. It's the most extreme version

16  of sloppy.

17  Q.    Well, if you look at your charging document,

18  right, ST616.

19  A.    Okay.

20  Q.    Here's the charge for corruption of minors

21  under 6301(a)1. You're charged as follows: "In that on

22  or about January 2008 to present, the defendant, Philip

23  Godlewski, being 18 years of age and upwards, did

24  corrupt or intend to corrupt the morals of the

25  victim..." it's blacked out, the name underneath that is

1  Brienna DuBorgel "...a minor under the age of 18 by

2  engaging in acts of sexual intercourse or aided,

3  abetted, enticed or encouraged a minor in the commission

4  of a crime or knowingly assisted or encouraged such

5  minor in violating his or her parole or court order in

6  violation of Section 6301(a)1 of the Pennsylvania Crime

7  Codes." It's an M1. "To wit, the defendant, Godlewski,

8  did engage in sexual intercourse with a minor child

9  victim under the age..." and on the next page, 617, it

10  says 16 years old.

11         MR. KOLMAN: Objection.

12  BY MR. HINTON:

13  Q.    Is that what the charging document in the

14  Criminal Complaint against you reads?

15  A.    That's what the charging document reads.

16  Q.    It claims that you had sex with a minor?

17         MR. KOLMAN: Objection.

18         THE WITNESS: That was the charge.

19  BY MR. HINTON:

20  Q.    Right.

21  A.    Anybody could be charged with anything at any

22  time.

23  Q.    Right.

24  A.    They have to prove that that happened. They

25  did not.

1  Q.    But a lot of cases -- you understand, a lot

2  of criminal cases are disposed of through a plea

3  bargain?

4         MR. KOLMAN: Objection.

5         THE WITNESS: I don't agree with that.

6  BY MR. HINTON:

7  Q.    You don't think a lot of cases are disposed

8  of?

9  A.    What percentage?

10  Q.    I don't know. But a lot of cases --

11  A.    Well, I don't know either. If you don't

12  know, how could I know?

13  Q.    Okay.

14  A.    If you would say, hey, by statistical

15  probability, 78 percent of cases are dismissed by a plea

16  bargain and, therefore, that means that the accused is

17  actually guilty of the crimes that he did not agree to.

18  If you could throw me that stat, show me paperwork on

19  that, I would agree with you. But the way you

20  categorized it, absolutely not.

21  Q.    Phil, when you were arrested, it was for

22  having sex with a minor.

23  A.    It was for many things.

24  Q.    Well, other than witness intimidation --

25  A.    Criminal use of communication facility.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   prosecute all of those charges except the corruption of
2   minor charge. Then if you know that I pled to an M1
3   corruption of minor, all you have to do is go to the
4   statute, Code 6301. It tells you exactly what the
5   charge involves.
6   Q.     It shows you the underlying act of how you
7   corrupted Brie?
8   A.     No, but the guilty plea colloquy could have.
9   Q.     But it didn't.
10  A.     Oh, sure it did. Do you want to ask me about
11  the guilty plea colloquy?
12  Q.     Yeah. Yeah.
13  A.     Let's do it.
14  Q.     All right. Phil, turn to 584, please.
15        Okay.
16  Q.     Phil, is this your handwriting?
17  A.     No.
18  Q.     You didn't fill out the form?
19  A.     No.
20  Q.     Is that your signature on the bottom of the
21  page?
22  A.     No, that's my initials.
23  Q.     Okay. Did you review each page and put your
24  initials on them?
25  A.     Yes.

1   Q.     And then you signed on Page 3 of the guilty
2  plea colloquy?
3  A.     Yes.
4  Q.     And then on the last page, Judge D'Andrea
5  signs you. Did you initial that page too?
6  A.     Yes.
7  Q.     And it's dated November 12th, 2010, correct?
8  A.     Correct. Yep.
9  Q.     And you entered this guilty plea colloquy on
10  that date, right, November 12th, 2010?
11  A.     I don't recall, but it's dated that date. I
12  don't think I would sign something if it were a
13  different -- I do see a little weird 11-12-10 in the
14  margin. I don't know if that was added before or after.
15  So I can't speak to the date, but I could speak to the
16  authenticity of the document.
17  Q.     And you read the entire document when you
18  initialed each page and signed it at the end, right?
19  A.     It was read to me.
20  Q.     Okay. All right. So in the first -- what's
21  your full name and it's Philip Godlewski, right?
22  A.     Yes.
23  Q.     "Do you wish to plead guilty to the charge of
24  corruption of minors," correct?
25  A.     Yes.

1   Q.     And you said yes. And it says, "How old are
2  you," correct?
3  A.     Correct.
4  Q.     You put your age 27.
5  A.     Yes.
6  Q.     Next question, "How far did you go in
7  school," and it says, "College grad."
8  A.     Yes.
9  Q.     Now, that's not true; is it?
10  A.     No.
11  Q.     Did you -- did you -- you reviewed this page,
12  right?
13  A.     I did. I don't know why Joe wrote that.
14  Q.     Well, you reviewed it after he wrote it,
15  right?
16  A.     I reviewed it while we were viewing it. So
17  when we would get to the end of the page, I initialed it
18  and we moved on. I don't know if -- I don't know why
19  Joe wrote that. I acknowledged, though, that by
20  initialing it, I agreed to it. But at that time, I had
21  no graduation criteria from any college.
22  Q.     Right.
23  A.     So I don't know why that's in there.
24  Q.     It's a falsehood to the court, right?
25        MR. KOLMAN: Objection. It speaks for

