# EXHIBIT "I"

1                   IN THE COURT OF COMMON PLEAS
2                OF LACKAWANNA COUNTY, PENNSYLVANIA
3
4                            *   *   *
5       PHILIP GODLEWSKI,        : CIVIL DIVISION
                Plaintiff        :
6                                :
                                 :
        vs                       : JURY TRIAL DEMANDED
7                                :
        CHRIS KELLY, et al.,     :
8               Defendants       : NO. 2021-CV-2195
9
                             *   *   *
10
11                   Oral deposition of DOROTHEA "DORI"
12      GALLAGHER, taken at the Lackawanna County Bar
13      Association, 233 Penn Avenue, Scranton, Pennsylvania
14      18503, on Thursday, July 20, 2023, beginning at 10:06
15      a.m. before Pamela Pratt, Court Reporter and Notary
16      Public in and for the Commonwealth of Pennsylvania.
17
18
19                           *   *   *
20
21                   VERITEXT LEGAL SOLUTIONS
                      MID-ATLANTIC REGION
22                    5100 Tilghman Street
23                        Suite 205
24              Allentown, Pennsylvania 18104
25                      (610) 434-8588

EXHIBIT
1

1  APPEARANCES:
2    TIMOTHY BOWERS, ESQUIRE
     KOLMAN LAW, PC
3    414 Hulmeville Avenue
     Penndel, Pennsylvania 19047
4    (844)537-2529
     TKolman@Kolmanlaw.com
5
     -- Representing the Plaintiff
6
7    J. TIMOTHY HINTON, ESQUIRE
8    HAGGERTY HINTON & COSGROVE, LLP
9    1401 Monroe Avenue, Suite 2
10   Dunmore, Pennsylvania 18509
11   (570)344-9845
12   timhinton@haggertylaw.net
13
14   -- Representing the Defendants
15
16
17   JOHN R. WILLIAMS, ESQUIRE
18   WILLIAMS LAW
19   700 Vine Street
20   Scranton, Pennsylvania 18510
21   (570)309-6857
22   jrwesq@johnwilliamslaw.com
23
24   -- Representing the witness
25     Dorothea Gallagher

1            I N D E X
2
3            * * *
4
5  WITNESS: Dorothea "Dori" Gallagher
6
7  QUESTIONED BY:          PAGE
8
9  Mr. Hinton      4, 102
10 Mr. Bowers         98
11
12
13
14
15
16
17        E X H I B I T S
18
19            * * *
20
21
22                    MARKED
23 NUMBER   DESCRIPTION      FOR ID
24
25   1   Exhibit binder       4

1            * * *
2       (It is hereby stipulated and agreed by
3   and among counsel for the respective parties that
4   sealing, certification, and filing are waived and that
5   all objections, except as to the form of the question,
6   are reserved until the time of trial.)
7       (Exhibit 1 binder was premarked for identification.)
8            * * *
9       DOROTHEA "DORI" GALLAGHER,
10      having been first duly sworn, was
11      examined and testified as follows:
12           * * *
13           EXAMINATION
14  BY MR. HINTON:
15   Q.    Please state your full name.
16   A.    Dorothea Gallagher Godlewski.
17   Q.    Okay.  Legal name right now is Dorothea --
18   A.    Dorothea Gallagher.
19   Q.    Gallagher.
20   A.    Yes.
21   Q.    Is it okay if I call you Dori?
22   A.    Yes.
23   Q.    Dori, my name's Tim Hinton.  I represent The
24  Scranton Times, Chris Kelly and Larry Holeva.  They're
25  the defendants in a lawsuit brought by your ex-husband,

1   Phil Godlewski.
2    A.    Okay.
3    Q.    I'm going to take your deposition today.
4   Have you ever had your deposition taken before?
5    A.    No.
6    Q.    Okay.  You testified in the custody case with
7   Phil, though, right?
8    A.    Yes.
9    Q.    This is similar.
10   A.    Oh, okay.
11   Q.    Similar to a deposition.  That was in court.
12  So it's a question-and-answer session under oath.
13  You've got to tell the truth.  You've been sworn in just
14  as if you're in a courtroom, okay?
15   A.    Okay.
16   Q.    There's a couple of ground rules for
17  depositions.  You have to verbalize all of your
18  responses rather than shaking your head or nodding your
19  head, okay?
20   A.    Okay.
21   Q.    You have to let me finish my question before
22  you begin talking so that the court reporter can get
23  down everything, okay?
24   A.    Okay.
25   Q.    If you answer my question, can we assume that

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 you heard and understood my question?
2 A. Yes.
3 Q. Okay. If you are confused by any of my
4 questions, you don't understand it, would you please let
5 me know that so I can rephrase?
6 A. Okay.
7 Q. All right. Great. So Dori, what is your
8 address right now? Where do you live?
9 A. ███████████████████████
10 Q. Okay. Is that the house that you and Phil
11 owned together at one point in time?
12 A. Yes.
13 Q. Are you the sole owner of that house now?
14 A. Yes.
15 Q. And what's your date of birth?
16 A. ████████.
17 Q. And Phil's date of birth is ███████, 1983?
18 A. Yes.
19 Q. So Phil would be three-years-and-four-months
20 older than you?
21 A. Yes.
22    MR. HINTON: Now, one of the things we
23 didn't talk about -- Tim, we're going to do the usual
24 stipulations for the deposition?
25    MR. BOWERS: Yeah. And we might want to

1 just have a little discussion quick about the procedure
2 for --
3    MR. HINTON: Spousal privilege.
4    MR. BOWERS: -- spousal immunity -- or
5 spousal privilege issues.
6    MR. HINTON: The ground rules we agreed
7 to in connection with the Court Order and your e-mail
8 about the five-step procedure are fine by me. We both
9 have that e-mail. I would only state that if you are
10 asserting spousal privilege to any of my questions, that
11 you put that on the record now. Those won't be
12 preserved, okay?
13    MR. BOWERS: Right. To the extent that
14 we're going to assert it, we'll assert it today as the
15 question is asked.
16    MR. HINTON: Very good.
17    MR. WILLIAMS: I don't mean to
18 interrupt. You're going assert that privilege?
19    MR. BOWERS: We are going to assert that
20 privilege on a question-by-question basis.
21    MR. WILLIAMS: Okay.
22    MR. BOWERS: As some may be covered,
23 some may not.
24    MR. WILLIAMS: So I'm not going -- I
25 won't make any objections unless I see something

1 egregious occur that Mr. Hinton does, okay?
2    MR. HINTON: Very good. Thank you.
3 BY MR. HINTON:
4 Q. Dori, have you had any conversations with
5 Phil's attorneys in preparation for today's deposition?
6 A. No.
7 Q. Did Phil send you any text messages or
8 e-mails about today's deposition?
9 A. Not really, no. Just, kind of, that it was
10 today and the time and -- I mean, we didn't really
11 discuss what would happen or anything like that.
12 Q. Did he talk to you about some of the
13 questions I may ask you about Brienna or --
14 A. No, not really. I think he said something
15 about the Facebook conversations that I had had with
16 Brie will most likely come up. But that was, pretty
17 much, it.
18 Q. Okay. When was the Facebook conversation
19 with Brie?
20 A. That was -- oh, boy. That was years ago. I
21 don't know exactly when. But I had -- I can't
22 remember -- I can't even remember if I had messaged her
23 first or she messaged me. But it was basically a
24 conversation about, you know, what was going on between
25 them. And she had just said that he was like a big

1 brother to her. He was helping her through a hard time
2 and nothing ever happened and I had nothing to worry
3 about and that was it.
4 Q. Do you still have that Facebook conversation?
5 A. I do not. I don't even have that account
6 anymore.
7 Q. Have you looked for it, see if you have a
8 copy of it somewhere?
9 A. No.
10 Q. All right. So when did you and Phil talk
11 about Brie and this conversation leading up to today's
12 deposition?
13 A. That was a while ago. I think it was
14 before -- before I even, kind of, knew when this was
15 going to happen.
16 Q. "This" meaning this deposition?
17 A. Yeah. Like, I was going to come. I'm, like,
18 well -- because when he had started the lawsuit, I knew
19 that he had mentioned my name in the lawsuit. So I
20 said, like, I want nothing to do with this. Why did you
21 include me? Whatever. And he said, the only thing
22 that's going to happen is what we're doing today. And I
23 said, well, what's going to happen there? And they said
24 that -- he had said that, like, things that I know, like
25 the Facebook thing may be asked. But that was -- that

1 was it.

2 Q. All right. So you live at Huckleberry,
3 right?

4 A. Yes.

5 Q. And you live there with your two sons?

6 A. Yes.

7 Q. And is there a mortgage on the house there?

8 A. No.

9 Q. Did Phil pay that mortgage off as part of the
10 divorce?

11 A. Yes.

12 Q. How much was the payment?

13 A. I don't know.

14 Q. Give me a rough idea.

15 A. I honestly have no idea. I really don't
16 know.

17 Q. Over a hundred thousand dollars?

18 A. Over, yeah. Yeah.

19 Q. Over $200,000?

20 A. Probably -- we were under contract to buy it
21 for two-something. So yeah, it was over 200. Yeah.

22 Q. That you owed on the house and Phil paid off?

23 A. He paid it off before it was transferred to
24 me.

25 Q. When did he pay it off?

1 A. I believe when he bought it. So we were in a
2 rent-to-own agreement when I had lived with him. And
3 before I moved out, we were still under that agreement.
4 So he bought the house after I had left. And he, I
5 believe, had a mortgage on it and he only had to pay off
6 a hundred thousand dollars after that. So he didn't
7 really pay anything when he gave it to me. He, kind of,
8 just gave me the house as a part of the divorce.

9 Q. Okay. He deeded the house to you loan-free?

10 A. Yes.

11 Q. Okay. So you moved out of that house when
12 you filed for divorce?

13 A. Before I filed. But yes.

14 Q. Okay. February of 2021, you moved out?

15 A. Yes.

16 Q. And you took the kids with you?

17 A. Yes.

18 Q. Did you go to Melissa's?

19 A. Yes.

20 Q. How long did you live with Melissa?

21 A. I believe I was there until April -- around
22 April, I moved into my own place. But I was there for
23 about three months.

24 Q. As part of the divorce, Phil transferred a
25 house that was in just his name to just your name?

1 A. Yes.

2 Q. Did he buy that car for you that you're
3 driving out there?

4 A. No.

5 Q. Okay. The Volkswagen I saw you pull up in.

6 A. Yeah. No.

7 Q. Was there any cash settlement as part of the
8 divorce?

9 A. No.

10 Q. He didn't give you a check?

11 A. Huh-uh.

12 Q. No payments?

13 A. Nope. Just the child support. That's it.

14 Q. Is that still a thousand dollars a month?

15 A. No.

16 Q. How much is it now?

17 A. 12,500.

18 Q. Per month?

19 A. Yes.

20 Q. And when did he start paying 12,500 per
21 month?

22 A. A little over a year ago, probably. Yeah.
23 Sorry.

24 MR. WILLIAMS: Those are public records,
25 I think.

1 THE WITNESS: Yeah.

2 BY MR. HINTON:

3 Q. So you work at Great -- what's it called,
4 Great Iron -- what's the name of your --

5 A. Iron Valley.

6 Q. Iron Valley.

7 A. Yes.

8 Q. With Jolen Brennan?

9 A. Yes.

10 Q. And you're a licensed Realtor?

11 A. Yes.

12 Q. How long have you been a licensed Realtor?

13 A. Probably about five years now.

14 MR. HINTON: Tim, here's some exhibits
15 I'm going to use during the deposition.

16 BY MR. HINTON:

17 Q. So I want you to turn to a page in that
18 booklet I just gave you.

19 A. Okay.

20 Q. There's Bates stamps on the bottom right-hand
21 portion of them.

22 A. Okay.

23 Q. And we're going to go to Page 2155. Do you
24 see ST2155?

25 A. Oh, yes.

4 (Pages 10 - 13)

1 Q. Do you see a sheet there with your name on
2 it?
3 A. Yes.
4 Q. And it indicates that you were to receive
5 commissions for the sale of copper, bronze, commission
6 payouts. Do you see that, from 7K Metals?
7 A. Yes.
8 Q. And did you receive $4,500 that's shown on
9 ST2155?
10 A. I did not.
11 Q. Do you know who did receive that money, if
12 anybody?
13 A. No.
14 Q. Did you ever get a 1099 form from 7K Metals?
15 A. I did not.
16 Q. Have you ever gotten any money from 7K
17 Metals?
18 A. No.
19 Q. Have you had conversations with Phil about
20 using your name in his multi-level marketing business
21 with 7K Metals?
22     MR. BOWERS: Objection. You need to
23 establish a time to determine spousal privilege.
24 BY MR. HINTON:
25 Q. Well, first of all, have you ever had any

1 conversations, yes or no, and then we'll go into that.
2 A. Yes.
3 Q. Okay. Was it while you were married to Phil?
4 A. Yes.
5     MR. HINTON: Okay. And if I ask her
6 what those conversations are, you're asserting spousal
7 privilege?
8     MR. BOWERS: We are.
9     MR. HINTON: Okay.
10 BY MR. HINTON:
11 Q. Have you had any conversations with Phil
12 after the divorce about him signing you up with 7K
13 Metals?
14 A. No.
15 Q. Okay. And your testimony is, you've never
16 received any money from 7K Metals?
17 A. Correct.
18 Q. Where did you and Phil first meet?
19 A. I worked at a tanning salon on Moosic Road in
20 Old Forge.
21 Q. Was that in about 2005?
22 A. Yes, summer of 2005.
23 Q. And was he a customer there?
24 A. Yes.
25 Q. And did you start dating after you met?

