# EXHIBIT "L"

```
 1        C O U R T   O F   C O M M O N   P L E A S

 2                    LACKAWANNA COUNTY

 3    _____    X
                                  X
 4    PHILIP GODLEWSKI,           X
                                  X
 5              Plaintiff,        X
                                  X
 6          -vs-                  X   No. 21-CV-2195
                                  X
 7    CHRIS KELLY, ET AL,         X
                                  X
 8              Defendants.       X
                                  X
 9    _____    X
```

TRANSCRIPT OF PROCEEDINGS

BEFORE:    HONORABLE CARMEN D. MINORA

DATE:      February 6, 2023

PLACE:     Lackawanna County Courthouse
           200 N. Washington Avenue
           Scranton, Pennsylvania 18503


A P P E A R A N C E S

For the Plaintiff:      TIMOTHY KOLMAN, ESQUIRE

For the Defendant:      TIMOTHY HINTON, ESQUIRE

                     Linda Krehel
                Official Court Reporter

EXHIBIT
L

WITNESSES

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defendant: | | | | |
| 1. Brienna DuBorgel | 16 | 42 | | |
| 2. Linda V. DuBorgel | 67 | 77 | | |
| 3. Philip Godlewski | 152 | 80 | | 158 |
| --recalled Philip Godlewski | | | | 167 |
| 4. Dennis Cheng | 169-176 | 175-188 | 189 | |

--called on rebuttal

Philip Godlewski:      190

1          PHILIP GODLEWSKI, called as a

2      witness, being duly sworn, testified as

3      follows:

4

5   AS ON CROSS EXAMINATION BY MR. HINTON:

6      Q.    Mr. Godlewski, did you have a sexual

7   relationship with Brienna DuBorgel?

8      A.    No, I did not.

9      Q.    Never did?

10     A.    That's-- I retract.  Yes, I did.

11     Q.    You did?

12     A.    Yes.

13     Q.    And did you answer discovery in this case

14  falsely in claim that you never did have a

15  relationship-- a sexual relationship with Brienna?

16     A.    I'm not sure.

17     Q.    Okay.  Let's take a look at that.  If we can

18  go to Exhibit Z.  That's a summary page.  If you can go

19  to Exhibit D.

20             THE COURT:  Did you say B as in boy?

21             MR. HINTON:  No.  Z.  Exhibit Z.

22             THE COURT:  Victor, David?

23             MR. HINTON:  Z as in zebra.

24  BY MR. HINTON:

25     Q.    Now, on November 18th, Mr. Godlewski, you

1   answered some discovery, some interrogatories by me.

2   And I want to point your attention to number seven.

3       A.   Okay.

4       Q.   Number seven says:  Did you have sex or a

5   sexual relationship with BD-- You know that's Brienna

6   DuBorgel?

7       A.   (Nodding in the affirmative.)

8               COURT REPORTER:  Yes?

9   BY MR. HINTON:

10      Q.   -- at any time?  Do you see that question?

11      A.   Yes.

12              THE COURT:  You can't nod.  That's

13          why she interrupted you.

14              MR. GODLEWSKI:  I got you.  Yeah.

15              THE COURT:  Okay.

16  BY MR. HINTON:

17      A.   My answer was no.

18      Q.   Okay.  So you lied there?

19      A.   I believe I misunderstood the question

20  because of the context.

21      Q.   What's so confusing about that question?  Do

22  you not understand the words any time?

23      A.   I believe this set of interrogatories was

24  part of another set of interrogatories that I got

25  relatively at the same time.  Some of those-- most of

1  the other questions in regards to my relationship with

2  Brie had the fifteen year old.  In fact, almost all of

3  your interrogatories had the fifteen year old.  This is

4  the only time that you ever asked me directly did I

5  have a sexual relationship with Brie.  And I believe I

6  misconstrued what you were asking as when she was

7  fifteen because of all of the prior interrogatories

8  that did mention when she was fifteen.

9       Now, I don't see those questions that I'm

10  referring to in this particular set, but there's been a

11  lot of different sets.

12       Q.  You're a smart guy, right?

13       A.  (No response given.)

14       Q.  Mensa?  Aren't you a member of Mensa?

15       A.  I'm not a member of Mensa, no.

16       Q.  High IQ, though?  You've had your IQ tested?

17            MR. KOLMAN:  Objection.  Irrelevant.

18  BY MR. HINTON:

19       Q.  So you were-- the second part of the

20  question is:  If yes, when did you have sex or sexual

21  relationship with her and how long did the sexual

22  relationship last?  And you answered N/A, not

23  applicable, correct?

24       A.  Yes.

25       Q.  So didn't that help clear up any confusion

1    you may have had about the question?

2        A.    No, it didn't clear up any confusion at all

3    because once I read if yes, I didn't read the rest

4    because the answer was no to number seven.

5        Q.    So at no time did you admit in discovery in

6    this case to ever having a sexual relationship with

7    Brienna, is that correct?

8        A.    Can you restate that?

9        Q.    Did you ever admit in any of your discovery

10   responses that you had a sexual past with Brie?

11       A.    I believe in the question that I was asked

12   in one of the interrogatory sets, if the text messages

13   between Brie and I, the most recent text messages, were

14   true.   And to that question I answered-- or were

15   accurate or were from me.   To that question I answered

16   yes.   And the content of the text messages in which I

17   was referring to did reference a recent sexual

18   relationship.

19       Q.    Okay.   Well, let's get that on paper here.

20             When was your recent sexual relationship

21   with her?

22                 THE COURT:   When was the admission

23             made or when did the act take place, Tim?

24                 MR. HINTON:   The only thing he

25             admitted, Your Honor, is that these were his

text messages.

THE COURT:  I'm asking you that.  I don't know what date you're asking about, when he made an admission or when he actually had it.

MR. HINTON:  When did he begin a sexual relationship with Brie.

BY MR. HINTON:

A.   I would say 2013, 2014, 15, somewhere in that--

Q.   All right.  So you're still on probation at that time from corrupting her at that time and you're having sex with her at that time?

A.   No.

Q.   You were on probation for two years, weren't you?

A.   I know.  You're putting me on the spot, and I can't remember when our relationship was.

Q.   So let's get this straight.  So you admitted in Court--

A.   I'm sorry.  I could correct the record if I may.  It was almost certainly from 2015 to 2016.  And I remember that because of the time that I started my real estate company was the same year.

Q.   Okay.  So you started the agency with George

```
 1    Plisko, correct, 2015?
 2         A.   Correct.
 3         Q.   And at that time you began a sexual
 4    relationship with Brie?
 5         A.   Yes.
 6         Q.   All right.  So you corrupted her--
 7                   MR. KOLMAN:  Objection.
 8    BY MR. HINTON:
 9         Q.   --2009 and 10, correct?
10                   THE COURT:  Factually accurate
11              question.  Overruled.
12    BY MR. HINTON:
13         Q.   You corrupted her in 2009 and 2010?
14         A.   I pled guilty to corruption of minors, yes.
15         Q.   Of her, though, not some unspecified victim?
16    It was Brienna, right?
17         A.   The one that was in the complaint, yes.
18         Q.   She's the victim?
19         A.   Of course.
20         Q.   You corrupted her?
21         A.   Yes.
22         Q.   And you served probation for two years and
23    then you began a sexual relationship with the person
24    you corrupted earlier?
25         A.   Correct.
```

1    Q.   Do you see anything wrong with that?

2    A.   No.

3         Can I elaborate?

4    Q.   No.

5    A.   I didn't think you'd want me to.

6    Q.   So-- And you're married at the time that

7    you're now in a sexual relationship with her?

8    A.   We were kind of on the outs of our marriage.

9    We weren't separated, but we were having severe

10   problems in our marriage.

11   Q.   She filed for divorce in March of 2021?

12   A.   Yes.

13   Q.   She never filed before then?  Dori I'm

14   talking about.

15   A.   Almost, but no.

16   Q.   But no.  All right.

17        So let's go through the time line here.

18              MR. HINTON:  Your Honor, it's

19              Exhibit AA, if you want to follow along in

20              your notebook.  I think it will speed things

21              up.

22   BY MR. HINTON:

23   Q.   Mr. Godlewski, I served interrogatories upon

24   you on July 9th of 2021, over a year and a half ago.

25   And in the one interrogatory I asked:  Do you have any

1   letters, e-mails, or text messages to or from the
2   fifteen year old girl?  Do you see that?
3        A.   Yes.
4        Q.   And you answered none?
5        A.   Correct.
6        Q.   Is that correct?
7        A.   Yes.
8        Q.   Now, as it turns out, Brie has given us five
9   hundred pages of text messages with you and her in just
10  2021 and 2022, is that correct?
11       A.   Yes.
12       Q.   And you've now admitted that those are your
13  true and accurate communications with Brie, is that
14  correct?
15       A.   That's correct.
16       Q.   Okay.  So you didn't admit to having those
17  when you answered my discovery, is that correct?
18                 THE COURT:  Where are you in this
19            chart?  You're losing me.
20                 MR. HINTON:  I'm right under
21            September 20th when he responded.
22                 THE COURT:  Oh, okay.  Now I got it.
23                 MR. HINTON:  Okay?
24                 THE COURT:  Okay.
25                 MR. HINTON:  Rather than saving

1          paper I didn't want to restate the
2          interrogatory and the response because
3          they're both included.
4               THE COURT:  That's all right.
5     BY MR. HINTON:
6          Q.   You answered none, is that correct, to
7     number 33?
8          A.   Yes.
9          Q.   Is that a deliberately false answer?
10         A.   No.
11         Q.   It's wrong--
12         A.   It's not a false answer at all.
13         Q.   Oh, so you're taking it literally, you-- you
14    thought I just meant a random fifteen year old girl?
15    Is that what you're saying to the Court?
16         A.   No.
17         Q.   You knew I was talking about Brie in that
18    interrogatory, right?
19         A.   Yes.
20         Q.   And where are the five hundred text messages
21    that you had with Brie?  Didn't you have those on your
22    phone?
23         A.   You asked--
24         Q.   Five hundred pages.
25         A.   You just asked me if I took the question

1  literally, which is what everyone does when they're

2  asked a question in a legal manner.  I took the

3  question very literally.  And what the question says--

4  I can read it back to you:  Do you have any letters,

5  e-mails, or text messages to or from the fifteen year

6  old girl?

7       Q.    Right.

8       A.    I had none of those with the fifteen year

9  old girl.  The fifteen year old girl references an age.

10  I had no contact or messages from the time that Miss

11  DuBorgel was fifteen years old.  In fact, you asked

12  that several times throughout that same interrogatory,

13  which was what I was asked.

14       Q.    And you didn't understand I was using

15  fifteen year old girl to protect her privacy?

16       A.    No, because in other areas of the

17  interrogatories you used BD.  That protects her

18  privacy.

19       Q.    Well, we went to BD.  It's just a double

20  down in--

21       A.    Mr. Hinton, I'm sorry to interrupt you, but

22  just-- looks like here two weeks later you used BD.

23  And prior to the first set of interrogatories you also

24  used BD.

25       Q.    But you didn't fess up to any communications

1    with BD either, did you?

2          A.    Yes, I did.

3          Q.    Where?

4          A.    In Exhibit AA.  From December--

5          Q.    These--

6          A.    I'm answering your question.

7          Q.    Go ahead.

8          A.    From December 8th, 2022 do you admit that

9    the documents attached here to Exhibit A, Scranton

10   Times 1021 to Scranton Times 1508, are copies of

11   electronic messages communications you had with BD?

12   Answer:  Yes.

13         Q.    Well, that's after-- Let's go--

14         A.    That's not what you asked me.

15         Q.    Let's back date, Mr. Godlewski.

16         A.    Okay.

17         Q.    Okay.  So let's-- So I asked you on

18   September 9th do you have any text messages to or from

19   the fifteen year old girl, your answer was none?

20         A.    That was a year prior.

21         Q.    Right.  Then also on that date, September

22   20th, I asked you if you had any documents.  This is in

23   a request for production.  I'm requesting any documents

24   to include tele-communicative documents sent to or from

25   the fifteen year old girl referred to in the article,

1    and your answer was none, right?

2        A.    Correct.

3        Q.    You didn't identify all the text messages

4    that have now been produced to the Court, is that

5    correct?

6        A.    (No answer given.)

7        Q.    The five hundred pages of text messages?

8        A.    That's correct, but I wasn't asked to.

9        Q.    Let's go further.

10           Then I asked you on June 24th, I asked you

11   in a request for production of documents set forth--

12   produce any text messages between Phil Godlewski and

13   Brienna DuBogel, BD.  That BD is only for our purposes.

14   In the actual request I spelled her name out, correct,

15   for you, for your purposes?

16       A.    I don't recall, but I knew who you were

17   speaking of, yes.

18       Q.    Okay.  From 2008 to the present date.

19   Present date being the Summer of 2022?

20       A.    Yes.

21       Q.    Your answer was I do not have any?

22       A.    That's correct.

23       Q.    And you stand by that?

24       A.    Yes.

25       Q.    Okay.  And then you're served with

1   interrogatories.  Exhibit M.  And I asked you:  Have

2   you communicated with BD about this lawsuit or your

3   damages from the article, and your answer was yes?

4       A.   Correct.

5       Q.   Correct.  And I say if yes, please state the

6   dates of such communications, the form of such

7   communications, and the substance of such

8   communications.  Do you see that?

9       A.   Yes.

10       Q.   And your answer was on July-- or on November

11   9th, 2022, answer, does not recall the specific date of

12   communications-- communication.  Plaintiff spoke with

13   BD in person.  You don't mention text messages, right?

14   You just say in person?

15       A.   Yes.

16       Q.   You spoke to her in person regarding the

17   filing and warned that it was eminent.  That's your

18   lawsuit against the Scranton Times, right?

19       A.   Yes.

20       Q.   You filed that in May of 2021, right?

21       A.   Yes.

22       Q.   You had about a thousand text messages with

23   her after you filed the lawsuit, right?

24       A.   Yes.

25       Q.   Okay.  You didn't say to me in answering

1   this discovery anything about your thousand text

2   messages with her, did you?

3        A.   No.

4        Q.   Did you do that to deceive me?

5        A.   No.

6        Q.   Why did you do that?  Why didn't you tell me

7   about them?

8        A.   You didn't ask me.  You said-- I don't know

9   why that's funny.

10       Q.   A text message isn't a communication?

11       A.   You asked me--

12                 MR. KOLMAN:  I'm going to ask

13            counsel to withdraw from being close to the

14            witness.

15  BY MR. HINTON:

16       A.   Can I continue?

17                 MR. HINTON:  No problem, Your Honor.

18  BY MR. HINTON:

19       Q.   Yes.

20       A.   In number seven, the interrogatory that

21  you're talking about, your question was-- your demand

22  or request was to produce any text messages between

23  myself and Brie.  I'm not-- I was not able to produce

24  those text messages.

25       Q.   Why?

1    A.    Because I didn't have them.

2    Q.    Where were they?

3    A.    They were deleted.

4    Q.    Okay.

5    A.    I can't produce something that's deleted.

6 You're welcome to subpoena whoever you need to try to

7 get the copies.

8    Q.    Was that your typical thing, to delete text

9 messages with Brie after you had them?

10    A.    Not just with Brie, but with numerous

11 people, yes.  I have thousands of text messages in my

12 phone that slow it down.  As well as e-mail and other

13 forms of communication.

14          Mr. Hinton, I was simply responding to what

15 you requested me to do.  I was in no way trying to be

16 deceitful whatsoever.  I take a little bit of offense

17 to the fact that you said that I took your question

18 literally.  I don't know how else you would expect me

19 to take it.

20          MR. HINTON:  Your Honor, I'm going

21          to go to Exhibit NN.

22 BY MR. HINTON:

23    Q.    Can you go to that, Mr. Godlewski?

24    A.    In the big book?

25    Q.    Yeah.  Thank you.

1    A.    Okay.

2    Q.    Mr. Godlewski, I'm directing your attention

3    to Plaintiff's response to Defendant's interrogatory

4    set five. And these were sent to me on December 8th,

5    2022. And the second to the last page, is that your

6    verification page to your answers to interrogatories?

