# EXHIBIT "N"

IN THE COURT OF COMMON PLEAS
OF LACKAWANNA COUNTY

MAURLE KELLY
LACKAWANNA COUNTY
2021 JUL 31 P 2 53
CLERK OF JUDICIAL
RECORDS CIVIL DIVISION

PHILIP GODLEWSKI,

Plaintiff

vs.

CHRIS KELLY, et al.

Defendants

---

No.: 2021-CV-2195

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

### HAGGERTY HINTON & COSGROVE LLP

J. Timothy Hinton, Jr. Esquire
PA ID. 61981
1401 Monroe Ave., Suite 2
Scranton, PA 18503
Ph. (570) 344-9845, Fax (570) 343-9731
timhinton@haggertylaw.net
Attorney for Defendants,
Chris Kelly and The Scranton Times, L.P



# Table of Contents

I. PROCEDURAL HISTORY .................................................................................1

II. BACKGROUND ............................................................................................2

III. STATEMENT OF THE QUESTIONS PRESENTED........................................5

IV. ARGUMENT ...............................................................................................6

    A.    Standard of Review.........................................................................6

    B.    Plaintiff has the burden to prove Defendants made false statements about Plaintiff in the article ...............................................................7

    C.    Statements in the article regarding Plaintiff having sex with a minor ..........10

    D.    Godlewski's 2010-11 criminal case...........................................................11

    E.    Evidence of Godlewski's sexual relationship with the minor victim..............16

    F.    Godlewski's testimony about why he pled guilty to the corruption charge........................................................................................20

    G.    Godlewski made false statements under oath in this case about whether he ever had sex with Brienna ...........................................25

    H.    Godlewski also gave False Sworn Statements about his Communications with Brienna DuBorgel.......................................27

    I.    Godlewski tried to bribe the minor victim to get her to testify their sexual relationship started when she was 18 years old...................28

    J.    Godlewski made false statements under oath about giving any gifts to the minor victim ...........................................................................35

    K.    Plaintiff must prove any false statements in the article were made with actual malice by clear and convincing evidence ....................37

    L.    Evidence relating to the actual malice defense.................................40

    M.    The statements in the article about QAnon and the insurrection are not defamatory .......................................................................44

    N.    Certain statements in the article are protected under the fair report privilege...................................................................................51

    O.    Plaintiff has insufficient evidence to prove loss of reputation or actual injury for his defamation claims.................................................52

    P.    Plaintiff's false-light claim ............................................................57

    Q.    Plaintiff claims of interference with existing or prospective contractual relations ................................................................58

    R.    Plaintiff cannot meet his burden to prove punitive damages .............60

V. CONCLUSION..............................................................................................61

i

Cases

*American Future Sys. v. Better Bus. Bureau*, 872 A.2d 1202 (Pa. Super. 2005)............................ 8

*American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania*, 592 Pa. 66

    (PA. 2007)........................................................................................................... 10, 37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 7

*Bartlett v. Bradford Publ'g Inc.*, 885 A.2d 562 (Pa. Super. 2005) ......................................... 38, 40

*Binder v. Triangle Publications, Inc.*, 275 A.2d 53 (1970) ..................................................... 51

*Birl v. Philadelphia Electric Co.*, 167 A.2d 472 (Pa. 1960)................................................... 44

*Blackwell v. Eskin*, 916 A.2d 1123 (Pa. Super. 2007) ............................................................ 38, 40

*Braig v. Field Communications*, 456 A.2d 1366 (Pa. Super. Ct. 1983) ................................... 45

*Commonwealth v. Mangel*, 181 A.3d 1154 (Pa. Super. 2018).................................................. 13

*Commonwealth v. Mosley*, 114 A.3d 1072 (Pa. Super. 2015) .................................................. 13

*Commonwealth v. Murray*, 174 A.3d 1147 (Pa. Super. 2017)................................................... 14

*Commonwealth v. Orr*, 255 A.3d 589 (Pa. Super. 2021)........................................................... 13

*Commonwealth v. Talley*, 236 A.3d 42 (Pa. Super. 2020).......................................................... 14

*Commonwealth v. Wright*, 255 A.3d 542 (Pa. Super. 2021)....................................................... 14

*Curran v. Children's Serv. Ctr. of Wyoming Cnty.*, 578 A.2d 8 (Pa. Super. 1990) ............... 55, 57

*Dibella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) ................................................................. 9, 10

*Disalle v. P.G. Publishing Company*, 544 A.2d 1345 (Pa. Super. 1988) .............................. 60, 61

*Dougherty v. Boyertown Times*, 547 A.2d 778 (Pa. Super. Ct. 1988) ........................................ 55

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1984) ................................. 8

*Ertel v. Patriot-News Co.*, 674 A.2d 1038 (Pa. 1996) ............................................................. 6, 40

*First Lehigh Hank v. Cowen*, 700 A.2d 498 (Pa. Super. 1997) ................................................... 6

*Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974) ............................................................ 45, 49, 52

*Glenn v. Point Park College, 441 Pa. 474 (1970)* ............................................................ 59

*Graboff v. Colleran Firm*, 744 F.3d 128 (2014) ............................................................ 58

*Harris by Harris v. Easton Publishing Company*, 483 A.2d 1377 Pa.Super (1984) ................... 57

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ..................... 9, 39, 40

*Jones v. City of Philadelphia*, 893 A.2d 837 (Pa. Commw. Ct. 2006) ........................................ 45

*Kernick v. Dardanell Press*, 236 A.2d 191 (Pa. 1967) ................................................ 50

*Krajewski v. Gusoff*, 53 A.3d 793 (2012) ............................................................ 58

*Kurowski v. Burroughs*, 994 A.2d 611 (Pa. Super. 2010) ............................................ 44

*Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185 (Pa. Super. 2003) ............................... 7, 38

*Lin v. Rohm and Haas Co.*, 293 F. Supp. 2d 505 (E.D. Pa. 2003) ........................................ 55

*Matus v. Triangle Publ.*, 286 A.2d 357 (Pa. 1971) ........................................................ 8

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ................................................ 38, 39

*Moore v. Vislosky*, 240 Fed. Appx. 457 (3d Cir. 2007) ............................................ 61

*Mosley v. Observer Pub. Co.*, 629 A.2d 965 (Pa. Super. 1993) ........................................ 6

*NAACP v.* Button, 371 U.S. 415 (1953) ............................................................ 37

*New York Times v. Sullivan*, 376 U.S. 254 (1967) ................................................ 37, 38

*Norton v. Glenn*, 860 A.2d 48 (Pa. 2004) ............................................................ 38

*Parano v. O'Connor*, 641 A.2d 607 (Pa. Super. 1994) ............................................ 45

*Phila. Newspapers v. Hepps*, 475 U.S. 767 (1986) ................................................ 7, 8, 9

*Pilchesky v. Gatelli*, 12 A.3d 430 (Pa. Super. 2011) ............................................ 52

*Redding v. Carlton*, 296 A.2d 880 (Pa. Super. 1972) ............................................ 51

*Robertson v. McCloskey*, 666 F. Supp. 241 (D.D.C. 1987) ........................................ 10

*Rybas v. Wapner*, 457 A.2d 108 (Pa. Super. 1983) ............................................ 50

*Samarin v. GAF Corp.*, 571 A.2d 398 (Pa. Super. 1989) ................................................................ 6

*Sciandra v. Lynett*, 187 A.2d 586 (Pa. 1963) ............................................................................. 51

*Sprague v. Walter*, 656 A.2d 890 (Pa. Super. 1995) ..................................................................... 60

*Strickland v. University of Scranton, 700 A.2d 979 (Pa. Super. 1997)* ........................................ 57

*Thomas Merton Center v. Rockwell Int'l Corp.*, 442 A.2d 213 (1981) ........................................ 45

*Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001) ....................................................................... 40

*Tucker v. Philadelphia Daily News*, 848 A.2d 113(Pa. 2004) .................................... 38, 44, 51, 52

*Veno v. Meredith*, 515 A.2d 571, 575 (Pa. Super. 1986) ............................................................. 45

*Wecht v. PG Pub. Co.*, 510 A.2d 769 (Pa. Super. 1986) .............................................................. 50

*William v. Pilgrim Life Ins. Co.*, 452 A.2d 269 (Pa. Super. 1982) ................................................ 6

*World Wide Assoc. of Specialty Prods. v. Pure, Inc.*, 450 F.3d 1132 (10th Cir. 2006) ................. 9

Statutes

18 Pa.C.S.A.§ 6301 ............................................................................................................... 14

42 Pa. C.S. § 8343 ............................................................................................................ 8, 44

42 Pa. C.S.A. § 5942 ................................................................................................................ 8

Restatement (Second) of Torts § 566 cmt. c (Am. Law Inst. 1977) ............................................. 45

Restatement (Second) of Torts § 652E ....................................................................................... 58

Rules

Pa. R. Civ. P. 1035 ................................................................................................................... 6

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Chris Kelly (hereinafter ("Kelly")) and The Scranton Times, L.P. (hereinafter "Scranton Times"), (collectively "Defendants"), by counsel, hereby file this Brief in Support of their Motion for Summary Judgment seeking judgment as a matter of law on all claims presented by Plaintiff Phillip Godlewski ("Plaintiff" or "Godlewski"), pursuant to Pennsylvania Rule of Civil Procedure 1035, and state as follows:

## I.  PROCEDURAL HISTORY

Godlewski, filed a six (6) count Complaint on May 2, 2021. This lawsuit is based on an opinion column authored by Kelly which was published in the Times-Tribune newspaper on February 14, 2021. This opinion column shall be referred to herein as the "article" and a true and correct copy is marked as **Exhibit "1"**. All of the exhibits referred to herein are included on the *Exhibit List for Brief in Support of Motion for Summary Judgment* and the *Exhibit List* along with the exhibits shall be filed as a separate document. There are numbers assigned to each paragraph of the article for reference purposes. Count 1 of Plaintiff's Complaint asserts Defendants defamed him based on one factual averment – Defendants made a statement of fact in a newspaper article that Godlewski had sexual intercourse with a fifteen-year-old girl. (Complaint, ¶¶ 96 and 103.) Count 2 asserts a defamation claim based on Godlewski's reputation as a realtor. Plaintiff claims the article depicts him as being involved in QAnon and not fit to sell real estate and as a child molester with no credibility. (Complaint, ¶¶ 110-111.) Count 3 claims Plaintiff was defamed because the article implies, he was involved in the insurrection at the U.S. Capitol on January 6, 2021. Count 4 asserts a false light invasion of privacy claim but includes no alleged facts. Count 5 asserts an intentional interference with Plaintiff's existing contractual relations as a realtor by publishing a defamatory article about him. Count 6 (mistakenly referred

to as Count 5 in the Complaint) pleads a claim for intentional interference with Plaintiff's prospective contractual relations as a realtor.

Defendants filed an Answer and New Matter to Plaintiff's Complaint. The pleadings are closed. Defendants undertook comprehensive discovery including nine (9) depositions and several sets of written discovery requests. Plaintiff conducted limited discovery which included two (2) depositions and written discovery requests. The Court entered a Case Management Order on July 11, 2023 which closed discovery as of December 31, 2023 and compelled Defendants to file their motion for summary judgement by January 31, 2024. On January 22, 2024, the Court entered an Order and Opinion sanctioning Plaintiff for failing to preserve and produce his text messages requested in discovery.

The parties have entered into three stipulations which have been approved by the Court and adopted into Orders of Court. On January 18, 2023, the Court entered an Order stating "for purposes of this litigation Plaintiff Philip Godlewski shall be deemed a public figure." Also on January 18, 2023, the Court filed a separate Order declaring that "Plaintiff's claims for economic or special damages are dismissed with prejudice." On January 2, 2024, the Court entered an Order dismissing Defendant Larry Holeva from the case.

## II. BACKGROUND

Godlewski's Complaint, paragraph 1, summarizes his claims against Defendants. He accuses Defendants of defaming him in the article by stating: (1) he had sex with a 15-year-old; (2) he is a "purveyor of a poison" who "curdled the hearts and minds of millions who may never recover"; (3) he was involved in the seditionist mayhem at the U.S. Capitol that resulted in five deaths; and (4) Plaintiff is an unreliable and unethical realtor who misrepresents the properties he sells. Back in 2011 Plaintiff pled guilty to corrupting the morals of a minor female. Godlewski

2

was more than ten (10) years older than the victim. Godlewski was charged with various crimes alleging a sexual relationship with this minor. He negotiated a guilty plea agreement whereby all charges were dismissed in return for his guilty plea to the corruption charge. Plaintiff has admitted this was a plea bargain. (A true and correct copy of Phil Godlewski's 7/25/23 Deposition is included in the *Exhibit List* and marked as **Exhibit "2"**, pp. 240-241.) On the day after Godlewski was sentenced on the corruption charge, July 12, 2011, the headline in the Times-Tribune newspaper read: "Ex-baseball coach sentenced for sex with a girl, 15." (A true and correct copy of the 7/12/2011 article is included in the *Exhibit List* and marked as **Exhibit "3"**.)

In 2021, Plaintiff launched a new career[1] as a social media broadcaster and leader in the QAnon movement. He calls himself a "truther" and "patriot reporter." (**Exhibit "2"**, pp. 200-201.) He quickly gained thousands of followers who watch his live video shows on the Q movement, election fraud, flat earth theory and a host of conspiracy theories. A principal tenant of the QAnon movement is that the world is run by a cabal of Satan-worshiping pedophiles. The irony of Plaintiff being a popular QAnon conspiracy broadcaster was not lost on Kelly since Plaintiff had been charged with numerous sex crimes against a child and he pled guilty to corrupting the minor. After this lawsuit was filed, Godlewski tried to bribe the minor victim to get her to say she was 18 when she had sex with him. He sent her text messages offering her a "unique financial opportunity" but cautioned her that the matter must be "handled properly by both of us." (A true and correct copy of the herein referenced text messages between Brienna DuBorgel and Godlewski form 5/28/2022, 8/5/2022, 8/6/2022, and 8/18/2022 are included in the

---

[1] Godlewski also became a multi-level marketer of silver commemorative coins through 7-K Metals. Godlewski used his social media platforms to market his followers to become buyers of coins or become sellers in his down-line.

3

*Exhibit List* and marked as **Exhibit "4"**, see ST 1460.) Plaintiff even teased his social media

followers when he posted: "what is everyone going to say when the victim testifies during my

Scranton Times lawsuit? What is she going to say? I have a feeling the truth is going to be

revealed." (See Godlewski's August 6, 2022 social media post is included in the *Exhibit List* and

marked as **Exhibit "5"**.) After this post Plaintiff met the victim and she refused his $50,000

offer. (A true and correct copy of the 6cript is included in the *Exhibit List* and marked as **Exhibit

"6"**, pp. 32-34.) Instead, she contacted defense counsel to tell the truth about Godlewski. Brienna

DuBogel (hereinafter referred to as the "minor victim" or "Breinna) executed an affidavit stating

she was involved in a sexual relationship with Godlewski when she was fifteen years old and he

was twenty-five. (A true and correct copy of Brienna DuBorgel's Affidavit is included in the

*Exhibit List* and marked as **Exhibit "7"**.) Further, she provided defense counsel with her text

messages with Godlewski from 2021-22. After the victim's affidavit was produced to

Godlewski, Godlewski sent the victim this text message in November 2022:

> "Brie – I'm going into the next Trump administration as a political advisor and
> intelligence figure My public persona is going absolutely no where. In fact, it's
> accelerating rapidly. There might be 10 million that know me now, but there will be 300
> million that know me 5 years from now. And I have to deny, deny, deny. I could have
> instead praised you for your honestly and called you a lifelong friend, in front of millions.
> But you signed that affidavit. You see it now? This gets worse. Not better. Way worse."

(A true and correct copy of the November 2022 text message is included in the *Exhibit List* and

marked as **Exhibit "8"**.) Godlewski produced this text message after the sanctions hearing on

February 6, 2023. Plaintiff then took to social media to threaten a lawsuit against her. (A true and

correct copy of Phil's December 5, 2022 social media post is included in the *Exhibit List* and

marked as **Exhibit "9"**.) He privately hounded Brienna to recant her first Affidavit (**Exhibit

"7"**) and claim she was intimidated and extorted by defense counsel into executing the affidavit.

