G<span>ODLEWSKI</span> v. A<span>LVEAR</span>, N<span>O</span>. 3:24—CV—00344 (JKM)
D<span>EFS</span>.' M<span>OT</span>. <span>TO</span> D<span>ISMS</span>.

# E<span>XHIBIT</span> "H"

Page 1

1              IN THE COURT OF COMMON PLEAS

2            OF LACKAWANNA COUNTY, PENNSYLVANIA

3

4                         *    *    *

5    PHILIP GODLEWSKI,        : CIVIL DIVISION

            Plaintiff         :

6                             :

            vs                : JURY TRIAL DEMANDED

7                             :

     CHRIS KELLY, et al.,     :

8            Defendants       : NO. 2021-CV-2195

9

                          *    *    *

10

11              Oral deposition of PHILIP GODLEWSKI,

12   taken at the Lackawanna County Bar Association, 233 Penn

13   Avenue, Scranton, Pennsylvania 18503, on Tuesday, July

14   25, 2023, beginning at 9:13 a.m. before Pamela Pratt,

15   Court Reporter and Notary Public in and for the

16   Commonwealth of Pennsylvania.

17

18

19                         *    *    *

20

21              VERITEXT LEGAL SOLUTIONS

                 MID-ATLANTIC REGION

22               5100 Tilghman Street

23                    Suite 205

24          Allentown, Pennsylvania 18104

25                 (610) 434-8588





**Page 22**

1  in June, you were facing a sentencing hearing with Judge
2  Barrasse regarding the bad check and doctoring bank
3  records charge?
4  A.  Correct.  You were there for that.
5  Q.  Well, it was on Zoom.
6  A.  Right.
7  Q.  I watched it on Zoom.
8  A.  Uh-huh.
9  Q.  And you went to jail for 30 days for that
10  charge; is that correct?
11  A.  Correct.
12  Q.  And you were feeling some stress over that
13  upcoming hearing coming up?
14  A.  Yes.
15  Q.  And then you saw somebody in John Kuna's
16  office next on June 8th, 2021 regarding ████████
17  ██ ████████?
18  A.  My sentence started June 22.  So that June
19  8th appointment that you're referencing would have been
20  before the sentence.  But yes.
21  Q.  Now, do you take a drug called Sertraline?
22  A.  Sertraline is the generic form of ████ but
23  it's the same drug that you were referencing in the last
24  document.
25  Q.  Okay.  And you take sildenafil for --

**Page 23**

1  A.  Occasionally.
2  Q.  Okay.  Prior to sex, correct?
3  A.  Yeah.
4  Q.  Now, looking at Page 16 -- I'm sorry, 1563
5  under the section entitled Marital, do you see that
6  about in the middle of the page?
7  A.  And then it says ████████?
8  Q.  Yes.
9  A.  Yes.
10  Q.  Let's focus on that paragraph.  You get to
11  the section on education and the -- Monica Stroz from
12  Dr. Berger's office wrote ████████
13  ████████  Do you see that?
14  A.  Yes.
15  Q.  Is that information you gave Monica?
16  A.  I'm unsure what college credit total means.
17  Q.  How about it's -- you've got five years worth
18  of credits but no degree, is that what you meant?
19  A.  To be honest with you, I don't remember
20  exactly what I said to Monica.  I was in school four or
21  five years, although they were not five full years and
22  they were separated in some cases by either months or
23  years in between.  I don't believe I would have said
24  that I had a total of five years of college credits.  I
25  don't think that's something I would have said because

**Page 24**

1  it's not true.
2  Q.  Under this section of ST1563, it says,
3  ████████████████████████
4  █ ████████████████████
5  ████████████  Is that information that you gave
6  to Monica?
7  A.  Half of that is true.  I don't have a
8  master's degree.  That's a completely different thing
9  than Master's of the Arts.  Master's of the Arts, I
10  believe, is an associate's degree or maybe even less
11  than that.  So she may have taken what I said maybe out
12  of confusion and she wrote master's degree.  But I,
13  obviously, don't have a master's degree.
14  Q.  Did you tell her that you attended Regent
15  University?
16  A.  I don't know if I had told her that I
17  attended -- what date was this?  I don't remember if I
18  told her that I attended or was planning on attending.
19  But I know I mentioned it to her for sure.
20  Q.  Okay.  Then reading on, on ST1563 it says,
21  ████████████████████████  Did you
22  tell Monica Stroz on May the 3rd, 2021 that you attended
23  a program at Harvard Business School on negotiation
24  mastery?
25  A.  Same answer as to the last one.  I don't know

**Page 25**

1  if I told her that I did attend or I planned on
2  attending.  I can't remember exactly what I told her.
3  And this is, obviously, very vague, so I'm not sure.
4  Q.  Is it your testimony here today, Phil, that
5  you never attended Regent University or any programs at
6  Regent University?
7  A.  It's a complicated answer because I thought I
8  did until you did discovery.
9  Q.  Okay.  Well, Phil, I supplied you with a
10  letter and e-mails from Regent University that they
11  don't have your name or any variation of your name in
12  their records that you ever attended any program there.
13  You saw that record, right?
14  A.  I saw that as well as the one from Harvard
15  which caused me to answer the last question that you
16  asked as the way I answered it.  I had been under the
17  impression, since I signed up for those courses, that I
18  did attend and I did take those courses as I intended.
19  Apparently -- and I took a course.  Apparently, I did
20  not take a course at the institutions that I thought I
21  did.  I think your records in discovery actually showed
22  that I did register with one or both of the schools.  I
23  was registered to take the course, but I never completed
24  the course.  So somewhere along the line, I think I got
25  duped.

Page 70

```
 1   Q.      And that's when you determined she was a
 2   lunatic?
 3   A.      Yes.
 4   Q.      Okay.  And then after that point in time, did
 5   you begin communicating with her again?
 6   A.      Yes.
 7   Q.      When was that?
 8   A.      She threatened to kill herself.
 9   Q.      Okay.  What year was that?
10   A.      It was right after the -- the -- so, again, I
11   described my communication with Brie in three different
12   phases.  The first phase was during Joe's death and all
13   of that.  Dori finds out about that, says, hey, this is
14   inappropriate, you have to stop.  I go back to Brie and
15   I say, hey, I'm, you know, resigning from Riverside as
16   the coach.  Things are getting out of hand here.  Dori
17   found our communications, doesn't like them, and -- you
18   know --
19   Q.      You were hiding them from Dori; were you?
20           MR. KOLMAN:  Objection.  Can he finish
21   his answer?
22           MR. HINTON:  Uh-huh.
23           MR. KOLMAN:  Thank you.
24           THE WITNESS:  And -- I will answer that
25   question.  But -- and as I communicated those feelings
```

Page 71

```
 1   to Brie is when she threatened suicide.  And between you
 2   and I, I totally -- well, it's not you and I, I guess,
 3   anymore.  But I totally believed her.
 4   BY MR. HINTON:
 5   Q.      Well, were you keeping your text messages
 6   with Brie a secret from Dori?
 7   A.      Not the -- not through that first round when
 8   Dori found them, no.  Dori had full access to my phone
 9   at all times.  That's how she found them to begin with.
10           The second time after I started
11   recommunicating with Brie when she threatened suicide, I
12   felt like if -- I felt like I was betraying Dori --
13   Dori's trust telling her that, okay, I'll stop talking
14   to her.  And I felt like if Dori found me talking to her
15   again, she would have assumed something was happening
16   that wasn't.  I truly felt at the time that if -- after
17   Brie said that to me -- I had a choice at that time.  Go
18   to the police, go to her counselor or talk to her and
19   wait it out.  Try to tell her how good her life is and
20   be the person that could ultimately help change her
21   mental state.
22   Q.      Did you feel she was a lunatic at that stage
23   too?
24           MR. KOLMAN:  Asked and answered.  You
25   can answer it for the third time.
```

Page 72

```
 1           MR. HINTON:  I'm breaking it into stages
 2   here.
 3           THE WITNESS:  When somebody says to you,
 4   I'm going to tell your wife a lie so that she'll break
 5   up with you and I could be with you, anything they say
 6   after that point to me, yes, I think you're a lunatic.
 7   For you to even put that into words let alone think
 8   it -- for you to even put that into words, you've
 9   changed my opinion about you forever.  So yes, I
10   believed Brie was a lunatic then.  I believe she's still
11   a lunatic today.  That -- my opinion on that has not
12   changed.  In fact, it's gotten worse.
13   BY MR. HINTON:
14   Q.      And the second phase where you reconnected
15   with Brie, how did that end, that phase of your
16   relationship?
17   A.      Poorly.
18   Q.      Okay.  It wasn't -- it ended before you were
19   charged with crimes on July 9th, 2010, right?
20   A.      Yeah.
21   Q.      Okay.  How long before you were charged with
22   crimes did it end?
23   A.      I don't know how long before.  I could tell
24   you when it ended and how -- the circumstances.  But
25   dates, I don't remember how long before it would have
```

Page 73

```
 1   been.
 2   Q.      How did it end?
 3   A.      I, again -- Dori, for the second time, found
 4   me speaking to Brie.  And now this time she's not as
 5   nice about it.  She's actually pissed.  And she demanded
 6   that I stop because now, as I mentioned before, just as
 7   I thought, she thought something in addition to me
 8   being -- and I showed it to her.  I showed all the text
 9   messages.  So she knew, but she didn't care anymore.
10   She took me telling her that I stopped talking to her as
11   truth and I violated that trust by talking to Brie
12   again.  So it doesn't matter what the contents of the
13   conversation was, which Dori knew about which she
14   testified to last week.  But --
15   Q.      Were you meeting her in person as well?
16   A.      Let me finish.  But the way that it ended
17   with Brie in that second phase was me telling Brie that
18   Dori found out again, now she's threatening to leave me
19   and I'm not going to let that happen.  So I need to stop
20   talking to you.  That's when Brie threatened to go to
21   the police.  And I said, the police?  For what?  And she
22   told me what.  I believe I still have an old Instant
23   Messenger conversation saved with that particular
24   conversation.  It wasn't very long, but this was through
25   writing -- or reduced to writing in the form of Instant
```

1  were you ever alone with Brie in person?
2  A.    No.
3  Q.    Did you and Brie chat a lot by phone, not
4  text messages, verbal phone conversations?
5  A.    No. I believe there were one or two
6  occasions where a drunken Brie would call me at what
7  sounded like a party in the background, it was very
8  loud, lot of voices, a lot of music, and asked me to
9  purchase her alcohol.
10  Q.    And did you?
11  A.    No.
12  Q.    Did you ever meet her at Amanda Turoni's
13  house before you were arrested?
14  A.    I have been with Brie at Amanda Turoni's
15  house, yes, but I never met Brie at Amanda Turoni's
16  house.
17  Q.    What was the occasion you were with Brie at
18  Amanda Turoni's house before you were arrested?
19  A.    Christine Turoni, Amanda's mother, and Sam
20  Turoni were good friends with my parents growing up.
21  Again, all from Taylor. And I believe we were either
22  listing -- I was a Realtor at the time. We were either
23  listing or talking about listing their house on Claire
24  Drive. But I don't remember if that predated my
25  conversations through text with Brie or if it was

1  afterwards. I don't remember the year that that all
2  happened.
3  Q.    Is that the only time you were at Amanda's
4  house?
5  A.    No, I've been at Amanda's house dozens of
6  times.
7  Q.    Because of the --
8  A.    We were friends.
9  Q.    Your parents were friends with her parents?
10  A.    Uh-huh.
11  Q.    Correct?
12  A.    Yes. Sorry.
13  Q.    Amanda would be nine years younger than you,
14  right?
15  A.    Uh-huh. Correct.
16  Q.    So you weren't friends with Amanda in high
17  school; were you?
18  A.    No. No. Amanda was too young for me to
19  be --
20  Q.    Friends with?
21  A.    -- friends with at the time. I mean, we're
22  good friends now. But Nikki Turoni was Amanda's
23  sister -- older sister. I wouldn't say we were friends,
24  either, but we were more of the same age. I think Nikki
25  was two years younger than me -- grades younger than me.

