<u>GODLEWSKI V. ALVEAR</u>, NO. 3:24—CV—00344 (JKM)
DEFS.' MOT. TO DISMS.

# EXHIBIT "L"

1

COURT   OF   COMMON   PLEAS

2

LACKAWANNA COUNTY

3

4   PHILIP GODLEWSKI,                    X
                                        X
5              Plaintiff,               X
                                        X
6         -vs-                          X   No. 21-CV-2195
                                        X
7   CHRIS KELLY, ET AL,                 X
                                        X
8              Defendants.              X
                                        X

*Original*

9

10

11              TRANSCRIPT OF PROCEEDINGS

12

13   BEFORE:   HONORABLE CARMEN D. MINORA

14

15   DATE:    February 6, 2023

16   PLACE:   Lackawanna County Courthouse
             200 N. Washington Avenue
17           Scranton, Pennsylvania 18503

18

19

20              A P P E A R A N C E S

21   For the Plaintiff:      TIMOTHY KOLMAN, ESQUIRE

22

23   For the Defendant:      TIMOTHY HINTON, ESQUIRE

24

25              Linda Krehel
         Official Court Reporter

EXHIBIT
L

2

WITNESSES

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

For the Defendant:

1. Brienna DuBorgel    16    42

2. Linda V. DuBorgel    67    77

3. Philip Godlewski    152    80    158

--recalled
Philip Godlewski    167

4. Dennis Cheng    169-176    175-188    189


--called on rebuttal

Philip Godlewski:    190

80

1     PHILIP GODLEWSKI, called as a

2    witness, being duly sworn, testified as

3    follows:

4

5 AS ON CROSS EXAMINATION BY MR. HINTON:

6   Q. Mr. Godlewski, did you have a sexual

7 relationship with Brienna DuBorgel?

8   A. No, I did not.

9   Q. Never did?

10   A. That's-- I retract.  Yes, I did.

11   Q. You did?

12   A. Yes.

13   Q. And did you answer discovery in this case

14 falsely in claim that you never did have a

15 relationship-- a sexual relationship with Brienna?

16   A. I'm not sure.

17   Q. Okay.  Let's take a look at that.  If we can

18 go to Exhibit Z.  That's a summary page.  If you can go

19 to Exhibit D.

20      THE COURT:  Did you say B as in boy?

21      MR. HINTON:  No.  Z.  Exhibit Z.

22      THE COURT:  Victor, David?

23      MR. HINTON:  Z as in zebra.

24 BY MR. HINTON:

25   Q. Now, on November 18th, Mr. Godlewski, you

81

1  answered some discovery, some interrogatories by me.

2  And I want to point your attention to number seven.

3      A.    Okay.

4      Q.    Number seven says:  Did you have sex or a

5  sexual relationship with BD-- You know that's Brienna

6  DuBorgel?

7      A.    (Nodding in the affirmative.)

8              COURT REPORTER:  Yes?

9  BY MR. HINTON:

10     Q.    -- at any time?  Do you see that question?

11     A.    Yes.

12              THE COURT:  You can't nod.  That's

13          why she interrupted you.

14              MR. GODLEWSKI:  I got you.  Yeah.

15              THE COURT:  Okay.

16  BY MR. HINTON:

17     A.    My answer was no.

18     Q.    Okay.  So you lied there?

19     A.    I believe I misunderstood the question

20  because of the context.

21     Q.    What's so confusing about that question?  Do

22  you not understand the words any time?

23     A.    I believe this set of interrogatories was

24  part of another set of interrogatories that I got

25  relatively at the same time.  Some of those-- most of

82

1    the other questions in regards to my relationship with

2    Brie had the fifteen year old.  In fact, almost all of

3    your interrogatories had the fifteen year old.  This is

4    the only time that you ever asked me directly did I

5    have a sexual relationship with Brie.  And I believe I

6    misconstrued what you were asking as when she was

7    fifteen because of all of the prior interrogatories

8    that did mention when she was fifteen.

9         Now, I don't see those questions that I'm

10   referring to in this particular set, but there's been a

11   lot of different sets.

12        Q.   You're a smart guy, right?

13        A.   (No response given.)

14        Q.   Mensa?  Aren't you a member of Mensa?

15        A.   I'm not a member of Mensa, no.

16        Q.   High IQ, though?  You've had your IQ tested?

17             MR. KOLMAN:  Objection.  Irrelevant.

18   BY MR. HINTON:

19        Q.   So you were-- the second part of the

20   question is:  If yes, when did you have sex or sexual

21   relationship with her and how long did the sexual

22   relationship last?  And you answered N/A, not

23   applicable, correct?

24        A.   Yes.

25        Q.   So didn't that help clear up any confusion

83

1   you may have had about the question?

2       A.   No, it didn't clear up any confusion at all

3   because once I read if yes, I didn't read the rest

4   because the answer was no to number seven.

5       Q.   So at no time did you admit in discovery in

6   this case to ever having a sexual relationship with

7   Brienna, is that correct?

8       A.   Can you restate that?

9       Q.   Did you ever admit in any of your discovery

10  responses that you had a sexual past with Brie?

11      A.   I believe in the question that I was asked

12  in one of the interrogatory sets, if the text messages

13  between Brie and I, the most recent text messages, were

14  true.  And to that question I answered-- or were

15  accurate or were from me.  To that question I answered

16  yes.  And the content of the text messages in which I

17  was referring to did reference a recent sexual

18  relationship.

19      Q.   Okay.  Well, let's get that on paper here.

20           When was your recent sexual relationship

21  with her?

22               THE COURT:  When was the admission

23           made or when did the act take place, Tim?

24               MR. HINTON:  The only thing he

25           admitted, Your Honor, is that these were his

84

1          text messages.
2                    THE COURT:  I'm asking you that.  I
3          don't know what date you're asking about,
4          when he made an admission or when he
5          actually had it.
6                    MR. HINTON:  When did he begin a
7          sexual relationship with Brie.
8   BY MR. HINTON:
9       A.   I would say 2013, 2014, 15, somewhere in
10  that--
11      Q.   All right.  So you're still on probation at
12  that time from corrupting her at that time and you're
13  having sex with her at that time?
14      A.   No.
15      Q.   You were on probation for two years, weren't
16  you?
17      A.   I know.  You're putting me on the spot, and
18  I can't remember when our relationship was.
19      Q.   So let's get this straight.  So you admitted
20  in Court--
21      A.   I'm sorry.  I could correct the record if I
22  may.  It was almost certainly from 2015 to 2016.  And I
23  remember that because of the time that I started my
24  real estate company was the same year.
25      Q.   Okay.  So you started the agency with George

85

1    Plisko, correct, 2015?

2         A.   Correct.

3         Q.   And at that time you began a sexual

4    relationship with Brie?

5         A.   Yes.

6         Q.   All right.  So you corrupted her--

7                   MR. KOLMAN:  Objection.

8    BY MR. HINTON:

9         Q.   --2009 and 10, correct?

10                   THE COURT:  Factually accurate

11        question.  Overruled.

12   BY MR. HINTON:

13        Q.   You corrupted her in 2009 and 2010?

14        A.   I pled guilty to corruption of minors, yes.

15        Q.   Of her, though, not some unspecified victim?

16   It was Brienna, right?

17        A.   The one that was in the complaint, yes.

18        Q.   She's the victim?

19        A.   Of course.

20        Q.   You corrupted her?

21        A.   Yes.

22        Q.   And you served probation for two years and

23   then you began a sexual relationship with the person

24   you corrupted earlier?

25        A.   Correct.

86

```
 1        Q.    Do you see anything wrong with that?

 2        A.    No.

 3              Can I elaborate?

 4        Q.    No.

 5        A.    I didn't think you'd want me to.

 6        Q.    So-- And you're married at the time that

 7   you're now in a sexual relationship with her?

 8        A.    We were kind of on the outs of our marriage.

 9   We weren't separated, but we were having severe

10   problems in our marriage.

11        Q.    She filed for divorce in March of 2021?

12        A.    Yes.

13        Q.    She never filed before then?  Dori I'm

14   talking about.

15        A.    Almost, but no.

16        Q.    But no.  All right.

17              So let's go through the time line here.

18                    MR. HINTON:  Your Honor, it's

19              Exhibit AA, if you want to follow along in

20              your notebook.  I think it will speed things

21              up.

22   BY MR. HINTON:

23        Q.    Mr. Godlewski, I served interrogatories upon

24   you on July 9th of 2021, over a year and a half ago.

25   And in the one interrogatory I asked:  Do you have any
```

1  letters, e-mails, or text messages to or from the

2  fifteen year old girl?  Do you see that?

3      A.   Yes.

4      Q.   And you answered none?

5      A.   Correct.

6      Q.   Is that correct?

7      A.   Yes.

8      Q.   Now, as it turns out, Brie has given us five

9  hundred pages of text messages with you and her in just

10  2021 and 2022, is that correct?

11      A.   Yes.

12      Q.   And you've now admitted that those are your

13  true and accurate communications with Brie, is that

14  correct?

15      A.   That's correct.

16      Q.   Okay.  So you didn't admit to having those

17  when you answered my discovery, is that correct?

18              THE COURT:  Where are you in this

19          chart?  You're losing me.

20              MR. HINTON:  I'm right under

21          September 20th when he responded.

22              THE COURT:  Oh, okay.  Now I got it.

23              MR. HINTON:  Okay?

24              THE COURT:  Okay.

25              MR. HINTON:  Rather than saving

88

1          paper I didn't want to restate the

2          interrogatory and the response because

3          they're both included.

4                    THE COURT:  That's all right.

5     BY MR. HINTON:

6          Q.    You answered none, is that correct, to

7     number 33?

8          A.    Yes.

9          Q.    Is that a deliberately false answer?

10         A.    No.

11         Q.    It's wrong--

12         A.    It's not a false answer at all.

13         Q.    Oh, so you're taking it literally, you-- you

14    thought I just meant a random fifteen year old girl?

15    Is that what you're saying to the Court?

16         A.    No.

17         Q.    You knew I was talking about Brie in that

18    interrogatory, right?

19         A.    Yes.

20         Q.    And where are the five hundred text messages

21    that you had with Brie?  Didn't you have those on your

22    phone?

23         A.    You asked--

24         Q.    Five hundred pages.

25         A.    You just asked me if I took the question

89

1   literally, which is what everyone does when they're

2   asked a question in a legal manner.  I took the

3   question very literally.  And what the question says--

4   I can read it back to you:  Do you have any letters,

5   e-mails, or text messages to or from the fifteen year

6   old girl?

7       Q.    Right.

8       A.    I had none of those with the fifteen year

9   old girl.  The fifteen year old girl references an age.

10  I had no contact or messages from the time that Miss

11  DuBorgel was fifteen years old.  In fact, you asked

12  that several times throughout that same interrogatory,

13  which was what I was asked.

14      Q.    And you didn't understand I was using

15  fifteen year old girl to protect her privacy?

16      A.    No, because in other areas of the

17  interrogatories you used BD.  That protects her

18  privacy.

19      Q.    Well, we went to BD.  It's just a double

20  down in--

21      A.    Mr. Hinton, I'm sorry to interrupt you, but

22  just-- looks like here two weeks later you used BD.

23  And prior to the first set of interrogatories you also

24  used BD.

25      Q.    But you didn't fess up to any communications

90

1  with BD either, did you?

2       A.    Yes, I did.

3       Q.    Where?

4       A.    In Exhibit AA.  From December--

5       Q.    These--

6       A.    I'm answering your question.

7       Q.    Go ahead.

8       A.    From December 8th, 2022 do you admit that

9  the documents attached here to Exhibit A, Scranton

10 Times 1021 to Scranton Times 1508, are copies of

11 electronic messages communications you had with BD?

12 Answer:  Yes.

13      Q.    Well, that's after-- Let's go--

14      A.    That's not what you asked me.

15      Q.    Let's back date, Mr. Godlewski.

16      A.    Okay.

17      Q.    Okay.  So let's-- So I asked you on

18 September 9th do you have any text messages to or from

19 the fifteen year old girl, your answer was none?

20      A.    That was a year prior.

21      Q.    Right.  Then also on that date, September

22 20th, I asked you if you had any documents.  This is in

23 a request for production.  I'm requesting any documents

24 to include tele-communicative documents sent to or from

25 the fifteen year old girl referred to in the article,

91

1    and your answer was none, right?

2    A.    Correct.

3    Q.    You didn't identify all the text messages

4    that have now been produced to the Court, is that

5    correct?

6    A.    (No answer given.)

7    Q.    The five hundred pages of text messages?

8    A.    That's correct, but I wasn't asked to.

9    Q.    Let's go further.

10        Then I asked you on June 24th, I asked you

11    in a request for production of documents set forth--

12    produce any text messages between Phil Godlewski and

13    Brienna DuBogel, BD.  That BD is only for our purposes.

14    In the actual request I spelled her name out, correct,

15    for you, for your purposes?

16    A.    I don't recall, but I knew who you were

17    speaking of, yes.

18    Q.    Okay.  From 2008 to the present date.

19    Present date being the Summer of 2022?

20    A.    Yes.

21    Q.    Your answer was I do not have any?

22    A.    That's correct.

23    Q.    And you stand by that?

24    A.    Yes.

25    Q.    Okay.  And then you're served with

92

1  interrogatories.  Exhibit M.  And I asked you:  Have

2  you communicated with BD about this lawsuit or your

3  damages from the article, and your answer was yes?

4      A.    Correct.

5      Q.    Correct.  And I say if yes, please state the

6  dates of such communications, the form of such

7  communications, and the substance of such

8  communications.  Do you see that?

9      A.    Yes.

10      Q.    And your answer was on July-- or on November

11  9th, 2022, answer, does not recall the specific date of

12  communications-- communication.  Plaintiff spoke with

13  BD in person.  You don't mention text messages, right?

14  You just say in person?

15      A.    Yes.

16      Q.    You spoke to her in person regarding the

17  filing and warned that it was eminent.  That's your

18  lawsuit against the Scranton Times, right?

19      A.    Yes.

20      Q.    You filed that in May of 2021, right?

21      A.    Yes.

22      Q.    You had about a thousand text messages with

23  her after you filed the lawsuit, right?

24      A.    Yes.

25      Q.    Okay.  You didn't say to me in answering

93

1   this discovery anything about your thousand text
2   messages with her, did you?
3       A.   No.
4       Q.   Did you do that to deceive me?
5       A.   No.
6       Q.   Why did you do that?  Why didn't you tell me
7   about them?
8       A.   You didn't ask me.  You said-- I don't know
9   why that's funny.
10      Q.   A text message isn't a communication?
11      A.   You asked me--
12              MR. KOLMAN:  I'm going to ask
13          counsel to withdraw from being close to the
14          witness.
15  BY MR. HINTON:
16      A.   Can I continue?
17              MR. HINTON:  No problem, Your Honor.
18  BY MR. HINTON:
19      Q.   Yes.
20      A.   In number seven, the interrogatory that
21  you're talking about, your question was-- your demand
22  or request was to produce any text messages between
23  myself and Brie.  I'm not-- I was not able to produce
24  those text messages.
25      Q.   Why?

94

1      A.    Because I didn't have them.

2      Q.    Where were they?

3      A.    They were deleted.

4      Q.    Okay.

5      A.    I can't produce something that's deleted.

6  You're welcome to subpoena whoever you need to try to

7  get the copies.

8      Q.    Was that your typical thing, to delete text

9  messages with Brie after you had them?

10     A.    Not just with Brie, but with numerous

11  people, yes.  I have thousands of text messages in my

12  phone that slow it down.  As well as e-mail and other

13  forms of communication.

14          Mr. Hinton, I was simply responding to what

15  you requested me to do.  I was in no way trying to be

16  deceitful whatsoever.  I take a little bit of offense

17  to the fact that you said that I took your question

18  literally.  I don't know how else you would expect me

19  to take it.

20          MR. HINTON:  Your Honor, I'm going

21          to go to Exhibit NN.

22  BY MR. HINTON:

23     Q.    Can you go to that, Mr. Godlewski?

24     A.    In the big book?

25     Q.    Yeah.  Thank you.

95

1    A.    Okay.

2    Q.    Mr. Godlewski, I'm directing your attention

3  to Plaintiff's response to Defendant's interrogatory

4  set five.  And these were sent to me on December 8th,

5  2022.  And the second to the last page, is that your

6  verification page to your answers to interrogatories?

