**ROTHENBERG & CAMPBELL**
Ryan P. Campbell, Esq. (#317838)
Dave W. Rothenberg, Esq. (#326483)
345 Wyoming Avenue, Suite 210
Scranton, Pennsylvania 18503
Phone: 570.207.2889 || Fax: 570.207.3991
E-mail:  Hrlaw04@gmail.com || Hrlaw06@gmail.com

*Attorneys for the Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PHILIP GODLEWSKI, | | CIVIL ACTION—LAW |
| | Plaintiff, | *(HON. JULIA K. MUNLEY)* |
| v. | | |
| EDUARDO NICOLAS ALVEAR | | JURY TRIAL DEMANDED |
| GONZALEZ, *AKA* ALVEAR GONZALEZ | | |
| EDUARDO NICOLAS, *AKA* | | |
| NICOLAS ALVEAR; and | | |
| GOOD LION TV, LLC, | | |
| | Defendants | No.: 3:24—CV—00344—JKM |

### DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF
### MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

**AND NOW COME** Defendants, Eduardo Nicolas Alvear Gonzalez, *aka* Alvear

Gonzalez Eduardo Nicolas, *aka* Nicolas Alvear ("Individual Defendant" or "Mr. Alvear")

and Good Lion TV, LLC ("Corporate Defendant"), by and through their counsel,

Rothenberg & Campbell, and hereby file their Supplemental Brief in Support of their

Motion to Dismiss Plaintiff's First Amended Complaint, arguing as follows:

### I.    SUPPLEMENTAL ARGUMENT

Defendants present the following supplemental argument supporting their Motion

to Dismiss Plaintiff's First Amended Complaint sounding in non-mutual issue preclusion



1

based on Judge Terrence R. Nealon's recent August 30, 2024 Memorandum and Order

granting Defendants', Chris Kelly and the Scranton Times, L.P., Motion for Summary

Judgment ("8/30/24 Order") in the civil matter filed in the Lackawanna County Court of

Common Pleas and docketed to <u>Philip Godlewski v. Chris Kelly and the Scranton Times,</u>

<u>L.P.</u> at number 2021—CV—2195 (the "Times-Tribune Lawsuit"). A true and accurate

copy of Judge Nealon's August 30, 2024 Memorandum and Order is attached hereto and

marked as Exhibit "A". As argued at length in Defendants' supporting briefs, both the

"Times-Tribune Lawsuit" and the instant lawsuit pose the same question to the court:

"*whether Plaintiff had inappropriate sexual relations with a 15-year-old girl.*" On August 30,

2024, Judge Nealon answered, "*yes*", holding:

> Godlewski claims that Kelly falsely reported that he "pleaded guilty to
> corruption of minors and admitted to having a sexual relationship with a 15-
> year-old girl." Based upon the content of Godlewski's text messages which
> served as the factual basis for the corruption of a minor charge set forth in the
> Criminal Information, and Godlewski's sworn plea to that specific crime in a
> court of law, both of the foregoing statements made by Kelly in his article are
> true. As a result of Godlewski's guilty plea to "inappropriate text [m]essages"
> and "contact" with Ms. DuBorgel, as set forth in the Affidavit of Probable
> Cause quoting the offending text messages admitting and memorializing a
> sexual relationship with a 15-year-old minor, *Godlewski is collaterally estopped
> from denying his participation in a sexual relationship with Ms. DuBorgel in
> 2010.*[1] *Thus, Godlewski has failed to come forward with sufficient evidence
> creating a genuine issue of material fact concerning the claimed falsity of Kelly's
> statement that Godlewski "pleaded guilty to corruption of minors and admitted to
> having a sexual relationship with a 15-year-old girl."*

---

[1] It is axiomatic that "defendants are bound by statements they make during their guilty plea colloquies
and may not successfully assert any claims that contradict those statements." <u>Com. v. Culsoir</u>, 209 A.3d
433, 437 (Pa. Super. 2019). "'A defendant who elects to plead guilty has a duty to answer questions
truthfully.'" <u>Com w. Yeomans</u>, 24 A.3d 1044, 1047 (Pa. Super. 2011) (*quoting* <u>Com. v. Pollard</u>, 832 A.2d
517, 523 (Pa. Super. 2003)). Godlewski presumably did so when entering his guilty plea before Judge
Geroulo. [See <u>Com., Dept. of Trans. v. Mitchell</u>, 535 A.2d 581, 585 (Pa. 1987); <u>Hawkins v.</u>
<u>Unemployment Compensation Bd. of Review</u>, 695 A.2d 963, 966 (Pa. Cmwlth. 1997), *app. denied*, 718
A.2d 786 (1998); and <u>Lynch v. DuCasse</u>, 2020 WL 3547375, at *3-4 (M.D. Pa. 2020)].

(ECF Doc. No. 33—1 at pp. 36—37) (*emphasis added*; citations included in footnote).

Defendants strongly contend that the 8/30/24 Order now precludes Plaintiff from relitigating this same issue defined herein as: "in the context of Plaintiff's civil reputational tort claims, Plaintiff's 2011 guilty plea to the corruption of a minor claim operates as an admission of fact as to whether Plaintiff had inappropriate sexual relations with a 15-year-old girl" (hereinafter, the "Pedophile Issue").  Defendants submit that the Pedophile Issue raised in the Times-Tribune Lawsuit is identical to the Pedophile Issue presented in the instant matter.  In the Times-Tribune matter, Plaintiff had a full and fair opportunity to litigate the Pedophile Issue before Judge Nealon resulting in a final judgment on the merits.[2]  Therefore, Plaintiff is now collaterally estopped from asserting his position that "he did not have inappropriate sexual relations with a 15-year-old child."  See Peloro v. United States, 488 F.3d 163, 175 (3d Cir. 2007).

When a federal court considers precluding a specific issue that has been previously (and finally) litigated in state court, the court must apply that state's substantial law[3] and can make any determination regardless of a pending appeal.[4]  Collateral estoppel, or issue preclusion, "bars 'successive litigation of an issue of fact or law actually litigated and

---

[2] Upon information and belief, Plaintiff's representation in the Times-Tribune Lawsuit was the same counsel representing his interests in the instant matter.

[3] When a federal court determines the collateral estoppel effect of an issue previously litigated in a state court proceeding, the tribunal "should apply the law of the state where the criminal proceeding took place."  Allen v. McCurry, 449 U.S. 90, 96 (1980); Anela v. City of Wildwood, 790 F.2d 1063, 1068 (3d Cir. 1986).

[4] Under Pennsylvania law, the fact that a prior decision is on appeal does not deprive it of being a final order for collateral estoppel purposes.  See In re Weidner, 476 B.R. 873 (E.D. Pa. Bnktcy. 2012) (*applying Pennsylvania law*); Connelly v. Wolf, Black, Schorr and Solis-Cohen, 463 F.Supp. 914 (E.D. Pa. 1978).

resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (*quoting* New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001)). In Pennsylvania, collateral estoppel applies if: 1) the issue decided in the prior adjudication is identical[5] to the one presented in the later action; 2) there has been a final[6] judgment on the merits[7]; 3) the party against whom collateral estoppel is asserted was a party or in privity with the party to the prior adjudication; and 4) the party against whom collateral estoppel is asserted has had a full and fair opportunity[8] to litigate the issue in question in the prior adjudication[9]. Siegel v. Goldstein, 657 F.Supp.3d 646, 654 (E.D. Pa. 2023) (*citing* Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999)). Put differently, when a party defensively asserts collateral estoppel against another party that has previously (often unsuccessfully) litigated an identical issue to final judgment contingent on that very same issue, the burden of re-litigation outweighs any additional opportunity for determination and the party is estopped

---

[5] "To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be 'substantial.'" Raytech Corp. v. White, 54 F.3d 187, 191 (3d Cir. 1995).

[6] "[F]or purposes of issue preclusion... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Witkowski v. Welch, 173 F.3d 192, 200 (3d Cir. 1999) (*quoting* Restatement (Second) of Judgments § 13(1982)).

[7] A determination on the merits "may be based on a failure of the pleading or of proof as well as on the sustaining of the burden of proof." Witkowski, 173 F.3d at 201 (*quoting* Restatement (Second) of Judgments § 27 cmt. d (1982)).

[8] The "full and fair opportunity to litigate" requirement is generally met only if the procedures involved in the earlier proceedings complied with the federal due process clause of the Fourteenth Amendment. See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 483 n. 24 (1982). The United States Supreme Court has repeatedly stated that "[t]he core of due process is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, 522 U.S. 262, 266 (1998)

[9] Some Pennsylvania courts state a fifth requirement to the issue preclusion doctrine; namely, that the determination of an issue in the prior case be "essential" to the previous judgment." Witkowski, 173 F.3d at 211. When determining whether the issue was "essential" to the previous judgment, courts look to whether the issue "was critical to the judgment or merely dicta." O'Leary v. Liberty Mut. Ins. Co., 923 F.2d 1026, 1067 (3d Cir. 1991).

4

from presenting that identical argument.  <u>See</u> Restatement (Second) of Judgments § 27, cmt. h; <u>O'Leary</u>, 923 F.2d at 1062.

There can be no question that the Pedophile Issue presented in the Times-Tribune Lawsuit is identical to the Pedophile Issue presented in the instant matter.  To be sure, this Honorable Court is asked to determine the exact same question answered by Judge Nealon in the Times-Tribune Lawsuit on substantially similar facts[10] and identical legal theories – namely, "whether Plaintiff's admission to having inappropriate sexual relations with a minor child precludes recovery of civil damages pursuant to state-law reputational tort claims." <u>See</u> <u>Witkowski</u>, 173 F.3d at 200; <u>Siegel v. Goldstein</u>, 657 F.Supp.3d 646, 654-56 (E.D. Pa. 2023); <u>Irish v. Ferguson</u>, 970 F.Supp.2d 317 (M.D. Pa. 2013); <u>Magoni-Detwiler v. Pennsylvania</u>, 502 F.Supp.2d 468 (E.D. Pa. 2007).  Furthermore, the granting of summary judgment operates as a "final adjudication on the merits" for purposes of issue preclusion. <u>See</u> <u>Scooper Dooper, Inc., v. Krafco Corp.</u>, 494 F.2d 840, 848-50 (3d Cir. 1974).  Plaintiff is the same individual named in the Times-Tribune Lawsuit, where he enjoyed all due process considerations of notice and an opportunity to be heard.  <u>See</u> ftn. 8 and 9 *supra*. The recent 8/30/24 Order establishes all four elements of non-mutual, defensive collateral estoppel, triggering the doctrine's application in this case and ultimately precluding Plaintiff's recovery of civil damages related to the Pedophile Issue.

---

[10] Defendants concede that the specific Discursive Acts may differ between the Times-Tribune and instant lawsuits, but the answer to the Pedophile Issue is dispositive of all.  Put another way, there are several iterations of the Pedophile Issue crystallized in statements ranging from the objective (sex with a minor) to the crass (Pedo Phil is a Phraud).  Regardless of where any independent Discursive Act falls on that continuum, the Pedophile Issue resolves each and every iteration across the board.

Effectively, Judge Nealon's holding in the Times-Tribune Lawsuit shields Defendants against **all** of Plaintiff's allegations related to the Pedophile Issue, which encompass at least seventy-eight (78) of the 110 Discursive Acts. (See ECF Doc. No. 26-1). The 8/30/24 Order's preclusive effects operate as the final nail in the coffin; all residual doubt regarding the defamatory nature of the Discursive Acts is put to rest. Plaintiff must now accept **as a legal fact** that he had inappropriate sexual relations with a 15-year-old child. As a result, his entire legal theory falls apart[11], unraveling like a spool of thread. In the context of this civil lawsuit, Plaintiff can no longer allege as wrongful being called a "pedophile," "pedo," "child molester" or even someone who has "groomed" or "f*cked" minors – the Pedophile Issue and all its progeny comments, however crass, now become **pre-litigated facts** determined by a court of competent jurisdiction. See Irish v. Ferguson, 970 F.Supp.2d 317 (M.D. Pa. 2013).

For those reasons and the reasons set forth in Defendants' previously filed briefs of record, Plaintiff's First Amended Complaint must be dismissed, with prejudice. In His Honor's issuance of the 8/30/24 Order, Judge Nealon toppled Plaintiff's core defense strategy of "**I didn't do it**" with a three-word phrase: "**yes, you did**". Defendants again summon the initial question posed to this court in their first Brief in Support and – utilizing

---

[11] State court criminal dispositions are considered public records of which a federal court may take judicial notice. Pension Benefit Guar. Corp. v White Consol. Indus., 998 F.2d 1192, 1197 (3d Cir. 1993); Lynch v. Ducasse, 2020 WL 3547375, at *4-5 (M.D. Pa. 2020) (*for persuasive value*); see also, J/H Real Estate Inc. v. Abramson, 901 F.Supp. 952, 954 (E.D. 1995).

the issues rightly decided in the 8/30/24 Order – respectfully request this Honorable

Court join in the good and learned company of Judge Nealon.[12]

Respectfully Submitted,

**ROTHENBERG & CAMPBELL**

By: _____

Ryan P. Campbell, Esquire (PAID: 317838)
345 Wyoming Ave., Ste. 210
Scranton, PA 18503
p. 570.207.2889 || e. HRLaw04@gmail.com

*ATTORNEYS FOR DEFENDANTS*

Date:  September 3, 2024

---

[12] Upon receiving the Pennsylvania Bar Association's Civil Litigation Professional Excellence Award in recognition of the jurisprudence exhibited during His Honor's two-dozen years serving as a Court of Common Pleas Judge,  one nominator stated: "[i]n terms of writing judicial opinions that reaffirm, guide and/or advance Pennsylvania jurisprudence in a wide variety of areas of the law, there is perhaps no other jurist who has done more in this regard..." *Lackawanna County Judge R. Nealon to Receive PBA Civil Litigation Professional Excellence Award*, Pennsylvania Bar Association, News Release (April 2023).

**ROTHENBERG & CAMPBELL**                    *Attorneys for the Defendants*
Ryan P. Campbell, Esq. (#317838)
Dave W. Rothenberg, Esq. (#326483)
345 Wyoming Avenue, Suite 210
Scranton, Pennsylvania 18503
Phone: 570.207.2889 || Fax: 570.207.3991
E-mail:  Hrlaw04@gmail.com || Hrlaw06@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILIP GODLEWSKI,** | **CIVIL ACTION—LAW & EQUITY** |
| Plaintiff, | *(HON. JULIA K. MUNLEY)* |
| v. | |
| **EDUARDO NICOLAS ALVEAR GONZALEZ,** *AKA* **ALVEAR GONZALEZ EDUARDO NICOLAS,** *AKA* **NICOLAS ALVEAR; and GOOD LION TV, LLC,** | **JURY TRIAL DEMANDED** |
| Defendants | No.: 3:24—CV—00344—JKM |

### CERTIFICATE OF COMPLIANCE

    I, Ryan P. Campbell, Esquire, on behalf of Defendants, do hereby certify that I performed a word-count on the above Brief using Microsoft® Word Version 16.83 (2024) and that the above-captioned document contains 2,487 words, excepting captions, salutatory and introductory language, signatory lines and Certificates of Compliance and Service, respectively.  As such, this filing complies with Local Rule 7.8.

