PHILIP GODLEWSKI,            :    IN THE COURT OF COMMON PLEAS

            Plaintiff,   :    OF LACKAWANNA COUNTY, PA

                       :    ✓

    v.                 :    No: ~~2022-cv-2195~~

                       :    21 - CV 2195

CHRIS KELLY et al.,           :

          Defendants.  :    JURY TRIAL DEMANDED

### **ORDER**

AND NOW, this ____ day of _____ 2024, upon consideration of

Plaintiff's Motion for Reconsideration, it is hereby ORDERED as follows:

A.    Reconsideration of this matter is expressly granted.

B.    Argument on reconsideration shall be held on the __ day of _____

2024 at _____ o'clock _____M in Courtroom No. _____ of the Lackawanna County

Courthouse.

C.    Plaintiff shall file a brief in support of his Motion for Reconsideration not later

than the _____ day of _____, 2024.

D.    Defendants shall file a brief in opposition to the Motion for Reconsideration not

later than the _____ day of _____, 2024.

BY THE COURT:

_____

TERRENCE R. NEALON, J.

**SCANNED**
**BK**

**Exhibit 1**

PHILIP GODLEWSKI,            :     IN THE COURT OF COMMON PLEAS
              Plaintiff,    :     OF LACKAWANNA COUNTY, PA
                         :
      v.                :     No: 2021-CV-2195
                         :
CHRIS KELLY et al.,          :
            Defendants.  :     JURY TRIAL DEMANDED

### PLAINTIFF'S MOTION RECONSIDERATION OF THE COURT'S ORDER DOCKETED SEPTEMBER 3, 2024 GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Philip Godlewski ("Godlewski") by and through his counsel, Kolman Law, PC and make the following Motion:

1.      On August 30, 2024 the Court's Memorandum setting forth its opinion on the Motion for Summary Judgment filed by Defendants was entered upon the docket by the Clerk of Judicial Records.

2.      On September 3, 2024 the Court's Order granting Defendant's Motion for Summary Judgment was entered on the docket by the Clerk of Judicial Records.

3.      Godlewski files this Motion, without waiver of any other issues that Godlewski may raise on appeal, requesting reconsideration of the Court's finding that Godlewski is collaterally estopped from denying a sexual relationship with Brienna DuBorgel ("DuBorgel") while DuBorgel was a minor, and the Court's finding that Godlewski failed to demonstrate actual malice on the part of the Defendants due to the alleged redaction of the transcript of Larry Holeva's deposition.

## COUNT I - COLLATERAL ESTOPPEL

4.     Paragraphs 1 through 3 of this Motion are restated and reincorporated by reference as though fully set forth.

5.     In its Memorandum at pp. 34 - 37, the Court concludes that Godlewski's guilty plea in the underlying criminal case operated to collaterally estop Godlewski from denying that Godlewski has a sexual relationship with DuBorgel while DuBorgel was a minor, thereby establishing the truth of the assertion in the Scranton Times article that Godlewski and DuBorgel engaged in such a relationship.

6.     The Court raised the collateral estoppel theory *sua sponte*.   While Defendants made much argument about the effect of the plea agreement as undermining Godlewski's credibility, Defendants did not assert a theory of issue preclusion.

7.     The Court based its ruling on *Com. Dept. of Transportation v. Mitchell*, 517 Pa. 203, 212, 535 A.2d 581, 585 (1987) and its progeny.

8.     Neither party briefed *Mitchell* and its progeny in their submissions to the Court.

9.     Pa.R.C.P. 1030 (a) provides that the defenses of estoppel and res judicata must be pleaded in a responsive pleading under the heading "New Matter."

10.     Pa.R.C.P. 1032 (a) provides that a party waives defenses not presented by preliminary objection, answer or reply.

11.     Defendants did not plead the defenses of estoppel and res judicata in their new matter.

12.     Defendants have waived the defenses of estoppel and res judicata in this matter by failing to plead them in new matter.

13.     Additionally or in the alternative, Godlewski respectfully suggests that the Court erred in finding that the statements in the affidavit of probable cause formed the basis for Godlewski's guilty plea as the majority of appellate and trial level opinion suggests that the Court must look to the indictment, information, and written and/or oral guilty plea colloquy to determine the factual basis of the plea and not to the criminal complaint or other documents.

14.     By email dated July 25, 2023, Godlewski requested the Lackawanna County Court Administrator to produce transcripts. See true and correct copy of email attached hereto as Exhibit 1.

15.     The transcript request sought production of the plea hearing transcripts from Godlewski's hearings on November 12, 2010, and July 11, 2011. See true and correct copy of transcript request attached hereto as Exhibit 2.

16.     On July 26, 2023, Catherine Nardozzi of the Court Administrator's office indicated that the transcripts were unavailable because the Court Administrator could not contact the court reporters. See Exhibit 1.

17.     Godlewski is unable, through no fault of his, to produce the transcripts.

18.     Additionally or in the alternative, there are sufficient factual conflicts between the text of the criminal complaint, the affidavit of probable cause, the guilty plea colloquy, and the information that there exists a genuine issue of material fact as to the factual basis for the plea and the Court is unable to conclude the factual basis of the guilty plea for purposes of res judicata and/or collateral estoppel in a civil case as, at summary judgment, the non-moving party must be given the benefit of factual doubts.

19.     Godlewski respectfully requests that the Court reverse its ruling that Godlewski has not presented enough evidence of the falsehood of the claims regarding the sexual relationship with DuBorgel and permit Godlewski's defamation and false light invasion of privacy claims to proceed to trial.

COUNT II - ACTUAL MALICE

20.     Paragraphs 1 through 19 of this Motion are restated and reincorporated by reference as though fully set forth.

21.     In its August 30, 2024, Memorandum at pp. 49 and 50, the Court concluded that Godlewski failed to adduce sufficient evidence of actual malice as the Court was unable to read the alleged "sweeping redactions" in the transcript of the deposition of Lawrence Holeva.

22.     By telephone conversation with Lackawanna County Clerk of Judicial Records Mauri B. Kelly, Godlewski's counsel has verified the following:

A.     The copy of Holeva's deposition submitted with Godlewski's original filings in opposition to the Motion for Summary Judgment was not redacted in any way. Instead, it contained numerous passages of text highlighted in color. This highlighted version is in the physical file with the Clerk of Judicial Records.

B.     The scanning equipment and software used by the Clerk of Judicial Records interprets text highlighted in color as redacted and shows it that way on the scanned versions of documents available on the Clerk's website.

C.     The original filing containing the copy of the deposition with the color-highlighted passages was available to the Court on the date of the argument on the Motion for Summary Judgment.

D.     In the event of an appeal, the Clerk of Judicial Records will transmit to the Superior Court the original filings showing the copy of the deposition with color-highlighted text rather than redacted text.

23.     Godlewski attaches hereto a true and correct copy of the deposition of Lawrence Holeva without annotations as Exhibit 3.

24.     Godlewski suggests that the Court should reconsider the issue of actual malice in light of the evidence filed of record by Godlewski and permit Godlewski's defamation and false light invasion of privacy claims to proceed to trial.

WHEREFORE, Plaintiff Philip Godlewski respectfully requests that the Honorable Court enter an Order providing the following relief:

A.     Vacating its Order and Judgment of September 3, 3024.

B.     Finding that Godlewski has adduced sufficient evidence of the falsehood of the allegations concerning the sexual relationship with DuBorgel to entitle Godlewski to proceed to trial.

C.     Finding that Godlewski has adduced sufficient evidence of actual malice on the part of Defendants to entitle Godlewski to proceed to trial.