1   itself and you asked -- asked it and you're being
2  argumentative. So please --
3        THE WITNESS: I wouldn't say it's a
4  falsehood to the court at all.
5  BY MR. HINTON:
6  Q.     Well, this is --
7  A.     It could very easily say on that line I had
8  no schooling and it wouldn't have mattered to the court.
9  It's absolutely of zero relevance. That's probably why
10  Joe never corrected it to begin with.
11  BY MR. HINTON:
12  Q.     But it's false?
13        MR. KOLMAN: Okay. It's false.
14        THE WITNESS: All right. Yeah, it's
15  false, like I said.
16  BY MR. HINTON:
17  Q.     Next question, "Do you read and write English
18  language?" "Yes." That's correct, right?
19  A.     Yes.
20  Q.     "Have you had an opportunity to read the
21  charges pending against you?"
22  A.     Yes.
23  Q.     And this is before the information is even
24  prepared; is that right? If I look at 588, that
25  information is not even filed until November 16th, 2010.

1 So this is filled out four days before the information.
2 A.     If those dates are accurate, then yes. But I
3 can't speak to when that was stamped. And I also did
4 not sign -- I don't think a judge could actually sign
5 this document.
6 Q.     What's "this document"?
7 A.     I'm sorry. ST588. I don't think a judge is
8 allowed to sign that in the absence of the guilty plea
9 colloquy. A judge needs to have this document first.
10 Q.     Going back to 584, 5B says, "Therefore, do
11 you know exactly what you are charged with and what you
12 are pleading to?" You said "Yes," correct?
13 A.     Correct.
14 Q.     Next question, "Have you ever been in a
15 mental institution or received treatment for mental
16 disease?" And you said "No."
17 A.     Correct.
18 Q.     Number seven, "Have you had any alcoholic
19 beverages or drugs within the last 24 hours?" And you
20 answered "No."
21 A.     Correct.
22 Q.     Number eight, "Have you fully discussed your
23 case with your attorney and are you fully satisfied that
24 he knows all the facts of your case and has had
25 sufficient time to look into the questions either he or

1 you may have about your case?" You answered "Yes."
2 A.     Correct.
3 Q.     8A is, "Are you satisfied with your
4 attorney?" You answered "Yes."
5 A.     Correct.
6 Q.     Nine, "Do you understand that even though you
7 are guilty or may be guilty, you are presumed innocent
8 and have a right to go to trial either before a judge or
9 before a jury of 12 individuals and the Commonwealth
10 must prove to the satisfaction of each and every one of
11 the 12 jurors or to the satisfaction of the judge that
12 you are guilty beyond a reasonable doubt?" You answered
13 "Yes."
14 A.     Correct.
15 Q.     Nine, "Do you understand that you and your
16 attorney have a right to participate in the selection of
17 a jury?" That's not answered.
18 A.     Correct.
19 Q.     Ten, "Do you understand that if you want to
20 go to trial, your attorney will be permitted to
21 cross-examine the Commonwealth's witnesses and to call
22 witnesses on your behalf? And if you plead guilty, you
23 will lose the right to call witnesses or to
24 cross-examine the Commonwealth witnesses?" And you
25 answered "Yes."

1 A.     Correct.
2 Q.     Number 11, "Do you understand that by
3 pleading guilty, you are admitting that you did things
4 you are charged with and that if you plead not guilty,
5 the Commonwealth cannot force you to take the stand and
6 either admit or deny that you did the things you are
7 charged with?" And you answered "Yes"?
8 A.     Correct.
9 Q.     Number 12, "Do you understand that by
10 pleading guilty, you are giving up your right to appeal
11 any question in this case except for those concerning
12 the right of this court to try you (jurisdiction over
13 the subject matter) or the legality of or propriety of
14 the sentence imposed?" And your answer was "Yes."
15 A.     Correct.
16 Q.     Number 13, "State specifically in detail any
17 plea agreement with the district attorney." And
18 handwritten here is, "Plea to corruption of minors.
19 Agreed sentence, three months home confinement to 23
20 months. All other counts dismissed." That was part of
21 your plea agreement, correct?
22 A.     Exactly.
23 Q.     Okay. So part of your agreement is if you
24 plead guilty to corrupting Brie's morals and do three
25 months of home confinement and another 23 months of

1 parole, they will drop all the other charges against
2 you, correct?
3 A.     Correct.
4 Q.     No judge dismissed all the other charges
5 against you, it was part of a plea deal, correct?
6           MR. KOLMAN: Objection. So what?
7           MR. HINTON: I'm asking --
8           MR. KOLMAN: You know what?
9           MR. HINTON: Do you have another
10 objection, Tim?
11           MR. KOLMAN: Let me put another
12 objection on the record.
13           MR. HINTON: Tim --
14           MR. KOLMAN: You are attempting to smear
15 my client through innuendo. You're --
16           MR. HINTON: Tim --
17           MR. KOLMAN: -- attempting to bootstrap
18 elements of this criminal case to try to prove that he
19 had sex with Brie, which he didn't have. And the
20 documents you have and the criminal documents that you
21 have do not in any way reflect that. In fact, they
22 reflect the very opposite.
23           MR. HINTON: Tim, your objection's
24 noted.
25           MR. KOLMAN: Thank you.