1 A. Yes.
2 Q. You started dating in 2005?
3 A. That summer, yeah.
4 Q. And what was Phil doing at that time?
5 A. He had worked at his family's gas station.
6 Q. Osmolia's?
7 A. Osmolia's, yep.
8 Q. The Shell station?
9 A. Yeah.
10 Q. And they had a Subway shop there too?
11 A. Yes. Yeah.
12 Q. So in 2005 when you met him, he was working
13 at Osmolia's and in the Subway store?
14 A. I don't believe he worked in the Subway
15 store. Just Osmolia's, like, service station.
16 Q. Was he also going to school?
17 A. Yes.
18 Q. Was he at the University of Scranton then?
19 A. Yes.
20 Q. And then he later went to Johnson?
21 A. Johnson? Yeah. Yeah, he did. It was a long
22 time ago.
23 Q. And before you had met Phil, had you heard
24 about Phil before you met him?
25 A. No, not really.

1 Q. Okay. And how soon after you met did you
2 begin dating him?
3 A. I don't know. A couple weeks, probably.
4 Q. And were you together with him from that
5 point until you married him?
6 A. Yeah.
7 Q. In 2012?
8 A. Yeah.
9 Q. September?
10 A. Yep.
11 Q. All right. So in 2005, how old were you at
12 that time?
13 A. I had just graduated, so 18.
14 Q. Okay. And he was over 21?
15 A. He was.
16 Q. When you first started dating him, what did
17 he tell you about his past?
18 A. That he played baseball and just, like,
19 normal stuff; baseball, his family store, we talked
20 about that. Just basic -- basic stuff.
21 Q. Did he tell you he went out to Duquesne
22 University?
23 A. Yes.
24 Q. To play baseball?
25 A. Yes.

1  Q.  He stayed out there for a year?
2  A.  Yes.
3  Q.  And did he tell you he never actually played
4  baseball on the team?
5  A.  He did not.
6  Q.  Was it your understanding that he actually
7  played a game of baseball for Duquesne University?
8  A.  Yeah.
9  Q.  He never told you that he never got past the
10 spring workouts for baseball?
11 A.  No.
12 Q.  What else did he tell you about his past?
13 A.  That he -- as far as, like, at that time?
14 Q.  Yeah.
15 A.  He blew his arm out at home and that was why
16 he couldn't go back to school -- well, not why he
17 couldn't go back to school but why he did not go back to
18 school for baseball.  He also had said that he didn't go
19 back because of his ex-girlfriend.
20 Q.  What was her name?
21 A.  Jessica Turi.
22 Q.  Spell the last name.
23 A.  T-U-R-I.  I believe she's married now.
24 Q.  Who is she married to?
25 A.  I'm not sure.

1  Q.  How old is Jessica?
2  A.  She's older than me.
3  Q.  Closer to Phil's age?
4  A.  Yeah.
5  Q.  Did Phil tell you that he did some bartending
6  out in Pittsburgh?
7  A.  Yes.
8  Q.  And did he tell you where he bartended in
9  Pittsburgh?
10 A.  He probably did, but I don't remember.
11 Q.  Okay.  Did he go to bartending school in
12 Pittsburgh?
13 A.  I'm not sure.
14 Q.  Okay.  Did he ever tell you when you started
15 dating him that he worked for the CIA?
16 A.  No.
17 Q.  Did he ever tell you he worked for the NSA?
18 A.  No.
19 Q.  Did he ever tell you that he worked for the
20 FBI?
21 A.  No.
22 Q.  Did he ever tell you that he worked for the
23 intelligence community?
24 A.  No.
25 Q.  Have you ever seen any evidence during your

1  marriage or during the time you've known Phil that he
2  worked in the intelligence community?
3  A.  No.
4  Q.  Do you know whether Phil ever graduated from
5  college?
6  A.  No.  I don't think he did as far as I know,
7  no.
8  Q.  Okay.  So it's your testimony, based on
9  everything you know about Phil and all of the years
10 you've been with him, he never graduated from college?
11 A.  No.
12 Q.  That's a correct statement I'm making, right?
13 A.  Yes.  Yeah.
14 Q.  Has Phil ever told you that he met Donald
15 Trump?
16 A.  No.
17 Q.  When did you and Phil start living together?
18 A.  We -- oh, boy.  It was right around when he
19 started real estate.  His dad had bought a house for us
20 in Scranton and then I had bought it off of him.  I
21 don't -- I would say 2006, 2007.  I'm not exactly sure.
22 Q.  Let's look at ST473, please.
23 A.  473?
24 Q.  Yeah.  This was in a newspaper, a property
25 transaction from John and Nancy Godlewski to Dorothea

1  Gallagher and Phil Godlewski, property at 430 Cayuga
2  Street in Scranton for 57,500.
3  A.  Yes.
4  Q.  And was that was a deed transfer from Phil's
5  dad -- John and Nancy to you and Phil?
6  A.  So we purchased the property from them, yes.
7  Q.  In 2009?
8  A.  Yes.
9  Q.  Did you live in that house before you
10 purchased it?
11 A.  Yes.
12 Q.  For how long?
13 A.  I would say a year or two, maybe.  I'm not a
14 hundred percent sure.  But when they had bought the
15 property, we moved in -- when John and Nancy had bought
16 the property.
17 Q.  Okay.  How long did you and Phil live at
18 Cayuga Street?
19 A.  We were there for -- oh, boy.  This was
20 2000 -- when was this?
21 Q.  2009 is the deed transfer.
22 A.  2009.  I think we bought our house in Avoca
23 in -- I don't know, 2013, maybe, somewhere around there.
24 So we lived in Cayuga and then we moved to Grove Street
25 in Avoca.

6 (Pages 18 - 21)

1  Q.    Okay. Did you buy that house in Avoca?
2  A.    Phil had purchased it, yes, but together we
3  bought it.
4  Q.    Okay. Which house did you sell to Luann
5  Holmes?
6  A.    This one, Cayuga Street. That's my mom.
7  Q.    That's your mom?
8  A.    Yes.
9  Q.    Okay. So from the time you started living
10 together at Cayuga Street a year or so before the deed
11 transfer, you lived with Phil except for some
12 separations up until February of 2021?
13 A.    I don't think we -- I mean, we had very
14 minimum separations. If -- I mean, it would be, like,
15 maybe a day or something. We never really --
16 Q.    You'd go to Melissa's?
17 A.    Usually, he would leave.
18 Q.    Where would he go to?
19 A.    Hotel. I don't -- I don't really know.
20 Q.    Did that happen during the Miranda Polidori
21 situation?
22 A.    Yes.
23 Q.    How long did he leave the home because of his
24 affair with Miranda?
25 A.    About two weeks.

1  Q.    Okay. And did you tell him you were going to
2  file for divorce at that point in time?
3  A.    No.
4  Q.    You never threatened to file for divorce
5  before?
6  A.    I did not. I told him that we could figure
7  it out. We had two small kids at the time. That was
8  before I knew it was actually true.
9  Q.    This affair with Miranda?
10 A.    Yeah. I kept questioning it and I told him
11 if it's true, just tell me it's true and we'll figure it
12 out. But then when I found out that it was actually
13 true, that was when I had asked him to leave.
14 Q.    And he left for about two weeks?
15 A.    Yeah.
16 Q.    And how did you resolve the situation after
17 that?
18 A.    We were -- we had a family trip planned to a
19 beach and I asked him to still come. We had two small
20 kids. And I don't know. We just, kind of, like, talked
21 everything out and decided to, you know, get into
22 marriage counseling and try to fix, you know, what was
23 going on.
24 Q.    Who did you go to for marriage counseling?
25 A.    What the heck was her name? She's in Clarks

1  Summit. I can't think of her name right now.
2  Q.    Was it Vennie?
3  A.    No.
4  Q.    Vennie, V-E-N-N-I-E, Katherine?
5  A.    Katherine. Yes, Katherine. Yes. That's her
6  first name. I can't remember her last name, though.
7  But yes.
8  Q.    And what years were the marriage counseling
9  visits, 2017 or '18?
10 A.    Yeah. Because ███████ was a baby, yeah.
11 Q.    So let's turn to ST474. So this is the
12 announcement in the newspaper about your engagement to
13 Phil; is it not?
14 A.    Yes.
15 Q.    And you got engaged to Phil in November of
16 2007?
17 A.    Yeah, sounds like.
18 Q.    When you and Phil were still engaged, did you
19 often talk about some day moving to California, San
20 Diego in particular? Do you remember that?
21 A.    I don't remember that.
22 Q.    I'm going to have you turn to ST2844. So,
23 Dori, these are text messages that have been produced in
24 the case from the criminal case between Phil and
25 Brienna -- I'm go to call her Brie for short.

1  A.    Okay.
2  Q.    And in these text messages on March 10th
3  of -- I'm sorry, March 6th of 2010, there's a
4  conversation between Brie and Phil about some post that
5  was made about you and Phil moving to San Diego. So I'm
6  asking, does that refresh your recollection that you and
7  Phil would post Facebook posts or something about moving
8  to San Diego some day, somewhere warm?
9  A.    I don't remember that.
10 Q.    Is it possible?
11 A.    That he made a Facebook post about us moving?
12 Q.    You made a Facebook post, I believe.
13 A.    No, I don't think -- I don't -- I don't
14 remember that at all, no.
15 Q.    You don't remember any social media posts
16 about --
17 A.    Us moving to there?
18 Q.    Yeah.
19 A.    No.
20 Q.    Did you ever go to California?
21 A.    No.
22 Q.    Did you ever go to Florida?
23 A.    Yes.
24 Q.    Did you go to Florida with Phil?
25 A.    Yes.

1  Q.      Did you and Phil have some dream about moving
2  to Florida some day?
3  A.      I mean, maybe. I don't know. I mean, I
4  don't think so. I don't really think that -- no.
5  Q.      Do you know Phil's mother's birth date,
6  Marie?
7  A.      I know it's January.
8  Q.      January 8th?
9  A.      Yes.
10  Q.      Okay. You remember that?
11  A.      Yeah.
12  Q.      And that's Marie, right.
13  A.      Marie, correct.
14  Q.      And do you see Phil's text message
15  about two-thirds of the way down incoming? "It appears
16  that you're talking about a January 8th post that I
17  referred to moving to San Diego. But yeah, I guess
18  that's close to a week ago, whatever. Text me when
19  you're over it." He's talking to Brie. And then two
20  below that he says, "It was ▮▮▮▮▮▮. I just looked
21  and that was two days before we started talking. I know
22  because January 8th is my mom's birthday and we started
23  after that." Do you see that?
24  A.      Uh-huh.
25  Q.      Does that text message sound like Phil, given

1  the years of texting you've had with him?
2  A.      Yeah.
3  Q.      Okay. So your son ▮▮▮ he was born 2015?
4  A.      Yes.
5  Q.      And ▮▮▮ was born in 2017?
6  A.      Yes.
7  Q.      And what's the custody arrangement now
8  between you and Phil?
9  A.      60/40.
10  Q.      You have 60 percent?
11  A.      Yes.
12  Q.      And do you allow the boys to travel with him
13  to Arizona and Nevada?
14  A.      Unfortunately, yes.
15  Q.      Okay. And when you filed for divorce, you
16  wanted Phil to only have supervised custody at that
17  time; is that correct?
18  A.      Yes.
19  Q.      You had concerns about Phil?
20  A.      Yes.
21  Q.      So just to nail down the dates here, if you
22  turn to ST3871, that's the deed from Dorothea and Phil
23  Godlewski to Luann Holmes, your mother, in 2016. Do you
24  see that?
25  A.      Yes.