7    A.    Set five?

8    Q.    Yes.

9    A.    December 7th, yes.

10   Q.    Yes. All right. So let's take a look at

11   your answers to interrogatories for set five. Number

12   one, how long has Plaintiff been using his current cell

13   phone for the number 570-780-4567? And you say I've

14   been using that since September of 2022. Is that

15   right?

16   A.    That's correct.

17   Q.    True and accurate?

18   A.    Yes.

19   Q.    Then I say number two: Has Plaintiff

20   deleted any text messages he had with Brienne DuBorgel

21   while using the current cell phone or phone number for

22   that number? Do you see that?

23   A.    Yes.

24   Q.    And what was your answer?

25   A.    No.

1    Q.    But now you just told the Court that you do

2    delete your text messages with Brie?

3    A.    At that time the cell phone was new.

4    September of 2022, that was the new model.  I believe

5    it was model 14 or whatever.  That was a new cell

6    phone.  The previous text-- When you asked me that

7    question, the answer was accurate.  I didn't delete any

8    of them.

9    Q.    Okay.  So how do you explain how your-- your

10   Telegram post has a text message on it from you?

11   A.    I don't know what you're referring to.

12   Q.    Let's look at Exhibit BB.

13   A.    What was the question?

14   Q.    That's a text message that you posted to

15   your Telegram page, is that correct?

16   A.    That's incorrect.

17   Q.    You didn't post that?

18   A.    That's not what I said.

19   Q.    Okay.  What is that?

20   A.    That is a screenshot of a text message.

21   Q.    From your phone?

22   A.    No.  It was taken from my laptop.

23   Q.    Okay.  Why didn't you produce it to me in

24   discovery?

25   A.    Because the text messages were no longer on

1   my phone.  That's what you asked for.  This is a
2   screenshot from a single-- looks like a single moment,
3   maybe a couple-minute conversation between Brie and I.
4   I have several screenshots like this.  You asked me for
5   text messages.

6        Q.   I asked you for any electronic
7   communications, Mr. Godlewski.

8        A.   This is not an electronic communication.
9   This is a screenshot, which is a JPG file.

10       Q.   So--

11       A.   I would have been happy to give you any
12  communications I had with Brie recently.  I have
13  nothing to hide there.  In fact, you have them all
14  anyway.

15       Q.   I do.  I got them from Brie.  I didn't get
16  them from you in discovery like you were supposed to
17  do.

18       A.   You didn't ask me for them.  You asked me if
19  I had certain messages, which at the time I did not
20  have.

21                  THE COURT:  Is a JPG file considered
22            analog?

23                  MR. GODLEWSKI:  Is it considered
24            what?

25                  THE COURT:  Analog.

1    MR. GODLEWSKI:  No.

2    THE COURT:  It's digital?

3    MR. GODLEWSKI:  It is digital.

4    THE COURT:  He asked for digital

5    communications.

6    MR. GODLEWSKI:  It's a photo though.

7    It's not a communication.

8    THE COURT:  It's a screenshot of a

9    digital communication.

10    MR. GODLEWSKI:  Of a communication.

11    THE COURT:  A JPG file?  It's like a

12    Xerox-- if you were analog, it would be like

13    a Xerox of a letter.  You've taken your

14    screenshot-- You've taken your screenshot,

15    and you just made a duplicate of it.  So you

16    can transmit it to another party?

17    MR. GODLEWSKI:  Yes, that's correct.

18    THE COURT:  Yeah.  That's all

19    digital.

20    MR. GODLEWSKI:  That-- Yes, that's

21    digital.  That's correct.

22    I think, Your Honor, where I was

23    most likely misunderstanding the question

24    asked by Mr. Hinton was he asked me for text

25    messages and communications.  When I think

1  of the term-- the broader term

2  communications, I think of a sent e-mail or

3  a received e-mail, a sent text message or a

4  received text message.  This is one single

5  JPEG file that I had of a much broader

6  conversation.  I didn't have any more of the

7  communications between Brie and I.  And,

8  furthermore, if I did, I would have been

9  happy to produce them.  He's asked for

10  several hundred things through discovery,

11  which I produced all of.  Had I had them,

12  there's nothing incriminating there for me

13  in regards to this case.  I would have

14  gladly produced them.  I just no longer had

15  the communications.  Had I thought of a

16  photo in the context that you just

17  described, I would have given him the photo.

18  I don't know-- I guess it's my opinion.  But

19  I don't know-- I think this one screenshot

20  of a much larger conversation could be taken

21  quite out of context since it's just one

22  screen grab with ten lines on it out of

23  maybe a hundred or two hundred line--

24      THE COURT:  Yeah, but your name is

25  on it so it would have been you that was

1    taken out of context. You chose to make a

2    screenshot of that-- If we-- we think of

3    this in mathematical terms-- Okay? --and

4    your entire message that you're concerned

5    about is a set--

6              MR. GODLEWSKI:  Right.

7              THE COURT:  --this is a subset of

8    that.  Right?

9              MR. GODLEWSKI:  Correct.

10             THE COURT:  So you've chosen to

11   create this subset?

12             MR. GODLEWSKI:  Yes.

13             THE COURT:  Okay.

14             MR. GODLEWSKI:  Correct.  But in

15   response to Mr. Hinton's question, I-- there

16   was nothing there that I deliberately

17   attempted to keep from the Court.  I think I

18   was probably-- Now I understand what he's

19   talking about, literal.  I was probably

20   taking his questions too literal.  And I-- I

21   don't-- it was not something that I

22   purposely, you know, tried to withhold from

23   you.  There was nothing content wise that

24   you could see that would have been harmful

25   to my case.

1 BY MR. HINTON:

2     Q.  Mr. Godlewski, if you look at these thousand

3 plus text messages, some of these text messages are

4 dated after I served you with discovery asking you for

5 the text messages and before you respond. Like, in

6 twenty, thirty, sixty-day windows you're communicating

7 with Brie while the request for production or

8 interrogatories is pending. You understand that,

9 correct?

10     A.  I don't know specifically what dates you're

11 speaking of.

12     Q.  Let's drill down on it. So if you look at

13 the first interrogatories I sent you, do you have any

14 text messages--

15     A.  Do you have a copy of that?

16     Q.  --to or from the fifteen year old girl?

17 That's on July 9th, right? And then I ask you in the

18 request for production of documents for copies of any

19 of those text messages. When did you respond-- When

20 did you respond to--

21           MR. KOLMAN:  Objection, Your Honor.

22 Asked and answered. He said--

23           THE COURT:  He didn't even finish

24 the question yet. Let him finish the--

25           MR. KOLMAN:  Your Honor, if I may,

1       the question deals with a fifteen year old

2       girl. That's something Mr. Godlewski has

3       already testified about.

4              MR. HINTON:  I don't believe it.

5       How about that?

6              MR. KOLMAN:  It's asked and answered

7       in the sense that--

8              THE COURT:  Overruled.

9              MR. KOLMAN:  --he already

10      testified--

11             THE COURT:  Overruled.

12             MR. KOLMAN:  --about texts from--

13             THE COURT:  Overruled, overruled,

14      and overruled.

15   BY MR. HINTON:

16      Q.   Mr. Godlewski, from the time I served you

17   with the interrogatories and request for production of

18   documents in early July, 2021, until the time of your

19   response on September 20th, there's thirty one pages of

20   text messages here, is that correct, during that time

21   period that it's pending?

22      A.   Yes, that's correct.

23      Q.   And are you-- Just so we understand your

24   position, you're saying I was inartful in the way I

25   asked for your text messages?

1    A.   Inartful?

2    Q.   Yeah.  I wasn't specific enough?

3    A.   I don't think that's a word.

4    Q.   I wasn't specific enough?

5    A.   Yes.

6           MR. KOLMAN:  Objection.

7 BY MR. HINTON:

8    Q.   And that's why you withheld the text

9 messages from production and discovery?

10   A.   I didn't withhold anything that was asked of

11 me at any time.  On your September 20th interrogatory

12 you asked me for messages or communications with a

13 fifteen year old girl.  I didn't have any of them.  I

14 haven't had them for years.  In fact, if anyone has

15 them, it would be the District Attorney's Office.

16        THE COURT:  Right above there, in

17          the Plaintiff's discovery time line, it

18          says:  These interrogatories are continuing

19          in nature.  It's the second box dated July

20          9th and July 12th.  These interrogatories

21          are continuing in nature and require you,

22          the Plaintiff, to file supplementary answers

23          pursuant to Rule 4007.4.

24        Did you ever file any supplementals?

25        MR. HINTON:  No, Your Honor.

1           MR. GODLEWSKI:  I don't believe so.

2           THE COURT:  Okay.

3           MR. GODLEWSKI:  But, again, Your

4      Honor, I was-- The specific question that

5      Mr. Hinton is asking me about right now

6      referenced twice question 33 and question

7      19, to or from the fifteen year old girl.  I

8      was quite literally taking his question as

9      it was asked.  I did not have any text

10     message conversations between myself and the

11     fifteen year old girl.  Had he said BD or

12     Brie DuBorgel, which he had said numerous

13     times afterwards, I would have answered

14     accordingly.  I wouldn't have-- I wouldn't

15     have purposely not answered the question.  I

16     asked what was-- I answered what was asked

17     of me quite literally.

18    BY MR. HINTON:

19       Q.   Well, let's examine that.

20       A.   Okay.

21       Q.   Let's go to August 22nd on the time line.

22           MR. KOLMAN:  Mr. Hinton, can you

23     move away from my client?

24           MR. HINTON:  I need a ledge here,

25     Tim.

1        MR. KOLMAN:  Okay.  Go ahead.

2        MR. HINTON:  Thank you.

3        MR. KOLMAN:  Go ahead.

4   BY MR. HINTON:

5        A.   Where you at?

6        Q.   Go to August 22nd in the time line.

7                 THE COURT:  About halfway down.

8   BY MR. HINTON:

9        A.   I got you.

10       Q.   It's asking you to produce any text messages

11  between Phil Godlewski and Brienna DuBorgel from 2008

12  to the present date.  Is that right?

13       A.   That's correct.

14       Q.   Okay.  And your answer was does not have

15  any, right?

16       A.   Yes.

17       Q.   And I'm showing you in the text messages,

18  ST-1483 through ST-1494, eleven pages of text messages

19  you had with her four days before your response?

20       A.   That's correct.

21       Q.   So--

22       A.   I believe.  Hold on one second.

23       Q.   So four days before you sign a verification

24  saying you don't have any, you had eleven pages of text

25  messages with her four days beforehand?

1    A.   The text messages that I had with her four

2    days beforehand that you just-- yes, that did happen.

3    Q.   No confusion about a fifteen year old there,

4    right?

5    A.   No.

6    Q.   You knew I was asking for Brie--

7              MR. KOLMAN:  Objection.  He didn't

8              finish his answer.

9    BY MR. HINTON:

10    Q.   Go ahead, please.

11    A.   No, I had no confusion as to what you were

12    asking about.  My answer was I did not have any.  I had

13    deleted the text messages.

14        The things that Brie and I would speak about

15    often times, especially during this period, were

16    private, somewhat sexual, and somewhat embarrassing in

17    nature, including videos, photos that we sent, not just

18    from me to her, but from her to me, as Mr. Kolman

19    identified earlier.  That's not something that I tend

20    to, like, keep around in my phone.  So when I'm having

21    those type of conversations with Brie, or with anyone,

22    even with my fiancée now, I delete them afterwards for

23    fear of that someone is going to grab my phone or my

24    phone will be hacked into or something like that.

25        So when I answered the question, had I

1  known-- had I had the foresight to know that you were

2  going to ask that question four days earlier, I would

3  have absolutely saved the text messages. At the time

4  you asked the question, and at the time that I

5  answered the question, my answer was Plaintiff does not

6  have any. I do not have them. They were deleted

7  because of privacy concerns, I guess, on my end and

8  for Brie.

9      Q.   But I served you-- As soon as you filed your

10  lawsuit, I served you with a preservation of evidence

11  letter, didn't I?

12      A.   Sure, yes.

13      Q.   Yeah. Right in the beginning of the

14  lawsuit, preserve all electronic device evidence,

15  didn't I?

16      A.   Yes.

17      Q.   And you went ahead and you started deleting

18  all your text messages with Brie and your photos with

19  Brie, right, sexual photos?

20      A.   Not just those photos, but numerous things I

21  deleted off my phone. I didn't think that anything

22  that I spoke with Brie about, especially of a-- of a--

23  of a nature such as, you know, a private nature was any

24  sort of evidence to this case.

25          My case is about suing the Scranton Times

1  and Chris Kelly for defamation. I had no idea a

2  conversation that I had with Brie has anything-- any

3  sort of evidentiary value to that case.

4      Q.  She's the prime witness in your case, isn't

5  she?

6              MR. KOLMAN:  Objection.

7          Argumentative.

8  BY MR. HINTON:

9      Q.  Isn't your case--

10             THE COURT:  Overruled.  It's cross

11         examination.

12 BY MR. HINTON:

13     A.  What was the question?

14     Q.  Your case is principally based on the

15 accusation that the Scranton Times article called you a

16 pedophile, isn't that true?

17     A.  Amongst several other things.

18     Q.  Well, they called you a QAnon person, right?

19     A.  Amongst several other things.

20     Q.  Well, you are a QAnon person?

21     A.  I don't know what that means.  I'm sorry.

22 You'd have to define that.

23             MR. KOLMAN:  Objection from people

24         laughing.

25             MR. GODLEWSKI:  Yeah.  He's very

1          distracting, Mr. Kelly.

2                THE COURT:  Why don't we-- If you

3          can't behave, Mr. Kelly, you're going to be

4          asked to leave.

5                MR. KELLY:  Understood, Your Honor.

6          I'm sorry.

7    BY MR. HINTON:

8          Q.  Well, let's get back to this.

9                Are you telling the Court you didn't

10   understand Brienna DuBorgel was a principal witness in

11   this case?

12         A.  No, I did not think she was a principal

13   witness in this case at all.

14               Our case with the Scranton-- my case with

15   Lackawanna County from 2008, 9, 10, whatever the dates

16   were, was settled many years ago.  We went through a

17   numerous amount of discovery, subpoena requests, cell

18   phone gathering.  They raided my-- not raided, but they

19   went to my place of employment, took my computers from

20   there; my house, took my computer from there.

21   Interviewed several dozen people as I understand it.

22   There were private investigators involved from my

23   criminal defense attorney.  This case was settled.

24   This case was over with.  I--

25         Q.  Well, you pled guilty, right?

1     A.    I was--

2            MR. KOLMAN:  Objection.  If he could

3         finish his answer.

4            THE COURT:  He was correcting the

5         word settled.

6  BY MR. HINTON:

7     Q.    You pled guilty?

8     A.    I pled guilty to one charge out of about a

9  dozen charges.

10    Q.    Of corrupting Brie?

11    A.    Yes.  And the charges were nolle prossed

12  against me for all of the felonies and all of the other

13  charges that the Scranton Times has accused me of--

14  of-- has written being truthful.  That's not how it

15  ended up in Court.  There was a Court decision on the

16  matter.  Ms. DuBorgel had her day in Court.  Brie had

17  her day in Court, and she chose to not testify.

18  Therefore, even though all of those things were

19  collected in discovery against me, the District

20  Attorney could not prove their case.

21    Q.    Mr.--

22    A.    So I don't think Brie has anything to do

23  with this particular trial.  You brought her into it,

24  not me.

25    Q.    But you understand that in a defamation case

1  truth is a defense?

2              MR. KOLMAN:  Objection.  Asks for a

3          legal conclusion.

4              THE COURT:  Sustained.

5  BY MR. HINTON:

6      Q.  I just asked for your understanding.  You

7  might be wrong.