Godlewski wrote to her "It all goes away Brie, once the affidavit goes away" and adds "You'll

have my lawyer." (A true and correct copy of text messages between Phil and Brie from November 29-30, 2022 are included in the *Exhibit List* and marked as **Exhibit "10".**)

### III.   STATEMENT OF THE QUESTIONS PRESENTED

(1)     Has Plaintiff, a public figure, presented sufficient evidence to prove Defendants made false statements about him in the article?

Suggested Answer:  No.

(2)     Has Plaintiff presented clear and convincing evidence that any false statements in the article were published with actual malice?

Suggested Answer:  No.

(3)     Are the statements in the article about Plaintiff spreading lies and being involved in QAnon defamatory?

Suggested Answer:  No.

(4)     Are certain statements in the article concerning Plaintiff's criminal case subject to the Fair Report Privilege?

Suggested Answer:  Yes.

(5)     Has Plaintiff produced sufficient evidence to prove harm to his reputation for his defamation claims?

Suggested Answer:  No.

(6)     Should Plaintiff's claim for false light invasion of privacy be dismissed since Plaintiff lacks evidence of the essential elements of the cause of action and he cannot prove actual malice?

Suggested Answer:  Yes.

(7)     Should Counts V and VI of the Complaint be dismissed since Plaintiff's claims

for economic damages have been dismissed and he otherwise lacks evidence to prove these claims?

Suggested Answer: Yes.

(8)     Does Plaintiff have sufficient evidence to recover punitive damages?

Suggested Answer: No.

## IV.   ARGUMENT

### A. Standard of Review

Pennsylvania courts have repeatedly acknowledged that "the motion for summary judgment has an important function in the context of a defamation case." *First Lehigh Hank v. Cowen*, 700 A.2d 498 (Pa. Super. 1997) (citing *Mosley v. Observer Pub. Co.*, 629 A.2d 965, 967 (Pa. Super. 1993)). Summary judgment is appropriate "(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action" or "(2) if an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action." Pa. R. Civ. P. 1035; *William v. Pilgrim Life Ins. Co.*, 452 A.2d 269 (Pa. Super. 1982). Once the motion for summary judgment has been properly supported, the burden is upon the non-movant to disclose evidence that is the basis for his argument resisting summary judgment. *Samarin v. GAF Corp.*, 571 A.2d 398 (Pa. Super. 1989).

The entry of summary judgment in favor of the defendant and against the plaintiff is appropriate when the plaintiff is unable to present evidence of an essential element of a claim on which the plaintiff bears the burden of proof. Pa. R. Civ. P. No. 1035.2(2); *Ertel v. Patriot-News Co.*, 674 A.2d 1038 (Pa. 1996) (for a non-moving party to survive summary judgment, it "must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof *such that a jury could return a verdict in its favor.*" *Ertel*, 674 A.2d at 1042 (emphasis

added). The moving party is not required to introduce evidence on an issue on which it does not

bear the burden of proof in order to have its motion granted. *Id.* at 1041-1042.

These requirements are equally applicable in cases involving claims for defamation, as

confirmed by the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242

(1986). The *Anderson* Court explained in detail the burden of a non-moving party in resisting a

motion for summary judgment on its defamation claim:

> Just as the "convincing clarity" requirement is relevant in ruling on a motion for directed
> verdict, it is relevant in ruling on a motion for summary judgment. When determining if
> a genuine factual issue as to actual malice exists in a libel suit brought by a public figure,
> a trial judge must bear in mind the actual quantum and quality of proof necessary to
> support liability under <u>New York Times</u>. For example, there is no genuine issue if the
> evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow
> a rational finder of fact to find actual malice by clear and convincing evidence. Thus, in
> a ruling on a motion for summary judgment, the judge must view the evidence presented
> through the prism of the substantive evidentiary burden.

*Anderson*, 477 U.S. at 242-55. As set forth in detail below, the higher standards of "convincing

clarity" or "clear and convincing evidence" applies to both the *New York Times*' requirement of

proving "actual malice" and the *Hepps*' requirement of proving falsity.

**B. Plaintiff has the burden to prove Defendants made false statements about Plaintiff
in the article**

In libel actions against a media defendant for publications on matters of "public concern,"

the First Amendment requires the plaintiff to bear the burden of proving that the publications are

false. *Phila. Newspapers v. Hepps*, 475 U.S. 767, 770 (1986); see also *Lewis v. Philadelphia

Newspapers, Inc.*, 833 A.2d 185, 191 (Pa. Super. 2003), appeal denied, 577 Pa. 690, 844 A.2d

553 (Pa. 2004) ("If the statement in question bears on a matter of public concern, *or* the

defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as

an additional element, that the alleged defamatory statement is in fact false.")

In *Hepps*, the Philadelphia Inquirer published a series of five articles about a grand jury

investigation into the connection of Mr. Hepps and his business to organized crime. *Hepps,* 475 U.S. at 769. The newspaper relied on confidential sources and, under Pennsylvania's Shield Law, 42 Pa. C.S.A. § 5942, it refused to disclose the identity of those sources to the plaintiffs. *Id.* at 770-71. Mr. Hepps had prevailed under Pennsylvania law which did not require a plaintiff in a defamation case to prove falsity but rather recognized truth as an affirmative defense to be proved by the defendant publisher. 42 Pa.C.S.A § 8343(b)(1). The United States Supreme Court, however, switched this burden in cases involving public concern, finding that the newspaper prevailed because the plaintiff could not prove falsity. *Id.* at 770.

The United States Supreme Court recognized in *Hepps* that there was a category of defamation claims "when the factfinding process will be unable to resolve conclusively whether the speech is true or false; it is in those cases that the burden of proof is dispositive." *Hepps,* 475 U.S. at 776. *Hepps* presented the classic example of such a case -- because grand jury investigations are secret, it is unlikely that anyone can conclusively prove what transpired before the grand jury. *Id.* at 769. The Hepps Court reached their result with full recognition that Pennsylvania's Shield Law makes it more difficult for plaintiffs to meet their burden of proving falsity in cases involving the media reporting on matters of public concern. *Hepps,* 475 U.S. at 779.

The Article here falls squarely within the *Hepps* Court's reasoning as it involves a newspaper defendant reporting on a matter of public concern. "Whether speech addresses a matter of public concern must be determined by its content, form and context, as evidenced by the entire record." *American Future Sys. v. Better Bus. Bureau,* 872 A.2d 1202, 1211 (Pa. Super. 2005) (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761 (1984)); see also *Matus v. Triangle Publ.,* 286 A.2d 357 (Pa. 1971) (matters of public concern are those

8

which contribute "to robust debate on public issues."). The article clearly qualifies as a report on a matter of public concern as it discusses the growing QAnon movement and its relation to the January 6th riot at the Capitol. The QAnon movement has been widely reported on in publications and media outlets such as The New York Times, Wall Street Journal, BBC, CBS News, Pew Research Center, CNN, NPR and AP News.

Although the United States Supreme Court has declined to rule on whether *Hepps* requires a plaintiff to prove falsity by clear and convincing evidence or under the lessor preponderance of the evidence standard, see *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 661 n.2 (1989), a majority of federal and state courts have concluded that falsity must be established by clear and convincing evidence. See *Dibella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) ("We also observe that many jurisdictions outside of New York that have considered this issue have found that clear and convincing proof of falsity is required for public figures and sometimes even private figures"); see also *World Wide Assoc. of Specialty Prods. v. Pure, Inc.*, 450 F.3d 1132 (10th Cir. 2006) (citing *Dibella*, and noting that "[t]he Second Circuit recently observed that the majority of state and federal courts apply the heightened clear and convincing standard to the element of falsity."). The heightened clear and convincing standard is particularly appropriate where a public figure sues a media defendant over a matter of public concern:

> [A] clear and convincing standard of proof for falsity would resolve doubts in favor of speech when the truth of a statement is difficult to ascertain conclusively. Indeed, as a practical matter, public-figure plaintiffs already bear such a burden, for in order to prove actual malice they must, of necessity, show by clear and convincing evidence that the defendant knew the statement was false or acted in reckless disregard of its truth. Finally, [the standard] has more than merely a logical or symmetrical appeal. To instruct a jury that a plaintiff must prove falsity by a preponderance of evidence, but must also prove actual malice, which to a large extent subsumes the issue of falsity, by a different and more demanding standard is to invite confusion and error.

*Dibella*, 403 F.3d at 114 (quoting *Robertson v. McCloskey*, 666 F. Supp. 241, 248 (D.D.C. 1987)). Plaintiff definitely has the burden to prove falsity here and that burden should under the clear and convincing standard of proof.

### C. Statements in the article regarding Plaintiff having sex with a minor

Plaintiff claims Defendants' statements about him having sex with a minor and admitting to sex with the minor as part of his guilty plea are false. Those statements are contained in paragraphs 21-22 and 26 of the article, which have been copied below for easy reference:

> 21. Here's "proof." In the normal course of reporting this column, I stumbled upon some legal troubles in Godlewski's recent past. In 2011, the former Riverside High School, baseball coach pleaded guilty to corruption of minors and admitted to having a sexual relationship with a 15-year old girl.
> 22. Lackawanna County detectives said Godlewski had sex with the girl in cars and homes he had access to as a real estate agent. Godlewski, 28 at the time, was sentenced to three to 23 months, with the first three months to be served under house arrest and the balance as probation.
> 26. In fact, my editor and I discussed whether to include the information, which is public and was previously published in The Times-Tribune. We decided it was relevant in regard to Godlewski's credibility. I have many character defects, but the last time I had sex with a 15-year-old was never.

**(Exhibit "1")**

There is no dispute that Godlewski pled guilty to the corruption charge and the detectives said Godlewski had sex with the girl in cars and houses which were up for sale. (A true and correct copy Plaintiff's Response to Defendants' Interrogatories (Set II) No. 1 is included in the *Exhibit List* and marked as **Exhibit "11"**, see also **Exhibit "2"**, pp. 216 and 219.) Godlewski admits he did in fact corrupt the morals of the minor victim. (**Exhibit "2"**, p. 108.) No liability can attach for true statements. See *American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania*, 592 Pa. 66, 77-78 (PA. 2007). The only issues here are whether Godlewski can prove he did not have sex with the minor victim and he did not admit to having a sexual relationship with a 15-year-old girl as part of his guilty plea. (**Exhibit "1"**, ¶¶ 21 and 26.)

### D. Godlewski's 2010-11 criminal case

Godlewski was arrested pursuant to an eight (8) count Criminal Complaint by the Lackawanna County District Attorney's Office on July 9, 2010. (A true and correct copy of the Warrant of Arrest and Criminal Complaint is included in the *Exhibit List* and marked as **Exhibit "12".**) Godlewski was charged with Statutory Sexual Assault, Involuntary Deviate Sexual Intercourse, Aggravated Indecent Assault, Unlawful Contact with a Minor, Corruption of minors and indecent assault. All six (6) charges were based on Godlewski's sexual intercourse with the minor victim (Brienna DuBorgel[2]). (**Exhibit "12".**) Godlewski's date of birth is in June 1983 and Brienna's date of birth is in September 1993. Godlewski was also charged with intimidation of the minor victim and a witness and criminal use of communication facility. The intimidation charge was based on Godlewski instructing the minor victim to tell law enforcement all the text messages he had with the victim were fake. He also told the victim she is the only person who can get him out of the charges. Godlewski told a witness (Thomas Nezlo) who was also charged with having sex with the minor victim to contact the victim to get their stories straight. (**Exhibit "12", See ST 628.**) (A true and correct copy of Thomas Nezlo's Affidavit is included in the *Exhibit List* and marked as **Exhibit "13".**) The Affidavit of Probable Cause attached to the criminal Complaint (**Exhibit "12", See ST 620**) stated Detective Mancuso met the minor victim at the Child Advocacy Center on March 19, 2010 to conduct a forensic interview. The victim was accompanied by her mother Linda and her father. The victim told the detective she had been involved in a sexual relationship with Godlewski starting in 2008. (**Exhibit "12"**) The victim

---

[2] As a standard practice, The Scranton Times does not disclose the identity of a sexual crime victim, especially one who was a minor at the time of the crime. However, Godlewski has filed a lawsuit against the minor victim disclosing her name and she has filed a Counterclaim against him with full disclosure of her name. Further, Ms. DuBorgel, the minor victim, who is now thirty years old, testified at an open Court hearing in this case on 2/6/23 and stated she was involved in

turned 15 in September 2008. According to the detective's affidavit, the victim reported she and

Godlewski engaged in oral and vaginal intercourse. An additional page of the Affidavit of

Probable Cause included various communications Godlewski had with the victim when she was

15 and 16 years of age. (**Exhibit "12"**, see ST 622.) The Affidavit of Probable Cause stated:

> On 02/25/2010 at 2235 GMT Ilme Philip GODLEWSKI 570-780-4567 stated to victim ▮▮▮▮▮▮ "I just want you to see that I really care about you, and not your body or our sex. Maybe that's the only way I can"
>
> On 02/25/2010 at 2238 GMT GODKLEWSKI states "I need you ▮▮▮, I need you more than anything in my life. I'm going to do everything I can to be with you as soon as I possibly can" and "you're my drug and I'm addicted." "To quote a dear friend. Sigh."
> On 02/28/2010 at 1922 GMT GODLEWSKI states "The only way we'd ever be sexually satisfied is if we did it like 4-5 times a day"
>
> On 03/06/2010 at 2208 GMT, GODLEWSKI "I hate my penis, Idk why the fuck that happens. You looked so good and were giving incredible head than BOOM, gone. Like wtf."
>
> GODLEWSKI typed a 2 page day log with times and entries. GODLEWSKI then gave this log to the victim. The day log includes a detailed account of his activities and thoughts throughout the day. The following are excerpts from the log:
>
> 10:14 realized that you're only 15, but quickly stopped caring
>
> 10:34 got sad bcuz we can't officially "go out". I just want everyone to know that I love you<3
>
> 11:39 I just pulled ▮▮ hair from my crotch are. hahahahalll
>
> 2:56 should we get a Jacuzzi suite? Hmm
>
> 3:56 why can't you be 21
>
> 5:28 why are we so compatible? I'm 10 years older than you . hmm

(**Exhibit "12"**, see ST 622.)

The four text messages referenced above were taken from the text messages attached to

Brienna's 2nd Affidavit dated March 28, 2023. (A true and correct copy of Brienna's Affidavit

dated March 28, 2023 and the 2-page day log is included in the *Exhibit List* and marked as

**Exhibit "14"**, see pp. ST 2797, ST 2814 and ST 2858.) Godlewski also handed Brienna a 2-page

day log around Christmas 2008 with some Christmas presents. (**Exhibit "14".**)

The Pennsylvania State Police downloaded Brienna's cell phone on March 22, 2010 and

were able to capture 17 days of text messages between the minor and Godlewski from February

---

a sexual relationship with Godlewski when she was fifteen (15) years old.

24, 2010 to March 12, 2010. The captured text messages end on March 12, 2010 which fits in with the Pennsylvania State Police form that notes the cell phone was put into the Taylor Police department's possession on March 13, 2010. The prosecutor who handled the criminal case against Godlewski was Patricia Lafferty. (A true and correct copy of Attorney Lafferty's Affidavit and the Exhibits thereto is included in the *Exhibit List* and marked as **Exhibit "15".**) At the time the Pennsylvania State Police downloaded Brienna's cell phone, she was 16-years-old and in 10th grade. Defendants' counsel in this case filed a motion to obtain the text messages downloaded from the victim's cell phone in the 2010 criminal case directly from the District Attorney's office. A Court Order allowing for their release was obtained and the text messages were produced by the DA's office to defendants and marked as ST 2790 to ST 2905. These messages were produced to Plaintiff in discovery. The text messages are attached to ADA Patricia Lafferty's Affidavit as Exhibit B. (See **Exhibit "15".**) Plaintiff's counsel has not recorded depositions of anyone from the DA's office, the Taylor Borough police department or the Pennsylvania State Police. Plaintiff has not conducted any discovery aimed at challenging the authenticity of the text messages secured by the DA's office. Plaintiff has not even recorded Brienna's deposition.