1  Q.    Were you ever at Amanda's house that Brie was
2  there?
3         MR. KOLMAN: Asked and answered. You
4  can answer it again.
5         THE WITNESS: Asked and answered. Yes.
6         MR. HINTON: I don't recall an answer.
7         MR. KOLMAN: He did. He said he was
8  there.
9  BY MR. HINTON:
10  Q.    You were there, but --
11  A.    Brie was there when I was attempting to list
12  or listing Amanda's home for sale -- Christine's home
13  for sale.
14  Q.    So you weren't alone with Brie on that
15  occasion, there were other people there?
16  A.    Yes.
17  Q.    Okay. Other than that time with Brie and
18  other people being present, were you ever personally
19  with Brie anywhere?
20  A.    No. Not that I recall, no.
21  Q.    You never took her to houses that were -- you
22  had listed for sale?
23  A.    Absolutely not.
24  Q.    You were never in a car with her before you
25  were arrested on July 9th, 2010?

1  A.    I was in a car with her, yes, with Amanda and
2  Christine.
3  Q.    Okay.
4  A.    Not alone, though.
5  Q.    Okay.
6  A.    As far as I remember.
7  Q.    What was the occasion that you were in a car
8  with Brie, Amanda and Amanda's mother?
9  A.    I don't recall. I think it had something to
10  do with Sam Turoni. But I don't recall.
11  Q.    Okay. In the May 3rd, 2002 [sic] five-hour
12  long chat with the hate group that you referred to them
13  as --
14  A.    Not this one, the other one.
15  Q.    The other one.
16  A.    Yeah.
17  Q.    Remember that long, long chat you had with
18  them?
19  A.    Yes.
20  Q.    Do you remember calling Brie conniving in
21  that chat?
22  A.    Yes.
23  Q.    Okay. And that's how you feel about her, she
24  was conniving?
25  A.    Absolutely.

21 (Pages 78 - 81)

1  Q.    Has that ever changed?
2  A.    Has it ever changed?
3  Q.    Your feeling of her as a conniving person.
4  A.    No. She's conceived many different false
5  truths or half-truths in many different situations in
6  her life. Not just with me; in many other situations as
7  well. So no, I believe the definition of conniving
8  would be the way that Brie acts. Absolutely.
9  Q.    You believe she's a lunatic and conniving?
10 A.    Yes.
11 Q.    Now, let's look at your supplemental Answer
12 to Interrogatory in this case. Let's see. It's the
13 second tab.
14 A.    12-9-21?
15 A.    Yes.
16 A.    Okay.
17 Q.    Let's look at Number 27 of your Supplemental
18 Answer to Interrogatory. Do you see that?
19 A.    Yes.
20 Q.    And Attorney Kolman's office typed these up.
21 The details are these. "Plaintiff's best childhood
22 friend, Joe, was dating the victim." Is that a true
23 statement, that he was your best childhood friend?
24 A.    I wouldn't categorize it as be -- I had a lot
25 of best childhood friends. I wouldn't single out Joe as

1  the only one. I could probably name six what I
2  considered at the time best friends. Joe would happen
3  to be one of those several that I was referring to. But
4  yes.
5  Q.    And you were at his house?
6  A.    What?
7  Q.    Did you ever go to Joe's house as one of your
8  childhood friends?
9  A.    I don't remember being at Joe's house ever,
10 no. Joe moved a lot. I don't really remember being at
11 too many of my friends' houses, specifically Joe's.
12 Q.    Reading on in 27 of your supplemental answer,
13 "He was 21, she was 16. They were having a sexual
14 relationship. Plaintiff did not know this at the time,
15 but apparently there was a threat to expose Joe. As a
16 result, he committed suicide. The relationship between
17 plaintiff and the victim was only with respect to
18 discussions regarding Joe and his suicide." Is that
19 true and accurate?
20 A.    Everything you read is just true. I would be
21 forced to say that there was a threat to expose Joe
22 in -- according to what Brie told me, in Brie's state of
23 mind at the time. She not only threatened to break up
24 with Joe because of the impregnation of another girl,
25 but she also threatened to go to the police on Joe. Joe

1  being 21 at the time and her being 16 was a crime,
2  especially if they were sexually involved, which they
3  were which both sets of parents knew about as far as
4  I -- as far as Brie told me and I was aware. So yes,
5  everything other than you said there is true except the
6  fact that there was a threat to expose Joe as sleeping
7  with Brie as a minor.
8  Q.    But all of your conversations with Brie,
9  text, in-person, phone, whatever they were, it was
10 always about Joe?
11      MR. KOLMAN: Objection.
12 BY MR. HINTON:
13 Q.    You can answer.
14 A.    The content of our text messages was
15 primarily about Joe. I'm not saying that there couldn't
16 be a text message out there that said, hey, how's your
17 day going. That's not about Joe, that's to state of
18 mind. So little innuendos and small talk like that, I'm
19 sure, did exist but, truthfully, I don't remember the
20 exact content of the conversations. But I do know that
21 the primary focus of our conversations was about Joe
22 Strok.
23 Q.    Did -- in your conversations with Brie about
24 Joe Strok, did you talk about or communicate with her
25 about her having sex with Joe Strok?

1  A.    Yeah.
2  Q.    Okay. Did you think that was appropriate?
3      MR. KOLMAN: Objection.
4  BY MR. HINTON:
5  Q.    You can answer.
6  A.    No.
7  Q.    It was not appropriate?
8  A.    Well, at the time, I guess I didn't see
9  anything wrong with it, especially considering the fact
10 that Joe had just killed himself and she was grieving.
11 Looking back on it now, and not only just now but also
12 when I pled to my misdemeanor, I totally believed that
13 all of my communication with Brie was inappropriate; all
14 of it.
15 Q.    Because you were in -- a person of authority?
16 A.    I wouldn't say I was a person of authority,
17 no. I was a coach at a high school. But the fact that
18 I was in my 20s and Brie was still in high school,
19 that's inappropriate.
20 Q.    She was a freshman?
21 A.    She was a freshman.
22 Q.    And you're communicating with her about her
23 past sex with Joe Strok?
24 A.    I wasn't communicat -- well, I guess I was
25 communicating with her, but she could bring it up. And

22 (Pages 82 - 85)

**Page 114**

1 I thought that that would have been on my -- on my
2 hand -- I thought that would have been blood on my
3 hands. But I also thought that what I was providing to
4 Brie was better than what she was getting. That is why
5 I pled guilty to corruption of minors. That was not
6 true. I know that now, but I'm 40 years old. At 25
7 years, you don't know things.
8 Q.    Did Brie ever communicate to you that she was
9 thinking about suicide because of Joe Strok killing
10 himself?
11 A.    No.
12 Q.    Okay. It was only after you told her that
13 you needed to stop communicating with her that she
14 talked about suicide?
15 A.    To me, yes. I don't know if she had those
16 sentiments to other people. But yes, she never talked
17 about suicide to me until after our impending breakup in
18 her mind -- in her words.
19 Q.    Turn to your Answers to Interrogatories, Set
20 7. It's one of the tabs there. Set 7.
21 A.    Okay.
22 Q.    Do you see Number 10? I asked, "At what
23 locations did you have sex with Brie DuBorgel in the
24 year 2015?"
25 A.    Yes.

**Page 115**

1 Q.    And in 2015, you considered her a lunatic,
2 right? You've already testified that you've always
3 thought she was a lunatic; is that correct?
4 A.    I thought Brie was a lunatic, yes.
5 Q.    Yeah. In 2015 too?
6 A.    Yes.
7 Q.    Okay. And so you've testified on February
8 6th you had sex with her at least five times in and
9 around 2015, correct?
10      MR. KOLMAN: Objection.
11 BY MR. HINTON:
12 Q.    You can answer.
13 A.    I don't remember my testimony from that day.
14 If you showed it to me, I could clarify it or confirm it
15 but --
16 Q.    How many times did you have sex with her in
17 and around 2015? Yeah, 2015.
18 A.    First of all, I believe the year is wrong. I
19 did testify to that. But the more I thought about it
20 and looked back at events versus my encounters with Brie
21 at that time, the year is definitely wrong. But it
22 probably was less than five.
23 Q.    What year did you think it was that you had
24 sex with her?
25 A.    I'm pretty sure it was 2017. It would have

**Page 116**

1 been later 2017.
2 Q.    Okay. 2015 or 2017, you've testified you've
3 thought she's been a lunatic her --
4 A.    Oh, yeah. I thought she was a lunatic then,
5 yeah.
6 Q.    Okay. So you had sex with her how many times
7 in 2017?
8 A.    Under five.
9 Q.    Okay. And looking at this Answer to
10 Interrogatory, you mention having sex with her in
11 vehicles; is that correct?
12 A.    Yes.
13 Q.    Do you remember having sex with her anyplace
14 else other than vehicles?
15 A.    No.
16 Q.    Did you ever have sex with her at her
17 grandparents' house?
18 A.    No.
19 Q.    Her grandmother's house?
20 A.    No.
21 Q.    What --
22 A.    I don't know where --
23 Q.    Never been to any of her grandparents'
24 houses?
25 A.    No. I don't know where they live, any of

**Page 117**

1 them.
2 Q.    Do you remember having sex with her in any
3 apartments?
4 A.    No.
5 Q.    Any houses?
6 A.    Nope.
7 Q.    You never went to the apartment she shared
8 with Ciara O'Malley in Old Forge in 2014?
9 A.    No.
10 Q.    Okay. You were here during Ciara O'Malley's
11 testimony where she said you came to that apartment in
12 Old Forge.
13 A.    I was here during Ciara's testimony where she
14 perjured herself, yes.
15 Q.    Was that a lie by Ciara O'Malley saying you
16 came to that apartment?
17 A.    It wasn't a lie, it was perjury. But yes.
18 Q.    Why did you have sex with Brie in 2017 when
19 you're married and you thought she was a lunatic that
20 ruined your life in 2010?
21 A.    I was in a very bad mental place in 2017. I
22 had just cheated on my wife with Miranda. That's the
23 first time I've ever cheated on my wife and probably the
24 first time I've cheated on a partner maybe ever. I felt
25 as though my marriage was -- I was losing my marriage.