7    A.    Set five?

8    Q.    Yes.

9    A.    December 7th, yes.

10    Q.    Yes.  All right.  So let's take a look at

11  your answers to interrogatories for set five.  Number

12  one, how long has Plaintiff been using his current cell

13  phone for the number 570-780-4567?  And you say I've

14  been using that since September of 2022.  Is that

15  right?

16    A.    That's correct.

17    Q.    True and accurate?

18    A.    Yes.

19    Q.    Then I say number two:  Has Plaintiff

20  deleted any text messages he had with Brienne DuBorgel

21  while using the current cell phone or phone number for

22  that number?  Do you see that?

23    A.    Yes.

24    Q.    And what was your answer?

25    A.    No.

1    Q.    But now you just told the Court that you do
2 delete your text messages with Brie?

3    A.    At that time the cell phone was new.
4 September of 2022, that was the new model.  I believe
5 it was model 14 or whatever.  That was a new cell
6 phone.  The previous text-- When you asked me that
7 question, the answer was accurate.  I didn't delete any
8 of them.

9    Q.    Okay.  So how do you explain how your-- your
10 Telegram post has a text message on it from you?

11    A.    I don't know what you're referring to.

12    Q.    Let's look at Exhibit BB.

13    A.    What was the question?

14    Q.    That's a text message that you posted to
15 your Telegram page, is that correct?

16    A.    That's incorrect.

17    Q.    You didn't post that?

18    A.    That's not what I said.

19    Q.    Okay.  What is that?

20    A.    That is a screenshot of a text message.

21    Q.    From your phone?

22    A.    No.  It was taken from my laptop.

23    Q.    Okay.  Why didn't you produce it to me in
24 discovery?

25    A.    Because the text messages were no longer on

97

1  my phone.  That's what you asked for.  This is a

2  screenshot from a single-- looks like a single moment,

3  maybe a couple-minute conversation between Brie and I.

4  I have several screenshots like this.  You asked me for

5  text messages.

6      Q.   I asked you for any electronic

7  communications, Mr. Godlewski.

8      A.   This is not an electronic communication.

9  This is a screenshot, which is a JPG file.

10     Q.   So--

11     A.   I would have been happy to give you any

12 communications I had with Brie recently.  I have

13 nothing to hide there.  In fact, you have them all

14 anyway.

15     Q.   I do.  I got them from Brie.  I didn't get

16 them from you in discovery like you were supposed to

17 do.

18     A.   You didn't ask me for them.  You asked me if

19 I had certain messages, which at the time I did not

20 have.

21             THE COURT:  Is a JPG file considered

22        analog?

23             MR. GODLEWSKI:  Is it considered

24        what?

25             THE COURT:  Analog.

98

1      MR. GODLEWSKI:  No.

2      THE COURT:  It's digital?

3      MR. GODLEWSKI:  It is digital.

4      THE COURT:  He asked for digital

5  communications.

6      MR. GODLEWSKI:  It's a photo though.

7  It's not a communication.

8      THE COURT:  It's a screenshot of a

9  digital communication.

10      MR. GODLEWSKI:  Of a communication.

11      THE COURT:  A JPG file?  It's like a

12  Xerox-- if you were analog, it would be like

13  a Xerox of a letter.  You've taken your

14  screenshot-- You've taken your screenshot,

15  and you just made a duplicate of it.  So you

16  can transmit it to another party?

17      MR. GODLEWSKI:  Yes, that's correct.

18      THE COURT:  Yeah.  That's all

19  digital.

20      MR. GODLEWSKI:  That-- Yes, that's

21  digital.  That's correct.

22      I think, Your Honor, where I was

23  most likely misunderstanding the question

24  asked by Mr. Hinton was he asked me for text

25  messages and communications.  When I think

99

of the term-- the broader term

communications, I think of a sent e-mail or

a received e-mail, a sent text message or a

received text message.  This is one single

JPEG file that I had of a much broader

conversation.  I didn't have any more of the

communications between Brie and I.  And,

furthermore, if I did, I would have been

happy to produce them.  He's asked for

several hundred things through discovery,

which I produced all of.  Had I had them,

there's nothing incriminating there for me

in regards to this case.  I would have

gladly produced them.  I just no longer had

the communications.  Had I thought of a

photo in the context that you just

described, I would have given him the photo.

I don't know-- I guess it's my opinion.  But

I don't know-- I think this one screenshot

of a much larger conversation could be taken

quite out of context since it's just one

screen grab with ten lines on it out of

maybe a hundred or two hundred line--

            THE COURT:  Yeah, but your name is

on it so it would have been you that was

100

1    taken out of context.  You chose to make a

2    screenshot of that-- If we-- we think of

3    this in mathematical terms-- Okay?  --and

4    your entire message that you're concerned

5    about is a set--

6              MR. GODLEWSKI:  Right.

7              THE COURT:  --this is a subset of

8    that.  Right?

9              MR. GODLEWSKI:  Correct.

10             THE COURT:  So you've chosen to

11   create this subset?

12             MR. GODLEWSKI:  Yes.

13             THE COURT:  Okay.

14             MR. GODLEWSKI:  Correct.  But in

15   response to Mr. Hinton's question, I-- there

16   was nothing there that I deliberately

17   attempted to keep from the Court.  I think I

18   was probably-- Now I understand what he's

19   talking about, literal.  I was probably

20   taking his questions too literal.  And I-- I

21   don't-- it was not something that I

22   purposely, you know, tried to withhold from

23   you.  There was nothing content wise that

24   you could see that would have been harmful

25   to my case.

1  BY MR. HINTON:

2      Q.   Mr. Godlewski, if you look at these thousand

3  plus text messages, some of these text messages are

4  dated after I served you with discovery asking you for

5  the text messages and before you respond.  Like, in

6  twenty, thirty, sixty-day windows you're communicating

7  with Brie while the request for production or

8  interrogatories is pending.  You understand that,

9  correct?

10     A.   I don't know specifically what dates you're

11 speaking of.

12     Q.   Let's drill down on it.  So if you look at

13 the first interrogatories I sent you, do you have any

14 text messages--

15     A.   Do you have a copy of that?

16     Q.   --to or from the fifteen year old girl?

17 That's on July 9th, right?  And then I ask you in the

18 request for production of documents for copies of any

19 of those text messages.  When did you respond-- When

20 did you respond to--

21                MR. KOLMAN:  Objection, Your Honor.

22           Asked and answered.  He said--

23                THE COURT:  He didn't even finish

24           the question yet.  Let him finish the--

25                MR. KOLMAN:  Your Honor, if I may,

1              the question deals with a fifteen year old

2              girl.  That's something Mr. Godlewski has

3              already testified about.

4                    MR. HINTON:  I don't believe it.

5              How about that?

6                    MR. KOLMAN:  It's asked and answered

7              in the sense that--

8                    THE COURT:  Overruled.

9                    MR. KOLMAN:  --he already

10            testified--

11               THE COURT:  Overruled.

12               MR. KOLMAN:  --about texts from--

13               THE COURT:  Overruled, overruled,

14            and overruled.

15  BY MR. HINTON:

16     Q.   Mr. Godlewski, from the time I served you

17  with the interrogatories and request for production of

18  documents in early July, 2021, until the time of your

19  response on September 20th, there's thirty one pages of

20  text messages here, is that correct, during that time

21  period that it's pending?

22     A.   Yes, that's correct.

23     Q.   And are you-- Just so we understand your

24  position, you're saying I was inartful in the way I

25  asked for your text messages?

103

1   A.   Inartful?

2   Q.   Yeah.  I wasn't specific enough?

3   A.   I don't think that's a word.

4   Q.   I wasn't specific enough?

5   A.   Yes.

6              MR. KOLMAN:  Objection.

7   BY MR. HINTON:

8   Q.   And that's why you withheld the text

9   messages from production and discovery?

10  A.   I didn't withhold anything that was asked of

11  me at any time.  On your September 20th interrogatory

12  you asked me for messages or communications with a

13  fifteen year old girl.  I didn't have any of them.  I

14  haven't had them for years.  In fact, if anyone has

15  them, it would be the District Attorney's Office.

16             THE COURT:  Right above there, in

17             the Plaintiff's discovery time line, it

18             says:  These interrogatories are continuing

19             in nature.  It's the second box dated July

20             9th and July 12th.  These interrogatories

21             are continuing in nature and require you,

22             the Plaintiff, to file supplementary answers

23             pursuant to Rule 4007.4.

24             Did you ever file any supplementals?

25             MR. HINTON:  No, Your Honor.

1      MR. GODLEWSKI:  I don't believe so.

2      THE COURT:  Okay.

3      MR. GODLEWSKI:  But, again, Your

4   Honor, I was-- The specific question that

5   Mr. Hinton is asking me about right now

6   referenced twice question 33 and question

7   19, to or from the fifteen year old girl.  I

8   was quite literally taking his question as

9   it was asked.  I did not have any text

10  message conversations between myself and the

11  fifteen year old girl.  Had he said BD or

12  Brie DuBorgel, which he had said numerous

13  times afterwards, I would have answered

14  accordingly.  I wouldn't have-- I wouldn't

15  have purposely not answered the question.  I

16  asked what was-- I answered what was asked

17  of me quite literally.

18  BY MR. HINTON:

19  Q.   Well, let's examine that.

20  A.   Okay.

21  Q.   Let's go to August 22nd on the time line.

22       MR. KOLMAN:  Mr. Hinton, can you

23  move away from my client?

24       MR. HINTON:  I need a ledge here,

25  Tim.

105

1      MR. KOLMAN: Okay. Go ahead.

2      MR. HINTON: Thank you.

3      MR. KOLMAN: Go ahead.

4 BY MR. HINTON:

5   A. Where you at?

6   Q. Go to August 22nd in the time line.

7      THE COURT: About halfway down.

8 BY MR. HINTON:

9   A. I got you.

10   Q. It's asking you to produce any text messages

11 between Phil Godlewski and Brienna DuBorgel from 2008

12 to the present date. Is that right?

13   A. That's correct.

14   Q. Okay. And your answer was does not have

15 any, right?

16   A. Yes.

17   Q. And I'm showing you in the text messages,

18 ST-1483 through ST-1494, eleven pages of text messages

19 you had with her four days before your response?

20   A. That's correct.

21   Q. So--

22   A. I believe. Hold on one second.

23   Q. So four days before you sign a verification

24 saying you don't have any, you had eleven pages of text

25 messages with her four days beforehand?

106

1    A.    The text messages that I had with her four

2  days beforehand that you just-- yes, that did happen.

3    Q.    No confusion about a fifteen year old there,

4  right?

5    A.    No.

6    Q.    You knew I was asking for Brie--

7              MR. KOLMAN:   Objection.  He didn't

8              finish his answer.

9  BY MR. HINTON:

10    Q.    Go ahead, please.

11    A.    No, I had no confusion as to what you were

12  asking about.  My answer was I did not have any.  I had

13  deleted the text messages.

14              The things that Brie and I would speak about

15  often times, especially during this period, were

16  private, somewhat sexual, and somewhat embarrassing in

17  nature, including videos, photos that we sent, not just

18  from me to her, but from her to me, as Mr. Kolman

19  identified earlier.  That's not something that I tend

20  to, like, keep around in my phone.  So when I'm having

21  those type of conversations with Brie, or with anyone,

22  even with my fiancée now, I delete them afterwards for

23  fear of that someone is going to grab my phone or my

24  phone will be hacked into or something like that.

25              So when I answered the question, had I

107

1  known-- had I had the foresight to know that you were

2  going to ask that question four days earlier, I would

3  have absolutely saved the text messages.  At the time

4  you asked the question, and at the time that I

5  answered the question, my answer was Plaintiff does not

6  have any.  I do not have them.  They were deleted

7  because of privacy concerns, I guess, on my end and

8  for Brie.

9      Q.    But I served you-- As soon as you filed your

10 lawsuit, I served you with a preservation of evidence

11 letter, didn't I?

12     A.    Sure, yes.

13     Q.    Yeah.  Right in the beginning of the

14 lawsuit, preserve all electronic device evidence,

15 didn't I?

16     A.    Yes.

17     Q.    And you went ahead and you started deleting

18 all your text messages with Brie and your photos with

19 Brie, right, sexual photos?

20     A.    Not just those photos, but numerous things I

21 deleted off my phone.  I didn't think that anything

22 that I spoke with Brie about, especially of a-- of a--

23 of a nature such as, you know, a private nature was any

24 sort of evidence to this case.

25          My case is about suing the Scranton Times

108

1    and Chris Kelly for defamation.  I had no idea a

2    conversation that I had with Brie has anything-- any

3    sort of evidentiary value to that case.

4        Q.   She's the prime witness in your case, isn't

5    she?

6                    MR. KOLMAN:  Objection.

7             Argumentative.

8    BY MR. HINTON:

9        Q.   Isn't your case--

10                   THE COURT:  Overruled.  It's cross

11            examination.

12   BY MR. HINTON:

13       A.   What was the question?

14       Q.   Your case is principally based on the

15   accusation that the Scranton Times article called you a

16   pedophile, isn't that true?

17       A.   Amongst several other things.

18       Q.   Well, they called you a QAnon person, right?

19       A.   Amongst several other things.

20       Q.   Well, you are a QAnon person?

21       A.   I don't know what that means.  I'm sorry.

22   You'd have to define that.

23                   MR. KOLMAN:  Objection from people

24            laughing.

25                   MR. GODLEWSKI:  Yeah.  He's very

1      distracting, Mr. Kelly.

2              THE COURT:  Why don't we-- If you

3      can't behave, Mr. Kelly, you're going to be

4      asked to leave.

5              MR. KELLY:  Understood, Your Honor.

6      I'm sorry.

7  BY MR. HINTON:

8      Q.   Well, let's get back to this.

9           Are you telling the Court you didn't

10 understand Brienna DuBorgel was a principal witness in

11 this case?

12     A.   No, I did not think she was a principal

13 witness in this case at all.

14          Our case with the Scranton-- my case with

15 Lackawanna County from 2008, 9, 10, whatever the dates

16 were, was settled many years ago.  We went through a

17 numerous amount of discovery, subpoena requests, cell

18 phone gathering.  They raided my-- not raided, but they

19 went to my place of employment, took my computers from

20 there; my house, took my computer from there.

21 Interviewed several dozen people as I understand it.

22 There were private investigators involved from my

23 criminal defense attorney.  This case was settled.

24 This case was over with.  I--

25     Q.   Well, you pled guilty, right?

110

1      A.    I was--

2                  MR. KOLMAN:  Objection.  If he could

3            finish his answer.

4                  THE COURT:  He was correcting the

5            word settled.

6  BY MR. HINTON:

7      Q.    You pled guilty?

8      A.    I pled guilty to one charge out of about a

9  dozen charges.

10     Q.    Of corrupting Brie?

11     A.    Yes.  And the charges were nolle prossed

12 against me for all of the felonies and all of the other

13 charges that the Scranton Times has accused me of--

14 of-- has written being truthful.  That's not how it

15 ended up in Court.  There was a Court decision on the

16 matter.  Ms. DuBorgel had her day in Court.  Brie had

17 her day in Court, and she chose to not testify.

18 Therefore, even though all of those things were

19 collected in discovery against me, the District

20 Attorney could not prove their case.

21     Q.    Mr.--

22     A.    So I don't think Brie has anything to do

23 with this particular trial.  You brought her into it,

24 not me.

25     Q.    But you understand that in a defamation case

111

1    truth is a defense?

2                    MR. KOLMAN:  Objection.  Asks for a

3            legal conclusion.

4                    THE COURT:  Sustained.

5    BY MR. HINTON:

6        Q.    I just asked for your understanding.  You

7    might be wrong.

8            But do you understand that we're mounting a

9    defense to prove that you did, in fact, have a sexual

10    relationship with--

11                    MR. KOLMAN:  Objection.

12    BY MR. HINTON:

13        Q.    --Brie DuBorgel--

14                    MR. KOLMAN:  Same objection.

15    BY MR. HINTON:

16        Q.    --when she was fifteen?

17                    THE COURT:  I'm going to tell you

18            something, Tim.  I'm trying to keep this

19            civil.  I want you to use the courtesy used

20            in the past, which is let him complete his

21            question before you object to it.  I can't

22            rule on it if it's a partial question.