                      Respectfully submitted,

                      **ROTHENBERG & CAMPBELL**

By: _____
                      Ryan P. Campbell, Esquire
                      *ATTORNEY FOR DEFENDANTS*

Date:  September 6, 2024

8

**ROTHENBERG & CAMPBELL**                                   *Attorneys for the Defendants*
Ryan P. Campbell, Esq. (#317838)
Dave W. Rothenberg, Esq. (#326483)
345 Wyoming Avenue, Suite 210
Scranton, Pennsylvania 18503
Phone: 570.207.2889 || Fax: 570.207.3991
E-mail:  Hrlaw04@gmail.com || Hrlaw06@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILIP GODLEWSKI,** | | |
| | Plaintiff, | **CIVIL ACTION—LAW & EQUITY** |
| v. | | *(HON. JULIA K. MUNLEY)* |
| **EDUARDO NICOLAS ALVEAR GONZALEZ,** *AKA* **ALVEAR GONZALEZ EDUARDO NICOLAS,** *AKA* **NICOLAS ALVEAR; and GOOD LION TV, LLC,** | | **JURY TRIAL DEMANDED** |
| | Defendants | No.:  3:24—CV—00344—JKM |

### CERTIFICATE OF SERVICE

    I, Ryan P. Campbell, Esquire, on behalf of Defendants, do hereby certify that I sent a true and accurate copy of Defendants' Brief in Support of their Motion to Dismiss Plaintiff's First Amended Complaint in the above-captioned case on this **6ʰ day of September, 2024** to the below named individuals *via* ECF and Electronic Mail addressed as follows:

        Timothy M. Kolman, Esq.
        e.  tkolman@kolmanlaw.com
        *ATTORNEYS FOR PLAINTIFF*

                        **ROTHENBERG & CAMPBELL**

        By: _____
                Ryan P. Campbell, Esquire
                *ATTORNEY FOR DEFENDANTS*

Date:  September 6, 2024

PHILIP GODLEWSKI,        :   IN THE COURT OF COMMON PLEAS
                            :     OF LACKAWANNA COUNTY
     Plaintiff           :

v.                       :     NO. 2021 CV 2195

CHRIS KELLY, and THE SCRANTON  :
TIMES, L.P.,              :
                            :
     Defendants        :

## MEMORANDUM AND ORDER

NEALON, J.

A self-proclaimed "patriot reporter," who claims to be "one of the highest Anons" in the QAnon movement and to earn $5,000,000.00 per month from his QAnon broadcasts on social media, has instituted this litigation advancing claims for defamation and false light invasion of privacy against a newspaper and its op-ed columnist based upon an article that they published on February 14, 2021. The ironic gist of the opinion column at issue was that the QAnon broadcaster, who affirmatively states in his published videos on social media that certain high-ranking elected and public officials are satanic, cannibalistic pedophiles sexually abusing children and drinking their blood to ingest the life-extending chemical adrenochrome, previously pled guilty in this county to corruption of a minor resulting from a sexual relationship with a 15-year-old girl while he was a 27-year-old baseball coach at her school. Upon the completion of discovery, the columnist and newspaper filed the instant motion for summary judgment on the ground that the broadcaster has failed to adduce sufficient evidence to satisfy his burdens of proof governing his defamation and false light claims.



1

Since the broadcaster is admittedly a public figure, he must establish that the op-ed columnist and newspaper published a false and defamatory statement concerning him, and that they did so with "actual malice" in that they either knew the factual statement was false or they subjectively acted with reckless disregard as to its truth or falsity because they had a high degree of awareness of its probable falsity or entertained serious doubts as to its truth. Even when the summary judgment record is evaluated in a light most favorable to the broadcaster, it lacks sufficient evidence that the columnist and newspaper published a false and defamatory statement about the broadcaster with actual malice. Furthermore, inasmuch as the broadcaster's claim for false light invasion of privacy similarly requires actual knowledge of, or subjective reckless disregard for, the falsity of the publication, the broadcaster's submitted evidence likewise is insufficient as a matter of law to sustain his false light invasion of privacy claim. Accordingly, for the reasons discussed in greater detail below, the motion for summary judgment filed by the columnist and the newspaper will be granted.

## I. FACTUAL BACKGROUND

Plaintiff, Philip Godlewski ("Godlewski"), has commenced this action against defendants, Chris Kelly ("Kelly"), and The Scranton Times, L.P. ("Scranton Times"), asserting claims for defamation and false light invasion of privacy.[1] (Docket Entry No. 1 at ¶¶ 95-104,

---

[1] Godlewski originally sued Times-Shamrock Communications, The Scranton Times-Tribune, and the Scranton Times' executive editor, Larry Holeva, as well. (Docket Entry No. 1 at ¶¶ 4-6). He later stipulated to the dismissal of Times-Shamrock Communications and The Scranton Times-Tribune as named defendants on January 18, 2023, and the substitution of The Scranton Times, L.P. in their stead. (Docket Entry No. 47). On January 2, 2024, Godlewski also stipulated to the voluntary dismissal of Larry Holeva as a party in this case. (Docket Entry No. 95).

106-115, 117-123, 125-128).  He avers that Kelly is "a journalist employed by the Scranton

Times" who authored a "false, defamatory, and malicious article" about him that was published

in the Scranton Times on February 14, 2021.  (Id. at ¶¶ 1, 3).  The article in question appeared

under the heading "QAnon Realtor sells rabbit holes on YouTube," and in its entirety, read:

> One of the QAnon movement's most devoted dead-enders is a Clark Summit-
> based Realtor who insists Donald Trump is still president and working behind
> the scenes to depose Joe Biden, impose martial law and bring final justice to
> elected Democrats and other Satanic child sex traffickers who unwind after a
> long day of evildoing with a glass of baby blood.
>
> Over the past year or so, many readers have alerted me to the online
> proselytizing of Phil Godlewski, who lives in Duryea but sells homes under the
> name of a national real estate franchise.  He sells QAnonsense to thousands of
> followers around the globe on a host of platforms, including a YouTube channel
> with more than 26,000 subscribers.
>
> I've reported on a few local manifestations of QAnonsense, but avoided
> Godlewski because I don't want to give unwarranted attention to a purveyor of a
> poison that has curdled the hearts and minds of millions who may never recover.
>
> Watching the second impeachment trial of Donald Trump changed my mind.
> There were many Q followers in the mob of domestic terrorists who ransacked
> the Capitol on Jan. 6.  They came from cities, towns and neighborhoods across
> the country.  They are our neighbors, friends and family.  They are Americans.
>
> The new video of the seditionist mayhem that resulted in five deaths and the
> airtight case made by the House managers convinced me we can't afford to
> ignore citizens of a separate reality who act, organize and seek to undermine and
> upend objective reality.
>
> The Capitol riot is empirical evidence that we ignore this insidious war on truth
> at our peril.  Despite the demolition of all its so-called prophecies, the Q
> movement marches on. Godlewski happily calls out the cadence.
>
> In a text message, Godlewski told me he wasn't at the Capitol on Jan. 6, but he
> showed up in USA Today's coverage of the riot.  Shortly after the mob stormed
> the People's House, Godlewski posted on Facebook that Vice President Mike
> Pence had been arrested.

3

It was a lie. Godlewski didn't return the newspaper's request for comment. He has since been banned from Facebook and Twitter, but somehow is still welcome on Instagram and YouTube. A reader sent me a link to one of his latest YouTube offerings.

"I want someone to answer for me one question, logically," Godlewski said to his audience. "I want a really good explanation. Why would (Trump) walk away? Why, why would Donald Trump walk away? He knows there's election fraud. He has the proof. He has them nailed to the wall and there's no doubt about that."

The self-proclaimed "patriot reporter" went on to cite widely debunked claptrap as proof the election was stolen and argued that Trump's failure to use the Insurrection Act and a host of other powers the presidency does not grant to stay in power is actually part of the grand, hidden strategy we mere mortals can't begin to comprehend.

This is the paradox of every crackpot conspiracy theory. When nothing makes sense, it's because you don't know everything – yet. Keep believing and all will be revealed. The "Great Awakening" is always just a little further down the rabbit hole.

There is no room for doubt in the QAnon cult. Adherents believe that "Q" is a mysterious individual (or group of them) with a high-level security clearance. Q is privy to a "plan" by Trump to round up and execute the Satanic vampire pedophiles in a sweeping cataclysm called "The Storm," which will lead to a "Great Awakening."

Ashli Babbitt, the Air Force veteran tragically shot and killed by a Capitol Police officer as she climbed through a smashed window, believed she was participating in The Storm. Her belief killed her just as sure as the bullet that brought her down.

I wanted to answer the question Godlewski posed in his video, so I reached out and proposed an interview. He declined. I suggested he record our discussion, as Andrew Torba – CEO of the Clark Summit-based right-wing antisocial media platform Gab – did a few weeks ago. No go.

*"All of the things I say will be dissected into oblivion, and only the 'crazy sounding' things will make the article,"* Godlewski texted. *"It'll ultimately be*

4

*painted to make me look insane, and my family will ultimately suffer in the future. I can't take that chance."*

I texted back in what soon became a sporadic exchange of messages that amounted to an interview:

*"I've been watching your videos and I have to ask: Do you really believe the things you say, or are you just in it for the attention? If the former, why not defend your beliefs on the record? If the latter, why pass on an opportunity to showcase yourself?"*

Godlewski's response:

*"I couldn't care less about attention. The reporting I do is because the average American Citizen can no longer get true information from the Main Stream Media. Between all platforms, I have over 75,000 followers that are depending on me for information that they can no longer get from their regular sources. I'm not the only citizen reporter. There are dozens of people like me, if not hundreds. If I wanted to "showcase myself", " in your words (not mine), I would have jumped at the opportunity to do your interview. It's not about that. It's about the truth.*

*"Again, Chris, no disrespect to you, but I know you're following the agenda. The theme of your article is already set for you. You can't go against the MSM narrative with your reporting, because you'll either 1.) get fired, or 2.) lose credibility with what the Tribune (or you) think is their "primary audience." Little do you known, your primary focus on subscribers should be people like me, who seek the truth and no longer listen to the garbage MSM narrative. The focus shouldn't be on the ones the Tribune wants your article to appeal to. I understand that's not your choice, but that's the reason I cannot do the interview. Your narrative is already set."*

This is the epitome of a self-fulfilling prophecy. Godlewski refuses to engage me as an admitted critic, ensuring that my report will be one-sided. He is automatically the martyr. I am a witless tool of the "deep state," or worse – a willing agent of oppression.

Here's "proof." In the normal course of reporting this column, I stumbled upon some legal troubles in Godlewski's recent past. In 2011, the former Riverside High School baseball coach pleaded guilty to corruption of minors and admitted to having a sexual relationship with a 15-year-old girl.

5

Lackawanna County detectives said Godlewski had sex with the girl in cars and homes he had access to as a real estate agent. Godlewski, 28 at the time, was sentenced to three to 23 months, with the first three months to be served under house arrest and the balance as probation.

Last February, Godlewski was charged with theft by deception, forgery and related charges. Police said Godlewski kited a check to an area building supplier and forged bank statements to cover it up. The case is still pending.

I texted Godlewski and told him I was likely to report both cases in the column. I didn't want him to be blindsided.

His response:

*"That shows your character as a journalist, Chris. You just lost all respect and credibility with me."*

In fact, my editor and I discussed whether to include the information, which is public and was previously published in The Times-Tribune. We decided it was relevant in regard to Godlewski's credibility. I have many character defects, but the last time I had sex with a 15-year-old was never.

Throughout the reporting of this column, I texted Godlewski to give him an opportunity to respond. Eventually, he asked me to stop.

*"Please stop messaging me. Bringing up my past only serves you, and your company. It will cause turmoil for my young children and family. I don't want to hear from you again. Go continue your self serving nature. Karma always has a way when it comes to people that do that kind of stuff to me."*

Karma is easy to see when it affects others, not so much when it's working on you. I am telling the truth in a local newspaper. Godlewski is spreading lies across the planet. Whether he's a true believer or a cynical opportunist, the damage is the same.

If Godlewski had agreed to speak with me, I would have answered his questions logically:

* Trump "walked away" because he lost the election and his shameless, treasonous and ultimately lethal attempt to overturn it failed. Democracy defeated Trump. On Nov. 3 and again on Jan. 6 and Jan. 20.

6

* Trump never presented a shred of evidence of mass voter fraud because there is none. If he had any legitimate proof, his lawyers would present it in a court of law. The idea that Trump would holster any "smoking gun" that bolstered his selfish claims is beyond ridiculous.

Trump didn't testify at either impeachment trial for the same reason Godlewski refused to speak with me. Trump and Godlewski don't dare leave their safe spaces – where truth is fluid and lies flow with no resistance – for fear of having to defend the indefensible. Subjecting themselves to even the slightest scrutiny makes them vulnerable to the hard lessons of accountability.

If you lose the presidential election, don't incite a mob to overthrow the government. If you choose to join that mob, don't do it in front of an army of photojournalists while carrying a location-pinging cellphone.

And if you hold yourself up as a "patriot reporter" who tells truths that can't be found anywhere else, don't traffic in lies.

Godlewski's lies have consequences beyond his immediate family. Millions of Americans have lost parents, grandparents, siblings, children and friends to the QAnon cult. They watched in helpless horror as their loved ones were led down rabbit holes from which they may never return.

Godlewski bears some responsibility for that, but I wish him no ill. It's my hope that he'll reflect on his role in curdling the hearts and minds of people who placed their trust in him and stop pushing the poison.

In that spirit, I offer a stitch of wisdom I learned the hard way, from one patriot reporter to another: It's fun to point fingers until some jerk holds up a mirror.

(Id. at pp. 25-32).

Godlewski contends in his verified Complaint that the above-quoted article contained three defamatory characterizations regarding him. First, he maintains that Kelly and the Scranton Times falsely accused "Godlewski of having a sexual relationship with a 15-year-old pursuant to a criminal matter which occurred in 2011," even though "he never had sex [with] an underage girl" and "pled to a misdemeanor." (Docket Entry No. 1 at ¶¶ 42, 45, 48, 51). He

7

avers that "Kelly deliberately conflated the charges against Mr. Godlewski of having sex with a girl, with his plea to a misdemeanor charge for corruption of minors," and claims that "[t]here is nothing in Mr. Godlewski's criminal record which indicates, relates and/or references to Mr. Godlewski pleading guilty to having had sex with a 15-year-old girl, or any other underage girl." (Id. at ¶¶ 55, 61).