D.     Setting a date for a jury trial in this matter.

E.     Such other relief as the Court may deem just.

Respectfully submitted,


**KOLMAN LAW, PC**


DATE:  September 13, 2024

/s/ Timothy M. Kolman
Timothy M. Kolman, PA51982



Timothy A. Bowers, PA77980



Kymberley L. Best, PA94596
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134
*Attorneys for Plaintiff.*

## COMBINED CERTIFICATE

I HEREBY CERTIFY that I have, this 13th day of September 2024, served a true and correct copy of the foregoing document by email upon the following:

J. Timothy Hinton, Esquire
timhinton@haggertylaw.net
Counsel for Defendants

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Timothy A. Bowers, PA77980

## FW: Transcript Request for Docket No. CR-2613-2010

Sarra Small <SSmall@KolmanLaw.com>

Fri 9/6/2024 5:02 PM

To:Timothy Bowers, Esq. <TBowers@KolmanLaw.com>;Timothy M. Kolman, Esq.
<TKolman@KolmanLaw.com>;Kym Best <KBest@KolmanLaw.com>;Kathleen A. Carrozza
<KCarrozza@KolmanLaw.com>

Hi All!

TimB, per your email yesterday, I am forwarding you my email to Lackawanna County in
which I requested the transcript from Phil's criminal hearing and the response thereto!

**From:** Cathene Nardozzi <NardozziC@lackawannacounty.org>
**Sent:** Wednesday, July 26, 2023 9:46 AM
**To:** Sarra Small <SSmall@KolmanLaw.com>
**Subject:** RE: Transcript Request for Docket No. CR-2613-2010

Good morning.  I received your request.  Unfortunately, because of the length of time we don't
have these transcripts available.  The one date was a per diem that filled in for us and I have
no contact info and the other reporter has left the County employ.  If you have any further
questions, please let me know.  Thank you! Cathene

**From:** Sarra Small <SSmall@KolmanLaw.com>
**Sent:** Tuesday, July 25, 2023 3:54 PM
**To:** Cathene Nardozzi <NardozziC@lackawannacounty.org>
**Cc:** Timothy M. Kolman, Esq. <TKolman@KolmanLaw.com>; Timothy Bowers, Esq.
<TBowers@KolmanLaw.com>; Kathleen A. Carrozza <KCarrozza@KolmanLaw.com>
**Subject:** Transcript Request for Docket No. CR-2613-2010

Good afternoon.

Please see attached transcript request concerning the above referenced matter.

Thank you.


**Sarra Small** | Paralegal
p:  +1 215-750-3134 |  f:  +1 215-750-3138
e:  SSmall@KolmanLaw.com
414 Hulmeville Avenue
Penndel, PA  19047

**Exhibit 1**





# KOLMAN LAW P.C.
## COMPLEX LITIGATION SINCE 1991

This e-mail communication is intended only for the use of the recipient(s) named above. This communication (or its attachments, if any) may contain information that is confidential, sensitive, protected by the attorney-client privilege, or subject to other protections. If you have received this communication in error and are not an intended recipient, you are advised that any review, use, forwarding, distribution or disclosure of its contents is strictly prohibited and that any inadvertent receipt is not to be deemed a waiver of the attorney-client privilege, the work product doctrine, or any other protection to which this communication may be subject. If you are not the intended recipient (or an agent or employee authorized to receive this communication for the intended recipient), please contact the sender immediately by reply e-mail or by telephone at (215) 750-3134 and delete all copies of this communication from your computer.

Please be advised that sending an e-mail to this law firm, or receipt of an e-mail from this law firm, does not establish an attorney-client relationship with any attorney, or with the firm, in the absence of an executed written fee agreement personally signed by you and a representative of the firm, and that no e-mail communications or other correspondence sent to or received from this law firm shall be deemed to modify the terms of any currently-existing written fee agreement in the absence of a written modification agreement personally signed by you and a representative of the firm. IRS CIRCULAR 230 DISCLOSURE:

To ensure compliance with Treasury Department regulations, we inform you that the information contained in this communication or its attachments is not written or intended to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed under the United States Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter addressed herein. Nothing in this communication is intended to meet the "covered opinion" test or to constitute tax advice.

Request for Transcript or Copy

<u>Lackawanna</u> County



Pursuant to Pa.R.J.A. 4007(A), this form must be completed by any person requesting a transcript for any court proceeding. Additional requirements may be found in the local rules of court for each judicial district. Local rules may be found by following the appropriate link at: <u>http://www.pacourts.us/courts/courts-of-common-pleas/</u>

If the cost of the transcript presents an economic hardship, there are reduced rates available to those who qualify. See Pa.R.J.A. 4007(E). Copies of this request must be served in accordance with Pa.R.J.A. 4007(B). A deposit determined by local rule may be required.

**I. Case Information**

| | |
|---|---|
| Case Caption:<br>Com. v. Philip Godlewski | Docket Number:<br>CR-2613-2010 |

Presiding Judge:
Hon. Vito P. Geruolo

Date(s) of Proceeding:
November 12, 2010, July 11, 2011

Court Reporter Name (if available):

Case Type (check the appropriate box): ☒Criminal ☐Civil ☐Family ☐Orphans' Court ☐Juvenile

Type of Proceeding: ☐Suppression ☐Argument ☐Trial ☒Plea ☒Sentence

or "Other" (please specify): _____

PCRA ☐Yes ☒No

Is the Transcript Associated with an Appeal? ☐Yes ☒No        Children's Fast Track: ☐Yes ☒No

**II. Requestor Information**

Name of Requestor/Attorney ID Number (if applicable): ____Timothy M. Kolman____

I am: ☒Counsel for Philip Godlewski        ☐Unrepresented ☐Not a party to this action

Agency/Firm: Kolman Law, PC        Court Represented: ☐Yes ☒No

Street Address: 414 Hulmeville Road    City: Penndel    State: PA    Zip: 19047

Email: tkolman@kolmanlaw.com    Phone: 215-750-3134    Fax: 215-750-3138

*Does this request qualify for a reduced rate pursuant to Pa.R.J.A. 4007(E)?* ☐*Yes* ☒*No*

*If Yes, please provide proof of authorization for a reduced rate or an affidavit required by Pa.R.J.A. 4008(B)(4) requesting a waiver of all or a portion of the costs.*

**III. Transcript Items Requested**

☒Entire proceeding ☐Jury Voir Dire ☐Opening statements ☐Closing arguments ☐Jury Instructions

☐Testimony (specify each witness):

☐Pre/Post trial hearing (specify):

☐Other (specify):

**Exhibit 2**

**IV. Transcript Delivery and Cost**

For the original transcript request, please select from the following:

| Delivery Time: | ☐ Ordinary | ☑ Expedited | ☐ Daily | ☐ Same Day |
|---|---|---|---|---|
| Original Transcript: | +$2.50 | +$3.50 | +$4.50 | +$6.50   (cost per page) |
| Copy for Requestor: ☑ Yes ☐ No | +$0.50 | +$0.75 | +$1.00 | +$1.25   (cost per page) |

Note: Expedited, Daily, and Same Day Requests are only available where provided by the judicial district or court reporter. Costs payable by requestor shall not exceed the rates prescribed in Pa.R.J.A. 4008(A)(1) and (D)(1).

Requesting Governmental Agency Rate (if applicable):  ☐ Yes  ☑ No

Manner of Delivery:  ☑ Electronic (PDF) Format  ☐ Hard copy (add $0.25 per page to page rates)

Other (if offered, extra charges may apply):  ☐ Complex Litigation  ☐ Real Time Feed

Special Requests (if offered):  ☐ Minuscript/Condensed  ☐ ASCII  ☐ Include Word Index  ☐ Other
If Other, please specify: _____

Are you requesting a photocopy of an existing transcript?  ☐ Yes  ☑ No  (For photocopy rates, please see Pa.R.J.A 4008(D))

Requestor's Signature: /s/ Timothy M. Kolman, Esquire          Date: July 25, 2023

*Note:  The first requestor of a transcript is obligated to pay for the original transcript, which is filed with the court, plus the copy rate if the requestor desires a personal copy (subject to any cost sharing with additional parties).*



## *For Court Use Only*

| | |
|---|---|
| Date of Request: | Docket Number: |

Case Caption:

Name of Requestor:

Email:_____ Phone:_____ Fax: _____

Are the costs waived or reduced? ☐ Yes ☐ No

---

Date Deposit Received: _____ Deposit Check/M.O. Number: _____

Date Transcript Assigned: _____ Transcript to be Prepared By: _____

Transcript Due Date: _____ Date Transcript Completed: _____

Date Balance Received: _____ Balance Check/M.O. Number:_____

Date Transcript Sent to Requesting Parties: _____

---

| | | | | | |
|---|---|---|---|---|---|
| Ordinary, County Paid | $ | X pages | =$ | Estimated Cost | $ |
| Ordinary, Private Paid | $ | X pages | =$ | Less Deposit | -$ |
| Expedited | $ | X pages | =$ | Balance Due | $ |
| Daily | $ | X pages | =$ | Adjusted Cost (+/-) | =$ |
| Same Day | $ | X pages | =$ | Final Page Total | |
| +Hard Copy | $0.25 | X pages | =$ | Final Balance | $ |
| +Requestor Copy | $ | X pages | =$ | | |
| +Additional Charges | $ | X pages | =$ | | |

Is the cost of the transcript being shared between parties? ☐ Yes ☐ No

Photocopy of Existing Transcript: ☐ Yes ☐ No

---

***Notes:***

---

Request for Transcript or Copy, AOPC 7/25/18

Page 1

1              IN THE COURT OF COMMON PLEAS
           OF LACKAWANNA COUNTY, PENNSYLVANIA
2

   PHILIP GODLEWSKI,            : CIVIL DIVISION
3                               :
                    Plaintiff   :
4                               :
           VS                   :
5                               : NO. 2021-CV-2195
   CHRIS KELLY, et al.          :
6                               :
                    Defendants  :
7

8

9

10           DEPOSITION OF LAWRENCE HOLEVA
11        Taken at the Lackawanna Bar Association,
12   233 Penn Avenue, Scranton, PA 18503, on Tuesday,
13   December 19, 2023 at 2:04 p.m., by Allison M.
14   Ross, RPR.
15

16

17

18

19

20

21

22              *  *  *
23          VERITEXT LEGAL SOLUTIONS
              MID-ATLANTIC REGION
24            4949 Liberty Lane
                Suite 200
25          Allentown, PA 18106    **Exhibit 3**

Page 1

1                IN THE COURT OF COMMON PLEAS
             OF LACKAWANNA COUNTY, PENNSYLVANIA
2

     PHILIP GODLEWSKI,              : CIVIL DIVISION
3                                   :
                      Plaintiff     :
4                                   :
           VS                       :
5                                   : NO. 2021-CV-2195
     CHRIS KELLY, et al.            :
6                                   :
                      Defendants    :
7

8

9

10              DEPOSITION OF LAWRENCE HOLEVA

11        Taken at the Lackawanna Bar Association,

12   233 Penn Avenue, Scranton, PA 18503, on Tuesday,

13   December 19, 2023 at 2:04 p.m., by Allison M.

14   Ross, RPR.

15

16

17

18

19

20

21

22                     * * *

23             VERITEXT LEGAL SOLUTIONS

                MID-ATLANTIC REGION

24               4949 Liberty Lane

                   Suite 200

25             Allentown, PA 18106



Page 2

1 APPEARANCES:
2 -- ON BEHALF OF THE PLAINTIFF:
3   KOLMAN LAW, P.C.
     BY: TIMOTHY M. KOLMAN, ESQUIRE
4    TIMOTHY A. BOWERS, ESQUIRE
     414 Hulmeville Avenue
5    Penndel, PA 19047
     724.989.7759
6
7 -- ON BEHALF OF THE DEFENDANTS:
8   HAGGERTY HINTON & COSGROVE LLP
     BY: J. TIMOTHY HINTON, ESQUIRE
9    1401 Monroe Avenue
     Suite 2
10   Dunmore, PA 18509
     570.344.9845
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        INDEX TO WITNESSES
2 DEPOSITION OF                    PAGE
3 Lawrence Holeva
4   By Mr. Bowers                    4
5
6
7
8
9 --------------------------------------------------
10       INDEX TO EXHIBITS
11 EXHIBIT                          PAGE
12   1 - newspaper column            25
13   2 - police criminal complaint   29
14   3 - information                 31
15   4 - guilty plea colloquy        33
16
17
18
19
20
21
22
23
24
25

Page 4

1            STIPULATION
2        It is hereby stipulated by and between
3 counsel for the respective parties that all
4 objections except as to the form of the question
5 are reserved to the time of the trial.
6                * * *
7        LAWRENCE HOLEVA, called as a witness,
8 being duly sworn, testified as follows:
9                * * *
10           EXAMINATION
11 BY MR. BOWERS:
12     Q. Hello, Mr. Holeva. My name is Tim
13 Bowers. We met informally before the deposition.
14 I represent Mr. Godlewski, and I have some
15 questions for you today. All right?
16     A. Sure.
17     Q. Would you prefer for me to call you
18 Mr. Holeva or Larry?
19     A. Larry is fine.
20     Q. Larry. Okay. I'm Tim and so is Tim and
21 so is Tim.
22        So have you ever been deposed before?
23     A. I have.
24     Q. How long ago?
25     A. At least 20 years ago.

Page 5

1     Q. So quite a while. So just a few ground
2 rules. When you give an answer, you have to give
3 a verbal linguistic answer like yes or no instead
4 of uh-huh or uh-uh. Okay?
5     A. Yes.
6     Q. Sometimes we get excited about asking
7 questions or giving answers and we may end up
8 talking over each other. Will you wait until I
9 finish the question before answering?
10     A. Absolutely.
11     Q. And in return, I'll give you the courtesy
12 of making sure you're finished with your answer
13 before I start another question. All right?
14     A. Thank you.
15     Q. Sometimes lawyers come out with a
16 horribly mangled garbled question that may be
17 unintelligible to regular people. If I ask
18 anything that you don't understand because it's
19 come out as a bad question, will you tell me so?
20     A. Yes.
21     Q. And if I ask you a question and you
22 answer it, can I presume that you've heard and
23 understood the question before answering?
24     A. Yes.
25     Q. Okay. Is there anything affecting your

2 (Pages 2 - 5)

Page 6

1  ability to understand questions put to you and to
2  give accurate answers today?
3      A. No.
4      Q. So let's move into the actual questions
5  then. Are you currently employed?
6      A. Yes.
7      Q. Where are you employed?
8      A. I'm employed at the Scranton
9  Times-Tribune.
10     Q. In what capacity are you employed?
11     A. I'm the executive editor.
12     Q. I saw a recent article in the Washington
13  Post. Do you anticipate that's going to continue
14  after this recent takeover?
15     A. Yes.
16     Q. How long have you been the executive
17  editor?
18     A. Twelve years.
19     Q. What was your job before being executive
20  editor?
21     A. I was the managing editor of the Citizens
22  Voice in Wilkes-Barre and the Standard Speaker in
23  Hazleton.
24     Q. How long were you managing editor of
25  those papers?

Page 7

1      A. Eight years.
2      Q. So we're back about 20 years now of
3  history. Are those other papers were they owned
4  by the same group as the Scranton Times?
5      A. Yes.
6      Q. And before being managing editor there,
7  how were you employed?
8      A. I was employed as a journalist in
9  different capacities since 1983.
10     Q. Okay.
11     A. 1987 with the Scranton Times. 1983 to
12  1987 with the former Scrantonian Tribune which
13  was a competitor.
14     Q. When you were employed as a journalist
15  before becoming an editor, what sort of
16  journalism did you do? What beats did you have?
17     A. I started off covering municipal news. I
18  moved and I covered cops and courts. I changed
19  papers and I took a city beat. I covered the
20  City of Scranton and the Scranton neighborhoods.
21  I moved to sports where I was a ten-year baseball
22  writer, four years as an assistant sports editor,
23  and then I moved back into the news department in
24  Scranton in 1998.
25     Q. What was your favorite thing to do?

Page 8

1      A. Covering baseball.
2      Q. You never covered Mr. Godlewski playing
3  baseball, did you?
4      A. I didn't know he did.
5      Q. You might have been a little young for
6  that when you were covering sports.
7          MR. GODLEWSKI: '98 to 2002.
8          THE WITNESS: I just left sports.
9          MR. BOWERS: Don't --
10         MR. GODLEWSKI: Oh, sorry.
11  BY MR. BOWERS:
12     Q. How long were you covering cops and
13  courts doing criminal stuff?
14     A. I did that for about a year and a half.
15     Q. Did you become familiar with the way a
16  criminal case flows at that point?
17     A. Yes. I covered Wayne County Court.
18     Q. Okay. How many cases do you think you
19  covered over the course of your year and a half?
20     A. Six because one was a long extended case.
21     Q. What was it?
22     A. It was a murder case.
23     Q. Okay. And you were there from arrest
24  through jury verdict?
25     A. Yes.