1  details to the case, it would have been in the guilty
2  plea colloquy. It does not exist in the guilty plea
3  colloquy. That's what went to the judge's desk. And
4  the judge put that in his document that he signed.
5     Q.    Phil, are you saying that because there's no
6  facts of how you corrupted Brie, then it never happened?
7          MR. KOLMAN: Objection.
8          THE WITNESS: That's not what I said at
9  all.
10  BY MR. HINTON:
11    Q.    Okay. Would you agree with me that there are
12  no facts at all in your guilty plea as to how you
13  corrupted Brie?
14    A.    I agree with that, yes. Zero facts.
15    Q.    Okay. So that doesn't -- does that give you
16  the license to state after the fact how you corrupted
17  Brie?
18          MR. KOLMAN: Objection.
19          THE WITNESS: I'm telling you in my
20  opinion how I corrupted Brie.
21  BY MR. HINTON:
22    Q.    Right. Right.
23    A.    That's my opinion.
24    Q.    Right.
25    A.    The statute speaks for itself. I don't have

1  to interpret this statute. The statute says I corrupted
2  or intended to corrupt a minor under the age of 18 by
3  doing the next couple lines, aids, abets, entices,
4  encourages such minor in the commission of any crime and
5  knowingly assists or encourages any minor in violating
6  his or her parole to the court commits a misdemeanor of
7  the first degree. I pled to a misdemeanor of the first
8  degree.
9    Q.    Right.
10    A.    I didn't plead to a misdemeanor of the second
11  degree or the third degree. I didn't plead anything
12  else other than exactly what that paragraph says right
13  there. That's what I pled to. Now, there's nothing in
14  the case file -- and you know this but you didn't know
15  this before. There's nothing in the case file that says
16  my offense was tied to a specific sexual act. Had it
17  been, it would have been number one in the guilty plea
18  colloquy. Number two, my attorney had the right to tell
19  me about it. In fact, my attorney, on the morning of
20  sentencing, told me the opposite. He said -- I insisted
21  that there's no language in there that has anything to
22  do with sexual activity. I, therefore, went ahead and
23  pled. Now, you could assume all you want that it was
24  sexual activity tied to the Misdemeanor 1, but you have
25  to prove it when I'm suing for defamation. And you

1  can't because it never happened.
2    Q.    But you can't prove that it --
3    A.    I don't have to prove anything. It's the
4  watermelon thing again.
5    Q.    Okay.
6    A.    I can't prove a negative.
7    Q.    So we're in a -- we're in a quandary --
8    A.    Yeah, we're going to a jury. You're right.
9  Let's see what they think.
10    Q.    -- because -- because it's in that middle
11  ground of nobody can prove it.
12    A.    Let's see if a jury believes me and my team.
13    Q.    Or believes Brie.
14    A.    Or believes Brie and Chris Kelly. I'm
15  perfectly fine with a jury deciding this case because
16  I'm in the right. Now, if a jury says that I'm wrong
17  and they believe the stuff that you're putting forward,
18  I lose.
19    Q.    Right.
20    A.    That's how court works. So let's see.
21    Q.    Okay. Phil, is Brie's birthday ████
22  ████ , 1993?
23    A.    I don't know her birthday. I know she was
24  born in September. That's about all I know.
25    Q.    Okay. When Principal Moceyunas questioned

1  you about Brie and he put in his memo that she's 15
2  years old, he apparently told you that in the phone
3  call, right? That she's a 15-year-old girl.
4    A.    Yes. If it's in his memo, I have no reason
5  to question it. Mr. Mo's --
6    Q.    Well, when you started communicating with
7  Brie over Facebook or whatever, did you know at that
8  time she was 15 years old -- or 14 -- 14 or 15?
9    A.    I don't think she was 14. I think I only
10  ever communicated with Brie after she had turned 15.
11    Q.    Fifteen. Okay. And when she's 15, you're
12  25, right?
13    A.    There was, I think, a little less than nine
14  years' separation between her and I.
15    Q.    Well, let's do the math. You're born in --
16    A.    ████ of '83.
17    Q.    '83. And she's born in ████ of '93.
18    A.    Yeah.
19    Q.    So that's ten-years-and-three-months.
20    A.    Yeah.
21    Q.    So you're ten-years-and-three-months older
22  than she is.
23    A.    Yes.
24    Q.    Okay. And when Joe D'Andrea came -- I think
25  you described it as you walked back into the

1   Q.      Did it make you mad?

2   A.      Mad? Yeah. Yeah. Motivated and angry.

3   Q.      So let's go to a clip here. We're going to

4   put up Clip 49.

5           (Video clip being played.)

6   BY MR. HINTON:

7   Q.      So, Phil, we just played a clip here about

8   the bail for your criminal case for the charges

9   involving Brie.

10  A.      Uh-huh. Yes.

11  Q.      And was that your voice in the clip?

12  A.      Yes.

13  Q.      And those were your statements?

14  A.      Yes.

15  Q.      That you and your family put up 250,000 cash

16  bail?

17  A.      Yes.

18  Q.      And if we look at ST776, please. Phil,

19  that's collateral mortgage taken out by Cutting Edge

20  Bail Bonds, LLC. Do you see that?

21  A.      Yes.

22  Q.      And is that your signature on that document?

23  A.      Yes.

24  Q.      And did you take out a mortgage on your house

25  to get bail, you and Dori?

1   A.      Yes.

2   Q.      And were you here for Marie's deposition that

3   she took out a mortgage on her house too so you could

4   get bail?

5   A.      Yes.

6   Q.      And you guys pledged your houses for bail,

7   you didn't put up 250,000 in this case; isn't that

8   correct?

9   A.      Correct.

10  Q.      So what you told the hate group in May of

11  2022 was incorrect; is that true?

12  A.      Yes. Purposely.

13  Q.      So you purposely lied to those people about

14  this situation?