1  Q.      Is that when you moved out of the --
2  A.      Cayuga into -- no. So we had moved into
3  Grove Street. My mom moved into Cayuga, but it took
4  her, I think, a year or so to be able to purchase the
5  property from us.
6  Q.      Okay. All right. I want you to turn to the
7  back of the note -- or back of the exhibits. There's a
8  hearing transcript from a hearing in front of Judge
9  Minora on February 6th, 2023 where Phil testified. And
10  I want to direct your attention to Page 83.
11  A.      Okay.
12  Q.      So I want you to follow along in the
13  testimony. I'm questioning Phil on Page 83 on Line 19
14  down at the bottom.
15  A.      Okay.
16  Q.      I said, "Okay. Well, let's get that on paper
17  here. When was your recent sexual relationship with
18  her?" And I'm asking about Brie. And if we go to the
19  next page, go down to Line 6, I asked when did he begin
20  a sexual relationship with Brie?
21  A.      I lost it. Oh, okay.
22  Q.      Go to Line 9, Phil's answer in this hearing
23  on February 6th was, "I would say 2013, 2014, '15,
24  somewhere in that." And then we go on. I asked on Line
25  11, "All right. So you're still on probation at the

1  time -- at that time from corrupting her at that time
2  and you're having sex with her at that time?" And his
3  answer was, "No." Question: "You were on probation for
4  two years; weren't you?" Answer: "I know. You're
5  putting me on the spot and I can't remember when our
6  relationship was." Question: "So let's get this
7  straight. So you admitted in court..." Answer: "I'm
8  sorry. I could correct the record, if I may. It was
9  almost certainly from 2015 to 2016 and I remember that
10  because of the time that I started my real estate
11  company was the same year." Question: "Okay. So you
12  started the agency with George Plisko, correct, 2015?"
13  Answer: "Correct." "And at that time, you began a
14  sexual relationship with Brie?" Answer: "Yes."
15           Down at the bottom of the page on Line
16  22 I asked the question, "And you served probation for
17  two years and then you began a sexual relationship with
18  the person you corrupted earlier?" Answer: "Yes."
19           Next page. Question: "Do you see
20  anything wrong with that?" Answer: "No." So were you
21  aware of their sexual relationship in 2015?
22  A.      No.
23  Q.      Were you aware of a sexual relationship in
24  2013 or '14?
25  A.      No.

1  Q.      Did Phil ever admit to you at any point that
2  he had a sexual relationship --
3          MR. BOWERS: Objection. Spousal
4  privilege depending on time frame.
5  BY MR. HINTON:
6  Q.      Did Phil ever admit to you that he had a
7  sexual relationship with Brie before you became married
8  to Phil on September 21st of 2012?
9  A.      No.
10 Q.      After your divorce from Phil in May of 2023,
11 did Phil ever admit that he had a sexual relationship
12 with Brie?
13 A.      No.
14 Q.      He just always denied it; didn't he?
15 A.      Yes.
16 Q.      Deny, deny, deny, right?
17 A.      Yes.
18 Q.      Dori, didn't you have about a two-hour phone
19 conversation with Brie a couple years back on the phone?
20 A.      I did, yes.
21 Q.      And didn't you apologizes to Brie for not
22 believing her?
23 A.      I did.
24 Q.      And she had told you -- she came to your
25 workplace when she was a minor with one of her friends

1  and told you at that time that she was involved in a
2  romantic relationship with Phil; didn't she?
3  A.      Yeah, she did.
4  Q.      She wanted to play a voicemail message on her
5  phone to you; didn't she?
6  A.      At that time, no.
7  Q.      At a later time?
8  A.      At a later time, she did, yes.
9  Q.      This was before Phil was charged, right?
10 A.      Correct.
11 Q.      He was charged in July of 2010 --
12 A.      Actually, no. When she came to me at my
13 workplace, it was after he was charged.
14 Q.      Be he hadn't pled guilty yet?
15 A.      No.
16 Q.      And she came to you and said what?
17 A.      That Phil was going to be calling her. And
18 we stood there -- I stood there outside of work for, I
19 don't know, half-an-hour. She's, like, he's calling me
20 at this time, he's calling me, he's calling me. And he
21 never called her. And I called her a liar and I left.
22 Q.      Besides the obvious affair with Brie during
23 your marriage right after -- around the time ███ was
24 born, right, if it's 2015?
25 A.      Apparently, yeah.

1  Q.      And besides that relationship during the
2  marriage and the relationship with Miranda Polidori,
3  were there other females he had extramarital affairs
4  with?
5  A.      As far as I know, no. I did find nude
6  pictures on his phone -- or in his e-mail. But no. As
7  far as I know, no.
8  Q.      Did he send those nude photos on his phone to
9  Melissa, who's Jason Thomas's girlfriend?
10 A.      I never -- I never saw it directly to
11 Melissa. I just know that they were out there. I never
12 saw, like, who they were sent to or anything like that.
13 Q.      What year was that that he was sending nude
14 photos around to other girls?
15 A.      2000 -- well, I don't know. That was
16 probably -- I don't know. I don't know exactly when
17 that was.
18 Q.      What kind of reputation did Phil have?
19 A.      Honestly, he had a -- he had a good
20 reputation. I mean, he came up from, you know, people
21 trying to bash him when he first opened the company to,
22 you know, this great company and a great reputation.
23 And I don't know what happened. I don't know.
24 Q.      Okay. How about the Mariotti lumber case?
25 He went to jail for 30 days. How was his reputation

1  then?
2  A.      Not good.
3  Q.      Okay. And how about all the publicity from
4  the sexual charges involving Brie, how was his
5  reputation then?
6  A.      Back then or now?
7  Q.      Back then.
8  A.      Honestly, I, at that time, kind of, tuned
9  myself out from all of it. So I want to say that it
10 wasn't good, but I didn't get involved. Like, I just --
11 I believed him and I didn't get involved in what other
12 people thought at the time.
13 Q.      Did you ever talk to Jason Thomas about the
14 photo that Phil sent to his girlfriend?
15 A.      I believe I did, yeah.
16 Q.      What did he tell you?
17 A.      He just told me that he had tooken Phil for a
18 ride and, pretty much, threatened him, you know, so...
19 Q.      He told you why he threatened him, though?
20 A.      He said that -- I don't know if he said that
21 there was a picture. I can't say that he said there was
22 a picture. But he said that something inappropriate had
23 happened.
24 Q.      Didn't he tell you that Phil sent a picture
25 of his penis to his girlfriend?

9 (Pages 30 - 33)

1  A.  I don't remember what exactly he said.
2  Honestly, I don't.
3  Q.  Why did Phil and his mom become estranged?
4  A.  I want to say it was because of what he put
5  me through.  But I don't really know exactly.
6  Q.  What he put you through with Miranda?
7  A.  Yeah.
8  Q.  What he put you through with Brie?
9  A.  Yeah.  Just all of it.
10  Q.  So Marie sided with you?
11  A.  Sided with me?  I don't know if she sided
12  with me.  She just, kind of -- she didn't want to see
13  what happened happen.  She didn't want to see us, you
14  know, get divorced and she didn't want -- so she tried
15  to not side with me but, kind of, like, talk to him,
16  talk some sense into him.  And that's --
17  Q.  How did that turn out?
18  A.  Not good.
19  Q.  Okay.  And were they estranged up until the
20  time Phil paid his mortgage off in January?
21  A.  I don't know.  I can't -- I can't say
22  exactly.  I don't know.
23  Q.  Do you let Marie see your boys?
24  A.  Yes.
25  Q.  Do you talk to Marie often?

1  A.  Yes.
2  Q.  Is she a good friend of yours?
3  A.  She is.
4  Q.  Well, and give me an idea.  Is that about the
5  time they became friends again?
6  A.  I would say.
7  Q.  And Phil paid off $172,000 mortgage for his
8  mom?
9  A.  Yes.
10  Q.  And for her second husband Tom, right?
11  A.  They're not married, but yes.
12  Q.  They're not?
13  A.  Yeah.
14  Q.  What's Tom's last name?
15  A.  Holland.
16  Q.  Did you, obviously, confide in Marie that
17  Phil cheated on you?
18  A.  Oh, yeah.  She knew, yeah.
19  Q.  She knew.  She knew about Miranda?
20  A.  Yeah.
21  Q.  She knew about Brie?
22  A.  She knew the whole situation that was going
23  on with Brie, yeah.
24  Q.  Did you ever follow Phil to see if he was
25  going to meet Brie?

1  A.  Yes, I followed Phil before.  Yeah.
2  Q.  And did you see him meet her?
3  A.  No.
4  Q.  How many times did you follow him?
5  A.  I don't -- I don't know.
6  Q.  Was this before he was charged with crimes?
7  A.  Yeah.
8  Q.  This was before he lost his job at the high
9  school as a baseball coach?
10  A.  Probably, yeah.
11  Q.  Do you remember that they asked him to step
12  down as a baseball coach because of the situation with
13  Brie?
14  A.  I do remember that, yeah.
15  Q.  Was it Principal Moceyunas that asked him to
16  step down?
17  A.  I can't remember who it was exactly.  I just
18  know that they asked him to do that.
19  Q.  Because Brie's mother wrote a letter to the
20  school?
21  A.  School, yeah.
22  Q.  And in the letter, there's photos of the
23  $2,800 earrings that Phil bought for Brie?
24  A.  Oh, I don't know about that.  I know there
25  was photos.

1  Q.  How about Miranda Polidori?  Didn't she send
2  you a text message about her relationship with Phil?
3  A.  She did, yes.
4  Q.  Do you still have it?
5  A.  No.
6  Q.  You sure?
7  A.  Yeah.
8  Q.  Okay.  What did the text message say?
9  A.  Everything that I was -- something about
10  everything that I was questioning is true.  And I just
11  said, well, what does that mean?  And she had sent me
12  pictures of the two of them together and said that I had
13  went away to the beech with a friend overnight and he
14  had taken my kids with her to a mall while I was at the
15  beach overnight.  And that was, pretty much, our
16  conversation.
17  Q.  I want to go back to the transcript of
18  February 6, 2023, the hearing in front of Judge Minora.
19  It's a tab in the back.  And I want to turn to Page 86.
20  And I asked the question on Line 6, "So and you're
21  married at the time that you're now in a sexual
22  relationship with her..." meaning Brie.  He's pinned
23  2015 now, the year ████ was born.
24  A.  Uh-huh.
25  Q.  And his answer was, "We were, kind of, on the

10 (Pages 34 - 37)

1  outs of our marriage. We weren't separated, but we were
2  having some severe problems in our marriage." Is that
3  true, were you having severe problems in 2015, the year
4  ████ was born?
5  A.      No. No.
6  Q.      Okay. And the next question, "She filed for
7  divorce in March of 2021?" Answer: "Yes." Question:
8  "She never filed before then? Dori I'm talking about."
9  Answer: "Almost, but no." When did you almost file for
10 divorce before you actually did in March of 2021?
11 A.      Probably 2017. I think it was 2017, I
12 reached out to Brian Cali.
13 Q.      Okay. And was that during the Miranda
14 Polidori situation?
15 A.      Yes.
16 Q.      And then you went away on vacation with Phil
17 and you dropped it?
18 A.      Yeah.
19 Q.      But you weren't having any problems in 2015
20 when he was having sex with Brie?
21 A.      No. No.
22 Q.      And he never admitted to having any sex with
23 Brie?
24 A.      No.
25 Q.      Were you and Phil planning to move to Boston

1  to try and save your marriage at one point in time?
2  A.      Yes.
3  Q.      What year was that?
4  A.      2017, 2018. It was shortly after the whole
5  Miranda thing.
6  Q.      And you thought maybe a fresh start would
7  help your situation?
8  A.      At first, yeah. Yeah.
9  Q.      Then you didn't move to Boston?
10 A.      No.
11 Q.      Did you realize there were still problems in
12 the marriage?
13 A.      Yeah. And I'm just very close to my family
14 and I couldn't do it. I just couldn't go.
15 Q.      Okay. Can we turn to Page 513 -- ST513?
16 This is a memo that Principal Moceyunas at Riverside
17 High School wrote. And he's already testified in this
18 case, Dori. And just to put this in significance,
19 Brie's a freshman in high school at the time of this
20 memo from Principal Moceyunas.
21 A.      Okay.
22 Q.      January 8th, 2009, Principal Moceyunas called
23 Phil on the morning of January 8th, 2009 and spoke to
24 him about some rumors that were going around the school
25 about he and another female student in tenth grade. She

1  was actually in ninth grade at the time. Did Phil tell
2  you ever about the call he got from Principal Moceyunas?
3  A.      No. The only one that I knew about was when
4  they asked him to step down.
5  Q.      Okay. He didn't voluntarily resign, they
6  asked him to step down?
7  A.      I think so, yeah. I don't really remember.
8  I want to say they asked him to. I don't know.
9  Q.      Okay. So in January of 2009 when Brie is a
10 freshman at Riverside, are you aware that he's talking
11 to her at that time?
12 A.      I don't remember when I became aware of it.
13 I don't remember exactly when.
14 Q.      How did you first learn that he was talking
15 to Brie?
16 A.      I don't know. I don't remember how I -- I
17 don't remember if someone said something. I don't know.
18 I don't remember how I figured it out.
19 Q.      Did you ever read his text messages on his
20 phone?
21 A.      Never.
22 Q.      Did you ever -- was he acting strangely or
23 suspiciously that there might be another woman in the
24 picture?
25 A.      I don't -- I don't know. I mean, I don't

1  think so, no. There was one night that he went out and
2  I had a lot of questions and he said he was with a
3  friend and I asked him and he was with that
4  friend. So I don't know. Not really.
5  Q.      Was his friend his uncle or was it his friend
6  that covered for him?
7  A.      No, he was a friend at the time.
8  Q.      Who was it?
9  A.      Tim -- I don't even remember his last name.
10 I don't know.
11 Q.      Did Phil -- you're engaged at this time
12 period in 2009, correct?
13 A.      Yeah.
14 Q.      You're not married?
15 A.      Not married.
16 Q.      And did Phil blame Brie's parents for him
17 losing his job at Riverside High School as a baseball
18 coach?
19 A.      I don't -- I don't know. I don't think so.
20 Q.      He never said that to you?
21 A.      No.
22 Q.      Well, in 2009 around the time he lost his job
23 as the baseball coach, did he ever talk to you about
24 Brie, some young girl that's in love with him or
25 something?