8          But do you understand that we're mounting a

9  defense to prove that you did, in fact, have a sexual

10 relationship with--

11             MR. KOLMAN:  Objection.

12 BY MR. HINTON:

13     Q.   --Brie DuBorgel--

14             MR. KOLMAN:  Same objection.

15 BY MR. HINTON:

16     Q.   --when she was fifteen?

17             THE COURT:  I'm going to tell you

18          something, Tim.  I'm trying to keep this

19          civil.  I want you to use the courtesy used

20          in the past, which is let him complete his

21          question before you object to it.  I can't

22          rule on it if it's a partial question.

23             MR. KOLMAN:  All right.

24 BY MR HINTON:

25     Q.   I lost my train of thought.

1  A. Me too.

2      THE COURT: Linda, do you want to

3     read it back, please.

4      (Whereupon, the referred-to question

5     was read back by the reporter.)

6 BY MR. HINTON:

7  Q. Yes. Did you hear that question? That

8 we're asserting in this case, this defamation case,

9 that you did, in fact, have a sexual relationship with

10 Brienna DuBorgel when she was fifteen? Do you

11 understand that?

12      MR. KOLMAN: That's my objection,

13     Judge.

14      THE COURT: Overruled.

15 BY MR. HINTON:

16  A. Yes, I understand that's what you're trying

17 to do.

18  Q. And that if we prove that, that you did, in

19 fact, have that relationship, it would be a defense to

20 that portion of your defamation case?

21      MR. KOLMAN: Objection. Legal

22     conclusion.

23      THE COURT: He's just asking if he

24     understood. Overruled.

25 BY MR. HINTON:

1   A.   Can you restate?

2   Q.   Never mind.

3        Mr.--

4   A.   I'm getting confused when--

5   Q.   Yeah.  Mr. Godlewski, the Telegram post you

6   have here, that coincides with the production from

7   Brienna-- Brienna's phone, which is Exhibit CC.  It's

8   the same text message here.  Is that correct?  If you

9   compare the two, right?

10                  THE COURT:  Tim, are you simply

11              asking him if PP and CC are the same thing?

12                  MR. HINTON:  As to one particular

13              text message, yes, Your Honor.

14                  THE COURT:  Okay.

15  BY MR. HINTON:

16  Q.   Can you read the heartstrings text message?

17  A.   The heartstrings?

18  Q.   Yep.

19                  THE COURT:  The top one on CC.

20                  MR. GODLEWSKI:  Oh.

21  BY MR. HINTON:

22  A.   So this would be from Brie to me on August

23  18th, two fifty seven p.m.  Listen, I already told you,

24  aside from your beef and tugging of the heartstrings

25  argument you have with Chris Kelly, or any prior

1  trouble aside from me, that is irregardless.  But I
2  will make sure that no one ever calls you a pedophile
3  again, and our public beef can be squashed, and Linda
4  leaves us the-- Can I say it?

5      Q.    Yeah, you can say it.

6      A.    -- fuck alone.

7      Q.    Yeah.  Okay.  So that's-- that's from the
8  production, the forensic download of Brie's phones, you
9  understand that, correct?

10     A.    Yes.

11     Q.    And then there's also a version of that text
12 message in Exhibit BB that's from your perspective, is
13 that correct?

14     A.    My perspectives?

15     Q.    It came from your laptop or your phone?

16     A.    Yeah.  That's the same screenshot that we
17 referenced earlier, the JPEG that I posted to the--

18     Q.    What's the date of the text message from
19 Brie about heartstrings?

20     A.    It's August 18th, 2022, two fifty seven p.m.

21     Q.    Okay.  Now, you had access to your version
22 of that text message, from your perspective?

23     A.    Yes.

24     Q.    And I assume you had other text messages
25 with Brie?  This wasn't just one isolated text message

1    on your laptop, you had many text messages with her?

2        A.    Yes.

3        Q.    And you didn't give me any of them?

4        A.    I had already explained this.

5        Q.    But I-- It's a yes or no.  Did you give me

6    any of your text messages in discovery?

7        A.    You asked me to produce text messages that

8    I had, and I did not have any at the time you asked

9    me.

10        Q.    And then when I asked you to describe your

11    communications with Brie, the only thing you said in

12    answer to my interrogatory was I forewarned her about

13    the lawsuit you were about to file to make sure she was

14    going to be okay with it, is that correct?

15        A.    You asked me if I had ever spoke -- Can you

16    show me what you--

17        Q.    Yeah.  It's right here.  On July-- On

18    November 9th, on the time line, I asked you if you've

19    had communications with her, to state the substance of

20    them?

21        A.    Yes.

22        Q.    Your answer on November 9th was:  You spoke

23    to her in person about the filing and warned her that

24    it was eminent, right?

25        A.    Yes.

1    Q.    You didn't admit to any of these text

2  messages that you had with her?

3    A.    I never spoke to Brie about the lawsuit in

4  the text message format.  The only time we ever spoke

5  about the lawsuit was in person or, I believe, over the

6  phone.

7    Q.    All right.  Let's get the pile of text

8  messages out from Brie's phone.

9    A.    Is that this here?

10    Q.    Yes, please.

11    A.    Okay.

12    Q.    So the first one I want to point your

13  attention to is on Page 1456.

14    A.    I'm sorry, Tim.  These are massively out of

15  order.  I got 1457, and then it goes to 1022, 1459.

16    Q.    Follow along with me.  I'll give you a new

17  stack.

18            THE COURT:  Did you say 1456, Tim?

19            MR. HINTON:  Yes.

20  BY MR. HINTON:

21    Q.    So 1456, you sent her a text message on

22  May 28th.  There were a lot of text messages that day,

23  right?

24    A.    I see one right now.  I don't remember what

25  else.

1     Q.   We're going to go through them.

2     A.   Okay.

3     Q.   And you text-- This is your text message to

4  her, right?

5     A.   Yes.

6     Q.   And you said:  But I get the feeling you

7  already know so I'll back off.  I'll be here if you

8  want to meet up and check.  Do you say that to her?

9     A.   Yes.

10     Q.   Okay.  You had asked her to hang out, right?

11     A.   Yes.

12     Q.   Let's flip forward here.  I don't want to

13  take up too much time of the Court's time.

14          Then on 1459 you text her and you say:  I

15  think it might be fair to say that there's a very, very

16  large and very, very unique financial opportunity that

17  exists in front of you.  Is that what you wrote to her?

18     A.   Yes.

19     Q.   And what-- Why did you write her that text

20  message?

21     A.   At the time we were-- my team and I were

22  considering starting a-- a new-- a related business to

23  the businesses that I had already started regarding

24  gold and silver.  I think you're aware of my PSI and 7K

25  business.  We were about to start another one in a

similar fashion. And what I learned with the first one, I incorrectly set it up. In the way that MLM's and direct sales companies operate you kind of want to have your most-- you kind of want to have your people at the top of the chain that are going to be most reliable, most trustworthy, most communicative-- communicative. You want to put good people up at the top.

So when we were starting this new company I wanted to, this time, which I didn't do the first time, I wanted to, this time, make sure that I solidified my downline or upline, as they call it, with the proper people. And I believe the first time that I did this with my first business it wasn't going to go well.

Now, this particular business I was trying to get Brie-- I knew she was having financial trouble from our prior conversations. I knew that she had ambitions to go to out of state to maybe do some legal work and stuff like that for her degree that she was trying to obtain. So I thought-- Brie and I always had a very good relationship, always from day one. Anybody that says otherwise is-- is a liar. So as a friend to Brie, and as a long-time acquaintance, as Brie has testified to today, I was trying to put Brie in the top of this company so that she could benefit

1   financially from it once it was launched.

2       Q.   To sell silver or gold?

3       A.   No.  This was not a gold or silver company.

4   This was an IRA, 401k rollover company.

5       Q.   Goldco?

6       A.   It's not Goldco.  It's actually-- Goldco was

7   one of the vendors, but there are several vendors that

8   are part of my GoldQuiz.com lead funnel I guess you

9   would call it.

10      Q.   Did you ever make her an offer to get

11  involved in that company?

12      A.   I wanted to.  She never responded.

13      Q.   Okay.  All right.

14      A.   She didn't-- She didn't seem interested.

15      Q.   What--

16      A.   I think she may have assumed that I might

17  have been talking about the Scranton Times case when I

18  wasn't.  I was trying to help her.

19      Q.   Okay.  So what was unique about this

20  financial opportunity for her?

21      A.   The money.

22      Q.   Oh.

23      A.   The amount of money associated with it.

24      Q.   All right.  So go to the next page, 1460.

25  You wrote to her:  The type of opportunity that happens

1    to hardly anyone.

2       A.    Yes.

3       Q.    That was this rollover retirement accounts

4    into gold or silver?

5       A.    Can I tell you what I meant by that

6    particular comment?

7       Q.    Sure.

8       A.    When I say the type of opportunity that

9    happens to hardly anyone, I don't necessarily mean

10    somebody rolling over their 401k or IRA into precious

11    metals. What I meant was me-- in the position that I'm

12    in, as a social media influencer or whatever you guys

13    want to call me, I have a large following. I have ten

14    million, twelve million, fourteen million people that

15    will watch me when I go live on social media.

16       The unique opportunity is that when I launch

17    something in front of that many people, it's a numbers

18    game at that point. If I could get one percent of

19    those people to sign up for the company, that's a lot

20    of people. That's way more than anybody in this room

21    or really anybody-- anyone can potentially get. So

22    Brie being at the top of that company chain, I thought

23    it would help her for the rest of her life, which was

24    important to me considering all we've been through.

25       Q.    Go to 1463, please.

1        Mr. Godlewski, on Page 1463 Brie responded

2   on this same day as part of this same conversation:

3   Oh, are you trying to recruit me for the silver thing?

4   And you responded.  If you could make the noise that

5   you would-- You said (making a non-transcribable sound)

6   No.

7        A.   It's more a (making a non-transcribable

8   sound).  Not a (making a non-transcribable sound).

9        Q.   Right.  But your impression was no, you

10  dummy?

11       A.   Yeah.

12       Q.   Yeah.  "I'm not trying to recruit you for

13  silver."?

14       A.   Correct, yeah.

15       Q.   All right.

16       A.   The silver thing I had launched in August of

17  21.  It was launched way prior to this conversation.

18  So Brie-- I would have had no opportunity to circumvent

19  the people that were already enrolled in 7k Metals or

20  Phil's Silver through Phil's Silver with Brie.  Once

21  you're enrolled, you're enrolled.  You can't go up the

22  upline, you have to go down the downline.  So Brie

23  getting enrolled then made no sense.  Getting enrolled

24  in GoldQuiz though, that did make sense.

25       Q.   Mr. Godlewski, you then responded, after you

1    said no, you said: We really need to meet and chat.

2    Is that correct?

3        A.    Yes.

4        Q.    And then on the next page you said: I can't

5    talk about this through text or over the phone. Is

6    that correct?

7        A.    Yes.

8        Q.    Why couldn't you talk about getting involved

9    in your 401k businesses by phone or text?

10       A.    I was advised not to. I have several

11   attorneys that represent me for FTC and SEC compliance

12   guidelines. When you do advertise this type of thing

13   on social media, and you do have a lot of people

14   listening to you, it's very, very easy to misstep out

15   of place and violate one of their-- one of their rules

16   or regulations.

17            So in recruiting for this team that I was

18   doing, which was part of this conversation, I wanted to

19   make sure that I abided by their wishes.

20            MR. KOLMAN: Your Honor, I have an

21            objection. I just don't see how this is

22            related to the issues before the Court in

23            terms of discovery.

24            MR. HINTON: Your Honor, I'm almost

25            done with this chain. It goes to intent,

1          too, by the way, Your Honor.

2               MR. KOLMAN:  My client didn't have

3          these documents, you know, before they were

4          produced.  And I'm not sure-- I mean, I

5          think Mr. Hinton is about to tell us why

6          he's asking these kind of questions.  I

7          think it's far afield.

8               THE COURT:  I don't.  Overruled.

9    BY MR. HINTON:

10        Q.   Mr. Godlewski, go to 1468, please.  The top

11   message to Brie, again on May 28th, can you read that

12   message?

13        A.   It's May 28th, 2022.  Okay.  Period.  Well,

14   that makes me feel better.  When you're ready I have an

15   opportunity that involves the both of us, but it

16   won't-- it won't work with just one of us.  I don't

17   know which way to go with it until I speak to you so

18   remember me when you feel better and we'll talk.

19        Q.   Then your bottom text messages reads:  But

20   it's a very delicate situation and unless it's handled

21   properly by both of us we stand to benefit absolutely

22   nothing.  And there is a financial windfall here if

23   handled properly.  That's all I can say through text.

24   I don't trust those motherfuckers, and I'm literally

25   foaming at the mouth to take them down once and for

1    all.

2              So are you still talking about your IRA

3    business that you've got on the horizon here?

4         A.   Yes.

5         Q.   Okay.  Whose-- Whose the motherfuckers that

6    you don't trust?

7         A.   That's a long answer, but I'll try to

8    incorporate it into a small response.  I really don't

9    like right now the Federal Government.  I think that

10   the IRS, the Federal Reserve, and several other

11   branches of government are highly, highly corrupt.  And

12   the fiat dollar of the United States is something that

13   I distrust more than anything in the world right now.

14             And when I referred to those motherfuckers,

15   I am specifically talking about the people that I

16   believe I'm helping to-- to take down by getting

17   people's money through GoldQuiz, which is an IRA, 401k

18   rollover to precious metals.  Precious metals, the

19   government can't touch precious metals in the manner of

20   which that I had it set up for Goldco.

21             So I highly, highly distrust government.

22   Not all government, like, you know, Judge Minora or

23   anything like that.

24                   THE COURT:  I don't take it

25             personally.

1      MR. GODLEWSKI:  Thank you.

2  BY MR. HINTON:

3      A.    I really don't mean, like, you know, local

4  government like this.  In some cases I do.  But in this

5  particular conversation-- And I wish I had the

6  opportunity to explain it to Brie in more detail, but I

7  was referring to, in particular, the Federal Reserve.

8  I really think it's best for everyone to take their

9  money that they have in savings and roll it to precious

10  metals if possible for numerous reasons, which will

11  take me an hour to explain.

12      Q.    Was it just a coincidence that fifty seconds

13  later you wrote to Brie on the next page, very next

14  text message:  "You're a good person, Brie.  You don't

15  deserve anything that's happened to you since we met

16  all those years ago.  And I think it's time to set the

17  record straight and shove our collective middle fingers

18  directly up their fucking assholes."?  Is that what you

19  wrote?

20      A.    Yes.

21      Q.    So is that the Federal Government, too, or

22  is that the Scranton Times?

23      A.    That-- No.  None of this was about the

24  Scranton Times.  First of all, I apologize for my

25  language.  This is how Brie and I had always

1  corresponded with this type-- I know it doesn't, you
2  know, sound like something that you would typically
3  hear.

4        But Brie had been put into, for the last ten
5  years-- Keep in mind I have a very close relationship
6  with Brie. Brie had been put into very, very, very
7  desperate financial constraints for a very long time.
8  Brie was having trouble getting an apartment, keeping
9  an apartment. From what she had told me, her family
10 was of little help to her. Brie had several thousands
11 of dollars in credit card debt. Brie had various loans
12 that I think had been suffocating her for a very long
13 time, not only credit cards and stuff like that, but
14 also student loans. And I really think that what these
15 entities have done to people like Brie and many others
16 are despicable, and I wanted to collectively shove our
17 middle fingers directly up their fucking ass.
18      Q.   Going to 1480, you specifically listed the
19 Scranton Times in that text message?
20      A.   Which one?
21      Q.   Page 1480.
22      A.   Yes.
23      Q.   You said: Listen, my friend. Things are
24 getting very nasty with the Scranton Times. I think
25 you should know what's going on. I'd like to talk to

1  you in person.  Right?

2       A.   Yes.

3       Q.   You don't want to talk in text or phone?

4       A.   No.

5       Q.   In person?

6       A.   Right.

7       Q.   I don't want you to be blind-sided by any of

8  this.