In recent years, the Pennsylvania Superior Court has issued a series of opinions pertaining to authentication of text messages. See *Commonwealth v. Orr*, 2021 PA Super 136, 255 A.3d 589 (Pa. Super. 2021). These decisions demonstrate that multiple factors help establish authentication of text messages, including (1) direct or circumstantial evidence as to the identity of who authored the text sent, *Commonwealth v. Mosley*, 2015 PA Super 88, 114 A.3d 1072, 1083 (Pa. Super. 2015); (2) testimony from the persons who sent or received the text messages, *Commonwealth v. Mangel*, 2018 PA Super 57, 181 A.3d 1154, 1162 (Pa. Super. 2018)

(recognizing recipient or sender testimony as direct evidence of authenticity); (3) contextual clues in the texts concerning the crime charged tending to reveal the sender's identity, *Commonwealth v. Murray*, 2017 PA Super 363, 174 A.3d 1147, 1156-57 (Pa. Super. 2017); (4) the defendant's possession of the cell phone containing the text messages, *id.* at 1157; (5) the defendant's admission to owning the cell phone, *id.*; (6) time and date of messages sent in relation to the crime charged, *Commonwealth v. Wright*, 2021 PA Super 119, 255 A.3d 542, 551 (Pa. Super. 2021); (7) evidence establishing a distinct characteristic of the message, *Commonwealth v. Talley*, 2020 PA Super 171, 236 A.3d 42, 60 (Pa. Super. 2020), appeal granted on other grounds, 250 A.3d 468 (Pa. 2021), aff'd, 2020 PA Super 171, 236 A.3d 42 (Pa. 2021); and (8) no evidence of a third-party having access to the cell phone, *Orr*, 255 A.3d at 601. All of these factors fit within the parameters of *Rule 901(b)(11)*.

Godlewski waived his right to have a Preliminary Hearing in in his 2010 criminal case on September 27, 2010. (A true and correct copy of the Waiver of Preliminary Hearing is included in the *Exhibit List* and marked as **Exhibit "16".**) Judge Geroulo conducted a Pre-Trial Conference on November 12, 2010. (See Case Summary and Guilty Plea Colloquy is included in the *Exhibit List* and marked as **Exhibit "17".**) At that conference Godlewski and the prosecutor agreed to a plea bargain whereby Godlewski would plead guilty to the corruption charge under 18 Pa.C.S.A.§ 6301(a)(1)[3] and all the other charges would be dismissed. (**Exhibit "17"**, See ST 3798, ¶13; **Exhibit "2"**, pp. 240-241.) At the time Godlewski was charged and when he signed the Guilty Plea Colloquy, § 6301(a) read:

(1) Whoever, being of the age of 18 years and upwards, by any act corrupts or tends to

---

[3] 18 Pa.C.S.A. § 6301 was amended effective December 6, 2010 to include a new section, specifically (a)(1)(ii) relating to sexual offenses. Godlewski could not be charged under this new section since it was not enacted at the time of his conduct or his arrest. Prior to December 6, 2010, law enforcement charged defendants under § 6301(a)(1) for sexual related conduct.

14

corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

(2) Any person who knowingly aids, abets, entices or encourages a minor younger than 18 years of age to commit truancy commits a summary offense. Any person who violates this paragraph within one year of the date of a first conviction under this section commits a misdemeanor of the third degree. A conviction under this paragraph shall not, however, constitute a prohibition under section 6105 (relating to persons not to possess, use, manufacture, control, sell or transfer firearms).

(See **Exhibits "12"** and a true and correct copy of the Information is included in the *Exhibit List* and marked as **Exhibit "18".**)

Godlewski and the prosecutor agreed upon a sentence of 3 months home confinement to 23 months. Godlewski's counsel reserved the right to withdraw the guilty plea if the Court did not accept the recommended sentencing.

Godlewski's Guilty Plea Colloquy signed November 12, 2010 states:

11.     Do you understand that by pleading guilty you are admitting **that you did things you are *charged with*** and that if you plead not guilty, the Commonwealth cannot force you to take the stand and either admit or deny that you did the things you are charged with? <u>Yes.</u>

Godlewski admitted he did the "things" he was charged with. (**Exhibit "2"**, pp. 235-241, specifically p. 240.) He was charged with corruption of a minor for having sexual intercourse with the minor victim. The Guilty Plea Colloquy was signed by Godlewski and his attorney. (**Exhibit "17"** and **Exhibit "2"**, p. 235.) An Information was filed by the District Attorney charging Godlewski with corruption of a minor for "repeatedly [having] inappropriate text messages and contact with a minor." (**Exhibit "18".**)

Judge Geroulo advised the parties the negotiated sentencing was "too light" and Godlewski would be getting off to easy for the magnitude of his crimes. (**Exhibit "2"**, pp. 257 and 265.) In light of the Judge's plan to hand-down a stiffer sentence the guilty plea was

15

withdrawn by Godlewski and the criminal case proceeded on all eight counts. A preliminary hearing was scheduled for a date in July 2011. At the preliminary hearing the minor victim asserted her 5th Amendment right to remain silent because Godlewski begged her to do so and even threatened suicide. (**Exhibit "7"**) Brienna just wanted the case to be over. (**Exhibit "7"**) The parties took a break from the preliminary hearing. Even though Brienna stopped cooperating with the prosecutor, the prosecutor refused to drop the case since she knew Godlewski just wore the victim down and she had his text messages proving he had sex with the victim. The parties reactivated the plea bargain discussions. The same plea deal and Guilty Plea Colloquy was brought back to Judge Geroulo. This time Judge Geroulo accepted the negotiated sentence. (**Exhibit "2"**, pp. 265.) All the charges except the corruption charge were nolle prossed on July 11, 2011, which is the same day Godlewski was sentenced on the corruption charge. (A true and correct copy of the Criminal Docket from case number CP-35-CR-0002613-2010 is included in the *Exhibit List* and marked as **Exhibit "19"**.)

### E. Evidence of Godlewski's sexual relationship with the minor victim

Brienna has executed an Affidavit stating she was in a sexual relationship with Godlewski when she was 15 and he was 25. (**Exhibit "7"**.) Also, Brienna testified in Court about this sexual relationship on February 6, 2023. (**Exhibit "6"**, pp. 18-19, 24, and 48-49.) She was cross-examined by Plaintiff's counsel. Plaintiff testified in his deposition "I can't prove that something didn't happen in this case." (See **Exhibit "2"**, pages 212-213 and 251-252.) Godlewski also testified "I can't prove a negative" and "I don't have to prove anything" when he was questioned about sex with the minor. (See **Exhibit "2"**, p. 252.)

Plaintiff concedes his corruption charge was for having sex with a minor child. (See **Exhibit "2"**, p. 228.) Godlewski admits that according to his Guilty Plea Colloquy he admits to

16

doing the things he was "charged with." (See **Exhibit "2"**, pp. 235-241, specifically p. 240.)

Since it is Plaintiff's burden to prove falsity under *Hepps*, the Court could end the case right here.

If the Court wants to dig deeper, there is substantial evidence proving Godlewski was in a sexual relationship with Brienna when she was a minor. Dori Gallagher (referred to herein as "Dori") started living with Godlewski in 2006-07 and they became engaged in 2007. (A true and correct copy of Dori Gallagher's 7/20/23 deposition is included in the *Exhibit List* and marked as **Exhibit "20"**, pp. 20 and 24.) Dori and Godlewski were married in 2012. (**Exhibit "20"**, p. 17.) Before Godlewski pled guilty to corrupting Brienna in 2011, Brienna came to Dori's place of work to tell her about her sexual relationship with Godlewski. (**Exhibit "20"**, pp. 30-31.) Dori called her a liar. (**Exhibit "20"**, p. 31.) A couple of years ago Dori apologized to Brienna for not believing her. (**Exhibit "20"**, p. 30.) Godlewski never showed Dori his text messages with Brienna. (**Exhibit "20"**, pp. 40 and 62.)

Before Godlewski was arrested, Dori sent Brienna messages on Facebook Messenger and asked her what was going on between her and Godlewski. (**Exhibit "20"**, p. 100-101.) Brienna responded to her stating they were just friends. (**Exhibit "20"**, p. 101.) Before sending Brienna this message, Dori reviewed her cell phone bill and saw entries for 500 text messages (but no content) between Godlewski and Brienna in just two days. (A true and correct copy of select pages from Dori Gallagher's 12/19/23 deposition is included in the *Exhibit List* and marked as **Exhibit "21"**, p. 11.) Dori found Brienna listed under a fake name in Godlewski's cell phone. (**Exhibit "21"**, p. 13.) The phone bill also shows they were having long phone conversations. (**Exhibit "21"**, pp. 13-14.) Even though she asked to see his text messages, Godlewski would not show them to her. (**Exhibit "21"**, p. 14.) He was deleting the messages. (**Exhibit "21"**, p. 15.)

Ciara O'Malley was Brienna's best friend in high school. (A true and correct copy of select pages from Ciara O'Malley's deposition transcript are included in the *Exhibit List* and marked as **Exhibit "22"**, p. 9.) Brienna first met Godlewski at a car wash fundraiser in the summer before Brienna entered 9th grade. (**Exhibit "22"**, pp. 10-11.) Brienna was 14 years old. (**Exhibit "22"**, p. 14.) Godlewski admits he invited Brienna to the car wash fundraiser. (**Exhibit "2"**, pp. 60.) Ciara saw Brienna and Godlewski together about 20 times when Brienna was in 9th and 10th grade. (**Exhibit "22"**, pp. 21.) Ciara and her friends would secretly follow Godlewski and Brienna after he picked her up in his car. (**Exhibit "22"**, p. 65.) Godlewski would take Brienna into houses. (**Exhibit "22"**, p. 66.) This happened maybe 10 times. (**Exhibit "22"**, p. 65.) Brienna's friends were coming down on Brienna in 10th grade about Godlewski. (**Exhibit "22"**, pp. 22-23.) They were at a sleepover and they took Brienna's phone to her mother. (**Exhibit "22"**, p. 23.)

Brienna has also signed an Affidavit (**Exhibit "14"**) swearing the text messages marked as ST 2790-2905 attached to her 2nd Affidavit (**Exhibit "14"**) are her text messages with Godlewski. Godlewski admits his cell number was (570) 780-4567 in 2010. (**Exhibit "2"**, p 101.) All of the text messages shown on **Exhibit "14"**, ST 2790-2905 match up to the exact times on Linda DuBorgel's phone bills for Brienna's cell phone. (A true and correct copy of Linda DuBorgel's Affidavit and her phone bill records covering the 17 days are included in the *Exhibit List* and marked as **Exhibit "23"**.) Godlewski has no evidence challenging the authenticity of Linda's phone bills. (A true and correct copy of Plaintiff's Response to Interrogatories (Set VIII) are included in the *Exhibit List* and marked as **Exhibit "24"**, see Nos. 49-51.) Linda Duborgel's phone bill records show the times of all text messages on Brienna's phone in Eastern Time (ET). The spreadsheet of text messages downloaded by the Pennsylvania

State Police shows all the text messages in Greenwich Mean Time (GMT) on a 24-hour clock. (A key showing the conversion of the two time zones is included in the *Exhibit List* and marked as **Exhibit "25"**.)

Certain of Godlewski's texts provide contextual clues which reveal the sender's identity to be Godlewski. For example, on page ST 2811, line 413 (**Exhibit "14"**) the sender tells Brienna on February 28, 2010 at 11:07 a.m. "I have an open house in moosic at 12:00, just getting stuff ready." The open house listings from The Sunday Times on February 28, 2010 shows that Phil Godlewski was indeed hosting an open house at 110 Springbrook Road, Moosic on February 28, 2010 at 12pm. (A true and correct copy of open house listing from The Sunday Times on February 28, 2010 is included in the *Exhibit List* and marked as **Exhibit "26"**.) **Exhibit "14"**, page ST 2863, discusses the sender buying Dori an Infiniti. Godlewski admits he did in fact buy his fiancée Dori an Infiniti in 2009-10. (**Exhibit "2."**, p. 284; **Exhibit "20"**, pp. 75-76.) In **Exhibit "14"**, page ST 2816, the sender wrote "I'm scared to buy you things since the earrings." Both Brienna and her mother testified in Court on February 6, 2023 that Godlewski gave Brienna diamond earrings when Brienna was in 9th grade, the year before this text message. (**Exhibit "6."**, pp. 19 and 68) In **Exhibit "14"**, page ST 2838, the sender from 570-780-4567 wrote "She went to the fucking school with earings and phone records and got me fired. Yeah, I'm pretty familiar with your mom." Linda DuBorgel did in fact go to the school. (**Exhibit "6."**, pp.68-69.) Godlewski's live-in fiancée at the time, Dori Gallagher, testified the high school made Godlewski to step down as a baseball coach because Brienna's mother wrote a letter to the school. (**Exhibit "20"**, p. 36.) **Exhibit "14"**, page ST 2844, the sender at 570-780-4567 wrote "It was January 8th, I just looked. And that was 2 days before we started talking. I know because Jan 8th is my moms bday and we started after that." Marie Godlewski is Phil's mother and she

testified that January 8th is indeed her birthday. (A true and correct copy of page 37 from Marie Godlewski's deposition transcript are included in the *Exhibit List* and marked as **Exhibit "27"**, p.37.)

Plaintiff made a post on social media on May 9, 2023: "After my team disproved their [the text messages] authenticity, my charges were dismissed, all but 1, and my guilty plea has NOTHING TO DO with sexual contact, sexual conversations, or ANYTHING TO DO WITH SEX, whatsoever." (A true and correct copy of the May 9, 2023 Telegram posts are included in the *Exhibit List* and marked as **Exhibit "28"**. See ST 3569.) He also posted on the same day: "The text messages recently released between "Phil and Brie" were NOT SENT BY ME. I will prove this beyond the shadow of a doubt in court, where it NEEDS TO BE PROVEN! Not on Telegram." (**Exhibit "28"**, see ST 3572.) Plaintiff must now come forward with his substantial evidence in order to prove the text messages (**Exhibit "14"**) are fake. Plaintiff was served with detailed interrogatories, specifically Nos. 1-4 and 17-22 requesting all his evidence that the 2010 text messages are not authentic. His responses show how weak his position is on this issue. (**Exhibit "24"**, see Nos. 1-4 and 17-22.) He has no evidence other than his denial. Godlewski has not performed any discovery aimed at challenging the authenticity of the 2010 text messages. The Court should reject Godlewski's "deny, deny, deny" defense. He has the burden to prove falsity and he has not met this burden.

### F. Godlewski's testimony about why he pled guilty to the corruption charge

Godlewski contends his guilty plea had nothing to do with him having sex with the minor. (**Exhibit "2"**, p. 108.) When asked how he corrupted the minor, this is what he said:

> Q. But if you're pleading to corrupting somebody's morals, you're admitting you did something wrong.
> A. Yes.
> Q. Okay. When did you do something wrong against Brie.

A. Again, I believe *the entire conversations* from the very beginning to the time that I was arrested were completely inappropriate and completely corrupting of her morals. I should not have talked to her at all. I should have referred her to a guidance counselor or a psychiatrist or I should have backed away from the situation. The very fact that I didn't back away from the situation and I inserted myself as that person was -- in my mind, fits the definition of corruption. If you read the definition, that's what I did.

Q. Can you give me just one example of a statement you made to Brie that morally corrupted her?

MR. KOLMAN: Objection.

MR. HINTON: Please.

MR. KOLMAN: Asked and answered. You can answer it again.

THE WITNESS: A specific statement? Something as simple as, *everything's going to be okay, Brie.* I don't know if everything's going to be okay. I'm not qualified to say that it is. And I could be leading her down a path of hope. I should not have done that.

BY MR. HINTON:

Q. Anything else that you can think of?

A. I'm sure I said dozens of things like that. I'm not even saying I said that specifically. It sounds like something I would say under these circumstances. But something like that are the things that I would have said to Brie at the time. *Just the consoling-type conversations.*

Q. So you're under oath and it's your testimony in this case that "something like that" caused you to plead guilty to a misdemeanor crime that could have put you in jail for five years?

MR. KOLMAN: Objection.