30 (Pages 114 - 117)

| Page 118 |
|---|
| 1   I tried very hard to gain it back. And every attempt |
| 2   that I made in trying to save the marriage was thwarted |
| 3   with aggressiveness by my ex-wife, Dori. So probably, I |
| 4   would say, out of frustration, sadness, aggravation, in |
| 5   fear of loss is why I started having sex with different |
| 6   women. I used sex at the time, I believe, as a crutch. |
| 7   Q.   Did you reach out to Brie to have sex with |
| 8   her? |
| 9   A.   No. I believe Brie reached out to me because |
| 10   she had heard Dori was leaving me. And around that time |
| 11   that Dori decided to leave, I was -- other than trying |
| 12   unsuccessfully to get Dori to come back, I was |
| 13   influenced by alcohol quite a bit, so I made some very |
| 14   poor decisions and one of them was engaging with Brie, |
| 15   the lunatic. |
| 16   Q.   Okay. Why did it happen repeatedly with |
| 17   Brie? Why did you repeatedly have sex with her? |
| 18   A.   It was good sex. |
| 19   Q.   Were you using her for sex? |
| 20   A.   Yes -- not just for sex. I wouldn't say |
| 21   using her for sex. So I'm going to say no to that if I |
| 22   can correct. I was using it as a medicine for loss. I |
| 23   was really messed-up then. |
| 24   Q.   And how did you break it off with Brie when |
| 25   you were having sex with her in 2017? |

| Page 119 |
|---|
| 1   A.   There was nothing to break off. They were |
| 2   casual encounters that I think we were both probably |
| 3   under the influence of alcohol. Me for certain and her |
| 4   probably; from what seemed to me, other drugs as well. |
| 5   But there was nothing to break off. It wasn't a |
| 6   full-blown relationship, so to speak, where you have to |
| 7   have a conversation and break up with the other party. |
| 8   It was just -- it sizzled. Went down to nothing. |
| 9   Q.   And you still thought she was a lunatic? |
| 10   A.   To this day, I think Brie is -- you know, I |
| 11   guess we would have to define lunatic, but I think Brie, |
| 12   based on her actions in particular to this case and up |
| 13   until recently with her affidavit, I think that Brie is |
| 14   totally mentally ill. |
| 15   Q.   And that's remained consistent throughout the |
| 16   entire time you've known her? |
| 17   A.   Pretty much. |
| 18   Q.   And -- so you were just using her for sex? |
| 19   A.   You already asked me that. |
| 20   MR. KOLMAN: Objection. Asked and |
| 21   answered. |
| 22   THE WITNESS: And what I said was, I |
| 23   wasn't using her for sex, so to speak. I think I was |
| 24   using her to cure something that was wrong with my mind. |
| 25   It was a distraction that I needed at the time. And |

| Page 120 |
|---|
| 1   Brie wasn't the only one. |
| 2   BY MR. HINTON: |
| 3   Q.   Who else? |
| 4   A.   Oh, Miranda. |
| 5   Q.   And who else? |
| 6   A.   I'd rather not admit to that today, but -- |
| 7   Q.   I just want to know how many affairs you had. |
| 8   A.   I wouldn't consider them affairs. |
| 9   MR. KOLMAN: Objection. |
| 10   BY MR. HINTON: |
| 11   Q.   Well, you were married. You were having sex |
| 12   with other people besides Amanda and Brie. |
| 13   A.   I was married, I was separated. I was |
| 14   separated. |
| 15   Q.   In 2017? |
| 16   A.   Yeah. I was kicked out. Dori testified to |
| 17   that last week. |
| 18   Q.   How long were you kicked out for? |
| 19   A.   Period of weeks. Probably three weeks. |
| 20   Q.   Did you have sex with Melissa, Jason Thomas's |
| 21   girlfriend? |
| 22   A.   Melissa -- Jason Thomas, the Realtor? |
| 23   Q.   Yeah. |
| 24   A.   Melissa Graziano? |
| 25   Q.   Yes. |

| Page 121 |
|---|
| 1   A.   No. |
| 2   Q.   How many other sex partners did you have |
| 3   while you were still married to Dori? |
| 4   MR. KOLMAN: Objection. |
| 5   BY MR. HINTON: |
| 6   Q.   You can answer. |
| 7   A.   While I was separated from Dori? |
| 8   Q.   Yes. |
| 9   A.   Under five. |
| 10   Q.   Okay. So you had five sexual partners up |
| 11   until the time she filed for divorce in March of 2021, |
| 12   correct? During the marriage. |
| 13   A.   Yes. |
| 14   Q.   Let's go to ST1580. |
| 15   A.   1580? |
| 16   Q.   Yes, 1580. Looking at ST1580, is this a post |
| 17   you made to your Telegram page? |
| 18   A.   No. |
| 19   Q.   Are you the Real Phil Godlewski 3.0? |
| 20   A.   Nope. |
| 21   Q.   So is it your belief that the text messages |
| 22   in your criminal case from 2010 were made up by 13- and |
| 23   14-year-old girls? |
| 24   MR. KOLMAN: Objection. |
| 25   THE WITNESS: I don't know who made up |

31 (Pages 118 - 121)

**Page 142**

1  credit card's declined?
2  A.    I don't remember. Could have been the phone
3  or it could have been through text. I don't remember.
4  Q.    Look at the exhibit Scranton Times ST1829,
5  please. Is this the -- a copy of the certificate that
6  you had hanging on your wall in one of your homes?
7  A.    I believe so, yes.
8  Q.    This is the one that got lost when you moved
9  to Shavertown?
10  A.    Yes.
11  Q.    And this is the one I was asking you to
12  produce rather than me using a --
13  A.    Photo.
14  Q.    -- photo of your videos?
15  A.    Yes.
16  Q.    And where did you get this document that was
17  hanging on your wall?
18  A.    It was mailed to me.
19  Q.    Okay. And when was that?
20  A.    Shortly after I completed the course which I
21  thought was at Harvard University Business School.
22  Q.    You got duped, right?
23  A.    I think so.
24  Q.    Yeah. And you read the Harvard testimony
25  from the two witnesses from Harvard that said, we don't

**Page 143**

1  hand out certificates that look like this?
2  A.    Yeah, I can't argue with their testimony. I
3  mean, they are the institution. So I'm not going to
4  argue against that. But I did have this document, this
5  document was sent to me in this frame. It was a classy
6  frame, too. It wasn't something that you get at
7  Wal-Mart.
8  Q.    So Harvard sent you not only the document,
9  they sent you the frame too?
10       MR. KOLMAN: Objection.
11       THE WITNESS: I didn't say Harvard sent
12  me anything. Apparently Harvard did not send me
13  anything at all because I didn't take a class there.
14  BY MR. HINTON:
15  Q.    Right.
16  A.    But this was sent to me, yes, the frame
17  included.
18  Q.    With the frame included?
19  A.    Yeah.
20  Q.    Okay. Back to 513 and then we'll take a
21  break for lunch. 513. Moceyunas.
22  A.    Oh, 513.
23  Q.    Yes.
24  A.    Got it.
25  Q.    So about ten lines from the bottom, Mr.

**Page 144**

1  Moceyunas writes, "He said that he doesn't speak to her
2  anymore and he hadn't in weeks." And he's referring to
3  you, whether you're speaking with Brie anymore. Did you
4  tell him on January 8th that you don't speak to her
5  anymore and hadn't in weeks?
6  A.    Yeah. So this conversation with Mr. Mo
7  happened after Brie had threatened me with police.
8  That's when I stopped speaking to her.
9  Q.    Right.
10  A.    And subsequently, the conversa -- I thought
11  it was over after that, but it wasn't. And that's when
12  I had this conversation with Mr. Mo.
13  Q.    And the second-to-the-last line he says,
14  "Make sure he has no contact or conversations with her.
15  I told him to make sure he has no contact or
16  conversations with her." Do you see that?
17  A.    Yes.
18  Q.    And do you remember him telling you that?
19  A.    Yes.
20  Q.    And did you listen to him?
21  A.    Yes. A few weeks later, my resignation was
22  accepted. Only, the next time, I believe, I started
23  communicating with Brie would have been when I had heard
24  that there was an investigation into me. And then I was
25  really pissed.

**Page 145**

1  Q.    Okay. So is it fair to say that you heard
2  about the investigation into you by the police about a
3  year later, 2010?
4  A.    I wouldn't say a year later. I think -- I
5  remember hearing about it and then a long period of time
6  passing before I got arrested. So this was in what,
7  February of 2009? So it would have definitely been
8  after February of 2009 but before July of 2010. But I
9  remember it felt like a long time passing before I heard
10  anything at all, so I didn't think anything was
11  happening. And then, suddenly, I got arrested.
12       MR. HINTON: Okay. Let's take a break
13  for lunch.
14       THE WITNESS: Yes.
15       THE VIDEOGRAPHER: We are going off the
16  record. The time is 12:11 p.m.
17       (A luncheon recess was taken from 12:11 p.m.
18       until 1:02 p.m.)
19       THE VIDEOGRAPHER: We are back on the
20  record. The time is 1:02 p.m.
21  BY MR. HINTON:
22  Q.    Phil, we had spent a good bit of time talking
23  about Mr. Moceyunas's memo dated January 8th, 2009
24  and -- where he reports that you told him you don't
25  speak to Brie anymore and hadn't in weeks, right?