23                    MR. KOLMAN:  All right.

24    BY MR HINTON:

25        Q.    I lost my train of thought.

112

1          A.    Me too.

2                     THE COURT:  Linda, do you want to

3             read it back, please.

4                     (Whereupon, the referred-to question

5             was read back by the reporter.)

6     BY MR. HINTON:

7          Q.    Yes.  Did you hear that question?  That

8     we're asserting in this case, this defamation case,

9     that you did, in fact, have a sexual relationship with

10    Brienna DuBorgel when she was fifteen?  Do you

11    understand that?

12                     MR. KOLMAN:  That's my objection,

13            Judge.

14                     THE COURT:  Overruled.

15    BY MR. HINTON:

16         A.    Yes, I understand that's what you're trying

17    to do.

18         Q.    And that if we prove that, that you did, in

19    fact, have that relationship, it would be a defense to

20    that portion of your defamation case?

21                     MR. KOLMAN:  Objection.  Legal

22            conclusion.

23                     THE COURT:  He's just asking if he

24            understood.  Overruled.

25    BY MR. HINTON:

113

1    A.    Can you restate?

2    Q.    Never mind.

3          Mr.--

4    A.    I'm getting confused when--

5    Q.    Yeah.  Mr. Godlewski, the Telegram post you

6  have here, that coincides with the production from

7  Brienna-- Brienna's phone, which is Exhibit CC.  It's

8  the same text message here.  Is that correct?  If you

9  compare the two, right?

10                   THE COURT:  Tim, are you simply

11              asking him if PP and CC are the same thing?

12                   MR. HINTON:  As to one particular

13              text message, yes, Your Honor.

14                   THE COURT:  Okay.

15  BY MR. HINTON:

16    Q.    Can you read the heartstrings text message?

17    A.    The heartstrings?

18    Q.    Yep.

19                   THE COURT:  The top one on CC.

20                   MR. GODLEWSKI:  Oh.

21  BY MR. HINTON:

22    A.    So this would be from Brie to me on August

23  18th, two fifty seven p.m.  Listen, I already told you,

24  aside from your beef and tugging of the heartstrings

25  argument you have with Chris Kelly, or any prior

114

1    trouble aside from me, that is irregardless. But I

2    will make sure that no one ever calls you a pedophile

3    again, and our public beef can be squashed, and Linda

4    leaves us the-- Can I say it?

5        Q.    Yeah, you can say it.

6        A.    -- fuck alone.

7        Q.    Yeah.  Okay.  So that's-- that's from the

8    production, the forensic download of Brie's phones, you

9    understand that, correct?

10       A.    Yes.

11       Q.    And then there's also a version of that text

12   message in Exhibit BB that's from your perspective, is

13   that correct?

14       A.    My perspectives?

15       Q.    It came from your laptop or your phone?

16       A.    Yeah.  That's the same screenshot that we

17   referenced earlier, the JPEG that I posted to the--

18       Q.    What's the date of the text message from

19   Brie about heartstrings?

20       A.    It's August 18th, 2022, two fifty seven p.m.

21       Q.    Okay.  Now, you had access to your version

22   of that text message, from your perspective?

23       A.    Yes.

24       Q.    And I assume you had other text messages

25   with Brie?  This wasn't just one isolated text message

115

1  on your laptop, you had many text messages with her?

2      A.    Yes.

3      Q.    And you didn't give me any of them?

4      A.    I had already explained this.

5      Q.    But I-- It's a yes or no.  Did you give me

6  any of your text messages in discovery?

7      A.    You asked me to produce text messages that

8  I had, and I did not have any at the time you asked

9  me.

10     Q.    And then when I asked you to describe your

11 communications with Brie, the only thing you said in

12 answer to my interrogatory was I forewarned her about

13 the lawsuit you were about to file to make sure she was

14 going to be okay with it, is that correct?

15     A.    You asked me if I had ever spoke -- Can you

16 show me what you--

17     Q.    Yeah.  It's right here.  On July-- On

18 November 9th, on the time line, I asked you if you've

19 had communications with her, to state the substance of

20 them?

21     A.    Yes.

22     Q.    Your answer on November 9th was:  You spoke

23 to her in person about the filing and warned her that

24 it was eminent, right?

25     A.    Yes.

116

1       Q.    You didn't admit to any of these text
2  messages that you had with her?
3       A.    I never spoke to Brie about the lawsuit in
4  the text message format.  The only time we ever spoke
5  about the lawsuit was in person or, I believe, over the
6  phone.
7       Q.    All right.  Let's get the pile of text
8  messages out from Brie's phone.
9       A.    Is that this here?
10      Q.    Yes, please.
11      A.    Okay.
12      Q.    So the first one I want to point your
13 attention to is on Page 1456.
14      A.    I'm sorry, Tim.  These are massively out of
15 order.  I got 1457, and then it goes to 1022, 1459.
16      Q.    Follow along with me.  I'll give you a new
17 stack.
18                  THE COURT:  Did you say 1456, Tim?
19                  MR. HINTON:  Yes.
20 BY MR. HINTON:
21      Q.    So 1456, you sent her a text message on
22 May 28th.  There were a lot of text messages that day,
23 right?
24      A.    I see one right now.  I don't remember what
25 else.

117

1    Q.    We're going to go through them.

2    A.    Okay.

3    Q.    And you text-- This is your text message to

4    her, right?

5    A.    Yes.

6    Q.    And you said:  But I get the feeling you

7    already know so I'll back off.  I'll be here if you

8    want to meet up and check.  Do you say that to her?

9    A.    Yes.

10    Q.    Okay.  You had asked her to hang out, right?

11    A.    Yes.

12    Q.    Let's flip forward here.  I don't want to

13    take up too much time of the Court's time.

14         Then on 1459 you text her and you say:  I

15    think it might be fair to say that there's a very, very

16    large and very, very unique financial opportunity that

17    exists in front of you.  Is that what you wrote to her?

18    A.    Yes.

19    Q.    And what-- Why did you write her that text

20    message?

21    A.    At the time we were-- my team and I were

22    considering starting a-- a new-- a related business to

23    the businesses that I had already started regarding

24    gold and silver.  I think you're aware of my PSI and 7K

25    business.  We were about to start another one in a

118

1    similar fashion. And what I learned with the first

2    one, I incorrectly set it up. In the way that MLM's

3    and direct sales companies operate you kind of want to

4    have your most-- you kind of want to have your people

5    at the top of the chain that are going to be most

6    reliable, most trustworthy, most communicative--

7    communicative. You want to put good people up at the

8    top.

9           So when we were starting this new company I

10   wanted to, this time, which I didn't do the first time,

11   I wanted to, this time, make sure that I solidified my

12   downline or upline, as they call it, with the proper

13   people. And I believe the first time that I did this

14   with my first business it wasn't going to go well.

15          Now, this particular business I was trying

16   to get Brie-- I knew she was having financial trouble

17   from our prior conversations. I knew that she had

18   ambitions to go to out of state to maybe do some legal

19   work and stuff like that for her degree that she was

20   trying to obtain. So I thought-- Brie and I always had

21   a very good relationship, always from day one.

22   Anybody that says otherwise is-- is a liar. So as a

23   friend to Brie, and as a long-time acquaintance, as

24   Brie has testified to today, I was trying to put Brie

25   in the top of this company so that she could benefit

119

1  financially from it once it was launched.

2      Q.    To sell silver or gold?

3      A.    No.  This was not a gold or silver company.

4  This was an IRA, 401k rollover company.

5      Q.    Goldco?

6      A.    It's not Goldco.  It's actually-- Goldco was

7  one of the vendors, but there are several vendors that

8  are part of my GoldQuiz.com lead funnel I guess you

9  would call it.

10      Q.    Did you ever make her an offer to get

11  involved in that company?

12      A.    I wanted to.  She never responded.

13      Q.    Okay.  All right.

14      A.    She didn't-- She didn't seem interested.

15      Q.    What--

16      A.    I think she may have assumed that I might

17  have been talking about the Scranton Times case when I

18  wasn't.  I was trying to help her.

19      Q.    Okay.  So what was unique about this

20  financial opportunity for her?

21      A.    The money.

22      Q.    Oh.

23      A.    The amount of money associated with it.

24      Q.    All right.  So go to the next page, 1460.

25  You wrote to her:  The type of opportunity that happens

120

1   to hardly anyone.

2       A.   Yes.

3       Q.   That was this rollover retirement accounts

4   into gold or silver?

5       A.   Can I tell you what I meant by that

6   particular comment?

7       Q.   Sure.

8       A.   When I say the type of opportunity that

9   happens to hardly anyone, I don't necessarily mean

10   somebody rolling over their 401k or IRA into precious

11   metals.  What I meant was me-- in the position that I'm

12   in, as a social media influencer or whatever you guys

13   want to call me, I have a large following.  I have ten

14   million, twelve million, fourteen million people that

15   will watch me when I go live on social media.

16       The unique opportunity is that when I launch

17   something in front of that many people, it's a numbers

18   game at that point.  If I could get one percent of

19   those people to sign up for the company, that's a lot

20   of people.  That's way more than anybody in this room

21   or really anybody-- anyone can potentially get.  So

22   Brie being at the top of that company chain, I thought

23   it would help her for the rest of her life, which was

24   important to me considering all we've been through.

25       Q.   Go to 1463, please.

121

1            Mr. Godlewski, on Page 1463 Brie responded
2    on this same day as part of this same conversation:
3    Oh, are you trying to recruit me for the silver thing?
4    And you responded.  If you could make the noise that
5    you would-- You said (making a non-transcribable sound)
6    No.
7            A.    It's more a (making a non-transcribable
8    sound).  Not a (making a non-transcribable sound).
9            Q.    Right.  But your impression was no, you
10   dummy?
11           A.    Yeah.
12           Q.    Yeah.  "I'm not trying to recruit you for
13   silver."?
14           A.    Correct, yeah.
15           Q.    All right.
16           A.    The silver thing I had launched in August of
17   21.  It was launched way prior to this conversation.
18   So Brie-- I would have had no opportunity to circumvent
19   the people that were already enrolled in 7k Metals or
20   Phil's Silver through Phil's Silver with Brie.  Once
21   you're enrolled, you're enrolled.  You can't go up the
22   upline, you have to go down the downline.  So Brie
23   getting enrolled then made no sense.  Getting enrolled
24   in GoldQuiz though, that did make sense.
25           Q.    Mr. Godlewski, you then responded, after you

122

1  said no, you said:  We really need to meet and chat.

2  Is that correct?

3      A.   Yes.

4      Q.   And then on the next page you said:  I can't

5  talk about this through text or over the phone.  Is

6  that correct?

7      A.   Yes.

8      Q.   Why couldn't you talk about getting involved

9  in your 401k businesses by phone or text?

10      A.   I was advised not to.  I have several

11  attorneys that represent me for FTC and SEC compliance

12  guidelines.  When you do advertise this type of thing

13  on social media, and you do have a lot of people

14  listening to you, it's very, very easy to misstep out

15  of place and violate one of their-- one of their rules

16  or regulations.

17           So in recruiting for this team that I was

18  doing, which was part of this conversation, I wanted to

19  make sure that I abided by their wishes.

20                MR. KOLMAN:  Your Honor, I have an

21           objection.  I just don't see how this is

22           related to the issues before the Court in

23           terms of discovery.

24                MR. HINTON:  Your Honor, I'm almost

25           done with this chain.  It goes to intent,

123

1      too, by the way, Your Honor.

2           MR. KOLMAN:  My client didn't have

3      these documents, you know, before they were

4      produced.  And I'm not sure-- I mean, I

5      think Mr. Hinton is about to tell us why

6      he's asking these kind of questions.  I

7      think it's far afield.

8           THE COURT:  I don't.  Overruled.

9  BY MR. HINTON:

10      Q.   Mr. Godlewski, go to 1468, please.  The top

11  message to Brie, again on May 28th, can you read that

12  message?

13      A.   It's May 28th, 2022.  Okay.  Period.  Well,

14  that makes me feel better.  When you're ready I have an

15  opportunity that involves the both of us, but it

16  won't-- it won't work with just one of us.  I don't

17  know which way to go with it until I speak to you so

18  remember me when you feel better and we'll talk.

19      Q.   Then your bottom text messages reads:  But

20  it's a very delicate situation and unless it's handled

21  properly by both of us we stand to benefit absolutely

22  nothing.  And there is a financial windfall here if

23  handled properly.  That's all I can say through text.

24  I don't trust those motherfuckers, and I'm literally

25  foaming at the mouth to take them down once and for

124

1  all.

2        So are you still talking about your IRA

3  business that you've got on the horizon here?

4        A.    Yes.

5        Q.    Okay.  Whose-- Whose the motherfuckers that

6  you don't trust?

7        A.    That's a long answer, but I'll try to

8  incorporate it into a small response.  I really don't

9  like right now the Federal Government.  I think that

10  the IRS, the Federal Reserve, and several other

11  branches of government are highly, highly corrupt.  And

12  the fiat dollar of the United States is something that

13  I distrust more than anything in the world right now.

14        And when I referred to those motherfuckers,

15  I am specifically talking about the people that I

16  believe I'm helping to-- to take down by getting

17  people's money through GoldQuiz, which is an IRA, 401k

18  rollover to precious metals.  Precious metals, the

19  government can't touch precious metals in the manner of

20  which that I had it set up for Goldco.

21        So I highly, highly distrust government.

22  Not all government, like, you know, Judge Minora or

23  anything like that.

24                THE COURT:  I don't take it

25        personally.

125

1                    MR. GODLEWSKI:  Thank you.

2  BY MR. HINTON:

3       A.   I really don't mean, like, you know, local

4  government like this.  In some cases I do.  But in this

5  particular conversation-- And I wish I had the

6  opportunity to explain it to Brie in more detail, but I

7  was referring to, in particular, the Federal Reserve.

8  I really think it's best for everyone to take their

9  money that they have in savings and roll it to precious

10 metals if possible for numerous reasons, which will

11 take me an hour to explain.

12      Q.   Was it just a coincidence that fifty seconds

13 later you wrote to Brie on the next page, very next

14 text message:  "You're a good person, Brie.  You don't

15 deserve anything that's happened to you since we met

16 all those years ago.  And I think it's time to set the

17 record straight and shove our collective middle fingers

18 directly up their fucking assholes."?  Is that what you

19 wrote?

20      A.   Yes.

21      Q.   So is that the Federal Government, too, or

22 is that the Scranton Times?

23      A.   That-- No.  None of this was about the

24 Scranton Times.  First of all, I apologize for my

25 language.  This is how Brie and I had always

1 corresponded with this type-- I know it doesn't, you

2 know, sound like something that you would typically

3 hear.

4 But Brie had been put into, for the last ten

5 years-- Keep in mind I have a very close relationship

6 with Brie. Brie had been put into very, very, very

7 desperate financial constraints for a very long time.

8 Brie was having trouble getting an apartment, keeping

9 an apartment. From what she had told me, her family

10 was of little help to her. Brie had several thousands

11 of dollars in credit card debt. Brie had various loans

12 that I think had been suffocating her for a very long

13 time, not only credit cards and stuff like that, but

14 also student loans. And I really think that what these

15 entities have done to people like Brie and many others

16 are despicable, and I wanted to collectively shove our

17 middle fingers directly up their fucking ass.

18 Q.    Going to 1480, you specifically listed the

19 Scranton Times in that text message?

20 A.    Which one?

21 Q.    Page 1480.

22 A.    Yes.

23 Q.    You said: Listen, my friend. Things are

24 getting very nasty with the Scranton Times. I think

25 you should know what's going on. I'd like to talk to

127

1    you in person.  Right?

2        A.   Yes.

3        Q.   You don't want to talk in text or phone?

4        A.   No.

5        Q.   In person?

6        A.   Right.

7        Q.   I don't want you to be blind-sided by any of

8    this.

9             Then on the next page you write to her:  I

10   have your back, Brie.  You're the one suing, not her,

11   but you have her back, right?

12       A.   Yes.

13       Q.   You should see what they're trying to do to

14   me; it's absolutely awful.  Is that right?

15       A.   That's right.

16       Q.   They're defending themselves in a lawsuit,

17   right?