Second, Godlewski alleges that by stating that "Godlewski was selling rabbit holes on YouTube, coupled with the cartoon of a real estate sign on top of which was written 'RABBIT HOLE FOR SALE!' and beneath the words "UNREAL-TOR" and next to a "diagram in the center of the sign that represents QAnon," Kelly and the Scranton Times "gratuitously, maliciously, unnecessarily, and inextricably linked Mr. Godlewski's professional integrity to his alleged political views using the latter to impugn his integrity as a realtor.[2]  (Id. at ¶¶ 17-20).  He asserts that he "made his reputation as a realtor by being trustworthy, reliable, and knowledgeable" and "discharging the highest ethical standards," but "was terminated [by ERA

---

[2] QAnon has been described in other litigation as "an American conspiracy movement" that "centers around 'Q,' who is supposedly 'a high-ranking government official' who 'leaks top secret information' about the 'Deep State.'" Flynn v. Cable News Network, Inc., 2024 WL 1765566, at *1 (S.D.N.Y. 2024).  It believes that a secret global cabal of Democrats and celebrities worship Satan, sexually abuse children, and drink the children's blood to ingest a life-extending chemical called adrenochrome. Id. at *6; U.S. v. Gieswein, 2021 WL 3168148, at *15 (D.D.C. 2021), aff'd, 2021 WL 5263635 (D.C. Cir. 2021); Angela S. Boettcher, "QAnon: What the Viral Conspiracy Theory Can Teach Us About The Mainstream Sex Trafficking Debate," 37 Berkeley J. Gender L. & Just. 195, 196 (2022).  QAnon is considered to be "the progeny of PizzaGate - - the theory that high-ranking Democratic officials were running a child-sex ring out of a Comet Ping Pong, a pizza parlor in Washington D.C." Connor B. Flannery, "§ 230 and Tinfoil Hats: What Conspiracy Theories Teach Us About The Marketplace of Ideas And Online Speech," 31 Cath. U.J.L. & Tech. 3, 21 n.103 (Spring 2023).
QAnon proponents believe "that then-President Trump was 'recruited by top military generals to run for President in 2016 to break up' the cabal, disrupt its control over world affairs, and 'bring its members to justice.'" Boettcher, supra.  They similarly "believe, without evidence, that President Trump was elected to defeat a purported cabal of cannibalistic pedophiles in the government." Patrick v. Daily Beast Company, LLC, 674 F.Supp.3d 159, 161 (E.D. Pa. 2023).  QAnon supporters also "claim that organizations funded by the Bill and Melinda Gates Foundation engineered, patented, and weaponized the novel coronavirus (COVID-19) to undermine then-President Trump's chances of re-election in 2020." Flannery, supra.

One Source Realty] because of the defamatory article written and published by" Kelly and the Scranton Times.[3]  (Id. at ¶¶ 9-10, 13).  Godlewski submits that he "has been defamed in his profession as a realtor in which he functions as a private individual," and that he "remains a private figure with respect to criminal charges which were brought against him and any plea agreement does not transform him into a public figure in that respect."[4]  (Id. at ¶¶ 90-91).

Third, Godlewski alleges that Kelly and the Scranton Times defamed him by referring to him as "a purveyor of poison" despite "not having one wit of evidence that Mr. Godlewski's views and opinions have irreparably damaged anyone."  (Id. at ¶¶ 21, 23).  He contends that "despite stating that Mr. Godlewski was not at the Capitol on January 6, 2021, the date of the insurgency," Kelly and the Scranton Times "tab Mr. Godlewski as, not only a supporter, but an active participant and organizer" who was "integrally involved in the unlawful assault on the Capitol and is part of a conspiracy to overthrow the United States government by force and is thus a 'seditionist.'"  (Id. at ¶¶ 25, 29).  Godlewski submits that by implying that he was "an integral part of the Capitol insurgency, the article labels Mr. Godlewski, not just as a seditionist insurgent and a traitor to his country, but also a murder, complicit in the depths (sic) of five persons."  (Id. at ¶ 74).

---

[3] Godlewski's now ex-wife, Dorothea (Dori) Gallagher, testified that Godlewski's employer at ERA One Source Realty, Ms. Sunita Arora, instructed Godlewski to discontinue his QAnon social media videos and informed him that "it wasn't something that she could have in her business." (Deposition of Dorothea "Dori" Gallagher dated 7/20/23, attached to Docket Entry No. 102 as Exhibit 20, at p. 45).

[4] However, by Order dated January 18, 2023, Judge James A. Gibbons approved the parties' stipulation in which Godlewski specifically agrees "that for purposes of this litigation, plaintiff, Philip Godlewski, shall be deemed a public figure." (Docket Entry No. 46).

Godlewski has advanced three causes of action for defamation in the Complaint labeled as "Defamation by Imputation of Crimes," "Defamation for Blackening [Godlewski's] Reputation as a Realtor," and "Defamation by Innuendo by Directly Associating [Godlewski] with the Insurgency on the Capitol on January 6, 2021." (Id. at ¶¶ 95-104, 106-115, 117-123). Relying upon the same factual allegations, he has asserted a separate claim for "false light invasion of privacy." (Id. at ¶¶ 125-128). Godlewski's final two claims seek to recover special damages for intentional interference with contractual relations and prospective contractual relations.[5] (Id. at ¶¶ 130-134, 136-140). His accompanying prayer for relief seeks to recover "actual and special damages," "out-of-pocket expenses due to the defamation and for injury done to his reputation," and "liquidated and/or punitive damages as permitted by applicable law." (Id. at pp. 19-20).

By Order dated July 11, 2023, all discovery in this matter was to be completed by December 31, 2023, any motion for summary judgment by Kelly or The Scranton Times was to "be filed no later than January 31, 2024," together with a supporting brief, and Godlewski's

---

[5] When Godlewski was pressed by defense counsel during his deposition to identify any people "who think less of you because they read [Kelly's] article" or someone he was "friends with before the article" who no longer associates with him because of the article published on February 14, 2021, the only individuals that Godlewski could identify were Brian Fredrick Gray, Jr. and Emily Elizabeth Gray, who owned "a $200,000.00 house" and "cancelled their listing with [Godlewski]" after the article appeared. (Deposition of Philip Godlewski dated 7/25/23, attached to Docket Entry No. 101 as Exhibit 2, at pp. 311-313). However, the records of the Lackawanna County Recorder of Deeds, Instrument #202010882, and the Divorce Decree issued by Judge Thomas J. Munley in Emily Elizabeth Gray v. Brian Fredrick Gray, Jr., No. 20 FC 40090 (Lacka. Co.) document that the Grays' property was actually sold for $202,127.00 on July 23, 2020, and that the Grays were divorced on August 5, 2020, more than six months prior to the publication of Kelly's article. (Docket Entry No. 101, Exhibit 1; Docket Entry No. 102, Exhibit 46). On January 18, 2023, Judge Gibbons approved the parties' stipulation pursuant to which Godlewski voluntarily "dismiss[ed] any and all claims he has for economic damages or special damages against all defendants in this lawsuit." (Docket Entry No. 47 at p. 3). Furthermore, in his brief in opposition to the pending motion for summary judgment, Godlewski affirmatively represents that "[g]iven the circumstances and state of evidence surrounding the case, Godlewski is not seeking relief under these causes of action" for intentional inference with existing or prospective contractual relations. (Docket Entry No. 108 at p. 29).

10

opposing brief was required to "be filed no later than February 29, 2024."[6] (Docket Entry No.

85). The summary judgment record reflects that on July 9, 2020, Detective Michele Mancuso

and Detective Justin Leri filed an Affidavit of Probable Cause seeking the filing of criminal

charges against Godlewski based upon his unlawful sexual activity with a minor, Brienna

DuBorgel.[7] Commonwealth v. Godlewski ("Godlewski I"), No. 10 CR 2613, Docket Entry No.

2 at pp. 12-15 (Lacka. Co.). Ms. DuBorgel informed Detective Mancuso that "she had been

involved in a sexual relationship with Philip Godlewski . . . while he was the baseball coach at

Riverside High School in 2008" when she was 14 years old and a 9th grade student at Riverside

---

[6] The pre-trial phase of this case featured frequent discovery disputes necessitating judicial intervention and resolution. While presiding over Discovery Motion Court, Senior Judge Carmen D. Minora issued and filed Orders on August 23, 2022, November 14, 2022, August 22, 2023, October 13, 2023, and December 18, 2023, granting the motions to compel filed by Kelly and the Scranton Times and directing Godlewski to serve answers to interrogatories and responses to requests for production of documents. (Docket Entry Nos. 21, 34, 88, 91, 93). On August 23, 2022, and February 21, 2023, Judge Minora also granted defense motions to compel the Lackawanna County District Attorney to produce subpoenaed materials regarding Godlewski's criminal prosecutions. (Docket Entry Nos. 22, 53). On December 18, 2023, Judge Minora granted the defense "Motions to Deem Admitted Requests Relative to Requests for Admission (Set V and Set VI)" that were served upon Godlewski. (Docket Entry No. 93). Additionally, by Order dated November 14, 2022, Kelly and the Scranton Times were "awarded $2,345.00 for counsel fees to be paid by [Godlewski] as a sanction due to [his] failure to properly respond to discovery requests," and on January 22, 2024, Judge Minora ordered Godlewski to pay $2,500.00 "made payable to Lackawanna Pro Bono, Inc." as "a sanction for failing to properly preserve evidence" and a separate sanction of $5,000.00 "made payable to The Scranton Times, L.P." for failing "to provide verified and complete answers to discovery as directed in this Court's November 14, 2022, Order." (Docket Entry Nos. 34, 99).
[7] In criminal prosecutions involving the sexual or physical abuse of a minor, the name of the minor victim is not to be disclosed, and any court records revealing the minor's name "shall not be open to public inspection." 42 Pa. C.S. § 5988(a). However, Ms. DuBorgel has voluntarily identified herself and provided affidavits in this matter attesting to the sexual offenses that she asserted against Godlewski in No. 10 CR 2613. (Docket Entry No. 101, Exhibits 7, 23). Moreover, Godlewski has identified Ms. DuBorgel by name in the civil action that he has filed against her based upon her affidavits in this case, and Ms. DuBorgel has filed a counterclaim in that action asserting claims against Godlewski for defamation, false light, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress based upon the same charges asserted in No. 10 CR 2613. Godlewski v. DuBorgel, No. 23 CV 1354, Gibbons, J., at pp. 3, 7-13 (Lacka. Co. June 21, 2024). Thus, Ms. DuBorgel's identity as the minor victim in No. 10 CR 2613 has been disclosed previously in publicly accessible filings.

High School.[8] Id. at p. 13. She further "stated they were involved in oral and vaginal sexual intercourse" which "started happening in his vehicle" in 2008. Id.

  Ms. DuBorgel advised Detective Mancuso on July 7, 2010, that Godlewski "has been contacting her while he was at work" as a realtor, and that "she has been keeping in contact with Godlewski through a throw away phone he keeps with him while at work." Id. at p. 14. After "the cell phones and computers" of Godlewski were seized and subject to forensic analysis "by Corporal Derek Fozard of the Pennsylvania State Police and Detective Justin Leri of the Lackawanna County [District Attorney's] Office," the investigators ascertained that the text messages between Godlewski and Ms. DuBorgel "contained conversations of sexual encounters, exchanges of gifts, and a brand-new vehicle for the victim." (Id.). Specifically, Corporal Fozard and Detective Leri were able to verify and authenticate the following text messages transmitted from Godlewski to Ms. DuBorgel:

---

[8] A court may take judicial notice of the pleadings, orders, and filings in other court proceedings where appropriate, particularly if the other proceedings involve one of the named parties. Lycoming County v. Pennsylvania Labor Relations Board, 943 A.2d 333, 335 n.8 (Pa. Cmwlth. 2007); Krenzel v. Southeastern Pennsylvania Transportation Authority, 840 A.2d 450, 454 n.6 (Pa. Cmwlth. 2003); Scott Township Sewer and Water Authority v. Tellip, 45 Pa. D. & C.5th 197, 201 (Lacka. Co. 2015). As a result, a court "may take judicial notice of information contained in the publicly-available docket" of a prior criminal prosecution involving one of the parties in a subsequent suit. Moss v. SCI-Mahanoy Superintendent Pennsylvania Board of Probation and Parole, 194 A.3d 1130, 1137 n.11 (Pa. Cmwlth. 2018), app. denied, 654 Pa. 426, 215 A.3d 562 (2019). Judicial notice is applied more narrowly when considering preliminary objections challenging the legal sufficiency or factual specificity of a complaint, and in that context, judicial notice may be taken of the filings in a prior criminal or civil proceeding only if the complaint specifically references that earlier criminal or civil action involving one of the parties. d'Happart v. First Commonwealth Bank, 282 A.3d 704, 716 (Pa. Super. 2022); Santiago v. Yates, 72 Pa. D. & C.5th 485, 489 n.2 (Lacka. Co. 2019). Since Godlewski's Complaint expressly references his prior criminal prosecutions, judicial notice could be taken of the filings and Godlewski's admissions in No. 10 CR 2613 even if preliminary objections, rather than a motion for summary judgment, were being considered. (Docket Entry No. 1 at ¶¶ 42-61, 75-79, 96-104).

2/25/10:        *"I just want you to see that I really care about you, and not your body or our sex.  Maybe that's the only way I can."*

2/28/10:        *"The only way we'd ever be sexually satisfied is if we did it like 4-5 times a day."*

3/6/10:         *"I hate my penis, idk [I don't know] why the fuck that happens. You looked so good and were giving incredible head then BOOM, gone.  Like wtf.*

Godlewski's 2 Page Day Log:

10:14 a.m.: *"Realized that you're only 15, but quickly stopped caring."*

11:39 a.m.: *"I just pulled [your] hair from my crotch area. hahahaha!!!"*

02:56 p.m.: *"Should we get a Jacuzzi suite? Hmm"*

Id. at p. 15.