Page 9

1      Q. Tell me about being an executive editor.
2  I don't know the newspaper world. What are your
3  duties as executive editor?
4      A. Currently or under the old ownership
5  because they're quite different?
6      Q. Let's do old ownership because that's
7  when the article would have been published that
8  gave rise to this lawsuit. So let's talk about
9  that period of time.
10     A. As the executive editor of the group, I
11  oversee the managing editors of each property.
12  So the managing editor in Scranton, Wilkes-Barre,
13  Hazleton, and Pottsville would report to me. I
14  would set vision and strategy. I would handle
15  our union negotiations. I would handle our
16  budgets. It was more of an administrative job
17  overseeing the journalism.
18         Under the new company, it's quite
19  different because it's a larger company and
20  corporate management handles the unions, the HR
21  issues, the budgeting, and more of the
22  administrative work.
23     Q. So you've now been able to return more to
24  the actual journalism side of that?
25     A. Yes.

3 (Pages 6 - 9)

Page 10

1  Q. In 2021 would you have had any direct
2  involvement with selection of material for
3  columns in one of the newspapers?
4  A. No.
5  Q. Who would have done that?
6  A. The managing editor at the newspaper.
7  Q. And the managing editor would work under
8  your strategic direction?
9  A. Correct.
10  Q. At that point in time had you issued any
11  strategic direction for sort of selection of
12  material for columns?
13  A. No.
14  Q. That brings up a term that I would like
15  to ask you about. I understand that you have a
16  distinction in journalism between columns and
17  maybe news articles?
18  A. Correct.
19  Q. Can you tell me about that distinction.
20  A. Yes. A news article would not reflect a
21  writer's opinion. A column would have more
22  latitude to add opinion. And that's the biggest
23  differentiation.
24  Q. Could you tell me more about that
25  latitude to add opinion. I'm gathering that that

Page 11

1  latitude is not without boundaries?
2  A. Correct. The opinion still needs to be
3  based in fact.
4  Q. Okay. How does basing that opinion in
5  fact differ from, say, gathering facts for a news
6  article?
7  A. I don't know.
8  Q. Okay. Maybe not the best question. If
9  one of your writers were going to produce a
10  column on a subject, what research or
11  investigation would you expect them to conduct in
12  order to generate material for the column?
13  A. The same research they would conduct if
14  they're writing a news story.
15  Q. What research is that?
16  A. I don't know specifically what you're
17  asking.
18  Q. Okay. Let's back up and make sure I
19  understand.
20     Whether someone is writing an article, a
21  news article, or an opinion column, you expect
22  them to do similar research to generate a factual
23  basis, correct?
24  A. Yes.
25  Q. What does research to generate a factual

Page 12

1  basis look like for a reporter or a columnist?
2  A. I think it would depend what the subject
3  matter they were reporting on.
4  Q. Okay. Tell me more about that.
5  A. It would require them to base their
6  reporting on accurately obtaining information.
7  Q. What does it mean to accurately obtain
8  information in journalism?
9  A. It means to have multiple sources. The
10  sources may be documentation. They may be
11  information derived from an interview. They may
12  be -- it may be information derived from data
13  depending on what the subject matter you're
14  researching would be.
15  Q. Okay. With respect to documents, is
16  there a standard in your paper for judging the
17  reliability or credibility of a document to be
18  used as a source?
19  A. Yes.
20  Q. What is that standard?
21  A. Generally, if it's a legal document it
22  would meet our standard.
23  Q. How about interviews? Is there a
24  standard for determining the credibility of
25  someone who's interviewed or the reliability?

Page 13

1  A. Yes.
2  Q. What is that standard?
3  A. You would test their credibility to make
4  sure that they had direct knowledge or had
5  expertise in whatever that area of research might
6  be.
7  Q. Okay. Let's talk about writing a column
8  about a criminal prosecution. And you are
9  familiar, again, with writing -- with journalism
10  in that field because you've done it yourself,
11  right?
12  A. Yes.
13  Q. What sort of documents would you expect
14  that your columnists would look at before forming
15  -- writing a column and forming opinions about a
16  criminal prosecution?
17  MR. HINTON: Objection to the form of the
18  question. You can answer.
19  THE WITNESS: I think that depends on
20  what they were writing about. In some cases it
21  might be a court document, it might be a
22  transcript of a court document, it might be a
23  police report. It may be an interview with
24  someone who has knowledge of the investigation
25  because they did the investigation. And there's

4 (Pages 10 - 13)



Page 14

1 probably others that I'm overlooking, but that
2 would be pretty much standard.
3    Q. Okay. Would you expect that, you know,
4 one of your journalists would look at a criminal
5 complaint?
6    A. Yes.
7    Q. Would you expect that they would look at
8 an affidavit of probable cause?
9    A. Yes.
10    Q. And just to clarify, those are terms with
11 which you're familiar from your experience?
12    A. Yes.
13    Q. Would you expect one of your columnists
14 to look at an information?
15    A. Yes.
16    Q. Would you -- do you understand the
17 difference between a criminal complaint and an
18 information?
19    A. Yes.
20    Q. What's your understanding of the
21 difference between the two?
22    A. The criminal information is what is going
23 to happen before the complaint is filed.
24    Q. All right. Would it surprise you to
25 learn that it's actually the other way around?

Page 15

1    A. No, it wouldn't. Actually, as I said
2 that to you I wasn't certain.
3    Q. Would it surprise you to learn a
4 complaint is filed first and then followed by an
5 information?
6    A. Correct, that does not surprise me.
7    Q. Okay. Do you understand that what is in
8 the information supersedes what's in a criminal
9 complaint?
10    MR. HINTON: Let me object to the form of
11 the question.
12    THE WITNESS: Yes.
13    MR. BOWERS: Okay.
14 BY MR. BOWERS:
15    Q. If a Defendant in a criminal case pled
16 guilty, would you expect your reporter or your
17 journalist to review the guilty plea colloquy?
18    A. Yes.
19    Q. In your opinion, would it be necessary to
20 review all of these documents to gather accurate
21 information about the nature of a criminal
22 prosecution?
23    A. It may.
24    Q. When may it?
25    A. It depends on the scope of the case and

Page 16

1 what's included in the information.
2    Q. Okay.
3    A. Those would be judgments, and that's kind
4 of what journalism is based on, a judgment.
5    Q. Okay. Are there any guidelines that
6 affect that judgment?
7    A. No.
8    Q. Are there any ethical standards that
9 affect that judgment?
10    A. Yes. And the ethical standard would be
11 that we would pursue information to the best of
12 our ability to get a complete story.
13    Q. In the context of reporting on a criminal
14 case, would it be consistent with that ethical
15 requirement to pursue information to the best of
16 your ability to review every available
17 document --
18    A. Yes.
19    Q. -- that's filed at the court system?
20    A. Yes.
21    Q. If a journalist does not review all of
22 those documents, might that indicate a lapse in
23 their ethical obligation to pursue information to
24 the best of their ability?
25    A. Not necessarily.