15  A.      No, that's not what I said.

16  Q.      Well, you said purposely.

17  A.      Yeah.

18  Q.      What did you mean?

19  A.      Purposely -- this hate group were kings and

20  queens of discovering documents that were connected to

21  me in any way, shape or form. This particular document

22  has multiple names on it; my name, Dori's name, my

23  mother's name, Tommy's name. And I thought that they

24  would harass those involved with me just like they've

25  been doing for the last couple years now because of the

1   article that Chris Kelly wrote. So my white lie was an

2   attempt to protect the group from trying to expose

3   anything further.

4           MR. HINTON: Okay. Let's go to the next

5   clip. Putting Clip 14 up.

6           (Video being played.)

7   BY MR. HINTON:

8   Q.      So, Phil, that clip -- and here we have a

9   picture of your Harvard certificate. Was that your

10  voice on that clip?

11  A.      It sounded like my voice was actually edited

12  a little bit. I don't know where that video came from,

13  but it sounded weird. But I did say that.

14  Q.      You did say you had a Harvard degree?

15  A.      Yes.

16  Q.      And you were sporting a Harvard sweatshirt?

17  A.      Well, I think that's why they asked me the

18  question. I didn't just volunteer that information.

19  That was a Q&A session and I was wearing the Harvard

20  shirt that I had purchased. So I think that's what

21  caused somebody to ask that question.

22  Q.      And so it wasn't correct, though, right? You

23  did not have a Harvard degree?

24  A.      From what I understood it at the time when I

25  said it, I did think I had a degree. And then when all

1   of the backlash came because of that comment, I realized

2   what I actually had was a certificate and not a degree.

3   But I referred to the picture that you just put on the

4   screen that I had on the wall behind me as a degree, but

5   it was not.

6   Q.      Okay. And you said in that video that you

7   have many degrees.

8   A.      The way I said that was anecdotal. It was,

9   kind of, I have "many" degrees. Kind of, like that. If

10  you re-listen to it, you'll hear the emphasis that I put

11  on that.

12  Q.      So you weren't being serious, right?

13  A.      I was being -- trying to be funny again. I'm

14  not really that funny. Sometimes my humor gets taken

15  the wrong way. I don't have many degrees. That's

16  something that I addressed later in that video. And,

17  again, that's why these videos are all out of context.

18  Because if you'd play that for another hour, you'll most

19  likely hear me say what I actually -- what the truth

20  actually was.

21  Q.      You don't have any college degrees, though,

22  right?

23  A.      No.

24  Q.      My statement's correct; yes?

25  A.      Yes, your statement's correct.

1  details to the case, it would have been in the guilty
2  plea colloquy. It does not exist in the guilty plea
3  colloquy. That's what went to the judge's desk. And
4  the judge put that in his document that he signed.
5  Q.    Phil, are you saying that because there's no
6  facts of how you corrupted Brie, then it never happened?
7       MR. KOLMAN: Objection.
8       THE WITNESS: That's not what I said at
9  all.
10 BY MR. HINTON:
11 Q.    Okay. Would you agree with me that there are
12 no facts at all in your guilty plea as to how you
13 corrupted Brie?
14 A.    I agree with that, yes. Zero facts.
15 Q.    Okay. So that doesn't -- does that give you
16 the license to state after the fact how you corrupted
17 Brie?
18       MR. KOLMAN: Objection.
19       THE WITNESS: I'm telling you in my
20 opinion how I corrupted Brie.
21 BY MR. HINTON:
22 Q.    Right. Right.
23 A.    That's my opinion.
24 Q.    Right.
25 A.    The statute speaks for itself. I don't have

1  to interpret this statute. The statute says I corrupted
2  or intended to corrupt a minor under the age of 18 by
3  doing the next couple lines, aids, abets, entices,
4  encourages such minor in the commission of any crime and
5  knowingly assists or encourages any minor in violating
6  his or her parole to the court commits a misdemeanor of
7  the first degree. I pled to a misdemeanor of the first
8  degree.
9  Q.    Right.
10 A.    I didn't plead to a misdemeanor of the second
11 degree or the third degree. I didn't plead anything
12 else other than exactly what that paragraph says right
13 there. That's what I pled to. Now, there's nothing in
14 the case file -- and you know this but you didn't know
15 this before. There's nothing in the case file that says
16 my offense was tied to a specific sexual act. Had it
17 been, it would have been number one in the guilty plea
18 colloquy. Number two, my attorney had the right to tell
19 me about it. In fact, my attorney, on the morning of
20 sentencing, told me the opposite. He said -- I insisted
21 that there's no language in there that has anything to
22 do with sexual activity. I, therefore, went ahead and
23 pled. Now, you could assume all you want that it was
24 sexual activity tied to the Misdemeanor 1, but you have
25 to prove it when I'm suing for defamation. And you

1  can't because it never happened.
2  Q.    But you can't prove that it --
3  A.    I don't have to prove anything. It's the
4  watermelon thing again.
5  Q.    Okay.
6  A.    I can't prove a negative.
7  Q.    So we're in a -- we're in a quandary --
8  A.    Yeah, we're going to a jury. You're right.
9  Let's see what they think.
10 Q.    -- because -- because it's in that middle
11 ground of nobody can prove it.
12 A.    Let's see if a jury believes me and my team.
13 Q.    Or believes Brie.
14 A.    Or believes Brie and Chris Kelly. I'm
15 perfectly fine with a jury deciding this case because
16 I'm in the right. Now, if a jury says that I'm wrong
17 and they believe the stuff that you're putting forward,
18 I lose.
19 Q.    Right.
20 A.    That's how court works. So let's see.
21 Q.    Okay. Phil, is Brie's birthday ███████
22 ██, 1993?
23 A.    I don't know her birthday. I know she was
24 born in September. That's about all I know.
25 Q.    Okay. When Principal Moceyunas questioned