11 (Pages 38 - 41)

1  A.    Not that she was in love with him, No.

2  Q.    What did he tell you?

3  A.    That he was helping her. She was friends

4  with Joe Strok, who had passed away and -- well, she was

5  boyfriend -- girlfriend with Joe. And she was in a real

6  bad spot and he was her friend.

7  Q.    Had you ever met Joe?

8  A.    Me? No.

9  Q.    Did Phil ever talk about Joe?

10  A.    No.

11  Q.    Did you ever know Joe and Phil to be friends?

12  A.    No.

13  Q.    So you had been with Phil since 2005?

14  A.    Correct.

15  Q.    Up until the time Joe died -- let's get that

16  on paper here. We're going to turn to Page 1538. So

17  this is on ST1538, a obituary for Joseph Stroke. Do you

18  see that?

19  A.    Yes.

20  Q.    And he died on November 10th, 2008. There's

21  a picture of him there. Had you ever met Joe Strok?

22  A.    No.

23  Q.    And up until the time of his death, did Phil

24  Godlewski ever mention the name Joe Strok to you?

25  A.    No.

1  Q.    Did you ever know Joe Strok and Phil

2  Godlewski to be friends?

3  A.    Not that I was aware of, no.

4  Q.    Did Phil attend Joe Strok's funeral? It's on

5  the next page, 1539, His funeral at the Semian Funeral

6  Home, did Phil go to that?

7  A.    I don't know.

8  Q.    Did he go to the viewing, if you know?

9  A.    I don't know.

10  Q.    You and Phil were living together at the

11  time.

12  A.    Yeah. I remember this coming up. I was

13  working at the time and I don't -- I don't know if he

14  went or not. I don't know.

15  Q.    Do you have any memory of Phil being overcome

16  by distraught because of Joe Strok's death in November

17  of 2008?

18  A.    No.

19  Q.    When Phil was charged in 2020 with passing a

20  bad check and doctoring bank records, did Sunita or

21  Nisha talk to Phil about what that means in terms of his

22  real estate license?

23  A.    Not as far as I know, no.

24  Q.    Okay. If you look at ST21, there's a news

25  article about Duryea man accused of bouncing $21,000

1  check. You see that?

2  A.    Yeah.

3  Q.    And Phil ultimately pled guilty to bouncing

4  that check in February of 2021 and then he was sentenced

5  to jail in June of 2021, correct?

6  A.    Correct.

7  Q.    And what did that do to Phil's reputation as

8  a Realtor in the local community?

9  A.    I don't -- I don't know. I don't think it

10  really did anything.

11  Q.    Did any of your fellow Realtors bring it up

12  to you at all?

13  A.    No.

14  Q.    Any of your good friends talk to you about

15  Phil and his criminal charges in the Mariotti case?

16  A.    Not really, no.

17  Q.    Did Phil -- strike that.

18        Did you ever receive any information as

19  to why Phil left his employment at ERA One Source?

20  A.    Yeah.

21  Q.    What do you know?

22        MR. BOWERS: Objection. Time frame.

23  Spousal communication.

24

25

1  BY MR. HINTON:

2  Q.    I don't want to know what you know from

3  Phil's mouth, I want to know what you know from others.

4        MR. BOWERS: Fair enough.

5        THE WITNESS: Okay. So the day that I

6  had left, Sunita called me and she told me that because

7  of the other article -- not this article -- that she had

8  to let -- she had to let Phil go.

9  BY MR. HINTON:

10  Q.    Okay. Did she have concerns about his QAnon

11  or Q movement social media videos?

12  A.    She had said that she asked him to not -- you

13  know, to not do it.

14  Q.    To not do the social media?

15  A.    Yeah. She had said, you know, she doesn't

16  understand why he's doing it. But, you know, it wasn't

17  something that she could have in her business.

18  Q.    Okay. Getting back to the criminal case

19  involving Brie, the sex charges, am I correct you and

20  Phil had to put your house up for bail for him to get

21  out of jail?

22  A.    We did, yes. And then -- I can't remember --

23  something happened and then his mother had to put her

24  house up.

25  Q.    Right.

1   A.     But yes, we did.
2   Q.     Nobody put up a cash bail, it was the homes,
3 the deeds, correct?
4   A.     I think so, yeah.
5   Q.     Well, let's look at ST776, it actually starts
6 on 775, Cutting Edge Bail Bonds, LLC. They filed a
7 collateral mortgage and it's signed by Philip Godlewski
8 and Dorothea Gallagher. Do you see that?
9   A.     Uh-huh.
10   Q.     And did you sign this collateral mortgage to
11 make bail for Phil?
12   A.     Yes.
13   Q.     Do you have any knowledge of Phil putting up
14 any cash to get out of jail?
15   A.     I remember us all, kind of, getting money
16 together to try to get him out. I don't remember the
17 exact details of how -- what went to what and -- it was
18 a crazy time.
19   Q.     Crazy time.
20   A.     Yeah.
21   Q.     And how much money did you and certain other
22 people get together to get him out?
23   A.     I honestly don't remember exactly how much
24 money. I don't know.
25   Q.     Did you have to put up any money to pay a

1 lawyer for Phil?
2   A.     I believe we did, yeah. We had to -- we had
3 to come up with money, yeah.
4   Q.     Who is the "we"?
5   A.     Me and Phil.
6   Q.     You and Phil?
7   A.     Yeah.
8   Q.     Was it Phil's grandfather, Osmolia?
9   A.     Oh, he gave money towards all of this, yeah.
10   Q.     How much did he put up?
11   A.     I don't remember. It was, kind of, just
12 everybody.
13   Q.     How many nights did Phil spend in jail
14 because of the charges involving Brie?
15   A.     I don't remember.
16   Q.     Dori, am I correct that you've watched --
17 reading your custody transcript -- and it came up a
18 lot -- the videos Phil was doing before you left the
19 home and filed for divorce.
20   A.     Did I watch them?
21   Q.     Yes.
22   A.     No.
23   Q.     Okay.
24   A.     I --
25   Q.     Would walk through the room while he was

1 doing them?
2   A.     Occasionally, yeah.
3   Q.     Before you left the home in February, you
4 asked him to stop; didn't you?
5   A.     Yes.
6   Q.     You told him that he was misleading people;
7 didn't you?
8   A.     I don't know what I said. But yes, I asked
9 him to stop. Yeah.
10   Q.     Why did you ask him to stop?
11   A.     I just didn't like --
12       MR. BOWERS: Objection. Spousal
13 testimony. Privilege.
14 BY MR. HINTON:
15   Q.     Phil was gaining in popularity after the
16 election in November of 2020 between Biden and Trump
17 with his social media videos, his followers were
18 growing?
19   A.     If I'm being honest, I wanted nothing to do
20 with it. I didn't follow it. I didn't -- I don't know.
21   Q.     You thought the Q movement was a cult,
22 correct?
23   A.     Yeah. I -- yeah.
24   Q.     And it scared you?
25   A.     Yes.

1   Q.     And you asked Phil to stop?
2   A.     Yes.
3       MR. BOWERS: Objection. Spousal
4 privilege.
5 BY MR. HINTON:
6   Q.     When you walked out of the house -- do you
7 remember the exact day you walked out of the house and
8 went to Melissa's?
9   A.     Yeah. Date? No. The day, yeah.
10   Q.     Okay. What day of the week was it?
11   A.     I want to say it was either a Tuesday or a
12 Thursday.
13   Q.     All right. When you walked out of the house
14 in February of 2021, Phil was still doing social media
15 videos at that time; was he not?
16   A.     I believe he was, yes.
17   Q.     And you had asked him to stop?
18   A.     Yes.
19   Q.     Were you aware that Phil -- in one of Phil's
20 videos, he claimed Hillary Clinton is a pedophile?
21   A.     No.
22   Q.     Are you aware that he's claiming all of these
23 high-level Democrats are pedophiles?
24   A.     Yeah. I've heard of that, yes.
25   Q.     What do you think of these statements?

13 (Pages 46 - 49)

1  A.    I don't know.  I -- I don't know.
2  Q.    Do they seem crazy to you?
3  A.    Yeah.
4  Q.    Did you see the video or hear about the video
5  where Phil claimed Hillary Clinton was executed after a
6  military tribunal?
7  A.    I did not hear that.
8  Q.    How about the real Joe Biden?  I think you
9  know this one.  The real Joe Biden was executed for
10 crimes against humanity in 2019 and the Joe Biden that
11 was elected in November of 2020 is really a body double.
12 Did you hear that?
13 A.    I've heard that one, yes.
14 Q.    What do you think of that one?
15 A.    I think it's crazy.  I don't know.
16 Q.    You don't believe it; do you?
17 A.    No, I don't believe it.  No.
18 Q.    And you think he's lying to people; is that
19 correct?
20 A.    Yeah.
21 Q.    And he's doing it on social media to gain
22 followers, correct?
23 A.    Yeah.
24 Q.    And the more followers he has, the more money
25 he makes by selling stuff to those followers; is that

1  correct?
2  A.    Seems like it, yeah.
3  Q.    And he's making a lot of money, right?
4  A.    Yeah.
5  Q.    How much money do you think he's making per
6  month right now?
7  A.    I couldn't even begin to guess.
8  Q.    Well, you had to have some idea when you
9  agreed to $12,500 a month in alimony; is that correct?
10 A.    Yeah, I guess.
11 Q.    Is he making over a hundred thousand dollars
12 a month?
13 A.    Probably.
14 Q.    Is he making over $300,000 a month?
15 A.    Probably.
16 Q.    Is he making over a million dollars a month?
17 A.    I don't know about that.
18 Q.    Well, you know about the real estate he's
19 bought, right?
20 A.    Yes.
21 Q.    Where did he buy homes?
22 A.    Hawaii, St. Thomas.
23 Q.    7.5 million in Hawaii?
24 A.    Yes.
25 Q.    St. Thomas, almost three million?

1  A.    Yeah.
2  Q.    Arizona?
3  A.    Arizona.
4  Q.    How much there; over a million?
5  A.    Probably.  I don't know.
6  Q.    Nevada?
7  A.    I know that he has one there, yes.
8  Q.    How much was that?
9  A.    I don't know.
10 Q.    How about Shavertown?
11 A.    Shavertown was 1.2, I think.
12 Q.    1.7.  You were the Realtor on that one.
13 A.    1.7.  Okay.  Yes.
14 Q.    How did it come to be that you were the
15 Realtor on that one?
16 A.    So he had asked me -- he said that he was
17 going to buy a new house and he was going to give me
18 Huckleberry and he asked if I wanted to be his agent.
19 Q.    Did you gain the commission?
20 A.    Yeah.
21      MR. WILLIAMS:  Hold on.  Is this while
22 you were married?
23      THE WITNESS:  Correct.
24      MR. HINTON:  I'll move on.
25 BY MR. HINTON:

1  Q.    So let me get this straight.  So Phil is
2  making millions of dollars per year now to buy all of
3  this real estate, correct?
4  A.    Correct.
5  Q.    When you left Phil in February of 2021, what
6  was your financial condition at that time?
7  A.    Not good.
8  Q.    When he wrote the bad check -- or the bad
9  check that led to the criminal charges involving
10 Mariotti lumber, the police indicated that you and Phil
11 had about 200-some-odd dollars in your bank account at
12 that time; is that accurate?
13 A.    Probably.  I never really monitored our bank
14 account, so I don't know.
15 Q.    Okay.  Did you have investments when you were
16 married?  When you were living with Phil in February of
17 2021, did you have investments?
18 A.    No.
19 Q.    Did you have a bank account with more than
20 $10,000 in it?
21 A.    When I left?
22 Q.    Yeah.
23 A.    No.
24 Q.    Would you say that you were in very bad
25 financial condition at the time you left?

14 (Pages 50 - 53)

1  A.    At the time I left, yeah. It wasn't good,
2  yeah.
3  Q.    And now he's doing much better?
4  A.    Yeah.
5  Q.    And now you're doing much better?
6  A.    Yeah.
7  Q.    Am I correct that the reasons you filed for
8  divorce would be Phil refusing to stop the QAnon videos?
9  That's one of the reasons; is that correct?
10 A.    Probably, yeah.
11 Q.    Another reason was his infidelity to you,
12 cheating on you?
13 A.    Yeah.
14 Q.    Am I also correct that the two of you just
15 weren't happy together anymore?
16 A.    Yeah.
17 Q.    And all of those reasons for the divorce
18 predated the article that appeared on Valentine's Day of
19 2021; is that correct?
20 A.    Yeah.
21 Q.    So the article that is in focus in this
22 lawsuit is in the documents I have in front of you. I
23 want to ask you if you ever read it. 3721. Dori, did
24 you ever read the Scranton Times article marked as 3721
25 through 3723?