9            Then on the next page you write to her:  I

10  have your back, Brie.  You're the one suing, not her,

11  but you have her back, right?

12       A.   Yes.

13       Q.   You should see what they're trying to do to

14  me; it's absolutely awful.  Is that right?

15       A.   That's right.

16       Q.   They're defending themselves in a lawsuit,

17  right?

18                      MR. KOLMAN:   Objection.

19                      MR. HINTON:   Withdrawn.  Withdrawn.

20            That's fine.

21  BY MR. HINTON:

22       Q.   And then she writes you a very long text

23  message--

24       A.   Oh.

25       Q.   --on August 6th, 2022.  I'll read you a

1    portion from the bottom:  I'm--

2                    THE COURT:  The bottom of 1481 or

3         1482?

4                    MR. HINTON:  1482.  Sorry, Your

5         Honor.

6                    THE COURT:  Okay.

7    BY MR. HINTON:

8         Q.   And I'm about twenty percent from the

9    bottom.  I'm legit in school for what I'm in school for

10   to protect myself against this shit and boring, sad,

11   lonely people from Scranton, PA, who have nothing

12   better to do than talk about a guy and a girl having

13   sex literally almost fifteen years ago.  I mean, it's

14   fucking pathetic and obnoxious to me now.  Phil, if we

15   can come to an amicable agreement so nothing-- that has

16   nothing to do with my schooling or you thinking

17   whatever you-- whatever, or my family or Chris Kelly or

18   any of it, if you and I can come to an amicable

19   agreement that you stop dragging me publically and

20   defending yourself and with defending yourself comes

21   making me look like a fuck-- the fucking asshole, if

22   you can agree to stop letting these bored-ass low-lifes

23   get under your skin and get a rise out of you and shut

24   your big opinionated mouth for ten minutes and stop

25   giving people ammo to shoot back at you, I can

1  promise-- I can and promise and I will make sure that
2  when all of this stops that you never have reason to
3  defend yourself ever again because I'll make sure that
4  the Times leaves you alone, leaves me alone, my family
5  alone, and my family and friends leave you the fuck
6  alone.  What do you think I've been doing, huh?
7  Listen, your personal shit aside, I don't care, and I
8  don't know-- I don't either, but publically we are
9  still tied and people are still bored and jerking off
10 to our sex life from fifteen years ago, and it's
11 honestly so weird and overbearing and fucking obnoxious
12 to me and I can't hear about it any more.  No Amanda,
13 no political tube, no lives, nothing.  You and I have
14 come to some kind of terms and all I ever wanted from
15 you is to please stop calling me a liar and making me
16 look like an asshole when it's not true, and all I've
17 ever done is try to protect myself and you by
18 association.  How's that?  And your response to her on
19 the next page--
20       A.   I'm sorry, Tim.  I don't have the next page
21 here.
22       Q.   Read your response into the record, please,
23 from 1485.
24       A.   Let's--
25       Q.   Meet?

1    A.    You said 1485.  I'm sorry.  I thought I was
2    on the wrong page.
3        Q.    Yeah.  The highlighted text message at the
4    top.
5        A.    Okay.  Let's meet and talk.  I think we're
6    mostly on the same page.
7        Q.    Okay.  And you didn't say to her, in
8    response to her long e-mail, no, we never had sex
9    fifteen years ago?  You said we're mostly on the same
10    page, right?
11        A.    In that particular text message I did not
12    say that, no.  And I-- based on what she wrote, which
13    was-- I've got to be honest with Brie and everybody
14    else.  I didn't read that entire text message when it
15    came through.  It looks like a lot on this page, but
16    imagine seeing it on the phone.  I read it several
17    hours later.  And most of what she said in that text
18    message is true, which is exactly what my response was.
19    Most.  Not all, but most.
20        Q.    You weren't talking about IRA's then, right?
21    You're talking about the Scranton Times?
22        A.    Well, first of all, you're taking these text
23    messages out of context because this is four months
24    later from the text messages that I was talking about
25    the IRA's before.

1    Q.   You don't have any text message that ever

2   mention IRA's, do you?

3    A.   Yes.  We just went over them.

4    Q.   How about the letters IRA, are they in any

5   of your text messages?

6    A.   No.  And as I testified to before, my

7   attorneys for that particular company told me not to

8   mention anything in writing or communicatively, however

9   you want to phrase it, in regards to that.  That's why

10  I was so coy on disguising what I was talking about.

11  But you're trying to link text messages from August and

12  September to text messages that happened in May.  And

13  that's an improper linkage, and you're trying to take

14  things out of context.

15       And, yes, most of what Brie said in that--

16  And by the way, you didn't read eighty percent of it.

17  Most of what she said in that text message is accurate

18  as I said in my response.

19    Q.   You-- When you pled guilty to corrupting

20  Brie in 2011, did you do that out of financial

21  reasons?

22             MR. KOLMAN:  Objection, Your Honor.

23         We're so far afield.  This is discovery, and

24         now he's asking about the plea, I mean, as

25         if it's a deposition.  I don't see how this

1    connects to the issues before the Court,

2    which are did he respond properly or did he

3    not, is he lying or is he not.

4         THE COURT:  Well, he is looking at

5    his responses when he's asking these

6    questions, isn't he?

7         MR. KOLMAN:  Your Honor, I didn't

8    object before.  I'm objecting now.  I think

9    it's too far afield.

10        THE COURT:  You want to respond to

11   the objection?  He's asking about his

12   motivation at the time of the guilty plea.

13        MR. HINTON:  Your Honor, I'll

14   withdraw it.  I'll withdraw it.  Let's stick

15   to the text messages.

16   BY MR. HINTON:

17        Q.   And so I'm trying to get straight your

18   sexual relationship with Brie.  You said it started in

19   2015?

20        A.   Ish.  Yes.  I don't remember the exact date,

21   but that would be the year, ish.

22        Q.   And did it carry on for years after that,

23   off and on?

24        A.   I wouldn't say years, but it carried on off

25   and on.

1   Q.   Okay.  And would you agree with me that it
2   would have been important for us as defendants to know
3   that a witness in this case you had a sexual
4   relationship with?

5        A.   As I testified to before, I never thought
6   Brie-- as Brie-- I never thought of Brie as a witness.
7   I was suing the Scranton Times and Mr. Kelly for
8   something defamatory that they said.  And I stand by
9   that today.  Brie had absolutely nothing to do with
10  what they said.

11       Q.   They said you had sex with her when she was
12  fifteen?

13       A.   That's correct.

14       Q.   And--

15       A.   Brie didn't make them say that.  Brie didn't
16  ask them to say that.  Brie didn't ask for any of this.
17  Neither did I.  They brought this upon themselves.
18  They called me a pedophile in front of millions and
19  millions of people, one of which is back there today in
20  charge of a hate group that is directing threats
21  towards me all the time.  And because of that article--
22  This was dead.  This case was dead for ten years.
23  Everybody had moved on.  They wrote the article, and it
24  drug it back up.  I'm suing them.  I'm not suing Brie.
25  You brought Brie here today, and you brought Brie into

1 this, not me.

2    Q.   So looking at your text messages again, now,

3 we talked about the financial--

4    A.   And it's pathetic that you did that, by the

5 way.

6    Q.   I'm sorry?

7    A.   Sorry.

8    Q.   What did you say?

9    A.   I think it's pathetic that you brought Brie

10 into this.  It's my own personal opinion, but it's

11 pathetic.  She doesn't deserve it, and you know it.

12              THE COURT:  Why don't you just

13         answer the questions that are put to you.

14              MR. GODLEWSKI:  I'm sorry, Your

15         Honor.  I know, it gets me fired up.

16              THE COURT:  You can editorialize all

17         you want when you're on the internet.

18              MR. GODLEWSKI:  I know.  I'm used to

19         it.  I gotcha.  I apologize to the Court.

20 BY MR. HINTON:

21    Q.   Mr. Godlewski, you did hear the witness

22 testify that she called me?  She wanted you to stop

23 your nonsense?

24    A.   Yes.  You didn't tell the full truth about

25 what she said to you though.

1    Q.   Tell me.  Explain.

2    A.   She called you for help.  Is that funny?

3    Q.   Yeah, it is funny.

4    A.   You're going to lie now?

5    Q.   She wanted me to know the truth.

6              MR. KOLMAN:  Objection.

7    BY MR. HINTON:

8    A.   No, she didn't.

9              MR. KOLMAN:  Objection to

10        characteristics made by counsel.

11   BY MR. HINTON:

12   A.   She called you for help.  We'll get into

13   that when it comes to the trial.

14   Q.   Mr. Godlewski, you texted Brie, in terms of

15   your sexual past, on March 31st, 2021.  This is on

16   Page ST-1061.  I had no idea your papa died.  I'm so

17   sorry.

18   A.   Can you tell me what page?  Yes.

19              THE COURT:  ST--

20              MR. HINTON:  ST-1061, Your Honor.

21   BY MR. HINTON:

22   A.   We're going now back to March of 21?

23   Q.   Yes.

24   A.   Okay.

25   Q.   Did I read your text message correct?

1    A.    Yes.

2    Q.    You had no idea her grandfather died?

3    A.    Yes.

4    Q.    And you then wrote:  I think we had sex in

5    their bed though.  Grandparents' bed?

6    A.    Yes.

7    Q.    And did you have sex in the grandparents'

8    bed?

9    A.    No.

10   Q.    You just made that up?

11   A.    I didn't make it up, but if I could explain.

12   When the case in 2009, 2010 surfaced, I was being

13   accused of so many vulgar, incorrect things.  I think

14   at one point the Scranton Times and the District

15   Attorney said that-- One or the other, I don't remember

16   which one, said that we had sexual intercourse in half

17   the houses in Northeastern Pennsylvania, which would

18   amount to about-- I did the math on this way back when.

19   --about fifty thousand houses.  So when Brie and I, in

20   years after, which is 2021, in years after the case

21   Brie and I would constantly try to make light of it.

22   It was a very, very bad time in both of our lives for

23   many years, even to this day obviously, and we would

24   always try to joke about it in some way, shape, or

25   form.  And what I was attempting to do there is

1   actually a psychological tactic.  I mentioned her

2   grandfather, which I never spoke to her about until

3   that text message, and then I realized, oh, shoot,

4   maybe I shouldn't have brought that up in this manner

5   through text.  So I tried to make light of the

6   situation, and it was just really, really terrible

7   communication on my part.  But I tried to.

8          Q.   Well, on Scranton Times 1083 she wrote to

9   you-- This is on March 31st, 2021.  We haven't been all

10  up under each other in so long.  Right?

11         A.   Yes, that's correct.

12         Q.   And you responded back very long?

13         A.   Yes.

14         Q.   Meaning the two of you hadn't slept together

15  in a very long time?

16         A.   That's correct.

17         Q.   And that's true?

18         A.   Yes.

19         Q.   Okay.  Did you offer Brie any money at any

20  point in time?  Did you offer any financial assistance

21  to Brie?

22         A.   At any point in time?

23         Q.   How about in the last two years?

24         A.   Yes, I have.

25         Q.   When was that?

138

A.    At some point last year Brie was, according
to what she told me, struggling to make ends meet with
college, and she had a very vigorous schedule in
college.  She would take a numerous amount of credits
per semester, which didn't really leave a lot of time
in the day to work.  So I believe we discussed, you
know, some sort of loan.

As I said before, I've always been-- whether
it's true or not, I always felt like I was a brother to
Brie.  And I always felt that it was somehow my
responsibility to help her if I could.  We've had,
obviously, some very well known public episodes with
one another.  But in the grand scheme of things we
always seemed to have each other's backs.  So when she
requested to me-- or when she informed me that she was
having some financial difficulty I was-- I was the
first to say that I could help.  In fact, I've done
that with dozens of people within the same time frame,
both family and non family.

Q.    Have you threatened to sue Brie because of
her giving me this Affidavit?

A.    Yes.

Q.    And did you threaten to sue--

A.    Can I retract real quick?  I didn't threaten
Brie directly, but I did say that I was considering a

1  lawsuit against Brie. But I never went to Brie and
2  said hey, I'm threatening you to-- You know, in the way
3  that you asked it, I just wanted to clarify that.
4      Q.   So you never threatened to sue her into
5  oblivion?
6      A.   I don't know what context or what you're
7  referring to. If you could show me, I'd be happy to
8  clarify it or comment on it.
9                MR. HINTON:  Your Honor, I'm going
10               to pull up a video if that's okay.
11               THE COURT:  You're--
12               MR. KOLMAN:  I'm going to object
13               because I don't see how this is connected
14               with Mr. Godlewski's response to
15               interrogatories and document requests.
16               THE COURT:  Tim, before you go up on
17               video now, he's made an objection.
18               MR. HINTON:  Your Honor--
19               THE COURT:  How is it related to the
20               discovery issues we're here for?
21               MR. HINTON:  So Mr. Godlewski, in
22               our opinion, our position is he's gone from
23               trying to buy her as a witness in this case
24               to now attempting to threaten and intimidate
25               her. And I have him on video doing exactly

1          that. He's not going to sue just Brie.

2     He's going to sue Brie's parents. He's

3     going to sue Brie's grandparents. He's

4     going to sue me. He's going to sue my law

5     firm. He made all of these statements on

6     December 5th, broadcast them to his ten

7     million followers, and he's done nothing.

8          MR. KOLMAN: Your Honor, so what?

9     You know, this has nothing whatever to do

10    with what's before the Court. Just bluster

11    at this point.

12         THE COURT: We're not here to try

13    the case. We're here to try whether--

14         MR. HINTON: Your Honor, this is a

15    travesty.

16         THE COURT: --whether his responses

17    have been adequate. That's the reason why

18    we're here, right?

19         MR. HINTON: Your Honor, she had the

20    courage to come forth and give us five

21    hundred pages of text messages that he hid,

22    that he lied about, that he hid. And now

23    that she's done that--

24         MR. GODLEWSKI: I feel a little

25    uncomfortable, Your Honor. I don't know if

1   that's--

2           THE COURT:  Too bad.  Deal with it.

3           MR. HINTON:  Now that she's done

4   that, we've now gone to threaten, harass,

5   and intimidate.  That's where we're at in

6   this case.  We've gone from buying her off

7   to threaten and intimidate.  And I have the

8   proof.

9           MR. KOLMAN:  Your Honor, then I

10  would urge Mr. Hinton to go to the District

11  Attorney or state that it is an intimidation

12  of a witness.  But this is not the context.

13  It's irrelevant to what's before the Court.

14          THE COURT:  All right.  So how does

15  this video, assuming I accept your offer,

16  how does this video advance-- You're saying

17  that the-- all these responses to discovery,

18  which is all we're here for-- You want to

19  try it on the merits, but we're not here for

20  that.  We're here for discovery issues.  So

21  how does that advance your position?  You're

22  saying now that there was a financial

23  incentive, and when that failed it became--

24          MR. HINTON:  Intimidation.

25          THE COURT:  All right.  I get that.

How does that fit into the discovery rules?

MR. HINTON: I'll leave it.

THE COURT: You understand why I'm asking that?

MR. HINTON: I do, Your Honor, but this has been a game, you know. You've seen the filings. It took a year to find out that he possess no Harvard Certificate, that he filed no tax returns. That's fine. All I wanted was a response nailing it down. It took discovery, motion to compel, motion for sanctions. Then they violated your order. They were supposed to give them to me within ten days; they didn't do that. They waited forty, fifty days. Mr. Kolman and I-- I got them-- I had to write them for him, what I wanted. I got them, we nailed it down. We didn't nail down one thing, though, and it's his lives. He broadcast to millions of people, and he's hiding his lives. He's basically said to me, you know, all I got-- I don't have them. I don't have any lives. He's saying-- You know, despite what he says to his followers, Your Honor-- And if I could play this because this is on point to

1    an issue that's remaining, the live videos.