BY MR. HINTON:

Q. You can answer.

A. Again, that's not what I said. You said that just now. What I said was, the entire nature of my conversations with Brie, in my opinion, were fitting the definition of corruption of minors. I didn't say -- you just said that my specific statement that I gave you as an example of something that I may not have even said. You said that that statement is why I pled guilty to corruption of minors. That's not true.

BY MR. HINTON:

Q. Well, I just want to know what statement it was that caused you to plead guilty to corruption of minors.

MR. KOLMAN: Objection.

THE WITNESS: I don't know exactly the statements that I made to Brie 14 years ago. I'm telling you what I think I would have said to Brie in this particular situation. We had hundreds of text messages with each other on this topic. *I was trying to console her. I was trying to make her feel better. I was trying to get her to not commit suicide. So you would say stuff on an encouraging level -- to a person that is about to commit suicide, you would say things like those. So that's what I think I said.* Specifically did I say that? I don't recall. I wish I still had the messages because we wouldn't be here today.

BY MR. HINTON:

Q. So you were trying to console her because you were afraid she was going to commit suicide?

21

A. After the first -- yes. Not originally, but yes.

**(Exhibit "2", pp. 110-113.)**

Godlewski's testimony is devoid of any details. He does not describe anything of a corrupting nature. Also, he mentions "suicide" in his testimony above. At the hearing on February 6, 2023, Godlewski testified Brienna was suicidal due to her boyfriend, Joe Strok, committing suicide and he was trying to console her. **(Exhibit "6", pp. 152-153.)** In his deposition on July 25, 2023, Godlewski testified Brienna was threatening suicide not because of Joe Strok's death but rather because Godlewski was trying to break off his relationship with her. **(Exhibit "2", pp. 114-115.)** He just cannot keep his stories straight.

Defendants' served Interrogatories (Set I) on Plaintiff on July 9, 2021. Interrogatory No. 27 asked:

27. Why did you plead guilty to corrupting a minor in 2011?

> **ANSWER: This interrogatory is objected to because it intrudes upon attorney-client privilege.**

(Plaintiff's Response to Interrogatories (Set I), is included in the *Exhibit List* and marked as **Exhibit "29"**, see No. 27.) Defense counsel then wrote to Plaintiff's counsel complaining about the improper objection. Plaintiff's counsel then served a verified supplemental answer to the interrogatory (Plaintiff's Supplemental Response letter dated December 9, 2021 is included in the *Exhibit List* and marked as **Exhibit "30"**.) that stated:

> 27. The details are these. Plaintiff's best childhood friend Joe was dating the victim. He was twenty-one. She was sixteen. They were having a sexual relationship. Plaintiff did not know this at the time but apparently, there was a threat to expose Joe. As a result, he committed suicide. **The relationship between Plaintiff and the victim was only with respect to discussions regarding Joe and his suicide.** This is possibly why the Victim pleaded the Fifth Amendment when asked any questions regarding this case. Plaintiff was 25 and all of this happened.

Plaintiff and Joe Strok were not friends. They were four years apart in school and over four years

apart age-wise. (A true and correct copy of select pages from the Deposition of Sherry Strok are included in the *Exhibit List* and marked as **Exhibit "31"**, pp. 10-12.) Joseph Strok's step-mother never knew Godlewski or even heard of him. (**Exhibit "31"**, pp. 22-25.) Godlewski did a social media interview on November 26, 2021, six months after commencing this lawsuit, in which he discussed his relationship with the minor victim. (A true and correct copy of Plaintiff's Response to Admissions (Set III) along with Exhibit "C" the transcription of select times from the November 26, 2021 interview are included in the *Exhibit List* and marked as **Exhibit "32".**) Godlewski's story in the interview is full of lies. He claimed he and Joe Strok were good friends. There were in kindergarten together and attended all the same classes together but parted ways for college. Joseph Strok had a great family. His parents were not divorced. He said he would go over to Joe Strok's house for dinner and exchanged Christmas presents. "[W]e graduated together." He even states Brienna "was actually consoling me" due to the death of Joe Strok. This statement is particularly sickening and shows how depraved Godlewski truly is.

Godlewski did not realize defense counsel would get the Riverside High School year books showing Strok graduated in 2006 and Godlewski graduated in 2002. When challenged at his deposition he said "I am aware of some embellishing" in the November 26, 2021 interview. (**Exhibit "2"**, p. 53.) Godlewski admitted Strok was four years younger than him and he didn't go to kindergarten with him. (**Exhibit "2"**, p. 43.) He admits they did not graduate together. Strok wasn't in high school when he graduated. (**Exhibit "2"**, pp. 44-45 and 54-55.) Incredibly, Godlewski testified what he was really trying to say on November 26, 2021 was that he and Strok had the same teachers in the school district. (**Exhibit "2"**, p. 55.) One can easily see Godlewski was lying and he didn't know Joe Strok at all. Strok's parents were divorced many years before Joe Strok died and his biological mother lived in California. (See a true and correct

copy of Joe Strok's obituary included in the *Exhibit List* and marked as **Exhibits "33"** and **"31"**, pp. 4, 6, 11 and 17.)

Godlewski made up a story about Joe Strok being his best childhood friend to give him an excuse for being in communication with the minor victim. (**Exhibit "2"**, pp. 92-94.) Godlewski never mentioned the name Joe Strok to Dori. (**Exhibit "20"**, p. 42.) Ciara O'Malley knew Joe Strok and he was not friends with Godlewski. (**Exhibit "22"**, pp. 16-17.) Godlewski pled guilty to the corruption charge because it was a good deal for him and the prosecutor had a multitude of text messages between him and the minor victim proving they were having sex. The 2010 text messages leave no doubt Godlewski was having sex with a minor. Below are some of the texts Godlewski sent to Brienna in 2010 when he was 26 and she was 16 years old:

"So am i like, the boy you use for sex, and hate every other day of the week now?" (See ST 2805, line 280.)

"I wanted you so bad because of the last few days" (See ST 2806, line 291.)

"I disagree, I think she'll still see me as the 25 year old that fucked her 15 year old daughter and lied to her about it" (See ST 2838, line 1058.)

"I'm going to fuck you so hard you'll probably split in half" (See ST 2840, line 1088.)

"Great, insults. No rational, just insults. I'm sorry if I don't want to hurt you. And as good as our sex might be, it fails in comparison to my love for you. I love you so fucking much that I've been in tears since 11:00 this morning" (See ST 2850, line 1265.)

"I literally can have sex with you for an entire day. Like if we had the while night tonight, we would have just kept going" (See ST 2858, line 1406.)

"Aww we had sex in mom mom's bed" (See ST 2887, line 2004.)

"I'm in shock and awe. I never had sex like that before. What happened yesterday? Was I dreaming? I don't understand. I'm frazzeled." (See ST 2889, line 2065.)

"You're beautiful and I think you're nuts. I wouldn't alter your appearance in any way even if I could. And you give incredible head. K." (See ST 2891, line 2091.)

"I leave my house to talk to you, go home late, let dori home for hours while we have sex, and I only give you 5%? you're the retard" (See ST 2904, line 2348.)

**(Exhibit "ST 14")**

Godlewski denies these are his text messages. Yet, he admits the following texts in 2021 are true and authentic text messages (A true and correct copy of Plaintiff's Response to Defendant's Request for Admissions (Set I) is included in the *Exhibit List* and marked as **Exhibit "34"**, see No. 1., also see **Exhibit "6"**, p. 87) between he and the minor victim:

Phil: YO WANNA GO TO OKLAHOMA?!? (4/2/2021, ST 1098)

Brie: This is like our 2010 dream (4/8/2021, ST 1108)

Phil: I suppose it is. (4/8/2021, ST 1108)

Brie: 4 nights in a beautiful hotel except. Out of state and no one bothering you so you could actually relax and just CHILL (4/8/2021, ST 1108)

Brie: And me being 27 lookin and feelin better than ever about to start my career so (4/8/2021, ST 1109)
Phil: We'll see if you could still suck dick (4/8/2021, ST 1109)

(A true and correct copy of the above-referenced text messages are included in the *Exhibit List* and marked as **Exhibit "35"**.) Phil's messages from 2021 sound like the sender's messages from Phil's phone number in 2010. The same crude, misogynistic person The conversation above is clearly related to the 2010 time-frame by use of the word "still" and Godlewski's response discusses oral sex.

### G. Godlewski made false statements under oath in this case about whether he ever had sex with Brienna

Godlewski testified he never had sex with Brienna when she was a minor. (**Exhibit "2"**, p. 123.) However, Godlewski has changed his story about his sex with Brienna three times during this lawsuit. First, Godlewski's verified answer to Interrogatory 7 (Set IV) made on

25

November 18, 2022 was as follows:

7. Did you have sex or a sexual relationship with Brienna DuBorgel at any time?

**ANSWER: No.**

If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

**ANSWER: N/A.**

(See Plaintiff's Response to Interrogatories (Set IV) is included in the *Exhibit List* and marked as

**Exhibit "36".**)

Later in the case, after Brienna DuBorgel executed an affidavit (**Exhibit "7"**) and produced her 2021-2022 text messages with Godlewski that discussed their past sexual experiences, Godlewski changed his story. At the February 6, 2023 Court hearing Godlewski testified he began a sexual relationship with Brienna, in 2013, 2014, 2015 and "certainly from 2015 to 2016." (See **Exhibit "6"**, pp. 84-85.) He married Dori in 2012 and she gave birth to their children in 2015 and 2017. (**Exhibit "20"**, p. 27.) At his deposition on July 25, 2023, Godlewski testified the sexual relationship with the victim "definitely" began in 2017, that being his third version. (**Exhibit "2"**, pp. 115-116.) Plaintiff further testified that the victim was a "lunatic" and he knew that as early as 2008 when he began talking to her. (**Exhibit "2"**, pp. 72 and 115.)

At Godlewski's deposition on July 25, 2023 he testified as follows:

Q. Why did you have sex with Brie in 2017 when you're married and you thought she [Brienna] was a lunatic that ruined your life in 2010?
A. I was in a very bad mental place in 2017. I had just cheated on my wife with Miranda. That's the first time I've ever cheated on my wife and probably the first time I've cheated on a partner maybe ever. I felt as though my marriage was -- I was losing my marriage. I tried very hard to gain it back. And every attempt that I made in trying to save the marriage was thwarted with aggressiveness by my ex-wife, Dori. So probably, I would say, out of frustration, sadness, aggravation, in fear of loss is why I started having sex with different women. I used sex at the time, I believe, as a crutch.
Q. Did you reach out to Brie to have sex with her?
A. No. I believe Brie reached out to me because she had heard Dori was leaving me.

26

And around that time that Dori decided to leave, I was -- other than trying unsuccessfully to get Dori to come back, I was influenced by alcohol quite a bit, so I made some very poor decisions and one of them was engaging with Brie, the lunatic.

Q. Okay. Why did it happen repeatedly with Brie? Why did you repeatedly have sex with her?

A. It was good sex.

Q. Were you using her for sex?

A. Yes – not just for sex. I wouldn't say using her for sex. So I'm going to say no to that if I can correct. I was using it as a medicine for loss. I was really messed-up then.

Q. And how did you break it off with Brie when you were having sex with her in 2017?

A. There was nothing to break off. They were casual encounters that I think we were both probably under the influence of alcohol. Me for certain and her probably; from what seemed to me, other drugs as well. But there was nothing to break off. It wasn't a full-blown relationship, so to speak, where you have to have a conversation and break up with the other party. It was just -- it sizzled. Went down to nothing.

Q. And you still thought she was a lunatic?

A. To this day, I think Brie is -- you know, I guess we would have to define lunatic, but I think Brie, based on her actions in particular to this case and up until recently with her affidavit, I think that Brie is totally mentally ill.

Q. And that's remained consistent throughout the entire time you've known her?

A. Pretty much.

**(Exhibit "2", pp. 1117-119.)**

Godlewski has told so many lies. The Court should remember Godlewski's mantra" "I have to deny, deny, deny." **(Exhibit "8")**

### H. Godlewski also gave False Sworn Statements about his Communications with Brienna DuBorgel

Plaintiff's response to Interrogatory 33 (Set I) dated August 20, 2021 **(Exhibit "29")** was as follows:

**32.    Do you have any letters, e-mails or text messages to or from the 15-year-old girl?**

**ANSWER: None.**

Plaintiff's Response to Request for Production of Documents (Set I), No. 20 (incorrectly numbered as 19 in Plaintiff's Response) dated August 20, 2021, (See Plaintiff's Response RFP's (Set I) included in the Exhibit List and marked as **Exhibit "37".**) stated:

27

19. **Any documents sent to or from the 15-year-old girl referred to in the article attached to your Complaint.**

**ANSWER: None.**

On August 22, 2022, Plaintiff served his verified Responses to Defendants Request for Production of Documents (Set IV) and answered No. 7 (A true and correct copy of Plaintiff's Response to Request for Production of Documents (Set IV) is included in the *Exhibit List* and marked as **Exhibit "38"**) as follows:

7. **Produce any text message between Phil Godlewski and Brienna DuBorgel between 1/1/2008 through the present date.**

**Answer: Plaintiff does not have any.**

On November 2, 2022, Brienna DuBorgel consented to have her cell phones down-loaded and she provided her two cell phones to a forensic technician to copy all of her Instant Messages (text messages/SMS) with Godlewski on her new cell phone and her old one. The technician was able to download 1235 Instant Messages between Plaintiff and Brienna from March 31, 2021 to May 11, 2022 and 151 Instant Messages from May 28, 2022 to September 9, 2022. Defendants then filed a motion for sanctions against Plaintiff due to his failure to produce his text messages with Brienna, most of which occurred while this lawsuit was pending. Plaintiff admitted these are his authentic text messages.

The Court held a hearing on Defendants' motion for sanctions on February 6, 2023. At the hearing, Plaintiff testified he had no documents concerning communications between himself and Brienna from 2008 to the present. (**Exhibit "6"**, pp. 90-91.) He hid his text messages from being discovered by defense counsel because they are damaging.

**I. Godlewski tried to bribe the minor victim to get her to testify their sexual relationship started when she was 18 years old**

Plaintiff filed this lawsuit on May 27, 2021. Godlewski and Brienna exchanged the

28

following text messages one year after the lawsuit was filed:

**(Exhibit "4".)**

5/28/2022

Phil: Okay kid. If you change your mind and want to hang out, let me know. Lots of stuff has been going on and I wanted to try to insulate you as much as possible. But I get the feeling you already know, so I'll back off. I'll be here if you want to meet up and chat *(See ST 1456)*

Brie: It's Brie *(See ST 1457)*

. . .

Phil: I think it might be fair to say that ***there is a very, very large, and very, very unique financial opportunity that exists in front of you*** *(See ST 1459)*

Brie: LOL *(See ST 1460)*

Phil: ***The type of opportunity that happens to hardly anyone*** *(See ST 1460)*

Brie: Oh are you trying to recruit me for the silver thing *(See ST 1463)*

Phil: Pfft, no *(See ST 1463)*

Phil: We really need to meet and chat *(See ST 1463)*

Phil: I cant talk about this through text or over the phone *(See ST 1464)*

Phil: Okay. Well that makes me feel better. When you're ready, I have an opportunity that involves the both of us. But it wont work with just one of us. I dont know which way to go with it until I speak to you. So, remember me for when you feel better, and we'll talk. *(See ST 1468)*

Brie: I know I've been wanting to talk to you about almost the same thing weirdly enough. I've been the one who has wanted to square things up with you that has nothing to do with romance or Amanda that would save both of our reputations but I didn't plan on talking to you about anything until my school stuff was over, I got my diploma, and my job was written in stone. I'm sure Amanda told you a little bit which is okay cause it wasn't a secret at least not from you we got our lives dragged through the mud for years together and it has effected us both professionally to the point where my internship was based on my ethics and morals but I passed with flying colors and pretty sure I may have gotten an almost full ride to get my MSL in data and privacy law. So yeah I'm okay and I know you've had to defend yourself for years which a lot hasn't had to do with me but I don't like that people make it seem like you were some creep or I was some homewrecking little tramp and I think us having each other's backs in some regards benefits both of us *(See ST 1468)*

Phil: I agree. ***But it's a very delicate situation***, and unless it's handled properly by both of us, we stand to benefit absolutely nothing. And there is a ***financial windfall here***, if handled properly. That's all I can really say through text. I don't trust those motherfuckers and I am literally foaming at the mouth to take them down once and for all. *(See ST 1468)*

Phil: You're a good person, Brie. You don't deserve anything that's happened to you since we met all of those years ago. And I think it's time ***to set the record straight***, and ***shove our collective middle fingers directly up their fucking assholes*** *(See ST 1469)*

29

Brie: No I know it's like the MOST delicate situation. Aside from any of your extra troubles or my extra troubles what happened between us follows us around the most and nothing between us was ever bad. Even when I heard things about you and Miranda or you being an asshole I mean my first thought was that Phil has never even so much raised his voice at me or said anything nasty to me ever. Through everything and all of it you've never been mean to me. You had to defend yourself cause you had no other choice. I mean I'm gonna be 29 and you're like 37.