37 (Pages 142 - 145)

**Page 194**

1 intelligence community at a very, very young age." Were
2 you trying to make the impression that you were one of
3 those people recruited at a very, very young age?
4 A.    I wasn't trying to make any impression at
5 all. The words are what they are.
6 Q.    What did you mean by it?
7 A.    I meant -- can you -- I meant what I said.
8 At very young ages, people get recruited to the
9 three-letter agencies.
10 Q.    Okay. But what does that have to do with
11 you?
12 A.    Nothing.
13 Q.    Well, the que -- you went off on this long
14 paragraph here, the question from the writer of the
15 article or interviewer was, "What more about your
16 background can you share with us?"
17 A.    Uh-huh.
18 Q.    And you went into this speech, I guess, about
19 how the CIA or the intelligence recruits people at a
20 very young age. Were you trying to make the impression
21 that you were one of those people?
22         MR. KOLMAN: Asked and answered.
23         THE WITNESS: You asked me that three
24 times now and the answer is no. I wasn't trying to make
25 that impression. I was asked about my background and

**Page 195**

1 what I thought was more pertinent to the article. And I
2 wanted to put what I knew from my background or from my
3 expertise into writing and I thought it was a good fit
4 for the article.
5 BY MR. HINTON:
6 Q.    Did you think of -- Brie, who you labeled a
7 lunatic today, did you think of her as your sister?
8 A.    As my sister?
9 Q.    Yeah.
10 A.    No.
11 Q.    Did you think you were a father figure for
12 Brie at any point in time?
13 A.    A father figure; I may have thought that for
14 a brief period of time.
15 Q.    What period of time did you consider yourself
16 to be a father figure for Brie?
17 A.    Brie, throughout her life, has had a lacking
18 male adult figure in her life starting from when her
19 parents got divorced at a young age. I think she was
20 always -- my opinion, I think she was always reaching
21 for some sort of older person to have in her life --
22 older male person to have in her life. I think one of
23 those people were me. Another was Tom Nezlo. Another
24 was the teacher at Lackawanna that she recently slept
25 with and got expelled for. So I think she's always

**Page 196**

1 wanted that father figure in her life. So I think over
2 the years of my relationship with Brie -- and I can say
3 this now but I couldn't say it earlier, you know, in
4 that relationship, I think that I've recognized or
5 realized the fact that I may have been a father figure
6 for her even though, at the time, I didn't necessarily
7 know it.
8 Q.    Did you know it when you were sleeping with
9 her in 2017?
10 A.    I didn't know much about that period in 2017.
11 My wife was leaving me, my kids hadn't -- you know, my
12 kids were young. I faced a potential divorce while
13 having infants at home. So I was a little distraught,
14 so I really wasn't thinking about anything but sex. It
15 was a mistake and I regret it.
16 Q.    You didn't make a similar mistake in 2009 and
17 2010; did you?
18         MR. KOLMAN: Objection.
19 BY MR. HINTON:
20 Q.    You can answer.
21         MR. KOLMAN: Asked and answered.
22         THE WITNESS: I don't know what you're
23 referencing, so I'd have to say no.
24 BY MR. HINTON:
25 Q.    In the transcript in front of Judge Minora on

**Page 197**

1 February the 6th, Page 138.
2 A.    Okay.
3 Q.    You see at the top the answer says, "At some
4 point last year, Brie was..." Do you see that page?
5 A.    Yes.
6 Q.    Phil, your testimony -- you're the person
7 answering the questions here. A little bit above the
8 middle of the page on Page 138 of this transcript you
9 say, "I always felt like I was a brother to Brie and I
10 always felt that it was somehow my responsibility to
11 help her if I could. We've had, obviously, some very
12 well-known public episodes with one another. But in the
13 grand scheme of things, we always seem to have each
14 other's backs." Did I read that correctly?
15 A.    Yes.
16 Q.    In what way did Brie have your back?
17 A.    Support through hard times that I was having
18 professionally and in my marriage. It was, as I stated,
19 a brother-sister-like relationship. I don't have a
20 brother or sister, so I could only speak to what I think
21 that would mean. But I do see now -- when I said this
22 in February, I do see the relationship that my sons have
23 with one another. The first person they go to, even
24 before me or their mom, is each other when there's --
25 when they have even a small problem in life. So I

50 (Pages 194 - 197)

Page 210

1 business. My response to Sunita was that my business is
2 better than it ever had been. In 2020, I was the top
3 real estate agent in the Greater Scranton Board of
4 Realtors.
5 Q.    I saw a 1099 from 2020 from Sunita for
6 $136,000. Is that what you made in 2020?
7 A.    Maybe it was 2019. When was COVID?
8 Q.    2019, your property went into foreclosure,
9 the land that you owned.
10 A.    It was 2020.
11 Q.    How much did you make in 2020?
12 A.    On one transaction, I made $90,000. What I
13 made from the rest, I don't remember. It could have
14 been 140 whatever you said, but I don't have a document
15 in front of me.
16 Q.    You're claiming you were the number one
17 Realtor in Lackawanna County?
18     MR. KOLMAN: Objection. Asked and
19 answered.
20     THE WITNESS: You're not -- you're
21 taking what I said in terms of income for some reason.
22 That's not what I said. When you're ranked as Realtor
23 in the Board, it's by total sales. I had 17 million.
24 In fact, I was just about to put a billboard up -- in
25 fact, I paid for the billboard and then the article came

Page 211

1 out by Chris Kelly.
2 BY MR. HINTON:
3 Q.    You've posted on social media that you have
4 no intention of ever going back to real estate. Isn't
5 that correct?
6 A.    Absolutely not. I did state that. I have no
7 intention of going back. Absolutely not.
8 Q.    You like what you're doing now?
9 A.    I like -- I like my career. I like my
10 lifestyle. I like helping people as much as I possibly
11 can. Real estate was a totally different employment
12 than what I do now. It was the opposite, in fact.
13 Q.    As a reporter and journalist, do you have a
14 code of ethics that you adhere to?
15 A.    Of course.
16 Q.    And does that code of ethics include being
17 fair, honest and accurate?
18 A.    Yes. As much as possible, sure.
19 Q.    And in your view, do you provide the truth to
20 your viewers?
21 A.    Yes.
22     MR. HINTON: Let's take a break.
23     THE VIDEOGRAPHER: We are going off the
24 record. The time is 2:33 p.m.
25     (A recess was taken from 2:33 p.m. until 2:49 p.m.)

Page 212

1     THE VIDEOGRAPHER: We are back on the
2 record. The time is 2:49 p.m.
3 BY MR. HINTON:
4 Q.    Phil, in this case here, you have stated your
5 position that you never had sex with Brie when she was a
6 minor, correct?
7 A.    Correct.
8 Q.    And how -- and she has produced an affidavit
9 saying she did have sex with you when she was a minor.
10     MR. KOLMAN: Is that a question?
11 BY MR. HINTON:
12 Q.    Yes.
13 A.    Yes.
14 Q.    And what evidence do you have that you didn't
15 have sex with her when she was a minor?
16     MR. KOLMAN: Objection.
17 BY MR. HINTON:
18 Q.    He can answer.
19     MR. KOLMAN: Objection.
20     MR. HINTON: I'm just asking if he has
21 any evidence.
22     THE WITNESS: You want me to prove --
23     MR. KOLMAN: Why does he have evidence
24 for a negative?
25     MR. HINTON: I'm just asking if he has

Page 213

1 any. If his position is you prove that I did it.
2     THE WITNESS: Can I give you an example
3 of -- when you ask me that question, can I give you an
4 example of what I think of?
5 BY MR. HINTON:
6 Q.    No. Phil, I --
7 A.    And then I'll answer it. But I don't think
8 you quite get it.
9 Q.    Go ahead.
10 A.    If I had a watermelon and I brought it in and
11 I put it right here and I put a knife next to it and I
12 said, Tim, the inside of that watermelon is blue. Until
13 you cut the skin, you slice the watermelon in half,
14 opens up, it's pink. And I say, No, I was right.
15 How are you going to prove that it was blue? How am I
16 going to prove that it was blue? You can't. I can't
17 prove that something didn't happen in this case. Chris
18 Kelly said that it happened.
19 BY MR. HINTON:
20 Q.    Right.
21 A.    He supposedly has proof as a journalist since
22 he put it in a major publication that it happened.
23 You've got to prove it. I can't prove that it didn't.
24 I'm suing Brie for her affidavit. You know that.
25 That's also defamatory and it's been made public by you.

54 (Pages 210 - 213)

**Page 226**

1    A.    No, not that I'm aware of.

2    Q.    Did you ever meet him in person?

3    A.    I think he was at events that I was at. I

4    don't know if I would say I met him per se, but he would

5    go to the -- there was an event up here at the Cultural

6    Center that I saw him at. He's a prominent reporter in

7    the area, so I knew of him. I have seen him at various

8    places. I think I saw him at the Italian Festival. I'd

9    say, what's up, Chris? He probably didn't know who I

10   was -- or maybe he did. I don't know. But he's a

11   popular guy.

12   Q.    Did you ever have any problems with him in

13   the past?

14   A.    Oh, yeah. I think his reporting is terrible.

15   I didn't have any problems personally with him.

16   Q.    Yeah.

17   A.    But in the sense of being a reporter, I think

18   he's awful.

19   Q.    Okay. You just think he's too liberal or

20   what is it?

21   A.    No, he's just -- he's a terrible person.

22   When he writes article, he lies --

23   Q.    Okay.

24   A.    -- about the people in the articles and I

25   think he sets out to destroy people's lives. And

**Page 227**

1    that's -- I guess that's my personal opinion, but it's

2    based on things that he's done to people in the past.

3    Q.    Well, do you -- do you think Chris disliked

4    you before this text message with you?

5    A.    I have no idea. He may have.

6    Q.    Are you claiming that Chris Kelly was sloppy

7    and should have done a better job investigating your

8    criminal case from 2010 and 2011?

9    A.    Sloppy?

10   Q.    Yeah.

11   A.    He said I slept with a 15-year-old girl and I

12   didn't. I went through the arrest of all of this and

13   the case went through litigation and was litigated. All

14   he had to do was research that. So sloppy wouldn't even

15   be the word I would use. It's the most extreme version

16   of sloppy.

17   Q.    Well, if you look at your charging document,

18   right, ST616.

19   A.    Okay.

20   Q.    Here's the charge for corruption of minors

21   under 6301(a)1. You're charged as follows: "In that on

22   or about January 2008 to present, the defendant, Philip

23   Godlewski, being 18 years of age and upwards, did

24   corrupt or intend to corrupt the morals of the

25   victim..." it's blacked out, the name underneath that is

**Page 228**

1    Brienna DuBorgel "...a minor under the age of 18 by

2    engaging in acts of sexual intercourse or aided,

3    abetted, enticed or encouraged a minor in the commission

4    of a crime or knowingly assisted or encouraged such

5    minor in violating his or her parole or court order in

6    violation of Section 6301(a)1 of the Pennsylvania Crime

7    Codes." It's an M1. "To wit, the defendant, Godlewski,

8    did engage in sexual intercourse with a minor child

9    victim under the age..." and on the next page, 617, it

10   says 16 years old.

11           MR. KOLMAN: Objection.

12   BY MR. HINTON:

13   Q.    Is that what the charging document in the

14   Criminal Complaint against you reads?

15   A.    That's what the charging document reads.

16   Q.    It claims that you had sex with a minor?

17           MR. KOLMAN: Objection.

18           THE WITNESS: That was the charge.

19   BY MR. HINTON:

20   Q.    Right.

21   A.    Anybody could be charged with anything at any

22   time.

23   Q.    Right.

24   A.    They have to prove that that happened. They

25   did not.

**Page 229**

1    Q.    But a lot of cases -- you understand, a lot

2    of criminal cases are disposed of through a plea

3    bargain?

4           MR. KOLMAN: Objection.

5           THE WITNESS: I don't agree with that.

6    BY MR. HINTON:

7    Q.    You don't think a lot of cases are disposed

8    of?