18                    MR. KOLMAN:  Objection.

19                    MR. HINTON:  Withdrawn.  Withdrawn.

20            That's fine.

21   BY MR. HINTON:

22       Q.   And then she writes you a very long text

23   message--

24       A.   Oh.

25       Q.   --on August 6th, 2022.  I'll read you a

128

1  portion from the bottom:  I'm--

2              THE COURT:  The bottom of 1481 or

3         1482?

4              MR. HINTON:  1482.  Sorry, Your

5         Honor.

6              THE COURT:  Okay.

7  BY MR. HINTON:

8     Q.    And I'm about twenty percent from the

9  bottom.  I'm legit in school for what I'm in school for

10 to protect myself against this shit and boring, sad,

11 lonely people from Scranton, PA, who have nothing

12 better to do than talk about a guy and a girl having

13 sex literally almost fifteen years ago.  I mean, it's

14 fucking pathetic and obnoxious to me now.  Phil, if we

15 can come to an amicable agreement so nothing-- that has

16 nothing to do with my schooling or you thinking

17 whatever you-- whatever, or my family or Chris Kelly or

18 any of it, if you and I can come to an amicable

19 agreement that you stop dragging me publically and

20 defending yourself and with defending yourself comes

21 making me look like a fuck-- the fucking asshole, if

22 you can agree to stop letting these bored-ass low-lifes

23 get under your skin and get a rise out of you and shut

24 your big opinionated mouth for ten minutes and stop

25 giving people ammo to shoot back at you, I can

129

1   promise-- I can and promise and I will make sure that

2   when all of this stops that you never have reason to

3   defend yourself ever again because I'll make sure that

4   the Times leaves you alone, leaves me alone, my family

5   alone, and my family and friends leave you the fuck

6   alone.  What do you think I've been doing, huh?

7   Listen, your personal shit aside, I don't care, and I

8   don't know-- I don't either, but publically we are

9   still tied and people are still bored and jerking off

10  to our sex life from fifteen years ago, and it's

11  honestly so weird and overbearing and fucking obnoxious

12  to me and I can't hear about it any more.  No Amanda,

13  no political tube, no lives, nothing.  You and I have

14  come to some kind of terms and all I ever wanted from

15  you is to please stop calling me a liar and making me

16  look like an asshole when it's not true, and all I've

17  ever done is try to protect myself and you by

18  association.  How's that?  And your response to her on

19  the next page--

20       A.   I'm sorry, Tim.  I don't have the next page

21  here.

22       Q.   Read your response into the record, please,

23  from 1485.

24       A.   Let's--

25       Q.   Meet?

130

1    A.    You said 1485.  I'm sorry.  I thought I was
2    on the wrong page.
3    Q.    Yeah.  The highlighted text message at the
4    top.
5    A.    Okay.  Let's meet and talk.  I think we're
6    mostly on the same page.
7    Q.    Okay.  And you didn't say to her, in
8    response to her long e-mail, no, we never had sex
9    fifteen years ago?  You said we're mostly on the same
10   page, right?
11   A.    In that particular text message I did not
12   say that, no.  And I-- based on what she wrote, which
13   was-- I've got to be honest with Brie and everybody
14   else.  I didn't read that entire text message when it
15   came through.  It looks like a lot on this page, but
16   imagine seeing it on the phone.  I read it several
17   hours later.  And most of what she said in that text
18   message is true, which is exactly what my response was.
19   Most.  Not all, but most.
20   Q.    You weren't talking about IRA's then, right?
21   You're talking about the Scranton Times?
22   A.    Well, first of all, you're taking these text
23   messages out of context because this is four months
24   later from the text messages that I was talking about
25   the IRA's before.

131

1      Q.   You don't have any text message that ever
2  mention IRA's, do you?

3      A.   Yes.  We just went over them.

4      Q.   How about the letters IRA, are they in any
5  of your text messages?

6      A.   No.  And as I testified to before, my
7  attorneys for that particular company told me not to
8  mention anything in writing or communicatively, however
9  you want to phrase it, in regards to that.  That's why
10  I was so coy on disguising what I was talking about.
11  But you're trying to link text messages from August and
12  September to text messages that happened in May.  And
13  that's an improper linkage, and you're trying to take
14  things out of context.

15         And, yes, most of what Brie said in that--
16  And by the way, you didn't read eighty percent of it.
17  Most of what she said in that text message is accurate
18  as I said in my response.

19      Q.   You-- When you pled guilty to corrupting
20  Brie in 2011, did you do that out of financial
21  reasons?

22         MR. KOLMAN:  Objection, Your Honor.
23         We're so far afield.  This is discovery, and
24         now he's asking about the plea, I mean, as
25         if it's a deposition.  I don't see how this

132

1        connects to the issues before the Court,

2        which are did he respond properly or did he

3        not, is he lying or is he not.

4             THE COURT:  Well, he is looking at

5        his responses when he's asking these

6        questions, isn't he?

7             MR. KOLMAN:  Your Honor, I didn't

8        object before.  I'm objecting now.  I think

9        it's too far afield.

10            THE COURT:  You want to respond to

11       the objection?  He's asking about his

12       motivation at the time of the guilty plea.

13           MR. HINTON:  Your Honor, I'll

14       withdraw it.  I'll withdraw it.  Let's stick

15       to the text messages.

16 BY MR. HINTON:

17    Q.   And so I'm trying to get straight your

18 sexual relationship with Brie.  You said it started in

19 2015?

20    A.   Ish.  Yes.  I don't remember the exact date,

21 but that would be the year, ish.

22    Q.   And did it carry on for years after that,

23 off and on?

24    A.   I wouldn't say years, but it carried on off

25 and on.

133

1    Q.    Okay.  And would you agree with me that it

2    would have been important for us as defendants to know

3    that a witness in this case you had a sexual

4    relationship with?

5    A.    As I testified to before, I never thought

6    Brie-- as Brie-- I never thought of Brie as a witness.

7    I was suing the Scranton Times and Mr. Kelly for

8    something defamatory that they said.  And I stand by

9    that today.  Brie had absolutely nothing to do with

10   what they said.

11   Q.    They said you had sex with her when she was

12   fifteen?

13   A.    That's correct.

14   Q.    And--

15   A.    Brie didn't make them say that.  Brie didn't

16   ask them to say that.  Brie didn't ask for any of this.

17   Neither did I.  They brought this upon themselves.

18   They called me a pedophile in front of millions and

19   millions of people, one of which is back there today in

20   charge of a hate group that is directing threats

21   towards me all the time.  And because of that article--

22   This was dead.  This case was dead for ten years.

23   Everybody had moved on.  They wrote the article, and it

24   drug it back up.  I'm suing them.  I'm not suing Brie.

25   You brought Brie here today, and you brought Brie into

134

1  this, not me.

2      Q.   So looking at your text messages again, now,

3  we talked about the financial--

4      A.   And it's pathetic that you did that, by the

5  way.

6      Q.   I'm sorry?

7      A.   Sorry.

8      Q.   What did you say?

9      A.   I think it's pathetic that you brought Brie

10  into this.  It's my own personal opinion, but it's

11  pathetic.  She doesn't deserve it, and you know it.

12              THE COURT:  Why don't you just

13              answer the questions that are put to you.

14              MR. GODLEWSKI:  I'm sorry, Your

15              Honor.  I know, it gets me fired up.

16              THE COURT:  You can editorialize all

17              you want when you're on the internet.

18              MR. GODLEWSKI:  I know.  I'm used to

19              it.  I gotcha.  I apologize to the Court.

20  BY MR. HINTON:

21      Q.   Mr. Godlewski, you did hear the witness

22  testify that she called me?  She wanted you to stop

23  your nonsense?

24      A.   Yes.  You didn't tell the full truth about

25  what she said to you though.

135

| | | |
|---|---|---|
| 1 | Q. | Tell me.  Explain. |
| 2 | A. | She called you for help.  Is that funny? |
| 3 | Q. | Yeah, it is funny. |
| 4 | A. | You're going to lie now? |
| 5 | Q. | She wanted me to know the truth. |

6          MR. KOLMAN:  Objection.

7  BY MR. HINTON:

8     A.   No, she didn't.

9          MR. KOLMAN:  Objection to

10         characteristics made by counsel.

11  BY MR. HINTON:

12     A.   She called you for help.  We'll get into

13  that when it comes to the trial.

14     Q.   Mr. Godlewski, you texted Brie, in terms of

15  your sexual past, on March 31st, 2021.  This is on

16  Page ST-1061.  I had no idea your papa died.  I'm so

17  sorry.

18     A.   Can you tell me what page?  Yes.

19         THE COURT:  ST--

20         MR. HINTON:  ST-1061, Your Honor.

21  BY MR. HINTON:

22     A.   We're going now back to March of 21?

23     Q.   Yes.

24     A.   Okay.

25     Q.   Did I read your text message correct?

136

A.    Yes.

Q.    You had no idea her grandfather died?

A.    Yes.

Q.    And you then wrote:  I think we had sex in their bed though.  Grandparents' bed?

A.    Yes.

Q.    And did you have sex in the grandparents' bed?

A.    No.

Q.    You just made that up?

A.    I didn't make it up, but if I could explain. When the case in 2009, 2010 surfaced, I was being accused of so many vulgar, incorrect things.  I think at one point the Scranton Times and the District Attorney said that-- One or the other, I don't remember which one, said that we had sexual intercourse in half the houses in Northeastern Pennsylvania, which would amount to about-- I did the math on this way back when. --about fifty thousand houses.  So when Brie and I, in years after, which is 2021, in years after the case Brie and I would constantly try to make light of it. It was a very, very bad time in both of our lives for many years, even to this day obviously, and we would always try to joke about it in some way, shape, or form.  And what I was attempting to do there is

137

1    actually a psychological tactic.  I mentioned her

2    grandfather, which I never spoke to her about until

3    that text message, and then I realized, oh, shoot,

4    maybe I shouldn't have brought that up in this manner

5    through text.  So I tried to make light of the

6    situation, and it was just really, really terrible

7    communication on my part.  But I tried to.

8        Q.   Well, on Scranton Times 1083 she wrote to

9    you-- This is on March 31st, 2021.  We haven't been all

10   up under each other in so long.  Right?

11       A.   Yes, that's correct.

12       Q.   And you responded back very long?

13       A.   Yes.

14       Q.   Meaning the two of you hadn't slept together

15   in a very long time?

16       A.   That's correct.

17       Q.   And that's true?

18       A.   Yes.

19       Q.   Okay.  Did you offer Brie any money at any

20   point in time?  Did you offer any financial assistance

21   to Brie?

22       A.   At any point in time?

23       Q.   How about in the last two years?

24       A.   Yes, I have.

25       Q.   When was that?

1    A.   At some point last year Brie was, according

2  to what she told me, struggling to make ends meet with

3  college, and she had a very vigorous schedule in

4  college.  She would take a numerous amount of credits

5  per semester, which didn't really leave a lot of time

6  in the day to work.  So I believe we discussed, you

7  know, some sort of loan.

8       As I said before, I've always been-- whether

9  it's true or not, I always felt like I was a brother to

10  Brie.  And I always felt that it was somehow my

11  responsibility to help her if I could.  We've had,

12  obviously, some very well known public episodes with

13  one another.  But in the grand scheme of things we

14  always seemed to have each other's backs.  So when she

15  requested to me-- or when she informed me that she was

16  having some financial difficulty I was-- I was the

17  first to say that I could help.  In fact, I've done

18  that with dozens of people within the same time frame,

19  both family and non family.

20    Q.   Have you threatened to sue Brie because of

21  her giving me this Affidavit?

22    A.   Yes.

23    Q.   And did you threaten to sue--

24    A.   Can I retract real quick?  I didn't threaten

25  Brie directly, but I did say that I was considering a

139

1   lawsuit against Brie.  But I never went to Brie and
2   said hey, I'm threatening you to-- You know, in the way
3   that you asked it, I just wanted to clarify that.
4       Q.   So you never threatened to sue her into
5   oblivion?
6       A.   I don't know what context or what you're
7   referring to.  If you could show me, I'd be happy to
8   clarify it or comment on it.
9               MR. HINTON:  Your Honor, I'm going
10              to pull up a video if that's okay.
11              THE COURT:  You're--
12              MR. KOLMAN:  I'm going to object
13              because I don't see how this is connected
14              with Mr. Godlewski's response to
15              interrogatories and document requests.
16              THE COURT:  Tim, before you go up on
17              video now, he's made an objection.
18              MR. HINTON:  Your Honor--
19              THE COURT:  How is it related to the
20              discovery issues we're here for?
21              MR. HINTON:  So Mr. Godlewski, in
22              our opinion, our position is he's gone from
23              trying to buy her as a witness in this case
24              to now attempting to threaten and intimidate
25              her.  And I have him on video doing exactly

140

1    that.  He's not going to sue just Brie.
2    He's going to sue Brie's parents.  He's
3    going to sue Brie's grandparents.  He's
4    going to sue me.  He's going to sue my law
5    firm.  He made all of these statements on
6    December 5th, broadcast them to his ten
7    million followers, and he's done nothing.
8          MR. KOLMAN:  Your Honor, so what?
9    You know, this has nothing whatever to do
10   with what's before the Court.  Just bluster
11   at this point.
12         THE COURT:  We're not here to try
13   the case.  We're here to try whether--
14         MR. HINTON:  Your Honor, this is a
15   travesty.
16         THE COURT:  --whether his responses
17   have been adequate.  That's the reason why
18   we're here, right?
19         MR. HINTON:  Your Honor, she had the
20   courage to come forth and give us five
21   hundred pages of text messages that he hid,
22   that he lied about, that he hid.  And now
23   that she's done that--
24         MR. GODLEWSKI:  I feel a little
25   uncomfortable, Your Honor.  I don't know if

141

1    that's--

2    THE COURT:  Too bad.  Deal with it.

3    MR. HINTON:  Now that she's done

4    that, we've now gone to threaten, harass,

5    and intimidate.  That's where we're at in

6    this case.  We've gone from buying her off

7    to threaten and intimidate.  And I have the

8    proof.

9    MR. KOLMAN:  Your Honor, then I

10   would urge Mr. Hinton to go to the District

11   Attorney or state that it is an intimidation

12   of a witness.  But this is not the context.

13   It's irrelevant to what's before the Court.

14   THE COURT:  All right.  So how does

15   this video, assuming I accept your offer,

16   how does this video advance-- You're saying

17   that the-- all these responses to discovery,

18   which is all we're here for-- You want to

19   try it on the merits, but we're not here for

20   that.  We're here for discovery issues.  So

21   how does that advance your position?  You're

22   saying now that there was a financial

23   incentive, and when that failed it became--

24   MR. HINTON:  Intimidation.

25   THE COURT:  All right.  I get that.

142

1          How does that fit into the discovery rules?

2                    MR. HINTON:  I'll leave it.

3                    THE COURT:  You understand why I'm

4          asking that?

5                    MR. HINTON:  I do, Your Honor, but

6          this has been a game, you know.  You've seen

7          the filings.  It took a year to find out

8          that he possess no Harvard Certificate, that

9          he filed no tax returns.  That's fine.  All

10         I wanted was a response nailing it down.  It

11         took discovery, motion to compel, motion for

12         sanctions.  Then they violated your order.

13         They were supposed to give them to me within

14         ten days; they didn't do that.  They waited

15         forty, fifty days.  Mr. Kolman and I-- I got

16         them-- I had to write them for him, what I

17         wanted.  I got them, we nailed it down.  We

18         didn't nail down one thing, though, and it's

19         his lives.  He broadcast to millions of

20         people, and he's hiding his lives.  He's

21         basically said to me, you know, all I got--

22         I don't have them.  I don't have any lives.

23         He's saying-- You know, despite what he says

24         to his followers, Your Honor-- And if I

25         could play this because this is on point to

143

1    an issue that's remaining, the live videos.

2         THE COURT:  How long?

3         MR. HINTON:  Two minutes.

4         THE COURT:  Just turn the volume up.

5         MR. HINTON:  I will.

6         MR. KOLMAN:  Just ask for an offer

7    of proof, Judge.

8         THE COURT:  Pardon?

9         MR. KOLMAN:  I'm asking for an offer

10   of proof.  What is it?