On July 9, 2010, the Commonwealth filed a criminal complaint against Godlewski charging him with Statutory Sexual Assault, 18 Pa. C.S. § 3122.1, Involuntary Deviate Sexual Intercourse, 18 Pa. C.S. § 3123(a)(7), Aggravated Indecent Assault, 18 Pa. C.S. § 3125(a)(8), Unlawful Contact with a Minor, 18 Pa. C.S. § 6318(a)(1), Intimidation of a Victim, 18 Pa. C.S. § 4952(a)(2), Criminal Use of a Communication Facility, 18 Pa. C.S. § 7512(a), Corruption of Minors, 18 Pa. C.S. § 6301(a)(1), and Indecent Assault, 18 Pa. C.S. § 3126(a)(8).  Id. at pp. 1-6.  However, following negotiations between counsel for the Commonwealth and Godlewski, the Commonwealth filed a Criminal Information on November 8, 2010, charging Godlewski with a single count of Corruption of Minors under the 2010 version of 18 Pa. C.S. § 6301(a)(1) on the factual basis that he "did repeatedly have inappropriate text [m]essages and contact with

13

a minor."[9] Id., Docket Entry No. 6. In connection with that filing, Godlewski originally tendered a *nolo contendere* plea to corruption of a minor with the understanding that he would receive a specified sentence, but after Judge Vito Geroulo "informed the parties that he was not accepting the conditional plea," Godlewski filed a motion to withdraw his *nolo contendere* plea, which Judge Geroulo granted on March 2, 2011. Id., Docket Entry Nos. 7, 10, 13.

Godlewski subsequently pled guilty, not *nolo contendere*, to the charge of corruption of a minor on July 11, 2011, and was sentenced by Judge Geroulo to three months to 23 months home confinement, and was specifically prohibited by Judge Geroulo from having any contact with Ms. DuBorgel during his 23 months of supervision.[10] Id., Docket Entry No. 17. Under the heading "Ex-Baseball Coach Sentenced For Sex With Girl, 15," The Scranton Times staff writer, Denis J. O'Malley, authored an article on July 12, 2011, concerning Godlewski's plea and sentence. (Docket Entry No. 101, Exhibit 3). That article notes that Godlewski was arrested for "having sex with the girl in two cars and homes for sale to which he had access as a real estate agent," and that the "relationship with the teen began in 2008, when she was only

---

[9] At the time of Godlewski's corruption of minor offense, Section 6301(a)(1) of the Crimes Code stated, in relevant part, that "[w]hoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices, or encourages any such minor in the commission of any such crime, . . . , commits a misdemeanor of the first degree." Commonwealth v. Tiffany, 926 A.2d 503, 507 n.15 (Pa. Cmwlth. 2007) (quoting 18 Pa. C.S. § 6301(a)), *app. denied*, 597 Pa. 706, 948 A.2d 804 (2008). The current version of Section 6301(a)(1) is further divided into two subsections (i) and (ii) pursuant to which a corruption of minors offense is graded as a felony of the third degree if it involves conduct relating to sexual offenses. *See* 18 Pa. C.S. § 6301(a)(1)(i)-(ii). The latter version of 18 Pa. C.S. § 6301(a)(1), which treats the crime of corruption of a minor involving sexual offenses as a felony under subsection (a)(1)(ii), was not in effect at the time of Godlewski's offense.

[10] Godlewski did not enter an "Alford" plea pursuant to North Carolina v. Alford, 400 U.S. 25, 37 (1970) whereby a defendant "claims innocence, but consents to the imposition of a prison sentence." Com. v. Pasture, 630 Pa. 440, 444 n.1, 107 A.3d 21, 23 n.1 (2014). An Alford plea is based upon the theory that "[w]hen a criminal defendant is unable or unwilling to admit to participating in acts constituting a crime, but the record contains strong evidence of guilt, the defendant may conclude that a guilty plea is in his or her best interests." Id. (citing Alford, supra).

14

14." (Id.). In identifying the evidence supporting Godlewski's corruption of a minor conviction, the article referenced "thousands of text messages between Mr. Godlewski and the girl in which he explicitly described their sexual exploits and expressed how much he cared about her." (Id.). On August 27, 2011, Judge Geroulo released Godlewski from the house arrest program to parole, and upon completing his remaining period of parole, Godlewski was discharged from parole on August 12, 2013. Godlewski I, supra, Docket Entry Nos. 23-25.

Godlewski testified that the QAnon "movement started in 2017" and that he is considered "one of the highest Anons" because he was "one of the original members or posters or one of those that w[as] involved from the very beginning" in QAnon. (Godlewski Depo. at pp. 35-36, attached to Docket Entry No. 101 as Exhibit 2). He describes himself as a "truther," "investigative journalist," and "patriot reporter" who broadcasts QAnon videos on social media platforms to an audience that he claims consists of "17 to 18 million subscribers." (Id. at pp. 153, 164, 188-189, 200-201). He stated under oath that as a result of his QAnon postings and videos, he currently is worth "[b]etween 75 and 100 million" dollars, and receives $5,000,000.00 per month from Rumble.com alone. (Id. at pp. 188, 190, 203).

The following is a sampling of events that Godlewski genuinely believes either took place or did not occur, and which are the subjects of his social media broadcasts:[11]

- United Airlines Flight 93 did not crash in Somerset County, Pennsylvania, on September 11, 2001, and instead landed safely "at O'Hare Airport in Chicago"

---

[11] During a discovery sanctions hearing before Judge Minora, Godlewski testified that he originally broadcast solely on Facebook, but that on January 20, 2021, "Facebook suspended and deleted [his] account permanently." (Transcript of Proceedings on 2/6/23, attached to Docket Entry No. 101 as Exhibit 6, at p. 147). Godlewski "then transitioned to YouTube," however, "YouTube deleted [his] account" too. (Id. at pp. 147-148). Godlewski maintains that "[a]ll of [his] videos are on Telegram," and that "[o]n average," each video is viewed by 14,230,000 people. (Id. at pp. 148-149).

where the passengers "were unloaded on the tarmac and taken to a hangar." (Id. at pp. 162-163).

- There "was no shooting" at the Route 91 Harvest Music Festival near the Mandalay Bay Hotel in Las Vegas, Nevada, on October 1, 2017. (Id. at p. 170).

- Donald Trump ordered the arrest of various public figures by the military and thereafter presided over their trials and executions by military tribunals at Guantanamo Bay. (Id. at p. 166). Among the individuals whose execution Donald Trump authorized and presided over included former Secretary of State Hillary Clinton on December 31, 2018, President Joseph Biden in 2019, Senator John McCain, and Tom Hanks. (Id. at pp. 163-164, 166-167, 170, 172). The individuals who people believe are President Biden, former Secretary Clinton, and Tom Hanks are actually body doubles or clones. (Id. at pp. 166-167, 172).

- Two women appearing to be Hillary Clinton and her former Chief of Staff, Huma Abedin, are depicted in a "video, which looks like the basement of Comet Pizza in Washington, D.C.," and shows both of them "laying different children on top of ping pong tables, which are in the basement, molesting those children, frightening those children with weapons and then drinking something which would line up with the theory that it is the blood of those children for purposes of extracting adrenochrome," which conduct is "the main reason that Hillary Clinton was executed." (Id. at pp. 173-174). President Biden was likewise executed "for crimes against humanity in 2019" based upon "many reports and investigative data" indicating "that Joe Biden was involved with children." (Id. at pp. 158, 167). Tom Hanks was also executed by a military tribunal because he "was a pedophile." (Id. at p. 172).

- Former Presidents George H.W. Bush and George W. Bush and "the Bush family were completely complicit with the child sex-trafficking ring globally," but only former President George H.W. Bush was executed by a military tribunal as a result. (Id. at pp. 175-176).

- There is audio and video proof that President Bill Clinton's Chief of Staff, John Podesta, molested children and scalded them with water. (Id. at pp. 174-175).

- President John F. Kennedy was not assassinated on November 22, 1963, and did not die until January 2021 or 2022. (Id. at pp. 176-177).

- California Governor Gavin Newsom "killed himself" and the person who is representing himself as Governor Newsom now is actually "a body double" or "a clone." (Id. at pp. 168-169).

16

- Former Secretary of the Defense, Mark Esper, "turned out to be a cabal Deep-State plant" and a traitor, and the former Chief Medical Advisor to the President of the United States, Anthony Fauci, "will be arrested and tried by a military tribunal," and if found guilty of "crimes against humanity," likewise will be sentenced to death. (Id. at p. 168).

- The District of Columbia has been under martial law "for several months and the patriots blew up the tunnels underneath the District of Columbia which were used for child-trafficking." (Id. at pp. 172-173).

- The COVID-19 vaccine was "developed by Big Pharma to control the minds and actions of humans by way of the 5G networks operated by the phone companies." (Id. at p. 169).

- There is "a second secret Constitution of the United States" and "the Supreme Court of the United States has already rendered a decision overturning the 2020 election." (Id. at p. 169).

- The foregoing "cabal is trafficking children" and "harvesting adrenochrome for . . . the elites that use it, but also for sex purposes and to play out their sadistic, disgusting fantasies." (Id. at p. 181). "The Storm" is "a global cleanup of this enterprise that is not only stealing, but torturing, raping and otherwise molesting our children, but also stealing and trafficking adults, getting them hooked on drugs, fentanyl, and heroin and worse." (Id. at pp. 182-183). The Storm is comprised of "worldwide military patriots that want to set humanity free," and Godlewski himself has "been summoned and called upon to lead a very complex, very covert operation to restore the Republic of America to its people." (Id. at pp. 183-184). Godlewski refused to discuss that covert operation during his deposition, claiming that he is subject to a nondisclosure agreement that prohibits him from doing so. (Id. at pp. 186-187).

- The people who "entered the Capitol waving the flags on January 6, 2021, were part of a false flag operation," and Congress "has the files that prove" that the attack "at the Capitol on January 6 was an FBI set-up." (Id. at pp. 219-220). In addition, "Ashli Babbitt was not really shot and killed at the Capitol on January 6." (Id. at pp. 220-221).

- Godlewski reported live on January 6, 2021, that Vice President Mike Pence had been arrested. (Id. at p. 220).

17

According to the filings in <u>Commonwealth v. Godlewski</u> ("<u>Godlewski II</u>"), No. 20 CR 664 (Lacka. Co.), Godlewski purchased kitchen cabinets, hardware for the cabinets, and granite countertops from Mariotti Building Products, and on the date of the delivery of the kitchen materials to his residence on November 13, 2019, he provided Mariotti with a check in the amount of $21,789.84 representing the balance due. (<u>Id.</u>, Docket Entry No. 2 at pp. 21-22). Two days later, Godlewski sent Mariotti an email stating "that the check he gave Mariotti posted to his account twice" totaling $43,579.68, and in subsequent emails in late November 2019, he represented to Mariotti that "the second posting was returned since he only had $35,000.00 in his account." (<u>Id.</u> at pp. 21, 23). On December 10, 2019, "Godlewski advised Eugene Mariotti that Wells Fargo Bank made an error and withdrew the $21,789.84 from his account twice," and on January 2, 2020, he told "Eugene Mariotti that he filed a lawsuit against the Bank to recover the funds and that his attorney would like to know if Mariotti wanted to cooperate in the lawsuit, if needed." (<u>Id.</u> at p. 25). Additionally, Godlewski provided Mariotti with what he represented as his Wells Fargo bank statements reflecting "that on November 13, 2019, the same day check #2022 in the amount of $21,789.84 was issued to Mariotti, there was a balance of $34,922.47 in the account." (<u>Id.</u>). However, Godlewski's actual statements from Wells Fargo Bank confirmed that "the actual balance in the account on November 13, 2019, was $267.95," and that "check #2022 in the amount of $21,789.84 was never deducted from the account balance because the balance was only $267.95 when the check was presented at the Bank." (<u>Id.</u> at p. 27).

On February 20, 2020, Godlewski was charged with forgery of bank records, 18 Pa.

C.S. § 4101(a)(2), theft by deception, 18 Pa. C.S. § 3922(a)(1), tampering with records, 18 Pa.

C.S. § 4104(a), and bad checks, 18 Pa. C.S. § 4105.[12]  (Id., Docket Entry No. 3).  Godlewski

later pled guilty to tampering with records and bad checks before Judge Michael J. Barrasse on

February 23, 2021.  (Transcript of Proceedings in Godlewski II dated 2/23/21 at pp. 1-2).

During his guilty plea, Godlewski expressly admitted that he "did provide Mariotti Building

Products with a copy of the doctored and fraudulent Wells Fargo Bank statement reflecting a

significantly higher balance than what was in the actual account," and that the "[f]raudulent

bank statement further reflected the check to be withdrawn from the account twice to make it

appear as though the Bank erred."  (Id. at pp. 3-4).  He further acknowledged that he "did

unlawfully pass a certain check . . . dated November 13, 2019, for payment of money in the

amount of $21,789.84 payable to the order of Mariotti Building Products and drawn on a Wells

Fargo bank account knowing well at the time of passing said check that it would not be

honored by the drawee."  (Id. at p. 4).  After Judge Barrasse ordered a pre-sentence

investigation report in aid of sentencing, (Id. at pp. 5-6), he sentenced Godlewski on June 22,

2021, to an intermediate punishment program comprised of one month imprisonment at the

Lackawanna County Prison, followed by three months of house arrest and four years of

probation.[13]  Godlewski II, supra, Docket Entry No. 21.

---

[12] Godlewski testified that "right after [his] arrest" in No. 20 CR 664, the State Real Estate Commission "actively suspended" his realtor's license.  (Godlewski Depo. at p. 127).
[13] By letter dated March 29, 2021, Godlewski's counsel advised Judge Barrasse that "we believe it would be beneficial to the Court that we get a psychological evaluation" of Godlewski as part of the "pre-sentence investigation."  Godlewski II, supra, Docket Entry No. 18.  The public record in No. 20 CR 664 does not reflect whether such a psychological evaluation was performed or the results of any such evaluation.

Near the conclusion of the pre-trial discovery period, Godlewski filed a motion seeking to obtain discovery of the financial wealth of Kelly and The Scranton Times in connection with his claim for punitive damages. (Docket Entry No. 96). The wealth of the defendant is a factor to be considered by the fact-finder in determining an appropriate amount of punitive damages, Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 102, 555 A.2d 800, 803 (1989), and a defendant's net worth is recognized "as a valid measure" of a defendant's wealth for purposes of punitive damages. Carlini v. Glenn O. Hawbaker, Inc., 219 A.3d 629, 640 (Pa. Super. 2019). Rule 4003.7 governs such financial wealth discovery, and states that "[a] party may obtain information concerning the wealth of a defendant in a claim for punitive damages only upon order of court setting forth appropriate restrictions as to the time of the discovery, the scope of the discovery, and the dissemination of the material discovered." Pa.R.Civ.P. 4003.7. For more than 20 years, the Court of Common Pleas of Lackawanna County has required plaintiffs to first articulate facts or produce evidence establishing a *prima facie* basis for the recovery of punitive damages as a condition precedent to securing financial wealth discovery under Rule 4003.7. *See* Kuehner v. Abdulqader, 73 Pa. D. & C.5th 180, 187 (Lacka. Co. 2019); Charlesworth v. Galacci, 68 Pa. D. & C.5th 79, 84 (Lacka. Co. 2017); Ogozaly v. American Honda Motor Co., Inc., 104 Lacka. Jur. 354, 360 (2003). Our application of that threshold requirement for financial wealth discovery is consistent with appellate precedent. *See* Cabot Oil and Gas Corporation v. Speer, 241 A.3d 1191, 1199-1200 (Pa. Super. 2020) ("In this case, the trial court properly concluded that Appellees had the right to punitive damages discovery under Rule 4003.7, based on evidence that Appellants intentionally and wantonly filed a second

federal lawsuit despite full knowledge of the prior settlement between Appellees and Kemble.").