Page 17

1    Q. When would it not?
2    A. If you don't know that that exists.
3    Q. Do you have experience reporting on court
4 cases?
5    A. Yes.
6    Q. You're familiar with all those documents,
7 right?
8    A. Correct.
9    Q. How long did it take you to become
10 familiar with the fact that those things were all
11 filed in criminal cases?
12    MR. HINTON: Let me object to the form of
13 the question. We're talking in vagueness here.
14 You haven't defined all things.
15    MR. BOWERS: All right.
16 BY MR. BOWERS:
17    Q. How long did it take you to realize that
18 a criminal complaint is something that's filed in
19 a criminal case?
20    A. Not very long.
21    Q. Okay. It's not hard to figure out when
22 you're starting?
23    A. Correct.
24    Q. How long did it take you to learn that
25 there's such a thing as an information that's

5 (Pages 14 - 17)

Page 18

1 filed?
2    A. Not very long either.
3    Q. Would it be the same thing for a guilty
4 plea colloquy?
5    A. I couldn't answer that. I've never had a
6 case that was pled.
7    Q. Okay. All right.
8    A. The cases I covered were cases that were
9 criminal trials.
10    Q. Very good. But would you agree with me
11 that knowledge of the existence of and sequence
12 of filings in a criminal case is something that a
13 reporter picks up fairly quickly?
14    A. Yes.
15    Q. And any veteran journalist, you know,
16 working for the Scranton Times should know the
17 sequence of filing in a criminal case?
18    A. If that's their beat, yes.
19    Q. Then it would be consistent with their
20 ethical responsibility that you told us about
21 earlier to view each of those documents to get
22 information that's reliable, correct?
23    A. Yes.
24    Q. Tell me about the process of writing a
25 column for the Scranton Times. How is the column

Page 19

1 initiated?
2    MR. HINTON: Generally speaking?
3    MR. BOWERS: Generally speaking, not with
4 respect to the column that's the subject of this
5 litigation, general speaking.
6    THE WITNESS: The idea would be initiated
7 by the columnist.
8 BY MR. BOWERS:
9    Q. And how are your columnists employed?
10 How were they employed in 2021? I understand
11 that may have changed.
12    A. They worked out of a central office. The
13 column ideas generally bubbled up from them to a
14 supervising editor. They would file a column, it
15 would get edited, and there would be questions
16 asked, and it would get handed back, and there
17 would be revisions made, and sometimes there
18 would be more questions asked. But that would be
19 the process of...
20    Q. So let's start -- let's take a column
21 from the start. The columnist has an idea for
22 the column, correct?
23    A. Yes.
24    Q. Writes the column, correct?
25    A. Correct.

Page 20

1    Q. And then sends that column to the
2 supervising editor, correct?
3    A. Yes.
4    Q. And I think you mentioned that the
5 supervising editor may have questions and sends
6 it back down to the columnist?
7    A. Yes.
8    Q. What sort of questions might a
9 supervising editor have?
10    A. It could be anything, organizational
11 issues, informational issues, writing style
12 problems. He will put the column through the
13 same general paces an editor would put a story
14 through.
15    Q. And then the column is revised, correct?
16    A. Yes.
17    Q. And then the column is sent back to the
18 supervising editor?
19    A. Yes.
20    Q. Assuming the supervising editor thinks
21 that the column is in good shape at that point
22 what happens next?
23    A. It moves through a copy editing process.
24 It would go to a copy desk. And in our setup,
25 that needs to have at least one other editing

Page 21

1 scrutiny.
2    Q. Who provides that other editing scrutiny?
3    A. An editor on the copy desk. It's not one
4 editor. There's multiple people, and it will
5 depend on what their work schedule and work flow
6 is for that day.
7    Q. And what is that person looking for in
8 their scrutiny?
9    A. The same thing the supervisor editor was
10 looking for. They will spot-check fact. They
11 will make sure that the column is -- has clarity,
12 that it's accurate, that it's got no grammatical
13 issues, that it meets the newspaper's standards
14 for publication.
15    Q. Can you describe to me the process of
16 spot-checking facts.
17    A. Yes. Every fact that's in a story would
18 have a CQ, a correct that the reporter would say
19 where they obtained the information. And that's
20 in a news story that I'm really speaking about.
21 The editor would spot-check those to see that
22 that was accurate. For instance, if it was a
23 name, they would have to find out is that name
24 spelled correctly. If there's a URL in the
25 story, they would have to put that URL into a

6 (Pages 18 - 21)

Page 22

1 browser and make sure that takes you to the
2 correct website and not to another website. If
3 there's a phone number, they would be required to
4 dial that number and make sure that's who
5 answered the phone. Those would be spot-checks.
6    Q. Would spot-checking involve review of
7 court documents if they were reporting on a
8 criminal case?
9    A. Most likely not.
10    Q. Are there circumstances in which it would
11 since you indicated that it was most likely not
12 the case?
13    A. Yes, depending on who the supervisory
14 editor was on the first read.
15    Q. All right.
16    A. So in this case, a column would be going
17 to a higher level supervisory editor, so there's
18 less chance that it would have gone through a
19 spot-check of documents at the next level of
20 editing.
21    Q. All right. At what level would it have
22 gone through a check of documents?
23    A. If the first draft of the story was not
24 handled by a senior editor, if it was handled by
25 a junior editor. So that would be a regular news

Page 23

1 story that came through the desk. And if the
2 supervisory editor had it afterwards they would
3 spot-check.
4    Q. That's for a regular news story, correct?
5    A. Correct.
6    Q. What about a column?
7    A. That would only happen at the supervisory
8 level on first draft.
9    Q. What happens next?
10    A. The editor who gives the story its final
11 edit would place it on a news page, they would
12 write a headline, they would proof the page, and
13 another editor would read the story on the page
14 to make sure that the headline matched the
15 content of the story, that it matched the visual
16 of the story if, in fact, there was a visual of
17 the story to make sure that information on the
18 page other than the story was also accurate and
19 that would be a photograph, did the caption read
20 accurately, does the jump line go to the right
21 page. They would get the page if it was jumping
22 and they would verify that it was landing on the
23 right page that we sent readers to.
24    Q. So that final edit is really about
25 formatting to make sure everything is in place

Page 24

1 correctly?
2    A. Correct. It's a proofing.
3    Q. And would it be accurate to say then that
4 content review would have happened at previous
5 levels?
6    A. Yes.
7    Q. And is this the process that is followed
8 every time a column is written?
9    A. Yes.
10    Q. At any point in time do questions about
11 columns come to you in your capacity as executive
12 editor?
13    A. Yes.
14    Q. When might a question about a column rise
15 to the level of you as an executive editor?
16    A. It would only happen if the managing
17 editor or designee for a column raised a question
18 with them.
19    Q. How frequently does that happen?
20    A. Rarely.
21    Q. What sorts of things raise questions that
22 are brought to you?
23    A. Gosh, I can't even think of one that did,
24 but they do on occasion. I want to think of
25 columns. A column that would raise a suspicion

Page 25

1 that there was an issue with it. I'm trying to
2 think of one that -- I'm trying to think of an
3 example and I can't, but there have been.
4    Q. In your 12 years as an executive editor,
5 how often do you think that that's happened?
6    A. Ten.
7    Q. All right. I would like to move our
8 discussion more specifically to the column that's
9 the subject matter of this case.
10    A. Sure.
11    Q. So I'm going to show you -- I have a copy
12 of it. I've marked it as Deposition Exhibit No.
13 1.
14       (Exhibit 1 was marked for
15 identification.)
16 BY MR. BOWERS:
17    Q. Do you recognize this as a copy of the
18 column written by Chris Kelly that ran on
19 February 14, 2021 titled QAnon Realtor Sells
20 Rabbit Holes on YouTube?
21    A. Yes.
22    Q. First, did this column, was it a column
23 that a managing editor raised a question with to
24 you?
25    A. No.

7 (Pages 22 - 25)

Page 26

1    Q. So it never -- this column never came to
2  your level prior to its publication?
3    A. Correct.
4    Q. Are you familiar with the column?
5    A. Subsequently I have become familiar with
6  it.
7    Q. When did you first read the column?
8    A. I read it on Sunday, February 14, 2021.
9    Q. Part of your job is to make sure you read
10 each paper that you're executive editor for when
11 it comes out?
12   A. Yes.
13   Q. Are you familiar with the general content
14 of the column?
15   A. Yes.
16   Q. Are you familiar with the fact that the
17 column asserts that Philip Godlewski pled guilty
18 to a crime involving sexual contact with a minor?
19   A. Yes.
20   Q. What sort of investigation of that fact
21 would you have expected Mr. Kelly to do prior to
22 writing the column?
23   A. He would have done research work that
24 would have included speaking to a county
25 detective, reviewing paperwork that may be

Page 27

1  available on it, reading the history of the case
2  which, you know, we would have in electronic
3  archives.
4    Q. When you say reviewing information, are
5  there particular documents that you would have
6  expected Mr. Kelly to have reviewed prior to
7  writing the column?
8    A. Yes.
9    Q. What would those documents be?
10   A. Whatever documents existed in this case.
11 And I don't know that, but I assume there's a
12 police report, a transcript of some court record.
13 I don't know more beyond this since it wasn't a
14 column that I edited or managed.
15   Q. Based on your experience as a journalist,
16 would you expect Mr. Kelly in the fulfillment of
17 his ethical obligation to pursue information to
18 the best of his ability to review the criminal
19 complaint?
20   A. Yes.
21   Q. Would you expect Mr. Kelly in the
22 exercise of his ethical obligation to pursue
23 information to the best of his ability to review
24 the information?
25   A. Yes.