1  you about Brie and he put in his memo that she's 15
2  years old, he apparently told you that in the phone
3  call, right? That she's a 15-year-old girl.
4  A.    Yes. If it's in his memo, I have no reason
5  to question it. Mr. Mo's --
6  Q.    Well, when you started communicating with
7  Brie over Facebook or whatever, did you know at that
8  time she was 15 years old -- or 14 -- 14 or 15?
9  A.    I don't think she was 14. I think I only
10 ever communicated with Brie after she had turned 15.
11 Q.    Fifteen. Okay. And when she's 15, you're
12 25, right?
13 A.    There was, I think, a little less than nine
14 years' separation between her and I.
15 Q.    Well, let's do the math. You're born in --
16 A.    ████ of '83.
17 Q.    '83. And she's born in ████████ of '93.
18 A.    Yeah.
19 Q.    So that's ten-years-and-three-months.
20 A.    Yeah.
21 Q.    So you're ten-years-and-three-months older
22 than she is.
23 A.    Yes.
24 Q.    Okay. And when Joe D'Andrea came -- I think
25 you described it as you walked back into the

64 (Pages 250 - 253)

1   Q.   Did it make you mad?
2   A.   Mad? Yeah. Yeah. Motivated and angry.
3   Q.   So let's go to a clip here. We're going to
4   put up Clip 49.
5        (Video clip being played.)
6   BY MR. HINTON:
7   Q.   So, Phil, we just played a clip here about
8   the bail for your criminal case for the charges
9   involving Brie.
10  A.   Uh-huh. Yes.
11  Q.   And was that your voice in the clip?
12  A.   Yes.
13  Q.   And those were your statements?
14  A.   Yes.
15  Q.   That you and your family put up 250,000 cash
16  bail?
17  A.   Yes.
18  Q.   And if we look at ST776, please. Phil,
19  that's collateral mortgage taken out by Cutting Edge
20  Bail Bonds, LLC. Do you see that?
21  A.   Yes.
22  Q.   And is that your signature on that document?
23  A.   Yes.
24  Q.   And did you take out a mortgage on your house
25  to get bail, you and Dori?

1   A.   Yes.
2   Q.   And were you here for Marie's deposition that
3   she took out a mortgage on her house too so you could
4   get bail?
5   A.   Yes.
6   Q.   And you guys pledged your houses for bail,
7   you didn't put up 250,000 in this case; isn't that
8   correct?
9   A.   Correct.
10  Q.   So what you told the hate group in May of
11  2022 was incorrect; is that true?
12  A.   Yes. Purposely.
13  Q.   So you purposely lied to those people about
14  this situation?
15  A.   No, that's not what I said.
16  Q.   Well, you said purposely.
17  A.   Yeah.
18  Q.   What did you mean?
19  A.   Purposely -- this hate group were kings and
20  queens of discovering documents that were connected to
21  me in any way, shape or form. This particular document
22  has multiple names on it; my name, Dori's name, my
23  mother's name, Tommy's name. And I thought that they
24  would harass those involved with me just like they've
25  been doing for the last couple years now because of the

1   article that Chris Kelly wrote. So my white lie was an
2   attempt to protect the group from trying to expose
3   anything further.
4        MR. HINTON: Okay. Let's go to the next
5   clip. Putting Clip 14 up.
6        (Video being played.)
7   BY MR. HINTON:
8   Q.   So, Phil, that clip -- and here we have a
9   picture of your Harvard certificate. Was that your
10  voice on that clip?
11  A.   It sounded like my voice was actually edited
12  a little bit. I don't know where that video came from,
13  but it sounded weird. But I did say that.
14  Q.   You did say you had a Harvard degree?
15  A.   Yes.
16  Q.   And you were sporting a Harvard sweatshirt?
17  A.   Well, I think that's why they asked me the
18  question. I didn't just volunteer that information.
19  That was a Q&A session and I was wearing the Harvard
20  shirt that I had purchased. So I think that's what
21  caused somebody to ask that question.
22  Q.   And so it wasn't correct, though, right? You
23  did not have a Harvard degree?
24  A.   From what I understood it at the time when I
25  said it, I did think I had a degree. And then when all

1   of the backlash came because of that comment, I realized
2   what I actually had was a certificate and not a degree.
3   But I referred to the picture that you just put on the
4   screen that I had on the wall behind me as a degree, but
5   it was not.
6   Q.   Okay. And you said in that video that you
7   have many degrees.
8   A.   The way I said that was anecdotal. It was,
9   kind of, I have "many" degrees. Kind of, like that. If
10  you re-listen to it, you'll hear the emphasis that I put
11  on that.
12  Q.   So you weren't being serious, right?
13  A.   I was being -- trying to be funny again. I'm
14  not really that funny. Sometimes my humor gets taken
15  the wrong way. I don't have many degrees. That's
16  something that I addressed later in that video. And,
17  again, that's why these videos are all out of context.
18  Because if you'd play that for another hour, you'll most
19  likely hear me say what I actually -- what the truth
20  actually was.
21  Q.   You don't have any college degrees, though,
22  right?
23  A.   No.
24  Q.   My statement's correct; yes?
25  A.   Yes, your statement's correct.