1  A.    Yes.
2  Q.    When did you read it?
3  A.    Probably the day it was in the paper, I would
4  say.
5  Q.    And the headline of it is QAnon Realtor Has a
6  Deal For Gullible, correct?
7  A.    Uh-huh.
8  Q.    And is that a fair thing to call him, a QAnon
9  Realtor? He's a Realtor and he's a proponent of the Q
10 movement?
11 A.    Yeah.
12 Q.    And from what you knew of QAnon up to the
13 time of this article, you thought it was a cult,
14 correct?
15 A.    Yeah.
16 Q.    And their focus was on child sex trafficking
17 and people that are drinking blood from children to get
18 the adrenochrome out of the blood, right? That's what
19 you knew about it?
20 A.    Yeah. I know there are things, you know,
21 that -- I don't know -- our government was corrupt and
22 all that stuff.
23 Q.    And Trump is the savior?
24 A.    Yeah.
25 Q.    And there's the Great Awakening and The Storm

1  and the cabal. You knew all about that?
2  A.    Bits of it, yes.
3  Q.    And it scared you?
4  A.    Yeah.
5  Q.    And you didn't believe in it?
6  A.    No.
7  Q.    So you were Phil's wife at the time and he
8  couldn't even convince you to believe in this QAnon
9  nonsense?
10 A.    No.
11 Q.    And one of the reasons you had sought
12 supervised custody only for Phil and your two boys was
13 because of his QAnon beliefs; is that correct?
14 A.    Yeah. Yeah.
15 Q.    Did you know that Phil was charged with and
16 pled guilty to more misdemeanor crimes for applying for
17 a gun and lying on the application to get a gun in
18 February of 2021?
19 A.    I was aware of that, yes.
20 Q.    So the guns that he applied for to get a
21 license for or purchase -- and he got charged for it --
22 did he actually get those guns, the AR-15 and the
23 handgun?
24 A.    I'm not sure.
25 Q.    Did he ever buy a handgun for you?

1  A.    No.
2  Q.    Have you ever seen a handgun in your house?
3  A.    No.
4  Q.    Did Phil ever own an AR-15?
5  A.    I don't know. Not when I was with him.
6  Q.    You know an AR-15 has a magazine in it and
7  you can shoot, you know, automatic shots?
8  A.    I know nothing about guns. All I know is
9  that when we were together, he never had a gun.
10 Q.    Okay. Did he ever have a gun that he showed
11 to your children in a video?
12 A.    Yes.
13 Q.    Whose gun was that?
14 A.    I believe it was his.
15 Q.    Was that after you had left the house?
16 A.    Yes.
17 Q.    Okay. So after you left the house. Was it
18 before you filed for divorce?
19 A.    Yes.
20 Q.    So you filed for divorce March 8th?
21 A.    Something like that, yeah.
22 Q.    Okay. So you left the house a few days after
23 the article?
24 A.    Uh-huh.
25 Q.    Yes?

15 (Pages 54 - 57)

1   A.    Yes.

2   Q.    And then you filed for divorce a few weeks

3  later?

4   A.    Yes.

5   Q.    So during that few-week period of time, Phil

6  had possession of a gun?

7   A.    Yes.

8   Q.    A rifle? Was it a big gun?

9   A.    It was a big gun.

10   Q.    It wasn't a pistol?

11   A.    No. It was a big gun.

12   Q.    And he was showing it to your older son

13  █████?

14   A.    My younger son.

15   Q.    Your younger son?

16   A.    Yes.

17   Q.    The one born in 2017?

18   A.    Yes.

19   Q.    So he would have been about four years old

20  and he's showing him a gun?

21   A.    Yes.

22   Q.    Did you have concerns about that?

23   A.    Yes.

24   Q.    When you read this article about Phil in the

25  Scranton Times marked as ST3721 through 3723, did you

1  have a conversation with Phil about the article?

2   A.    Yes.

3        MR. HINTON: And if I asked you

4  questions about Phil's statements to you about the

5  article, Mr. Bowers, are you going to asserts privilege

6  and --

7        MR. BOWERS: Yes, we are.

8        MR. HINTON: -- not allow me to ask

9  those questions?

10       MR. BOWERS: I am indeed.

11       MR. HINTON: Okay. And just to get it

12  on the record, Mr. Bowers, are you going to object to

13  any questions I ask this witness about statements Phil

14  has made to her while they were still married about this

15  article?

16       MR. BOWERS: I am, unless a proper

17  foundation is laid that those statements would have been

18  made in the presence of other parties, thereby,

19  destroying the privilege.

20       MR. HINTON: Okay.

21  BY MR. HINTON:

22   Q.    Did Phil make any statements to you about the

23  Scranton Times article written by Chris Kelly in the

24  presence of anybody else, a third party?

25   A.    Not that I can remember.

1   Q.    Were you with Phil when he read this article

2  for the first time?

3   A.    No.

4   Q.    Was he not home?

5   A.    I wasn't home.

6   Q.    You weren't home. Okay. Did you have a

7  Scranton Times delivered to your home or did he read it

8  on the Internet?

9   A.    The Internet.

10   Q.    And what was his mood or affect when you got

11  home and you talked about the article?

12   A.    Not happy.

13   Q.    Up until the time that this article came out,

14  I'm correct that Phil never admitted to you that he had

15  slept with Brienna DuBorgel before?

16   A.    No.

17   Q.    Did Phil ever tell you why he pled guilty to

18  corrupting the morals of Brie?

19   A.    Yeah.

20       MR. BOWERS: Objection. Lay a time

21  frame for the question.

22       MR. HINTON: We all know it's before the

23  marriage. He pled guilty in July of 2011, okay?

24       MR. BOWERS: Statements made before or

25  after, so I just wanted to lock that down.

1  BY MR. HINTON:

2   Q.    When Phil pled guilty in July of 2011 to

3  corrupting Brie, did he tell you why he was pleading

4  guilty?

5   A.    I mean, I was part of the decision. So I was

6  there, yeah.

7   Q.    Okay. And who was there at the time of this

8  decision?

9   A.    Me, his grandfather, his mother, his dad. I

10  can't remember exactly everybody, but that was, pretty

11  much, the...

12   Q.    Were you at the courthouse?

13   A.    Yes.

14   Q.    I want you to turn to ST20, if you could,

15  please. This is the newspaper article that came out the

16  day after Phil pled guilty to corruption. And this

17  article's dated July 12th, 2011. And in the fourth

18  column of that article, it says, "Among the evidence

19  against him were thousands of text messages between Mr.

20  Godlewski and the girl in which he explicitly described

21  their sexual exploits and expressed how much he cared

22  about her, according to the affidavit." Do you see

23  that?

24   A.    Uh-huh.

25   Q.    You have to say yes.

1    A.    Yes. Sorry.

2    Q.    Did Phil ever show you the actual text

3    messages between him and Brie?

4    A.    Never.

5    Q.    Did he ever talk to you about those text

6    messages at all?

7    A.    No.

8    Q.    And the article then continues. It says, "On

9    Monday, Mr. Godlewski waived his right to a preliminary

10   hearing in the case." Is that what happened at the

11   courthouse the day before, he waived his hearing and

12   pled guilty?

13   A.    Yeah. Yeah.

14   Q.    Okay. You were in these family discussions

15   about what we're going to do?

16   A.    Yes.

17   Q.    And one of those decisions that was made in

18   this group decision was that he waived his preliminary

19   hearing; is that correct?

20   A.    Yeah. I mean, we just -- I guess that's what

21   it meant, yeah.

22   Q.    Were you in the courtroom when one of the

23   detectives provided the stack of text messages -- or the

24   prosecutor provided the stack of text messages to the

25   judge that was hearing the preliminary hearing?

1    A.    I don't think any of that was -- even

2    happened.

3    Q.    Okay. Nobody testified, nothing happened, he

4    just waived the hearing?

5    A.    No. Brie was on the stand.

6    Q.    Brie was on the stand and then he waived the

7    preliminary hearing after Brie was on the stand?

8    A.    Brie was on the stand and we -- I don't know.

9    We all left the courtroom after she left the stand, pled

10   the Fifth Amendment and we all went outside and

11   discussed, you know, what they were offering and -- it

12   was crazy. I don't know.

13   Q.    But, Dori, after you left the courtroom --

14   the hearing's not over yet, you just took a break in the

15   hearing, correct?

16   A.    I don't know. Maybe. I guess that's what

17   happened. I don't --

18   Q.    Did you then go back in the courtroom and

19   waive the preliminary hearing?

20   A.    I don't know. I don't -- I guess. I don't

21   know. I don't remember. It was -- I just know that he,

22   you know, took that deal. That's what I remember.

23   Q.    Took the deal?

24   A.    Yeah.

25   Q.    And did anybody in this group conversation

1    about why Phil should take the deal -- did anybody ask

2    Phil what did you actually do to corrupt Brie?

3    A.    No.

4    Q.    That never came up?

5    A.    No.

6    Q.    Well, what was your understanding as to why

7    he was admitting to a crime that had three years of

8    incarceration or electronic monitoring and two years of

9    probation? Why was he admitting to something if he

10   didn't do it?

11   A.    We just wanted it over. I mean, he was

12   facing a lot of time and we just -- we just wanted -- we

13   wanted it to go away; we just wanted it to go away.

14   Q.    Well, did you ever ask Phil -- you lived with

15   him at the time, but did you ever ask him, were you ever

16   alone with the girl? Did you ever kiss her? Did you

17   ever have any physical contact with her? Didn't you ask

18   those questions?

19   A.    No. I believed that they were friends. I

20   just -- I talked to her about it.

21   Q.    Talked to who?

22   A.    Brie; I talked to Brie about it.

23   Q.    Back then?

24   A.    Back then.

25   Q.    What did you talk about?

1    A.    I just had asked her, like, what exactly is

2    going on. She said they were friends. Like, he was a

3    big brother to her. That's what she told me.

4    Q.    He was over ten years older than her.

5    A.    Yeah.

6    Q.    Did you think it was weird that he was

7    friends with somebody more than ten years younger than

8    him?

9    A.    Yeah and no. I did tell him he should be

10   careful. I don't know. I was young myself, honestly.

11   Q.    Did you ever know what -- do you know whether

12   Phil ever attended an online program at Harvard

13   University?

14   A.    I don't know that, no.

15   Q.    Did you have a joint checking account?

16   A.    Yes.

17   Q.    Did you ever see any payments to Harvard

18   University for an online program?

19   A.    I didn't really follow our bank account very

20   closely. But no, I did not.

21   Q.    Do you have any information or knowledge that

22   he attended a program a Regent University?

23   A.    No.

24   Q.    And from the time you met Phil in 2005 until

25   the time of the criminal charges in July of 2010, where

17 (Pages 62 - 65)

1  did Phil work during those five years?
2  A.  Say that again. Which --
3  Q.  From 2005 when you met Phil.
4  A.  Yeah.
5  Q.  You started living with him, right?
6  A.  Yeah. Well, shortly after that, yeah.
7  Q.  And then until the time of the criminal
8  charges when he got charged with all the sex crimes,
9  2010 --
10 A.  Okay.
11 Q.  -- where did Phil work during that five-year
12 period of time?
13 A.  At his family's gas station and as a real
14 estate agent for Lewith & Freeman.
15 Q.  Who was the broker at --
16 A.  Marion Gatto was our broker for our office.
17 Q.  Did he work anywhere else?
18 A.  No, I don't think so.
19 Q.  So looking at these news articles, they start
20 on ST18. This is a news article from November 13th,
21 2010. Do you see that date on that?
22 A.  Uh-huh.
23 Q.  So about --
24     MR. WILLIAMS:  Is that a yes?
25     THE WITNESS:  Oh, sorry. Yes.