2             THE COURT:  How long?

3             MR. HINTON:  Two minutes.

4             THE COURT:  Just turn the volume up.

5             MR. HINTON:  I will.

6             MR. KOLMAN:  Just ask for an offer

7    of proof, Judge.

8             THE COURT:  Pardon?

9             MR. KOLMAN:  I'm asking for an offer

10   of proof.  What is it?

11            THE COURT:  I think he just

12   explained it, but I-- What is the offer of

13   proof, Tim?  Before you play it, what's the

14   offer?

15            MR. HINTON:  He says he has his live

16   videos in a safe, in a digital safe.

17            THE COURT:  Do the best you can,

18   Linda.

19            (Whereupon, the following is the

20   video being played and Mr. Godlewski is

21   speaking.)

22            I'm doing this for my children.  I

23   guess it's two-fold.  I know what's

24   happening.  I know what's about to happen.

25   I know where we're going, and I want to

document all of it. Every minute of every
single time I go live I have all these
saved, not only, you know, on a computer or
in a cloud somewhere, or on Rumble or
YouTube or whatever, but I have every one of
my lives that I've ever done in digital
files that I keep in my safe so my kids will
some day go back and be able to watch
whatever ones they want to watch of their
dad talking to hundreds of thousands of
people telling them of what's to come,
educating, teaching, and comforting a lot of
people through the process of which I'm
doing right now, and I've been doing. And,
secondly--

(Whereupon, the video ended.)

MR. HINTON: So, I mean, he's saying
to his millions-- Mr. Godlewski, I asked a
simple request. Give me a copy of your live
videos. Don't make me go searching the
internet trying to find these things, and
he's basically done just that. Go to
Rumble, see what you can get from Rumble. I
don't have any. But he tells his millions I
have them all saved digitally in a file.

1    You ordered him to supply me those

2 on November 14th within ten days.  He has

3 defied your order.  That is a reason we're

4 here, too.  Not just hiding the text

5 messages.  Give me your live videos.

6    This guy is a Holocaust denier--

7    MR. KOLMAN:  Okay.  Objection, Your

8 Honor.

9    MR. HINTON:  He's got--

10    MR. KOLMAN:  Objection.

11    MR. HINTON:  He's got videos all

12 over the place.

13    MR. KOLMAN:  Objection.

14    MR. HINTON:  On multiple platforms.

15    MR. KOLMAN:  Your Honor, that was

16 answered.  What happened was that his

17 Facebook-- these were on Facebook, and then

18 Facebook deleted his presence, and with it

19 all those files.  The only place where those

20 files are is on Rumble.  So--

21    THE COURT:  He just said they were

22 in a safe, too.

23    MR. KOLMAN:  Yeah.  And I think he

24 should be asked about that, instead of Mr.

25 Hinton coming to, you know, conclusions

1          which are incorrect and also laughing in the

2          interim, which I think is unprofessional.

3                    THE COURT:  Well, follow up on this.

4          Let's go.

5   BY MR. HINTON:

6       Q.   So where's the safe?

7       A.   I don't know what you're referencing.  I'm

8   sorry.

9       Q.   You just listened to the video.  You said

10  you have a copy of all your videos for your children's

11  sake so they can see all the good you've done.  You've

12  got them digitally saved in a safe.  Where is the safe?

13      A.   The concept of digitally saving something is

14  in direct contrast to physically saving something,

15  first of all.  You can't digitally save something

16  physically.  So when that's--

17                    THE COURT:  Sure you can.  You can

18          back it up and make it a hard copy and put a

19          hard copy in a safe.

20                    MR. GODLEWSKI:  Yeah, but--

21                    THE COURT:  I'm an idiot on

22          computers and--

23                    MR. GODLEWSKI:  You don't call that

24          digitally, though.  That would be physically

25          saving it to a thumb drive or something like

that. I'm not able to do that with the
platforms that I run. The safe comment,
although I probably used it out of context,
and I can see how it could be misconstrued,
the safe comment went towards an old
mechanism that YouTube had in place. I
was-- When I was starting my live broadcast
the only place that I would do my live
broadcast on was Facebook. On the
Inauguration of 2021, January 20th Facebook
suspended and deleted my account
permanently. Every single live that I used
to store on Facebook had been deleted. On
that day, or in the days following that day,
I then transitioned to YouTube. YouTube had
an encrypted software feature at the time
anyway. I would ask when that video was
taken because it's old. That was when I was
still on YouTube. In fact, I saw the
YouTube logo on it while I was just watching
it.

YouTube had an encryption software
type thing that they called a digital safe.
That is literally what they called them.
Now, the context that I said it on that

1           video was improper, and I can see how you

2           might have been misled to think that a safe

3           means, you know, a combination safe.  That's

4           not what I meant.  YouTube had all of my

5           videos from January 20th up to the point

6           that I said that.  YouTube deleted my

7           account.

8      BY MR. HINTON:

9           Q.   So Facebook deleted your account, YouTube

10     deleted your account?

11          A.   That's correct.

12          Q.   What about your videos on Telegram?

13          A.   All of my videos are on Telegram.

14          Q.   Well, you have the ability to remove stuff

15     from your channel, correct?  You can make them

16     accessible or not accessible?  Aren't you in charge of

17     your channel?

18          A.   Sure I am, but I don't know what you mean

19     remove from.  I don't know what you--

20          Q.   You can delete posts?

21          A.   Oh, sure, yes.

22          Q.   Okay.  And posts might include a video that

23     you do?

24          A.   Yes.

25          Q.   Okay.

1     A.   But that's not what you were asking for in

2  the-- in the interrogatories. You were asking for all

3  my live stream videos. That's specifically what you

4  asked for.

5        All of those live-- Mr. Hinton, I have

6  nothing to hide on my live stream videos. You can have

7  every single one of them that's in my possession. I

8  don't physically have, as Judge Minora said, a copy

9  that I can hand to you. Every one of them, there are

10  fifteen, sixteen, seventeen pages of them on Rumble.

11  They're all public for anyone in this courtroom to

12  view. They're not private by any means.

13  Having a DVD or a CD is an antiquated version to hold

14  that data. We don't do that any more in this realm.

15     Q.   Mr. Godlewski, you-- you do shows almost

16  weekly, is that right, videos?

17     A.   Yes. More than that, but, yes.

18     Q.   And they're viewed by millions of people,

19  right?

20     A.   Fourteen million, two hundred and thirty

21  three thousand.

22     Q.   Per video?

23     A.   On average.

24     Q.   Okay. And on one video that I have you--

25  you applauded Adolf Hitler, and you said he wasn't

1  responsible for killing six million Jews--

2                    MR. KOLMAN:  Objection.

3  BY MR. HINTON:

4       Q.   Is that right?

5                    MR. KOLMAN:  Objection.

6                    THE COURT:  Sustained.  Sustained.

7            We're not getting into content.

8                    MR. HINTON:  It just goes to the

9            importance of-- You know, I'm just trying to

10           get the evidence, Your Honor.  You know,

11           this is like pulling teeth.  I just showed

12           you the video of the digital safe, and he's

13           got the Harvard Diploma on the wall that he

14           refused--

15                   MR. KOLMAN:  Objection.

16                   Is this argument, or is he going to

17           ask a question?

18                   MR. HINTON:  It's just exhausting.

19           Every discovery thing in this case and every

20           excuse--

21                   MR. KOLMAN:  Objection.

22                   MR. HINTON:  --this man gives is

23           exhausting.

24                   MR. KOLMAN:  It's exhausting

25           arguments, Your Honor.

1    MR. GODLEWSKI:  It's exhausting

2    because you can't prove that I slept with

3    her because I didn't.  That's why you're

4    exhausting yourself.  You're going through

5    all these videos--

6         THE COURT:  Do you have any question

7    pending for this answer?

8         MR. HINTON:  No.

9         THE COURT:  Then don't give me

10   your--

11        MR. GODLEWSKI:  I'm sorry.

12        THE COURT:  You're not on the air

13   here.

14        MR. GODLEWSKI:  I know.

15        THE COURT:  Okay?

16        MR. GODLEWSKI:  He's-- he's baiting

17   me, though, it feels like, you know.

18        THE COURT:  When you have a question

19   pending, you answer.

20        MR. GODLEWSKI:  I understand, Your

21   Honor.  I'm sorry.

22        MR. HINTON:  Nothing further, Your

23   Honor.

24        MR. KOLMAN:  I just have two

25   questions.

DIRECT EXAMINATION BY MR. KOLMAN:

Q.    Phil, what was your relationship with Brie when she was fifteen or sixteen?  And the second question is:  Why did you buy the earrings?  I don't have anything else.

A.    Brie went through something that you would never wish any of your sons or daughters to go through, and that was the suicide of her boyfriend.  It just so happened at the-- Excuse me.  It just so happened at the time that I was coaching junior varsity baseball at my alma mater, Riverside High School, and in coaching those games and practices my team was full of freshman and sophomore-aged men, boys.  And in that their friends would typically come to our games and practices.  And there was a particular group of friends that Brie belonged to to come see their friends play in the games.  And I had learned of the situation with her boyfriend's suicide through my friends, and I had seen her come to the games in the past.  And after the suicide happened it was a very large funeral in our town.  Taylor is a very small town; everyone kind of knew everybody.  I had a relationship with, you know, most of the kids that played on my team, and, you know, and years before they even played on my team.

So we all kind of found out about Joe's

1  suicide. I could see Brie was-- Brie just was not in

2  really a great mindset. And some of her friends were

3  actually telling me-- her friends that were on my

4  baseball team were actually telling me that she was

5  suicidal at the time. Now, this is where I made an

6  enormous mistake. And, you know, it's easy to say I

7  regret it now because of everything that I was charged

8  with, but I don't know if I regret it because the

9  relationship that Brie and I developed in the years to

10  follow, I don't know if I would want to trade that. I

11  struggle with that thought.

12        Nonetheless, the mistake that I made was

13  trying to comfort Brie in a time that she was visibly

14  shaken, and she was putting those type of words-- she

15  was articulating those type of words to other people

16  that I associated with and I was around on a regular

17  basis. What I should have done was go to her parents

18  and go to her guidance counselor at the school who--

19     Q.    When you say words, articulated words, what

20  words?

21     A.    She was verbalizing that she wanted to

22  commit suicide to her friends, which were my players.

23  And that gets around. When you're fifteen, sixteen

24  years old, at that level, you can't help but hear

25  things as a coach, you know. So I just screwed up.

You know, I got a little too close to Brie in those years. I believe Brie caught feelings for me at some point when she was of that age. I was engaged to be married, and I was-- I was caught in a situation that I should have never got myself in.

Now, there were-- I wish we still had them, but there were a lot of text message conversations that took place between Brie and I in that time, specifically regarding the death of her boyfriend and how she should cope and just me trying to make light of the situation that was a terrible situation for any fifteen or sixteen year old girl to be in. I tried to act, I guess, as some sort of father figure. And I think the reason why I did that is because I never had brothers or sisters growing up. I was never in the position to be a big brother, you know, to any adolescent or to any-- anyone. When I formed the relationship that I formed with my players on the junior varsity team, it was not just a coach relationship-- Like, I had fantasy baseball teams with them, and we would go places together. They really liked me. I took a couple of my kids out of state to baseball conventions.

I almost developed a relationship with my players that was similar to a father figure in a sense.

So when this was happening with Brie my young mind said, oh, well, I can continue that type of relationship with this girl, who is going through a traumatic event.  That was a mistake on my part. And looking back on it now I know that that was a mistake, and I paid for that mistake dearly, and I still do to this day.  But that's how the-- that's how the development of the relationship occurred, and I ended up getting arrested for it.

Q.   And what about the earrings?

A.   I never purchased Brie any earrings.  I've heard this before in accusations from the District Attorney's Office when I was first arrested on this. Somebody-- Can I see them?  I don't know.  I've never purchased Brie-- I have purchased Brie things before; that is true.  But twenty eight thousand dollar earrings, I don't know what--

Q.   I think they were two thousand, eight hundred.

A.   Oh, okay.  That's much better.  But for a twenty four year old, twenty five year old, I didn't have that type of money at the time.  I was just starting my real estate career.  I was doing side jobs, such as a junior varsity coach, which I made eighteen hundred dollars a year for.  That's not something-- I

1   had given Brie gifts as to try to cheer her up in what

2   I thought was an appropriate manner. Looking back at

3   it now it was completely inappropriate. And guess

4   what? I pled guilty to corruption of morals of a

5   minor. And I felt like I did corrupt the morals of a

6   minor, and I still feel like that today.

7   Q. You said you were close to her, too close.

8   What does that mean?

9   A. I think I crossed the line being a figure of

10  authority, especially in the school district that she

11  attended. I think I crossed the line of an appropriate

12  nature and an inappropriate nature. Not in the sense

13  of anything sexual, but in the sense of someone that

14  young that's going through that type of tragedy could

15  latch onto someone of my age in the position that I was

16  in in a way that I'm not anticipating or, even while

17  it's happening, noticing. I shouldn't have put myself

18  in that position.

19  Q. In respect of the discovery, which is being

20  the key focus here, the interrogatories and the

21  document requests, have you attempted to answer those

22  to the best of your ability?

23  A. Mr. Kolman, I am willing to give absolutely

24  anything to the defense that they want without any sort

25  of limitation at all. I have absolutely nothing to

hide in this particular case. As Mr. Hinton said

before, I'm the one that filed the lawsuit, not them.

I knew discovery was going to be nasty. I knew that

this was going to bring up all of those events that

they brought up, you know, many years ago, not only for

me, but also for Brie. I knew they were going to bring

her into this. They had a private investigator go to

her house several times in 2021 after the case was

filed, after my lawsuit was field. And if anybody has

been intimidating anyone, I believe it's been the

defendants to Brie.

     Q.    Have you willfully withheld any documents?

     A.    Absolutely not. You could have everything I

have.

     Q.    Have you willfully not answered any

interrogatory that's been propounded to you?

     A.    Absolutely not. And I won't in the future.

     Q.    Do you have any position that could possibly

be relevant to any document request that was asked

for?

     A.    Relevant or irrelevant I'm not the one to

make that call. I'm willing to give them anything that

they need.

              MR. KOLMAN: I have nothing further,

              Your Honor.

1  RECROSS EXAMINATION BY MR. HINTON:

2      Q.    Mr. Godlewski, what gifts did you buy Brie?

3  You said you bought her some gifts?

4      A.    Yeah.   There was-- In that same time period,

5  right after Joe had taken his own life, I went on a

6  baseball trip that I just referenced with one of my

7  team members.  His name is BJ.  We went to

8  Jacksonville, Florida, I believe it was, for a baseball

9  camp.

10          While we were at a shopping endeavor there--

11 This was in the time that I was communicating with Brie

12 after the death of Joe.  In fact, it was that winter.

13 I think Joe-- It doesn't matter, the dates.  But,

14 nonetheless, right after that happened I was shopping

15 at a mall down there with BJ.  We went out after one of

16 the expositions that day.  We got something to eat.  It

17 was just me and BJ.  No one else went on the trip.  And

18 there was an Ed Hardy hat.  I think it was a hat,

19 t-shirt, something.  Ed Hardy.  She was big into Ed

20 Hardy at the time.  We had talked about that in our

21 conversations.  So I purchased her that.  And I think

22 I got her, in addition to that, I think I bought her a

23 tanning package one time to a tanning salon in Taylor,

24 which is no longer there.  It's a-- something else

25 now.

1    Q.    So Joe Strok died November 10th, 2008.  Does

2  that sound right?

3    A.    2000 what?

4    Q.    8.

5    A.    Yeah.  So it would have been-- I believe it

6  would have been that Winter of 2008.

7    Q.    So Brie is fifteen years old and three

8  months at that time?

9    A.    No.  I believe she-- I have no idea, to be

10  honest.  I don't remember.  I thought she turned

11  sixteen-- Yeah, I believe she would have been fifteen.