I know this sounds crazy but there's examples of cases where let's say the girl was older like 18 or 19 and the boy was 16. That age difference is nothing but if the girl had a very high IQ and the boys was significantly lower than that could be considered statutory because it shows despite the age she was clearly taking advantage. It's the IQ defense. My friends and my mother blew this wide open after my first love hung himself when I was 16 and the older I got and the more I learned from school and this field it really bothers me. But we have both been dealt our fair share of nonsense throughout the years and trying to get our lives in order but I say all the time, I've told my family and friends and professors who basically took me under their wing that aside from any kind of trouble either of us have been in- you were never mean to me, never took advantage of me, it wasn't even about sex. I have been mentally 20 since I was a teenager but literally my whole entire life whenever I have needed you you have picked up the phone. We were never enemies and we never intentionally tried to hurt each other. But yes *this is very delicate* and I believe being allies would shut up a lot of people *(See ST 1469)*

Phil: Well, let's meet when you're ready. Sooner rather than later. I miss you anyway *(See ST 1470)*

8/5/2022

Brie; Like I answered you at 9 something and was like whoops lmao

Phil: Listen my friend. Things are getting very nasty with the Scranton Times. I think you should know what's going on. I'd like to talk to you in person. I don't want you to be blindsided by any of this *(See ST 1480)*

8/6/2022

Phil: I have your back, Brie. You should see what they are trying to do to me. It's absolutely awful.

Brie: I wasn't not answering I have weird stuff going on right now too lol I was up til 4am doing work so I fell asleep without an alarm and here I am. I'm gonna try not to be grouchy cause I am but you don't have my back I have yours. This has nothing to do with me Phil. I'm sorry a reporter politically dragged you because of something that happened to us 12 years ago. I read the entire article recently and it was definitely quite excessive and very unnecessary to throw that in about me and you. It was basically an entire article just dragging you and your life and then casually throwing in "oh also he slept with a 15 year old girl" blah blah blah real estate stuff. It was dumb. It was just a shot at you and by association I am involved. But the thing is I never wanted it to happen. I'm gonna be 29 though and full blown in this field now and still blame my mom and my friends for what

30

happened and no one can ever reason with me otherwise. *But the problem for me is that I haven't been able to speak up then (which was my choice) or now to you or to anyone who can end this because the truth is (like I told my mom the other day) I don't remember if I was 15 or 16 when we slept together, I really don't.* But I do know I've always been 10+ years past my age, you weren't my coach, you weren't an authority figure of mine, you didn't hurt me, and what happened back then (the arrest) and etc was just *the beginning of what would continue to be us sleeping together on and off and whether we were fucking or talking or whatever we were always on good terms I've never genuinely hated you or you me.* But my truth, and my story and the way I feel and the way we could end this is the complete opposite of everything you've been saying and building off of since it happened. Personally, to me- I think the times is annoying for bringing it up and it also pissed me off. I think people that still talk about it are annoying. The fact you chose to start doing political stuff has nothing to do with me but when those people specifically come at you and your only defense that you feel like you really have because of *(ST 1481)*

all those years ago is to say I was some sick and crazy love struck obsessed teenager and because you were so loyal to dori and it was so wrong but yet Joe strok was your best friend too (yeah mhm) you were there for me and because I was so broken and lost and sad and love struck I told on you and tried to get you arrested because I was just so in love. You've been telling that story for 12 years as I've had to sit back and never speak my side never even think about it and the only reason that that gets to happen is because I got up on the stand as a 16 year old and threw away the prosecution's entire case in front of a court room and my family and the entire town because I loved you and I never wanted it to happen either. My mom has tried telling me that some lawyer for the times asked her to come in and talk. You are always telling me you are ready to come out swinging and fight with them and go against them. *Well I'm against all of it.* My mom is a huge reason this happened in the first place and the fact she has the audacity to even think for a second about doing this again when I'm going into this field as an adult NOW because of what happened then. I screamed my lungs out at her probably last month. *Then I gotta hear from you asking you to help me when you go on YouTube live for the last however many years and tell thousands and thousands of people that I'm a liar and it never happened and we have no affiliation.* And the times chasing you and whatever beef you have with them and them trying to drag this back out again is also fucking annoying. *The side you tell to the public is not the truth and I'm not saying that in a mean way I understand you basically had no other choice especially at the time.* My mother has absolutely no fucking idea what happened between us and the times has absolutely no idea what happened between us. Phil I don't see you as my public enemy or some guy who hurt me or ruined my life or any of that, *I see you as my ex boyfriend because that's what you are to me.* What happened during the arrest is just what went public and made you look bad but all you've done is battle those claims and it was my fault to never speak up on my side. I plead the 5th then and basically always have throughout the rest of my life because I too have been

31

cleaning up the mess that made and the mess that followed me with jay and drugs and hell I mean from 20-24 I was a broken sad depressed zombie because of all the shit that happened between us and between everything. I finally got my shit together and straightened things out internally and externally and then boom we link up as adults and fly across the country together and you pulled that shit with Amanda. And still I have never said one nasty thing about you publicly or anything that could ever hurt you. And I know the only reason that you have had to do the same to me is because of something that happened 12 years ago- *but we didn't just sleep together when I was 16- it was 17, 18, 19, 20, 21, 22- Phil we have always been in each other's lives and never hated each other I've just never said a word or argued about it or cared because the public story you tell isn't true and the story the times published then and now also isn't true. It's all untrue. There was no scandal in my eyes, you weren't some gross old man, you were never mean to me ever, I hear shit about dori and all these ex girlfriends and shit that happened and my jaw drops. Yeah sure I think you lie but we went through the biggest thing ever and you have never raised your voice at me and we have basically always been friends, sleeping together or not sleeping together we've always been cool.* But to me, and to you too- it wasn't a scandal. I was going through the worst time of my life the most traumatic thing I've ever experienced (still) and you weren't some scandal to me or some cool older guy I thought was so cool and you weren't some creepy coach exercising authority and preying on teenagers. We genuinely cared about each other and *you were my boyfriend,* except you were engaged. We didn't break up we were legally pulled apart before we ever figured anything out and neither of us had a say. Well I did and *I chose to protect you and it's because you never hurt me ever.* I mean I don't even know if you remember this but it was years after everything happened and I was with jay still and in a really bad place and you and I met up in a hotel room and because I didn't look good and wasn't myself and was telling you about jay you didn't even touch me. I don't even think we kissed, we sat on a bed and you were almost in tears begging me to please get my shit together and please get away from jay. Neither of us were in trouble. I was in my early 20s at that point but that is my point- this goes so much deeper than what it was made out to be I mean we genuinely loved each other but back then, now and probably always it doesn't matter how you feel or what you want you only care about the story you tell and your public image and you much rather have people write articles about you and drag you and lie about you and make you look like some sicko instead of ever bending or changing your public story that you told all those years ago even if it's still making you look bad. You'd literally rather that than ever remotely slightly go back on anything you've ever said. I'm legit in school for what I'm in school for to protect myself against this shit and boring sad lonely people from Scranton pa who have nothing better to do than to talk about a guy and a girl having sex literally almost 15 years ago I mean it's so fucking pathetic and obnoxious to me now. Phil if we can come to an amicable agreement that has nothing to do with my schooling or you thinking whatever or my family or Chris Kelly or any of it- if you and I can come to an amicable agreement that YOU stop dragging me publicly and defending yourself and with defending yourself comes

making me look like the fucking asshole- if you can agree to stop letting these bored ass low life's get under your skin and get a rise out of you and shut your big opinionated mouth for 10 minutes and stop giving people ammo to shoot back at you- I can and promise and will make sure that when all of this stops that you never have a reason to defend yourself ever again because I will make sure that the times leaves you alone, leaves me alone, my family alone and my family and friends leaves you the fuck alone. What do you think I've been doing huh???? Listen our personal shit aside I don't care and I know you don't either but publicly we are still tied and people are still bored and jerking off to our sex life from 15 years ago and it's honestly so weird and overbearing and fucking obnoxious to me and I can't hear about it anymore. No Amanda. No political tube. No lives. Nothing. You and I have to come to some kind of terms and all I've ever wanted from you is to *please stop calling me a liar and making me look like an asshole when it's not true and all I've ever done is try to protect myself and you by association.* How's that??? *(See ST 1482)*

Phil:    *Let's meet and talk. I think we're mostly on the same page. (See ST 1483)*

8/18/2022
Phil:    Irregardless, we need to meet and speak. You need to know some stuff that you aren't aware of *(See ST 1492)*

Brie:    Irregardless. Looks like we're both smack dab in the middle of quite the legal tornado. *(See ST 1493)*

Phil:    Not really. We have to talk in person *(See ST 1493)*

Brie:    Listen I already told you. Aside from your beef and tugging of the heart strings argument you have with Chris Kelly or any prior trouble aside from me that is irregardless. But I will make sure that no one ever calls you a pedophile again and our public beef can be squashed and Linda leaves us the fuck alone *(See ST 1494)*

Phil:    It's not that Brie. It's more than that. We have to meet because there's stuff you don't know *(See ST 1494)*

Plaintiff has admitted these texts obtained from the download of Brienna's phones are his true and authentic text messages with Brienna. (**Exhibit "34"**, see No. 1; also see **Exhibit "6"**, p. 87.) In response to Brienna's long text message, Godlewski stated "we're mostly on the same page." Brienna's long message stated they were having sex when she was 15 or 16 years of age. There is no denial from Godlewski in his response.

After Godlewski sent Brienna these text messages about a "financial opportunity" she met Godlewski at her friend Amanda Turoni's house. (**Exhibit "6"**, p. 38.) During the February 6, 2023 Court hearing, Godlewski testified as follows:

Q. Okay. Did you offer Brie any money at any point in time? Did you offer any financial assistance to Brie?
A. At any point in time?
Q. How about in the last two years?
A. Yes, I have.
Q. When was that?
A. At some point last year Brie was, according to what she told me, struggling to make ends meet with college, and she had a very vigorous schedule in college. She would take a numerous amount of credits per semester, which didn't really leave a lot of time in the day to work. So I believe we discussed, you know, some sort of loan.

As I said before, I've always been-- whether it's true or not, I always felt like I was a brother to Brie. And I always felt that it was somehow my responsibility to help her if I could. We've had, obviously, some very well known public episodes with one another. But in the grand scheme of things we always seemed to have each other's backs. So when she requested to me-- or when she informed me that she was having some financial difficulty I was-- I was the first to say that I could help. In fact, I've done that with dozens of people within the same time frame, both family and non family.
Q. Have you threatened to sue Brie because of her giving me this Affidavit?
A. Yes.

(**Exhibit "6"**, p. 137-138.) In this testimony, Godlewksi claims he was always like a brother to Brienna and they always had each other's backs. Obviously, she asserted her 5th Amendment right for him. Godlewski offered her Fifty Thousand Dollars if she would say she was eighteen when they started having sex. (**Exhibit "6"**, pp. 32-34.) Brienna refused to lie under oath for Godlewski. (**Exhibit "6"**, p. 34.) Amanda Turoni testified that Godlewski and Brienna did meet at her house. (A true and correct copy of select pages from Amanda Turoni's deposition is included in the *Exhibit List* and marked as **Exhibit "39"**, see p. 73.) Their cell phones were put in her microwave during the meeting. (**Exhibit "39"**, p. 74.) This was done to prevent any type of tapping into phones or listening. (**Exhibit "39"**, p. 75.) Godlewski wanted to talk to Brienna about his lawsuit against The Scranton Times. (**Exhibit "39"**, pp. 76-77.) Godlewski testified on February 6, 2023 he was only texting Brienna about his distrust of the federal government, not The Scranton Times. (**Exhibit "6"**, pp. 123-126.) Godlewski wrote to Brienna "it's time to set the record straight and shove our collective middle fingers directly up their fucking assholes." He

claims he was not referring to The Scranton Times. (**Exhibit "6"**, p. 125.) It is easy to see he was trying to rig this case by suborning perjury from Brienna.

### J.  Godlewski made false statements under oath about giving any gifts to the minor victim

Godlewski lied in his written discovery responses when he wrote he never gave gifts to Brienna. (**Exhibit "37** and **Exhibit "29".**) Then he testified on Feb. 6, 2023 in Court and said he gave Brienna a tanning package, an Ed Hardy hat and maybe a shirt. (**Exhibit "6"**, p. 155-163.) These gifts were given to Brienna in 2008 right after her boyfriend, Joe Strok, committed suicide. (**Exhibit "6"**, p. 158; also see **Exhibit "33".**)

Linda DuBorgel is the mother of Brienna DuBorgel. (**Exhibit "6"**, pp. 67-74.) Linda learned her daughter was involved in a relationship with Godlewski when he gave her an expensive pair of earrings. (**Exhibit "6"**, p. 68.) Linda and her husband wrote a letter to the Riverside School District on January 27, 2009. (**Exhibit "6"**, p. 68; a true and correct copy of the January 27, 2009 letter is included in the *Exhibit List* and marked as **Exhibit "40".**) Linda brought the diamond earrings into Court on February 6, 2023. (**Exhibit "6"**, pp. 69-70.) Linda would not allow her daughter to wear them. (**Exhibit "6"**, p. 70.) She took the earrings to Zales (they were in a Zales box). She was informed at Zales the earrings cost $2,850. (**Exhibit "6"**, p. 72; Photos of the earrings is included in the *Exhibit List* and marked as **Exhibit "41".**) Linda spoke to Godlewski on the phone about the earrings and he said he was just "trying to be friendly." (**Exhibit "6"**, p. 79.) Linda later went to the police about the relationship. (**Exhibit "6"**, p. 72.) The police interviewed her daughter. (**Exhibit "6"**, pp. 72-73.) Brienna was emotional and did not want to talk to the police initially but she broke down and told them about the sexual relationship. (**Exhibit "6"**, p. 73.)

Joseph Moceyunas was the principal at Riverside High School back in 2009. Mr. Moceyunas wrote a memo regarding an unusual phone call he had with Godlewski on January 8, 2009. (A true and correct copy of the January 8, 2009 memo is included in the *Exhibit List* and marked as **Exhibit "42"** and a true and correct copy of select pages of Joseph Moceyunas's deposition transcript are included in the *Exhibit List* and marked as **Exhibit "43"**, see p. 15.) He called Godlewski in the morning of January 8, 2009 because of rumors going around the school that Godlewski was involved in an inappropriate relationship with Brienna. (**Exhibit "43"**, p. 16.) Godlewski denied buying her diamond earrings to Mr. Moceyunas but admitted to him he maybe gave her a hoagie. (**Exhibit "43"**, p. 18-19.) Godlewski told Mr. Moceyunas he had not spoken to Brienna in weeks. (**Exhibit "43"**, p. 21.) Mr. Moceyunas directed him to have no contact with Brienna. (**Exhibit "43"**, p. 21-22.) Mr. Moceyunas received a letter form Brienna's parents dated January 27, 2009. (**Exhibit "43"**, p. 25 and **Exhibit "40"**.) The letter stated Godlewski gave their daughter diamond earrings. (**Exhibit "43"**, p. 26.) The letter included the parents' phone records showing 250 text messages between Godlewski and Brienna on the day of Moceyunas' morning phone call with Godlewski. (**Exhibit "43"**, p. 27-28.) Godlewski did not adhere to Mr. Moceyunas's no-contact directive.