9    A.    What percentage?

10   Q.    I don't know. But a lot of cases --

11   A.    Well, I don't know either. If you don't

12   know, how could I know?

13   Q.    Okay.

14   A.    If you could say, hey, by statistical

15   probability, 78 percent of cases are dismissed by a plea

16   bargain and, therefore, that means that the accused is

17   actually guilty of the crimes that he did not agree to.

18   If you could throw me that stat, show me paperwork on

19   that, I would agree with you. But the way you

20   categorized it, absolutely not.

21   Q.    Phil, when you were arrested, it was for

22   having sex with a minor.

23   A.    It was for many things.

24   Q.    Well, other than witness intimidation --

25   A.    Criminal use of communication facility.

58 (Pages 226 - 229)

Page 234

1  prosecute all of those charges except the corruption of
2  minor charge. Then if you know that I pled to an M1
3  corruption of minor, all you have to do is go to the
4  statute, Code 6301. It tells you exactly what the
5  charge involves.
6  Q.    It shows you the underlying act of how you
7  corrupted Brie?
8  A.    No, but the guilty plea colloquy could have.
9  Q.    But it didn't.
10 A.    Oh, sure it did. Do you want to ask me about
11 the guilty plea colloquy?
12 Q.    Yeah. Yeah.
13 A.    Let's do it.
14 Q.    All right. Phil, turn to 584, please.
15 A.    Okay.
16 Q.    Phil, is this your handwriting?
17 A.    No.
18 Q.    You didn't fill out the form?
19 A.    No.
20 Q.    Is that your signature on the bottom of the
21 page?
22 A.    No, that's my initials.
23 Q.    Okay. Did you review each page and put your
24 initials on them?
25 A.    Yes.

Page 235

1  Q.    And then you signed on Page 3 of the guilty
2  plea colloquy?
3  A.    Yes.
4  Q.    And then on the last page, Judge D'Andrea
5  signs you. Did you initial that page too?
6  A.    Yes.
7  Q.    And it's dated November 12th, 2010, correct?
8  A.    Correct. Yep.
9  Q.    And you entered this guilty plea colloquy on
10 that date, right, November 12th, 2010?
11 A.    I don't recall, but it's dated that date. I
12 don't think I would sign something if it were a
13 different -- I do see a little weird 11-12-10 in the
14 margin. I don't know if that was added before or after.
15 So I can't speak to the date, but I could speak to the
16 authenticity of the document.
17 Q.    And you read the entire document when you
18 initialed each page and signed it at the end, right?
19 A.    It was read to me.
20 Q.    Okay. All right. So in the first -- what's
21 your full name and it's Philip Godlewski, right?
22 A.    Yes.
23 Q.    "Do you wish to plead guilty to the charge of
24 corruption of minors," correct?
25 A.    Yes.

Page 236

1  Q.    And you said yes. And it says, "How old are
2  you," correct?
3  A.    Correct.
4  Q.    You put your age 27.
5  A.    Yes.
6  Q.    Next question, "How far did you go in
7  school," and it says, "College grad."
8  A.    Yes.
9  Q.    Now, that's not true; is it?
10 A.    No.
11 Q.    Did you -- did you -- you reviewed this page,
12 right?
13 A.    I did. I don't know why Joe wrote that.
14 Q.    Well, you reviewed it after he wrote it,
15 right?
16 A.    I reviewed it while we were viewing it. So
17 when we would get to the end of the page, I initialed it
18 and we moved on. I don't know if -- I don't know why
19 Joe wrote that. I acknowledged, though, that by
20 initialing it, I agreed to it. But at that time, I had
21 no graduation criteria from any college.
22 Q.    Right.
23 A.    So I don't know why that's in there.
24 Q.    It's a falsehood to the court, right?
25       MR. KOLMAN: Objection. It speaks for

Page 237

1  itself and you asked -- asked it and you're being
2  argumentative. So please --
3       THE WITNESS: I wouldn't say it's a
4  falsehood to the court at all.
5  BY MR. HINTON:
6  Q.    Well, this is --
7  A.    It could very easily say on that line I had
8  no schooling and it wouldn't have mattered to the court.
9  It's absolutely of zero relevance. That's probably why
10 Joe never corrected it to begin with.
11 BY MR. HINTON:
12 Q.    But it's false?
13       MR. KOLMAN: Okay. It's false.
14       THE WITNESS: All right. Yeah, it's
15 false, like I said.
16 BY MR. HINTON:
17 Q.    Next question, "Do you read and write English
18 language?" "Yes." That's correct, right?
19 A.    Yes.
20 Q.    "Have you had an opportunity to read the
21 charges pending against you?"
22 A.    Yes.
23 Q.    And this is before the information is even
24 prepared; is that right? If I look at 588, that
25 information is not even filed until November 16th, 2010.

60 (Pages 234 - 237)

**Page 238**

1  So this is filled out four days before the information.
2  A.      If those dates are accurate, then yes. But I
3  can't speak to when that was stamped. And I also did
4  not sign -- I don't think a judge could actually sign
5  this document.
6  Q.      What's "this document"?
7  A.      I'm sorry. ST588. I don't think a judge is
8  allowed to sign that in the absence of the guilty plea
9  colloquy. A judge needs to have this document first.
10  Q.      Going back to 584, 5B says, "Therefore, do
11  you know exactly what you are charged with and what you
12  are pleading to?" You said "Yes," correct?
13  A.      Correct.
14  Q.      Next question, "Have you ever been in a
15  mental institution or received treatment for mental
16  disease?" And you said "No."
17  A.      Correct.
18  Q.      Number seven, "Have you had any alcoholic
19  beverages or drugs within the last 24 hours?" And you
20  answered "No."
21  A.      Correct.
22  Q.      Number eight, "Have you fully discussed your
23  case with your attorney and are you fully satisfied that
24  he knows all the facts of your case and has had
25  sufficient time to look into the questions either he or

**Page 239**

1  you may have about your case?" You answered "Yes."
2  A.      Correct.
3  Q.      8A is, "Are you satisfied with your
4  attorney?" You answered "Yes."
5  A.      Correct.
6  Q.      Nine, "Do you understand that even though you
7  are guilty or may be guilty, you are presumed innocent
8  and have a right to go to trial either before a judge or
9  before a jury of 12 individuals and the Commonwealth
10  must prove to the satisfaction of each and every one of
11  the 12 jurors or to the satisfaction of the judge that
12  you are guilty beyond a reasonable doubt?" You answered
13  "Yes."
14  A.      Correct.
15  Q.      Nine, "Do you understand that you and your
16  attorney have a right to participate in the selection of
17  a jury?" That's not answered.
18  A.      Correct.
19  Q.      Ten, "Do you understand that if you want to
20  go to trial, your attorney will be permitted to
21  cross-examine the Commonwealth's witnesses and to call
22  witnesses on your behalf? And if you plead guilty, you
23  will lose the right to call witnesses or to
24  cross-examine the Commonwealth witnesses?" And you
25  answered "Yes."

**Page 240**

1  A.      Correct.
2  Q.      Number 11, "Do you understand that by
3  pleading guilty, you are admitting that you did things
4  you are charged with and that if you plead not guilty,
5  the Commonwealth cannot force you to take the stand and
6  either admit or deny that you did the things you are
7  charged with?" And you answered "Yes"?
8  A.      Correct.
9  Q.      Number 12, "Do you understand that by
10  pleading guilty, you are giving up your right to appeal
11  any question in this case except for those concerning
12  the right of this court to try you (jurisdiction over
13  the subject matter) or the legality of or propriety of
14  the sentence imposed?" And your answer was "Yes."
15  A.      Correct.
16  Q.      Number 13, "State specifically in detail any
17  plea agreement with the district attorney." And
18  handwritten here is, "Plea to corruption of minors.
19  Agreed sentence, three months home confinement to 23
20  months. All other counts dismissed." That was part of
21  your plea agreement, correct?
22  A.      Exactly.
23  Q.      Okay. So part of your agreement is if you
24  plead guilty to corrupting Brie's morals and do three
25  months of home confinement and another 23 months of

**Page 241**

1  parole, they will drop all the other charges against
2  you, correct?
3  A.      Correct.
4  Q.      No judge dismissed all the other charges
5  against you, it was part of a plea deal, correct?
6           MR. KOLMAN: Objection. So what?
7           MR. HINTON: I'm asking --
8           MR. KOLMAN: You know what?
9           MR. HINTON: Do you have another
10  objection, Tim?
11           MR. KOLMAN: Let me put another
12  objection on the record.
13           MR. HINTON: Tim --
14           MR. KOLMAN: You are attempting to smear
15  my client through innuendo. You're --
16           MR. HINTON: Tim --
17           MR. KOLMAN: -- attempting to bootstrap
18  elements of this criminal case to try to prove that he
19  had sex with Brie, which he didn't have. And the
20  documents you have and the criminal documents that you
21  have do not in any way reflect that. In fact, they
22  reflect the very opposite.
23           MR. HINTON: Tim, your objection's
24  noted.
25           MR. KOLMAN: Thank you.

61 (Pages 238 - 241)

Page 250

1  details to the case, it would have been in the guilty
2  plea colloquy. It does not exist in the guilty plea
3  colloquy. That's what went to the judge's desk. And
4  the judge put that in his document that he signed.
5  Q.    Phil, are you saying that because there's no
6  facts of how you corrupted Brie, then it never happened?
7          MR. KOLMAN: Objection.
8          THE WITNESS: That's not what I said at
9  all.
10 BY MR. HINTON:
11 Q.    Okay. Would you agree with me that there are
12 no facts at all in your guilty plea as to how you
13 corrupted Brie?
14 A.    I agree with that, yes. Zero facts.
15 Q.    Okay. So that doesn't -- does that give you
16 the license to state after the fact how you corrupted
17 Brie?
18         MR. KOLMAN: Objection.
19         THE WITNESS: I'm telling you in my
20 opinion how I corrupted Brie.
21 BY MR. HINTON:
22 Q.    Right. Right.
23 A.    That's my opinion.
24 Q.    Right.
25 A.    The statute speaks for itself. I don't have

Page 251

1  to interpret this statute. The statute says I corrupted
2  or intended to corrupt a minor under the age of 18 by
3  doing the next couple lines, aids, abets, entices,
4  encourages such minor in the commission of any crime and
5  knowingly assists or encourages any minor in violating
6  his or her parole to the court commits a misdemeanor of
7  the first degree. I pled to a misdemeanor of the first
8  degree.
9  Q.    Right.
10 A.    I didn't plead to a misdemeanor of the second
11 degree or the third degree. I didn't plead anything
12 else other than exactly what that paragraph says right
13 there. That's what I pled to. Now, there's nothing in
14 the case file -- and you know this but you didn't know
15 this before. There's nothing in the case file that says
16 my offense was tied to a specific sexual act. Had it
17 been, it would have been number one in the guilty plea
18 colloquy. Number two, my attorney had the right to tell
19 me about it. In fact, my attorney, on the morning of
20 sentencing, told me the opposite. He said -- I insisted
21 that there's no language in there that has anything to
22 do with sexual activity. I, therefore, went ahead and
23 pled. Now, you could assume all you want that it was
24 sexual activity tied to the Misdemeanor 1, but you have
25 to prove it when I'm suing for defamation. And you