11        THE COURT:  I think he just

12   explained it, but I-- What is the offer of

13   proof, Tim?  Before you play it, what's the

14   offer?

15        MR. HINTON:  He says he has his live

16   videos in a safe, in a digital safe.

17        THE COURT:  Do the best you can,

18   Linda.

19        (Whereupon, the following is the

20   video being played and Mr. Godlewski is

21   speaking.)

22        I'm doing this for my children.  I

23   guess it's two-fold.  I know what's

24   happening.  I know what's about to happen.

25   I know where we're going, and I want to

144

1    document all of it.  Every minute of every

2    single time I go live I have all these

3    saved, not only, you know, on a computer or

4    in a cloud somewhere, or on Rumble or

5    YouTube or whatever, but I have every one of

6    my lives that I've ever done in digital

7    files that I keep in my safe so my kids will

8    some day go back and be able to watch

9    whatever ones they want to watch of their

10   dad talking to hundreds of thousands of

11   people telling them of what's to come,

12   educating, teaching, and comforting a lot of

13   people through the process of which I'm

14   doing right now, and I've been doing.  And,

15   secondly--

16            (Whereupon, the video ended.)

17            MR. HINTON:  So, I mean, he's saying

18   to his millions-- Mr. Godlewski, I asked a

19   simple request.  Give me a copy of your live

20   videos.  Don't make me go searching the

21   internet trying to find these things, and

22   he's basically done just that.  Go to

23   Rumble, see what you can get from Rumble.  I

24   don't have any.  But he tells his millions I

25   have them all saved digitally in a file.

1          You ordered him to supply me those

2    on November 14th within ten days.  He has

3    defied your order.  That is a reason we're

4    here, too.  Not just hiding the text

5    messages.  Give me your live videos.

6          This guy is a Holocaust denier--

7          MR. KOLMAN:  Okay.  Objection, Your

8    Honor.

9          MR. HINTON:  He's got--

10          MR. KOLMAN:  Objection.

11          MR. HINTON:  He's got videos all

12    over the place.

13          MR. KOLMAN:  Objection.

14          MR. HINTON:  On multiple platforms.

15          MR. KOLMAN:  Your Honor, that was

16    answered.  What happened was that his

17    Facebook-- these were on Facebook, and then

18    Facebook deleted his presence, and with it

19    all those files.  The only place where those

20    files are is on Rumble.  So--

21          THE COURT:  He just said they were

22    in a safe, too.

23          MR. KOLMAN:  Yeah.  And I think he

24    should be asked about that, instead of Mr.

25    Hinton coming to, you know, conclusions

146

1      which are incorrect and also laughing in the

2      interim, which I think is unprofessional.

3             THE COURT:  Well, follow up on this.

4      Let's go.

5  BY MR. HINTON:

6      Q.    So where's the safe?

7      A.    I don't know what you're referencing.  I'm

8  sorry.

9      Q.    You just listened to the video.  You said

10  you have a copy of all your videos for your children's

11  sake so they can see all the good you've done.  You've

12  got them digitally saved in a safe.  Where is the safe?

13     A.    The concept of digitally saving something is

14  in direct contrast to physically saving something,

15  first of all.  You can't digitally save something

16  physically.  So when that's--

17             THE COURT:  Sure you can.  You can

18             back it up and make it a hard copy and put a

19             hard copy in a safe.

20             MR. GODLEWSKI:  Yeah, but--

21             THE COURT:  I'm an idiot on

22             computers and--

23             MR. GODLEWSKI:  You don't call that

24             digitally, though.  That would be physically

25             saving it to a thumb drive or something like

147

1   that.  I'm not able to do that with the

2   platforms that I run.  The safe comment,

3   although I probably used it out of context,

4   and I can see how it could be misconstrued,

5   the safe comment went towards an old

6   mechanism that YouTube had in place.  I

7   was-- When I was starting my live broadcast

8   the only place that I would do my live

9   broadcast on was Facebook.  On the

10  Inauguration of 2021, January 20th Facebook

11  suspended and deleted my account

12  permanently.  Every single live that I used

13  to store on Facebook had been deleted.  On

14  that day, or in the days following that day,

15  I then transitioned to YouTube.  YouTube had

16  an encrypted software feature at the time

17  anyway.  I would ask when that video was

18  taken because it's old.  That was when I was

19  still on YouTube.  In fact, I saw the

20  YouTube logo on it while I was just watching

21  it.

22       YouTube had an encryption software

23  type thing that they called a digital safe.

24  That is literally what they called them.

25  Now, the context that I said it on that

148

1        video was improper, and I can see how you

2        might have been misled to think that a safe

3        means, you know, a combination safe.  That's

4        not what I meant.  YouTube had all of my

5        videos from January 20th up to the point

6        that I said that.  YouTube deleted my

7        account.

8  BY MR. HINTON:

9        Q.   So Facebook deleted your account, YouTube

10 deleted your account?

11       A.   That's correct.

12       Q.   What about your videos on Telegram?

13       A.   All of my videos are on Telegram.

14       Q.   Well, you have the ability to remove stuff

15 from your channel, correct?  You can make them

16 accessible or not accessible?  Aren't you in charge of

17 your channel?

18       A.   Sure I am, but I don't know what you mean

19 remove from.  I don't know what you--

20       Q.   You can delete posts?

21       A.   Oh, sure, yes.

22       Q.   Okay.  And posts might include a video that

23 you do?

24       A.   Yes.

25       Q.   Okay.

149

1     A.   But that's not what you were asking for in

2   the-- in the interrogatories.  You were asking for all

3   my live stream videos.  That's specifically what you

4   asked for.

5       All of those live-- Mr. Hinton, I have

6   nothing to hide on my live stream videos.  You can have

7   every single one of them that's in my possession.  I

8   don't physically have, as Judge Minora said, a copy

9   that I can hand to you.  Every one of them, there are

10   fifteen, sixteen, seventeen pages of them on Rumble.

11   They're all public for anyone in this courtroom to

12   view.  They're not private by any means.

13   Having a DVD or a CD is an antiquated version to hold

14   that data.  We don't do that any more in this realm.

15     Q.   Mr. Godlewski, you-- you do shows almost

16   weekly, is that right, videos?

17     A.   Yes.  More than that, but, yes.

18     Q.   And they're viewed by millions of people,

19   right?

20     A.   Fourteen million, two hundred and thirty

21   three thousand.

22     Q.   Per video?

23     A.   On average.

24     Q.   Okay.  And on one video that I have you--

25   you applauded Adolf Hitler, and you said he wasn't

150

1  responsible for killing six million Jews--
2              MR. KOLMAN:  Objection.
3  BY MR. HINTON:
4      Q.   Is that right?
5              MR. KOLMAN:  Objection.
6              THE COURT:  Sustained.  Sustained.
7          We're not getting into content.
8              MR. HINTON:  It just goes to the
9          importance of-- You know, I'm just trying to
10         get the evidence, Your Honor.  You know,
11         this is like pulling teeth.  I just showed
12         you the video of the digital safe, and he's
13         got the Harvard Diploma on the wall that he
14         refused--
15             MR. KOLMAN:  Objection.
16             Is this argument, or is he going to
17         ask a question?
18             MR. HINTON:  It's just exhausting.
19         Every discovery thing in this case and every
20         excuse--
21             MR. KOLMAN:  Objection.
22             MR. HINTON:  --this man gives is
23         exhausting.
24             MR. KOLMAN:  It's exhausting
25         arguments, Your Honor.

151

1    MR. GODLEWSKI:  It's exhausting
2  because you can't prove that I slept with
3  her because I didn't.  That's why you're
4  exhausting yourself.  You're going through
5  all these videos--
6    THE COURT:  Do you have any question
7  pending for this answer?
8    MR. HINTON:  No.
9    THE COURT:  Then don't give me
10  your--
11    MR. GODLEWSKI:  I'm sorry.
12    THE COURT:  You're not on the air
13  here.
14    MR. GODLEWSKI:  I know.
15    THE COURT:  Okay?
16    MR. GODLEWSKI:  He's-- he's baiting
17  me, though, it feels like, you know.
18    THE COURT:  When you have a question
19  pending, you answer.
20    MR. GODLEWSKI:  I understand, Your
21  Honor.  I'm sorry.
22    MR. HINTON:  Nothing further, Your
23  Honor.
24    MR. KOLMAN:  I just have two
25  questions.

152

1  DIRECT EXAMINATION BY MR. KOLMAN:

2      Q.    Phil, what was your relationship with Brie

3  when she was fifteen or sixteen?  And the second

4  question is:  Why did you buy the earrings?  I don't

5  have anything else.

6      A.    Brie went through something that you would

7  never wish any of your sons or daughters to go through,

8  and that was the suicide of her boyfriend.  It just so

9  happened at the-- Excuse me.  It just so happened at

10  the time that I was coaching junior varsity baseball at

11  my alma mater, Riverside High School, and in coaching

12  those games and practices my team was full of freshman

13  and sophomore-aged men, boys.  And in that their

14  friends would typically come to our games and

15  practices.  And there was a particular group of friends

16  that Brie belonged to to come see their friends play in

17  the games.  And I had learned of the situation with her

18  boyfriend's suicide through my friends, and I had seen

19  her come to the games in the past.  And after the

20  suicide happened it was a very large funeral in our

21  town.  Taylor is a very small town; everyone kind of

22  knew everybody.  I had a relationship with, you know,

23  most of the kids that played on my team, and, you know,

24  and years before they even played on my team.

25          So we all kind of found out about Joe's

153

1   suicide.  I could see Brie was-- Brie just was not in

2   really a great mindset.  And some of her friends were

3   actually telling me-- her friends that were on my

4   baseball team were actually telling me that she was

5   suicidal at the time.  Now, this is where I made an

6   enormous mistake.  And, you know, it's easy to say I

7   regret it now because of everything that I was charged

8   with, but I don't know if I regret it because the

9   relationship that Brie and I developed in the years to

10  follow, I don't know if I would want to trade that.  I

11  struggle with that thought.

12      Nonetheless, the mistake that I made was

13  trying to comfort Brie in a time that she was visibly

14  shaken, and she was putting those type of words-- she

15  was articulating those type of words to other people

16  that I associated with and I was around on a regular

17  basis.  What I should have done was go to her parents

18  and go to her guidance counselor at the school who--

19      Q.   When you say words, articulated words, what

20  words?

21      A.   She was verbalizing that she wanted to

22  commit suicide to her friends, which were my players.

23  And that gets around.  When you're fifteen, sixteen

24  years old, at that level, you can't help but hear

25  things as a coach, you know.  So I just screwed up.

154

1    You know, I got a little too close to Brie in those

2    years.   I believe Brie caught feelings for me at some

3    point when she was of that age.   I was engaged to be

4    married, and I was-- I was caught in a situation that I

5    should have never got myself in.

6             Now, there were-- I wish we still had them,

7    but there were a lot of text message conversations that

8    took place between Brie and I in that time,

9    specifically regarding the death of her boyfriend and

10   how she should cope and just me trying to make light of

11   the situation that was a terrible situation for any

12   fifteen or sixteen year old girl to be in.   I tried to

13   act, I guess, as some sort of father figure.   And I

14   think the reason why I did that is because I never had

15   brothers or sisters growing up.   I was never in the

16   position to be a big brother, you know, to any

17   adolescent or to any-- anyone.   When I formed the

18   relationship that I formed with my players on the

19   junior varsity team, it was not just a coach

20   relationship-- Like, I had fantasy baseball teams with

21   them, and we would go places together.   They really

22   liked me.   I took a couple of my kids out of state to

23   baseball conventions.

24            I almost developed a relationship with my

25   players that was similar to a father figure in a sense.

155

1    So when this was happening with Brie my young mind

2    said, oh, well, I can continue that type of

3    relationship with this girl, who is going through a

4    traumatic event.  That was a mistake on my part.

5    And looking back on it now I know that that was a

6    mistake, and I paid for that mistake dearly, and I

7    still do to this day.  But that's how the-- that's how

8    the development of the relationship occurred, and I

9    ended up getting arrested for it.

10        Q.   And what about the earrings?

11        A.   I never purchased Brie any earrings.  I've

12   heard this before in accusations from the District

13   Attorney's Office when I was first arrested on this.

14   Somebody-- Can I see them?  I don't know.  I've never

15   purchased Brie-- I have purchased Brie things before;

16   that is true.  But twenty eight thousand dollar

17   earrings, I don't know what--

18        Q.   I think they were two thousand, eight

19   hundred.

20        A.   Oh, okay.  That's much better.  But for a

21   twenty four year old, twenty five year old, I didn't

22   have that type of money at the time.  I was just

23   starting my real estate career.  I was doing side jobs,

24   such as a junior varsity coach, which I made eighteen

25   hundred dollars a year for.  That's not something-- I

156

1  had given Brie gifts as to try to cheer her up in what

2  I thought was an appropriate manner.  Looking back at

3  it now it was completely inappropriate.  And guess

4  what?  I pled guilty to corruption of morals of a

5  minor.  And I felt like I did corrupt the morals of a

6  minor, and I still feel like that today.

7       Q.   You said you were close to her, too close.

8  What does that mean?

9       A.   I think I crossed the line being a figure of

10  authority, especially in the school district that she

11  attended.  I think I crossed the line of an appropriate

12  nature and an inappropriate nature.  Not in the sense

13  of anything sexual, but in the sense of someone that

14  young that's going through that type of tragedy could

15  latch onto someone of my age in the position that I was

16  in in a way that I'm not anticipating or, even while

17  it's happening, noticing.  I shouldn't have put myself

18  in that position.

19       Q.   In respect of the discovery, which is being

20  the key focus here, the interrogatories and the

21  document requests, have you attempted to answer those

22  to the best of your ability?

23       A.   Mr. Kolman, I am willing to give absolutely

24  anything to the defense that they want without any sort

25  of limitation at all.  I have absolutely nothing to

1    hide in this particular case.  As Mr. Hinton said

2    before, I'm the one that filed the lawsuit, not them.

3    I knew discovery was going to be nasty.  I knew that

4    this was going to bring up all of those events that

5    they brought up, you know, many years ago, not only for

6    me, but also for Brie.  I knew they were going to bring

7    her into this.  They had a private investigator go to

8    her house several times in 2021 after the case was

9    filed, after my lawsuit was field.  And if anybody has

10   been intimidating anyone, I believe it's been the

11   defendants to Brie.

12        Q.    Have you willfully withheld any documents?

13        A.    Absolutely not.  You could have everything I

14   have.

15        Q.    Have you willfully not answered any

16   interrogatory that's been propounded to you?

17        A.    Absolutely not.  And I won't in the future.

18        Q.    Do you have any position that could possibly

19   be relevant to any document request that was asked

20   for?

21        A.    Relevant or irrelevant I'm not the one to

22   make that call.  I'm willing to give them anything that

23   they need.

24              MR. KOLMAN:  I have nothing further,

25        Your Honor.

158

RECROSS EXAMINATION BY MR. HINTON:

Q.   Mr. Godlewski, what gifts did you buy Brie? You said you bought her some gifts?

A.   Yeah.  There was-- In that same time period, right after Joe had taken his own life, I went on a baseball trip that I just referenced with one of my team members.  His name is BJ.  We went to Jacksonville, Florida, I believe it was, for a baseball camp.

While we were at a shopping endeavor there-- This was in the time that I was communicating with Brie after the death of Joe.  In fact, it was that winter. I think Joe-- It doesn't matter, the dates.  But, nonetheless, right after that happened I was shopping at a mall down there with BJ.  We went out after one of the expositions that day.  We got something to eat.  It was just me and BJ.  No one else went on the trip.  And there was an Ed Hardy hat.  I think it was a hat, t-shirt, something.  Ed Hardy.  She was big into Ed Hardy at the time.  We had talked about that in our conversations.  So I purchased her that.  And I think I got her, in addition to that, I think I bought her a tanning package one time to a tanning salon in Taylor, which is no longer there.  It's a-- something else now.

159

1     Q.   So Joe Strok died November 10th, 2008.  Does

2  that sound right?

3     A.   2000 what?

4     Q.   8.

5     A.   Yeah.  So it would have been-- I believe it

6  would have been that Winter of 2008.

7     Q.   So Brie is fifteen years old and three

8  months at that time?