In addressing Godlewski's request for discovery under Rule 4003.7, Judge Minora observed that Godlewski "must prove Defendants acted with 'actual malice' to succeed in his claims," and that "were [Godlewski] to establish Defendants' liability, he would necessarily be entitled to the consideration of punitive damages, which are recoverable 'when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct.'" (Docket Entry No. 96 at p. 1) (quoting Dubose v. Quinlan, 125 A.3d 1231, 1240 (Pa. Super. 2015)). He concluded that "case law makes clear that a claim for punitive damages alone is insufficient to support a request for wealth discovery unless accompanied with evidence to establish there is a factual basis for the claim," Id. (citing Cabot Oil and Gas Corporation, supra), and that at a minimum, "'plaintiff must identify facts that establish a *prima facie* basis for the recovery of punitive damages under Pennsylvania law.'" Id. (emphasis in original) (quoting Charlesworth, supra). Consequently, to secure financial wealth discovery from Kelly and The Scranton Times, Godlewski was required to identify facts or evidence establishing a *prima facie* basis for finding that Kelly or The Scranton Times acted with actual malice by displaying a reckless disregard for the truth or falsity of the factual statements contained in the subject article. However, on January 12, 2024, Judge Minora denied Godlewski's motion for discovery under Rule 4003.7 based "on the undeniable truth that [Godlewski] has not submitted in support of his motion any evidence, as he must, to establish a *prima facie* basis for the entitlement to punitive damages." (Id. at p. 3) (emphasis in original).

21

Even though discovery in this matter was concluded by January 12, 2024, Judge Minora found on that date that Godlewski "has not at present satisfied his burden to convince us he is entitled to conduct wealth discovery." (Id.).

Kelly and The Scranton Times have filed a motion for summary judgment seeking to dismiss Godlewski's defamation and false light claims on the grounds that Godlewski cannot establish that any factual statements concerning him in the article are false, and that other content set forth in the article constitute Kelly's "legally protected opinions" that are "not actionable." (Docket Entry No. 98 at ¶¶ 32, 42-44). They also assert that they are entitled to judgment as a matter of law since Godlewski cannot "prove by clear and convincing evidence" that any alleged false statements were published with actual malice in that Kelly or The Scranton Times knew that the statements were false or acted with reckless disregard as to whether they were true or false. (Id. at ¶¶ 33-41). Kelly and The Scranton Times further submit that Godlewski "has not produced any evidence of harm to his reputation" or any other recoverable damages that he claims are attributable to defamatory or false light statements.[14] (Id. at ¶¶ 47-50, 52).

---

[14] Kelly and The Scranton Times state in their motion for summary judgment, and Godlewski admits in "Plaintiff's Response to Defendants' Motion for Summary Judgment," that Godlewski "broadcast to his social media followers" that he has "a degree and a certificate from Harvard University and a certificate from Regent University." (Docket Entry No. 98 at ¶ 66; Docket Entry No. 105 at ¶ 66). Godlewski also served verified discovery responses stating that he was "pursuing a master in the arts of law" at Regent University and "took a course 'Mastery of Negotiation' at the Harvard Business School." (Docket Entry No. 98 at ¶ 67; Docket Entry No. 105 at ¶ 67). However, in response to records subpoenas and deposition inquiries, "Harvard University, Harvard Business School, and Regent University responded they have no records on Philip Godlewski and affirmed he never attended a program or obtained a certificate or degree from their schools." (Docket Entry No. 98 at ¶¶ 68-89; Docket Entry No. 105 at ¶¶ 68-69).

In support of their motion for summary judgment, Kelly and The Scranton Times have submitted 1,147 pages of exhibits. (Docket Entry No. 101 at pp. 1-617; Docket Entry No. 102 at pp. 1-530). Included among those exhibits are portions of the depositions of Godlewski, Dorothea Gallagher, Ciara O'Malley, Marie Godlewski, Sherry Strok, Amanda Turoni, Joseph Moceyunas, and Kelly. (Docket Entry No. 101, Exhibit 2; Docket Entry No. 102, Exhibits 20, 21, 22, 27, 31, 39, 43, 44). They have also presented the affidavits completed by Ms. DuBorgel, Thomas Nezlo, former Assistant District Attorney Patricia Lafferty, and Linda DuBorgel. (Docket Entry No. 101, Exhibits 7, 13, 14, 15; Docket Entry No. 102, Exhibit 23).

Kelly and The Scranton Times note that "[n]o liability can attach for true statements," and emphasize that Godlewski pled guilty to corruption of a minor for his "inappropriate text messages and contact" with DuBorgel as memorialized in his 2010 text messages to her as quoted in the Affidavit of Probable Cause supporting the Criminal Information.[15] (Docket Entry No. 103 at pp. 10-12). Citing Godlewski's deposition testimony, they assert that Godlewski "concedes his corruption charge was for having sex with a minor child," and that per his guilty plea colloquy, "he admits to doing the things he was 'charged with'" in the

---

[15] In their supporting brief, Kelly and The Scranton Times state that in addition to Godlewski's "career as a social media broadcaster and leader in the QAnon movement," he "also became a multi-level marketer of silver commemorative coins through 7-K Metals" and "used his social media platforms to market his followers to become buyers of coins or become sellers in his down-line." (Docket Entry No. 103 at p. 3 & n.1). They also maintain that Godlewski attempted to convince Ms. DuBorgel to recant her affidavits in this case. To that end, they quote a text message that he reportedly transmitted to her in November 2022 in which he stated "I'm going into the next Trump administration as a political advisor and intelligence figure" and "there will be 300 million that know me five years from now," and warned that although he "could have . . . called you a lifelong friend in front of millions," now "[t]his gets worse," "[n]ot better," just "[w]ay worse." (Id. at p. 4) (quoting Docket Entry No. 101, Exhibit 8).

Criminal Information.  (Id. at pp. 16-17) (citing Godlewski Depo. at pp. 228, 240).

Referencing the deposition testimony and affidavits that they have attached as exhibits, Kelly

and The Scranton Times submit that "there is substantial evidence proving Godlewski was in a

sexual relationship with Ms. DuBorgel when she was a minor."[16]  (Id. at pp. 17-20, 24-25)

(citing Docket Entry No. 101, Exhibit 14; Docket Entry No. 102, Exhibits 20, 21, 22, 31).

        Kelly and The Scranton Times argue that due to Godlewski's status as a public figure,

he must also "establish that [they] made a false and defamatory statement with actual malice,"

"which is defined as knowledge that the publications were false or a reckless disregard of

whether they were true or false - - by clear and convincing evidence."  (Id. at pp. 37-38) (citing

New York Times v. Sullivan, 376 U.S. 254, 279-280 (1964)).  They state that prior to preparing

the article, Kelly reviewed "archived news articles at the The Times-Tribune and court

documents from the criminal case," and "Kelly also talked to people in law enforcement who

corroborated statements [Kelly] made in the article."  (Id. at pp. 42-43, citing Docket Entry No.

102, Exhibit 44).  Kelly and The Scranton Times posit that negligence or departure from

journalistic standards is insufficient as a matter of law to establish the "reckless disregard"

element for actual malice.[17]  (Id. at pp. 38-40).

---

[16] Kelly and The Scranton Times devote a considerable portion of their brief to discussing and documenting Godlewski's "false statements under oath in this case" concerning a sexual relationship with Ms. DuBorgel.  (Id. at pp. 25-36) (quoting Docket Entry No. 101, Exhibits 2, 4, 6, 8; Docket Entry No. 102, Exhibits 20, 29, 33, 34, 37, 39, 40, 41, 42, 43).

[17] Kelly states that "[b]efore the article was published, Kelly realized that the QAnon movement was turning into a dangerous thing and that a local guy, Godlewski, was one of the leading voices of the movement" which "challenged objective reality and every institution in this country."  (Id. at p. 41).  After "Kelly checked out Godlewski's videos and postings online," he "believed Godlewski was broadcasting nonsensical Q movement theories," which "is why he used the figurative language in the article stating Godlewski sells 'rabbit holes'" and "used the word 'poison' in the article to refer to the lies, nonsense, and disinformation Godlewski was spreading on the internet."  (Id. at pp. 40-42).

Kelly and The Scranton Times additionally argue that "certain statements in the article are protected under the fair reporter privilege" as an account "of official government reports or proceedings," and that Godlewski has produced "insufficient evidence to prove loss of reputation or actual harm for his defamation claims." (Id. at pp. 51-52). With respect to the latter defense, they cite various exhibits reflecting that "Sunita Arora let Godlewski go from his real estate job because of his QAnon videos," Godlewski "likes his career now and he's never going back to real estate," Godlewski "is worth $75,000,000.00 and earns over $5,000,000.00 per month," and Dorothea Gallagher "filed for divorce in March 2021 due to Godlewski's infidelities and his involvement in QAnon which she described as a cult."[18] (Id. at pp. 55-56). Kelly and The Scranton Times assert that Godlewski's false light claim and demand for punitive damages should be dismissed for the same reasons warranting summary judgment on Godlewski's defamation claim. (Id. at pp. 57-58, 60-61).

In his opposition to the motion for summary judgment, Godlewski acknowledges that as a public figure, he bears the burden of proving "the falsehood of the defamatory communication." (Docket Entry No. 108 at p. 6 n.1). He contends that the article falsely accuses him of "sexual activity with a minor" or "committing a sex crime against a minor." (Id. at pp. 9, 14). With regard to the affidavits of Ms. DuBorgel, Ciara O'Malley, and Linda DuBorgel attesting that Godlewski was involved in a sexual relationship with Ms. DuBorgel while she was a minor, Godlewski asserts that he "offered his oral testimony that his sexual

---

[18] Godlewski testified that he "had five sexual partners" during his marriage to Dorothea Gallagher until "she filed for divorce in March 2021." (Godlewski Depo. at p. 121).

relationship with DuBorgel began after DuBorgel was an adult," thereby creating "a genuine issue of material fact which must be submitted to a jury."[19]  (Id. at p. 19).

Godlewski asserts that the article "suggested that Godlewski was not an honest realtor," which constitutes a statement of fact "capable of defamatory meaning." (Id. at pp. 9-10).  He argues that the suggestion of "unreality" in the article stemming from his QAnon activity and broadcasts questioned his fitness as a realtor.  (T.P. 8/19/24 at p. 57).  Godlewski further alleges that "[d]espite admitting that Godlewski was not present at the Capitol on January 6, the column goes on to link Godlewski with the event by mentioning Godlewski's posts to Facebook that day," and falsely implied that he was affiliated with the "insurrection" on January 6, 2021.  (Docket Entry No. 108 at pp. 10-11).

Godlewski admits that "as a public figure, [he] must demonstrate actual malice on the part of" Kelly and The Scranton Times.  (Id. at p. 7).  He also agrees that such "'[a]ctual malice' must be proven with 'clear and convincing' evidence." (Id. at p. 25).  Godlewski contends that "[r]eporters have an ethical standard to pursue information to the best of their ability to get a complete story," including the "ethical responsibility to review all of the documents listed in a criminal case," and claims that Kelly and The Scranton Times "deviated from acceptable journalistic standards to a degree which constitutes reckless conduct."  (Id. at

---

[19] The transcript from the sanctions hearing reflects that Godlewski answered discovery requests in this case by stating that he was never involved in any type of a sexual relationship with DuBorgel at any time. (T.P. 2/6/23 at pp. 80-81). He later conceded and testified during the hearing that he began his sexual relationship with DuBorgel in 2013 or 2014. (Id, at pp. 83-84). But upon being questioned by defense counsel regarding the fact that he was "still on probation at that time . . . and was having sex with her at that time" notwithstanding Judge Geroulo's sentence barring Godlewski from having any contact with DuBorgel during his 23 month period of supervision, Godlewski changed his testimony and stated that their sexual relationship began in 2015. (Id, at pp. 84-85).

pp. 25-26). He submits that "Pennsylvania courts consistently apply the same analysis to defamation and false light claims when the causes of action are based on the same set of underlying facts," and that based upon his "reasons articulated in the analysis of the defamation claims," the "motion for summary judgment must be denied with respect to the false light invasion of privacy claims." (Id. at p. 29) (citing Suniga v. Downingtown Area School District, 504 F.Supp.3d 430, 454 (E.D. Pa. 2020)).

Kelly and The Scranton Times filed a reply brief in which they assert that Godlewski has not denied in his opposing brief "Kelly's opinion that Godlewski spreads lies on the internet." (Docket Entry No. 109 at pp. 1-2). In support of their argument that Godlewski was not harmed by the article, Kelly and The Scranton Times underscore that "[Godlewski] himself circulated the Kelly article to thousands of people on social media the day it was published along with a message that stated Kelly 'took the bait.'" (Id. at p. 11). Oral argument on the motion for summary judgment was conducted on August 19, 2024, and upon the filing of the transcript of that proceeding on August 29, 2024, the motion for summary judgment became ripe for disposition. (Docket Entry No. 115).

## II. DISCUSSION

### (A) STANDARD OF REVIEW

Summary judgment is appropriate in cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. In re Trust B Under Agreement of Richard H. Wells Dated September 28, 1956,

311 A.3d 1057, 1067 (Pa. 2024).  The moving party bears the burden of demonstrating the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the nonmoving party.  Khalil v. Williams, 278 A.3d 859, 871 (Pa. 2022) (citing Bourgeois v. Snow Time, Inc., 663 Pa. 376, 397, 242 A.3d 637, 650 (2020)).  A trial "court may grant summary judgment only when the right to such a judgment is clear and free from doubt."  Gallagher v. GEICO Indemnity Co., 650 Pa. 600, 620, 201 A.3d 131, 136-137 (2019); Sunoco (R & M), LLC v. Pennsylvania National Mut. Cas. Ins. Co., 2024 WL 3688402, at *3 (Pa. Super. 2024).