Page 28

1    Q. Would you -- I'm sorry these are a little
2  repetitive. Would you expect Mr. Kelly in the
3  exercise of his ethical obligation to pursue
4  information to the best of his ability to review
5  the terms of the guilty plea colloquy?
6    A. Yes.
7    Q. In your opinion, based on your experience
8  in journalism, would you say it's necessary to
9  review those documents to accurately know whether
10 or not Phil Godlewski pled guilty to a crime
11 involving sex with a minor?
12      MR. HINTON: Objection. You're going
13 beyond his involvement in managing and serving as
14 an executive director. It's outside the scope of
15 his -- he's a fact witness. He's not your expert
16 witness here.
17      MR. BOWERS: Let me rephrase.
18 BY MR. BOWERS:
19   Q. Would you, as an executive editor of the
20 Scranton Times, expect Chris Kelly to review all
21 of these documents in drafting a column about
22 Phil Godlewski?
23   A. I would expect that Chris would or any
24 journalist would review whatever is available,
25 whatever they can find on that case --

Page 29

1    Q. Okay.
2    A. -- until they make a determination that
3  they've got source or sufficient source to assert
4  something as a fact.
5    Q. I'm going to show you a copy of what I
6  marked for identification as Deposition Exhibit
7  2.
8      (Exhibit 2 was marked for
9  identification.)
10 BY MR. BOWERS:
11   Q. I'm going to represent to you that this
12 is a copy of the police criminal complaint that
13 was filed in Mr. Godlewski's case. Do you see
14 that it appears to be a police criminal complaint
15 naming Philip Godlewski as the Defendant?
16   A. I'm having a hard time following it just
17 because my eyes are bothering me.
18   Q. Sure. Take your time. I will direct you
19 to the very top.
20   A. Yes.
21   Q. Do you see the words police criminal
22 complaint?
23   A. Absolutely.
24   Q. Do you see Commonwealth of Pennsylvania
25 versus Philip Godlewski?

8 (Pages 26 - 29)



Page 30

1    A. Thank you.
2    Q. You've seen criminal complaints before in
3  your experience as a journalist, correct?
4    A. Yes.
5    Q. I'm going to direct you to a page of the
6  complaint that's got a Bate stamp on the bottom
7  that says ST0616.
8      Do you see at Offense Number 7 -- it's
9  toward the top of the complaint -- that there's a
10  charge of corruption of minors?
11    A. Yes.
12    Q. And do you see that the accusation in
13  that criminal complaint is that in that on or
14  about January 2008 through the present, the
15  Defendant, Philip Godlewski, being 18 years of
16  age and upwards, did corrupt or tend to corrupt
17  the morals of the victim, redacted, a minor under
18  the age of 18 years, by engaging in acts of
19  sexual intercourse or aided, abetted, enticed, or
20  encouraged a minor in the commission of a crime
21  or knowingly assisted or encouraged such minor in
22  violating his or her parole or court order?
23    A. Yes.
24    Q. And there is an acquisition in there
25  Mr. Godlewski engaged in sexual intercourse with

Page 31

1  a minor, correct?
2    A. Yes.
3    Q. What's your understanding of the
4  importance of an accusation in a criminal
5  complaint?
6    A. (No response.)
7    Q. Let me rephrase that. That's a bad
8  question.
9      As a journalist, do you read accusations
10  in a criminal complaint as the truth?
11    A. No, it's an allegation.
12    Q. Allegation. Good. And would you have
13  expected Mr. Kelly to review the criminal
14  complaint prior to writing the February 14, 2021
15  column about Mr. Godlewski?
16    A. Yes.
17    Q. Okay. I'm going to show you a copy of
18  what's marked for identification as Deposition
19  Exhibit 3.
20      (Exhibit 3 was marked for
21  identification.)
22  BY MR. BOWERS:
23    Q. I'll represent to you that this is the
24  information filed in Mr. Godlewski's case. Does
25  that appear to be what it is to you?

Page 32

1    A. Yes.
2    Q. Do you now recall after we talked about
3  the sequence of criminal complaint versus
4  information that an information is filed after a
5  criminal complaint?
6    A. Yes.
7    Q. And would you recall from your experience
8  that an information is filed once a case -- a
9  criminal case passes through the magistrate's
10  office and goes to the Court of Common Pleas?
11    A. Yes, that's correct.
12    Q. And would it be your understanding that
13  an information is the document upon which the
14  Commonwealth proceeds to charge a Defendant?
15    A. Yes.
16    Q. So how many counts do you see on
17  Mr. Godlewski's information?
18    A. One.
19    Q. And what is that count?
20    A. A corruption of minors.
21    Q. And can you read the description of that
22  offense. Don't worry about the citation and the
23  grading but just what it says he did.
24    A. Unlawfully, being at the age of 18 years
25  and upwards, corrupt or tend to corrupt a morals

Page 33

1  of any minor less than 18 years of age, or did
2  aid, abet, entice, or encourage any such minor in
3  the commission of any crime, or did knowingly
4  assist or encourage such minor in violating his
5  or her parole or any order of the court to wit;
6  the Defendant did repeatedly have inappropriate
7  text messages and contact with a minor.
8    Q. Is there any allegation in there of
9  sexual contact specifically?
10    A. No.
11    Q. No. Would you have expected Mr. Kelly to
12  review the information prior to writing his
13  article about Mr. Godlewski?
14    A. If available, yes.
15    Q. I'm going to show you what I've marked
16  for identification as Deposition Exhibit 4.
17      (Exhibit 4 was marked for
18  identification.)
19  BY MR. BOWERS:
20    Q. I'll represent to you this is a copy of
21  Mr. Godlewski's guilty plea colloquy that he
22  entered in that case. Are you familiar with what
23  a guilty plea colloquy is?
24    A. Yes.
25    Q. What's your understanding of what it is?

9 (Pages 30 - 33)

Page 34

1    A. This would be the final disposition
2 before the Court had accepted the plea.
3    Q. And have you seen these before?
4    A. No.
5    Q. Not this particular one but a guilty plea
6 colloquy in general?
7    A. Oh yes, I have.
8    Q. And is a guilty plea colloquy something
9 that you would expect Mr. Kelly to have reviewed
10 prior to writing his article -- his column about
11 Mr. Godlewski?
12    A. Again, if it was available, yes, or if it
13 was necessary. There would be a time where you
14 might not because you have the information from
15 another source.
16    Q. Okay.
17    A. Whether that be someone with firsthand
18 knowledge of the case or documentation.
19    Q. Let's focus on this document for a moment
20 then we can talk about those things.
21       I'm going to direct you to page 3 of it
22 which is also marked with a Bate stamp ST 0586.
23       Do you see paragraph 16? It says, The
24 elements of the crimes charged are as follows?
25    A. Yes.