70 (Pages 274 - 277)

1  A.  Correct.
2  Q.  So this is obviously before May 21st of 2021
3  when you sued?
4  A.  Was that the date that I filed?
5  Q.  Yeah. It's either the 21st or the 24th.
6  A.  Yeah, so it would be before that date.
7      MR. KOLMAN: What page is that?
8      MR. HINTON: 476.
9  BY MR. HINTON:
10  Q.  So -- and we talked about this earlier. In
11  the middle of this post you said, "Please be patient
12  with me. I'm not going anywhere, but I've been advised
13  to halt the livestreams for multiple reasons; the
14  strength of my legal case and the safety for my family."
15  So is this what you were talking about earlier about
16  there was a time when I halted livestreams?
17  A.  Yes.
18  Q.  It wasn't because of Dori. We showed
19  livestreams you did after Dori talked to you about not
20  doing them anymore, right?
21  A.  No, not necessarily. It was partially
22  because of Dori. And as the legal case -- once I
23  realized that I did have a case, I was afraid that I was
24  going to say something that would damage the case. So
25  many people, Tim included, and other attorneys that I

1  talked to, once they learned the circumstances of my
2  show and all that, they told me I should probably not do
3  that anymore. And that was, obviously, the same advice
4  that Dori was -- not advice, but the same pleading that
5  Dori was offering me as well so... And on the back of
6  the article, things got really bad after that article
7  was written in February. So the end of February, the
8  second half of February as well as March had me afraid
9  for a little while.
10  Q.  So in this post, 476, you state, "Things are
11  very, very shaky right now at best and I am carefully
12  navigating the waters. I purchased an AR-15 today as
13  well as a handgun for my wife both for home/personal
14  protection. I've never owned a weapon until now." Did
15  I read that correctly?
16  A.  Yes.
17  Q.  And that's not true; is it? You did not
18  purchase an AR-15 and a handgun as you state you did
19  there?
20  A.  I did purchase an AR-15. I never purchased a
21  handgun for my wife, though. I said that as a deterrent
22  for people that might be -- because of the article,
23  might have some sort of malice against me thinking that
24  I'm a pedophile.
25  Q.  So let's look at ST1576. Keep that page in

1  your hand, but go to 1576.
2  A.  Okay.
3  Q.  Now, this the Affidavit of Probable Cause for
4  the criminal case filed against you for two false
5  statements regarding the purchase of firearms, correct?
6  A.  Correct.
7  Q.  And it says on February 17th, 2021, you
8  attempted to purchase a Stag Arms Model Stag 15 Tac 5.5,
9  6 millimeter rifle, correct?
10  A.  Correct.
11  Q.  You didn't actually get that rifle; did you?
12  A.  No.
13  Q.  Okay. Is that the same thing as the AR-15?
14  A.  No, that's a different model, but -- it is an
15  AR-15, but it's not the model that I ended up
16  purchasing.
17  Q.  Okay. Where did you get an AR-15 from?
18  A.  I don't remember his name, but it was a guy
19  in Dunmore.
20  Q.  And did you truthfully fill out the
21  application for that purchase?
22  A.  No. You don't need an application for a long
23  gun. I didn't know that.
24  Q.  Okay.
25  A.  The handgun you do, in Pennsylvania. A long

1  gun like an AR or a shotgun or something like
2  that -- long gun refers to the barrel length, I believe.
3  You don't need to fill out an application for that.
4  Q.  So when did you buy the AR-15?
5  A.  Did you say that this was posted in March?
6  Q.  It's some time before the lawsuit.
7  A.  It's possible that I bought -- I don't know
8  if I bought it prior to this application or before, but
9  I would think that I bought it prior to the application
10  at The Cabin and that this would have been my second
11  purchase. It's possible. But I was declined for that
12  purchase.
13  Q.  So after you were declined for that purchase,
14  did you then go buy the AR-15 in Dunmore?
15  A.  No, I believe it would have predated this
16  denial.
17  Q.  So you were attempting to get a second
18  AR-15-type rifle?
19  A.  Yes. I believe so, yes. From what I
20  remember, yes. This was a very bad time for me.
21  Q.  Now, you were out on bail in the bank
22  records/bad checks case at that time.
23  A.  No.
24  Q.  Yeah. You were charged in 2020 in the
25  Mariotti case.

73 (Pages 286 - 289)

1  A.     It's not true?
2  Q.     No.
3  A.     Okay. Good. Is Holeva his editor?
4  Q.     He's an executive editor. I'm sure you got
5  his name off the masthead. I don't think he was the
6  editor.
7  A.     Maybe somebody else needs to be added. I
8  don't know. Ultimately, though, I think the Scranton
9  Times is irresponsible because they put these people in
10  place and if they're allowing defamatory and slanderous
11  articles like that to be written, they're responsible
12  for their content. They print it.
13  Q.     Now, would you agree that based on everything
14  you know, Brienna did initially tell the police that she
15  was involved in a sexual relationship with you?
16  Initially, when she went to the police?
17  A.     I believe she initially did, yeah.
18  Q.     And then you received information that she
19  tried to recant that story?
20  A.     Several times.
21  Q.     And are you also aware that the detectives,
22  Michelle Mancuso particularly said to her, Brie, we have
23  the text messages between you and Phil. We know it's
24  still ongoing? Were you aware of that?
25  A.     I was aware -- I wasn't aware of that

1  specifically, but I was aware that they declined her
2  request to recant. And they said -- this is what she
3  told me. They said that if you recant, we may have to
4  file against you for filing a false police report.
5  That's a felony in Pennsylvania. And as a 16,
6  17-year-old kid, I don't know what I would have done in
7  that situation, which is why I didn't necessarily blame
8  Brie for what happened after that. I believe that there
9  was also -- I don't want to call it conspiracy, but also
10  some sort of influence from the DA's Office by the hand
11  of Michelle Mancuso or Justin Leri or Kolcharno that
12  stopped Brie from doing the right thing before it got
13  too far. She pled the Fifth Amendment on the stand to
14  reverse all of that.
15  Q.     Did you know in advance that she was going to
16  plead the Fifth Amendment on that day?
17  A.     No.
18  Q.     You didn't know?
19  A.     I was surprised. Joe was very surprised.
20  Oh. I'm sorry. There were rumors circulating that Brie
21  had been telling people that she was advised by counsel,
22  which I never knew who it was, for her to get out of
23  this scot-free, to plead the Fifth Amendment that day.
24  So Joe and I were actually aware that it may happen.
25  When it happened, we were very surprised because we