1  BY MR. HINTON:
2  Q.  So about four months after Phil is charged on
3  July 9th of 2010, he's agreed to plead guilty to a
4  corruption charge, okay?  The preliminary hearing
5  involving Brie is in July of 2011. Do you remember that
6  Phil initially agreed to plead guilty and then he
7  withdrew that plea and then we had the preliminary
8  hearing and he agreed to plead guilty again?  Do you
9  remember that situation?
10 A.  Not really.
11 Q.  Okay. So we have the article marked as ST18
12 and then here's another article, ST19, Taylor Team Wants
13 its Gear From Seized Car. Did you see these articles
14 when they were published?
15 A.  I may have. I'm sure I did, yeah.
16 Q.  And then we have the article from July 12th,
17 ST20, where Ex-Baseball Coach Sentenced For Sex With
18 Girl 15.
19 A.  Uh-huh.
20 Q.  What was your reaction to the headline?
21 A.  I don't remember. I don't know.
22 Q.  Well, did you have any problem with the
23 headline?
24 A.  I don't -- I had a problem with everything
25 that was going on, so I'm sure I did. It was a very

1  difficult time.
2  Q.  And was there television news coverage of the
3  sex crime case against Phil?
4  A.  The day he was arrested, I remember there
5  was, yeah.
6  Q.  Like, all three networks covered it?
7  A.  Yeah.
8  Q.  Pretty bad, right?
9  A.  Yeah.
10 Q.  And could you tell that everybody in the
11 local community knew about it?
12 A.  Oh, yeah.
13 Q.  And what did that do to Phil's reputation?
14 A.  I honestly think that a lot of people at
15 first didn't believe it. It didn't really do much to
16 his reputation in the beginning. He was well-known in
17 real estate, he was well-known in the community. A lot
18 of people reached out to me and asked what they could do
19 to help, honestly.
20 Q.  Do you remember when Phil started the agency
21 with George Plisko, that some unknown person sent a
22 packet of news articles to every resident in Lackawanna
23 County --
24 A.  Yes.
25 Q.  -- including these news articles that we just

1  went over trying to bring Phil down?
2  A.  I'm not sure it was the same articles. But
3  yes, I do remember articles going around.
4  Q.  And how did that affect Phil's reputation?
5  A.  I don't know. I don't -- I think they tried
6  to do something that didn't really work. His business
7  seemed to do really well after that. I don't know.
8  Q.  Okay. How about the Chris Kelly article?
9  One article about his QAnon but mentions his criminal
10 past involving Brie; how did that affect his reputation?
11 A.  That was different because I feel like a lot
12 of people had forgotten about all of that. He wasn't
13 charged with having sex with her.
14 Q.  He was not charged with having sex with her?
15 A.  No. At least that's -- you know.
16 Q.  You weren't aware that he was charged with
17 statutory rape?
18 A.  No.
19 Q.  Okay. He was charged with a bunch of
20 felonies. Don't you remember that?
21 A.  Yeah, but I'm saying, his sentence was for
22 that. Like, he didn't -- the charges didn't stick. So
23 like --
24 Q.  You know the difference between what you're
25 charged with and then what you ultimately plead to,

18 (Pages 66 - 69)

1  right, a plea bargain?
2  A.  Yeah.
3  Q.  He got a good deal, right?
4  A.  I guess, yeah.
5  Q.  Did Phil ever tell you that he -- before you
6  got married to him in 2012, did Phil ever tell you that
7  he thought all these text messages in the criminal case
8  involving Brie was made up by young girls?
9  A.  Yes.
10  Q.  That they were fabricated?
11  A.  Yes.
12  Q.  Did he tell you what proof he had that they
13  were fabricated back then?
14  A.  I don't remember.
15  Q.  When you left Phil in February of 2021, were
16  you in bad shape mentally?
17  A.  No, I don't believe so.
18  Q.  Did Phil ever tell you that he's glad that
19  you left him?
20  A.  No.
21  Q.  Turn to ST1042, if you could, please.  The
22  top text message is from Phil to Brie on March 31st,
23  2021 where he writes, "I'm glad she's gone but I want
24  the boys back.  It kills me not having them here every
25  day."  Do you see that?

1  A.  Yep.
2  Q.  Was that how he reacted to you leaving, that
3  he's glad you left him?
4  A.  No.
5  Q.  Did he ever say those words to you, that he's
6  glad you left?
7  A.  No.
8  Q.  Go to the page right before it, ST1041.  Phil
9  wrote to Brie, the bottom text message.  On March 31st,
10  2021 Phil wrote to Brie -- I don't know what that
11  first -- meh.
12  A.  Meh.
13  Q.  What does that mean?
14  A.  La.
15  Q.  La?
16  A.  Yeah.
17  Q.  "I'm good.  I feel better she's gone.  To be
18  honest, the sex sucked or was nonexistent."  Was that
19  true or was that false?
20  A.  I mean, it was nonexistent, yeah, I'd agree
21  with that.
22  Q.  Up to the time you left, the sex was
23  nonexistent between the two of you?
24  A.  Yeah.
25  Q.  He says to Brie, "She was constantly

1  miserable.  She wasn't even really a great mother."
2  What's your reaction to that?
3  A.  If I wasn't a great mother, I'm not really
4  sure who is because I literally did everything for our
5  kids.
6  Q.  Okay.  When Phil pled guilty to corrupting
7  Brie in 2011, did your family members talk to you about
8  that; your parents, your siblings?
9  A.  When he was arrested, yeah.  Yeah.
10  Q.  And what did they say to you about it?
11  A.  I was crazy for staying.
12  Q.  You stayed with him anyways?
13  A.  I did.
14  Q.  When you were married to Phil, did you ever
15  have a security detail or security guards guarding you
16  and Phil and the boys?
17  A.  No.
18  Q.  Did Phil ever tell you during the time you
19  lived together with Phil all those years from what, 2007
20  or '8 up until February of 2021, did he ever mention to
21  you that he has a security detail looking out for him
22  because he's a covert operative?
23  A.  No.
24  Q.  Did he ever tell you during all those years
25  you lived with Phil that he did secret missions, covert

1  missions?
2  A.  No.
3  Q.  Are you aware that that's what he says on
4  social media?
5  A.  I've heard that he says it.
6  Q.  Do you think it's a bunch of lies?
7  A.  Yeah.
8  Q.  Now, turning back to the guns, I want to show
9  you something on Page -- let's go to Page ST476.  So
10  this is a social media post that Phil made when he was
11  in the process of interviewing law firms to sue the
12  Scranton Times.  So I think it's early 2021.  And I
13  don't think you've quite yet filed for divorce yet in
14  March.  I want you to focus on the paragraph towards the
15  bottom that begins, "Things are very, very shaky right
16  now at best.  I am very carefully navigating the waters.
17  I purchased an AR-15 today as well as a handgun for my
18  wife, both for home and personal protection.  I've never
19  owned a weapon until now."  So did Phil purchase a
20  handgun for you?
21  A.  No.
22  Q.  And you did realize he was on bail at the
23  time that he posted this for the Mariotti lumber case,
24  right?
25  A.  I don't -- I wasn't even aware of this --

19 (Pages 70 - 73)

1 this post so...
2 Q. Do you think it's a lie?
3 A. Probably.
4 Q. Okay. And did Phil -- in the custody
5 transcript, did Phil talk to you after the presidential
6 election in November about getting a gun for the house
7 because of social unrest in the country?
8 MR. WILLIAMS: Is this during the
9 marriage?
10 MR. BOWERS: We'll assert it. Why not?
11 BY MR. HINTON:
12 Q. They've raised the privilege
13 so that you can't answer that question, okay?
14 A. Okay.
15 Q. So I have a video clip from January 20th. I
16 can play it, but maybe you remember it. January 20th,
17 Phil broadcast to all of his followers -- January 20,
18 '21, Phil says, "My wife says I'm misleading people."
19 You've already said that that's true, correct?
20 A. Uh-huh.
21 Q. Yes?
22 A. Yes.
23 Q. That you had concerns over QAnon?
24 A. Yes.
25 Q. And you had asked Phil to stop doing the

1 videos?
2 A. Yes.
3 Q. And that you told him that Q movement was a
4 cult?
5 A. Yes.
6 Q. It's also correct you didn't want your
7 children around this cult?
8 A. Correct.
9 Q. You didn't want your children exposed to this
10 cult?
11 A. Correct.
12 Q. And you told him that he should not be lying
13 to his followers?
14 A. Correct.
15 Q. Did Phil buy you an Infiniti car before he
16 got charged with the crimes involving Brie?
17 A. Yes.
18 Q. Was that in 2009, 2010?
19 A. Probably, yeah.
20 Q. How long did you have that car for?
21 A. I don't know. A couple years, probably.
22 Q. He bought that for you, correct?
23 A. Yeah. I can't remember if it was in my name
24 or his name, but yes.
25 Q. Do you remember what dealership he got it

1 from?
2 A. I want to say it was Select Motors, I think.
3 Q. Where is Select Motors?
4 A. They were on -- I want to say it was on
5 Birney Avenue when I bought it -- or not Birney
6 Avenue -- Keyser Avenue when I bought it and then he
7 moved to Birney Avenue. I'm pretty sure that's where I
8 got it. I had a lot of cars.
9 Q. Okay. But you definitely had an Infiniti?
10 A. Yes.
11 Q. That Phil purchased for you in 2009 or 2010?
12 A. Yeah.
13 Q. And then your sister, Becky, she goes out
14 with Tom Nezlo now?
15 A. Correct.
16 Q. And that's been going on for about five
17 years?
18 A. Probably, yeah.
19 Q. Pretty serious relationship?
20 A. Yeah.
21 Q. And in your family and the holidays, the
22 Gallagher family, do you get together on the holidays?
23 A. Yes.
24 Q. And when you and Phil were still together up
25 until February of 2021, did Phil come with you and the

1 boys to the Gallagher home for holidays?
2 A. Not to my dad's. To my mother's, yes.
3 Q. Was he not welcome at your dad's?
4 A. Yeah.
5 Q. Because of the way he treated you?
6 A. Yeah.
7 Q. The cheating?
8 A. I guess, yeah.
9 Q. The lying?
10 A. Yeah.
11 Q. And Phil would come to your mother's house on
12 the holidays, correct?
13 A. Yeah, or they'd come to our house. But yeah.
14 Q. Would Tom Nezlo and Becky be there too?
15 A. Yeah.
16 Q. Did you ever see Tom Nezlo and Phil talk with
17 one another?
18 A. Nah, not really. Just, kind of, hi.
19 Q. Okay. But they would be in each other's
20 presence?
21 A. Yeah.
22 Q. They would exchange pleasantries, I guess?
23 A. I guess.
24 Q. Okay. And did you ever talk to Tom Nezlo
25 about Brie?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   A.     Never.

2   Q.     Did Phil ever tell you prior to the marriage

3 that Tom Nezlo was involved sexually with Brie?

4   A.     I don't know. I don't know if he said that

5 or if it came up after Tom was arrested or -- I don't

6 know.

7   Q.     Have you ever see Tom and Phil do any

8 activity together, go anywhere together?

9   A.     No.

10   Q.     Would you say they're friendly?

11   A.     Not really.

12   Q.     Not really?

13   A.     No.

14   Q.     Okay. During the marriage, did Phil ever

15 talk to you about Tom Nezlo?

16   A.     No.

17         MR. WILLIAMS: I mean, I agreed that I

18 wasn't going to object for spousal privilege because

19 it's actually Phil's privilege.

20         MR. BOWERS: We're good.

21 BY MR. HINTON:

22   Q.     When Phil worked at Osmolia's prior to the

23 criminal charges involving Brie, worked in the gas

24 station --

25   A.     Uh-huh.

1   Q.     -- did he work with his uncles there?

2   A.     Yeah.

3   Q.     Which ones?

4   A.     Mickey and Pete -- Michael, Mickey, whatever.

5   Q.     Okay. And back then before you were married,

6 did Phil at all confide in you that one of his uncles

7 with cheating on his wife?

8   A.     No.

9   Q.     He never mentioned that Mickey or Pete were

10 cheating on their wives?

11   A.     No.

12   Q.     You know the insurrection that happened on

13 January 6th, 2021 involving the certification of the

14 election, all the people got arrested for storming into

15 the Capitol?

16   A.     Capitol, okay.

17   Q.     Do you remember that Phil was planning to go

18 to that on that day?

19   A.     No.

20   Q.     Okay. Do you recall overhearing any

21 conversations of Phil talking to other people about

22 going to the U.S. Capitol on January 6th?

23   A.     No.

24   Q.     Before the criminal charges involving Brie,

25 did you ever stop by the Subway and grab a hoagie while

1 Phil was working?

2   A.     Yeah.

3   Q.     How did Phil feel about drinking, alcohol,

4 beer, liquor?

5   A.     At what time?

6   Q.     Back then when he got charged with crimes

7 involving Brie, was he a drinker or not a drinker?

8   A.     Not really, no. I mean, we would hang out

9 with our friends occasionally and stuff, but it wasn't

10 like an all-the-time kind of thing or anything like

11 that.

12   Q.     Did Phil take you on a cruise in 2009 or

13 2010?

14   A.     We were on -- yeah. Yeah, probably. We were

15 on many cruises. I don't know if that's exactly when,

16 but yeah.

17   Q.     Did Phil like the show American Idol back

18 then?

19   A.     Yes.

20   Q.     Loved it, right?

21   A.     Yeah.

22   Q.     Was crazy about that show?

23   A.     Yeah, he did like American Idol.

24   Q.     Let me just look over my notes here. I'll

25 probably have more questions.

1         (Pause)

2         Did you get any information that Miranda

3 Polidori received a payment from the agency?

4   A.     I did know of that, yes.

5   Q.     Did you work at the agency too?

6   A.     I did.

7   Q.     And did the agency pay Miranda $11,000,

8 approximately, because they fired her after she texted

9 you about the extramarital affair?