12  She turned sixteen in September the following year.

13  Yes.

14    Q.    And you-- You bought her gifts for that

15  Christmas?

16    A.    I don't think it was Christmas, no.  They

17  were just in general gifts.  There was no Christmas

18  gifts per se, to my recollection.  There was a gift

19  that I bought when we were at the mall in Florida that

20  was the Ed Hardy-- It might have been a shirt and a

21  hat.  Don't quote me.

22    Q.    Okay.

23    A.    But--

24    Q.    But definitely you bought her gifts?

25    A.    Those two things or three things are the

1  only things that I had ever purchased for Brie.

2  Earrings are-- Miss DuBorgel, Linda, testified today

3  that she spoke to a sales associate, and she made it

4  seem that the sales associate sold me those earrings.

5  At least in my interpretation.  That's false.  She may

6  have spoke to a sales associate about the particular

7  type of earrings, and ascertained that Zales sells that

8  particular type of earring, but that had nothing to do

9  with me at all.  I don't know where they came from.

10      Q.   Mr. Godlewski, there's a notebook of

11  exhibits in front of you.  Can you turn to Exhibit H,

12  please.

13      A.   Sure.  Did you-- What letter?

14      Q.   H.

15      A.   H.

16      Q.   Go to the back of that exhibit.  You'll see

17  your verification page for your signature that you've

18  approved these answers to interrogatories on August

19  20th, 2021.  Is that your completed verification page

20  digitally?

21      A.   Yes, sir.

22      Q.   Okay.  So you--

23      A.   August 20th, 2021?

24      Q.   Yeah.

25      A.   Yes, sir.

1     Q.    You reviewed these answers.  You understood

2   that you were making them under oath, right?

3     A.    Yes, sir.

4     Q.    And you know that it's important to the

5   lawsuit to be truthful and accurate in your answers to

6   the Court, is that correct?

7     A.    Yes, sir.

8     Q.    It's important to be truthful in the

9   discovery process?

10     A.    Yes, sir.

11     Q.    It's like perjury if you lie about it,

12   right?

13     A.    I'm not sure.

14     Q.    So let's go to question number thirty four

15   in your answers to interrogatories.

16         Question:  Did you give any gifts to the

17   fifteen year old girl referred to in defendant's

18   article?  If yes, please state what they were and when

19   you gave them to her.  And your answer was:  Plaintiff

20   does not recall giving her any gifts.

21     A.    Yes.

22     Q.    How is it that your memory is better today

23   in 2023 than it was on August 20th, 2021?

24     A.    I wouldn't say that my memory is better.  I

25   would just say that this happened, when the gifts that

1  I mentioned were purchased, this happened in 2008, as
2  you just said.

3      Q.   No, I didn't just say.

4      A.   You didn't just say that in 2008 when Joe
5  Strok--

6      Q.   I asked-- I told you Joe Strok died on
7  November 10th, 2008.  I asked you if you gave her
8  Christmas presents, and you said it may have been a
9  little bit later than that.

10     A.   No, I didn't say that.  That's not what I
11 said.

12     Q.   Whatever.

13     A.   I said I didn't give her Christmas presents.
14 But you're putting words in my mouth.  That's not-- We
15 could read it back.

16     Q.   Why did you give this answer that you don't
17 recall giving her any gifts?

18     A.   I didn't recall giving her any gifts.

19     Q.   But now you do?

20     A.   I recall now, yeah, sure.  You're asking me
21 to remember things from twelve years ago.  It's very
22 hard to do that.  As I had thought more about the case,
23 and talked to my counsel about the case, I had gone
24 back to try to find anything that I could to, you know,
25 either on a-- to remember or to find documents that you

1   were asking for to these interrogatories.  And at some
2   point it had come to my recollection that I do remember
3   purchasing her an Ed Hardy hat or shirt and a tanning
4   package.
5       Q.   Now--
6       A.   I had to be reminded about that actually.
7       Q.   So you had thirty days to answer that
8   interrogatory.  I think you took more than thirty days
9   to answer them.  And you had the assistance of counsel,
10  is that correct?
11      A.   I don't know any of that to be true.
12      Q.   All right.
13           So, Mr. Godlewski, going back to your text
14  messages with Brie-- and you indicated that you've
15  moved text messages over to a computer or maybe a hard
16  drive or a laptop at your house?
17                  MR. KOLMAN:  I'm going to object,
18              Your Honor.  This is beyond the scope of my
19              redirect-- of my direct.
20                  THE COURT:  He asked about earrings
21              and he asked about gifts.
22                  MR. HINTON:  I'll withdraw it, Your
23              Honor.  Nothing further, Your Honor.
24                  MR. KOLMAN:  I have nothing.
25                  THE COURT:  Okay.

1    MR. KOLMAN: You can step down. I
2 have nothing.
3          MR. GODLEWSKI: Okay.
4          MR. HINTON: Call Dennis Cheng as
5 our last witness. He'll be short, Your
6 Honor.
7          MR. KOLMAN: Can I have a quick
8 colloquy with counsel?
9          THE COURT: Sure.
10         MR. HINTON: Your Honor, our last
11 witness is on a very narrow subject matter
12 that his Telegram post of the text message,
13 this expert will testify just very briefly
14 about that it had to come from Phil. It's
15 from Phil's perspective. That's really it.
16         THE COURT: Is this the guy that
17 downloaded the content of the phones?
18         MR. HINTON: Yes. But I don't need
19 him for that. He's admitted they're all
20 true and accurate text messages.
21         MR. KOLMAN: It's true.
22         But, Your Honor, what's he going to
23 do? He's going to establish that he's an
24 expert. That's going to take awhile.
25         MR. HINTON: It's actually not.

MR. KOLMAN: All right. And it's an opinion.

What's the purpose of this at the end of the day? What do you want the Court to know?

MR. HINTON: That he had them all along. He had his text messages all along. He didn't give them to us. I had to get them from Brie.

MR. KOLMAN: Well, that's obvious you had to--

MR. HINTON: He intentionally withheld those.

THE COURT: I thought he only downloaded her phone?

MR. HINTON: He downloaded her two phones, the phone she currently uses and the one she had immediately before it. She gave-- The five hundred pages of text messages come from the download. Phil has now admitted yes, they're his text messages. That issue is a done deal. We don't even need to get into how he downloaded or that it's-- it was done correctly or whatever because everybody admits yeah, these are the

communications.

What-- I called this expert for a
secondary purpose. I said let's look at
this post Phil Godlewski put up on November
27th. This one right here. Where did it
come from? And he's going to say it didn't
come from Brie, it didn't come from her
download, it came from Phil, meaning he's
had it all along. If they want to now admit
yeah, he's had it all along-- And I think
Phil will admit that.

MR. KOLMAN: Let me talk to my
client. Maybe he needs to clarify. Okay?

THE COURT: All right. Take a few
minutes.

MR. HINTON: He's going to agree,
that came from one of his devices.

MR. KOLMAN: Yeah, it did. It came
from his laptop.

MR. HINTON: Okay. You can
stipulate on the record that it came from
one of his electronic devices.

MR. KOLMAN: I can stipulate it came
from his laptop, sure.

MR. HINTON: Okay.

167

```
1            MR. KOLMAN:  He testified about
2       that.
3            MR. HINTON:  All right.  I want
4       it clear on the record where that came
5       from.
6            MR. KOLMAN:  He's going to come up.
7
8            PHILIP GODLEWSKI, recalled as a
9       witness, having previously been sworn,
10      testified as follows:
11
12           THE COURT:  You're still considered
13      under oath.
14           MR. GODLEWSKI:  Yes, sir.
15 RECROSS EXAMINATION BY MR. HINTON(CONT'D):
16      Q.   Mr. Godlewski, showing you Exhibit BB.  You
17 recognize that?
18      A.   Yes.
19      Q.   Okay.  This is a post you made to your
20 Telegram channel?
21      A.   Yes.
22      Q.   You made it on November 27th, 2022?
23      A.   I'm sorry.  There's no date.
24      Q.   I'll bring an expert up to testify about
25 that.
```

1  A. Okay.

2  Q. Unless your--

3  A. I don't know the date.  You're asking me the

4 date.

5  Q. Was it late November?

6  A. I have absolutely no idea, Tim.  You know

7 how many posts I put on Telegram?

8  Q. Was it after we gave you the digital

9 downloads of Brie's text messages that you posted this?

10  A. Oh, yes, it is.  Here's why.  Because you

11 gave me the digital downloads, and I know that to be

12 fact because it's redacted right there.  Her name is

13 redacted.  That didn't come from my device at all.

14 That came from your discovery from her phone.

15  Q. This right here did?

16  A. Yes.

17  Q. Okay.  Now we need to call the witness.

18    THE COURT:  That assures it.  Stand

19    down.

20    MR. GODLEWSKI:  That's redacted at

21    the top.

22    MR. HINTON:  That's okay.  No more

23    questions.

24    MR. GODLEWSKI:  I could be wrong.

25    MR. HINTON:  I'll bring my--

1          THE COURT: You can stand down. You

2     can stand down, Mr. Godlewski.

3          MR. GODLEWSKI: Okay.

4          THE COURT: You're done.

5          MR. HINTON: Dennis, come on up.

6

7          DENNIS CHENG, called as a witness,

8     being duly sworn, testified as follows:

9

10          THE COURT: Have a seat, Dennis.

11     Make yourself comfortable.

12          MR. CHENG: Thank you.

13          THE COURT: Hopefully you won't be

14     here that long, but they've been wrong about

15     that all morning. So go ahead.

16          MR. CHENG: I'm used to waiting.

17     Thank you.

18 DIRECT EXAMINATION ON CREDENTIALS BY MR. HINTON:

19     Q.  Mr. Cheng, please state your full name for

20 the record.

21     A.  Dennis Gene Cheng.

22     Q.  Okay. And you work for Twobytwo Solutions,

23 LLC?

24     A.  Yes.

25     Q.  What does that company do?

PHILIP GODLEWSKI,      :     IN THE COURT OF COMMON PLEAS
     Plaintiff          :     OF LACKAWANNA COUNTY
                          :
     v.               :     CIVIL DIVISION
                          :
CHRIS KELLY, TIMES SHAMROCK   :     JURY TRIAL DEMANDED
COMMUNICATIONS, THE SCRANTON :
TIMES-TRIBUNE, LARRY HOLEVA   :
     Defendants.         :     No.: 2021-CV-2195

## PLAINTIFF'S RESPONSE TO DEFENDANT'S INTERROGATORIES SET IV

## GENERAL OBJECTIONS

1. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they are ambiguous, vague, over-broad, and/or unduly burdensome.

2. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they seek information protected by the attorney-client privilege and/or the attorney work-product doctrine.

3. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they improperly seek information that is not relevant to any of the issues in this dispute and/or are not reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff generally objects to Defendants' Interrogatories (Set IV) as discovery has not yet closed and this matter has not yet been prepared for trial.

5. Accordingly, these Answers are made without prejudice to Plaintiff's right to amend the answers set forth herein and/or to present additional information that is hereafter obtained or evaluated.

6. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they cause unreasonable annoyance, embarrassment, oppression, burden and/or expense.

7. Plaintiff generally objects to each of Defendants' Interrogatories (Set IV) to the extent that their scope exceeds the scope of discovery permitted by the Pennsylvania Rules of Civil Procedure.

8. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent that formulating full and complete answers would require Plaintiff to review documents not presently in Plaintiff's possession, custody and/or control.

9. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they imply that information is to be provided by more than one person other than the responding Plaintiff. These Interrogatory Answers have been made to the best of Plaintiff's

1



5. Did you have sex or a sexual relationship with ███████████ at any time?

   **ANSWER: Yes.**

   If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

   **ANSWER: Plaintiff had sexual relationship with ███████████ for a month or two in 2018. Plaintiff does not recall specifics.**

6. Did you have sex or a sexual relationship with ███████████ at any time?

   **ANSWER: No.**

   If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

   **ANSWER: N/A.**

7. Did you have sex or a sexual relationship with Brienna DuBorgel at any time?

   **ANSWER: No.**

   If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

   **ANSWER: N/A.**

Respectfully submitted:

Date: <u>11/18/2022</u>

/s/ *Timothy M. Kolman*
Timothy M. Kolman, Esquire
Kolman Law, P.C.
414 Hulmeville Avenue
Penndel, Pennsylvania 19047
*Attorney for Plaintiff*

## VERIFICATION

I, Philip Godlewski, verify that the statements made in *Plaintiff's Response to Defendants' Interrogatories (Set IV)*, are true and correct to the best of my knowledge and belief. I understand that false statements made herein are subject to the penalties of 18 PA. C.S., Subsection 4904, relating to unsworn falsification to authorities.

Date: 11/18/22

_____
Philip Godlewski – Plaintiff

| PHILIP GODLEWSKI, | : | IN THE COURT OF COMMON PLEAS |
| Plaintiff | : | OF LACKAWANNA COUNTY |
| | : | |
| v. | : | CIVIL DIVISION |
| | : | |
| CHRIS KELLY, TIMES SHAMROCK | : | JURY TRIAL DEMANDED |
| COMMUNICATIONS, THE SCRANTON | : | |
| TIMES-TRIBUNE, LARRY HOLEVA | : | |
| Defendants. | : | No.: 2021-CV-2195 |

## CERTIFICATE OF SERVICE

I, **Timothy M. Kolman, Esquire**, certify that on this 18th day of November 2022, I

caused a true and correct copy of the *Plaintiff's Response to Defendant's Interrogatories Set (IV)*

to be served upon the following parties via email:

**J. Timothy Hinton, Jr., Esquire**
Haggerty Hinton & Cosgrove LLP
1401 Monroe Avenue, Suite 2
Dunmore, Pennsylvania 18509
*Attorney for Defendants*

Respectfully submitted:

Date: 11/18/2022

/s/ *Timothy M. Kolman*

Timothy M. Kolman, Esquire
Kolman Law, P.C.
414 Hulmeville Avenue
Penndel, Pennsylvania 19047
*Attorney for Plaintiff*

4

From: +15707804567 Phil
To: [_____] Brie DuBorgel (owner)

Okay kid. If you change your mind and want to hang out, let me know. Lots of stuff has been going on and I wanted to try to insulate you as much as possible. But I get the feeling you already know, so I'll back off. I'll be here if you want to meet up and chat

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [____] Brie DuBorgel | | 5/28/2022 3:42:47 PM(UTC-4) | |

Status: Read

5/28/2022 3:42:27 PM(UTC-4)

Source Extraction:
Advanced Logical (2)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0xDE4852 (Table: message, handle, chat; Size: 230879232 bytes)

EXHIBIT
Ex. DB
ALL-STATE LEGAL®




www.cellebrite.com

# Extraction Report - Apple iPhone

## Participants


+15707804567
Phil*


+
Brie Duborgel* (owner)

## Conversation - Instant Messages (151)



From: Brie Duborgel (owner)
To: +15707804567 Phil

It's Brie

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:43:03 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:43:03 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x237FB1 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: Brie Duborgel (owner)

Tf?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 5/28/2022 3:43:22 PM(UTC-4) | |

Status: Read

5/28/2022 3:43:22 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x237D8D (Table: message, handle, chat; Size: 29642752 bytes)

ST 1457



From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

I just got the text you just sent me that other phone is garbage I'm only still using it before I transfer all my stuff over

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:43:36 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:43:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x237BB4 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: +1[REDACTED] Brie Duborgel (owner)

Death of the 7619 number?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[REDACTED] Brie Duborgel | | 5/28/202 2 3:45:55 PM(UTC -4) | |

Status: Read

5/28/2022 3:45:54 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2370A9 (Table: message, handle, chat; Size: 29642752 bytes)

From: +15707804567 Phil
To: +1[REDACTED] Brie Duborgel (owner)

What a shame

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1[REDACTED] Brie Duborgel | | 5/28/202 2 3:49:25 PM(UTC -4) | |

Status: Read

5/28/2022 3:49:25 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23769A (Table: message, handle, chat; Size: 29642752 bytes)