Plaintiff admits he had sex with Brienna a number of times after she turned 18. That fact alone is telling. The preceding sections in this brief prove Godlewski is a liar when it come to his relationship with Brienna. He lied about whether he ever had sex with Brienna. He lied about whether he ever gave her gifts. He lied about whether he had communications with her after he filed this lawsuit. He lied about his relationship with Joseph Strok. He lied about the "financial opportunity" he offered to Brienna. He lied about all these matters because the truth on those matters tend to show he had sex with Brienna when she was a minor.

**K. Plaintiff must prove any false statements in the article were made with actual malice by clear and convincing evidence**

The *New York Times v. Sullivan*, 376 U.S. 254 (1967) the Supreme Court held "libel can claim no talismanic immunity form constitutional limitations." *Id.* at 269. Against the "background of a profound national commitment to the principle that debate on public issues should be uninhabited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *Id.* The *First Amendment* guarantees have consistently refused to recognize an exception for any test of truth – whether administered by judges, juries, or administrative officials – and especially one that puts the burden of proving truth on the speaker." *Id.* at 270-271. Freedoms of expression require "breathing space." *Id.* at 272. quoting *NAACP v.* Button, 371 U.S. 415, 433 (1953) Recognizing that public figures assume special prominence in the affairs of society, the Supreme Court in *Getz* observed that two characteristics are particularly relevant to such designation, namely the ability to rebut the defamatory statements due to greater access to the channels of communication than private individuals. *Getz*, 418 U.S. at 344. "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements that private individuals normally enjoy." *Id.* at 345 (indicating that "public officials and public figures have voluntarily exposed themselves to increased risk of injury form defamatory falsehood concerning them.")

"If plaintiff is a public official or public figure ... and the statement relates to a matter of public concern, then to satisfy First Amendment strictures the plaintiff must establish that the defendant made a false and defamatory statement with actual malice." *American Future Sys., Inc. v. Better Bus. Bureau*, 592 Pa. 66, 84 (Pa. 2007); *New York Times v. Sullivan*, 376 U.S. 254,

279-80 (1964). A public official or public figure must prove actual malice—which is defined as knowledge that the publications were false or a reckless disregard of whether they were true of false—by clear and convincing evidence. *See New York Times*, 376 U.S. at 279-80; *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 127-128 (Pa. 2004) (the plaintiff "must prove, *by clear and convincing evidence* that the allegedly defamatory statements were false and that Appellant-newspapers either knew they were false or recklessly disregarded their falsity."). Indeed, the actual malice standard is expressly predicated on the need to protect reporting of matters of public concern involving public officials:

> Actual malice is a fault standard, predicated on the need to protect the public discourse under the First Amendment from the chill that might be fostered by less vigilant limitations on defamation actions brought by public officials. The stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.

*Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 191 (Pa. Super. 2003). The U.S. Supreme Court expanded this substantial burden of proof to include "public figures" who file defamation actions. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14 (1990).

"The burden of proof imposed is substantial, as the actual malice standard goes so far as to forbid imposition of liability even in those instances where the defendant negligently publishes false, defamatory statements about a public figure or public official." *Blackwell v. Eskin*, 916 A.2d 1123, 1125 (Pa. Super. 2007) (quoting in part *Norton v. Glenn*, 860 A.2d 48, 56 (Pa. 2004)). Indeed, "the actual malice standard is a rigorous, if not impossible, burden to meet in most circumstances." *Bartlett v. Bradford Publ'g Inc.*, 885 A.2d 562, 566 (Pa. Super. 2005) (quotations omitted). The "failure to check sources, or negligence alone, is simply insufficient to

maintain a cause of action for defamation ... Recklessness generally and in the context of actual malice is not easily shown." *Id.* (quotations omitted). Rather, to establish that a defendant acted with reckless disregard for the truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Norton*, 860 A.2d at 55. "Moreover, establishment of a defamation claim requires clear and convincing evidence, the highest level of proof for civil claims." *Blackwell*, 916 A.2d at 1125. This standard requires evidence "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the trust of the precise facts in issue." *Bartlett*, 885 A.2d at 566.

"The requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law." *Tucker*, 848 A.2d at 128 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990). "The question whether evidence in the record in a defamation case is sufficient to support a finding of actual malice is initially a question of law." *Id.* The important role the court serves in determining this threshold issue of actual malice as a matter of law is well-documented:

> This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged ... Most fundamentally, the rule is premised on the recognition that *judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.*

*Tucker*, 848 A.2d at 128 (emphasis in original) (quoting *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

Pennsylvania appellate courts have routinely upheld the granting of summary judgment[4] by trial courts where a plaintiff cannot meet its burden of showing facts establishing actual malice. *See, e.g. Ertel v. Patriot-News Co.*, 674 A.2d 1038 (Pa. 1996) (affirming trial court's entry of summary judgment where plaintiff could not show actual malice by clear and convincing evidence); *Blackwell v. Eskin*, 916 A.2d 1123, 1126 (summary judgment proper where record did not contain sufficient facts to support finding of malice, despite evidence showing that defendant may have been negligent for not confirming story with more accurate sources); *Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562, at 566-67 (affirming grant of summary judgment where public figure failed to prove actual malice, because evidence that reporter negligently investigated article was insufficient as a matter of law).

As then-Judge Alito explained, "even an extreme departure from professional standards, without more, will not support a finding of actual malice." *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989).

## L. Evidence relating to the actual malice defense

Plaintiff's only evidence is his own testimony that he never had sex with Brienna until she was an adult and that he pled guilty to corrupting her just because he should not have been consoling her which led her to become obsessed with him. Plaintiff has no evidence that the *Scranton Times* or *Kelly* knew the statements at issue – Plaintiff had sex with a 15-year-old

---

[4] Also see the following case where summary judgment was granted due to the absence of actual malice: *Henderson v. Lancaster Newspapers, Inc.*, 2011 Pa. Dist. & Cnty. Dec. LEXIS 542, affirmed 60 A.3d 863(Pa. Super. 2012); *Sprague v. Porter,* 106 A.2d 175 (2014); *Tucker v. Philadelphia Daily News,* 848 A.2d 113 (Pa. 2004); *Lewis v. Philadelphia Newspaper, Inc.,* 833 A.2d 185, appeal denied, 844 A.2d 553 (Pa. 2004); *Lewis v. Philadelphia Newspaper, Inc.,* 844 A.2d 553 (Pa. 2004); *Blackwwll v. Eskin, et al.,* 916 A.2d 1123 (Pa. Super 2007); *Rush v. Philadelphia Newspapers, Inc.,* 732 A.2d 648 (Pa. Super. 1999); *Savitt v. Fraternal Order of*

minor and he admitted to it as part of his guilty plea - were false or that Defendants had subjective doubts as to the truth or falsity of these statements.

Plaintiff testified he has no idea as to Kelly's state of mind when he wrote these statements. (**Exhibit "2"**, pp. 297 and 300.) According to Plaintiff, if Kelly didn't know what he was writing was false, "he should have." (**Exhibit "2"**, p. 298.) He describes Kelly's statements as "gross negligence." (**Exhibit "2"**, p. 298.) Kelly didn't "investigate good enough." (**Exhibit "2"**, pp. 298-299.) "I think he [Kelly] relied upon his own Scranton Times article "[the 2011 article by Denis O'Malley **Exhibit "3"**] and "he stopped right there, I think." (**Exhibit "2"**, p. 301.) Godlewski testified in his deposition: "I don't have to prove anything." (**Exhibit "2"**, p. 252.)

Before the article was published Kelly realized that the QAnon movement was turning into a dangerous thing and that a local guy, Godlewski, was one of the leading voices of the movement. (A true and correct copy of select pages from Chris Kelly's deposition are included in the *Exhibit List* and marked as **Exhibit "44"**, see p. 16.) During the month before the article went to print Kelly checked out Godlewski's videos and postings online. (**Exhibit "44"**, p. 18.) It was Kelly's opinion before writing the article that the Q movement was dangerous. (**Exhibit "44"**, p. 22.) The Q movement challenged objective reality and every institution in this country. (**Exhibit "44"**, p. 22.) Even after Joe Biden was sworn in as the President, Godlewski was telling people Donald Trump was still the president. (**Exhibit "44"**, pp. 23-24.) Kelly believed Godlewski was broadcasting nonsensical Q movement theories and that is why he used the figurative language in the article stating Godlewski sells "rabbit holes." (**Exhibit "44"**, pp. 27-28.) When Kelly used the word "poison" in the article he was referring to the lies, nonsense, and

---

*Police, et al.*, 915 A.2d 159 (Pa. Super. 2006).

disinformation Godlewski was spreading on the internet. (**Exhibit "44"**, p. 33.) For example, Kelly noticed that Godlewski was telling his viewers the real Joe Biden is dead and a body double has been put in his place. (**Exhibit "44"**, p. 33.)

Godlewski reported on January 6, 2021 that VP Mike Pence had been arrested and he hoped people at the top levels get arrested and executed. (**Exhibit "44"**, p. 40.) The article never stated Godlewski was physically present at the U.S. Capitol on January 6th or had a direct role in the U.S. Capitol riot. (**Exhibit "44"**, p. 40-41.) Kelly simply believes Godlewski's role in the Q movement as a leading proponent helped to fuel the riot. (**Exhibit "44"**, pp. 40-41.)

Kelly's investigation into whether Godlewski had a sexual relationship with a 15-year-old girl included his review of archived news articles at the Times-Tribune and court documents from the criminal case. (**Exhibit "44"**, p. 42-43.) (A true and correct copy of the archived articles on Godlewski's 2010-11 criminal case are included in the *Exhibit List* and marked as **Exhibit "45"** and **Exhibit "3"**.) Kelly specifically reviewed the 2011 article by Denis O'Malley under the headline: "Ex-baseball coach sentenced for sex with girl, 15." (**Exhibit "44"**, p. 45.) He thinks he also reviewed the criminal court case affidavit and Godlewski's guilty plea colloquy. (**Exhibit "44"**, pp. 45-46 and 53.) Kelly's testimony was as follows:

> Q. And would you agree with me he did plead guilty to corruption of minors according to all the documents?
> A. Yes.
> Q. And according to -- can you show me where in his guilty plea colloquy he admits to having a sexual relationship with a 15-year-old girl?
> A. Can explain that sentence. That sentence came out of the archives. It came out of the fact that he pleaded guilty to the corruption of minors, and I knew the underlying charges. I believed absolutely and still believe today that he had sex with that girl. And everything that's come out since this started supports that. And, jeez, you know, where I was? This is -- this was all reported at the time. It was all out there.

(**Exhibit "44"**, pp. 56-57.)

Kelly further testified:

Q. So you relied exclusively on articles that said he admitted that?

A. Not exclusively. I had those articles. I had the court documents, the affidavit, and I talked to other people. Corroborated the things that were in those stories with other people.

Q. When you read the guilty plea colloquy and saw no mention of sex, did you think maybe you should look further?

A. No. I believed absolutely that the charges is that he had sex with this young girl, and everything I learned since supports that.

Q. Well, you weren't there, right?

A. I was not there. You mean in the bedroom? No, I was not.

Q. And you've only talked with a friend?

A. No. That's one of the people I spoke with.

Q. And two others that --

A. Two others.

Q. That spoke with you on condition of anonymity?

A. Yes.

Q. Are either of them an eyewitness?

A. Again, I don't know whether they ever had sex in front of other people, but these are people who were in a position to know.

**(Exhibit "44", pp. 57-58.)**

Kelly testified:

Q. Did you attempt to ascertain more carefully the nature of the facts to which Mr. Godlewski pleaded?

A. Yes. I spoke to -- and including one of the people I spoke to who was in a position to know to reinforce my belief that his plea to corruption of minors was based on his guilt in the sex charges. And that turns out to be true. And I had that -- again, I went to background sources and got these things confirmed, someone who was there, someone who understands what happened in the process. And the fact is that they got -- he got the victim not to testify, and that is how he got this sweetheart deal.

**(Exhibit "44", p. 62.)**

Kelly also talked to people in law enforcement who corroborated the statements he made in the article. **(Exhibit "44", pp. 62-63.)** There is no evidence in this case that Kelly subjectively entertained serious doubts about the truth or falsity of his statements in the article.

Plaintiff falls far short of meeting his burden to prove the article's alleged false statements were made by Defendants when they subjectively knew them to be false or

entertained serious doubts about the truth of them. Even if Godlewski could somehow prove that the statements he complains of in the article are false and defamatory, the Defendants are entitled to summary judgment for the independent reason that Plaintiff cannot meet his burden under *New York Times* of proving the complained of statements were published with "actual malice."

## M. The statements in the article about QAnon and the insurrection are not defamatory

"In an action for defamation, the plaintiff has the burden of proving the defamatory character of the communication." *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 123 (Pa. 2004) (quoting in part 42 Pa. C.S. § 8343(a). "It is the function of the court to determine if the publication is capable of a defamatory meaning [and] [i]f the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Id.* at 123-24. "To determine whether a statement is capable of a defamatory meaning, [the court] consider[s] whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Id.* (quoting *Birl v. Philadelphia Electric Co.*, 167 A.2d 472, 475 (Pa. 1960) The court "must view the statements in context." *Id.* (quoting *Baker v. Lafayette College*, 532 A.2d 399, 402 (Pa. 1987)). "It is not enough that the victims of the statements ... be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respective society." *Id.* at 124.

A "distinct standard is applied [where] the publication is of an opinion." *Kurowski v. Burroughs*, 994 A.2d 611, 618 (Pa. Super. 2010). "A statement in the form of an opinion is actionable only if it may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion ... A simple expression of opinion based on disclosed facts is itself not sufficient for an action of defamation" *Id.* at 618 (quoting *Veno v. Meredith*,

515 A.2d 571, 575 (Pa. Super. 1986). Accordingly, Pennsylvania courts have routinely

dismissed defamation claims based on statements of opinion. *See Neish v. Beaver Newspapers,*

*Inc.*, 581 A.2d 619, 622-24 (Pa. Super. 1990) (article that criticized individual for the way he

handled his job and which suggested replacing him was mere opinion, and while the statements

in the article "might be viewed as annoying and embarrassing, [they were] not tantamount to

defamation."); *Baker*, 532 A.2d at 402-403 (affirming grant of summary judgment based upon

statements in letters that a professor presence in class was an "academically deplorable

arrangement" and that professor was "cavalier in his dealings with students"); *Thomas Merton*

*Center v. Rockwell Int'l Corp.*, 442 A.2d 213, 215-16 (dismissing complaint where article

conveyed the impression that members of group were communists); *Scott-Taylor*, 229 A.2d at

733 (statement by chairman of board of supervisors that proposed new building would end up

looking like a "chicken coop" not capable of defamatory meaning); *Parano v. O'Connor*, 641

A.2d 607 (Pa. Super. 1994) (statements that plaintiff was adversarial, less than helpful and

uncooperative were non-actionable opinion).

Under the First Amendment, opinions based on disclosed facts are "absolutely

privileged," no matter "'how derogatory'" they are. *Braig v. Field Communications*, 310 Pa.

Super. 569, 456 A.2d 1366, 1373 (Pa. Super. Ct. 1983) (quoting 3 Restatement (Second) of Torts

§ 566 cmt. c (Am. Law Inst. 1977)) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94

S. Ct. 2997, 41 L. Ed. 2d 789 (1974)). That holds true even when an opinion is extremely

derogatory, like calling another person "anti-Semitic." *Jones v. City of Philadelphia*, 893 A.2d

837, 845 (Pa. Commw. Ct. 2006).