Page 252

1  can't because it never happened.
2  Q.    But you can't prove that it --
3  A.    I don't have to prove anything. It's the
4  watermelon thing again.
5  Q.    Okay.
6  A.    I can't prove a negative.
7  Q.    So we're in a -- we're in a quandary --
8  A.    Yeah, we're going to a jury. You're right.
9  Let's see what they think.
10 Q.    -- because -- because it's in that middle
11 ground of nobody can prove it.
12 A.    Let's see if a jury believes me and my team.
13 Q.    Or believes Brie.
14 A.    Or believes Brie and Chris Kelly. I'm
15 perfectly fine with a jury deciding this case because
16 I'm in the right. Now, if a jury says that I'm wrong
17 and they believe the stuff that you're putting forward,
18 I lose.
19 Q.    Right.
20 A.    That's how court works. So let's see.
21 Q.    Okay. Phil, is Brie's birthday ██████
22 ██, 1993?
23 A.    I don't know her birthday. I know she was
24 born in September. That's about all I know.
25 Q.    Okay. When Principal Moceyunas questioned

Page 253

1  you about Brie and he put in his memo that she's 15
2  years old, he apparently told you that in the phone
3  call, right? That she's a 15-year-old girl.
4  A.    Yes. If it's in his memo, I have no reason
5  to question it. Mr. Mo's --
6  Q.    Well, when you started communicating with
7  Brie over Facebook or whatever, did you know at that
8  time she was 15 years old -- or 14 -- 14 or 15?
9  A.    I don't think she was 14. I think I only
10 ever communicated with Brie after she had turned 15.
11 Q.    Fifteen. Okay. And when she's 15, you're
12 25, right?
13 A.    There was I, think, a little less than nine
14 years' separation between her and I.
15 Q.    Well, let's do the math. You're born in --
16 A.    ████ of '83.
17 Q.    '83. And she's born in ████████ of '93.
18 A.    Yeah.
19 Q.    So that's ten-years-and-three-months.
20 A.    Yeah.
21 Q.    So you're ten-years-and-three-months older
22 than she is.
23 A.    Yes.
24 Q.    Okay. And when Joe D'Andrea came -- I think
25 you described it as you walked back into the

64 (Pages 250 - 253)

Page 274

1  Q.      Did it make you mad?
2  A.      Mad? Yeah. Yeah. Motivated and angry.
3  Q.      So let's go to a clip here. We're going to
4  put up Clip 49.
5          (Video clip being played.)
6  BY MR. HINTON:
7  Q.      So, Phil, we just played a clip here about
8  the bail for your criminal case for the charges
9  involving Brie.
10 A.      Uh-huh. Yes.
11 Q.      And was that your voice in the clip?
12 A.      Yes.
13 Q.      And those were your statements?
14 A.      Yes.
15 Q.      That you and your family put up 250,000 cash
16 ball?
17 A.      Yes.
18 Q.      And if we look at ST776, please. Phil,
19 that's collateral mortgage taken out by Cutting Edge
20 Bail Bonds, LLC. Do you see that?
21 A.      Yes.
22 Q.      And is that your signature on that document?
23 A.      Yes.
24 Q.      And did you take out a mortgage on your house
25 to get bail, you and Dori?

Page 275

1  A.      Yes.
2  Q.      And were you here for Marie's deposition that
3  she took out a mortgage on her house too so you could
4  get bail?
5  A.      Yes.
6  Q.      And you guys pledged your houses for bail,
7  you didn't put up 250,000 in this case; isn't that
8  correct?
9  A.      Correct.
10 Q.      So what you told the hate group in May of
11 2022 was incorrect; is that true?
12 A.      Yes. Purposely.
13 Q.      So you purposely lied to those people about
14 this situation?
15 A.      No, that's not what I said.
16 Q.      Well, you said purposely.
17 A.      Yeah.
18 Q.      What did you mean?
19 A.      Purposely -- this hate group were kings and
20 queens of discovering documents that were connected to
21 me in any way, shape or form. This particular document
22 has multiple names on it; my name, Dori's name, my
23 mother's name. And I thought that they
24 would harass those involved with me just like they've
25 been doing for the last couple years now because of the

Page 276

1  article that Chris Kelly wrote. So my white lie was an
2  attempt to protect the group from trying to expose
3  anything further.
4          MR. HINTON: Okay. Let's go to the next
5  clip. Putting Clip 14 up.
6          (Video being played.)
7  BY MR. HINTON:
8  Q.      So, Phil, that clip -- and here we have a
9  picture of your Harvard certificate. Was that your
10 voice on that clip?
11 A.      It sounded like my voice was actually edited
12 a little bit. I don't know where that video came from,
13 but it sounded weird. But I did say that.
14 Q.      You did say you had a Harvard degree?
15 A.      Yes.
16 Q.      And you were sporting a Harvard sweatshirt?
17 A.      Well, I think that's why they asked me the
18 question. I didn't just volunteer that information.
19 That was a Q&A session and I was wearing the Harvard
20 shirt that I had purchased. So I think that's what
21 caused somebody to ask that question.
22 Q.      And so it wasn't correct, though, right? You
23 did not have a Harvard degree?
24 A.      From what I understood it at the time when I
25 said it, I did think I had a degree. And then when all

Page 277

1  of the backlash came because of that comment, I realized
2  what I actually had was a certificate and not a degree.
3  But I referred to the picture that you just put on the
4  screen that I had on the wall behind me as a degree, but
5  it was not.
6  Q.      Okay. And you said in that video that you
7  have many degrees.
8  A.      The way I said that was anecdotal. It was,
9  kind of, I have "many" degrees. Kind of, like that. If
10 you re-listen to it, you'll hear the emphasis that I put
11 on that.
12 Q.      So you weren't being serious, right?
13 A.      I was being -- trying to be funny again. I'm
14 not really that funny. Sometimes my humor gets taken
15 the wrong way. I don't have many degrees. That's
16 something that I addressed later in that video. And,
17 again, that's why these videos are all out of context.
18 Because if you'd play that for another hour, you'll most
19 likely hear me say what I actually -- what the truth
20 actually was.
21 Q.      You don't have any college degrees, though,
22 right?
23 A.      No.
24 Q.      My statement's correct; yes?
25 A.      Yes, your statement's correct.

70 (Pages 274 - 277)

Page 250

1  details to the case, it would have been in the guilty
2  plea colloquy. It does not exist in the guilty plea
3  colloquy. That's what went to the judge's desk. And
4  the judge put that in his document that he signed.
5  Q.    Phil, are you saying that because there's no
6  facts of how you corrupted Brie, then it never happened?
7        MR. KOLMAN: Objection.
8        THE WITNESS: That's not what I said at
9  all.
10 BY MR. HINTON:
11 Q.    Okay. Would you agree with me that there are
12 no facts at all in your guilty plea as to how you
13 corrupted Brie?
14 A.    I agree with that, yes. Zero facts.
15 Q.    Okay. So that doesn't -- does that give you
16 the license to state after the fact how you corrupted
17 Brie?
18        MR. KOLMAN: Objection.
19        THE WITNESS: I'm telling you in my
20 opinion how I corrupted Brie.
21 BY MR. HINTON:
22 Q.    Right. Right.
23 A.    That's my opinion.
24 Q.    Right.
25 A.    The statute speaks for itself. I don't have

Page 251

1  to interpret this statute. The statute says I corrupted
2  or intended to corrupt a minor under the age of 18 by
3  doing the next couple lines, aids, abets, entices,
4  encourages such minor in the commission of any crime and
5  knowingly assists or encourages any minor in violating
6  his or her parole to the court commits a misdemeanor of
7  the first degree. I pled to a misdemeanor of the first
8  degree.
9  Q.    Right.
10 A.    I didn't plead to a misdemeanor of the second
11 degree or the third degree. I didn't plead anything
12 else other than exactly what that paragraph says right
13 there. That's what I pled to. Now, there's nothing in
14 the case file -- and you know this but you didn't know
15 this before. There's nothing in the case file that says
16 my offense was tied to a specific sexual act. Had it
17 been, it would have been number one in the guilty plea
18 colloquy. Number two, my attorney had the right to tell
19 me about it. In fact, my attorney, on the morning of
20 sentencing, told me the opposite. He said -- I insisted
21 that there's no language in there that has anything to
22 do with sexual activity. I, therefore, went ahead and
23 pled. Now, you could assume all you want that it was
24 sexual activity tied to the Misdemeanor 1, but you have
25 to prove it when I'm suing for defamation. And you

Page 252

1  can't because it never happened.
2  Q.    But you can't prove that it --
3  A.    I don't have to prove anything. It's the
4  watermelon thing again.
5  Q.    Okay.
6  A.    I can't prove a negative.
7  Q.    So we're in a -- we're in a quandary --
8  A.    Yeah, we're going to a jury. You're right.
9  Let's see what they think.
10 Q.    -- because -- because it's in that middle
11 ground of nobody can prove it.
12 A.    Let's see if a jury believes me and my team.
13 Q.    Or believes Brie.
14 A.    Or believes Brie and Chris Kelly. I'm
15 perfectly fine with a jury deciding this case because
16 I'm in the right. Now, if a jury says that I'm wrong
17 and they believe the stuff that you're putting forward,
18 I lose.
19 Q.    Right.
20 A.    That's how court works. So let's see.
21 Q.    Okay. Phil, is Brie's birthday█████████
22 █, 1993?
23 A.    I don't know her birthday. I know she was
24 born in September. That's about all I know.
25 Q.    Okay. When Principal Moceyunas questioned

Page 253

1  you about Brie and he put in his memo that she's 15
2  years old, he apparently told you that in the phone
3  call, right? That she's a 15-year-old girl.
4  A.    Yes. If it's in his memo, I have no reason
5  to question it. Mr. Mo's --
6  Q.    Well, when you started communicating with
7  Brie over Facebook or whatever, did you know at that
8  time she was 15 years old -- or 14 -- 14 or 15?
9  A.    I don't think she was 14. I think I only
10 ever communicated with Brie after she had turned 15.
11 Q.    Fifteen. Okay. And when she's 15, you're
12 25, right?
13 A.    There was, I think, a little less than nine
14 years' separation between her and I.
15 Q.    Well, let's do the math. You're born in --
16 A.    ████ of '83.
17 Q.    '83. And she's born in ████████ of '93.
18 A.    Yeah.
19 Q.    So that's ten-years-and-three-months.
20 A.    Yeah.
21 Q.    So you're ten-years-and-three-months older
22 than she is.
23 A.    Yes.
24 Q.    Okay. And when Joe D'Andrea came -- I think
25 you described it as you walked back into the

**Page 274**

1  Q.    Did it make you mad?

2  A.    Mad?  Yeah.  Yeah.  Motivated and angry.

3  Q.    So let's go to a clip here.  We're going to

4  put up Clip 49.