9     A.   No.  I believe she-- I have no idea, to be

10  honest.  I don't remember.  I thought she turned

11  sixteen-- Yeah, I believe she would have been fifteen.

12  She turned sixteen in September the following year.

13  Yes.

14     Q.   And you-- You bought her gifts for that

15  Christmas?

16     A.   I don't think it was Christmas, no.  They

17  were just in general gifts.  There was no Christmas

18  gifts per se, to my recollection.  There was a gift

19  that I bought when we were at the mall in Florida that

20  was the Ed Hardy-- It might have been a shirt and a

21  hat.  Don't quote me.

22     Q.   Okay.

23     A.   But--

24     Q.   But definitely you bought her gifts?

25     A.   Those two things or three things are the

160

1    only things that I had ever purchased for Brie.

2    Earrings are-- Miss DuBorgel, Linda, testified today

3    that she spoke to a sales associate, and she made it

4    seem that the sales associate sold me those earrings.

5    At least in my interpretation.  That's false.  She may

6    have spoke to a sales associate about the particular

7    type of earrings, and ascertained that Zales sells that

8    particular type of earring, but that had nothing to do

9    with me at all.  I don't know where they came from.

10        Q.    Mr. Godlewski, there's a notebook of

11   exhibits in front of you.  Can you turn to Exhibit H,

12   please.

13        A.    Sure.  Did you-- What letter?

14        Q.    H.

15        A.    H.

16        Q.    Go to the back of that exhibit.  You'll see

17   your verification page for your signature that you've

18   approved these answers to interrogatories on August

19   20th, 2021.  Is that your completed verification page

20   digitally?

21        A.    Yes, sir.

22        Q.    Okay.  So you--

23        A.    August 20th, 2021?

24        Q.    Yeah.

25        A.    Yes, sir.

161

1     Q.   You reviewed these answers. You understood

2  that you were making them under oath, right?

3     A.   Yes, sir.

4     Q.   And you know that it's important to the

5  lawsuit to be truthful and accurate in your answers to

6  the Court, is that correct?

7     A.   Yes, sir.

8     Q.   It's important to be truthful in the

9  discovery process?

10     A.   Yes, sir.

11     Q.   It's like perjury if you lie about it,

12  right?

13     A.   I'm not sure.

14     Q.   So let's go to question number thirty four

15  in your answers to interrogatories.

16          Question: Did you give any gifts to the

17  fifteen year old girl referred to in defendant's

18  article? If yes, please state what they were and when

19  you gave them to her. And your answer was: Plaintiff

20  does not recall giving her any gifts.

21     A.   Yes.

22     Q.   How is it that your memory is better today

23  in 2023 than it was on August 20th, 2021?

24     A.   I wouldn't say that my memory is better. I

25  would just say that this happened, when the gifts that

162

1    I mentioned were purchased, this happened in 2008, as

2    you just said.

3         Q.    No, I didn't just say.

4         A.    You didn't just say that in 2008 when Joe

5    Strok--

6         Q.    I asked-- I told you Joe Strok died on

7    November 10th, 2008.  I asked you if you gave her

8    Christmas presents, and you said it may have been a

9    little bit later than that.

10        A.    No, I didn't say that.  That's not what I

11   said.

12        Q.    Whatever.

13        A.    I said I didn't give her Christmas presents.

14   But you're putting words in my mouth.  That's not-- We

15   could read it back.

16        Q.    Why did you give this answer that you don't

17   recall giving her any gifts?

18        A.    I didn't recall giving her any gifts.

19        Q.    But now you do?

20        A.    I recall now, yeah, sure.  You're asking me

21   to remember things from twelve years ago.  It's very

22   hard to do that.  As I had thought more about the case,

23   and talked to my counsel about the case, I had gone

24   back to try to find anything that I could to, you know,

25   either on a-- to remember or to find documents that you

1   were asking for to these interrogatories.  And at some

2   point it had come to my recollection that I do remember

3   purchasing her an Ed Hardy hat or shirt and a tanning

4   package.

5        Q.   Now--

6        A.   I had to be reminded about that actually.

7        Q.   So you had thirty days to answer that

8   interrogatory.  I think you took more than thirty days

9   to answer them.  And you had the assistance of counsel,

10  is that correct?

11       A.   I don't know any of that to be true.

12       Q.   All right.

13            So, Mr. Godlewski, going back to your text

14  messages with Brie-- and you indicated that you've

15  moved text messages over to a computer or maybe a hard

16  drive or a laptop at your house?

17            MR. KOLMAN:  I'm going to object,

18            Your Honor.  This is beyond the scope of my

19            redirect-- of my direct.

20            THE COURT:  He asked about earrings

21            and he asked about gifts.

22            MR. HINTON:  I'll withdraw it, Your

23            Honor.  Nothing further, Your Honor.

24            MR. KOLMAN:  I have nothing.

25            THE COURT:  Okay.

164

1          MR. KOLMAN:  You can step down.  I

2    have nothing.

3          MR. GODLEWSKI:  Okay.

4          MR. HINTON:  Call Dennis Cheng as

5    our last witness.  He'll be short, Your

6    Honor.

7          MR. KOLMAN:  Can I have a quick

8    colloquy with counsel?

9          THE COURT:  Sure.

10          MR. HINTON:  Your Honor, our last

11    witness is on a very narrow subject matter

12    that his Telegram post of the text message,

13    this expert will testify just very briefly

14    about that it had to come from Phil.  It's

15    from Phil's perspective.  That's really it.

16          THE COURT:  Is this the guy that

17    downloaded the content of the phones?

18          MR. HINTON:  Yes.  But I don't need

19    him for that.  He's admitted they're all

20    true and accurate text messages.

21          MR. KOLMAN:  It's true.

22          But, Your Honor, what's he going to

23    do?  He's going to establish that he's an

24    expert.  That's going to take awhile.

25          MR. HINTON:  It's actually not.

1        MR. KOLMAN:  All right.  And it's

2    an opinion.

3        What's the purpose of this at the

4    end of the day?  What do you want the Court

5    to know?

6        MR. HINTON:  That he had them all

7    along.  He had his text messages all along.

8    He didn't give them to us.  I had to get

9    them from Brie.

10       MR. KOLMAN:  Well, that's obvious

11   you had to--

12       MR. HINTON:  He intentionally

13   withheld those.

14       THE COURT:  I thought he only

15   downloaded her phone?

16       MR. HINTON:  He downloaded her two

17   phones, the phone she currently uses and the

18   one she had immediately before it.  She

19   gave-- The five hundred pages of text

20   messages come from the download.  Phil has

21   now admitted yes, they're his text messages.

22   That issue is a done deal.  We don't even

23   need to get into how he downloaded or that

24   it's-- it was done correctly or whatever

25   because everybody admits yeah, these are the

166

1   communications.

2       What-- I called this expert for a

3   secondary purpose.  I said let's look at

4   this post Phil Godlewski put up on November

5   27th.  This one right here.  Where did it

6   come from?  And he's going to say it didn't

7   come from Brie, it didn't come from her

8   download, it came from Phil, meaning he's

9   had it all along.  If they want to now admit

10  yeah, he's had it all along-- And I think

11  Phil will admit that.

12      MR. KOLMAN:  Let me talk to my

13  client.  Maybe he needs to clarify.  Okay?

14      THE COURT:  All right.  Take a few

15  minutes.

16      MR. HINTON:  He's going to agree,

17  that came from one of his devices.

18      MR. KOLMAN:  Yeah, it did.  It came

19  from his laptop.

20      MR. HINTON:  Okay.  You can

21  stipulate on the record that it came from

22  one of his electronic devices.

23      MR. KOLMAN:  I can stipulate it came

24  from his laptop, sure.

25      MR. HINTON:  Okay.

167

```
 1            MR. KOLMAN:  He testified about
 2      that.
 3            MR. HINTON:  All right.  I want
 4      it clear on the record where that came
 5      from.
 6            MR. KOLMAN:  He's going to come up.
 7
 8            PHILIP GODLEWSKI, recalled as a
 9      witness, having previously been sworn,
10      testified as follows:
11
12            THE COURT:  You're still considered
13      under oath.
14            MR. GODLEWSKI:  Yes, sir.
15  RECROSS EXAMINATION BY MR. HINTON(CONT'D):
16      Q.    Mr. Godlewski, showing you Exhibit BB.  You
17  recognize that?
18      A.    Yes.
19      Q.    Okay.  This is a post you made to your
20  Telegram channel?
21      A.    Yes.
22      Q.    You made it on November 27th, 2022?
23      A.    I'm sorry.  There's no date.
24      Q.    I'll bring an expert up to testify about
25  that.
```

168

1     A.   Okay.

2     Q.   Unless your--

3     A.   I don't know the date. You're asking me the

4  date.

5     Q.   Was it late November?

6     A.   I have absolutely no idea, Tim. You know

7  how many posts I put on Telegram?

8     Q.   Was it after we gave you the digital

9  downloads of Brie's text messages that you posted this?

10    A.   Oh, yes, it is. Here's why. Because you

11  gave me the digital downloads, and I know that to be

12  fact because it's redacted right there. Her name is

13  redacted. That didn't come from my device at all.

14  That came from your discovery from her phone.

15    Q.   This right here did?

16    A.   Yes.

17    Q.   Okay. Now we need to call the witness.

18           THE COURT: That assures it. Stand

19       down.

20           MR. GODLEWSKI: That's redacted at

21       the top.

22           MR. HINTON: That's okay. No more

23       questions.

24           MR. GODLEWSKI: I could be wrong.

25           MR. HINTON: I'll bring my--

169

1      THE COURT:  You can stand down.  You
2  can stand down, Mr. Godlewski.
3      MR. GODLEWSKI:  Okay.
4      THE COURT:  You're done.
5      MR. HINTON:  Dennis, come on up.
6
7      DENNIS CHENG, called as a witness,
8  being duly sworn, testified as follows:
9
10     THE COURT:  Have a seat, Dennis.
11 Make yourself comfortable.
12     MR. CHENG:  Thank you.
13     THE COURT:  Hopefully you won't be
14 here that long, but they've been wrong about
15 that all morning.  So go ahead.
16     MR. CHENG:  I'm used to waiting.
17 Thank you.
18 DIRECT EXAMINATION ON CREDENTIALS BY MR. HINTON:
19     Q.   Mr. Cheng, please state your full name for
20 the record.
21     A.   Dennis Gene Cheng.
22     Q.   Okay.  And you work for Twobytwo Solutions,
23 LLC?
24     A.   Yes.
25     Q.   What does that company do?

PHILIP GODLEWSKI,           :    IN THE COURT OF COMMON PLEAS
    Plaintiff                 :    OF LACKAWANNA COUNTY
                              :
    v.                        :    CIVIL DIVISION
                              :
CHRIS KELLY, TIMES SHAMROCK :    JURY TRIAL DEMANDED
COMMUNICATIONS, THE SCRANTON :
TIMES-TRIBUNE, LARRY HOLEVA :
    Defendants.               :    No.: 2021-CV-2195
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### PLAINTIFF'S RESPONSE TO DEFENDANT'S INTERROGATORIES SET IV

### GENERAL OBJECTIONS

1. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they are ambiguous, vague, over-broad, and/or unduly burdensome.

2. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they seek information protected by the attorney-client privilege and/or the attorney work-product doctrine.

3. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they improperly seek information that is not relevant to any of the issues in this dispute and/or are not reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff generally objects to Defendants' Interrogatories (Set IV) as discovery has not yet closed and this matter has not yet been prepared for trial.

5. Accordingly, these Answers are made without prejudice to Plaintiff's right to amend the answers set forth herein and/or to present additional information that is hereafter obtained or evaluated.

6. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they cause unreasonable annoyance, embarrassment, oppression, burden and/or expense.

7. Plaintiff generally objects to each of Defendants' Interrogatories (Set IV) to the extent that their scope exceeds the scope of discovery permitted by the Pennsylvania Rules of Civil Procedure.

8. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent that formulating full and complete answers would require Plaintiff to review documents not presently in Plaintiff's possession, custody and/or control.

9. Plaintiff generally objects to Defendants' Interrogatories (Set IV) to the extent they imply that information is to be provided by more than one person other than the responding Plaintiff. These Interrogatory Answers have been made to the best of Plaintiff's

1



5.  Did you have sex or a sexual relationship with ██████████ at any time?

    **ANSWER: Yes.**

    If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

    **ANSWER: Plaintiff had sexual relationship with ████████████ for a month or two in 2018. Plaintiff does not recall specifics.**


6.  Did you have sex or a sexual relationship with ███████ at any time?

    **ANSWER: No.**

    If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

    **ANSWER: N/A.**


7.  Did you have sex or a sexual relationship with Brienna DuBorgel at any time?

    **ANSWER: No.**

    If "yes" when did you have sex or a sexual relationship with her and how long did the sexual relationship last?

    **ANSWER: N/A.**

                                    Respectfully submitted:

    Date: 11/18/2022                /s/ *Timothy M. Kolman*
                                    Timothy M. Kolman, Esquire
                                    Kolman Law, P.C.
                                    414 Hulmeville Avenue
                                    Penndel, Pennsylvania 19047
                                    *Attorney for Plaintiff*

                                    3

## VERIFICATION

I, Philip Godlewski, verify that the statements made in *Plaintiff's Response to Defendants' Interrogatories (Set IV)*, are true and correct to the best of my knowledge and belief. I understand that false statements made herein are subject to the penalties of 18 PA. C.S., Subsection 4904, relating to unsworn falsification to authorities.

Date: 11/18/22

_____
Philip Godlewski – Plaintiff

6

| | | |
|---|---|---|
| PHILIP GODLEWSKI, | : | IN THE COURT OF COMMON PLEAS |
|    Plaintiff | : | OF LACKAWANNA COUNTY |
| | : | |
|    v. | : | CIVIL DIVISION |
| | : | |
| CHRIS KELLY, TIMES SHAMROCK | : | JURY TRIAL DEMANDED |
| COMMUNICATIONS, THE SCRANTON | : | |
| TIMES-TRIBUNE, LARRY HOLEVA | : | |
|    Defendants. | : | No.: 2021-CV-2195 |

## CERTIFICATE OF SERVICE

I, **Timothy M. Kolman, Esquire**, certify that on this 18th day of November 2022, I

caused a true and correct copy of the *Plaintiff's Response to Defendant's Interrogatories Set (IV)*

to be served upon the following parties via email:

**J. Timothy Hinton, Jr., Esquire**
Haggerty Hinton & Cosgrove LLP
1401 Monroe Avenue, Suite 2
Dunmore, Pennsylvania 18509
*Attorney for Defendants*

Respectfully submitted:

Date: 11/18/2022

/s/ *Timothy M. Kolman*
Timothy M. Kolman, Esquire
Kolman Law, P.C.
414 Hulmeville Avenue
Penndel, Pennsylvania 19047
*Attorney for Plaintiff*

4

From: +15707804567 Phil
To: [        ] Brie DuBorgel  (owner)

Okay kid. If you change your mind and want to hang out, let me know.  Lots of stuff has been going on and I wanted to try to insulate you as much as possible.  But I get the feeling you already know, so I'll back off.  I'll be here if you want to meet up and chat

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [    ] Brie DuBorgel | | 5/28/2022<br>3:42:47<br>PM(UTC-4) | |

Status: Read

5/28/2022 3:42:27 PM(UTC-4)

Source Extraction:
Advanced Logical (2)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0xDE4852 (Table: message, handle, chat; Size: 230879232 bytes)

EXHIBIT
Ex.
DB
ALL-STATE LEGAL®

ST 1456

436




## Extraction Report - Apple iPhone

## Participants


+15707804567
Phil*


Brie Duborgel* (owner)

## Conversation - Instant Messages (151)



From: Brie Duborgel (owner)
To: +15707804567 Phil

It's Brie

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:43:03 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:43:03 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x237FB1 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: Brie Duborgel (owner)

TY?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Duborgel Brie | | 5/28/2022 3:43:22 PM(UTC-4) | |

Status: Read

5/28/2022 3:43:22 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x237D8D (Table: message, handle, chat; Size: 29642752 bytes)

ST 1457

1



From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil
I just got the text you just sent me that other phone is garbage I'm only still using it before I transfer all my stuff over

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:43:36 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:43:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x237BB4 (Table: message, chat, handle; Size: 29642752 bytes)