"'Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of a cause of action.'"  In re R.H.M., 303 A.3d 146, 155 (Pa. Super. 2023) (quoting True Railroad Realty, Inc. v. McNees Wallace and Nurick, 275 A.3d 490, 494 (Pa. Super. 2022)); Kline v. Travelers Personal Security Ins. Co., 223 A.3d 677, 685 (Pa. Super. 2019) (quoting Chenot v. A.P. Green Services, Inc., 895 A.2d 55, 61 (Pa. Super. 2006)), *app. denied*, 661 Pa. 521, 237 A.3d 388 (2020).  In responding to a motion for summary judgment, the nonmoving party cannot rest upon the nonmovant's pleadings or answers in order to withstand the entry of summary judgment."  Salsberg v. Mann, 310 A.3d 104, 130 n.21 (Pa. 2024); Kornfeind v. New Werner Holding Co., Inc., 241 A.3d 1212, 1216 (Pa. Super. 2020), *aff'd*, 280 A.3d 918 (Pa. 2022).  "To survive a motion for summary judgment, the non-moving party…'must set forth specific facts by way of affidavit, or in some other way as provided by the rule, demonstrating that a genuine issue exists.'"  Caterpillar Financial Services Corporation v. Get 'Er Done Drilling, Inc., 286 A.3d 302, 306 (Pa. Super. 2022) (quoting Salerno v.

<u>Philadelphia Newspapers, Inc.</u>, 377 Pa. Super. 83, 89, 546 A.2d 1168, 1171 (1988)). "Failure of a nonmoving party to adduce sufficient evidence on an issue essential to his[/her] case and on which [s]he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." <u>Azaravich v. Wilkes Barre Hospital Co., LLC</u>, 2024 WL 22825957, at *3 (Pa. Super. 2024); <u>Shellenberger v. Kreider Farms</u>, 288 A.3d 898, 905 (Pa. Super. 2023); <u>Selective Way Ins. Co. v. MAK Services, Inc.</u>, 232 A.3d 762, 767 (Pa. Super. 2020). Thus, it must be determined whether the record "contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder." <u>Shellenberger</u>, <u>supra</u>; <u>Caterpillar Financial Services Corporation</u>, <u>supra</u>; <u>Patel v. Kandola Real Estate, LP</u>, 271 A.3d 421, 426 (Pa. Super. 2021).

Under the rule announced in <u>Borough of Nanty-Glo v. American Surety Co. of New York</u>, 309 Pa. 236, 163 A.3d 523 (1932), the party moving for summary judgment may not rely upon the deposition testimony or affidavits of its own witnesses to establish the nonexistence of genuine issues of material fact, since the credibility of that oral testimony is a matter for the fact-finder. <u>Woodford v. Insurance Department</u>, 663 Pa. 614, 629-630, 243 A.3d 60, 69-70 (2020); <u>American Southern Ins. Co., Inc. v. Halbert</u>, 203 A.3d 223, 226 n.2 (Pa. Super. 2019). But it "does not preclude the grant of summary judgment when the moving party relies on the testimonial evidence of an adverse party." <u>Sanchez-Guardiola v. City of Philadelphia</u>, 87 A.3d 934, 938 (Pa. Cmwlth. 2014); <u>KMB Shamrock, Inc. v. LNR Transportation, Inc.</u>, 50 Pa. D. & C.5th 259, 281 (Lacka. Co. 2015). Nor does it foreclose the entry of summary judgment based upon the testimony of a witness whose interests are adverse to the movant. <u>Mobley v.</u>

<u>Coleman</u>, 110 A.3d 216, 222 n.9 (Pa. Cmwlth. 2015); <u>Mills v. Gubbio's, LLC</u>, 50 Pa. D. &

C.5th 520, 534 n.5 (Lacka. Co. 2015), *aff'd*, 153 A.3d 1120 (Pa. Super. 2016).


### *(B) DEFAMATION BURDEN OF PROOF*

Under Section 8343(a) of the Uniform Single Publication Act, 42 Pa. C.S., Godlewski

has the burden of proving: (1) "the defamatory character" of Kelly's article; (2) its publication

by Kelly and The Scranton Times; (3) its application to Godlewski; (4) the recipient's

understanding of its defamatory meaning; (5) the recipient's understanding "of it as intended to

be applied to" Godlewski; (6) special harm resulting to Godlewski from its publication; and (7)

the abuse of a conditionally privileged occasion by Kelly and The Scranton Times.  <u>Menkowitz</u>

<u>v. Peerless Publications, Inc.</u>, 653 Pa. 573, 579 n.6, 218 A.3d 797, 800 n.6 (2019); <u>Morrissey v.</u>

<u>St. Joseph's Preparatory School</u>, 2024 WL 3909544, at *4 (Pa. Super. Aug. 23, 2024).  Section

8343(b) generally provides that "when the issue is properly raised," the defendant in a

defamation action bears the burden of proving the "truth of the defamatory communication,"

the "privileged character of the occasion on which it was published," and the "character of the

subject matter of defamatory comment as of public concern."  42 Pa. C.S. § 8343(b).  But,

decisional "[p]recedent has further developed the law of defamation, recognizing the tort's

evolving constitutional infrastructure" and "the contours of the law of libel, which involves the

accommodation of federal constitutional interests of free speech and a robust press with state

interests in protecting the reputations of its citizens from defamatory falsehoods."  <u>Joseph v.</u>

<u>Scranton Times, L.P.</u>, 634 Pa. 35, 70-71, 129 A.3d 404, 425 (2015).

As formulated by federal and state appellate authority, "[t]he relevant burdens in a defamation action depend on the status of the plaintiff, the subject matter of the communication, and the nature of the defendant." Rubin v. CBS Broadcasting, Inc., 170 A.3d 560, 565 (Pa. Super. 2017). "'If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove . . . that the alleged defamatory statement is in fact false.'" Kuwait & Gulf Link Transport Company v. Doe, 216 A.3d 1074, 1087 (Pa. Super. 2019) (quoting Luis v. Philadelphia Newspapers, Inc., 833 A.2d 185, 191 (Pa. Super. 2003), app. denied, 577 Pa. 690, 844 A.2d 553 (2004)), app. denied, 657 Pa. 476, 226 A.3d 92 (2020). Similarly, the "First Amendment provides heightened protection for libel defendants when the plaintiff is a public official or public figure," in which event "the burden is shifted to the plaintiff to show that the statement was false." Weber v. Lancaster Newspapers, Inc., 878 A.2d 63, 75 (Pa. Super. 2005) (citing New York Times v. Sullivan, 376 U.S. 254 (1964)), app. denied, 591 Pa. 666, 916 A.2d 634 (2007). Godlewski has stipulated that he is "a public figure" for "purposes of this litigation," and as such, he bears the burden of proving that Kelly's factual statements concerning him are false. (Docket Entry No. 46).

Furthermore, under Gertz v. Robert Welch, Inc., 418 U.S. 323, 343 (1974), "the appropriate standard of fault depends on whether the plaintiff is a public or private figure." American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania, 592 Pa. 66, 83, 923 A.2d 389, 400 (2007), cert. denied, 552 U.S. 1076 (2007); Constantakis v. Bryan Advisory Services, LLC, 275 A.3d 998, 1027 (Pa. Super. 2022). If the plaintiff is a private

31

figure, [s]he need only prove negligence on the part of the defendant in order to recover damages for actual injuries. <u>Joseph</u>, 624 Pa. at 76-77, 129 A.3d at 428-429; <u>Constantakis</u>, <u>supra</u>. However, if the plaintiff is a public figure, "'then to satisfy First Amendment strictures, the plaintiff must establish that the defendant made a false and defamatory statement with actual malice.'" <u>Castellani v. The Scranton Times, L.P.</u>, 633 Pa. 230, 238 n.4, 124 A.3d 1229, 1234 n.4 (2015) (quoting <u>American Future Systems, Inc.</u>, 592 Pa. at 84, 923 A.2d at 400).

Therefore, to survive the motion for summary judgment filed by Kelly and The Scranton Times, Godlewski must adduce sufficient evidence to establish triable issues of fact with respect to his burden of proving that Kelly and The Scranton Times (1) made a false statement of fact, (2) that was capable of defamatory meaning, and (3) was published with "actual malice." <u>Tucker v. Philadelphia Daily News</u>, 577 Pa. 598, 624-625, 848 A.2d 113, 130 (2004) (citing <u>Hepps v. Philadelphia Newspapers, Inc.</u>, 475 U.S. 767, 777 (1986)); <u>Castellani v. The Scranton Times, L.P.</u>, 161 A.3d 285, 298 (Pa. Super. 2017), <em>app. denied</em>, 643 Pa. 652, 174 A.3d 553 (2017). The elements of Godlewski's burden of proof will be addressed <em>seriatim</em>.

### (1) Falsity of Factual Statements

Godlewski must first produce sufficient evidence that Kelly published a factual statement about him that was false. <u>Tucker</u>, 577 Pa. at 625, 848 A.2d at 130; <u>Kuwait & Gulf Link Transport Company</u>, 216 A.3d at 1087. "'The law does not require perfect truth, so long as any inaccuracies do not render the substance and 'gist' of the statements untrue.'" <u>Rubin</u>, 170 A.3d at 565 (quoting <u>ToDay's Housing v. Times Shamrock Communications, Inc.</u>, 21 A.3d 1209, 1215 (Pa. Super. 2011)); <u>Walter v. Herbert</u>, 2024 WL 2159516, at *5 (M.D. Pa. 2024)

32

(same). Rather, the defense of substantial truth "absolve[s] a defendant even if [s]he cannot justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 516-517 (1991); <u>Rubin</u>, <u>supra</u>.

Godlewski contends that the article of February 14, 2021, contains three factual statements that are false and defamatory. First, he alleges that the article falsely stated that he "had a sexual relationship" with Ms. DuBorgel when she was a minor. (T.P. 8/19/24 at pp. 9, 43-45, 48-49). Second, Godlewski asserts that by using the word "Unreal-tor" to describe him, the article falsely made an "imputation that [he] was not fit to be a realtor." (<u>Id.</u> at pp. 9, 54-55). Third, he avers that Kelly's article falsely tied "Godlewski to the criminal insurrection at the Capitol on January 6" where there "were criminal acts for which people have been criminally prosecuted and criminally convicted."[20] (<u>Id.</u> at pp. 9, 57-58).

Kelly and The Scranton Times reference the testimony and affidavits of Ms. DuBorgel, Ciara O'Malley, Linda DuBorgel, and others as "an abundance of evidence in this case that stacks up against Mr. Godlewski in his attempt to prove the falsity of factual representations in the article." (<u>Id.</u> at pp. 18-21). Godlewski counters that the <u>Nanty-Glo</u> rule bars Kelly and The Scranton Times from securing summary judgment based upon the testimonial evidence of its own witnesses. (<u>Id.</u> at pp. 42-43, 53, 61). Godlewski is correct in that regard, and the

---

[20] Godlewski does not allege that Kelly's representations relating to Godlewski's active involvement with and support of the QAnon movement are untrue or defamatory. (<u>Id.</u> at pp. 55-57). *Compare* <u>Flynn v. Cable News Network, Inc.</u>, 2021 WL 5964129, at *4, 6 (S.D. N.Y. 2021) (brother of Lieutenant General Michael Flynn and his wife alleged defamation *per se* by a media defendant which implied "that they were QAnon followers" and therefore "members of a dangerous, violent, insurrectionist, domestic terrorist organization").

credibility and weight of that testimony will not serve as grounds for the grant of summary

judgment in this case. *See* Ludwig v. McDonald, 204 A.3d 935, 944 n.8 (Pa. Super. 2019)

(under the Nanty-Glo rule, "the party moving for summary judgment may not rely solely upon

its own testimonial affidavits or depositions, or those of its witnesses, to establish the non-

existence of genuine issues of material facts," but may rely upon "documentary evidence," or

"the deposition testimony of an adverse witness").

      Godlewski's guilty plea and sentencing in Godlewski I, his arrest in Godlewski II, and

his above-quoted social media QAnon broadcasts predated the publication of Kelly's article on

February 14, 2021. As noted above, the only text messages quoted in the Affidavit of Probable

Cause in Godlewski I are those in which Godlewski acknowledged and described oral sex with

Ms. DuBorgel, the presence of her hair in his "crotch area," and his sexual activity with her in

2010 when she was 15 years of age. Godlewski I, supra, Docket Entry No. 2 at p. 15. Those

text messages served as the factual predicate for the single count of Corruption of Minors, 18

Pa. C.S. § 6301(a)(1), contained in the Criminal Information charging that Godlewski "did

repeatedly have inappropriate text [m]essages and contact with a minor" in 2010. Id., Docket

Entry No. 6. Indeed, Godlewski's counsel conceded at the time of oral argument that "[t]he

corruption of minors count in the complaint was consistent with the information in the

affidavit." (T.P. 8/19/24 at p. 47).

      In his guilty plea colloquy in Godlewski I, Godlewski admitted that his executed

colloquy was a "signed statement," that he "kn[e]w exactly what you are charged with and

what you are pleading to," that he understood "that by pleading guilty you are admitting that

you did the things you are charged with," that he understood "the elements of the crime

charged that you are pleading to," and that he "admit[ted] that you did the above stated act"

constituting corruption of a minor.  Godlewski I, Docket Entry No. 5 at pp. 1-3.  The following

clause appears directly above his signature on his guilty plea colloquy:

> I affirm that I have read the above document in its entirety and have reviewed it
> with my attorney.  I affirm that I am aware of the full implications of pleading
> guilty and nevertheless wish to plead to the specified offense(s).  I further affirm
> that my signature on this Guilty Plea Colloquy and initials on each page of this
> document are true and correct.

Id. at p. 3.  Based upon the truthfulness of Godlewski's attestation, Judge Geroulo accepted

Godlewski's guilty plea and sentenced him to three months to 23 months house arrest.  Id.,

Docket Entry No. 17.

It is "well settled that a guilty plea constitutes an admission to all of the facts averred in

the indictment," and that a trial court may grant summary judgment based upon such an

admission.  Com., Department of Transportation v. Mitchell, 517 Pa. 203, 212, 535 A.2d 581,

585 (1987).  *Accord.* Kedra v. Schroeter, 876 F.3d 424, 443 n.14 (3d Cir. 2017); Linnen v.