Page 35

1    Q. And would you agree with me that it says
2 being of the age of 18 or older, by an act
3 corrupts or tends to corrupt the morals of a
4 minor?
5    A. Yes, I think.
6    Q. Is there any reference in paragraph 16 to
7 sexual contact between Mr. Godlewski and a minor?
8    A. No. It's vague enough that it doesn't
9 say that.
10    Q. And if we look at paragraph 17, would you
11 agree with me that it says, The District Attorney
12 indicates this is what you did on the date of the
13 crime charged and there's nothing written in
14 after that?
15    A. Yes.
16    Q. So is there any factual indication in the
17 guilty plea colloquy that Mr. Godlewski had
18 sexual intercourse with a minor?
19    A. No.
20    Q. Does it appear from the text of the
21 guilty plea colloquy that Mr. Godlewski admitted
22 to having sex with a minor?
23    A. No.
24    Q. Based on the documents that you have in
25 front of you, would you consider it consistent

Page 36

1 with a journalist's ethical obligation to pursue
2 information to the best of his ability to end an
3 inquiry about whether or not Mr. Godlewski had
4 sex with a minor with this information?
5    A. Again, I think it depends on what other
6 information the journalist knows to be factual,
7 and you would have obtained that in a lot of
8 different ways. As I read number 16, it appears
9 to be intentionally vague. It's not specific
10 about what constituted those corruption of a
11 minor. It's an admission but not a detail.
12    Q. So to come back to my question, based on
13 these documents alone that you've seen, you
14 couldn't conclude that he admitted to having sex
15 with a minor?
16    A. Correct.
17    Q. And if I understand you, you are of the
18 opinion that a journalist would need more
19 information in order to conclude that
20 Mr. Godlewski admitted to having sex with a
21 minor?
22    A. Yes.
23    Q. What information or rather what sources
24 of information would you expect a journalist in
25 the discharge of the ethical obligation to pursue

Page 37

1 information to the best of his ability to look at
2 to verify that?
3    A. Investigative files, investigative work,
4 investigative insight, investigative sourcing.
5    Q. Whose files -- when you say investigative
6 files, whose files are you talking about?
7       MR. HINTON: Objection to the form of the
8 question. He said investigative sourcing.
9 Doesn't just necessarily mean hard paper and hard
10 files.
11       MR. BOWERS: Mr. Holeva said a number of
12 things. I believe files were one of them. We
13 are going to go through the list.
14       MR. HINTON: Then we focus right on just
15 files.
16 BY MR. BOWERS:
17    Q. Do you need me to repeat the question?
18    A. Yes, please.
19    Q. When you said investigative files, whose
20 files?
21    A. It could be anyone who is investigating
22 this case. I don't know if that's District
23 Attorney. I don't know if that's municipal. I
24 don't know at what level this case was --
25    Q. So by investigative files, you're

10 (Pages 34 - 37)

Page 38

1  referencing law enforcement files?
2      A. Yes.
3      Q. Okay. Do you know if Mr. Kelly did any
4  of that investigation?
5      A. I don't know specifically on this case.
6      Q. Okay. Fair enough. In addition to
7  investigative files, what other sources would you
8  expect would be necessary to make a determination
9  about the issue of whether Mr. Godlewski admitted
10 to having sex with a minor?
11     A. Court files, independent interviews. I
12 mean, it could be any type of investigative work
13 that would lead you to make that conclusion or
14 any conclusion.
15     Q. If that investigative work beyond
16 reviewing the three documents I've shown you was
17 not done, would that be a breach of a
18 journalist's ethical obligation to pursue
19 information to the best of his ability prior to
20 writing a story that says Phil Godlewski admitted
21 to having sex with a minor?
22     A. Yes.
23     Q. Okay. And, again, because you weren't
24 directly involved with this article, you don't
25 know whether that investigation was done,

Page 39

1  correct?
2      A. Correct.
3      Q. Have you told me all the sources of other
4  information you would expect a journalist to
5  investigate prior to writing the column about
6  Mr. Godlewski?
7      A. Yes.
8          MR. BOWER: One moment, please.
9          (A short break was taken at 2:48 p.m.;
10 after which, the following occurred at 2:49 p.m.)
11 BY MR. BOWERS:
12     Q. Larry, I would like to ask you, if I can,
13 about some other aspects of the Chris Kelly QAnon
14 Realtor Sells Rabbit Holes on YouTube. And you
15 have the copy in front of you I see?
16     A. Yes.
17     Q. In addition to the accusation in it that
18 Mr. Godlewski had sexual intercourse with a
19 minor, there are a number of accusations about
20 Mr. Godlewski's involvement with the January 6
21 insurrection at the Capitol, correct?
22         MR. HINTON: Objection to the form of the
23 question. Can you point him out to the specific
24 accusations.
25         MR. BOWERS: Okay. I'm asking him for

Page 40

1  his recollection.
2          MR. HINTON: Of this ten-page article
3  that you put in front of him?
4          MR. BOWERS: Let me rephrase the question
5  a little bit.
6          MR. HINTON: Why don't you point him to
7  the paragraphs that you claim Mr. Godlewski was
8  involved in the insurrection.
9          MR. BOWERS: I appreciate your educating
10 me on the way to take a deposition and ask a
11 question.
12         MR. HINTON: I'm giving you a lot of
13 leeway, Tim. You've been extremely vague in all
14 of your questions here today. So I'm giving you
15 some leeway, but let's talk specifics.
16 BY MR. BOWERS:
17     Q. Larry, are you familiar with the entire
18 content of the article?
19     A. Yes.
20     Q. Would you agree with me that the
21 accusation that Mr. Godlewski had sexual
22 intercourse with a minor is not the only
23 accusation about Mr. Godlewski contained in the
24 column?
25     A. Yes.

Page 41

1      Q. Based on your recollection of the column,
2  what else does it assert about Mr. Godlewski?
3      A. It asserts that he is involved with
4  QAnon. Do you want me to look at the column or
5  take this off recollection?
6      Q. Just tell me your recollection of it
7  first and then we can look at specifics.
8      A. It asserts that he had some USA Today
9  exposure in the January 6th riot at the Capitol.
10     Q. Okay. And that's your recollection based
11 on reading the column as, you know, the day it
12 was printed as an average Scranton Times reader
13 might see it, correct?
14     A. Correct.
15     Q. And you understood those things to refer
16 to Phil Godlewski, correct?
17         MR. HINTON: Objection to the form of the
18 question. You can answer.
19         THE WITNESS: Specific parts were
20 directed at Mr. Godlewski. There was also a lot
21 of QAnon generalities in this column.
22 BY MR. BOWERS:
23     Q. When the column suggests that
24 Mr. Godlewski beat the drum of the QAnon
25 movement, how did you understand that accusation?

11 (Pages 38 - 41)

Page 42

1    A. That he was spreading the word of the
2    QAnon movement.
3    Q. Did you understand it to mean that he was
4    a leader in that movement?
5    A. No.
6    Q. What sort of research would you have
7    expected Mr. Kelly to do in the discharge of his
8    ethical obligation to pursue information to the
9    best of his ability to perform in verifying that
10    Mr. Godlewski beat the drum of the Q movement?
11    A. It would mean that he had talked with
12    enough people who had listened or heard of
13    Mr. Godlewski's involvement with QAnon.
14    Q. How many people?
15    A. I don't know if there's a specific answer
16    to that.
17    Q. I'm going to direct you to page -- the
18    second page, and I'm going to look at the
19    paragraph that is next to the bottom that starts
20    the Capitol riot. Would you agree with me that
21    it says, The Capitol riot is empirical evidence
22    that we ignore this insidious war on truth at our
23    peril. Despite the demolition of all its
24    so-called prophecy, the Q movement marches on,
25    Godlewski happily calls out the cadence.