1  heard a lot of rumors during the case that don't
2  necessarily pan out the truth. But, yes, I did -- I was
3  made aware through rumblings, private investigator as
4  well as Facebook and different comments that you saw in
5  different areas, that she was thinking about doing that.
6  Q.     Phil, who -- I questioned you on February 6th
7  in front of Judge Minora about the financial opportunity
8  that you were offering to Brie in late May of 2021, I
9  believe it was.
10  A.     Yep.
11  Q.     2022. I forget which one. Tell me again
12  what the financial opportunity is that you were offering
13  her.
14  A.     It would have been -- I don't think at that
15  time -- if it was '21, it could have very well been 7K
16  Metals. It would have been '21? So it was probably 7K
17  Metals.
18  Q.     I'm sorry. It was not '21. It
19  was 2022. It was not 7K Metals. Because 2021, you
20  started 7K Metals after you came out of jail?
21  A.     Correct.
22  Q.     So you came out of jail in August.
23  A.     So it would have been May of '22?
24  Q.     May of '22. Like, May 28th, you sent a text
25  to her about a unique financial opportunity.

1  A.     Uh-huh.
2  Q.     So you had already gotten 7K Metals going.
3  A.     Yeah, so it wasn't 7K.
4  Q.     Yeah. It wasn't Goldco, either, because --
5  A.     No, it couldn't have been Goldco. It was
6  most likely Tax Refund -- or Max Refund, rather.
7  Q.     Yeah, but that's not a multi-level marketing
8  company.
9  A.     Oh, in this case, it would have been. So
10  Rumble and I ended up partnering with a company that's
11  called EZ-ERC. EZ-ERC is a massive
12  six-hundred-million-dollar ERC benefit company. There
13  were conversations between me and Rumble of whether we
14  partner with a massive company like that or I put my own
15  team together and instead of only getting a portion of
16  the commission from EZ-ERC, we get all the commission.
17  And that was a big difference; huge. Millions and
18  millions of dollars huge. Ultimately, I ended up
19  deciding that it was easier and probably not worth my
20  time to form another team, go through another set of
21  leads, go through another scheduling calendar, manage
22  all that. I was trying to take things off of my plate
23  so I could concentrate more on my family, not add new
24  things. So at the time that I was talking to Brie about
25  it, the way we were going to structure the team was, in

1  a sense, she would get the maximum of commission based
2  on our structure. I wanted to help Brie financially if
3  I could.
4  Q.  Okay. And you never set up a business to
5  fill her in like that, correct?
6  A.  No. Subsequently?
7  Q.  Yeah.
8  A.  No.
9  Q.  Okay. So, you know, am I correct that
10 there's nobody else that you've filled into Brie's slot
11 to make a lot of money?
12 A.  No, that particular business didn't even --
13 it wasn't even structured that way. We outsourced to
14 the larger company. I still get commission, but no one
15 else does.
16 Q.  No one else does?
17 A.  That's right. It's just me. It's much
18 smaller too but...
19 Q.  As it turns out, there was no position for
20 Brie?
21 A.  At the time that I said it, there was. As it
22 turns out --
23 Q.  You were thinking about it, but you didn't
24 put it into motion?
25 A.  Well, I wouldn't say I didn't put it into

1  motion. I would say that I chose a different path than
2  what I was talking to Brie about. It just didn't -- it
3  wasn't the best business model to do it that way. It
4  would have been beneficial to not only Brie, but
5  everybody else that I was going to put on my team. But
6  it would have required a lot more work for me and I
7  just -- again, I was trying to subtract, not add.
8  Q.  But as it turns out, you didn't create a team
9  at all, right?
10 A.  No, because we part -- well, I do have a
11 team, yeah. It's EZ-ERC Company.
12 Q.  Right.
13 A.  Those people. They're my team technically.
14 Q.  But nobody like Amanda Turoni or nobody like
15 that?
16 A.  No. No. No. No, we didn't go that route
17 ultimately.
18 Q.  All right. So, Phil --
19 A.  Tim, may I on the same topic? It could have
20 also been Lifewave. I don't remember what I was talking
21 talk to Brie about in that month. But I do remember in
22 2022, I was going to start an additional MLM company
23 called Lifewave. They have patches that you wear that
24 stimulate stem cells. And it's an MLM company similar
25 to 7K except a lot easier.

1  7K caught wind of me wanting to do that
2  and talked me out of it. So I don't know -- I don't
3  remember what specific company I was talking about
4  getting Brie involved in. All I knew is either of the
5  companies that I would have had her involved in would
6  have been financially beneficial to her without doing
7  very much work.
8  Q.  Phil, can you name for me any persons who
9  have refused to do business with you because they read
10 Chris Kelly's article?
11 A.  Oh, boy. I'd have to go back and look. I
12 can't name them at this time. There have been hundreds,
13 if not more than that, that would send me an e-mail.
14 There's an entire hate group that refuses to do business
15 with me and tells lies about me all the time because
16 they're convinced that I'm a pedophile because of your
17 client's article. That hate group didn't exist prior to
18 the article. There were no hate groups and my career
19 was doing just fine. And I'd probably still be in it
20 today. It turns out that I turned my life around and
21 accelerated things and I'm doing better now, as you said
22 earlier. But to name a specific person, which I most
23 likely can do if I went back and looked, I think the
24 greater number is the unquantifiable people that will
25 not approach me and say, hey, I'm not doing business