10   A.     Yes.

11   Q.     Did you work at a hotel up at the Moosic

12 Mountain cleaning rooms before Phil was charged with the

13 sex crimes involving Brie?

14   A.     Yes.

15   Q.     And is that where Brie and her friend came to

16 see you at work?

17   A.     Yes.

18   Q.     And you really didn't want to listen to them;

19 is that correct?

20   A.     No.

21   Q.     And she was trying to tell you that she was

22 involved in a sexual relationship with Phil who you were

23 engaged to?

24   A.     Yes.

25   Q.     And you didn't want to hear it?

1  A.   That was after he was arrested, so I was told
2  to stay away from her.
3  Q.   Well, the detectives tried to talk to you,
4  too; didn't they?
5  A.   Yes.
6  Q.   And they tried to show you the text messages?
7  A.   I don't think they showed me text messages.
8  Q.   Let's look at ST -- back at ST621. It's in
9  the Affidavit of Probable Cause for the sex crimes. It
10 says, "On July 7th, 2010, Detective Chris Kolcharno was
11 driving past 430 Cayuga Street to check and see if there
12 was any activity at the house and he saw Dori Gallagher
13 getting into her vehicle." Do you remember being
14 approached by a detective when you were getting in your
15 vehicle?
16 A.   Oh, yeah.
17 Q.   "At this time, Detective Kolcharno approached
18 her and asked her if she would be willing to come to the
19 DA's office and talk to Detectives Leary and Mancuso.
20 Did he ask you that?
21 A.   That's a nice way of putting it, yeah.
22 Q.   And you agreed to come and came into the
23 office. Did you go to their office?
24 A.   I did.
25 Q.   And "Their intentions with Dori were to see

1  if she had any additional information regarding the
2  relationship with Godlewski and..." blacked out, that's
3  Brie's name there.
4  A.   Uh-huh.
5  Q.   "Dori stated she knew what was going on and
6  did not believe any of the accusations against
7  Godlewski." Is that what you told them?
8  A.   Yeah.
9  Q.   And you stated you were engaged to Godlewski
10 and believes he had no contact with Brie; is that
11 correct?
12 A.   Yeah.
13 Q.   Let me ask you this. Getting to the
14 relationship Phil had with Brie, do you remember that
15 around the time of Joe Strok's death, you were talking
16 or texting, you found out about it and you said, cut it
17 out, and he did for a while and then he restarted
18 communicating with Brie again. Do you remember that?
19 A.   So you're saying around the time Joe died,
20 they were talking --
21 Q.   Late 2008; November, December, right?
22 A.   Okay.
23 Q.   Is that the time frame you thought Brie and
24 Phil were talking?
25 A.   I don't know. I don't remember when it was

1  that I suspected something or found out they were
2  talking. I don't remember.
3  Q.   You don't remember any of that?
4  A.   I don't remember when it was.
5  Q.   Did Phil ever admit to you that he bought her
6  gifts?
7  A.   No.
8  Q.   He never mentioned he bought her a tanning
9  package?
10 A.   No.
11 Q.   He never mentioned he bought her an Ed Hardy
12 hat?
13 A.   No.
14 Q.   Ever?
15 A.   Never.
16 Q.   He never mentioned he bought her earrings?
17 A.   No.
18 Q.   A shirt?
19 A.   No.
20 Q.   A hoagie at Subway?
21 A.   No.
22 Q.   Nothing?
23 A.   Nothing.
24 Q.   Did he ever tell you who befriended who
25 first, how he came into contact with Brie?

1  A.   I believe it was, she was in the store crying
2  and he --
3  Q.   She was in the Subway or the gas station?
4  A.   In the Subway, yeah, crying with her friend
5  and he went over to see what was going on. And that's
6  how it started.
7  Q.   Did he ever tell you that he thought she was
8  suicidal?
9  A.   Yes.
10 Q.   Okay. When did he tell you that?
11 A.   I don't know. I guess maybe when I started,
12 like, asking why he was talking to her or whatever. I
13 don't really remember exactly when.
14 Q.   And he told you she was suicidal over the
15 death of her boyfriend?
16 A.   Yeah.
17 Q.   Okay. And that concerned him?
18 A.   Yeah.
19 Q.   And he had never known this girl beforehand?
20 A.   Yeah.
21 Q.   Did you tell him to report the situation to
22 her counselor at Riverside High School?
23 A.   Yes.
24 Q.   And what did he say?
25 A.   I don't remember. I don't know.

22 (Pages 82 - 85)

1  Q.      Why did your engagement last so long, 2007 to
2  2012?
3  A.      We were remodeling our house, all that
4  happened.
5  Q.      When you say "all that," you mean the charges
6  involving Brie?
7  A.      Yeah.
8  Q.      Okay.
9  A.      Just saving money, planning.  No real reason, I
10  guess.
11  Q.      Which hotel were you working at when Brie
12  approached you?
13  A.      The Hampton Inn.
14  Q.      You cleaned there?
15  A.      I cleaned the rooms, yeah.
16  Q.      What years did you work there?
17  A.      Oh, boy.  2000 -- probably 2005.  And then
18  we -- I don't know when I stopped working there.  I
19  can't remember how long I was there.  A few years, I
20  worked there.
21  Q.      So is it your testimony that the news
22  articles from 2010 and 2011 and the publicity about him
23  pleading guilty to corrupting the morals of a minor did
24  not have any effect on Phil's reputation?
25  A.      I'm sure it had some, but I don't think it

1  impacted -- it didn't -- it didn't really ruin his
2  career.  You know, it didn't -- people still used him
3  for real estate and people who were his friends before
4  that were still his friends.  No, I think -- I think
5  people believed him.
6  Q.      You know that Miranda Polidori got a PFA
7  against Phil, correct?
8  A.      I did not know that.
9  Q.      It's in here.  The situation involving
10  Miranda, did that affect Phil's reputation at all?
11  A.      No, I don't think too many people knew about
12  it.
13  Q.      Did you go to Phil's wedding --
14  A.      No.
15  Q.      -- to Keri?
16  A.      No.
17  Q.      But your boys did?
18  A.      Yes.
19  Q.      Who was watching the boys down there in the
20  Dominican Republic?
21  A.      Phil, Keri and Phil's mother and Tommy.
22  Q.      And Tommy.  When you apologized to Brie for
23  not believing her when you had this long phone
24  conversation with her --
25  A.      Uh-huh.

1  Q.      -- you had finally come to realize that Phil
2  did have a sexual relationship with her?
3  A.      I don't know if I realized that he did or if
4  I just realized that -- what he put me through, all the
5  lies that I believed.  I believed that there was a
6  chance that, you know, he lied to me then, then.  And
7  that's, kind of, what I meant by that.
8  Q.      Did you come to know how old Miranda Polidori
9  is?
10  A.      I do know, yeah.
11  Q.      And she's significantly younger than Phil as
12  well?
13  A.      Yeah, I believe she's the same age as Brie.
14  Yeah.
15  Q.      So she's either nine, ten years younger than
16  Phil too?
17  A.      Yeah.
18  Q.      Have you come to realize that Phil is
19  attracted to younger women?
20  A.      Yeah.  I mean, I guess he is, yeah.
21  Q.      Okay.  What's your interactions with Phil now
22  that you're divorced?
23  A.      Just, pretty much, the kids.
24  Q.      Strictly talk about the kids?
25  A.      For the most part, yeah.

1  Q.      Does he seem happy?
2  A.      He does.
3  Q.      Phil?
4  A.      Yeah, he does.
5  Q.      Happy with his new life?
6  A.      Yes.
7  Q.      His new wife?
8  A.      Yeah.
9  Q.      His new career?
10  A.      Yeah.
11  Q.      Did he tell you, I'm never going back to real
12  estate?
13  A.      Yeah, he has said that.
14  Q.      Yeah?
15  A.      Yeah.
16  Q.      He's very happy doing what he's doing?
17  A.      Yeah.
18  Q.      When Phil was married to you, was he on
19  medications for depression or anxiety?
20  A.      Yeah.
21  Q.      Okay.  And that was before the article?
22  A.      Yeah.
23  Q.      I just want to look over your testimony from
24  the custody hearing you had with Phil.
25  A.      Okay.

1  Q.    It starts on ST486. On Page 489, it shows
2  four pages from the transcript on each page.
3  A.    Okay.
4  Q.    Page 11, Mr. Williams, your attorney here
5  today, asked the question, the question is, "What are
6  your concerns with regard to him using the children
7  through his social media or various online enterprises?"
8  And what was your answer at that time?
9  A.    "I don't know how to answer it because when I
10  try to answer..."
11  Q.    Then the next question was, "That is okay.
12  Answer the question the best you can. What are your
13  concerns? What are you worried about?" And what was
14  your answer at this hearing?
15  A.    "That there are people who support him and
16  are dangerous and he's putting them in danger."
17  Q.    Okay. And that's truthful and honest
18  testimony from you at that time, correct?
19  A.    Yeah.
20  Q.    Then if we go to Page 12, the bottom question
21  on Line 23, the question was, "What are your concerns
22  with regard to Q&I?" I think it's a mistype. It means
23  QAnon.
24  A.    Right.
25  Q.    "The conspiracy theories that he's involved

1  in." And what's your answer?
2  A.    "It's a cult and people that do a lot of
3  crazy things and -- I mean, people who drink blood and
4  get high and all of this stuff. And he reports this and
5  he believes this and then he puts my children in these
6  videos and on social media for people to see them and it
7  is scary, very scary."
8  Q.    Then on Page 14, Mr. Williams asked you a
9  question on Line 1, "So you said that they have a lot of
10  bizarre beliefs. I think you said that they believe
11  that people drink babies' blood. Can you detail some of
12  the beliefs that you believe are concerning with regard
13  to the conspiracy theory?" What was your answer?
14  A.    "There's a lot of things. There's the blood.
15  There's the neo..."
16  Q.    Nazis?
17  A.    Yeah. "They believe in white supremacy, that
18  Trump is still our president, Biden is dead and is an
19  actor. In the White House, he believes that he has
20  alien blood. It's crazy."
21  Q.    And then the next question was, "He's told
22  you these things? You've heard them come from his mouth
23  personally?" And what was your answer?
24  A.    "Yes."
25  Q.    And then on Page 185, Line 5, Mr. Williams

1  asked you the question, "Have you ever observed Mr.
2  Godlewski to have conversations with your children that
3  were inappropriate or otherwise not age-appropriate for
4  children?" And your answer was?
5  A.    "Yes."
6  Q.    If we go to Page 25 in the transcript, it's
7  ST492, at the bottom of Line 24, question, "Is it fair
8  to say one of your concerns about the blogging is that
9  there are a bunch of people that are involved with these
10  bloggings that you call crazy?" Your answer was?
11  A.    "Yes."
12  Q.    That's true and accurate?
13  A.    Yes.
14  Q.    Next question, "In response to that, you said
15  that there were theories that you feel are crazy that go
16  along with those bloggings such as the world is flat and
17  that kind of stuff?" Your answer?
18  A.    "Yes."
19  Q.    Truthful and accurate?
20  A.    Yeah.
21  Q.    And you said, "Another reason is that the
22  children were involved in these blogs?" Your answer?
23  A.    Yes. "It is a big reason, yes."
24  Q.    Looking at Page 36 of the transcript on Line
25  11 -- in your custody battle with Phil, on Line 11 the

1  question is, "Do you feel as though someone who holds
2  views of white supremacy would be poor or be
3  inappropriate to parent your children?" And your
4  answer, after some objections, on Line 21 was, "I
5  believe that the belief could be part of that, yes."
6  Witness -- down below on Line 25, "I believe their
7  belief could be bad parenting, yes."
8         Next page, "Do you want your kids
9  exposed to white supremacy?" Answer: "Absolutely not,"
10  correct?
11  A.    Correct.
12  Q.    And that's your view; true and honest
13  testimony; is that correct?
14  A.    Yes.
15  Q.    You're then asked the question, "Do you want
16  your children exposed to cult theories about drinking
17  babies' blood?" And your answer was?
18  A.    "Absolutely not, no." Oh, "No." Yeah,
19  sorry, I was on the wrong one.
20  Q.    If you turn to ST497, Mr. Williams was
21  cross-examining Phil on Page 42, Line 17. "Do you
22  believe that there are people that exist in America that
23  are keeping children in captivity and are extracting
24  drugs from their body through some source and using them
25  recreationally?" And Phil's answer was, "Yes. But I

24 (Pages 90 - 93)

1 have to correct a portion of what you said because
2 they're not extracting drugs from the child's body.
3 There's a widely-known natural chemical that is produced
4 within the child's -- in only a child six or under --
5 body similar to adrenaline." Do you remember that
6 testimony from Phil?
7 A. Uh-huh.
8 Q. Yes?
9 A. Yes.
10 Q. And that's his belief, that there is a cult
11 out there torturing and cannibalizing children to
12 extract adrenochrome from their scared bodies; is that
13 correct?
14 A. Yeah.
15 Q. And that's what he propagates on the social
16 media; is that correct?
17 A. Yes.
18 Q. And he wants all his believers to believe?
19 A. Yeah.
20 Q. That high-level Democrats and actors -- the
21 elites, he calls them, are torturing, sacrificing and
22 cannibalizing children to get adrenochrome, correct?
23 A. Yes.
24 Q. And that troubles you; does it not?
25 A. Yeah.