From: +[REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

And no nothing really has been going on aside from me doing an internship for basically 8 months and they've tried and done everything to piss me off and make me snap and hack into my shit and see if I can kick them out and just ... the most extra thing I've ever experienced. Except one of the main people involved is friends with my uncle Johnny so it's basically why I know I'm okay and I know I'm getting a crazy good job but it's almost not been worth the stress I've been put through

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:49:26 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:49:26 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's IPhone/mobile/Library/SMS/sms.db : 0x239F8D (Table: message, chat, handle; Size: 29642752 bytes)



From: +[REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

Yes the 7619 number is toast

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:49:42 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:49:41 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's IPhone/mobile/Library/SMS/sms.db : 0x239998 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: +[REDACTED] Brie Duborgel (owner)

I think it might be fair to say that there is a very, very large, and very, very unique financial opportunity that exists in front of you

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[REDACTED] Brie Duborgel | | 5/28/2022 3:51:03 PM(UTC-4) | |

Status: Read

5/28/2022 3:50:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's IPhone/mobile/Library/SMS/sms.db : 0x239F83 (Table: message, handle, chat; Size: 29642752 bytes)



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil
LOL

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:51:19 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:51:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x239C99 (Table: message, chat, handle; Size: 29842752 bytes)



From: +15707804567 Phil
To: [redacted] Brie Duborgel (owner)
The type of opportunity that happens to hardly anyone

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[redacted] Brie Duborgel | | 5/28/2022 3:51:19 PM(UTC-4) | |

Status: Read

5/28/2022 3:51:19 PM (UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x239A87 (Table: message, handle, chat; Size: 29842752 bytes)



From: +15707804567 Phil Brie Duborgel (owner)
To: +15707804567 Phil
dude I know. it makes me want to throw up

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:51:20 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:51:27 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23984A (Table: message, chat, handle; Size: 29842752 bytes)



From: +1 [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

And everyone knows but me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:51:33 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:51:33 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2395F6 (Table: message, chat, handle; Size: 29642752 bytes)



From: +1 [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

Mom mom can't look me in the eyes for more than 1.2 seconds

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:51:52 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:51:52 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2393C2 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: +1 [REDACTED] Brie Duborgel (owner)

Why?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [REDACTED] Brie Duborgel | | 5/28/2022 3:52:05 PM(UTC-4) | |

Status: Read

5/28/2022 3:52:05 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23AF83 (Table: message, handle, chat; Size: 29642752 bytes)



From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

Cause everyone knows but me it seems like

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:52:36 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:52:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23AAF5 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: [REDACTED] Brie Duborgel (owner)

I dont think we're talking about the same thing, Ms. Duborgel

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[REDACTED] Brie Duborgel | | 5/28/2022 3:52:59 PM(UTC-4) | |

Status: Read

5/28/2022 3:52:59 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23A895 (Table: message, handle, chat; Size: 29642752 bytes)

From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

Laughed at "I dont think we're talking about the same thing, Ms. Duborgel"

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:53:16 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:53:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23A59B (Table: message, chat, handle; Size: 29642752 bytes)

**ST 1462**

From: +[REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

Oh are you trying to recruit me for the silver thing

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/20/2022 3:53:58 PM(UTC-4) | | |

Status: Sent

5/20/2022 3:53:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23A2F5 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: +[REDACTED] Brie Duborgel (owner)

Pfft, no

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[REDACTED] Brie Duborgel | | 5/28/2022 3:54:07 PM(UTC-4) | |

Status: Read

5/28/2022 3:54:07 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23BF83 (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: +[REDACTED] Brie Duborgel (owner)

We really need to meet and chat

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[REDACTED] Brie Duborgel | | 5/28/2022 3:54:16 PM(UTC-4) | |

Status: Read

5/28/2022 3:54:15 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23BD96 (Table: message, handle, chat; Size: 29642752 bytes)



From: ▮▮▮▮▮ Brie Duborgel (owner)
To: (15707804567) Phil

Laughed at "Pfft, no"

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:54:16 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:54:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23BB3F (Table: message, chat, handle; Size: 29642752 bytes)

---

From: +15707804567 Phil
To: ▮▮▮▮▮ Brie Duborgel (owner)

I cant talk about this through text or over the phone

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ Brie Duborgel | | 5/28/2022 3:54:33 PM(UTC-4) | |

Status: Read

5/28/2022 3:54:33 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23B900 (Table: message, handle, chat; Size: 29642752 bytes)

---

From: ▮▮▮▮▮ Brie Duborgel (owner)
To: (15707804567) Phil

I can't meet up or see anyone right now I'm going through some stuff physically and basically doing a cleanse of my system and got my period yesterday and I'm barely alive

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:56:07 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:56:06 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23B6C3 (Table: message, chat, handle; Size: 29642752 bytes)

**ST 1464**



From: +15707804567 Phil
To: | Brie Duborgel (owner)

doesnt have to be today.  "Some stuff physically"? Wtf?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 5/28/2022 3:58:36 PM(UTC-4) | |

Status: Read

5/28/2022 3:58:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23CF83 (Table: message, handle, chat; Size: 29842752 bytes)

From: +15707804567 Phil
To: | Brie Duborgel (owner)

You're dodging me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 5/28/2022 3:58:56 PM(UTC-4) | |

Status: Read

5/28/2022 3:58:56 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23CA16 (Table: message, handle, chat; Size: 29842752 bytes)



From: | Brie Duborgel (owner)
To: +15707804567 Phil

No I'm not

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:50:03 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:50:03 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23C813 (Table: message, chat, handle; Size: 29842752 bytes)

ST 1465



From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

No one will ever understand what I just went through this semester

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:59:19 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:59:19 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23C5F7 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: 1 [REDACTED] Brie Duborgel (owner)

Im kinda of worried about you

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [REDACTED] Brie Duborgel | | 5/28/202 2 4:00:58 PM(UTC -4) | |

Status: Read

5/28/2022 4:00:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23C364 (Table: message, handle, chat; Size: 29642752 bytes)



From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

Why

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:01:50 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:01:50 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23DF8D (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: 1 [redacted] Brie Duborgel (owner)

**Idk, you're talking all crazy-pants.  Doesnt seem like the brie I know**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] Brie Duborgel | | 5/28/2022 4:02:10 PM(UTC-4) | |

Status: Read

5/28/2022 4:02:10 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23DD7B (Table: message, handle, chat; Size: 29642752 bytes)



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

No I'm very okay I just legit went through 8 months of semi torture and it only ended like two days ago so I'm trying to do the right thing and get my mind and body in order and detox off of medication I've been on since I got sober 6 years ago and it doesn't help all my accounts got hacked and I can't talk to anyone about anything until I have my answers about what exactly I'm going to be doing for work which will be on Tuesday. I'm honestly just exhausted and healing

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:07:05 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:07:05 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23DB17 (Table: message, chat, handle; Size: 29642752 bytes)

From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

Truly

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:07:11 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:07:11 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23D1AD (Table: message, chat, handle; Size: 29642752 bytes)

**ST 1467**

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)

Okay. Well that makes me feel better. When you're ready, I have an opportunity that involves the both of us. But it wont work with just one of us. I dont know which way to go with it until I speak to you. So, remember me for when you feel better, and we'll talk.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 4:08:30 PM(UTC-4) | |

Status: Read

5/28/2022 4:08:29 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23EF83 (Table: message, handle, chat; Size: 29642752 bytes)

From: [redacted] | Brie Duborgel (owner)
To: +15707804567 Phil

I know I've been wanting to talk to you about almost the same thing weirdly enough. I've been the one who has wanted to square things up with you that has nothing to do with romance or Amanda that would save both of our reputations but I didn't plan on talking to you about anything until my school stuff was over. I got my diploma, and my job was written in stone. I'm sure Amanda told you a little bit which is okay cause it wasn't a secret at least not from you we got our lives dragged through the mud for years together and it has effected us both professionally to the point where my internship was based on my ethics and morals but I passed with flying colors and pretty sure I may have gotten an almost full ride to get my MSL in dala and privacy law. So yeah I'm okay and I know you've had to defend yourself for years which a lot hasn't had to do with me but I don't like that people make it seem like you were some creep or I was some homewrecking little tramp and I think us having each other's backs in some regards benefits both of us

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +14707804567 Phil | 5/28/2022 4:18:58 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:18:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23E88D (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)

I agree. But it's a very delicate situation, and unless it's handled properly by both of us, we stand to benefit absolutely nothing. And there is a financial windfall here, if handled properly. That's all I can really say through text. I don't trust those motherfuckers and I am literally foaming at the mouth to take them down once and for all.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 4:25:30 PM(UTC-4) | |

Status: Read

5/28/2022 4:21:24 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23FF83 (Table: message, handle, chat; Size: 29642752 bytes)

ST 1468

From: +15707804567 Phil
To: [redacted] Brie Duborgel (owner)

You're a good person, Brie. You don't deserve anything that's happened to you since we met all of those years ago. And I think it's time to set the record straight, and shove our collective middle fingers directly up their fucking assholes

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 4:26:30 PM(UTC-4) | |

Status: Read

5/28/2022 4:22:20 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23FAD7 (Table: message, handle, chat; Size: 29642752 bytes)

From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

No I know it's like the MOST delicate situation. Aside from any of your extra troubles or my extra troubles what happened between us follows us around the most and nothing between us was ever had. Even when I heard things about you and Miranda or you being an asshole I mean my first thought was that Phil has never even so much raised his voice at me or said anything nasty to me ever. Through everything and all of it you've never been mean to me. You had to defend yourself cause you had no other choice. I mean I'm gonna be 29 and you're like 37.

I know this sounds crazy but there's examples of cases where let's say the girl was older like 18 or 19 and the boy was 16. That age difference is nothing but if the girl had a very high IQ and the boys was significantly lower than that could be considered statutory because it shows despite the age she was clearly taking advantage. It's the IQ defense. My friends and my mother blew this wide open after my first love hung himself when I was 16 and the older I got and the more I learned from school and this field it really bothers me. But we have both been dealt our fair share of nonsense throughout the years and trying to get our lives in order but I say all the time. I've told my family and friends and professors who basically took me under their wing that aside from any kind of trouble either of us have been in- you were never mean to me, never took advantage of me, it wasn't even about sex. I have been mentally 20 since I was a teenager but literally my whole entire life whenever I have needed you you have picked up the phone. We were never enemies and we never intentionally tried to hurt each other. But yes, this is very delicate and I believe being allies would shut up a lot of people.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:44:59 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:44:59 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x240D90 (Table: message, chat, handle; Size: 29642752 bytes)

ST 1469



From: +15707804567 Phil
To: ▮ Brie Duborgel (owner)

Well, let's meet when you're ready. Sooner rather than later. I miss you anyway

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮ Brie Duborgel | | 5/29/2022 2:20:18 PM(UTC-4) | |

Status: Read

5/28/2022 4:58:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x241802 (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: ▮ Brie Duborgel (owner)

How you feelin B

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 5/29/202 2 2:20:18 PM(UTC -4) | |

Status: Read

5/29/2022 12:11:52 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x24446F (Table: message, handle, chat; Size: 29642752 bytes)



From: ▮ Brie Duborgel (owner)
To: +15707804567 Phil

Hello Phillipe I saw you inquired my assistance on my garbage phone aka my photo library with a number how may I assist trice on this lovely Saturday evening

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 6/18/2022 6:53:17 PM(UTC-4) | | |

Status: Sent

6/18/2022 6:53:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2A2F8D (Table: message, chat, handle; Size: 29642752 bytes)

ST 1470



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil
That's what I meant

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/5/2022 11:51:54 PM(UTC-4) | | |

Status: Sent

8/5/2022 11:51:54 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E3713 (Table: message, chat, handle; Size: 29842752 bytes)



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil
Like I answered you at 9 something and was like whoops lmao

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/5/2022 11:52:23 PM(UTC-4) | | |

Status: Sent

8/5/2022 11:52:22 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E34E4 (Table: message, chat, handle; Size: 29842752 bytes)

From: +15707804567 Phil
To: [redacted] Brie Duborgel (owner)
Listen my friend. Things are getting very nasty with the Scranton Times. I think you should know what's going on. I'd like to talk to you in person. I don't want you to be blindsided by any of this

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1[redacted] Brie Duborgel | | 8/5/2022 11:52:52 PM(UTC-4) | |

Status: Read

8/5/2022 11:52:47 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E4F83 (Table: message, handle, chat; Size: 29842752 bytes)

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)

Attachments:



Title: IMG_5469.mov
File name: ~/Library/SMS/Attachments/0c/12/541D0D34-BC44-4220-ADF4-5977C621157B/IMG_5469.mov
~/Library/SMS/Attachments/0c/12/541D0D34-BC44-4220-ADF4-5977C621157B/IMG_5469.mov

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 8/6/2022 3:03:15 PM(UTC-4) | |

Status: Read

8/6/2022 11:12:15 AM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E4C08 (Table: message, handle, attachment, chat; Size: 29642752 bytes)
Brie's iPhone/mobile/Library/SMS/Attachments/0c/12/541D0D34-BC44-4220-ADF4-5977C621157B/IMG_5469.mov : (Size: 24156351 bytes)

---

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)

I have your back, Brie. You should see what they are trying to do to me. It's absolutely awful.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 8/6/2022 3:03:15 PM(UTC-4) | |

Status: Read

8/6/2022 12:09:05 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E499C (Table: message, handle, chat; Size: 29642752 bytes)

---

From: [redacted] Brie Duborgel (owner)
To: +15707804567 [redacted]

I wasn't not answering. I have weird stuff going on right now too lol. I was up til 4am doing work so I fell asleep without an alarm and here I am. I'm gonna try not to be grouchy cause I can't say you don't have my back I have yours. This has nothing to do with me Phil. I'm sorry a reporter politically dragged you because of something that happened to us 12 years ago. I read the entire article recently and it was definitely quite excessive and very unnecessary to throw that in about me and you. It was basically an entire article just dragging you and your life and then casually throwing in "oh also he slept with a 15 year old girl" blah blah blah real estate stuff. It was dumb. It was just a shot at you and by association I am involved. But the thing is I never wanted it to happen. I'm gonna be 29 though and full blown in this field now and still blame my mom and my friends for what happened and no one can ever reason with me otherwise. But the problem for me is that I haven't been able to speak up then (which was my choice) or now to you or to anyone who can end this because the truth is (like I told my mom the other day) I don't remember if I was 15 or 16 when we slept together. I really don't. But I do know I've always been 10+ years past my age, you weren't my coach, you weren't an authority figure of mine, you didn't hurt me, and what happened back then (the arrest) and etc was just the beginning of what would continue to be us sleeping together on and off and whether we were fucking or talking or whatever we were always on good terms I've never genuinely hated you or you me. But my point and my story and the way I feel and the way you could word this is the complete opposite of everything you've been saying and building off of since it happened. Personally to me I think the times is annoying for bringing it up and it also pissed me off. I think people that still talk about it are annoying. The fact you chose to start doing political stuff has nothing to do with me but when those people specifically come at you and your only defense that you feel like you really have because of