The article includes facts that Godlewski had become a social media patriot reporter with

thousands of followers. He was broadcasting that Donald Trump was still the president and

working behind the scenes to depose Joe Biden, impose martial law and bring final justice to elected Democrats and satanic child sex traffickers. (See **Exhibit "1"**, ¶ 1.) Kelly stated he watched the impeachment trial of Donald Trump which included video coverage showing many QAnon followers at the U.S. Capitol on January 6th. (**Exhibit "1"**, ¶ 4.) According to Kelly's article he viewed videos of the mayhem at the U.S. Capitol on January 6th that resulted in 5 deaths. Kelly's article even noted that Godlewski professed he was not at the U.S. Capital on January 6th. Godlewski did report that day V.P. Mike Pence had been arrested. (**Exhibit "2"**, p. 220.) The article references facts that Godlewski did a YouTube show in which Godlewski stated to his audience "I want a really good explanation. Why would (Trump) walk away? Why, why would Donald Trump walk away? He knows there's election fraud. He has the proof. He has them nailed to the wall and there's no doubt about that." (**Exhibit "1"**, ¶ 9.) Godlewski in his YouTube video program went on to say "Trump's failure to use the Insurrection Act . . . is actually part of a grand, hidden strategy we mere mortals can't begin to comprehend." (**Exhibit "1"**, ¶ 10.)

The article also includes Kelly's opinions that Godlewski sells "QAnonsense to thousands of followers," he is a "purveyor of a poison," he is one of the "citizens of a separate reality who act, organize and seek to undermine and upend objective reality," that Godlewski "calls out the cadence" for the Q movement, and that Godlewski "spread lies." Even Plaintiff's wife at the time, Dori Gallagher, thought Godlewski was misleading people and that QAnon is a cult. (**Exhibit "2"**, p. 154 and **Exhibit "20"**, p. 48.)

According to Godlewski, the cabal is a global group of elites such as high-ranking government officials, high-ranking CEOs and presidents of Companies, central bankers worldwide and other billionaires that control the world without any of its citizens knowing it.

(Exhibit **"2"**, p. 172.) Godlewski believes the government is controlled by the cabal. (**Exhibit "2"**, p. 180.) The cabal operates a global child sex-trafficking ring to harvest adrenochrome and for sex purposes. (**Exhibit "2"**, p. 181.) Godlewski preaches about the coming "Storm" when the world-wide military patriots will set humanity free from the Cabal's rule. (**Exhibit "2"**, p. 183.) Godlewski's role in the QAnon movement is to provide grassroots dissemination of information of what is happening and the lies of the mainstream media. (**Exhibit "2"**, p. 183.) He labels himself as a highly ranked Anon (short for anonymous) in the Q movement. (**Exhibit "2"**, pp. 35-36.) Godlewski admits he got pretty vocal about the Q movement right after the November 3, 2020 election. (**Exhibit "2"**, pp. 222-223.) Godlewski grew his viewership and subscribers from 7-8 million people to 17-18 million people. (**Exhibit "2"**, p. 188.) He earns $50,000-75,000 per month from Locals.com for subscriptions and advertisements. (**Exhibit "2"**, pp. 189-190.) He earns another $5 million per month from Rumble.com. (**Exhibit "2"**, p. 190.)

Godlewski did video shows on social media claiming Flight 93 never crashed in Shanksville, Pennsylvania, but instead the plane landed at O'Hara Airport in Chicago. (**Exhibit "2"**, pp. 161-162.) The plane is still in use today according to Godlewski. (**Exhibit "2"**, p. 162.) Godlewski broadcast that Hillary Clinton and her Chief of Staff Huma Abedin were filmed laying children on top of ping pong tables in a basement, where those children were molested and frightened so adrenochrome could be extracted from them. (Exhibit "2", p. 174.) This is the "main reason that Hillary Clinton was executed." (Exhibit "2", p. 174.) Godlewski claims Hillary Clinton was executed at Guantanamo Bay on December 31, 2018 after a military tribunal. (**Exhibit "2"**, pp. 163-166.) Donald Trump was present for the execution. (**Exhibit "2"**, p. 166.) A body-double has been posing as Hillary Clinton since then. (**Exhibit "2"**, p. 166.) Joe Biden was also executed in 2019 after a military tribunal for crimes against humanity. (**Exhibit "2"**, p.

167.) The person elected president in 2020 is not really Joe Biden, he is a body double or clone. (**Exhibit "2"**, p. 167.)

Godlewski asserts Trump's Secretary of Defense, Mark Esper, "turned out to be a cabal deep-state plant" and a trader. (**Exhibit "2"**, p. 168.) Godlewski's did video shows stating Anthony Fauci will be arrested and tried by a military tribunal. (**Exhibit "2"**, p. 168.) California Governor Gavin Newsom killed himself and the person standing in for him is a body double or a clone. (**Exhibit "2"**, pp. 168-169.) Godlewski asserts the COVID vaccine was developed so the cabal could control our minds and actions. (**Exhibit "2"**, p. 169.) Godlewski has reported there is really "a second secret Constitution of the United States" and "the Supreme Court of the United States has already rendered a decision overturning the 2020 election" which has not yet been made public. (**Exhibit "2"**, pp. 169-170.) Godlewski broadcasted that John McCain was one of the first persons executed after a military tribunal. (**Exhibit "2"**, p. 170.) Godlewski claims Andrew Cuomo is a pedophile who raped, tortured and killed children. (**Exhibit "2"**, p. 170.) He declared on social media there was no actual shooting at the concertgoers at Mandalay Bay in Las Vagas. (**Exhibit "2"**, p. 170.)

According to Godlewski, Tom Hanks was a pedophile was executed after a military tribunal. (**Exhibit "2"**, p. 172.) Godlewski reported that the District of Columbia has been under marshal law and the patriots have "blown up the tunnels under D.C." that were used for child-trafficking. (**Exhibit "2"**, p. 173.) President Bill Clinton's Chief of Staff John Podesto is a pedophile who tortured and burned children. (**Exhibit "2"**, p. 174.) Godlewski claims the Bush family was involved in a global sex-trafficking ring and George H.W. Bush, the 41st president, was executed. (**Exhibit "2"**, pp. 175-176.)

Godlewski made broadcasts stating Joe Biden's inauguration in January 2020 was not

going to happen. (**Exhibit "2"**, p. 153.) Godlewski claimed Biden's election was fraudulent and involved constitution violations. He wanted the military to correct the constitutional violation. (**Exhibit "2"**, p. 154.) Godlewski specifically made broadcasts calling for the execution of election officials who rigged the election for Biden. (**Exhibit "2"**, pp. 156-157 and 206.)

Godlewski claims the people who entered the U.S. Capitol on January 6th were "part of a false flag operation." (**Exhibit "2"**, p. 219.) It was an FBI set-up to make Trump and his supporters look bad. (**Exhibit "2"**, pp. 219-220.) He reported on January 6th that V.P. Mike Pence was arrested. (**Exhibit "2"**, p. 220.) Godlewski reported Ashli Babbitt was not really shot at the Capitol. (**Exhibit "2"**, pp. 220-221.) He broadcasted that after Arizona decertifies its electoral votes in favor of Joe Biden the military will take over the country. (**Exhibit "2"**, p. 221.) Godlewski got started doing his social media posts and videos a little bit before the November 3, 2020 election. (**Exhibit "2"**, p. 222.) Godlewski has broadcast these statements to "millions" of his subscribers. (**Exhibit "2"**, p. 176.)

The United States Supreme Court has also made it clear that defamation actions cannot be based on a statement of opinion. *Gertz v. Welch*, 418 U.S. 323, 340 (1974); *Milkovich v. Loraine Journal Co.*, 497 U.S. 1, 19 (1990). Even Godlewski acknowledges Kelly is entitled to his opinions in the following testimony:

Q. Okay. The article also says that you traffic in lies; doesn't it?
A. I -- can you --
Q. Yeah. If we look at Paragraph 29 -- do you see the numbers next to each paragraph?
A. Yes.
Q. In the bottom of that paragraph it said, "Godlewski is spreading lies across the planet." Is that false and defamatory?
A. It's certainly false. I don't know if it meets the definition of defamatory, but it's absolutely false, yes.
Q. Well, he's calling you a liar.
A. Yes.

Q. And then if you look at Paragraph 35, he says that -- the paragraph begins "And if you hold yourself up as a patriot reporter who tells truths that can't be found anywhere else, don't traffic in lies." So he's -- Chris Kelly's saying you traffic in lies; is that correct?

A. That is what he's saying, yes.

Q. Is that false?

A. Yeah, especially the part where he says "that can't be found anywhere else." I think that shows a lack of research and due diligence on his part. The things that I talk about -- I don't actually know what he's referring to in terms of the whole category of traffic in lies. He was never really specific, I don't think, in this article. I think he's just generally calling me a liar and saying that everything I say is a lie.

Q. Did you find that offensive, that Chris would say that about you?

A. No. I think Chris is entitled to his opinion on certain things like that. I don't think that Chris has to believe in the things that I believe in, nor do I have to believe the things that Chris believes in. We're free to believe in what we want to believe in. The problem I had with the article are the three things that I mentioned earlier.

**(Exhibit "2", pp. 33-34.)**

Kelly's opinions about Plaintiff spreading lies and nonsense cannot be the basis of a defamation claim. Like expressions of opinion, mere name-calling or hyperbole also cannot serve as the basis for a defamation action. The Pennsylvania Supreme Court has recognized that:

> The person who is the target of unkind words is bound to feel hurt, but he or she often exaggerates in his or her mind the extent of damage done to his or her reputation in the public mind. The public has many things to think and talk about, and it does not linger on [articles which appear in the local newspaper.]

*Kernick v. Dardanell Press*, 236 A.2d 191, 192 (Pa. 1967); see also *Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. 1983); and *Wecht v. PG Pub. Co.*, 510 A.2d 769, 771 (Pa. Super. 1986) (portrayal of public figure as "vile, obscene, abusive, insensitive and paranoid individual" not defamatory).

The Pennsylvania Superior Court, in particular, has recognized that criticisms, hyperbole and opinion directed at public officials are not actionable defamation:

> [I]n deciding whether or not a publication is defamatory, courts should be guided by America's profound commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement caustic and sometimes unpleasantly sharp attacks on government and public officials. The constitutionally protected area of free speech revolves around the freedom to criticize

50

government and the officials responsible for government operations. To prevent a chilling effect on free speech, the Supreme Court of Pennsylvania has held that statements which represent differences of opinion or are annoying or embarrassing, are without more not libelous. Neither is a statement libelous which is no more than rhetorical hyperbole or a vigorous epithet used to describe what the publisher believes to be another's extremely unreasonable position.

*Redding v. Carlton*, 296 A.2d 880, 881 (Pa. Super. 1972).

Kelly's opinions about Godlewski are well-founded and not defamatory.

### N. Certain statements in the article are protected under the fair report privilege

The fair report privilege provides that a news source has a qualified privilege to make a fair and accurate report of official governmental reports or proceedings if the publication is not solely made for the purpose of causing harm to the subject of the report. *See Sciandra v. Lynett*, 187 A.2d 586, 588-89 (Pa. 1963). The privilege is premised "upon the theory that it is in the public interest that information be made available as to what takes place in public affairs." *Id.* The fair report privilege does not require that a publication contain a "verbatim recitation" of the subject matter of the report, but only requires that the article provide a "substantially accurate" summary. *Tucker v. Philadelphia Daily News*, 757 A.2d 938, 946 (Pa. 2000).

The statements in the article about Plaintiff's conviction on the corruption charge concerns a Criminal Complaint and a guilty plea entered by the Court of Common Pleas of Lackawanna County. The detectives' allegations about where Godlewski had sex with the minor victim came right from the search warrant served on Plaintiff. Plaintiff has admitted the detectives' served him with a Search Warrant and Affidavit did allege he had sex with the minor in cars and in houses he had access to as a realtor. (**Exhibit "11".**) Because the article reports on court records from an official judicial proceeding, these particular statements are privileged. *Binder v. Triangle Publications, Inc.*, 275 A.2d 53, at 56 (1970) (privilege extends to accounts of judicial proceedings.)

51

**O. Plaintiff has insufficient evidence to prove loss of reputation or actual injury for his defamation claims**

A plaintiff alleging defamation has the burden of proving damages. "[E]very defamation plaintiff must prove actual harm." *Pilchesky v. Gatelli*, 2011 PA Super 3, 12 A.3d 430, 444 (Pa. Super. Ct. 2011) (citing *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)]).

The plaintiff must demonstrate whether the statements in the article tend to so harm his reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him. *Tucker v. Philadelphia Daily News*, 377 Pa. 598, 615, 848 a.2d 113, 124 (2004). The Pennsylvania Supreme Court has held, "it is not enough that the victim of the [statements] . . . be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." *Id.*

Godlewski has failed to present evidence showing the existence of damages – "special" or otherwise - to overcome Defendants' summary judgment motion. At the outset of this case, Defendants served Plaintiff with Interrogatories (Set I) and Plaintiff responded to these interrogatories as follows (see **Exhibit "29"**, Nos. 38-42.):

38. Identify all persons who you believe have an unfavorable view of your reputation due to the February 14, 2021 publication.

   **ANSWER: This interrogatory is objected to on the basis Plaintiff cannot possibly meaningfully respond to this question at this juncture of the proceedings.**

39. Identify all recipients of the allegedly defamatory statements who have exposed Plaintiff to public hatred, contempt and ridicule.

   **ANSWER: This interrogatory is objected to on the basis Plaintiff cannot possibly meaningfully respond to this question at this juncture of the proceedings. By way of further answer, the Defendant has access to the number of views that The Scranton Times/Times Shamrock receive from their digital advertising, share**

buttons via their website, Facebook (and other social media) views/shares, or newspaper sales & analytics.

40. Identify any persons who refused to do business with or associate with Plaintiff as a result of the article.

ANSWER: This interrogatory is objected to on the basis Plaintiff cannot possibly meaningfully respond to this question at this juncture of the proceedings. By way of further answer, the Defendant has received hundreds of threats and harassment on social media from anonymous uses, which spiked after the article was released. In addition Plaintiff was terminated from his real estate job after the article was published.

41. Identify any persons whose opinion of the Plaintiffs reputation was affected by the article.

ANSWER: See answers to 37-39 hereinabove.

42. State all damages suffered or claimed by you in this case and how the damages were computed and all facts supporting each claim.

ANSWER: This interrogatory is objected to on the basis Plaintiff cannot possibly meaningfully respond to this question at this juncture of the proceedings. By way of further answer, and in no way in derogation of the foregoing, Plaintiff is claiming so far unspecified damages for pain-and-suffering and for damages to his reputation including punitive damages. Plaintiff is also claiming economic loss having been released from his job as an independent contract & Real Estate professional at ERA One Source Realty because it received complaints and hate mail, directly related to the article. Additionally, Plaintiff's online reputation has been severely damaged and he is being libeled online of as a 'pedophile'. This started after the article was released.

Defendants served a Request for Production of Documents (Set I) upon Plaintiff to which he responded as follows (See **Exhibit "37"**, No. 8):

8. Any Documents evidencing harm to your reputation, lost earnings, diminished earning capacity, embarrassment, and/or humiliation caused by the article reference in the Complaint.

ANSWER: Plaintiff is in the process of collecting them. There are literally hundreds of messages, screenshots, online comments, hate emails, hate mail, and other documents evidencing the damage to the Plaintiffs reputation. Gathering all of these will take some time.

No such documents have ever been provided and discovery is closed now. Plaintiff then

53

provided supplemental discovery responses to 38-42 above which again provided no proof of

damages or injuries. His supplemental answers were as follows (See **Exhibit "30"**):

38. Plaintiff cannot provide a complete list. A sample of the individuals who now have an unfavorable view of his reputation, were provided by your client. However, the Plaintiff intends to do some statistical research, to find out how extensive this is. This is not been undertaken as yet. Further, Plaintiff believes that, in his industry, selling real estate, his reputation has been significantly harmed. Once again, Plaintiff intends to research this issue more carefully. In short, plaintiff does not have a complete answer to this point.

39. See answer to 38.

40. Obviously ERA is no longer doing business with the Plaintiff.

41. See answer to 38.

Plaintiff did not supplement the response to No. 8 of Request for Production of Documents (Set

I).