5         (Video clip being played.)

6  BY MR. HINTON:

7  Q.    So, Phil, we just played a clip here about

8  the bail for your criminal case for the charges

9  involving Brie.

10 A.    Uh-huh.  Yes.

11 Q.    And was that your voice in the clip?

12 A.    Yes.

13 Q.    And those were your statements?

14 A.    Yes.

15 Q.    That you and your family put up 250,000 cash

16 bail?

17 A.    Yes.

18 Q.    And if we look at ST776, please.  Phil,

19 that's collateral mortgage taken out by Cutting Edge

20 Bail Bonds, LLC.  Do you see that?

21 A.    Yes.

22 Q.    And is that your signature on that document?

23 A.    Yes.

24 Q.    And did you take out a mortgage on your house

25 to get bail, you and Dori?

**Page 275**

1  A.    Yes.

2  Q.    And were you here for Marie's deposition that

3  she took out a mortgage on her house too so you could

4  get bail?

5  A.    Yes.

6  Q.    And you guys pledged your houses for bail,

7  you didn't put up 250,000 in this case; isn't that

8  correct?

9  A.    Correct.

10 Q.    So what you told the hate group in May of

11 2022 was incorrect; is that true?

12 A.    Yes.  Purposely.

13 Q.    So you purposely lied to those people about

14 this situation?

15 A.    No, that's not what I said.

16 Q.    Well, you said purposely.

17 A.    Yeah.

18 Q.    What did you mean?

19 A.    Purposely -- this hate group were kings and

20 queens of discovering documents that were connected to

21 me in any way, shape or form.  This particular document

22 has multiple names on it; my name, Dori's name, my

23 mother's name, Tommy's name.  And I thought that they

24 would harass those involved with me just like they've

25 been doing for the last couple years now because of the

**Page 276**

1  article that Chris Kelly wrote.  So my white lie was an

2  attempt to protect the group from trying to expose

3  anything further.

4         MR. HINTON:  Okay.  Let's go to the next

5  clip.  Putting Clip 14 up.

6         (Video being played.)

7  BY MR. HINTON:

8  Q.    So, Phil, that clip -- and here we have a

9  picture of your Harvard certificate.  Was that your

10 voice on that clip?

11 A.    It sounded like my voice was actually edited

12 a little bit.  I don't know where that video came from,

13 but it sounded weird.  But I did say that.

14 Q.    You did say you had a Harvard degree?

15 A.    Yes.

16 Q.    And you were sporting a Harvard sweatshirt?

17 A.    Well, I think that's why they asked me the

18 question.  I didn't just volunteer that information.

19 That was a Q&A session and I was wearing the Harvard

20 shirt that I had purchased.  So I think that's what

21 caused somebody to ask that question.

22 Q.    And so it wasn't correct, though, right?  You

23 did not have a Harvard degree?

24 A.    From what I understood it at the time when I

25 said it, I did think I had a degree.  And then when all

**Page 277**

1  of the backlash came because of that comment, I realized

2  what I actually had was a certificate and not a degree.

3  But I referred to the picture that you just put on the

4  screen that I had on the wall behind me as a degree, but

5  it was not.

6  Q.    Okay.  And you said in that video that you

7  have many degrees.

8  A.    The way I said that was anecdotal.  It was,

9  kind of, I have "many" degrees.  Kind of, like that.  If

10 you re-listen to it, you'll hear the emphasis that I put

11 on that.

12 Q.    So you weren't being serious, right?

13 A.    I was being -- trying to be funny again.  I'm

14 not really that funny.  Sometimes my humor gets taken

15 the wrong way.  I don't have many degrees.  That's

16 something that I addressed later in that video.  And,

17 again, that's why these videos are all out of context.

18 Because if you'd play that for another hour, you'll most

19 likely hear me say what I actually -- what the truth

20 actually was.

21 Q.    You don't have any college degrees, though,

22 right?

23 A.    No.

24 Q.    My statement's correct; yes?

25 A.    Yes, your statement's correct.

70 (Pages 274 - 277)

Page 286

1   A.      Correct.
2   Q.      So this is obviously before May 21st of 2021
3   when you sued?
4   A.      Was that the date that I filed?
5   Q.      Yeah. It's either the 21st or the 24th.
6   A.      Yeah, so it would be before that date.
7           MR. KOLMAN: What page is that?
8           MR. HINTON: 476.
9   BY MR. HINTON:
10  Q.      So -- and we talked about this earlier. In
11  the middle of this post you said, "Please be patient
12  with me. I'm not going anywhere, but I've been advised
13  to halt the livestreams for multiple reasons; the
14  strength of my legal case and the safety for my family."
15  So is this what you were talking about earlier about
16  there was a time when I halted livestreams?
17  A.      Yes.
18  Q.      It wasn't because of Dori. We showed
19  livestreams you did after Dori talked to you about not
20  doing them anymore, right?
21  A.      No, not necessarily. It was partially
22  because of Dori. And as the legal case -- once I
23  realized that I did have a case, I was afraid that I was
24  going to say something that would damage the case. So
25  many people, Tim included, and other attorneys that I

Page 287

1   talked to, once they learned the circumstances of my
2   show and all that, they told me I should probably not do
3   that anymore. And that was, obviously, the same advice
4   that Dori was -- not advice, but the same pleading that
5   Dori was offering me as well so... And on the back of
6   the article, things got really bad after that article,
7   was written in February. So the end of February, the
8   second half of February as well as March had me afraid
9   for a little while.
10  Q.      So in this post, 476, you state, "Things are
11  very, very shaky right now at best and I am carefully
12  navigating the waters. I purchased an AR-15 today as
13  well as a handgun for my wife both for home/personal
14  protection. I've never owned a weapon until now." Did
15  I read that correctly?
16  A.      Yes.
17  Q.      And that's not true; is it? You did not
18  purchase an AR-15 and a handgun as you state you did
19  there?
20  A.      I did purchase an AR-15. I never purchased a
21  handgun for my wife, though. I said that as a deterrent
22  for people that might be -- because of the article,
23  might have some sort of malice against me thinking that
24  I'm a pedophile.
25  Q.      So let's look at ST1576. Keep that page in

Page 288

1   your hand, but go to 1576.
2   A.      Okay.
3   Q.      Now, this the Affidavit of Probable Cause for
4   the criminal case filed against you for two false
5   statements regarding the purchase of firearms, correct?
6   A.      Correct.
7   Q.      And it says on February 17th, 2021, you
8   attempted to purchase a Stag Arms Model Stag 15 Tac 5.5,
9   6 millimeter rifle, correct?
10  A.      Correct.
11  Q.      You didn't actually get that rifle; did you?
12  A.      No.
13  Q.      Okay. Is that the same thing as the AR-15?
14  A.      No, that's a different model, but -- it is an
15  AR-15, but it's not the model that I ended up
16  purchasing.
17  Q.      Okay. Where did you get an AR-15 from?
18  A.      I don't remember his name, but it was a guy
19  in Dunmore.
20  Q.      And did you truthfully fill out the
21  application for that purchase?
22  A.      No. You don't need an application for a long
23  gun. I didn't know that.
24  Q.      Okay.
25  A.      The handgun you do, in Pennsylvania. A long

Page 289

1   gun like an AR or a shotgun or something like
2   that -- long gun refers to the barrel length, I believe.
3   You don't need to fill out an application for that.
4   Q.      So when did you buy the AR-15?
5   A.      Did you say that this was posted in March?
6   Q.      It's some time before the lawsuit.
7   A.      It's possible that I bought -- I don't know
8   if I bought it prior to this application or before, but
9   I would think that I bought it prior to the application
10  at The Cabin and that this would have been my second
11  purchase. It's possible. But I was declined for that
12  purchase.
13  Q.      So after you were declined for that purchase,
14  did you then buy the AR-15 in Dunmore?
15  A.      No, I believe it would have predated this
16  denial.
17  Q.      So you were attempting to get a second
18  AR-15-type rifle.
19  A.      Yes. I believe so, yes. From what I
20  remember, yes. This was a very bad time for me.
21  Q.      Now, you were out on bail in the bank
22  records/bad checks case at that time.
23  A.      No.
24  Q.      Yeah. You were charged in 2020 in the
25  Mariotti case.

73 (Pages 286 - 289)

**Page 302**

1  A.    It's not true?

2  Q.    No.

3  A.    Okay.  Good.  Is Holeva his editor?

4  Q.    He's an executive editor.  I'm sure you got

5  his name off the masthead.  I don't think he was the

6  editor.

7  A.    Maybe somebody else needs to be added.  I

8  don't know.  Ultimately, though, I think the Scranton

9  Times is irresponsible because they put these people in

10  place and if they're allowing defamatory and slanderous

11  articles like that to be written, they're responsible

12  for their content.  They print it.

13  Q.    Now, would you agree that based on everything

14  you know, Brienna did initially tell the police that she

15  was involved in a sexual relationship with you?

16  Initially, when she went to the police?

17  A.    I believe she initially did, yeah.

18  Q.    And then you received information that she

19  tried to recant that story?

20  A.    Several times.

21  Q.    And are you also aware that the detectives,

22  Michelle Mancuso particularly said to her, Brie, we have

23  the text messages between you and Phil.  We know it's

24  still ongoing?  Were you aware of that?

25  A.    I was aware -- I wasn't aware of that

**Page 303**

1  specifically, but I was aware that they declined her

2  request to recant.  And they said -- this is what she

3  told me.  They said that if you recant, we may have to

4  file against you for filing a false police report.

5  That's a felony in Pennsylvania.  And as a 16,

6  17-year-old kid, I don't know what I would have done in

7  that situation, which is why I didn't necessarily blame

8  Brie for what happened after that.  I believe that there

9  was also -- I don't want to call it conspiracy, but also

10  some sort of influence from the DA's Office by the hand

11  of Michelle Mancuso or Justin Leri or Kolcharno that

12  stopped Brie from doing the right thing before it got

13  too far.  She pled the Fifth Amendment on the stand to

14  reverse all of that.

15  Q.    Did you know in advance that she was going to

16  plead the Fifth Amendment on that day?

17  A.    No.

18  Q.    You didn't know?

19  A.    I was surprised.  Joe was very surprised.

20  Oh.  I'm sorry.  There were rumors circulating that Brie

21  had been telling people that she was advised by counsel,

22  which I never knew who it was, for her to get out of

23  this scot-free, to plead the Fifth Amendment that day.