---

From: +15707804567 Phil
To: +1[REDACTED] Brie Duborgel (owner)
Death of the 7619 number?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1[REDACTED] Brie Duborgel | | 5/28/2022 3:45:55 PM(UTC-4) | |

Status: Read

5/28/2022 3:45:54 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2370A9 (Table: message, handle, chat; Size: 29642752 bytes)

---

From: +15707804567 Phil
To: +1[REDACTED] Brie Duborgel (owner)
What a shame

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1[REDACTED] Brie Duborgel | | 5/28/2022 3:49:25 PM(UTC-4) | |

Status: Read

5/28/2022 3:49:25 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23769A (Table: message, handle, chat; Size: 29642752 bytes)



From: +[redacted] Bria Duborgel (owner)
To: +15707804567 Phil

And no nothing really has been going on aside from me doing an internship for basically 8 months and they've tried and done everything to piss me off and make me snap and hack into my shit and see if I can kick them out and just ... the most extra thing I've ever experienced. Except one of the main people involved is friends with my uncle Johnny so it's basically why I know I'm okay and I know I'm getting a crazy good job but it's almost not been worth the stress I've been put through

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:49:26 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:49:26 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Bria's iPhone/mobile/Library/SMS/sms.db : 0x239F8D (Table: message, chat, handle; Size: 29642752 bytes)



From: +[redacted] Bria Duborgel (owner)
To: +15707804567 Phil

Yes the 7619 number is toast

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:49:42 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:49:41 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Bria's iPhone/mobile/Library/SMS/sms.db : 0x239998 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: +[redacted] Bria Duborgel (owner)

I think it might be fair to say that there is a very, very large, and very, very unique financial opportunity that exists in front of you

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[redacted] Bria Duborgel | | 5/28/2022 3:51:03 PM(UTC-4) | |

Status: Read

5/28/2022 3:50:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Bria's iPhone/mobile/Library/SMS/sms.db : 0x239F83 (Table: message, handle, chat; Size: 29642752 bytes)

ST 1459

3









From: +1 [redacted] Brie Duborgel (owner)
To: +1670 [redacted]

And everyone knows but me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:51:33 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:51:33 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2395F6 (Table: message, chat, handle; Size:
29642752 bytes)



From: +1 [redacted] Brie Duborgel (owner)
To: +1670 [redacted]

Mom mom can't look me in the eyes for more than 1,2 seconds

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:51:52 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:51:52 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2393C2 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: +1 [redacted] Brie Duborgel (owner)

Why?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 3:52:05 PM(UTC-4) | |

Status: Read

5/28/2022 3:52:05 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23AF83 (Table: message, handle, chat; Size:
29642752 bytes)



From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

**Cause everyone knows but me it seems like**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:52:36 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:52:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23AAF5 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: [REDACTED] Brie Duborgel (owner)

**I dont think we're talking about the same thing, Ms. Duborgel**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +[REDACTED] Brie Duborgel | | 5/28/2022 3:52:59 PM(UTC-4) | |

Status: Read

5/28/2022 3:52:59 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23A895 (Table: message, handle, chat; Size: 29642752 bytes)

From: [REDACTED] Brie Duborgel (owner)
To: +15707804567 Phil

**Laughed at "I dont think we're talking about the same thing, Ms. Duborgel"**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:53:16 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:53:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23A59B (Table: message, chat, handle; Size: 29642752 bytes)

From: +█████ Brie Duborgel (owner)
To: +15707804567 Phil

Oh are you trying to recruit me for the silver thing

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | | 5/20/2022 3:53:56 PM(UTC-4) | |

Status: Sent

5/20/2022 3:53:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23A2F5 (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: +█████ Brie Duborgel (owner)

Pfft, no

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +█████ Brie Duborgel | | 5/28/2022 3:54:07 PM(UTC-4) | |

Status: Read

5/28/2022 3:54:07 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23BF83 (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: +█████ Brie Duborgel (owner)

We really need to meet and chat

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +█████ Brie Duborgel | | 5/20/2022 3:54:16 PM(UTC-4) | |

Status: Read

5/20/2022 3:54:15 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23BD96 (Table: message, handle, chat; Size: 29642752 bytes)

ST 1463

From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

Laughed at 'Pfft, no'

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:54:16 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:54:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23BB3F (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: [redacted] Brie Duborgel (owner)

I cant talk about this through text or over the phone

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 3:54:33 PM(UTC-4) | |

Status: Read

5/28/2022 3:54:33 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23B900 (Table: message, handle, chat; Size: 29642752 bytes)

From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

I can't meet up or see anyone right now I'm going through some stuff physically and basically doing a cleanse of my system and got my period yesterday and I'm barely alive

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:56:07 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:56:06 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23B6C3 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: | Brie Duborgel (owner)

doesnt have to be today. "Some stuff physically"? Wtf?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 5/28/2022 3:58:36 PM(UTC-4) | |

Status: Read

5/28/2022 3:58:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23CF83 (Table: message, handle, chat; Size: 29842752 bytes)

From: +15707804567 Phil
To: | Brie Duborgel (owner)

You're dodging me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 5/28/2022 3:58:56 PM(UTC-4) | |

Status: Read

5/28/2022 3:58:56 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23CA16 (Table: message, handle, chat; Size: 29842752 bytes)



From: | Brie Duborgel (owner)
To: +15707804567 Phil

No I'm not

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:59:03 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:59:03 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23C813 (Table: message, chat, handle; Size: 29842752 bytes)

ST 1465



From: ▓▓▓▓▓ Brie Duborgel (owner)
To: +15707804567 Phil
No one will ever understand what I just went through this semester

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 3:59:19 PM(UTC-4) | | |

Status: Sent

5/28/2022 3:59:19 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23C5F7 (Table: message, chat, handle; Size: 20642752 bytes)



From: +15707804567 Phil
To: ▓ Brie Duborgel (owner)
Im kinda of worried about you

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + Brie Duborgel | | 5/28/202 2 4:00:58 PM(UTC-4) | |

Status: Read

5/28/2022 4:00:58 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23C364 (Table: message, handle, chat; Size: 20642752 bytes)



From: ▓ Brie Duborgel (owner)
To: +15707804567 Phil
Why

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:01:50 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:01:50 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23DF8D (Table: message, chat, handle; Size: 20642752 bytes)

**ST 1466**

From: +15707804567 Phil
To: 1 | Brie Duborgel (owner)

**Idk, you're talking all crazy-pants.  Doesnt seem like the brie I know**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + ▮▮▮ | Brie Duborgel | | 5/28/2022 4:02:10 PM(UTC-4) | |

Status: Read

5/28/2022 4:02:10 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23DD7B (Table: message, handle, chat; Size: 29642752 bytes)



From: ▮▮▮ | Brie Duborgel (owner)
To: +15707804567 Phil

No I'm very okay I just legit went through 8 months of semi torture and it only ended like two days ago so I'm trying to do the right thing and get my mind and body in order and detox off of medication I've been on since I got sober 6 years ago and it doesn't help all my accounts got hacked and I can't talk to anyone about anything until I have my answers about what exactly I'm going to be doing for work which will be on Tuesday. I'm honestly just exhausted and healing

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:07:05 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:07:05 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23DB17 (Table: message, chat, handle; Size: 29642752 bytes)



From: ▮▮▮ | Brie Duborgel (owner)
To: +15707804567 Phil

Truly

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:07:11 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:07:11 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23D1AD (Table: message, chat, handle; Size: 29642752 bytes)

ST 1467

11

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)
Okay. Well that makes me feel better. When you're ready, I have an opportunity that involves the both of us. But it wont work with just one of us. I dont know which way to go with it until I speak to you. So, remember me for when you feel better, and we'll talk.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 4:08:30 PM(UTC-4) | |

Status: Read

5/28/2022 4:08:29 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23EF83 (Table: message, handle, chat; Size: 29642752 bytes)



From: [redacted] | Brie Duborgel (owner)
To: +15707804567 Phil
I know I've been wanting to talk to you about almost the same thing weirdly enough. I've been the one who has wanted to square things up with you that has nothing to do with romance or Amanda that would save both of our reputations but I didn't plan on talking to you about anything until my school stuff was over. I got my diploma, and my job was written in stone. I'm sure Amanda told you a little bit which is okay cause it wasn't a secret at least not from you. We got our lives dragged through the mud for years together and it has effected us both professionally to the point where my internship was based on my ethics and morals but I passed with flying colors and pretty sure I may have gotten an almost full ride to get my MSL in dala and privacy law. So yeah I'm okay and I know you've had to defend yourself for years which a lot hasn't had to do with me but I don't like that people make it seem like you were some creep or I was some homewrecking little tramp and I think us having each other's backs in some regards benefits both of us

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +14707804567 Phil | 5/28/2022 4:18:56 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:18:56 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23E88D (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)
I agree. But it's a very delicate situation, and unless it's handled properly by both of us, we stand to benefit absolutely nothing. And there is a financial windfall here, if handled properly. That's all I can really say through text. I don't trust those motherfuckers and I am literally foaming at the mouth to take them down once and for all.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 4:25:30 PM(UTC-4) | |

Status: Read

5/28/2022 4:21:24 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23FF83 (Table: message, handle, chat; Size: 29642752 bytes)

ST 1468

12

From: +15707804567 Phil
To: [redacted] | Brie Duborgel (owner)

**You're a good person, Brie. You don't deserve anything that's happened to you since we met all of those years ago. And I think it's time to set the record straight, and shove our collective middle fingers directly up their fucking assholes**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Brie Duborgel | | 5/28/2022 4:25:30 PM(UTC-4) | |

Status: Read

5/28/2022 4:22:20 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x23FAD7 (Table: message, handle, chat; Size: 29642752 bytes)

From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

No I know it's like the MOST delicate situation. Aside from any of your extra troubles or my extra troubles what happened between us follows us around the most and nothing between us was ever bad. Even when I heard things about you and Miranda or you being an asshole I mean my first thought was that Phil has never even so much raised his voice at me or said anything nasty to me ever. Through everything and all of it you've never been mean to me. You had to defend yourself cause you had no other choice. I mean I'm gonna be 29 and you're like 37.

I know this sounds crazy but there's examples of cases where let's say the girl was older like 18 or 19 and the boy was 16. That age difference is nothing but if the girl had a very high IQ and the boy was significantly lower than that could be considered statutory because it shows despite the age she was clearly taking advantage. It's the IQ defense. My friends and my mother blew this wide open after my first love hung himself when I was 16 and the older I got and the more I learned from school and this field it really bothers me. But we have both been dealt our fair share of nonsense throughout the years and trying to get our lives in order but I say all the time. I've told my family and friends and professors who basically took me under their wing that aside from any kind of trouble either of us have been in- you were never mean to me, never took advantage of me, it wasn't even about sex. I have been mentally 20 since I was a teenager but literally my whole entire life whenever I have needed you you have picked up the phone. We were never enemies and we never intentionally tried to hurt each other. But yes, this is very delicate and I believe being allies would shut up a lot of people

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 5/28/2022 4:44:50 PM(UTC-4) | | |

Status: Sent

5/28/2022 4:44:49 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x240D90 (Table: message, chat, handle; Size: 29642752 bytes)

**ST 1469**

13

From: +15707804567 Phil
To: ▮          ▮ Brie Duborgel (owner)

Well, let's meet when you're ready.  Sooner rather than later.  I miss you anyway

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮ Brie Duborgel | | 5/29/2022 2:20:18 PM(UTC-4) | |

Status: Read

5/28/2022 4:58:36 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x241802 (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: ▮          ▮ Brie Duborgel (owner)

How you feelin B

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮ Brie Duborgel | | 5/29/202 2 2:20:18 PM(UTC -4) | |

Status: Read

5/29/2022 12:11:52 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x24446F (Table: message, handle, chat; Size: 29642752 bytes)



From: ▮▮▮▮▮▮▮▮▮ Brie Duborgel (owner)
To: +15707804567 Phil

Hello Phillipe I saw you inquired my assistance on my garbage phone aka my photo library with a number how may I assist trice on this lovely Saturday evening

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 6/18/2022 6:53:17 PM(UTC-4) | | |

Status: Sent

6/18/2022 6:53:16 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x2A2F6D (Table: message, chat, handle; Size: 29642752 bytes)

**ST 1470**

14



From: [ ] Brie Duborgel (owner)
To: +15707804567 Phil

That's what I meant

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/5/2022 11:51:54 PM(UTC-4) | | |

Status: Sent

8/5/2022 11:51:54 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E3713 (Table: message, chat, handle; Size: 29842752 bytes)



From: [ ] Brie Duborgel (owner)
To: +15707804567 Phil

Like I answered you at 9 something and was like whoops lmao

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/5/2022 11:52:23 PM(UTC-4) | | |

Status: Sent

8/5/2022 11:52:22 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E34E4 (Table: message, chat, handle; Size: 29842752 bytes)

From: +15707804567 Phil
To: [ ] Brie Duborgel (owner)

Listen my friend. Things are getting very nasty with the Scranton Times. I think you should know what's going on. I'd like to talk to you in person. I don't want you to be blindsided by any of this

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1 [ ] Brie Duborgel | | 8/5/2022 11:52:52 PM(UTC-4) | |

Status: Read

8/5/2022 11:52:47 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E4F83 (Table: message, handle, chat; Size: 29842752 bytes)

**ST 1480**

24

From: +15707804567 Phil
To: | Brie Duborgel (owner)

Attachments:



Title: IMG_5489.mov
Size: 24166351
File name: ~/Library/SMS/Attachments/0c/12/541D0D34-BC44-4220-ADF4-
5977C621157B/IMG_5489.mov
~/Library/SMS/Attachments/0c/12/541D0D34-BC44-4220-ADF4-
5977C621157B/IMG_5489.mov

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 8/6/2022 3:03:15 PM(UTC -4) | |

Status: Read

8/6/2022 11:12:15 AM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E4C08 (Table: message, handle, attachment,
chat; Size: 29642752 bytes)
Brie's iPhone/mobile/Library/SMS/Attachments/0c/12/541D0D34-BC44-4220-ADF4-
5977C621157B/IMG_5489.mov : (Size: 24156351 bytes)

---

From: +15707804567 Phil
To: | Brie Duborgel (owner)

I have your back, Brie. You should see what they are trying to do to me. It's absolutely
awful.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Brie Duborgel | | 8/6/2022 3:03:15 PM(UTC-4) | |

Status: Read

8/6/2022 12:09:05 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E499C (Table: message, handle, chat; Size: 29642752 bytes)

---

From: | Brie Duborgel (owner)
To: +15707804567

I wasn't not answering. I have weird stuff going on right now too lol I was up till 4am doing
work so I felt asleep without an alarm and here I am. I'm gonna try not to be grouchy cause I
guess you know I have my back I have yours. This has nothing to do with me Phil. I'm sorry a
reporter politically dragged you because of something that happened to us 12 years ago. I
read the entire article recently and it was definitely quite excessive and very unnecessary to
throw that in about me and you. It was basically an entire article just dragging you and your
life and then casually throwing in "oh also he slept with a 15 year old girl" blah blah blah real
estate stuff. It was dumb. It was just a shot at you and by association I am involved. But the
thing is I never wanted it to happen. I'm gonna be 29 though and full blown in this field now
and still blame my mom and my friends for what happened and no one can ever reason with
me otherwise. But the problem for me is that I haven't been able to speak up then (which
was my choice) or now (to you or to anyone who can end this because the truth is (like I told
my mom the other day) I don't remember if I was 15 or 16 when we slept together. I really
don't. But I do know I've always been 10+ years past my age, you weren't my coach, you
weren't an authority figure of mine, you didn't hurt me, and what happened back then (the
arrest) and etc was just the beginning of what would continue to be us sleeping together on
and off and whether we were fucking or talking or whatever we were always on good terms.
I've never genuinely hated you or you me. But my point is and my story and the way I feel and
the way you told everyone is the complete opposite of everything you've been saying and
building on of since it happened. Personally, to me, I think the times is annoying for bringing
it up and it also pissed me off. I think people that still talk about it are annoying. The fact you
chose to start doing political stuff has nothing to do with me but when those people
specifically come at you and your only defense that you feel like you really have because of