Armainis, 991 F.2d 1102, 1105 (3d Cir. 1993).  A guilty plea is equivalent to and has the same

force as a conviction at trial under Pennsylvania law.  McGriff v. Vidovich, 699 A.2d 797, 800

n.6 (Pa. Cmwlth. 1997), *app. denied*, 553 Pa. 693, 717 A.2d 1030 (1998); Lynch v. DuCasse,

2020 WL 3547375, at *3 (M.D. Pa. 2020); Basile v. Township of Smith, 752 F.Supp.2d 643,

662 n.20 (W.D. Pa. 2010); DiJoseph v. Vuotto, 968 F.Supp. 244, 247 (E.D. Pa. 1997).  Because

a "guilty plea is an admission of facts averred in the complaint," it "is conclusive proof of the

wrongdoing for which [s]he was charged."  Hawkins v. Unemployment Compensation Board

of Review, 695 A.2d 963, 966 (Pa. Cmwlth. 1997), *app. denied*, 553 Pa. 701, 718 A.2d 786

(1998). For that reason, "[a] person determined to be guilty of a crime following . . . a plea of

guilty cannot be heard to deny in a civil action that which was established in his prior

determination of guilt without proof that his guilt was procured by fraud, perjury, or some

manner of error sufficient to set aside his determination of guilt." Department of Navy v.

Unemployment Compensation Board of Review, 158 Pa. Cmwlth. 605, 623 n.13, 632 A.2d

622, 631 n.13 (1993). *See also*, Lynch, supra, at *4 (facts admitted in a guilty plea are

conclusive admissions in subsequent civil litigation, and the individual who pled guilty is

collaterally estopped from denying those admitted facts as uncontroverted for purposes of

summary judgment); Moyer v. Allstate Insurance Company, 2010 WL 3328035, at *6 (M.D.

Pa. 2010) (person who pled guilty was collaterally estopped from denying his criminal acts that

he acknowledged committing); Domitrovich v. Monaca, 2010 WL 3489137, at *5 (W.D. Pa.

2010) (same).

Godlewski claims that Kelly falsely reported that he "pleaded guilty to corruption of

minors and admitted to having a sexual relationship with a 15-year-old girl." Based upon the

content of Godlewski's text messages which served as the factual basis for the corruption of a

minor charge set forth in the Criminal Information, and Godlewski's sworn plea to that specific

crime in a court of law, both of the foregoing statements made by Kelly in his article are true.

As a result of Godlewski's guilty plea to "inappropriate text [m]essages" and "contact" with

Ms. DuBorgel, as set forth in the Affidavit of Probable Cause quoting the offending text

messages admitting and memorializing a sexual relationship with a 15-year-old minor,

Godlewski is collaterally estopped from denying his participation in a sexual relationship with Ms. DuBorgel in 2010.[21] <u>Mitchell</u>, 517 Pa. at 212, 535 A.2d at 585; <u>Hawkins</u>, 695 A.2d at 966; <u>Lynch</u>, <u>supra</u>, at *3-4. Thus, Godlewski has failed to come forward with sufficient evidence creating a genuine issue of material fact concerning the claimed falsity of Kelly's statement that Godlewski "pleaded guilty to corruption of minors and admitted to having a sexual relationship with a 15-year-old girl."

Godlewski alternatively alleges that Kelly made false factual statements by indicating that Godlewski was "selling rabbit holes" and by displaying an image of an "Unreal-tor" sign in the accompanying cartoon, thereby suggesting "unreality" on Godlewski's part and questioning his fitness as a realtor in the process. (Docket Entry No. 108 at pp. 9-10; T.P. 8/19/24 at pp. 9, 54-55, 57). Kelly testified that he viewed Godlewski's QAnon videos before he authored "an opinion column" about Godlewski. (Deposition of Christopher J. Kelly dated 12/20/23, attached to Docket Entry No. 102 as Exhibit 44, at pp. 18, 20-21, 59). Kelly stated that his article did not "raise an inference that Mr. Godlewski is not fit to be a realtor" because of his QAnon activities, but agreed that he utilized a "rabbit hole figuratively" to reference "the QAnon movement and the rabbit holes people go down believing all this nonsensical stuff." (<u>Id.</u> at pp. 25, 27-28). Kelly considers the illustration prepared by The Scranton Times' John Cole depicting a rabbit hole and "Unreal-tor" sign to be "a very clever parody on [Godlewski's]

---

[21] It is axiomatic that "defendants are bound by statements they make during their guilty plea colloquies and may not successfully assert any claims that contradict those statements." <u>Com. v. Culsoir</u>, 209 A.3d 433, 437 (Pa. Super. 2019). "'A defendant who elects to plead guilty has a duty to answer questions truthfully.'" <u>Com. v. Yeomans</u>, 24 A.3d 1044, 1047 (Pa. Super. 2011) (quoting <u>Com. v. Pollard</u>, 832 A.2d 517, 523 (Pa. Super. 2003)). Godlewski presumably did so when entering his guilty plea before Judge Geroulo.

job as a realtor and what he was doing" in broadcasting baseless QAnon conspiracies.[22] (Id. at p. 28).

It is noteworthy that the phrase "rabbit hole" has been used in other court proceedings and legal publications to describe the effect of the QAnon movement on its adherents. See, e.g., Flynn v. Cable News Network, Inc., 2024 WL 1765566, at *9 (S.D. N.Y. 2024) (quoting testimony "that many people simply get 'sucked into the rabbit hole' of QAnon and 'are victims'"); Payton Yahn, "Conspiracy Theory Belief And The Case For Abolishing The Insane Delusion Doctrine," 16 U. St. Thomas J. L. & Pub. Pol'y 516, 516 (March 2023) (describing "a story that overtook American journalism: a person with warm, loving relationships falls through their phone screen and down a rabbit hole, emerging as a 'ghost' of their former self and an ardent believer in QAnon"); Madeline M. Cook, "Bringing Down Big Data: A Call For Federal Data Privacy Legislation," 74 Okla. L. Rev. 733, 756 (Summer 2022) (stating that QAnon's "extremist ideology is designed to send people down rabbit holes, radicalizing them according to their own personality type," and that "[t]he hysteria that compounds as people crawl deeper down those rabbit holes could more than likely eventually lead to their thinking that Hillary Clinton eats children"); Elizabeth Newland, "Extreme Religion, Extreme Beliefs: Comparing The Role Of Children's Rights In Extremists Religions," 42 Child. Legal Rts. J. 121, 122 (2022) (reporting that QAnon "membership has increased significantly as a product of

---

[22] Godlewski has attached to his opposing brief a heavily redacted copy of the deposition of The Scranton Times' Executive Editor, Lawrence Holeva. (Docket Entry No. 108 at pp. 37-50). Although Godlewski has redacted 44 lines of the questioning of and responses by Holeva regarding the title "QAnon Realtor Sells Rabbit Holes" and the "Unreal-tor" sign, Holeva agreed with Kelly that they simply constituted a "parody" of Godlewski's "pursuit of the profession of realty," and did "not directly" suggest that his QAnon activities impacted his fitness as a realtor. (Deposition of Lawrence Holeva dated 12/19/23, attached to Docket Entry No. 108, at pp. 45-49, 51).

the pandemic because of added time at home to fall down the QAnon rabbit hole" where "more people are becoming entrapped into the deep, cultic side of this extreme belief"). Other legal journals have similarly noted the detachment from reality of QAnon's conspiracy theories. *See*, *e.g.*, Richard K. Sherwin, "Anti-Speech Acts And The First Amendment," 16 Harv. L. & Pol'y Rev. 353, 366 (Summer 2022) ("Adding to the increasing destabilization of a shared, fact-based reality is the growing normalization of QAnon, a cult-like web phenomenon that features intensely paranoid, conspiracy driven discourse"). Hence, Kelly and The Scranton Times are not alone in using the word "unreal" and the phrase "rabbit holes" in describing the QAnon movement and its activities.

Prior to the publication of the article at issue, Godlewski had publicly broadcasted on social media that United Airlines Flight 93 never crashed in Somerset County on September 11, 2001, that Stephen Paddock did not shoot and kill 60 people and wound another 413 individuals in a mass shooting from the Mandalay Bay Hotel in Las Vegas, that former President Donald Trump had authorized and presided over the executions of President Biden, Hillary Clinton, and other public figures by military tribunals, that the late President George H. W. Bush was also executed by a military tribunal due to the Bush family's involvement with children sex-trafficking, that various Democratic officials were molesting children and drinking their blood to ingest adrenochrome in the basement of a Washington pizzeria, and other equally absurd representations. Such public pronouncements reflect a declarant who is untethered from reality, and Kelly has testified that he viewed those videos prior to preparing his article.

Even when the summary judgment record is viewed in a light most favorable to Godlewski as the nonmoving party, it demonstrates that the "sells rabbits holes" reference in the title and the "UNREAL-TOR" sign and rabbit hole appearing in the cartoon illustration are mere parody rather than actionable statements of fact. *See* Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 57 (1988) (affirming finding that parody cannot be reasonably understood as describing actual facts or events); O'Donnell v. Knott, 283 F.Supp.3d 286, 304 (E.D. Pa. 2017) (stating that "both Pennsylvania and federal courts recognize that speech which cannot reasonably be taken as stating actual facts is afforded protections as parody/satire under the First Amendment"). "Defamation is, by its nature, mutually exclusive of parody." Victoria Square, LLC v. Glastonbury Citizen, 49 Conn. Supp. 452, 455, 891 A.2d 142, 145 (2006). "'By definition, defamation requires a false statement of fact,'" but parody "'cannot constitute a false statement of fact.'" Hamilton v. Prewett, 860 N.E.2d 1234, 1244 (Ct. App. Ind. 2007) (quoting 50 Am. Jur.2d Libel & Slander § 159, "Parody and Satire" (2006)), *app. denied*, 869 N.E.2d 459 (Ind. 2007). For the reasons set forth above, Godlewski's second allegation of a false statement of fact is likewise devoid of merit.

Godlewski's final claimed statements of fact concern Kelly's representation that Godlewski "happily calls out the cadence" of the QAnon movement and is "a purveyor of a poison," which Godlewski asserts conveys that he bears some responsibility for the "criminal acts" committed during the Capitol riot. (T.P. 8/19/24 at pp. 56, 58). Kelly testified that the words "happily calls out the cadence" constituted "figurative language" that referenced Godlewski's broadcasts on January 6, 2021, when he "said that [Vice President Mike] Pence

had been arrested," which statement "got [Godlewski] in U.S.A. Today," and Godlewski's

"rallying cry" that the Democratic legislators should be "arrested" and "get executed at top

levels." (Kelly Depo. at pp. 39-40). As for the phrase "purveyor of a poison," Kelly indicated

that he was referring to "the lies and nonsense and disinformation and misinformation that

[Godlewski] was spreading on the Internet," such as representing as true that "the real Joe

Biden has been executed and the guy who's in the White House is a body double . . . in a studio

out in Arizona," and "that [Godlewski] had traveled in time and talked to Nikola Tesla." (Id. at

pp. 32-33).

   The role of the QAnon movement and its followers in the events at the Capitol on

January 6, 2021, has been widely reported in legal literature. *See* Neil Fulton, "What Comes

Next?," 62 Washburn L.J. 189, 209 (Winter 2023) ("Many QAnon adherents were active at the

Capitol on January 6 under the belief that it represented the long-promised 'storm' within

American society."); Courtelyou C. Kenney, "Defamation 2.0," 56 Loy. L.A. L.Rev. 1, 42

(Winter 2023) ("QAnon played a major role in the Capitol insurrection on January 6, 2021.");

Brendan Williams, "Divided We Fall: The Concerted Attack On U.S. Democracy," 59

Willamette L.Rev. 121, 135 (Spring 2023) ("In the U.S. Capitol insurrection, an Air Force

veteran killed rioting reportedly 'avidly followed the QAnon conspiracy theory, convinced that

Trump was destined to vanquish a cabal of child abusers and Satan-worshiping Democrats' and

believed January 6, 2021 'would be the storm, when QAnon mythology holds that Trump

would capture and execute his opponents.'"); Matthew J. Blaney, "Posting In The

'Metaphysical Public Square': Defining Social Media User's Rights On The Online Platforms

Of Government Officials," 45 N.C. Cent. L.Rev. 135, 159 (2022-2023) ("In fact, if QAnon's conspiracy theorists have shown the nation anything, it is that online communications have the ability to develop into a national crisis - - for example, by fostering a community where some of the followers removed their voices from social media and ascended on the Capitol Building to riot on January 6th."); Newland, 42 Child. Legal Rts. J. at 125 (2022) ("Many cults take expansive and violent actions to further their mission. QAnon follows this model, as they expected and helped plan the January 6 insurrection."); Joshua J. Schroeder, "The Dark Side Of Due Process: How To Use Irreverent Talk To Speak Back To Bad Men," 53 St. Mary's L.J. 929, 936 (2022) ("QAnon grew up under [Justice Oliver Wendell] Holmes' marketplace of ideology until it attempted to end American democracy on January 6, 2021, where QAnon followers equated a violent, Trumpian *coup d'etat* with First Amendment freedoms of speech and assembly."). However, Kelly "never said [Godlewski] was at the rally" in his article. (Kelly Depo. at p. 40). To the contrary, Kelly's article expressly states that "Godlewski told me he wasn't at the Capitol on January 6, but he showed up in USA Today's coverage of riot" after "Godlewski posted on Facebook that Vice President Mike Pence had been arrested." (Docket Entry No. 1 at p. 26).

Once again, Godlewski has not identified sufficient evidence indicating that Kelly made false factual statements "tying Mr. Godlewski to the criminal insurrection at the Capitol on January 6." (T.P. 8/19/24 at p. 57). Kelly's reference to Godlewski happily "calling out the cadence" of the QAnon movement is supported by the plethora of QAnon conspiracies broadcasted by Godlewski on social media and viewed by Kelly prior to authoring his article.

The other description of Godlewski as a "purveyor of poison" constitutes satirical commentary by Kelly based upon Godlewski's above-quoted QAnon broadcasts, rather than an actionable false statement of fact.[23]  *See* O'Donnell, 283 F.Supp.3d at 296 n.4 (describing constitutionally protected satire as "a long-established artistic form that uses means such as ridicule, derision, burlesque, irony, parody, or caricature to censure the vices, follies, abuses, or shortcomings of an individual or society").  Therefore, Kelly and The Scranton Times are entitled to summary judgment due to the absence of sufficient evidence in the record that Kelly or The Scranton Times made a false statement of fact regarding Godlewski in the article published on February 14, 2021.

### (2) Defamatory Character of Factual Representation

In addition to establishing that Kelly or The Scranton Times made a false factual statement about him, Godlewski also bears the burden of proving the "defamatory character" of that statement.  42 Pa. C.S. § 8343(a)(1).  Whether a particular statement is capable of a defamatory meaning is a question of law for the court to decide.  Vivian v. Blank Rome, LLP, 318 A.3d 890, 900 (Pa. Super. 2024); Blackwell v. Eskin, 916 A.2d 1123, 1125 (Pa. Super. 2007).  A statement is defamatory if it "tends to harm an individual's reputation so as to lower

---

[23] With respect to Kelly's reference to Godlewski "pushing the poison" of QAnon, other publications have chronicled the adverse impact of the QAnon movement upon family relationships. *See, e.g.*, Newland, 42 Child. Legal Rts. J. at 134 (observing that QAnon members "form habits and cognitive dissonance akin to alcoholism and videogame addiction," and stating that "[t]his QAnon addiction can fracture families by forcing younger members 'down the rabbit hole' spreading terrifying misinformation, and threatening to cut off familial contact for breaking extremist rules").  During his deposition in this case, Kelly mentioned an unidentified individual "who initially along with his spouse believed the Q stuff and, in fact, were followers of [Godlewski]," but "when one of the spouses woke up and realized what was happening," the "other spouse would not and so the marriage broke up over it."  (Kelly Depo. at p. 37).