Page 43

1    A. Yes, I see it.
2    Q. Would you agree with me that that
3    connects Mr. Godlewski to the Capitol riots?
4    A. Not directly.
5    Q. Would you agree with me that it creates
6    the implication that Mr. Godlewski was involved
7    in the Capitol riots?
8    MR. HINTON: Objection.
9    THE WITNESS: I wouldn't even go that
10    far, but it does indicate that he is calling out
11    in support of the Q movement.
12    BY MR. BOWERS:
13    Q. What sort of sources or research should
14    Chris Kelly have done in his pursuit of his
15    ethical obligation to pursue information to the
16    best of his ability in determining that Godlewski
17    happily calls out the cadence of a Q movement
18    that it perpetrated a riot at the Capitol?
19    MR. HINTON: Objection to the form of the
20    question. That's not what it says, but you can
21    answer.
22    THE WITNESS: A reporter who is covering
23    this would have multiple sources, whatever they
24    may be, interviews with people, witness to
25    literature, documentation whether that be video

Page 44

1    or written word, and information you would derive
2    from interviews.
3    Q. Have you now told me every source of
4    information that you would expect a reporter to
5    look to to pursue the -- to discharge the ethical
6    obligation to pursue information to the best of
7    his ability prior to writing the column about
8    Mr. Godlewski?
9    A. To the best of my knowledge I have.
10    Q. And if a reporter had not, in fact,
11    examined all of the sources of information prior
12    to writing the column about Mr. Godlewski, would
13    that be a breach of the ethical obligation?
14    A. We're talking ethical obligations of two
15    different things, an opinion story or a news
16    article. It certainly would on a news article.
17    The columnist has latitude in an opinion piece,
18    but the fact is still going to be the fact. And
19    --
20    Q. Just to be clear, did you tell me earlier
21    that you would expect the same research to be
22    done whether it was a news article or an opinion
23    column?
24    A. On fact I did, yes.
25    Q. And would you agree with me that the

Page 45

1    question of whether Mr. Godlewski beats the
2    cadence of the Q movement is a matter of fact?
3    A. Yes.
4    Q. So that's not a matter of opinion?
5    A. Correct.
6    Q. And that's something that can be
7    demonstrated through witness interviews, correct?
8    A. Sure.
9    Q. Or review of literature, correct?
10    A. Yes.
11    Q. Or documentation, correct?
12    A. Yes.
13    Q. And that those things would be necessary
14    to discharge the ethical obligation of a
15    columnist writing the column about Mr. Godlewski,
16    correct?
17    A. Yes.
18    Q. I'm going to direct you to the front
19    page. Do you see that in the title of the column
20    it says QAnon Realtor Sells Rabbit Holes?
21    A. Yes.
22    Q. And do you see that there's a cartoon
23    that appears immediately below that showing what
24    appears to be a parody of a real estate sign
25    saying unrealtor?

12 (Pages 42 - 45)

Page 46

1    A. Yes.
2    Q. Mr. Godlewski was working as a realtor at
3    the time that this was published, correct?
4    A. I know that from reading this column,
5    yes.
6    Q. What's the connection between
7    Mr. Godlewski's activity as a realtor and
8    political views he's expressed?
9    A. I don't know.
10    Q. Do you see any connection between the
11    two?
12    A. No.
13    Q. What's the connection between
14    Mr. Godlewski's work as a realtor and the
15    accusation that he had sexual relations with a
16    minor?
17    A. I don't understand the question.
18    Q. Well, this is a column about
19    Mr. Godlewski's political beliefs, correct?
20    MR. HINTON: Objection. The column
21    speaks for itself.
22    MR. BOWERS: You can answer.
23    THE WITNESS: Yes.
24    BY MR. BOWERS:
25    Q. And you've said you don't see a

Page 47

1    connection between being a realtor and having a
2    set of political beliefs, correct?
3    A. Correct.
4    Q. One could have any number of exotic
5    political beliefs and be a perfectly good
6    realtor, correct?
7    A. Sure.
8    Q. Similarly, one could be accused of having
9    sexual intercourse with a minor and be a
10    perfectly good realtor, correct?
11    A. Yes.
12    Q. Does being a realtor impact assessment of
13    Mr. -- strike that. Does the fact that
14    Mr. Godlewski -- strike that again. Does the
15    fact that Mr. Godlewski is engaged in the
16    business of selling real estate affect assessment
17    of his political beliefs by the general public
18    who are reading this?
19    A. I wouldn't know that.
20    MR. HINTON: Are you speaking for the
21    general public?
22    THE WITNESS: Yeah, I wouldn't know that.
23    BY MR. BOWERS:
24    Q. Does mention of the fact that
25    Mr. Godlewski as a realtor do anything other than

Page 48

1    impugn his integrity as a realtor?
2    MR. HINTON: Objection.
3    THE WITNESS: I think the mention of
4    Mr. Godlewski as a realtor is only an identifier.
5    It speaks to who he does or what he does.
6    BY MR. BOWERS:
7    Q. Would you agree with me there's not just
8    a mention somewhere in the article that he's a
9    realtor? There is, in fact, a cartoon drawing
10    the icon conspicuously to the fact that he's a
11    realtor, correct?
12    A. Yes.
13    Q. And, in fact, that he is an unrealtor,
14    correct?
15    A. That is the parody of this illustration.
16    Q. And does that not -- and it says that he
17    sells rabbit holes as a realtor, correct?
18    A. Again, as the parody of this illustration
19    does say that.
20    Q. And doesn't it suggest that Mr. Godlewski
21    is, in fact, in some way not an honest realtor?
22    MR. HINTON: Objection.
23    THE WITNESS: I don't know how to answer
24    that. I could tell you the unreal is the focus
25    of this illustration. Unreal is, though, not

Page 49

1    believable.
2    BY MR. BOWERS:
3    Q. Is there a single factual allegation in
4    this article that Mr. Kelly has in some way been
5    a dishonest realtor?
6    MR. HINTON: Objection to the form.
7    Godlewski.
8    MR. BOWERS: Sorry. I apologize. Let me
9    rephrase.
10    BY MR. BOWERS:
11    Q. Is there any factual allegation in this
12    article that Mr. Godlewski is a dishonest
13    realtor?
14    A. No.
15    MR. HINTON: Hold on. Let me object to
16    the form of the question. Do you want to read
17    the article and take a look at it, Larry, or do
18    you want to go by memory?
19    THE WITNESS: I can go by memory I think
20    on this one.
21    MR. HINTON: Okay.
22    THE WITNESS: I don't see anything in
23    this article that questions his ability to be a
24    realtor other than a character assessment based
25    on the criminal elements that were included in

13 (Pages 46 - 49)

Page 50

1  this.
2  BY MR. BOWERS:
3      Q.  And the criminal elements that were
4  included in the column, have nothing to do with
5  his profession as a realtor, do they?
6      MR. HINTON:  Let me object to form of the
7  question and point out that the article
8  specifically says last February Godlewski was
9  charged with theft by deposition, forgery, and
10  related charges --
11      MR. BOWERS:  Counsel, you're not
12  testifying.
13      MR. HINTON:  The Real Estate Commission
14  has taken his license.
15      MR. BOWERS:  You're not testifying here
16  today.
17      MR. HINTON:  You have put in front of him
18  a ten-page article and said go by memory of what
19  it says.  Go ahead, sir.
20      MR. BOWERS:  I think Mr. Holeva is
21  perfectly capable for answering for himself.
22      MR. HINTON:  Go ahead.
23  BY MR. BOWERS:
24      Q.  So Mr. Holeva, is there an allegation
25  that crimes he committed were in connection with

Page 51

1  his profession as a realtor?
2      A.  No.
3      Q.  And is there any allegation that his
4  activities as, you know, an alleged proponent of
5  the QAnon movement impacted his pursuit of the
6  profession of realty?
7      A.  Not directly, no.
8      Q.  And yet, the headline leads with the fact
9  that he's a realtor, correct?
10      A.  Yes.
11      Q.  And the cartoon chosen focuses on the
12  fact that Mr. Godlewski was a realtor, correct?
13      A.  Yes.  Again, it's a parody and play on
14  the fact that he was a realtor, unreal.
15      Q.  And do you think a reader would
16  understand the title and the cartoon taken
17  together to suggest that Mr. Godlewski is not an
18  honest realtor?
19      A.  I think that's the reader's
20  determination.  I don't necessarily know that to
21  be the fact.
22      Q.  But you can't say that such an
23  interpretation would be unreasonable, correct?
24      A.  No, no.
25      MR. BOWERS:  Mr. Holeva, thank you so

Page 52

1  much for answering our questions.
2      (The deposition concluded at 3:07 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 53

1          CERTIFICATE
2      I hereby certify that the proceedings and
3  evidence are contained fully and accurately in
4  the notes taken by me on the within proceedings
5  and that this is a correct transcript of the
6  same.  ─
7
8
9
10      Allison M. Ross, RPR
     Notary Public
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830