1  with you. Most people aren't going to say anything,
2  probably 80, 90 percent of people.
3  Q.  Well, I just want to know, can you identify
4  any persons by name that won't do business with you
5  because of the Chris Kelly article?
6  A.  Yeah. I've had people quit 7K.
7  Q.  Okay. Can you give me their names?
8  A.  I could. Not right now. I wasn't prepared
9  to bring names today. But I could get names for you,
10 sure.
11 Q.  Okay. I need contact information for them
12 too.
13 A.  Sure. Absolutely. I mean, I don't know if I
14 have contact information for some of the people. There
15 may have just been a message on Telegram where somebody
16 said something. They don't go by their real names on
17 Telegram often. So I'll get you what I have; you could
18 take it from there.
19 Q.  Okay. So I remember you making statements on
20 social media that you said, I was a very bad person and
21 then I found God.
22 A.  Uh-huh.
23 Q.  Do you remember saying that?
24 A.  Yes.
25 Q.  When did you find God?

78 (Pages 306 - 309)

1  A.    When?
2  Q.    Yes. Like, when did you have this
3  conversion? Was it after jail, before jail?
4  A.    Around then. I lost my family. I didn't
5  see -- didn't see my boys for nine months.
6  Q.    Well, Phil, when you were sending Brie
7  pictures of you naked masturbating in March of 2021
8  after Brie left you --
9  A.    Dori.
10 Q.    Were you -- after Dori left you, at that
11 point in time, you hadn't found God yet?
12 A.    No.
13 Q.    Okay.
14 A.    It was a period of the article, that's when
15 everything changed, between the article and jail or
16 slightly after my release from jail that I was in
17 terrible shape mentally. I sought help because of the
18 shape that I was in. You have the reports. I was
19 afraid of harming myself. I was afraid of going out in
20 public. People, once again, for a case that was some
21 12, 13 years old, thought I was a pedophile. And I was
22 afraid and I drank a lot, stayed home a lot. Wasn't
23 communicating with my kids because of it -- not because
24 of it but because Dori seemed to think that the article
25 was a deterrent for the kids to be with me because she

1  didn't know exactly what I thought, is somebody going to
2  knock on my door and blow me away.
3  Q.    Phil, can you state for me the identity of
4  any persons that read the Chris Kelly article and think
5  less of you because they read that article?
6  A.    I think you already asked me that. In fact,
7  you just asked me that and I said that as I sit here
8  now, I don't have their names. But there have been
9  numerous people in the last two-and-a-half years that
10 the article has been published and is still published
11 that think the article is accurate. And it has caused
12 hate groups to form which drive by my house, send nasty
13 messages to me, my friends, my in-laws, my new in-laws.
14 Anybody that I tag on Facebook, all sorts of messages
15 get sent to all of these people, including messages to
16 me. And I will absolutely share that list with you. Do
17 I have it right here and I can say, here you go? No.
18 But it's been bad.
19 Q.    Phil, you've said your damages are not able
20 to be calculated.
21 A.    I think what I said is it's unquantifiable.
22 But yes.
23 Q.    And that's your truth, that they're
24 unquantifiable?
25 A.    A hundred percent. How would I prove how

1  many people don't follow me because of the article?
2  Q.    Do you know, Phil, that in this case, you've
3  already stipulated that you have no economic damages?
4  A.    I don't need economic dam -- my income has
5  gone up since your article.
6  Q.    Right.
7  A.    So I'm not suing for economic loss in terms
8  of that. I'm suing for what the article has already
9  done and will do in the future. That article has been
10 published now and on that website for two-and-a-half
11 years. How do I know that one of my children isn't
12 going to go to a birthday party some day and say -- and
13 get called, hey, your dad's a pedophile. Can you put a
14 number on that? Because I can't. It's unquantifiable.
15 Q.    Phil, do you have any persons that you were
16 friends with before the article that said, Phil, I'm not
17 going to be friends with you anymore because I read what
18 Chris Kelly wrote and I believe it?
19 A.    Tim, that's not -- that's not something that
20 happens in real life. People don't come to you and say,
21 hey, I'm no longer going to be friends with you because
22 of an article that I read. They just stop talking to
23 you. And yes, that has happened dozens, if not hundreds
24 of times, with my friends from high school, people in
25 the area that I used to do business with, many times.

1  Q.    Can you name them?
2  A.    You just asked me that four times in the last
3  five minutes.
4  Q.    Well --
5  A.    Just now I just remembered one, so happens.
6  Q.    Who is it?
7  A.    I was still doing real estate and it was
8  Freddie Gray. Freddie Gray had a house on -- what the
9  heck street was that -- in Old Forge, his wife Emily,
10 Emily Gray. They cancelled their listing with me. A
11 $200,000 house. Again, I'm not suing for economic loss.
12 You know that, you said that. I'm suing for what the
13 damage that your article has done to my family and to me
14 for years and years to come.
15 Q.    Medically speaking, I think we've already
16 established that you haven't had any treatment after
17 those two therapy visits in John Kuna's office, correct?
18 A.    I started to see a little bit more clearly
19 after my 30 days in jail. I met some good friends in
20 there, believe it or not, and a lot of them help talk me
21 through things. Amanda Turoni helped -- helped me a lot
22 on a friendship basis. And I think the overall harm --
23 the psychological harm that I was going through -- the
24 psychological period that I was going through, kind of,
25 got better after I got out. So I didn't feel the need

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830