1 Q. Very much so, correct?
2 A. Yes.
3 Q. Now, looking at Page 55, Phil is testifying
4 on cross-examination for Mr. Williams. And it's at the
5 bottom of Page 55 on line 24, Phil says, "The whole
6 reason that the gun was purchased to begin with was for
7 protection of my family. There was a lot of civil
8 unrest going on around the country and I just -- I just
9 wanted to be safe. If somebody were to have to come to
10 our house, we did not have any protection." Do you
11 recall Phil ever talking to you about buying a rifle to
12 protect your family because of civil unrest in the
13 community?
14 A. Yes.
15 Q. Did he actually buy a rifle?
16 A. No.
17 Q. So he's lying here in his testimony?
18 A. I don't know. Wait.
19 Q. He says he purchased it.
20 A. Then, yeah. I mean, unless he purchased it
21 after he's speaking of -- after I left. But he didn't
22 purchase one when we lived together, no.
23 Q. Let's go to Page 84 in the transcript.
24 A. Okay.
25 Q. So on Line 19 he says, "It it your

1 contention -- Question: "Is it your contention that you
2 pled guilty to a crime your wife committed to protect
3 her?" His answer was, "Yes." Did he direct you to
4 write out the check that bounced?
5 A. Yes.
6 Q. Okay. Did he tell you there was money in the
7 account to cover the check?
8 A. Yes.
9 Q. The next question on Line 25 on Page 84, "Why
10 did you have to get a firearm?" Answer -- this is from
11 Phil now. Answer on Line 1, "My wife and I discussed
12 getting a firearm for the months leading up to the
13 purchase. We actually -- one night, we were about to go
14 to Roll Call to purchase one. So we discussed that at
15 length and we thought that the political environment as
16 well as the circumstances happening in the world
17 required us to be safe." Did you discuss for months
18 with Phil purchasing a gun and going to Roll Call?
19 MR. BOWERS: Objection. Spousal
20 privilege.
21 MR. HINTON: Well, it's already out.
22 This is his testimony. He said it to third parties. Do
23 you want to withdraw the objection? He said it to a
24 judge.
25 MR. BOWERS: Yeah. Sure. Go ahead.

1 MR. HINTON: Okay. Thank you.
2 BY MR. HINTON:
3 Q. Did that happen?
4 A. I don't know. Him bringing up us buying a
5 gun and me saying no, I guess that is a discussion. But
6 I don't remember discussing going to Roll Call to buy
7 one, no.
8 Q. And to your knowledge, you never bought one?
9 A. No.
10 Q. And he never bought one?
11 A. No.
12 Q. He says below on Page 85, Line 12, Question:
13 "Were there threats that were made against you or your
14 family?" Answer: "Yes. I've had threats made against
15 me for a number of years from real estate as well as
16 what I do now for a living." Are you aware of any
17 threats?
18 A. Not doing real estate, no.
19 Q. How about what he does now in terms of social
20 media?
21 A. Yes.
22 MR. HINTON: All right. Those are all
23 the questions I have.
24 MR. BOWERS: I have a very few and then
25 we'll get you done if we can go straight through.

25 (Pages 94 - 97)

1  THE WITNESS: Okay.
2  * * *
3  EXAMINATION
4  * * *
5  BY MR. BOWERS:
6  Q.  Dori, would it be fair to say that you
7  disagree with Phil about all the QAnon stuff?
8  A.  Yeah.
9  Q.  And could you be induced to agree with it in
10  exchange for a house? In other words, could he get you
11  to agree to that stuff by giving you a house?
12  A.  No.
13  Q.  Nah. Could he get you to agree to that by
14  paying you 12,500 bucks a month in child support?
15  A.  No.
16  Q.  In fact, could he pay you any amount of money
17  to get you to agree with that?
18  A.  No.
19  Q.  In fact, could any amount of money induce
20  you -- get you to lie under oath?
21  A.  No.
22  Q.  Okay. During your divorce -- Mr. Hinton
23  asked you some questions about that -- were you
24  represented by Mr. Williams throughout your entire
25  divorce?

1  A.  I did have Brian Cali for a little while, but
2  he pretty much just filed the paperwork and then
3  Attorney Williams, yeah.
4  Q.  Okay. So you had lawyers throughout the
5  entire process, correct?
6  A.  Correct. Yeah.
7  Q.  And your divorce took a little over two years
8  to settle, correct?
9  A.  Yes.
10  Q.  And during that time -- and I don't want you
11  to tell me anything that you said to Mr. Williams or Mr.
12  Williams said to you, but did you consult with Mr.
13  Williams about various proposals to settle your divorce?
14  A.  Yes.
15  Q.  Okay. Did you consider any proposals to
16  settle your divorce?
17  A.  Not really, no. We, kind of, just came up
18  with the house and that was that.
19  Q.  Okay. And after consultation with your
20  counsel, did you feel that that was a fair deal to
21  settle your divorce?
22  A.  Yes.
23  Q.  Okay. And I believe despite all of your
24  misgivings about Phil's QAnon view, you eventually
25  agreed to a 60-40 split for custody of your boys, right?

1  A.  Yeah.
2  Q.  That going pretty well?
3  A.  Yeah.
4  Q.  Yeah. Okay. So I want to come to just one
5  thing.
6  A.  Okay.
7  Q.  Very early in your testimony, you said you
8  had a conversation with Brie in which Brie admitted to
9  you that she did not have a sexual relationship with
10  Phil.
11  A.  Correct.
12  Q.  When was that?
13  A.  That was before he was arrested; I don't know
14  exactly when. I know it was before he was arrested;
15  shortly after I had, kind of, found out that they were
16  talking. I don't remember the exact time.
17  Q.  Okay. That's fine. Did this conversation
18  happen in person or on the phone?
19  A.  It was on Facebook Messenger.
20  Q.  Okay. So it was by Messenger?
21  A.  Yeah.
22  Q.  And what is it -- how did this conversation
23  come to happen?
24  A.  I don't remember. I don't know if I messaged
25  her or she messaged me. I don't remember exactly how it

1  started.
2  Q.  Okay. But you and Brie found your way into
3  contact with one another, correct?
4  A.  Yeah.
5  Q.  Okay. No doubt you were wondering what on
6  earth was going on.
7  A.  Yeah.
8  Q.  What did Brie tell you?
9  A.  That he was nothing but a friend, like a big
10  brother. He was just helping her through a hard time
11  and there was nothing to worry about.
12  Q.  Did you have any reason to doubt that?
13  A.  No.
14  Q.  Do you have any reason to think that's untrue
15  today?
16  A.  I mean, I guess not. I don't know. I mean,
17  I know the lies that he said to me, so -- now and in the
18  past. So I don't know what to believe. But no, I have
19  no reason to believe that it wasn't true.
20  Q.  Okay. And then after that, you were in court
21  when Brie said, I plead the Fifth, I'm not going to
22  testify, right?
23  A.  Yes.
24  Q.  One moment.
25  (Pause)

26 (Pages 98 - 101)

1    MR. BOWERS: Thank you. We have no
2 further questions.
3    MR. HINTON: Just a couple follow-ups.
4 Sorry, Jonathan.
5    MR. WILLIAMS: You're killing me.
6        * * *
7        EXAMINATION
8        * * *
9 BY MR. HINTON:
10   Q.    Looking at ST620, if you could open up to
11 that, please, Dori.
12   A.    Yes.
13   Q.    That's the Affidavit of Probable Cause from
14 the police, the detectives. In the middle of the page
15 on ST620, it says, "Between June 9th and June 11th,
16 2010, investigators attempted to contact Phil Godlewski
17 at his place of employment. Several messages were left
18 for him asking him to contact investigators as soon as
19 possible. On June 11th, 2010, Godlewski called Mancuso
20 and informed her that he was represented by an attorney
21 from Harrisburg and Godlewski stated he was advised not
22 to talk to me. I contacted the Harrisburg attorney and
23 asked him to contact me after he has had time to talk
24 with Godlewski. As of date, I have not heard back from
25 the Harrisburg attorney." So, Dori, to put this in

1 context, Phil was charged on July 9th, the detectives
2 are talking to Phil on June 9th and 11th -- or 11th --
3   A.    Yeah.
4   Q.    -- Godlewski calls Mancuso. Did Phil ever
5 tell you he was contacted by the detectives in mid June
6 of 2010?
7   A.    He did, yes.
8   Q.    What did he tell you?
9   A.    Just that there was some -- there was
10 something going on with the whole thing with Brie and
11 that he had gotten an attorney. And that if they came
12 to me, that I don't have to say anything.
13   Q.    And did Phil ever cooperate with the
14 detectives and sit down and give them a statement and --
15   A.    I don't believe so.
16   Q.    -- tell them his side of the story?
17   A.    I don't believe so.
18   Q.    He at least never told you that?
19   A.    No.
20   Q.    Did you ever suggest to Phil back in 2010 in
21 these months, June, sit down and just tell them the
22 truth and let them know this girl's lying, I never had
23 sex with her?
24   A.    Honestly, no, I didn't because I watched
25 stupid shows and stuff and I feel like you shouldn't

1 talk. You know, you get an attorney and you don't say
2 anything regardless of the situation. So no, I didn't
3 tell him to just sit down and talk to them.
4   Q.    Okay. So this conversation you had with Brie
5 where she told you Phil's like a friend, a big brother
6 to me, how close in time was it to the time that the
7 detectives are trying to talk to Phil in June of 2010?
8 Was it around that same time period?
9   A.    I don't remember. I don't know.
10   Q.    Could it have been the year before, 2009?
11   A.    I mean, I don't know. Maybe. I don't know.
12 I really don't remember when that conversation was.
13   Q.    But Phil never told you the principal called
14 him in and asked him about his relationship with Brie?
15   A.    No, I don't remember that. No.
16   Q.    Phil never told you the principal told Phil
17 on January 8th of 2009, stop being in contact with Brie?
18   A.    Huh-uh.
19        MR. WILLIAMS: Is that a no?
20        THE WITNESS: No. Sorry.
21        MR. WILLIAMS: That's okay.
22 BY MR. HINTON:
23   Q.    The $12,500 per month, does that have an end
24 date on it when that ends? Is it for ten years? Is it
25 five years? How long is it for?

1   A.    Until they're 18 -- until my kids are 18.
2   Q.    And then once your youngest son -- ██?
3   A.    Yes.
4   Q.    Turns 18, it's over?
5   A.    Yes.
6   Q.    And is there any other financial compensation
7 paid to you other than 12,500?
8   A.    No.
9        MR. HINTON: Those are all the questions
10 I have.
11        (Witness excused.)
12   (The deposition was concluded at 12:04 p.m.)
13        * * *
14
15
16
17
18
19
20
21
22
23
24
25

27 (Pages 102 - 105)

## C E R T I F I C A T E

1
2
3
4          I, Pamela Pratt, Court Reporter and
5    Notary Public in and for the Commonwealth of
6    Pennsylvania, certify that the foregoing is a true and
7    accurate transcript of the deposition of said witness
8    taken by me on the date and place hereinbefore set
9    forth.
10
11          I further certify that I am neither
12   attorney nor counsel for, nor related to or employed by,
13   any of the parties to the action in which this
14   deposition was taken, and further, that I am not a
15   relative or employee of any attorney or counsel employed
16   in this action, nor am I financially interested in this
17   case.
18
19
20
21
22
         *Pamela Pratt*
23      Pamela Pratt, Court Reporter
         Notary Public
24
25

1    Dorothea Godlewski
2    115 Huckleberry Lane, Duryea, PA 18642
3          August 8, 2023
4    RE:   Godlewski, Philip v. Kelly, Chris Et Al
5    7/20/2023, Dorothea "Dori" Godlewski (#5997513)
6    The above-referenced transcript is available for
7    review.
8          Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12         The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-midatlantic@veritext.com
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

1    Godlewski, Philip v. Kelly, Chris Et Al
2    Dorothea "Dori" Godlewski (#5997513)
3          E R R A T A   S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____       _____
24   Dorothea "Dori" Godlewski          Date
25

1    Godlewski, Philip v. Kelly, Chris Et Al
2    Dorothea "Dori" Godlewski (#5997513)
3          ACKNOWLEDGMENT OF DEPONENT
4          I, Dorothea "Dori" Godlewski, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____       _____
12   Dorothea "Dori" Godlewski          Date
13   *If notary is required
14         SUBSCRIBED AND SWORN TO BEFORE ME THIS
15         _____ DAY OF _____, 20___.
16
17
18   _____
19   NOTARY PUBLIC
20
21
22
23
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830