ST 1481

25

all those years ago is to say I was some sick and crazy love struck obsessed teenager and because you were so loyal to dori and it was so wrong but ya, dori, shut, was your best friend too yeah mmm you were there for me and because I was so broken and lost and sad and love struck I told you you and tried to get you arrested because I was just so in love. You I've been telling that story for 12 years as I've had to sit back and never speak my side never even think about it and the only reason that that gets to happen is because I got up on the stand as a 16 year old and threw away the prosecutions entire case in front of a courtroom and my family and the entire town because I loved you and I never wanted it to happen either. My mom has tried telling me that some lawyer for the times asked her to come in and talk. You are always telling me you are ready to come out swinging and shut you down and go against them. Well I'm against all of it. My mom's a huge reason for this happening in the first place and the fact she has the audacity to even think for a second about doing this again when I'm going into this field as an adult NOW because of what happened then I screamed my lungs out at her probably last month. Then I gotta hear from you asking you to help me when you go on YouTube live for the last however many years and tell thousands and thousands of people that I'm a liar and it never happened and we have no affiliation. And the times chasing you and whatever beef you have with them and them trying to drag this back out again is also fucking annoying. The side you tell is to publicize and the truth and I'm not saying that in a mean way I understand you basically had no other choice especially at the time. My mother has absolutely no fucking idea what happened between us and the times has absolutely no idea what happened between us. Phil I don't see you as my public enemy or some guy who hurt me or ruined my life or any of that. I see you as my ex boyfriend because that's what you are to me. What happened during the arrest is just what went public and made you look bad but all you've done is battle those claims and it was my fault to never speak up on my side. I plead the 5th then and basically always have throughout the rest of my life because I too have been cleaning up the mess that I made and the mess that followed me with jay and drugs and self medication and 20-22 I was a broken sad depressed zombie because of all the shit that happened between us and between everything. I finally got my shit together and straightened things out internally and externally and then boom we link up as adults and fly across the country together and you pulled that shit with Amanda. And still I have never said one nasty thing about you publicly or anything that could ever hurt you. And I know the only reason that you have had to do the same to me is because of something that happened 12 years ago- but we didn't just sleep together when I was 16- it was 17, 18, 19, 20, 21, 22- Phil we have always been in each other's lives and never hated each other. I've just never said a word or acted out in any way about it because the public story you tell right now and the story it gives you pulled me in and my love obsession etc. etc. it's all true. There was no scandal in my eyes you weren't some gross old man you were never mean to me ever. I hear shit about dori and all these ex girlfriends and shit that happened and my jaw drops. Yeah sure I think you is but we went through the biggest thing ever and you have never raised your voice at me and we have basically always been friends, sleeping together or not sleeping together we've always been cool. But to me and to you too- it wasn't a scandal. I was going through the worst time of my life the most traumatic thing I've ever experienced (still) and you weren't some scandal to me or some cool older guy I thought was so cool and you were in some way cooler or exciting authority and prey in my teenagers. We genuinely cared about each other and you were my boyfriend except you were engaged. We didn't break up we were legally pulled apart before we ever figured anything out and neither of us had a say. Well I did and I chose to protect you and it's because you never hurt me ever. I mean I don't even know if you remember this but it was years after everything happened and I was with jay still and in a really bad place and you and I met up in a hotel room and because I didn't look good and wasn't myself and was telling you about jay you didn't even touch me I didn't even think we kissed you just sat on a bed and you were almost in tears begging me to please get my shit together and please get away from jay. Neither of us were in trouble I was in my early 20s at that point but that is my point this goes so much deeper than what it was made out to be I mean we genuinely loved each other but back then, now and probably always it doesn't matter how you feel or what you want you only care about the story you tell and your public image and you much rather have people write articles about you and drag you and lie about you and make you look like some sicko instead of ever bending or changing your public story that you told all those years ago even if it's still making you look bad. You'd literally rather that than ever remotely slightly go back on anything you've ever said and I just alluded to you what I'm much rather to protect myself against this shit and looking as loudly people from scranton pa who have nothing better to do than to talk about a guy and a girl having sex literally almost 15 years ago I mean it is so fucking pathetic and obnoxious to me now Phil if we can come to an amicable agreement that has nothing to do with my scrolling or you thinking whatever of my family or Chris Kelly or any of it- if you and I can come to an amicable agreement that YOU stop dragging me publicly and defending yourself and with defending yourself it comes making me look like the fucking asshole- if you can agree to stop telling these bored ass low life's get under your skin and get a rise out of you and stuff like a problem in telling me for 10 minutes and stop giving people a minute to shit back at you each and anybody else and will make sure I'm aware of all this stops that you never have a reason to defend yourself ever again because I will make sure that the times leaves you alone leaves me alone my family alone and my family and friends leaves you the fuck alone. What do you think I've been doing huh???? Listen our personal shit aside I dont care and I know you don't either but publicly we are still tied and people are still bored and jerking off to our sex life from 15 years ago and it's honestly so weird and overbearing and fucking obnoxious to me and I cant hear about it anymore. No Amanda. No political tube. No lives. Nothing. You and I have to come to some kind of terms and all I've ever wanted from you is to please stop defending me and making me look like an asshole when its not true and all I've ever done is try to protect myself and you by association. How's that???

Participant                    Delivered          Read          Played
+15707804607 Phil              8/6/2022 1:24:24
                               PM (UTC-4)

Status: Sent

ST 1482

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E8F8D (Table: message, chat, handle; Size: 28642752 bytes)

From: +15707804567 Phil
To: +[              ] Brie Duborgel (owner)

**Let's meet and talk. I think we're mostly on the same page.**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[        ] Brie Duborgel | | 8/6/2022 5:56:09 PM(UTC-4) | |

Status: Read

8/6/2022 5:55:25 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3EAF83 (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: +[              ] Brie Duborgel (owner)

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[        ] Brie Duborger | | 8/18/2022 1:44:25 PM(UTC-4) | |

Status: Read

8/18/2022 12:01:21 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5B788E (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: +[              ] Brie Duborgel (owner)

**We have to meet and talk, mi amigo.**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[        ] Brie Duborger | | 8/18/2022 1:44:25 PM(UTC-4) | |

Status: Read

8/18/2022 12:03:27 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5B76A8 (Table: message, handle, chat; Size: 29642752 bytes)



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil
Laughed at "YES"

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:42:31 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:42:31 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5DAF4C (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: [redacted] Brie Duborgel (owner)
Irregardless, we need to meet and speak. You need to know some stuff that you aren't aware of

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 8/18/2022 2:52:51 PM(UTC-4) | |

Status: Read

8/18/2022 2:43:44 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5DA7A3 (Table: message, handle, chat; Size: 29642752 bytes)

From: +[redacted] Brie Duborgel (owner)
To: +15707804567 Phil
Laughed at "Irregardless, we need to meet and speak. You need to know some stuff that you aren't aware of"

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:53:12 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:53:11 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E0613 (Table: message, chat, handle; Size: 29642752 bytes)

**ST 1492**



From: [redacted] Brie Duborgel (owner)
To: +157078045567 Phil

You would say that

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +157078045567 Phil | 8/18/2022 2:53:18 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:53:18 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E032E (Table: message, chat, handle; Size: 29642752 bytes)

From: [redacted] Brie Duborgel (owner)
To: +157078045567 Phil

Irregardless. Looks like we're both smack dab in the middle of quite the legal tornado.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +157078045567 Phil | 8/18/2022 2:53:37 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:53:37 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E1F8D (Table: message, chat, handle; Size: 29642752 bytes)

From: +157078045567 Phil
To: [redacted] Brie Duborgel (owner)

Not really. We have to talk in person

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1 Duborgel [redacted] Brie | | 8/18/202 2 2:54:52 PM(UTC -4) | |

Status: Read

8/18/2022 2:54:51 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E1CCB (Table: message, handle, chat; Size: 29642752 bytes)

**ST 1493**

From: + [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

Listen I already told you. Aside from your beef and tugging of the heart strings argument you
have with Chris Kelly or any prior trouble aside from me that is irregardless. But I will make
sure that no one ever calls you a pedophile again and our public beef can be squashed and
Linda leaves us the fuck alone.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:57:12 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:57:03 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E1670 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: + [redacted] Brie Duborgel (owner)

It's not that Brie. It's more than that. We have to meet because there's stuff you don't
know

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] Brie Duborgel | | 8/18/2022 3:16:48 PM(UTC-4) | |

Status: Read

8/18/2022 3:08:12 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E560C (Table: message, handle, chat; Size: 29642752 bytes)



From: + [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

Hang on

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 3:16:57 PM(UTC-4) | | |

Status: Sent

8/18/2022 3:16:56 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5EAB84 (Table: message, chat, handle; Size: 29642752 bytes)

ST 1494



Phil Godlewski 2.0 [FAKE]
340K subscribers

document as evidence. It was fake.                    76.9K ◎ 09:23

**August 6, 2022**

Phil Godlewski 2.0

What is everyone going to say when the victim testifies during my Scranton Times lawsuit?

What is she going to say?

I have a feeling the truth is going to be revealed.    83.2K ◎ 12:13

**August 8, 2022**

Phil Godlewski 2.0

Okay all. The time has come for me to call an end to this.

From this moment on, there will be NO mention of any "in-fighting" or "defamation" between myself, and any other Truther/journalist/reporter.

🔍 victim                                              ✕

Phil Godlewski 2.0 [FAKE]
@phil_godlewskii

**340K**        **3.6K**      **913**     **29**     **2.55K**
Subscribers    Photos        Videos      Filed       Links

⚠️ Warning: Many users report that this account impersonates a famous person or organisation.

✈ DOWNLOAD TELEGRAM

About    Blog    Apps    Platform



EXHIBIT

ST 1847



Phil Godlewski 3.0 [FAKE]
286K subscribers

"Mr. Godlewski stands by the allegations in the defamation complaint against the Scranton Times. He has recently become aware of some troubling and coercive background that may have given rise to the victim's sudden and improvident affidavit. Any sexual relationship occurred when the couple were of age, and this has never been denied. We expect to have more news on this issue shortly. In the meantime, the litigation will continue."

Tim Kolman for KOLMAN LAWPC.

91.9K  ⊙ 19:05

December 6, 2022

Phil Godlewski 3.0
Question:

Would you take a chance at defaming someone, publicly, if that someone had $500,000 in available cash to spend on legal fees to sue you into oblivion?

Personally, I wouldn't take that chance 🤷

#gotime

81.9K  ⊙ 14:46

Q defaming

Phil Godlewski 3.0 [FAKE]
@phil_godlewski

286K        4.01K     1.05K    35      2.74
Subscribers  Photos    Videos   Files   Links

⚠ Warning: Many users report that this account impersonates a famous person or organisation.

◄ DOWNLOAD TELEGRAM

About   Blog   Apps   Platform

Previously

EXHIBIT
"9"

tabbies

ST 3540



To: Brie Duborgel

Tue, Nov 20 at 6:47 PM

You okay?

As okay as I can be :/
You?

Everything is going to be fine
I promise

I hope so. I just want what I earned and deserve. You have no idea what a terrible fuckin year
I've had

I do know

Only bits and pieces. Maybe one day I'll be able to explain to you

Wed, Nov 30 at 10:00 AM

11 or 1130

Anywhere in thee
Tr

Kk Shakespeare

I shall

Wed, Nov 30 at 12:35 PM

The Daily Beast
thedailybeast.com

Wed, Nov 30 at 8:46 PM

7 Photos

folks. May God continue to bless, guide and
protect you and your family 💜
6h   Like   Reply   Hide

Barbara Clinton
You are a good man, Phil. May your
generosity be returned a thousand times
over. Love how you are sharing us the way
forward.
3h   Like   Reply   Hide

Steven Hood
Perlo Phil
https://ezodul.com/qanon-leader-
pedo/article-into-null-great-htdono



EXHIBIT
"10"

ST 3747

4



Steven Head
Pedo Pill

https://pzdsdst.com/qanon-leader-accidentally-outs-self-as-statutory-rapist-164183676769/amp
See Translation

QAnon Leader Accidentally Outs
Self As Statutory Rapist In Lawsui...
Pzdsdst.com

2h   Like   Reply   Hide                    1 👍

Nancy Olson
God bless you 🙏🙏🙏
2h   Like   Reply   Hide

Welp- you finally got everything you've ever wanted. You're famous.

I'm not lying but I'm not gonna let anybody call you a child predator either

I am shook to my fucking core

> No one asked you to lie, Brie
> You were intimidated and extorted for your affidavit. Those are facts.

I didn't say that

No I wasn't I called and asked for help and didn't get it

> But you proceeded on the promise of help
> Which is extortion

Yeah to stand up against you PROVATELY

but now this is Rolling Stones public

> You know I'm right. We can talk more about it but at the end of the day, the above comments
> are the rest of my life

As you currently thank your fans

Phil I'm right here with ya

No one else is on this boat besides us

So here we go I guess

> So help me fix it, for both of us

5

I knew in my stomach today something was gonna happen. I felt it coming. Why do you think I told you I was gonna get creative

> Creative doesn't get rid of a sworn statement. Creative would have been before the statement

This is gonna be international news if it isn't already

I'm gonna tell MY truth but really drive home u don't like kids and it makes me wanna spit at whoever say that

> Not gunna matter brie

> I gotta go Live now

You don't know how persuasive I can be. No more times telling my story or you telling my story I am telling MY story

Kk go get 'em Robin Hood

> If you say we had sex before you were 18, it'll have an even worse effect. If that's something you feel you have to say, I'd rather you do nothing at all

If I hide in ur shadow for another living breathing second I will quite literally turn invisible. I would have rathered you dropped this suit or have never filed this in the first place or made my story and our story as ducking public as you have. Now I have no other choice. This quite literally about to make international news

I can't believe any of this right now. I'm gonna have reporters at my house

> I warned you it'll get worse

> Way worse

Wed, Nov 30 at 11:57 PM

I'm glad you're following and Amanda are more important than me and I hope you had fun threatening me tonight. I'm actually afraid. You're a fucking jack ass

You brought this attention to both of us and now you're sad? When really I've been the one protecting both of us. You've been friends with Amanda for what a year? No. You only know each other through me and idk what the fuck you got her involved in but YOU are MY friend no you're my ex and SHE is MY friend. This is all a fuckin joke. But yeah threaten me with outing my mental health. Yeah anyone would be stressed carrying around the weight of both of our problems. You're un fucking real.

I've been the one who's had your back all these years ME. I've been loyal to you- ME. you've known Amanda a year. You haven't even known your fiancé that long. You've been a constant in my life for 14 years literally these people don't even fucking know you. But if you wanna have a public smear campaign and absolutely destroy each other then fine that's what we'll do. If this is what you want.

6

ST 3749

I've been the one who's had your back all these years ME. I've been loyal to you- ME. you've known Amanda a year. You haven't even known your fiancé that long. You've been a constant in my life for 14 years literally these people don't even fucking know you. But if you wanna have a public smear campaign and absolutely destroy each other then fine that's what we'll do. If this is what you want.

> I honestly have no idea what you're talking about

K

I figured as much

I'm scared but enjoy ur fame

> Brie my live was about giving to people in need. I never once even mentioned you

Omg

I just watched it

> I'm not sure you did lol



Phil's $25k Christmas Giveaway

November 30th 2022

Phil's $25k Christmas Giveaway
rumble.com

Is that you dressed as Santa?

> You most likely watched something old. Because you weren't mentioned at all.

> No, it's me photoshopped as Santa

Why is Santa blonde?

> Gold

> Evidently you just realized that you were watching an old video. What was the date?

> Just curious

ST 3750



To: Brie Duborgel

I'm sleeping up mom moms so I don't have reporters crawling through my window

November 26

Excellence avoidance of the question

Classico

We don't even hate each other this is stupid

You're stupid

It all goes away Brie, once the affidavit goes away. No one will ever mention us in a negative way ever again. Ever.

It's the only way and you know it.

I'm going to bed

Call me tomorrow

No it's not I literally need a lawyer and I'm still being kind me and my big nice stupid heart doesn't want to hurt you even though you don't care about me I'm still sitting over here like hMmMmmM hOw dO I mAke SuRe NoOne HurTs pHilS fEeLInGs

K

You'll have my lawyer.

Gnite :d

Goodnight you stupid dick

ST 3751

1

2

# C E R T I F I C A T E

3     I hereby certify that the proceedings and

4 evidence are contained fully and accurately in the

5 notes taken by me of the above cause and that this copy

6 is a correct transcript of the same to the best of my

7 ability.

8

9

10 _____ 2/13/23

11 Linda Krehel
    Official Court Reporter

12

13

14     The foregoing record of the proceedings on the

15 above cause is hereby approved and directed to be

16 filed.

17

18

19 2/16/13

20 Date                    HONORABLE CARMEN D. MINORA

21

22

23 (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means

24 unless under the direct control and/or supervision of
    the certifying reporter.)

25