Godlewski's own testimony was as follows:

Q. Phil, do you have any persons that you were friends with before the article that said, Phil, I'm not going to be friends with you anymore because I read what Chris Kelly wrote and I believe it?
A. Tim, that's not -- that's not something that happens in real life. People don't come to you and say, hey, I'm no longer going to be friends with you because of an article that I read. They just stop talking to you. And yes, that has happened dozens, if not hundreds of times, with my friends from high school, people in the area that I used to do business with, many times.
Q. Can you name them?
A. You just asked me that four times in the last five minutes.
Q. Well --
A. Just now I just remembered one, so happens.
Q. Who is it?
A. I was still doing real estate and it was Freddie Gray. Freddie Gray had a house on -- what the heck street was that -- in Old Forge, his wife Emily, Emily Gray. They cancelled their listing with me. A $200,000 house. Again, I'm not suing for economic loss. You know that, you said that. I'm suing for what the damage that your article has done to my family and to me or years and years to come.

**(Exhibit "2"**, pp. 312-313.)

However, as the Pennsylvania Superior Court has declared, "Injury to reputation is

judged by the reaction of other persons in the community and not by the party's self-estimation." *Dougherty v. Boyertown Times*, 547 A.2d 778, 783 (Pa. Super. 1988). Godlewski's personal beliefs about his reputation are not sufficient evidence of damages. Plaintiff has already stipulated he has no economic or special damages. The Court entered an Order on January 8, 2023 dismissing such claims.

Godlewski's mere conjectures fall short of the standard of "specific facts" showing damages. See *Curran v. Children's Serv. Ctr. of Wyoming Cnty.*, 578 A.2d 8, 9 (Pa. Super. 1990) (emphasis added) (citation omitted) ("To avoid summary judgment the nonmoving party must set forth specific facts...demonstrating that a genuine factual issue exists."). See also *Lin v. Rohm and Haas Co.*, 293 F. Supp. 2d 505, 520 (E.D. Pa. 2003)

Plaintiff has not taken a deposition of Sunita Arora or ERA One Source Realty. Plaintiff claims he was fired by Sunita Arora by an email but he has never provided Defendants with a copy of this email. Sunita Arora let Godlewski go from his real estate job because of his QAnon videos. (**Exhibit "20"**, p. 45.) Plaintiff claims he lost one real estate listing agreement with Freddie Gray and his wife Emily due to the article. (**Exhibit "2"**, p. 313.) Plaintiff never deposed Fredie Gray or his wife. Nor did he obtain an affidavit from either of them. Defendants did obtain the records on Freddie Gray's sale of his house and his divorce from public offices. (A true and correct copy of the recorded deed of transfer from the Grays to the Grantees and a copy of the Grays' Divorce Decree are included in the *Exhibit List* and marked as **Exhibit "46"**.) Freddie Gray and his wife sold their house and were divorced before the article was even published.

Plaintiff admits he had less than $200 to his name when the article was published. (**Exhibit "2"**, p. 203.) Now, he claims he is worth $75 million dollars, and he earns over $5

million per month. (**Exhibit "2"**, p. 203.) Godlewski has not named anybody who read the article, believed the alleged false statements about him and has treated him differently. (**Exhibit "2"**, p. 312.) Godlewski simply claims his damages are "unquantifiable" and he is suing for the harm to his family and his potential loss of business. (**Exhibit "2"**, p. 208.)

Plaintiff has admitted he was a "bad person" until be went to jail in the summer of 2021 (5 months after the article was published) and he found God. (**Exhibit "2"**, pp. 213-214, 309-313.) He has met the love of his life after his release from jail. (**Exhibit "2"**, p. 203.) He likes his career now and he's never going back to real estate. (**Exhibit "2"**, p. 211.) He has been on Zoloft since 2018 and it helps him with anxiety and depression. (**Exhibit "2"**, p. 20.) Zoloft keeps him in a good place and he is doing fine. (**Exhibit "2"**, p. 20.) He has had no mental health treatment since June 2021. (**Exhibit "2"**, p. 21.) He treated with mental health providers in May and June 2021 due to his marital issues and an upcoming sentencing hearing for guilty pleas on a bad check and tampering with bank records charges. (**Exhibit "2"**, p. 21-22.)

Dori Gallagher, his wife at the time, testified she filed for divorce in March 2021 mainly due to Godlewski's infidelities and his involvement in QAnon which she described as a cult. (**Exhibit "20"**, p. 54.) Dori is three years and 4 months younger than Godlewski. (**Exhibit "20"**, p. 6.) In 2017, Godlewski cheated on his wife Dori with an employee at his real estate company named Miranda. (**Exhibit "2"**, pp. 16-18.) Dori found out about the affair with Miranda. (**Exhibit "20"**, p. 22-23.) Godlewski left the marital home for about two weeks. (**Exhibit "20"**, p. 22-23.) Miranda is the same age as Brienna, ten years younger than Godlewski. (**Exhibit "20"**, p. 88.) Dori admits Godlewski is attracted to younger females. (**Exhibit "20"**, p. 88.) Godlewski fired Miranda for telling Dori about the affair. (**Exhibit "20"**, p. 81.) The real estate agency paid Miranda $11,000 because of her firing. (**Exhibit "20"**, p. 81.)

Dori filed for divorce from Godlewski on March 8, 2021. Just 23 days later, Godlewski wrote a text message to Brienna which stated:

> "Meh. I'm good. I feel better that she's [Dori] gone to be honest. The sex sucked or was non-existent, but always one of the 2. She was constantly miserable. She wasn't even really a great mother. The kids always wanted to be with me and not her. It was a disaster."

(A true and correct copy of the text message from Godlewski to Brienna on 3/31/21 and admitted to being authentic is included in the *Exhibit List* and marked as **Exhibit "47"**.) Incredibly, in this case Plaintiff is trying to blame the Defendants and the article for Dori leaving him. Before she left the marital home in February 2021, Dori asked Godlewski to stop doing social media videos. (**Exhibit "20"**, p. 49.) She thinks his videos are crazy and he is lying to people. (**Exhibit "20"**, p. 50.) Dori agrees Godlewski is a "QAnon Realtor." (**Exhibit "20"**, p. 55.) The Q movement scares her. (**Exhibit "20"**, pp. 55-56.) She requested Godlewski only have supervised custody of the children because of his QAnon beliefs. (**Exhibit "20"**, p. 56.)

### P. Plaintiff's false-light claim

Godlewski's false-light claim fares no better than his defamation claims. The tort of false light - - invasion of privacy involves "publicity that unreasonably places the other in a false light before the public." *Strickland v. University of Scranton, 700 A.2d 979, 987 (Pa. Super. 1997)* (quoting *Curren v. Children's Serv. Ctr. of Wyoming County, Inc.*, 396 Pa. Super. 29, 578 A.2d 8, 12 (Pa. Super. 1990). A cause of action for invasion of privacy will be found where a major misrepresentation of a person's character, history, activities or beliefs is made that could reasonably be expected to cause a reasonable man to take serious offense. *Harris by Harris v. Easton Publishing Company*, 335 Pa.Super. 141, 483 A.2d 1377, 1384 (1984). The elements to be proven are publicity, given to private facts, which would be highly offensive to a reasonable person and which are not of legitimate concern to the public." *Id.*

A false-light claim also requires actual malice where the Plaintiff is a public figure. *See* 3 Restatement (Second) of Torts § 652E; *Graboff v. Colleran Firm*, 744 F.3d at 136 (noting that Pennsylvania follows the Second Restatement); *see also Krajewski v. Gusoff*, 53 A.3d at 807-08, 810. In order for Plaintiff's false light claim to be successful, Plaintiff must show a highly offensive false statement was publicized by Defendants with knowledge of its falsity or in reckless disregard of the falsity of the statements. *Neish v. Beaver Newspapers, Inc.*, 398 Pa.Super. 588, 581 A.2d 619, 624 (1990), *alloc. denied*, 527 PA. 648, 593 A.2d 421 (1991). None of the statements made by Defendants were false. Many news articles had previously described Plaintiff's involvement with the minor victim. Godlewski's failure to prove actual malice as discussed above dooms this claim as well.

## Q. Plaintiff claims of interference with existing or prospective contractual relations

In Count V (interference with existing contractual relations) of the Complaint, Plaintiff alleges Defendants wrote the article knowing its effect would be detrimental to Plaintiff's reputation and therefore his ability to make a living as a realtor. (Complaint, ¶ 131.) Further, Plaintiff claims the article was published to hurt Plaintiff's relationship with his current employer and that he was terminated from his position as a realtor as a direct consequence of the article. (Complaint, ¶¶ 133-134.) In Count VI (interference with prospective contractual relations) of the Complaint, Plaintiff asserts that Defendants' article was intended to harm Plaintiff's prospective contractual relationships with potential real estate clients and other realtors. (Complaint, ¶ 139.)

To make out a cause of action for intentional interference with a contractual relation, a plaintiff must demonstrate "purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring." *Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa.Super. 1997). In *Glenn v. Point Park College,*

*supra*, the Pa. Supreme Court established the four elements to prove a cause of action for

intentional *interference* with prospective *contractual relations*. Those elements are:

(1) a prospective *contractual relation*;
(2) the purpose or intent to harm the plaintiff by preventing the *relation* from occurring;
(3) the absence of privilege or justification on the part of the defendant; and
(4) the occasioning of actual damage resulting from the defendant's conduct.

The elements of the tort of inducing breach of contract or refusal to deal, are "one who,

without a privilege to do so, induces or otherwise purposely causes a third person not to (a)

perform a contract with another, or (b) enter into or continue a business relation with another is

liable to the other for the harm caused thereby'. In other words, the actor must act (1) for the

purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged,

and (3) the harm must actually result." *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393

A.2d 1175, 1182 (Pa. 1978).

Godlewski testified he has no intention of ever going back to being a realtor. (**Exhibit**

**"2"**, pp. 211.) "I like my career. I like my lifestyle." (**Exhibit "2"**, pp. 211.) Godlewski testified

his income has gone up since the article was published. (**Exhibit "2"**, pp. 312.) He specifically

said: "I'm not suing for economic loss." (**Exhibit "2"**, pp. 312.) An Order of Court has been

filed in this case dismissing all of Plaintiff's claims for economic damages. Godlewksi had his

real estate license revoked due to the bad check and tampering with bank records convictions.

(**Exhibit "2"**, pp. 316.) His testimony on that subject was: "So I wasn't going back to real estate

anyway. Whether or not they (Pennsylvania Real Estate Commission) revoked it or suspended

was irrelevant to me, so I just let it go." (**Exhibit "2"**, pp. 316.) Plaintiff earned $136,000 in

2020 as a realtor. Plaintiff earns over $5 million dollars per month now as a social media reporter

and influencer. (**Exhibit "2"**, p. 190.) Plaintiff has no evidence of actual damage or harm in

order to move forward with Counts V and VI. Counts V and VI based solely on alleged

interference with his real estate work. They must be dismissed.

### R. Plaintiff cannot meet his burden to prove punitive damages

Under Pennsylvania law, to prevail on a claim for punitive damages, must not only establish actual malice, which is essential element of their claim for defamation, but also common law malice. In *Disalle v. P.G. Publishing Company*, 544 A.2d 1345, 1369-70 (Pa. Super. 1988), the Pennsylvania Superior Court, after an extensive analysis, stated "we hold that a public official, [public figures are treated the same] who must prove actual malice to establish liability in a defamation action, may not also recover punitive damages absent an additional finding that the defendant acted with common law malice in publishing the defamatory statement." The court has since reaffirmed that holding. *See Sprague v. Walter*, 656 A.2d 890, 922 (Pa. Super. 1995) (to recover punitive damages in defamation action, "the plaintiff must not only prove 'actual malice,' but must also demonstrate that the defendant acted with 'common law malice' in publishing the defamatory statement.").

Under Pennsylvania law, "common law malice involves conduct that is outrageous (because of defendant's evil motive or his reckless indifference to the rights of others), and is malicious, wanton, reckless, willful, or oppressive." *Sprague*, 656 A.2d at 922 (quoting *DiSalle*, 544 A.2d at 1364). "In determining whether a particular defendant's conduct displays the necessary degree of evil volition, the focus is not on the nature or category of the tort, but rather on the defendant's disposition toward the plaintiff at the time of the wrongful act." *Id.* (citing *DiSalle*, 544 A.2d at 1369). "[B]efore punitive damages will be allowed in a case involving the defamation of a public official, the plaintiff must prove that the defendant displayed actual or apparent ill will." *Id.* (citing *DiSalle*, 544 A.2d 1370). "This is so because punitive damages in public official defamation actions are specifically intended to punish and deter publication with

60

actual or apparent ill will." *Id.* (citing *DiSalle*, 544 A.2d at 1371). "Proper application of the common law malice standard assures that a media defendant's rights are sufficiently protected under both the First Amendment and the Pennsylvania constitution." *Id.* (citing *DiSalle*, 544 A.2d at 1371). Accordingly, even where a public official shows actual malice, punitive damages cannot be awarded except upon proof of common law malice. *See Moore v. Vislosky*, 240 Fed. Appx. 457, 473 (3d Cir. 2007) (upholding trial court's refusal to give punitive damages instruction despite showing of actual malice).

As set forth above, Plaintiff cannot meet his burden of showing actual malice or common law malice. Therefore, his claims for punitive damages fail as a matter of law and should be dismissed.

## V. **CONCLUSION**

The article discusses the QAnon movement and its detrimental effect on society which is a matter of public concern. Plaintiff admits he is a public figure and the Court has entered an order declaring him to be a public figure. By his own admission, Plaintiff is a leading voice for he Q movement. Plaintiff has made a good living on social media peddling lies and conspiracy theories. The central focus of QAnon believers is its war on a world-wide cabal of pedophiles. A common definition of a pedophile is an adult who is sexually attracted to children. There is a substantial amount of evidence referenced herein indicating Godlewski fits this definition. Brienna was a child when Godlewski had sex with her. His story about why he pled guilty to corrupting a child makes no sense. The *Scranton Times* is entitled to summary judgment because Plaintiff cannot meet his burden to prove falsity and actual malice for publishing the article. Additionally, Plaintiff's claims based on statements which constitute Kelly's opinions or statements that are not capable of defamatory meaning must be dismissed. Plaintiff has also

61

failed to produce any witnesses that understood the alleged statements were defamatory and he has no evidence of suffering actual injury or harm from the article. Plaintiff must present evidence of an injury to his reputation and he has failed to present such evidence here. Defendant respectfully requests that the case be dismissed with prejudice.

RESPECTFULLY SUBMITTED,

HAGGERTY HINTON & COSGROVE LLP

Date: January 31, 2024

By: _____
Timothy Hinton, Jr., Esq.
1401 Monroe Ave., Suite 2
Dunmore, PA 18509
(570) 344-9845
timhinton@haggertylaw.net
Attorneys for Defendants,
*Chris Kelly and The Scranton Times, L.P.*

<u>**CERTIFICATE OF COMPLIANCE**</u>

I hereby certify that this filing complies with the provisions of the Public Access Policy

of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts

that require filing confidential information and documents differently than non-confidential

information and documents.

MAURI B. KELLY
LACKAWANNA COUNTY
2024 JAN 31 P 2: 53
CLERK OF JUDICIAL
RECORDS CIVIL DIVISION

*/s/ J. Timothy Hinton, Jr., Esq.*
**J. TIMOTHY HINTON, JR., ESQUIRE**
**PA I.D. 61981**

| | | |
|---|---|---|
| PHILIP GODLEWSKI, | : | IN THE COURT OF COMMON PLEAS |
| Plaintiff | : | OF LACKAWANNA COUNTY |
| | : | |
| v. | : | CIVIL DIVISION |
| | : | |
| CHRIS KELLY, et al. | : | JURY TRIAL DEMANDED |
| Defendants. | : | |
| | : | No.: 2021-CV-2195 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January 2024, I caused to be served by electronic mail, a true and correct copy of the foregoing Defendants' Brief in Support of Motion for Summary Judgment upon all parties:

Timothy M. Kolman, Esq.
Timothy Bowers, Esq.
414 Hulmeville Ave.
Penndel, PA 19047
TKolman@kolmanlaw.com
TBowers@kolmanlaw.com
*Attorneys for Plaintiff*

RESPECTFULLY SUBMITTED,

HAGGERTY HINTON & COSGROVE LLP

By: _____
J. Timothy Hinton, Jr., Esq.
1401 Monroe Ave., Suite 2
Dunmore, PA 18509
(570) 344-9845
timhinton@haggertylaw.net
Attorneys for Defendants,
*Chris Kelly and The Scranton Times, L.P.*