24  So Joe and I were actually aware that it may happen.

25  When it happened, we were very surprised because we

**Page 304**

1  heard a lot of rumors during the case that don't

2  necessarily pan out the truth.  But, yes, I did -- I was

3  made aware through rumblings, private investigator as

4  well as Facebook and different comments that you saw in

5  different areas, that she was thinking about doing that.

6  Q.    Phil, who -- I questioned you on February 6th

7  in front of Judge Minora about the financial opportunity

8  that you were offering to Brie in late May of 2021, I

9  believe it was.

10  A.    Yep.

11  Q.    2022.  I forget which one.  Tell me again

12  what the financial opportunity is that you were offering

13  her.

14  A.    It would have been -- I don't think at that

15  time -- if it was '21, it could have very well been 7K

16  Metals.  It would have been '21?  So it was probably 7K

17  Metals.

18  Q.    I'm sorry.  I'm sorry.  It was not '21.  It

19  was 2022.  It was not 7K Metals.  Because 2021, you

20  started 7K Metals after you came out of jail?

21  A.    Correct.

22  Q.    So you came out of jail in August.

23  A.    So it would have been May of '22?

24  Q.    May of '22.  Like, May 28th, you sent a text

25  to her about a unique financial opportunity.

**Page 305**

1  A.    Uh-huh.

2  Q.    So you had already gotten 7K Metals going.

3  A.    Yeah, so it wasn't 7K.

4  Q.    Yeah.  It wasn't Goldco, either, because --

5  A.    No, it couldn't have been Goldco.  It was

6  most likely Tax Refund -- or Max Refund, rather.

7  Q.    Yeah, but that's not a multi-level marketing

8  company.

9  A.    Oh, in this case, it would have been.  So

10  Rumble and I ended up partnering with a company that's

11  called EZ-ERC.  EZ-ERC is a massive

12  six-hundred-million-dollar ERC benefit company.  There

13  were conversations between me and Rumble of whether we

14  partner with a massive company like that or I put my own

15  team together and instead of only getting a portion of

16  the commission from EZ-ERC, we get all the commission.

17  And that was a big difference; huge.  Millions and

18  millions of dollars huge.  Ultimately, I ended up

19  deciding that it was easier and probably not worth my

20  time to form another team, go through another set of

21  leads, go through another scheduling calendar, manage

22  all that.  I was trying to take things off of my plate

23  so I could concentrate more on my family, not add new

24  things.  So at the time that I was talking to Brie about

25  it, the way we were going to structure the team was, in

77 (Pages 302 - 305)

Page 306

1  a sense, she would get the maximum of commission based
2  on our structure. I wanted to help Brie financially if
3  I could.
4      Q.     Okay. And you never set up a business to
5  fill her in like that, correct?
6      A.     No. Subsequently?
7      Q.     Yeah.
8      A.     No.
9      Q.     Okay. So, you know, am I correct that
10 there's nobody else that you've filled into Brie's slot
11 to make a lot of money?
12     A.     No, that particular business didn't even --
13 it wasn't even structured that way. We outsourced to
14 the larger company. I still get commission, but no one
15 else does.
16     Q.     No one else does?
17     A.     That's right. It's just me. It's much
18 smaller too but...
19     Q.     As it turns out, there was no position for
20 Brie?
21     A.     At the time that I said it, there was. As it
22 turns out --
23     Q.     You were thinking about it, but you didn't
24 put it into motion?
25     A.     Well, I wouldn't say I didn't put it into

Page 307

1  motion. I would say that I chose a different path than
2  what I was talking to Brie about. It just didn't -- it
3  wasn't the best business model to do it that way. It
4  would have been beneficial to not only Brie, but
5  everybody else that I was going to put on my team. But
6  it would have required a lot more work for me and I
7  just -- again, I was trying to subtract, not add.
8      Q.     But as it turns out, you didn't create a team
9  at all, right?
10     A.     No, because we part -- well, I do have a
11 team, yeah. It's EZ-ERC Company.
12     Q.     Right.
13     A.     Those people. They're my team technically.
14     Q.     But nobody like Amanda Turoni or nobody like
15 that?
16     A.     No. No. No. No, we didn't go that route
17 ultimately.
18     Q.     All right. So, Phil --
19     A.     Tim, may I on the same topic? It could have
20 also been Lifewave. I don't remember what I was talking
21 talk to Brie about in that month. But I do remember in
22 2022, I was going to start an additional MLM company
23 called Lifewave. They have patches that you wear that
24 stimulate stem cells. And it's an MLM company similar
25 to 7K except a lot easier.

Page 308

1          7K caught wind of me wanting to do that
2  and talked me out of it. So I don't know -- I don't
3  remember what specific company I was talking about
4  getting Brie involved in. All I knew is either of the
5  companies that I would have had her involved in would
6  have been financially beneficial to her without doing
7  very much work.
8      Q.     Phil, can you name for me any persons who
9  have refused to do business with you because they read
10 Chris Kelly's article?
11     A.     Oh, boy. I'd have to go back and look. I
12 can't name them at this time. There have been hundreds,
13 if not more than that, that would send me an e-mail.
14 There's an entire hate group that refuses to do business
15 with me and tells lies about me all the time because
16 they're convinced that I'm a pedophile because of your
17 client's article. That hate group didn't exist prior to
18 the article. There were no hate groups and my career
19 was doing just fine. And I'd probably still be in it
20 today. It turns out that I turned my life around and
21 accelerated things and I'm doing better now, as you said
22 earlier. But to name a specific person, which I most
23 likely can do if I went back and looked, I think the
24 greater number is the unquantifiable people that will
25 not approach me and say, hey, I'm not doing business

Page 309

1  with you. Most people aren't going to say anything,
2  probably 80, 90 percent of people.
3      Q.     Well, I just want to know, can you identify
4  any persons by name that won't do business with you
5  because of the Chris Kelly article?
6      A.     Yeah. I've had people quit 7K.
7      Q.     Okay. Can you give me their names?
8      A.     I could. Not right now. I wasn't prepared
9  to bring names today. But I could get names for you,
10 sure.
11     Q.     Okay. I need contact information for them
12 too.
13     A.     Sure. Absolutely. I mean, I don't know if I
14 have contact information for some of the people. There
15 may have just been a message on Telegram where somebody
16 said something. They don't go by their real names on
17 Telegram often. So I'll get you what I have; you could
18 take it from there.
19     Q.     Okay. So I remember you making statements on
20 social media that you said, I was a very bad person and
21 then I found God.
22     A.     Uh-huh.
23     Q.     Do you remember saying that?
24     A.     Yes.
25     Q.     When did you find God?

78 (Pages 306 - 309)

**Page 310**

1  A.    When?
2  Q.    Yes. Like, when did you have this
3  conversion? Was it after jail, before jail?
4  A.    Around then. I lost my family. I didn't
5  see -- didn't see my boys for nine months.
6  Q.    Well, Phil, when you were sending Brie
7  pictures of you naked masturbating in March of 2021
8  after Brie left you --
9  A.    Dori.
10  Q.    Were you -- after Dori left you, at that
11  point in time, you hadn't found God yet?
12  A.    No.
13  Q.    Okay.
14  A.    It was a period of the article, that's when
15  everything changed, between the article and jail or
16  slightly after my release from jail that I was in
17  terrible shape mentally. I sought help because of the
18  shape that I was in. You have the reports. I was
19  afraid of harming myself. I was afraid of going out in
20  public. People, once again, for a case that was some
21  12, 13 years old, thought I was a pedophile. And I was
22  afraid and I drank a lot, stayed home a lot. Wasn't
23  communicating with my kids because of it -- not because
24  of it but because Dori seemed to think that the article
25  was a deterrent for the kids to be with me because she

**Page 311**

1  didn't know exactly what I thought, is somebody going to
2  knock on my door and blow me away.
3  Q.    Phil, can you state for me the identity of
4  any persons that read the Chris Kelly article and think
5  less of you because they read that article?
6  A.    I think you already asked me that. In fact,
7  you just asked me that and I said that as I sit here
8  now, I don't have their names. But there have been
9  numerous people in the last two-and-a-half years that
10  the article has been published and is still published
11  that think the article is accurate. And it has caused
12  hate groups to form which drive by my house, send nasty
13  messages to me, my friends, my in-laws, my new in-laws.
14  Anybody that I tag on Facebook, all sorts of messages
15  get sent to all of these people, including messages to
16  me. And I will absolutely share that list with you. Do
17  I have it right here and I can say, here you go? No.
18  But it's been bad.
19  Q.    Phil, you've said your damages are not able
20  to be calculated.
21  A.    I think what I said is it's unquantifiable.
22  But yes.
23  Q.    And that's your truth, that they're
24  unquantifiable?
25  A.    A hundred percent. How would I prove how

**Page 312**

1  many people don't follow me because of the article?
2  Q.    Do you know, Phil, that in this case, you've
3  already stipulated that you have no economic damages?
4  A.    I don't need economic dam -- my income has
5  gone up since your article.
6  Q.    Right.
7  A.    So I'm not suing for economic loss in terms
8  of that. I'm suing for what the article has already
9  done and will do in the future. That article has been
10  published now and on that website for two-and-a-half
11  years. How do I know that one of my children isn't
12  going to go to a birthday party some day and say -- and
13  get called, hey, your dad's a pedophile. Can you put a
14  number on that? Because I can't. It's unquantifiable.
15  Q.    Phil, do you have any persons that you were
16  friends with before the article that said, Phil, I'm not
17  going to be friends with you anymore because I read what
18  Chris Kelly wrote and I believe it?
19  A.    Tim, that's not -- that's not something that
20  happens in real life. People don't come to you and say,
21  hey, I'm no longer going to be friends with you because
22  of an article that I read. They just stop talking to
23  you. And yes, that has happened dozens, if not hundreds
24  of times, with my friends from high school, people in
25  the area that I used to do business with, many times.

**Page 313**

1  Q.    Can you name them?
2  A.    You just asked me that four times in the last
3  five minutes.
4  Q.    Well --
5  A.    Just now I just remembered one, so happens.
6  Q.    Who is it?
7  A.    I was still doing real estate and it was
8  Freddie Gray. Freddie Gray had a house on -- what the
9  heck street was that -- in Old Forge, his wife Emily,
10  Emily Gray. They cancelled their listing with me. A
11  $200,000 house. Again, I'm not suing for economic loss.
12  You know that, you said that. I'm suing for what the
13  damage that your article has done to my family and to me
14  for years and years to come.
15  Q.    Medically speaking, I think we've already
16  established that you haven't had any treatment after
17  those two therapy visits in John Kuna's office, correct?
18  A.    I started to see a little bit more clearly
19  after my 30 days in jail. I met some good friends in
20  there, believe it or not, and a lot of them help talk me
21  through things. Amanda Turoni helped -- helped me a lot
22  on a friendship basis. And I think the overall harm --
23  the psychological harm that I was going through -- the
24  psychological period that I was going through, kind of,
25  got better after I got out. So I didn't feel the need

79 (Pages 310 - 313)