ST 1481

25

all those years ago is to say I was some sick and crazy love struck obsessed teenager and because you were so loyal to dori and it was so wrong but yet he's sick, was your best friend too yeah mhm. you were there for me and because it was so broken and lost and sad and love struck I told you and tried to get you arrested because I was just so in love. You've been telling that story for 12 years as I've had to sit back and never speak my side never even think about it and the only reason that that gets to happen is because I got up on the stand as a 16 year old and threw away the prosecution's entire case in front of a courtroom and my family and the entire town because I loved you and I never wanted it to happen either. My mom has tried telling me that some lawyer for the times asked her to come in and talk. You are always telling me you are ready to come out swinging and right up until them and go against them. Well I'm against all that. My mom is a huge reason in its nowhere til the first place and the fact she has the audacity to even think for a second about doing this again when I'm going into this field as an adult NOW because of what happened then I screamed my lungs out at her probably last month. Then I gotta hear from you asking you to help me when you go on YouTube live for the last however many years and tell thousands and thousands of people that I'm a liar and it never happened and we have no affiliation. And the times chasing you and whatever beef you have with them and them trying to drag this back out again is also fucking annoying. The side you tell is to the public is from the truth and I'm not saying that in a mean way I understand why but basically that was your choice especially at the time. My mother has absolutely no fucking idea what happened between us and yet the times has absolutely no idea what happened between us. Phil I don't see you as my public enemy or some guy who hurt me or ruined my life or any of that. I see you as my ex boyfriend because that's what you are to me. What happened during the arrest is just what went public and made you look bad but all you've done is battle those claims and it was my fault to never speak up on my side. I plead the 5th then and basically always have throughout the rest of my life because I too have been cleaning up the mess that I made and the mess that followed me with jay and drugs and well I mean from 2012 on I was a broken sad depressed zombie because of all the shit that happened between us and between everything. I finally got myself together and straightened things out internally and externally and then boom we link up as adults and fly across the country together and you pulled that shit with Amanda. And still I have never said one nasty thing about you publicly or anything that could ever hurt you. And I know the only reason that you have had to do the same to me is because of something that happened 12 years ago- but we didn't just sleep together when I was 16- I was 17, 18, 19, 20, 21, 22- Phil we have always been in each other's lives and never hated each other. I've just never said a word or retaliated with the arrest because the public story you tell right then and the story the times published then anymore publicist who truly it's all untrue. There was no scandal in my eyes you weren't some gross old man you were never meant to me ever. I mean shit about dori and all these ex girlfriends and shit that happened and my jaw drops. Yeah sure I think you and I are went through the biggest thing ever and you have never raised your voice at me and we have basically always been friends, sleeping together or not sleeping together we've always been cool. But to me, and to you too- it wasn't a scandal. I was going through the worst time of my life the most traumatic thing I've ever experienced (still) and you weren't some scary creep or existing cool older guy I thought was so cool and you were in a semi seriously going out or existing authority and everyone in teenagers. We genuinely cared about each other and you were my boyfriend except you were engaged. We didn't break up we were legally pulled apart before we ever figured anything out and neither of us had a say. Well I did and I chose to protect you and it's because you never hurt me ever. I mean I don't even know if you remember this but it was years after everything happened and I was with jay still and in a really bad place and you and I met up in a hotel room and because I didn't look good and wash myself and was telling you about jay you didn't even touch me I didn't even think we kissed I was sat on a bed and you were almost in tears begging me to please stay with jay and be off and that please get away from jay. Nature of the whole trouble. I was in my early 20s at that point but that is my point, this goes so much deeper than what I was made out to be I mean we genuinely loved each other but back then, now and probably always it doesn't matter how you feel or what you want you only care about the story you tell and you public image and you much rather have people write articles about you and drag you and lie about you and make you look like some sick instead of ever bending or changing your public story that you told all those years ago even if it's still making you look bad. You'd literally rather that than ever remotely slightly go back on anything you've ever said until I spun all out for the time. It im just so off or to protect myself against this shit and boring as blokely people from scranton how to have nothing better to do than to talk about a guy and a girl having sex literally almost 14 years ago I mean it's so fucking pathetic and obnoxious to me now. Phil if we can come to an amicable agreement that has nothing to do with my schooling or you thinking whatever of my family or Chris Kelly or any of it- if you and I can come to an amicable agreement that YOU stop dragging me publicly and defending yourself and with defending yourself it comes making me look like the fucking asshole- if you can agree to stop telling these bored ass low life's get under your skin and get a rise out of you and shut you to a proplortionate fun under 10 minutes and stop giving people ammo to shoot back at you I can and no one else can will make sure as when's all of this stops that you never have a reason to defend yourself ever again because I will make sure that the times leaves you alone, leaves me alone, my family alone and my family and friends, leaves you the fuck alone. What do you think I've been doing huh???? Listen our personal shit aside I don't care and I know you don't either but publicly we are still tied and people are still bored and jerking off to our sex life from 10 years ago and it's honestly so weird and overbearing and fucking obnoxious to me and I can't hear about it anymore. No Amanda. No political tube. No lives. Nothing. You and I have to come to some kind of terms and all I've ever wanted to do is please, stop dragging me publicly and making me look like an asshole when its not true and all I've ever done is try to protect myself and you by association. How's that???

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804607 Phil | 8/9/2022 1:24:24 PM (UTC-4) | | |

ST 1482



6/6/2022 4:24:23 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3E6F6D (Table: message, chat, handle; Size: 28642752 bytes)

From: +15707804567 Phil
To: +                    Brie Duborgel (owner)

Let's meet and talk. I think we're mostly on the same page.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +            Brie Duborgel | | 8/6/2022 5:56:09 PM(UTC-4) | |

Status: Read

8/6/2022 5:55:25 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x3EAF83 (Table: message, handle, chat; Size: 29642752 bytes)



From: +15707804567 Phil
To: +                    Brie Duborgel (owner)

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +            Brie Duborger | | 8/18/2022 1:44:25 PM(UTC-4) | |

Status: Read

8/18/2022 12:01:21 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5B788E (Table: message, handle, chat; Size: 29642752 bytes)

From: +15707804567 Phil
To: +                    Brie Duborgel (owner)

We have to meet and talk, mi amigo.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +            Brie Duborger | | 8/18/2022 1:44:25 PM(UTC-4) | |

Status: Read

8/18/2022 12:03:27 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5B76A8 (Table: message, handle, chat; Size: 29642752 bytes)

**ST 1483**



From: ████████ Brie Duborgel (owner)
To: +15707804567 Phil
Laughed at "YES"

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:42:31 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:42:31 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5DAF4C (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: █████████ Brie Duborgel (owner)
Irregardless, we need to meet and speak. You need to know some stuff that you aren't aware of

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ████████ Brie Duborgel | | 8/18/2022 2:52:51 PM(UTC-4) | |

Status: Read

8/18/2022 2:43:44 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5DA7A3 (Table: message, handle, chat; Size: 29642752 bytes)



From: +█████████ Brie Duborgel (owner)
To: +15707804567 Phil
Laughed at "Irregardless, we need to meet and speak. You need to know some stuff that you aren't aware of"

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:53:12 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:53:11 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E0613 (Table: message, chat, handle; Size: 29642752 bytes)

ST 1492



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

You would say that.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:53:18 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:53:18 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E032E (Table: message, chat, handle; Size: 29642752 bytes)



From: [redacted] Brie Duborgel (owner)
To: +15707804567 Phil

Irregardless. Looks like we're both smack dab in the middle of quite the legal tornado.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:53:37 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:53:37 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E1F8D (Table: message, chat, handle; Size: 29642752 bytes)



From: +15707804567 Phil
To: [redacted] Brie Duborgel (owner)

Not really. We have to talk in person

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +1 Duborgel | Brie | | 8/18/2022 2:54:52 PM(UTC-4) |

Status: Read

8/18/2022 2:54:51 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E1CCB (Table: message, handle, chat; Size: 29642752 bytes)

**ST 1493**



From: +█████ Brie Duborgel (owner)
To: +15707804567 Phil

Listen I already told you. Aside from your beef and tugging of the heart strings argument you have with Chris Kelly or any prior trouble aside from me that is irregardless. But I will make sure that no one ever calls you a pedophile again and our public beef can be squashed and Linda leaves us the fuck alone

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 2:57:12 PM(UTC-4) | | |

Status: Sent

8/18/2022 2:57:03 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E1670 (Table: message, chat, handle; Size: 29642752 bytes)

From: +15707804567 Phil
To: +█ Brie Duborgel (owner)

It's not that Brie. It's more than that. We have to meet because there's stuff you don't know

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +█ Brie Duborgel | | 8/18/2022 3:16:48 PM(UTC-4) | |

Status: Read

8/18/2022 3:08:12 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5E560C (Table: message, handle, chat; Size: 29642752 bytes)



From: █████ Brie Duborgel (owner)
To: +15707804567 Phil

Hang on

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15707804567 Phil | 8/18/2022 3:16:57 PM(UTC-4) | | |

Status: Sent

8/18/2022 3:16:56 PM(UTC-4)

Source Extraction:
Logical (1), Advanced Logical (1)
Source Info:
Brie's iPhone/mobile/Library/SMS/sms.db : 0x5EAB84 (Table: message, chat, handle; Size: 29642752 bytes)

ST 1494



Phil Godlewski 2.0 FAKE
340K subscribers

**August 6, 2022**

Phil Godlewski 2.0

What is everyone going to say when the victim testifies during my Scranton Times lawsuit?

What is she going to say?

I have a feeling the truth is going to be revealed.          83.2K 👁 12:13

**August 8, 2022**

Phil Godlewski 2.0

Okay all. The time has come for me to call an end to this.

From this moment on, there will be NO mention of any "in-fighting" or "defamation" between myself, and any other Truther/journalist/reporter.

Phil Godlewski 2.0 FAKE
@phil_godlewskii

340K          3.6K          913          29          2.55K
Subscribers   Photos       Videos       Filed       Links

⚠ Warning: Many users report that this account impersonates a famous person or organisation.

✈ DOWNLOAD TELEGRAM

About      Blog      Apps      Platform



EXHIBIT
L

ST 1847



Phil Godlewski 3.0 [FAKE]
286K subscribers

Not sure if he'll print it, so I wanted to put it here.

"Mr. Godlewski stands by the allegations in the defamation complaint against the Scranton Times. He has recently become aware of some troubling and coercive background that may have given rise to the victim's sudden and improvident affidavit. Any sexual relationship occurred when the couple were of age, and this has never been denied. We expect to have more news on this issue shortly. In the meantime, the litigation will continue."

Tim Kolman for KOLMAN LAWPC.

91.9K  👁 19:05

December 6, 2022

Phil Godlewski 3.0
Question:

Would you take a chance at defaming someone, publicly, if that someone had $500,000 in available cash to spend on legal fees to sue you into oblivion?

Personally, I wouldn't take that chance 😌

#gotime

61.9K  👁 14:46

🔍 defaming                                                              ✕

Phil Godlewski 3.0 [FAKE]
@phil_godlewskii

286K          4.01K        1.05K       35         2.74
Subscribers   Photos       Videos      Files      Links

⚠ Warning: Many users report that this account impersonates a famous person or organisation.

✈ DOWNLOAD TELEGRAM

About      Blog      Apps      Platform

Previously

EXHIBIT
"9"

ST 3540



To: Brie Duborgel

Tue, Nov 29 at 6:47 PM

You okay?

As okay as I can be :/

You?

Everything is going to be fine

I promise

I hope so. I just want what I earned and deserve. You have no idea what a terrible fuckin year I've had

I do know

Only bits and pieces. Maybe one day I'll be able to explain to you

Wed, Nov 30 at 10:00 AM

11 or 1130

Anywhere in thee

Kk Shakespeare

I shall

Wed, Nov 30 at 12:35 PM

The Daily Beast
thedailybeast.com

Wed, Nov 30 at 8:46 PM

7 Photos



EXHIBIT
"10"

ST 3747



To: Brie Duborgel

Steven Head
Pedu Pill

https://pcmelnt.com/qanon-leader-
accidentally-outs-self-as-statutory-
rapist-1849336769/amp
See Translation

QAnon Leader Accidentally Outs
Self As Statutory Rapist In Lawsui...
Pedofora11

2h  Like  Reply  Hide

Nancy Olson
God bless you♥♥♥♥
2h  Like  Reply  Hide

Welp- you finally got everything you've ever wanted, You're famous.

I'm not lying but I'm not gonna let anybody call you a child predator either

I am shook to my fucking core

> No one asked you to lie, Brie

> You were intimidated and extorted for your affidavit. Those are facts.

I didn't say that

No I wasn't I called and asked for help and didn't get it

> But you proceeded on the promise of help

> Which is extortion

Yeah to stand up against you PROVATELY

but now this is Rolling Stones public

> You know I'm right. We can talk more about it but at the end of the day, the above comments
> are the rest of my life

As you currently thank your fans

Phil I'm right here with ya

No one else is on this boat besides us

So here we go I guess

> So help me fix it, for both of us

5

ST 3748



To: Brie Duborgel

I knew in my stomach today something was gonna happen. I felt it coming. Why do you think I told you I was gonna get creative

Creative doesn't get rid of a sworn statement. Creative would have been before the statement

This is gonna be international news if it isn't already

I'm gonna tell MY truth but really drive home u don't like kids and it makes me wanna spit at whoever say that

Not gunna matter brie

I gotta go Live now

You don't know how persuasive I can be. No more times telling my story or you telling my story I am telling MY story

Kk go get 'em Robin Hood

If you say we had sex before you were 18, it'll have an even worse effect. If that's something you feel you have to say, I'd rather you do nothing at all

If I hide in ur shadow for another living breathing second I will quite literally turn invisible. I would have rathered you dropped this suit or have never filed this in the first place or made my story and our story as ducking public as you have. Now I have no other choice. This quite literally is about to make international news

I can't believe any of this right now. I'm gonna have reporters at my house

I warned you it'll get worse

Way worse

Wed, Nov 30 at 11:57 PM

I'm glad you're following and Amanda are more important than me and I hope you had fun threatening me tonight. I'm actually afraid. You're a fucking jack ass

You brought this attention to both of us and now you're sad? When really I've been the one protecting both of us. You've been friends with Amanda for what a year? No, You only know each other through me and Idk what the fuck you got her involved in but YOU are MY friend no you're my ex and SHE is MY friend. This is all a fuckin joke. But yeah threaten me with outing my mental health. Yeah anyone would be stressed carrying around the weight of both of our problems. You're un fucking real.

I've been the one who's had your back all these years ME. I've been loyal to you- ME. you've known Amanda a year. You haven't even known your fiancé that long. You've been a constant in my life for 14 years literally these people don't even fucking know you. But if you wanna have a public smear campaign and absolutely destroy each other then fine that's what we'll do, if this is what you want.

6

**ST 3749**



To: Brie Duborgel

I've been the one who's had your back all these years ME. I've been loyal to you- ME. you've known Amanda a year. You haven't even known your fiancé that long. You've been a constant in my life for 14 years literally these people don't even fucking know you. But if you wanna have a public smear campaign and absolutely destroy each other then fine that's what we'll do. If this is what you want.

> I honestly have no idea what you're talking about

K

I figured as much

I'm scared but enjoy ur fame

> Brie my live was about giving to people in need. I never once even mentioned you

Omg

I just watched it

> I'm not sure you did lol

November 30th, 2022
Phil's $25k Christmas Giveaway
rumble.com

Is that you dressed as Santa?

> You most likely watched something old. Because you weren't mentioned at all.

> No, it's me photoshopped as Santa

Why is Santa blonde?

> HA
> Gold

> Evidently you just realized that you were watching an old video. What was the date?
> Just curious

ST 3750



ST 3751

203

1          C E R T I F I C A T E

2

3          I hereby certify that the proceedings and

4    evidence are contained fully and accurately in the

5    notes taken by me of the above cause and that this copy

6    is a correct transcript of the same to the best of my

7    ability.

8

9

10         _____ 2/13/23

11         Linda Krehel
           Official Court Reporter

12

13

14         The foregoing record of the proceedings on the

15   above cause is hereby approved and directed to be

16   filed.

17

18

19   2/16/13

20   Date                    HONORABLE CARMEN D. MINORA

21

22

23   (The foregoing certificate of this transcript does not
     apply to any reproduction of the same by any means
24   unless under the direct control and/or supervision of
     the certifying reporter.)

25