43

him or her in the estimation of the community or deter third persons from associating or dealing with him or her." Meyers v. Certified Guaranty Company, LLC, 221 A.3d 662, 669 (Pa. Super. 2019), *app. denied*, 661 Pa. 514, 237 A.3d 386 (2020). However, "it is not enough that the victim of the statements . . . be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." Joseph, 634 Pa. at 79, 129 A.3d at 430; Kurowski v. Burroughs, 994 A.2d 611, 617-618 (Pa. Super. 2010), *app. denied*, 608 Pa. 655, 12 A.3d 752 (2010).

In determining whether a statement is defamatory, the court must consider whether the challenged statement constitutes an opinion or an assertion of fact. "'A statement of fact can be verified as true or false, whereas an expression of opinion only conveys a subjective belief of the speaker.'" Vivian, supra (quoting Meyers, supra). "Expressions of opinion are not actionable," nor are statements constituting "no more than rhetorical hyperbole" or a "vigorous epithet." Burns v. Cooper, 244 A.3d 1231, 1236 (Pa. Super. 2020), *app. denied*, 666 Pa. 268, 252 A.3d 235 (2021). "A statement in the form of an opinion is actionable only if it may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Vivian, supra; Kurowski, 994 A.2d at 618. However, "'[a] simple expression of opinion based on disclosed facts is not itself sufficient for an action of defamation.'" Vivian, supra (quoting Kuwait & Gulf Link Transportation Company, 216 A.3d at 1086).

The summary judgment record reflects that Kelly is an "op-ed columnist" who wrote "an opinion column" on Godlewski. (Kelly Depo. at pp. 13, 59). In that capacity, Kelly believed it was his responsibility "to inform and entertain" by gathering facts from

44

"documents" and "people," and then "decide what I think those facts mean and share my opinion on them." (Id. at pp. 12-13). As stated in Section (II)(B)(1) above, the only factual statements that Kelly made about Godlewski are true. The remainder of the article of February 14, 2021, is replete with Kelly's opinions regarding the QAnon movement, its impact on society, and Godlewski's acknowledged involvement with it. Godlewski has not alleged, let alone identified evidence, that Kelly based his various opinions in his op-ed article on undisclosed defamatory facts. Besides the truthful factual statements addressed above, Kelly's article as a whole contains expressions of opinion based upon disclosed facts, and arguably "vigorous epithet" and satirical commentary, as a result of which Godlewski's proffered evidence is insufficient as a matter of law to establish the "defamatory character" of a communication in compliance with 42 Pa. C.S. § 8343(a)(1).

### (3) Actual Malice

Godlewski must not only demonstrate that Kelly and The Scranton Times published a (1) false and (2) defamatory statement about him, but he must further prove that they did so (3) with actual malice. Castellani, 633 Pa. at 238 n.4, 124 A.3d at 1234 n.4; American Future Systems, Inc., 592 Pa. at 84, 923 A.2d at 400 (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 343 (1974)). "'Actual malice' is a fault standard, predicated on the need to protect the public discourse under the First Amendment from the chill that may be fostered by less vigilant limitations on defamation actions brought by public officials" or figures. Kuwait & Gulf Link Transport Company, 216 A.3d at 1087. It requires the plaintiff to prove, by clear and convincing evidence, that the publisher of the false and defamatory statement either knew that

the factual statement was false or recklessly disregarded whether it was true or false.

Castellani, 633 Pa. at 249, 124 A.3d at 1241; Tucker, 577 Pa. at 621, 841 A.2d at 127-128

(citing Milkovich v. Lorain Journal Company, 497 U.S. 1, 15 (1990)).

     "'The requirement that the plaintiff be able to show actual malice by clear and

convincing evidence is initially a matter of law,'" Joseph, 634 Pa. at 89, 129 A.3d at 429

(quoting Tucker, 577 Pa. at 626, 848 A.2d at 130), and "'[t]he question of whether the evidence

in the record in a defamation case is sufficient to support a finding of actual malice is a

question of law.'" Id. (quoting Milkovich, 497 U.S. at 17). The evidentiary metric of clear and

convincing evidence is "the highest standard of proof for civil claims." Kuwait & Gulf Link

Transport Company, 216 A.3d at 1088; Manning v. WPXI, Inc., 886 A.2d 1137, 1144 (Pa.

Super. 2005) (quoting Lewis, 833 A.2d at 192), app. denied, 589 Pa. 731, 909 A.2d 305

(2006)). In defamation cases, the clear and convincing evidence standard requires evidence

that is "so clear, direct, weighty, and convincing" as to enable the fact-finder "to come to a

clear conviction, without hesitancy, of the truth of the precise facts in issue." Coleman v.

Ogden Newspapers, Inc., 142 A.3d 898, 906 (Pa. Super. 2016), app. denied, 641 Pa. 12, 165

A.3d 873 (2017); Manning, supra.

     The rule requiring judges to decide as a matter of law whether the evidence is sufficient

to support a finding of actual malice is premised upon "the unique character of the interest

protected by the actual malice standard," Harte-Hanks Communications, Inc. v. Connaughton,

491 U.S. 657, 685-686 (1989), and recognizes that "'[j]udges, as expositors of the Constitution,

must independently decide whether the evidence in the record is sufficient to cross the

46

constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.'" <u>Joseph</u>, 634 Pa. at 89, 129 A.3d at 436 (quoting <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 511 (1984)); <u>Coleman</u>, <u>supra</u> (quoting <u>Joseph</u>, <u>supra</u>). "'Proof of actual malice calls a defendant's state of mind into question.'" <u>Castellani</u>, 633 Pa. at 249-250, 124 A.3d at 1241 (quoting <u>Hutchinson v. Proxmire</u>, 443 U.S. 111, 120 n.9 (1979)). The actual malice requirement "is not met through a showing of ill will or malice in the ordinary sense of the term" or "the failure to investigate even when a reasonably prudent person would have done so." <u>Joseph</u>, 634 Pa. at 90, 129 A.3d at 436-437 (citing <u>Harte-Hanks Communications, Inc.</u>, 491 U.S. at 666-692). "The difficulty of meeting the burden to establish actual malice is demonstrated in <u>St. Amant [v. Thompson</u>, 390 U.S. 727 (1968)], where the Supreme Court specified that this evidentiary burden requires more than consideration of whether a reasonable person would have published the statement without further investigation; rather, it requires the plaintiff to present evidence sufficient 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" <u>Castellani</u>, 633 Pa. at 250, 124 A.3d at 241 (quoting <u>St. Amant</u>, 390 U.S. at 731).

Under the actual malice standard, "[t]he burden of proof imposed is substantial, as 'the actual malice standard go so far as to forbid imposition of liability even in those instances where the defendant negligently publishes false, defamatory statements about a public figure or public official.'" <u>Blackwell</u>, 916 A.2d at 1125 (quoting <u>Norton v. Glenn</u>, 580 Pa. 212, 860 A.2d 48, 56 (2004), *cert. denied*, 544 U.S. 956 (2005)). "Malice in the context of defamation

requires a showing that 'the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication.'" <u>Menkowitz</u>, 653 Pa. at 578 n.5, 211 A.3d at 800 n.5 (quoting <u>Joseph</u>, 634 Pa. at 90, 129 A.3d at 437). "'The fact that [defendant] could have employed a higher degree of journalistic responsibility does not constitute actual malice.'" <u>Coleman</u>, 142 A.3d at 906 (quoting <u>Manning</u>, 886 A.2d at 1144). Hence, "[t]he actual malice standard is a rigorous, if not impossible, burden to meet in most circumstances." <u>Manning</u>, 886 A.2d at 1143.

The only evidence submitted by Godlewski in support of his "actual malice" claim consists of the deposition transcripts of Kelly and The Scranton Times' Executive Editor, Holeva. Kelly testified that in preparing the article, he reviewed "The Times-Tribune archives," including earlier articles about Godlewski authored by Jeremy Burton and Denis O'Malley, "legal documents," "court documents," "the criminal affidavit and his guilty plea colloquy." (Kelly Depo. at pp. 43, 45-46, 57-58). He also "spoke to some other people to back up some information I found" in those materials, one of whom was Ciara O'Malley who stated "all the stuff in the column was true" regarding Godlewski's "relationship with his victim" and "how he got her not to testify against him." (<u>Id.</u> at pp. 43-44). Another anonymous source for Kelly in gathering information "to reinforce [Kelly's] belief that [Godlewski's] plea to corruption of minors" was based on his guilt to the sex offenses was "[s]omeone who was in the law enforcement process" involving the criminal charges against Godlewski. (<u>Id.</u> at pp. 62-63).

The substance of Holeva's testimony is somewhat difficult to decipher due to the extensive redactions in his deposition transcript that is attached to Godlewski's brief. For example, Holeva's 14 line response to the question "[c]an you describe to me the process of spot-checking facts" and the 14 lines reflecting his answer to the ensuing question "[w]hat happens next" have been redacted in their entirety. (Holeva Depo. at pp. 21, 23). Similarly, Holeva's admission that he would "have expected Mr. Kelly to review the criminal complaint prior to writing the February 14, 2021 column" is preceded by 67 lines of redactions and followed by an additional 25 lines of redactions. (Id. at pp. 26-33). Moreover, 26 lines of the 34 lines of questions and answers are redacted immediately prior to the inquiry "[h]ave you told me all the sources of other information you would expect a journalist to investigate prior to writing the column about Mr. Godlewski?" (Id. at pp. 37-39).

No reason has been offered in the parties' submissions for the sweeping redactions in Holeva's deposition transcript. Holeva was questioned concerning the sources of information a journalist would have an "ethical obligation to pursue," and identified "investigative files, investigative work, investigative insight, investigative sourcing" and "maybe interviews with people, witness to literature, documentation whether that be video or written word, and information you would derive from interviews." (Id. at pp. 36-37, 43-44). He indicated that a journalist would be expected to conduct the same research on factual matters regardless of whether those facts appear in "an opinion story or a news article," but further noted that a "columnist has latitude in an opinion piece." (Id. at p. 44). To the extent that Holeva's

testimony can be construed as suggesting that Kelly should have exercised greater "journalistic responsibility," it is insufficient to establish actual malice. Coleman, supra; Manning, supra.

Kelly testified that the article was designed to note "the obvious irony in a guy being a leader in the QAnon movement, which is all about saving children from pedophiles, having been a pedophile himself" as reflected in Godlewski I. (Kelly Depo. at pp. 65-66). Even when the summary judgment record is examined in a light most favorable to Godlewski, it lacks clear and convincing evidence that Kelly or The Scranton Times either knew that the factual statements pertaining to Godlewski in the article were false, or that Kelly or The Scranton Times had a "high degree of awareness of [their] probable falsity" or "entertained serious doubts as to the truth of [the] publication." *See* Menkowitz, supra; Joseph, supra. It is incumbent upon Godlewski to produce sufficient evidence that Kelly or The Scranton Times recklessly disregarded the truth or falsity of any factual statements in the article, and as stated in Section (I) above, Judge Minora held earlier this year that Godlewski was not entitled to financial wealth discovery since he had failed to identify facts or evidence establishing a *prima facie* case of recklessness by Kelly or The Scranton Times. (Docket Entry No. 96 at p. 3). We agree with Judge Minora's conclusion in that regard and find that Kelly and The Scranton Times are also entitled to summary judgment based upon Godlewski's failure to produce sufficient evidence of "actual malice" on the part of Kelly or The Scranton Times.

### (C) FALSE LIGHT INVASION OF PRIVACY

Godlewski has advanced a separate claim for false light invasion of privacy. A person who gives publicity to a matter "concerning another that places the other before the public in a

false light" is liable for false light invasion of privacy if (a) the false light "would be highly offensive to a reasonable person," and (b) the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Vivian, 318 A.3d at 903; Rubin, 170 A.3d at 568.  The tort of "false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression." Meyers, 221 A.3d at 674; Rubin, supra.

"As with defamation, the elements of a claim for false light include knowledge of, or reckless disregard for, the falsity of a publication." Coleman, 142 A.3d at 905.  For the same reasons that Godlewski has failed to establish that Kelly or The Scranton Times knew of the falsity of their published statements, or recklessly disregarded their truth or falsity, in support of his defamation claim, he is unable to prove that same scienter element of his false light invasion of privacy claim.  Accordingly, Kelly and The Scranton Times are entitled to summary judgment with respect to Godlewski's cause of action for false light invasion of privacy.  An appropriate Order follows.

PHILIP GODLEWSKI,          :    IN THE COURT OF COMMON PLEAS

      Plaintiff        :      OF LACKAWANNA COUNTY

                  :        NO. 2021 CV 2195

v.                      :

                  :

CHRIS KELLY, and THE SCRANTON  :

TIMES, L.P.,             :

                  :

      Defendants      :

## ORDER

AND NOW, this 30th day of August, 2024, upon consideration of "Defendants' Motion for Summary Judgment," the exhibits and memoranda of law submitted by the parties, and the oral argument of counsel on August 19, 2024, and based upon the reasoning set forth in the foregoing Memorandum, it is hereby ORDERED and DECREED that:

1. "Defendants' Motion for Summary Judgment" is GRANTED; and

2. The Clerk of Judicial Records is directed to enter judgment in favor of defendants, Chris Kelly and The Scranton Times, L.P., and against plaintiff, Philip Godlewski, in the above-captioned matter.

BY THE COURT:

_Terrence R. Nealon_, J.

Terrence R. Nealon

*cc: Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa.R.Civ.P. 236(a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

Timothy M. Kolman, Esquire                    tkolman@kolmanlaw.com
Timothy Bowers, Esquire                       tbowers@kolmanlaw.com
Kymberley L. Best, Esquire                    kbest@kolmanlaw.com
Kolman Law, P.C.
414 Hulmeville Avenue
Penndell, PA  19047
        *Counsel for Plaintiff*

J. Timothy Hinton, Jr., Esquire               timhinton@haggertylaw.net
Haggerty, Hinton & Cosgrove, LLP
Suite 2, 1401 Monroe Avenue
Dunmore, PA  18509
        *Counsel for Defendants*

53